**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WALTER BEINECKE, III, EAGLIS
ALTERNATIVE INVESTMENTS I, LLC,
GEOFFREY T. FREEMAN, GRAHAM
GUND, HENRY A. JORDAN, JENNIFER C.
McNEIL, J. STUART MOORE, and CARL
NOVOTNY, TRUSTEE of the S&H
NOMINEE TRUST,

          Plaintiffs,

          -against-

S&H MARKETING, INC. f/k/a S&H
GREENPOINTS, INC., and THE SPERRY
AND HUTCHINSON COMPANY, INC.,

          Defendants.

08 Civ. 2483 (GBD)

**ELECTRONICALLY FILED**

**DECLARATION OF PETER HERRICK
IN SUPPORT OF THE REPLY BRIEF IN
FURTHER SUPPORT OF
DEFENDANTS' MOTION TO
TRANSFER VENUE TO THE CENTRAL
DISTRICT OF CALIFORNIA**

---

I, Peter Herrick, pursuant to 28 U.S.C. §1746, declare and state as follows:

1.     I am an attorney with the law firm O'Melveny & Myers LLP, attorneys for

Defendants S&H Marketing, Inc. f/k/a S&H Greenpoints, Inc. ("S&H"), and The Sperry and

Hutchinson Company, Inc. ("Sperry"). I submit this Declaration in support of the Reply Brief in

Further Support of Defendants' Motion to Transfer Venue to the Central District of California,

dated April 14, 2008 (the "Reply Brief"). All terms used in this Declaration are intended to have

the same meanings set forth in the Reply Brief.

2.     Attached hereto as Exhibit A is a true and correct copy of the transcript of the

January 25, 2008, hearing before the Honorable Thomas Donovan, United States Bankruptcy

Judge, Case No. 07-BK-20027-TD, captioned *In re Solidus Networks, Inc.*, and currently

pending in the Central District of California.

3.      Attached hereto as Exhibit B is a true and correct copy of the Asset Sale and

Purchase Agreement, dated March 28, 2008, and consummated on March 31, 2008, between YT

Acquisition Corporation, Solidus Networks, Inc. ("Solidus"), and certain Solidus subsidiaries.

4.      Attached hereto as Exhibit C is a true and correct copy of the Delaware Chancery

Court's Amended Order Appointing Provisional Custodian Pendente Lite Over Solidus

Networks, Inc., dated November 16, 2007, appointing Thomas Lumsden as provisional custodian

*pendente lite*, as an agent of the court, to take possession and control of Solidus and its

subsidiaries and affiliates.

Dated: New York, New York              By: _____
       April 14, 2008                        Peter Herrick

- 2 -

# EXHIBIT A



ORIGINAL

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

1

2

3

4 In Re:                                     ) Case No. LA07-20027-TD
                                             )
                                             ) Los Angeles, California
5 SOLIDUS NETWORKS, INC.,                     ) Friday, January 25, 2008
                                             ) 1:00 p.m.
6          Debtor.                            )
                                             )

7

8 HRG RE MOTION FOR ORDER
  ESTABLISHING PROCEDURES FOR
  INTERIM COMPENSATION AND
9 REIMBURSEMENT OF EXPENSES FOR
  PROFESSIONALS EMPLOYED AT THE
10 EXPENSE OF THE BANKRUPTCY
   ESTATES

11

12 HRG RE MOTION FOR ORDER
   AUTHORIZING THE EMPLOYMENT OF
   THOMAS E. LUMSDEN AND FTI
13 CONSULTING, INC., AS CHIEF
   RESTRUCTURING OFFICER AND
14 ADVISORS, NUNC PRO TUNC TO
   DECEMBER 14, 2007 PURSUANT TO
15 SECTION 363 OF THE BANKRUPTCY
   CODE

16

17 HRG RE MOTION FOR AUTHORITY TO
   EMPLOY AND COMPENSATE
18 PROFESSIONALS NUNC PRO TUNC
   FOR SPECIFIC SERVICES RENDERED
   TO THE DEBTORS IN THE ORDINARY
19 COURSE OF BUSINESS

20 CONT'D FINAL HRG RE DEBTOR'S
   MOTION FOR ORDER (1)
21 AUTHORIZING DEBTORS TO OBTAIN
   POST-PETITION FINANCING
22 PURSUANT TO SECTIONS 363 AND
   364 OF THE BANKRUPTCY CODE,
23 (II) GRANTING LIENS AND

24 Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1   SUPERPRIORITY CLAIMS TO POST-
    PETITION LENDERS PURSUANT TO
2   SECTION 363 OF THE BANKRUPTCY
    CODE, (IV) PROVIDING ADEQUATE
3   PROTECTION TO PREPETITION
    LENDERS PURSUANT TO SECTIONS
4   361, 362, 363, AND 364 OF THE
    BANKRUPTCY CODE
5
    CONT'D HRG RE MOTION OF
6   BIOMETRIC PAYMENT SOLUTIONS
    FOR ORDER (I) DETERMINING THAT
7   DEBTOR LACKS BENEFICIAL
    INTEREST IN CERTAIN PATENT
8   RIGHTS, (II) COMPELLING
    ABANDONMENT THEREOF, (III) TO
9   THE EXTENT NECESSARY, AMENDING
    FINAL ORDER AUTHORIZING
10  EMERGENCY FINANCING (IV) TO
    THE EXTENT NECESSARY, AMENDING
11  THE INTERIM ORDER AUTHORIZING
    EMERGENCY FINANCING IN THE
12  CHAPTER 11 PROCEEDING AND (V)
    TO THE EXTENT NECESSARY,
13  OBJECTION TO THE FINAL ORDER
    AUTHORIZING EMERGENCY MOTION
14  IN THE CHAPTER 11 PROCEEDING

15  CONT'D HRG RE STATUS
    CONFERENCE RE INVOLUNTARY
16  PETITION

17         TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE THOMAS DONOVAN
18       UNITED STATES BANKRUPTCY JUDGE

19  APPEARANCES:

20  For the Debtor:          JAMES O. JOHNSTON, ESQ.
                             Hennigan, Bennett & Dorman
21                           865 South Figueroa Street
                             Suite 2900
22                           Los Angeles, California 90017
                             (213) 694-1030
23

24

25

iii

```
1  APPEARANCES:  (cont'd.)

2  For the Creditors Committee:    GARY KLAUSNER, ESQ.
                                   NATHAN A. SCHULTZ, ESQ.
3                                  Stutman, Treister & Glatt
                                   1901 Avenue of the Stars
4                                  12th Floor
                                   Los Angeles, California 90067
5

6  For Plainfield:                 MARK SHINDERMAN, ESQ.
                                   TODD ROSEN, ESQ.
7                                  Munger, Tolles & Olson, LLP
                                   355 South Grand Avenue
8                                  35th Floor
                                   Los Angeles, California 90071
9                                  (213) 683-9554

10 For OZ/Denarius:                KAREN RINEHART, ESQ.
                                   KATHERINE MCCORMICK, ESQ.
11                                 O'Melveny & Myers, LLP
                                   400 South Hope Street
12                                 Los Angeles, California 90071
                                   (213) 430-6407
13

14 For the U.S. Trustee:           RUSSELL CLEMENTSON, ESQ.
                                   Office of the United States
15                                   Trustee
                                   725 South Figueroa Street
16                                 Los Angeles, California 90017
                                   (213) 894-6811
17

18 For the Noteholders:            THOMAS R. KRELLER, ESQ.
                                   Milbank, Tweed, Hadley
19                                   & McCloy LLP
                                   601 South Figueroa Street
20                                 Los Angeles, California 90017
                                   (213) 892-4463
21

22 For Mayer Brown:                KIMBERLY S. WINICK, ESQ.
                                   Mayer Brown LLP
23                                 350 South Grand Avenue
                                   25th Floor
24                                 Los Angeles, California 90071
                                   (213) 229-5132
25
```

iv

| | |
|---|---|
| 1 | APPEARANCES:  (cont'd.) |
| 2 | For Whorl, LLC: |
| | LEE BOGDANOFF, ESQ. |
| | Klee, Tuchin, Bogdanoff |
| 3 | & Stern LLP |
| | 1999 Avenue of the Stars |
| 4 | Thirty-Ninth Floor |
| | Los Angeles, California 90067 |
| 5 | (310) 407-4070 |
| 6 | For Biometrics: |
| | PAUL COUCHOT, ESQ. |
| | Winthrop, Couchot |
| 7 | 660 Newport Center Drive |
| | 4th Floor |
| 8 | Newport Beach, California |
| | 92660 |
| 9 | (949) 720-4100 |
| 10 | For Vasser Racing: |
| | GREG FICKS, ESQ. |
| | Coblentz, Patch, Duffy |
| 11 | & Bass |
| | One Ferry Building |
| 12 | Suite 200 |
| | San Francisco, California |
| 13 | 94111 |
| | (415) 391-4800 |
| 14 | |
| 15 | For Solidus Networks: |
| | KENNETH GUERNSEY, ESQ. |
| | Cooley, Godward & Kronish |
| 16 | 101 California Street |
| | 5th Floor |
| 17 | San Francisco, California |
| | 94111 |
| 18 | (415) 693-2000 |
| 19 | Court Recorder: |
| | Wanda Toliver |
| | Pat Pennington |
| 20 | United States Bankruptcy Court |
| | Edward R. Roybal Federal |
| 21 | Building |
| | 255 East Temple Street |
| 22 | Los Angeles, California 90012 |
| | (213) 894-5011 |
| 23 | |
| 24 | |
| 25 | |



v

1  Transcriber:                    Briggs Reporting Company, Inc.
                                   6336 Greenwich Drive, Suite B
2                                  San Diego, California 92122
                                   (310) 410-4151
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    <u>LOS ANGELES, CALIFORNIA FRIDAY, JANUARY 25, 2008 1:00 PM</u>

2                           --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Good afternoon.  May I have your

5    appearances, please, on Solidus.

6            MR. JOHNSTON:  Good afternoon, your Honor.  Jim

7    Johnston of Hennigan, Bennett and Dorman, on behalf of the

8    Debtors and Debtors in Possession.

9            MR. LOGAN:  Good afternoon, your Honor.  Ben Logan

10   of O'Melveny and Myers.  I'm here with Karen Rinehart and

11   Katherine McCormick.  We represent OZ Master Fund and its

12   affiliates as well as Denarius, Touch LLC.

13           THE COURT:  Good afternoon.

14           MR. SHINDERMAN:  Good afternoon, your Honor.  Mark

15   Shinderman, Munger, Tolles and Olson.  I'm here with Todd

16   Rosen as well.

17           MR. ROSEN:  On behalf of Plainfield, your Honor.

18           MR. KLAUSNER:  Good afternoon, Judge Donovan.

19   Gary Klausner and Nathan Schultz, Stutman, Treister and

20   Glatt, appearing on behalf of the Official Committee of

21   Unsecured Creditors.

22           MS. WINICK:  Good afternoon, your Honor.  Kimberly

23   Winick of Mayer Brown, LLP, appearing on behalf of Mayer

24   Brown, LLP as an unsecured creditor and as an ordinary

25   course professional.

2

1          THE COURT:  Good afternoon.

2          MR. KRELLER:  Good afternoon, your Honor.  Tom

3   Kreller of Milbank, Tweed, Hadley and McCloy, appearing on

4   behalf of the S and H Noteholders.

5          MR. BOGDANOFF:  And, finally, hello, your Honor.

6   Lee Bogdanoff, a member of Klee, Tuchin, Bogdanoff and

7   Stern, appearing on behalf of Whorl, LLC.  I'm joined in

8   court this afternoon with Tim Robinson who is the managing

9   member of Whorl, LLC and the party who -- the declarant to

10  our objection and the party who has proposed to provide

11  financing to the IP Sup.

12         THE COURT:  Thank you.

13         MR. COUCHOT (Telephonic):  Not quite final, your

14  Honor.

15         THE COURT:  Okay.

16         MR. COUCHOT:  Paul Couchot, Winthrop, Couchot, on

17  behalf of Biometrics, telephonic.

18         THE COURT:  Thank you.

19         MR. FICKS (Telephonic):  Good afternoon, your

20  Honor.  Greg Ficks, Coblentz, Patch, Duffy and Bass,

21  appearing telephonically for creditor Pettit, Talcogen,

22  Vasser Racing, LLC.

23         THE COURT:  Good afternoon.

24         MR. GUERNESEY:  Good afternoon, your Honor.

25  Kenneth Guernesey of Cooley, Godward, Kronish, corporate

3

1  counsel to Solidus Networks.

2          THE COURT:  Thank you.

3          MR. JOHNSTON:  That sounds like everybody, your

4  Honor.

5          THE COURT:  Okay.  Mr. Johnston?

6          MR. JOHNSTON:  Good afternoon.  Your Honor, there

7  are a number of matters on calendar this afternoon, and with

8  your permission, I'd like to take the ones that are

9  uncontested or hopefully uncontested before we turn to the

10  matter of the -- continuing matter of the Debtor in

11  Possession financing and use of cash collateral.

12          THE COURT:  Okay.

13          MR. JOHNSTON:  First one that I have on my list is

14  the Debtor's motion to establish interim compensation

15  procedures.  In a nutshell, what we request are standard

16  professional compensation procedures along the lines of

17  those approved way back when by the Ninth Circuit BAP in the

18  Knudsen case.  Specifically, the procedures would provide

19  for monthly invoicing by professionals sent to the Debtors,

20  the Committee, and the U.S. Trustee.  Those parties would

21  have a 15-day period to raise any objections or concerns

22  with the monthly fees or expenses.  At the conclusion of the

23  15-day period, the Debtors would be authorized to pay 80

24  percent of the invoiced fees and 100 percent of the invoiced

25  expenses that are not then subject to an objection, and then

4

1 every four months, the professionals would file a notice,

2 full blown interim fee applications in which they would seek

3 allowance of their previously invoiced fees and expenses and

4 request payment of the 20 percent hold-back amount.  All

5 interim payments made pursuant to the procedures would, of

6 course, be without prejudice to any party's rights in

7 respect of the formal fee applications either on an interim

8 or on a final basis.

9          I'd submit, your Honor, that these are pretty

10 standard procedures in this district and elsewhere, and we

11 would submit that they're appropriate under the

12 circumstances.  I did note from your tentative that you

13 indicated you might have a few questions with respect to the

14 relief.  So I'm here to answer them.

15          THE COURT:  I have no problem with the -- the

16 program.  I have one or two questions having to do with

17 wording.  For example, on page five, line 15 of your notice

18 of motion and motion, there seems to be a -- either a word

19 missing or an inadvertent word inserted or something, the

20 interim or final of compensation.  As I read the sentence,

21 it just doesn't make complete sense to me.

22          MR. JOHNSTON:  Looking at page five, line 15 of

23 the motion or is it of the order?

24          THE COURT:  Of the motion.  I think the same

25 language is used in the order.

5

1          MR. JOHNSTON:  Neither the payment of -- neither

2  the payment of, failure to pay, nor the failure to object to

3  in whole or in part, monthly interim compensation and

4  reimbursement?

5          THE COURT:  Right.  The next line.

6          MR. JOHNSTON:  I'm sorry.  As provided herein were

7  binding with respect to the interim or final compensation

8  and reimbursement.  The concept here -- and I'm -- I

9  apologize.  It's -- I may be slow today.  I don't see the

10 missing word.

11         THE COURT:  The word "of" may be unimportant one

12 way or the other, but I just don't understand what of refers

13 to.  Or should there be the word order in there?

14         MR. JOHNSTON:  Or final.  The word "of" should be

15 deleted, yes.  That is absolutely right.  And the concept is

16 as I stated earlier.  These procedures are completely

17 without prejudice to parties' rights to interim or final

18 allowance of fees when the time comes.

19         THE COURT:  Okay.  Fine.  Do you have an order?

20         MR. JOHNSTON:  I do, your Honor.

21         THE COURT:  Okay.  You don't need to --

22         MR. JOHNSTON:  I'll make that interlineation as

23 the hearing goes on, and then I'll hand it up at the end.

24         THE COURT:  Okay.

25         MR. JOHNSTON:  The next item that I have is the

6

1   Debtor's motion to authorize -- motion for authorization to
2   employ and pay certain professionals in the ordinary course
3   of business.  As we indicated in our moving papers, the
4   Debtors do have the fairly large roster of professionals who
5   will assist in the day-to-day operations of the business,
6   particularly with respect to the maintenance and protection
7   of the Debtor's portfolio of intellectual property.  These
8   are services that would be required whether or not the
9   Debtors were in bankruptcy.  They're not related to the
10  reorganization or claims adjustment process.
11          As common in such circumstances, we request
12  authority to retain and pay these types of professionals in
13  the ordinary course of business but subject to certain
14  limitations designed to protect the interest of the estate.
15  Those limitations would be that under these procedures no
16  firm can receive a payment in excess of $10,000 in any one
17  month or in excess of $100,000 in total. If a firm exceeds
18  those amounts, we would seek formal retention through the
19  normal process.  Every 90 days we will file and serve a
20  schedule that summarizes the amounts paid to each ordinary
21  course professional and that briefly describes the services
22  that are performed and the ordinary course professionals
23  will be required to file statements confirming that they are
24  disinterested except with respect to any claims for pre-
25  petition fees and expenses.

7

1          Again, your Honor, I would submit that these are
2 pretty standard provisions in this district and elsewhere
3 and we would ask that you approve them.
4          THE COURT:  I agree.
5          MR. JOHNSTON:  Thank you.  The third matter that I
6 have is the motion to employ Mr. Lumsden and FTI Consulting
7 as chief restructuring officer and advisors.  Your Honor's
8 well aware of the history of how Mr. Lumsden came to be
9 involved in the case and of the critical role that he's now
10 playing as the CRO of the Debtors.  We summarize those facts
11 in the motion, and I won't repeat them here.
12          Because of the fact that Mr. Lumsden is an
13 officer, we cannot seek approval of his engagement under
14 Section 327.  So we're here to request approval pursuant to
15 Section 363 of the Bankruptcy Code in accord with what's
16 become known as the Jay Alex protocol which has been adopted
17 by courts in other districts and by the U.S. Trustee in
18 other districts in lieu of retention under Section 327 and
19 compensation under Section 330.
20          To briefly summarize, the protocol would provide
21 for Mr. Lumsden's firm, FTI, to allow Mr. Lumsden to serve
22 as chief restructuring officer and to provide additional
23 personnel to assist Mr. Lumsden in the course of his duties
24 as needed.  The Debtors will pay FTI's usual hourly rates
25 for those services.  Monthly, FTI will file with the Court

8

1  and serve on the Debtors and the Committee and the U.S.

2  Trustee a report of its staffing for the previous month, and

3  then quarterly FTI will file and serve a more detailed

4  report of the compensation and expenses incurred, including

5  a listing of services and time records by Mr. Lumsden and

6  the various FTI personnel working on the engagement.

7          Parties in interest would then have the right to

8  object to any of those fees and expenses listed in the

9  quarterly reports within 20 days, and if an objection is

10 filed, the Court would resolve those objections based on a

11 reasonableness standard.

12         We'd submit under the unique circumstances of this

13 case and how Mr. Lumsden came to be in the critical role

14 that he is performing for these Debtors, that the procedures

15 are appropriate under the circumstances, and I did note also

16 on your tentative that your Honor had questions about this

17 one.  So --

18         THE COURT:  Only one question.  The application

19 was filed on December 28th, and it says our rates are going

20 to change on January 1.  Could you provide me with a

21 schedule of '08 rates?

22         MR. JOHNSTON:  I do not have that information with

23 me.  We will file a schedule of '08 rates, and I know I owe

24 your Honor one from my firm as well, and that's in the

25 hopper right now.

9

1          THE COURT:  Okay.  Thank you.

2          MR. JOHNSTON:  Thank you, your Honor.

3          The next matter I'd like to turn to is Mr.

4   Couchot's motion on behalf of Biometric Payment.  As your

5   Honor is aware from the numerous stipulations that have been

6   submitted continuing the response deadline and continuing

7   the hearing, we have been engaged in a pretty lengthy back

8   and forth settlement dialogue, and I'm pleased to report

9   that actually this morning the parties have reached a deal

10  in principle.  That deal needs to be put down on paper, and

11  it needs to get the sign off of the various relevant

12  parties, but I'm confident that that will be achieved, and

13  if I may actually consult my Blackberry, I got an E-mail

14  from Mr. Couchot on the way over here that summarized in

15  broad brush terms the concept of the deal that we'd like to

16  put on the record just so your Honor understands --

17          THE COURT:  Sure.

18          MR. JOHNSTON:  -- the notion.  We will be filing a

19  9019 motion once we get the document signed and finalized.

20  And the deal, in a nutshell, provides for the debtors to

21  transfer back to Biometric Payment the entire bundle of

22  rights known as the transfer patents which were transferred

23  to the Debtors pursuant to the patent assignment agreement

24  at issue.

25          In turn, Biometric Payment would give a non-

10

1  exclusive license of those rights back to the Debtors, and

2  in the event that the Debtors sell their business, that

3  license would be assignable.

4        There is a provision for a royalty in that

5  license, but Biometric has agreed to an exemption from the

6  payment of royalty for the current operations of the

7  paycheck secure business with respect to those portions of

8  the transferred patents that are actually right now issued

9  patent claims.  There will be general releases among the

10 parties and various bells and whistles, but that is the

11 economic substance of the deal.

12        THE COURT:  Okay.

13        MR. JOHNSTON:  And I'd ask Mr. Couchot to confirm

14 that I got it right.

15        THE COURT:  Mr. Couchot?

16        MR. COUCHOT:  Yes, your Honor.  I'm sorry.  I

17 agree that that is in broad brush the general principle.

18 But I would just add that the -- the royalty exemption would

19 be limited not just to Paycheck secured products but for

20 check cashing use.  That would be the only thing that I

21 would add on that.

22        MR. JOHNSTON:  For the -- that's accurate.  It's

23 for the current operations of Paycheck secure.

24        THE COURT:  Okay.

25        MR. JOHNSTON:  Okay.

11

1           THE COURT:  All right.  Thank you.

2           MR. COUCHOT:  Your Honor?

3           THE COURT:  Yes.

4           MR. COUCHOT:  Only because I'd like to excuse

5  myself, we also wanted to continue the hearing -- the

6  existing hearing for a week while pending documentation.

7           THE COURT:  That's fine.  Do you have a day in

8  mind or --

9           MR. COUCHOT:  I was thinking one week from today,

10 your Honor, if that was possible.

11          MR. JOHNSTON:  And, looking at my calendar, your

12 Honor, realizing and fully hoping that this is completely

13 hypothetical, I have a conflict in the morning, but my

14 afternoon would be open.

15          THE COURT:  What about Thursday morning?  I could

16 hear this at 10:00 on Thursday morning.

17          MR. JOHNSTON:  My calendar is open then.

18          MR. COUCHOT:  Your Honor, I'm actually not

19 available on Thursday morning.  Is there anything on Monday,

20 the following Monday?

21          THE COURT:  You are available on Friday afternoon?

22          MR. JOHNSTON:  Yes, I am.

23          THE COURT:  Okay.  2:00 o'clock Friday afternoon.

24          MR. COUCHOT:  Thank you, your Honor.

25          THE COURT:  The 1st.

12

1          MR. COUCHOT:  And, Mr. Johnston, would you also

2  confirm, I'm not sure that you mentioned the part about the

3  -- paying the fees.

4          MR. JOHNSTON:  That's right.  While the parties

5  are documenting the settlement and before the transfer, the

6  Debtor will commit to continue to maintain the various

7  intellectual property that's within the rights that will be

8  transferred back to -- back to BPS, and that includes paying

9  some issue and application fees that are coming due in the

10  next week which we will commit to do.

11          MR. COUCHOT:  Thank you.

12          THE COURT:  All right.  Thank you very much.

13          MR. JOHNSTON:  And just --

14          MR. COUCHOT:  Your Honor, I'm going to excuse

15  myself if that is okay.

16          THE COURT:  Sure.  Thank you, Mr. Couchot.

17          MR. JOHNSTON:  I believe that brings us to the

18  controversial part of the agenda, which is the hearing --

19  continued hearing on the Debtor's motion for entry of a

20  final order approving the Debtor in Possession financing

21  facility and use of cash collateral and adequate protection.

22          There were a number of letters submitted to you

23  yesterday and this morning, your Honor, and I think in what

24  may have been a first, our submission was by far the

25  shortest.  We had put in a proposed form of order that kind

*Briggs Reporting Company, Inc.*

13

1 of reflected the state of the discussions which were still

2 in flux and were in flux up to the time of this hearing.

3       What the -- the goal being, at your Honor's urging

4 from the last hearing, to try to get as agreed upon a form

5 of final order as possible, and I do think we made quite a

6 great deal of progress.  Now, the reason the Debtors didn't

7 put in a substantive submission with argument is because it

8 really reflects the nature of our position right now, which

9 is that we're in the cross fire.  By now your Honor knows

10 what the Debtor's objectives are here.  We need the new DIP

11 financing, and we need the right to use cash collateral or

12 the business won't survive.  That's period.

13       That hasn't changed since the petition date, and

14 it hasn't changed since the hearing last Thursday.

15       There are some substantial disagreements that

16 remain among the creditor constituents and the lender

17 constituents, and those issues need to be resolved today so

18 that the Debtors can keep their doors open.  At the end of

19 the day, the lenders can either agree to fund the company on

20 the terms and conditions that your Honor is willing to

21 approve or they can shut down the company.  One way or

22 another, we do need some closure today or we need an

23 agreement by the lenders to continue to fund while these

24 existing disagreements are worked out.  There really is no

25 other option.

14

1    I think it makes sense rather than having me try

2 to summarize the differing positions of the lenders and the

3 objectors as to the open issues, it's probably wise for me

4 to let them speak for themselves. I'll react and respond

5 when I think I can add something productive, but at this

6 point in time, unless your Honor wanted to address any

7 issues in the submissions that have come in with me right

8 now, what I would do is turn the podium over to the other

9 constituencies and hear what they have to say.

10    THE COURT: Okay. My reaction is I didn't have a

11 chance to read any of the new stuff until really this

12 morning. I read all the new stuff, number of letters,

13 number of issues, number of ways of presenting what has been

14 done, what is being done, and concerns and hopes about

15 resolution of some of the issues.

16    I suppose my principal concern is the fear of

17 getting hopelessly confused by the large number of ways of

18 looking at the issues that are presented in a 40-plus page

19 order. I've looked at the black line. The black line is

20 highly confusing because it's hard to read and hard to

21 digest and hard to incorporate all of the thoughts that were

22 argued last week and presented again in yesterday and

23 today's letters.

24    So my -- my hope is that you folks will find a

25 really simple way to hit me right between the eyes with what

15

1 I need to think about and what my choices are, because what

2 I fear is otherwise this hearing could go on a long time,

3 and it could become a morass.

4      MR. JOHNSTON:  Right.  And Mr. Klausner has risen,

5 and I think I know why.  He has prepared over the course of

6 the last couple of days kind of a summary chart of the open

7 issues that the Creditors Committee had with the form of

8 order.  I believe he actually submitted that to your Honor.

9 What he's got today which I've seen is an updated version of

10 that issue list, and I think there were eight issues on

11 there that reflects what in his mind was resolved by the

12 form of order that I had submitted yesterday and reflects

13 what the additional open issues are, recognizing that those

14 are only the Committee issues and Mr. Bogdanoff has a set of

15 additional issues and the lenders have a set of a few

16 additional issues.

17      THE COURT:  Mr. --

18      MR. JOHNSTON:  That at least might be a good place

19 to start.

20      THE COURT:  Mr. Logan is looking for equal time.

21      MR. JOHNSTON:   I'm sure.

22      MR. KLAUSNER:  That I was hoping to do, your

23 Honor, is hand up to you --

24      MR. LOGAN:  I'm going to agree with you, Gary.

25 Your Honor, I think there's been a lot of work done over the

16

1 last several days, and a lot of issues have gotten narrowed

2 very substantially.  From our perspective, I think that

3 there will be a handful of issues that we can really bring

4 to your Honor's attention.  There's a lot of word smithing

5 and very technical changes that lawyers get all wrapped up

6 in and have gotten all wrapped up in, and I think we've

7 gotten close to resolution if not absolute resolution.  But

8 there are a handful of very important issues.  I think

9 probably the most critical is Mr. Bogdanoff's issue, quite

10 frankly.  But I think Mr. Klausner's chart, updated chart,

11 which he handed to me before the start of the hearing

12 synthesizes the issues that -- between the Committee and the

13 lenders nicely, and we got some material disagreements, and

14 there are some proposals that we've made to deal with those,

15 but I think that that -- what I would actually suggest, your

16 Honor, is that because it is probably the most paramount

17 business issue and the one that really strikes the heart of

18 the deal would be to address the issue Mr. Bogdanoff raised,

19 and then I think Mr. Klausner's chart is a very good vehicle

20 to walk through the other, which are, quite frankly,

21 important but more technical.

22          THE COURT:  Okay.

23          MR. KLAUSNER:  However you want to go, your Honor.

24 I just thought because your starting point was from a

25 position of being a little bit confused as to where we are

17

1  and maybe it might facilitate actually the discussion of Mr.

2  Bogdanoff's issue if we could just give you a perspective on

3  what's been resolved and what's open.

4             THE COURT:  Okay.

5             MR. KLAUSNER:  It's up to you, but I think it

6  might help just to clear up -- clear the air a little and

7  then get started with whatever we have to dispute.

8             THE COURT:  Okay.

9             MR. KLAUSNER:  So --

10            THE COURT:  While we're still at the introductory

11 stage, it looks like Mr. Kreller would like to say a word or

12 two.

13            MR. KLAUSNER:  Sure.

14            MR. KRELLER:  Thank you, your Honor.  And I'll be

15 brief.  Just not to be lost in the shuffle here, I do have

16 issues.  As I stand here right now, I will tell you I'm a

17 bit confused as to where my issues stand.  I continue to be

18 told things by the lenders that I take a fair amount of

19 comfort in.  They don't resolve all of my issues, but they

20 resolve several of my issues, but on the one hand I'm told

21 those things.  On the other hand, my suggested comments to

22 the revised order to implement what I think are agreements

23 don't seem to make it into any of the versions of the

24 documents that I've seen.

25            So, just to be aware, as we talk about things that

18

1 other parties may have resolved, I have my issues that as

2 far as I know are a bit up in the air.

3           THE COURT:  Okay.

4           MR. KRELLER:  So as not to be forgotten, your

5 Honor, I'll be standing up later in the hearing on those.

6           THE COURT:  Thank you.

7           MR. LOGAN:  Your Honor, just very briefly on Mr.

8 Kreller's point, we do have -- I think as far as Mr.

9 Kreller's issues are concerned, there may be one substantive

10 issue, and the rest really ought to be handled by lawyers

11 getting together, and we have a very recent draft.  I'm not

12 sure if you've seen it.

13           MR. KRELLER:  I have seen it.  It's not

14 sufficient, and I agree with you I do believe that they

15 would -- most of the -- many of the issues that I'm talking

16 about would be resolved best by a conversation and a walk

17 through of the document as opposed to argued in court, but

18 I've yet to be able to engage in that discussion.

19           MR. SHINDERMAN:  Your Honor --

20           THE COURT:  Mr. Shinderman?

21           MR. SHINDERMAN:  -- I'm going to be a partially

22 dissenting voice on the way we proceed, and hopefully I'm

23 not setting a tone for today.  But the chart that Mr.

24 Klausner is going to hand up is based off or refers to an

25 order that was submitted last night by the Debtor.  That

19

1   form of order has not been agreed to by the lenders and is

2   not the starting place for discussion.  So to the extent

3   that when Mr. Klausner hands you, says the order gets it

4   rights, well, the order submitted on the 24th, gets it

5   right, that was not authorized and it -- it's not been

6   agreed to.  That reflects -- so we have no misunderstanding

7   -- the O'Melveny firm has done a fantastic job of trying to

8   keep up in realtime, Ms. Rinehart especially.  And so, as we

9   were discussing issues that were right for a potential

10  settlement, Ms. Rinehart tried to memorialize them, and I'm

11  hoping that that's what was submitted to the Court.

12          Unfortunately, substantively there are differences

13  with that order, and then technically some of the language

14  in that order doesn't reflect necessarily the concept we

15  thought we had agreed to.  So, while Mr. Klausner can hand

16  up the points, it may be just simpler to say there are nine

17  points and then let Mr. Klausner use the left-hand column of

18  his chart to say what those points are, but any reference in

19  this chart you're about to get to the last night's order may

20  not be accurate.

21          THE COURT:  Okay.

22          MR. JOHNSTON:  Your Honor can appreciate my

23  comment about being in a cross fire I think.

24          THE COURT:  I'm wondering if I ought to just have

25  the doors locked and I'll sneak out and leave you guys to

20

1  work it out.

2          MR. JOHNSTON:   Duck, yeah.

3          MR. KLAUSNER:   Well, I just feel like we ought to

4  at least report to you as to where we are.   I think we --

5          THE COURT:   Sure.

6          MR. KLAUSNER:   I think we understand that the

7  order that was submitted to you yesterday by Mr. Johnston is

8  not agreed upon by all parties.   It did reflect, you could

9  say, a work in process, and it was the articulation of some

10  proposals that were being considered by all parties, and it

11  was done in -- as part as a package.   So I wouldn't want you

12  to believe that we've agreed to that order or that any other

13  party has agreed to all its provisions.   But it was a good

14  starting point for discussion, and I guess what I would like

15  to do is at least go through my chart with you and let you

16  know where we are on this, on the subjects.

17          THE COURT:   Okay.   Before you start on that, Mr.

18  Klausner, I guess one question has come up just from the

19  variety of comments I've gotten this afternoon.   I take it

20  from what Mr. Logan said and Mr. Shinderman didn't say that

21  the lenders would like an order this afternoon and my

22  signature on it and we go on from there, and if that's the

23  case, I think we -- I'd like to figure out a mechanism for

24  us to get there, and I certainly want to listen to everybody

25  who has something to say before I pick up a pen to sign an

21

1  order.

2         MR. KLAUSNER:  And --

3         THE COURT:  I'm just wondering about the

4  mechanics.

5         MR. KLAUSNER:  Frankly, one of my concerns, your

6  Honor, is that in the sense that the default, if we don't

7  reach an agreement, would be that the easiest thing to do is

8  to sign an order that the lenders hand up to you on the

9  theory that, well, I have to do something today.  The Debtor

10 needs the money.  The doors are closed.  And in that regard,

11 the sort of the imposed deadline works against us in trying

12 to resolve this because, you know, the easiest thing to do

13 is to sign something that's put in front of you.

14        THE COURT:  The day is young.

15        MR. KLAUSNER:  Okay.  And I think we're not that

16 far apart.  And I think, frankly, if we can get to a

17 resolution of things that we need to resolve, at least as

18 far as I'm concerned, are either in the order or can be done

19 by interlineation very simply.  So I don't want you to feel

20 that you have no choice but to sign whatever it is the

21 lenders hand up to you or the lights are off.

22        THE COURT:  Yeah.

23        MR. KLAUSNER:  I think we can modify this order,

24 assuming you're in agreement.  I think we can modify this

25 order very simply and very quickly.

22

1          MR. LOGAN:  I'm actually going to agree with Mr.
2   Klausner again.  Your Honor, we do have a form of order that
3   reflects variance on what Mr. Johnston filed yesterday that
4   the lenders could live with.  I don't think -- there's one
5   really big issue, and that's involving Mr. -- Mr.
6   Bogdanoff's client.  Beyond that, we're going to get into
7   some technical things, and I'm going to need to talk to my
8   clients about them.  Mr. Shinderman's going to need to talk
9   to his client about, but as far as the mechanics of entering
10  an order, we'll figure it out.  We'll get from here to
11  there, whether it's interlineation or going back to our
12  office.  We'll figure that out.  So I -- and I don't -- I
13  wouldn't -- it would be tempting, but I would not suggest
14  that we just our way or the highway.  It's not our order.
15  If your Honor has serious issues that Mr. Klausner
16  legitimately raises, I'll have to talk to my client about
17  them, but we'll figure out a way to get it in the document.
18          THE COURT:  Okay.
19          MR. KLAUSNER:  I appreciate that.  I -- frankly, I
20  think that maybe the best process is for us to update you.
21  Everybody knows this is -- nobody's bound to anything at the
22  moment, but at least you'll be updated.  I think some of the
23  confusion by the letters in this 50-page document with some
24  black lines might be eliminated, and maybe it would be
25  appropriate -- it's just my suggestion -- we could take a

23

1 break, talk among ourselves, and figure out how much of this

2 we can resolve without asking you to resolve it for us and

3 then how much we have to come back and let you deal with.

4          That being said, we have another copy of the chart

5 that Nathan is going to hand up to you.

6          THE COURT:  Okay.  Thank you.

7          MR. KLAUSNER:  I don't want to make any argument

8 now.  I just want to let you know where we are.  I mean, we

9 had certain objectives on behalf of the Committee.  We

10 wanted to avoid, you know, a precipitous foreclosure.  We

11 wanted to try to protect unencumbered assets.  We want to

12 leave open our right to challenge liens and avoid what we

13 would consider to be just unreasonably burdensome terms.  So

14 those are our objectives, and to -- we sort of identified, I

15 would say, you know, eight issues that reflected those

16 problems.  And I can tell you what at least we've

17 preliminarily done to try to resolve them.

18          One issue had to do with the encumbering of

19 previously unencumbered assets and avoidance actions, and

20 they were encumbered in two different ways.  One was a

21 security for the DIP financing so we would be creating liens

22 for the stip loan, and then, secondly, we would be

23 encumbering these unencumbered assets as a form of adequate

24 protection.  And sort of two different types of problems.

25 And, in particular, when you get around to addressing Mr.

24

1   Bogdanoff's issues with regard to Whorl, you know, there is

2   one particular body of assets which we refer to as the IP

3   Sub which would be subject to newly created liens that I

4   know are objectionable to Whorl.

5         The compromise, if you will, that the Committee

6   has indicated a willingness to go along with, assuming other

7   things could be agreed upon, is to allow a lien to be -- to

8   allow the unencumbered assets and the avoidance actions to

9   be subject to the lien for the DIP financing, but to try to

10  -- but to protect the interests of the estate by preserving

11  the rights, if any, of parties in interest to request a

12  marshaling so that while liens would be created, there would

13  at least be the opportunity for someone to come before you

14  and suggest that the liens shouldn't be enforced against a

15  particular asset unless and until other assets have been

16  exhausted.

17        So, rather than prevent the liens from attaching,

18  our compromise was let them attach but give us the

19  opportunity to point you in another direction.

20        As expressed in the revised order that was

21  submitted to you yesterday, the language that pertains to

22  this issue is acceptable to us.

23        Another issue we were concerned about in

24  connection with the DIP was the fact that there appeared to

25  be an event of default if the Debtor went out to try to find

25

1 a replacement facility, and our suggestion was that it
2 shouldn't be an event of default, and there was language
3 that makes clear that it isn't an event of default as long
4 as the Debtor doesn't seek a -- to prime the lenders.  And
5 that expression as set forth in the order is also acceptable
6 to us.

7        With regard to the subject of relief from stay,
8 which you know occupied a great deal of our argument, we
9 took to heart a couple of comments that the Court made at
10 the last hearing, which is that if it's part of the deal,
11 you're really not inclined to undo it.  On the other hand,
12 you expected that before some actions were taken within this
13 five-day notice period, that you expected that the Debtor or
14 the Committee would be down here, you know, asking you to
15 reimpose the stay, and you indicated a willingness to
16 accommodate those requests and to be available.

17        So our position was to try to articulate that in
18 the order, and we've provided some language that essentially
19 says that if anybody comes down to -- if any -- if the
20 Debtor or the Committee request a hearing within that time
21 period, that the Court will either set a hearing within that
22 time period or at such earlier -- at the earliest date after
23 the five days, but that until the Court has made a ruling,
24 there won't be any enforcement of these particular remedies.
25 That was acceptable to us.

26

1        With regard to the subject of professional fees,
2  now, our concern was that, to use the sort of a tired
3  expression, this was a blank check that lenders would simply
4  submit bills and the Debtor would pay them, and this had to
5  do with the fees incurred in connection with the post-
6  petition DIP facility.
7        So our solution to that would simply be show us
8  invoices, give us a period to object, and we provide -- we
9  thought that would be a simple solution.  What is set forth
10 in the order as it's now written, is not acceptable to us
11 because what happened is somehow in the last week, the deal
12 changed from what was presented to the Court originally, and
13 the lenders are now taking the position that not only would
14 their fees incurred in connection with the post-petition
15 financing be paid in the ordinary course, but they would
16 also be able to be paid in the ordinary course for fees
17 incurred in connection with the prepetition loan.  So not --
18 so (a) that wasn't part of the deal originally and (b) we
19 don't think it's appropriate.  So that's a provision of the
20 proposed order that would not be acceptable to the
21 Committee.  The Committee is willing to compromise and allow
22 the lenders to be paid with regard to their post-petition
23 services as long as we have an opportunity to review the
24 invoices and make objections, but the Committee would not be
25 agreeable to allowing the professional fees for services

27

1  rendered in connection with the prepetition to be paid at

2  all.  It's just not appropriate to be paying prepetition

3  debt at this time.  We don't know that they're fully

4  secured.  We don't know that there's enough value in their

5  collateral to do that.  And it could be that it's just an

6  imposition of an unreasonable firm that isn't necessary and

7  wasn't requested.  And I apologize because I'm getting into

8  argument, but the point is we did -- we've resolved that

9  issue except the open question is whether or not their

10  entitlement to fees should include prepetition and gap work.

11        Item five is the same issue of attaching the lien

12  to unencumbered assets and avoidance actions, but in this

13  context it relates to the replacement lien as a form of

14  adequate protection.  In the earlier provision really we're

15  focused on the DIP.  And here we've essentially done the

16  same -- the similar resolution that was acceptable to us

17  which was to say it's permissible to have a post-petition

18  adequate protection replacement lien on what had previously

19  been unencumbered, but we do want to preserve the right to

20  marshal.

21        In addition, your Honor, when we got into an

22  argument about the IP sub, it was our understanding that Mr.

23  Logan on behalf of his clients had agreed that they would

24  not have a replacement lien on the assets of the IP sub.  So

25  that would be something that we would require in the order

28

1 as well.

2          And there was one other entity called the ATMD
3 acquisition or ATM Direct, which was another entity that
4 hadn't been a guarantor, just like the IP sub.  These
5 entities had not been guarantors of the prepetition debt.
6 So they were not obligors, and there was obviously a
7 controversy about creating a lien on their assets as either
8 security for the DIP which they -- which Mr. Bogdanoff is
9 still fighting over with regard to the IP sub, or creating a
10 replacement lien.

11          So it was our understanding that with regard to
12 the IP sub there is no replacement lien, and we would want
13 that same provision with regard to ATM Direct.

14          With regard to item six, which is the -- so we're
15 very close on that issue.  With regard to the issue of the
16 challenge deadline, there were a couple of issues there.
17 One was just what is the time period that the Committee
18 would have to challenge the liens or claims of the secured
19 creditors.  The original proposal in the proposed order was
20 February 15, which we thought was too short.  We had
21 suggested April 15.  We were willing to compromise on April
22 1, and I think that would be easy to do, but there really
23 are two other issues that emerged, and one was our ability
24 to challenge not only the prepetition liens but the gap
25 liens at least as they related to entities that were not in

29

1 bankruptcy at the time the gap debt was created.

2        What had happened was when the involuntary was
3 filed, Solidus came down here with a lot of other entities
4 that were not in bankruptcy, and the Court approved gap
5 financing and, in effect, obligated these non-debtors for
6 the gap loan.  It's argued that now that they're in a
7 bankruptcy proceeding, there should be some ability for the
8 Creditors Committee to take a look at the gap loan and make
9 sure that there's no reason to challenge it.

10        So, with regard to the right to challenge, one
11 issue would be whether the right to challenge would include
12 not only the prepetition debt but the gap debt.

13        Secondly, one -- the issues with regard to timing
14 was, at least as expressed by the lenders at last weeks'
15 hearing, they were concerned that if we stretch out the
16 timing too far and in the interim there's like maybe a sale
17 or an auction, they want to be able to come in and credit
18 bid, and the fact that there may be some dispute about their
19 claim shouldn't take away from their ability to credit bid.
20 And their suggestion was that they would -- that their right
21 to credit bid would not be impaired by a challenge to their
22 claim, but they would be agreeable to disgorging at a later
23 date if there was a claim and it proved -- and it was
24 upheld.

25        The problem was that when we got down to drafting,

30

1  the solution became worse than the problem in that the
2  lenders want to confirm that they have a right to credit
3  bid.  Our position is that to the extent they have a right
4  to credit bid, it won't be affected adversely if we have a
5  challenge to their claim or their lien.  But we're not
6  acknowledging at this time for the purpose of this financing
7  order a right to credit bid.  That wasn't part of the deal.
8  The issue of credit bid only emerged as a fix on the issue
9  of when we have to challenge their claim, and in order to
10  get an extension to challenge their claim, we understand
11  that if there is a challenge, they don't want that to be
12  used against them, but we don't want to be using their -- we
13  don't want to be using the solution to that problem to
14  create another one, which is confirmation of a right to
15  credit bid where nobody is ready to agree to that.  So
16  that's an open issue on the challenge deadline, and that's
17  item seven as well.  I mean, that's a separate item seven,
18  and we have specific language that we've proposed to address
19  and solve that problem.
20          And the final issue is retroactivity, and we're --
21  in item eight, and we're okay with the Debtor's proposed
22  order.  So, in summary, with regard to the eight items here
23  -- and, again, this is just our view.  We understand
24  nobody's agreed to find finally, but in our view, issue one
25  is resolved by the revised order.  Issue two is resolved by

31

1 the revised order.  Issue three is resolved by the revised
2 order.  Issue four is resolved except for the question of
3 whether the estate should now have to pay not only the post-
4 petition fees but the prepetition fees.  That's what's open.
5 Item five we think it's -- well, item five is -- would be
6 resolved by the proposed order, assuming some language
7 changes.
8         And, by the way, none of this has any -- none of
9 this pertains to what was -- it was something handed up to
10 us when we were walking into court, which was another
11 revised order.  I don't think that's been submitted, has it,
12 to the judge?  Yes.  So we can ignore that for the moment.
13         Anyway, item five, the concept is similar to what
14 we did with item one, but we just need language changes, and
15 we need to protect ATM acquisition.
16         Item six on the challenge deadline, the open issue
17 really is whether we can challenge the gap and whether April
18 1 is an acceptable date.  On item seven, it's the credit bid
19 issue which is an open issue, as I explained to you.  And
20 item eight is, as far as we're concerned, resolved by the
21 order.
22         So I think that's the playing field in terms of
23 the open issues except that we have -- that Whorl is -- is
24 taking the position that -- on what Mr. Bogdanoff stated to
25 you, but this doesn't reflect the resolution or even the

32

1 identification of Whorl's issues.  Nor is it intended to

2 identify or resolve the issues that Mr. Kreller's raised on

3 behalf of S and H.

4       THE COURT:  Okay.  Thank you, Mr. Klausner.

5       Mr. Logan?

6       MR. LOGAN:  Your Honor, let me suggest a couple of

7 things.  One is I think at least from the perspective of my

8 two clients we can check a number of the items Mr. Klausner

9 had on his list just off.  There's not a problem, and I

10 don't see any point in wasting the Court's time spending a

11 lot of time on those.  And with respect to the others, let

12 me at least articulate the issue from our perspective, but

13 then I really want to come back to Mr. Bogdanoff's issue

14 because I think we're ignoring the elephant by talking,

15 quite frankly, about a lot of this.

16       The first issue about marshaling, let me explain

17 the concern we have there.  I think we are agreeable in

18 concept with some method of dealing with the imponderable of

19 how one determines the amount of debt that is secured by an

20 asset of the type that wasn't encumbered prepetition, and

21 I'm using the word "type" because I think there's a drafting

22 issue that flows through some of this that can be

23 problematic and the devil is in the details.

24       Inventory and accounts receivable, pursuant to

25 Bankruptcy Code Section 552, there's a wall that comes down,

33

1 and even though it's a replacement inventory or replacement

2 account receivable, unless you get a replacement lien, which

3 we provided for in the order, it's not prepetition

4 collateral in a very technical sense.

5        That's not what we're arguing about in concept,

6 but we've got to be very careful that we don't do something

7 that has a severe adverse consequence to Mr. Shinderman's

8 clients and my clients and prevent them from looking to

9 inventory and accounts receivable and other assets that

10 really were the heart of their collateral package when we

11 entered these cases.

12       There's another universe of assets, and I think

13 it's actually quite small with respect to the prepetition

14 debt, because we did agree and the order reflects that the

15 prepetition debt, the SPA debt, will not get liens or

16 guarantees against the assets of what I'm going to call IP

17 sub because I can never remember the full name of the

18 company.  But we -- we are not going to get asset liens on

19 those.  So as far as the SPA debt is concerned, there is no

20 new pool of assets there that are available.

21       And the only new pools of assets that I'm aware of

22 would be this ATMD subsidiary we talked about, and we did

23 not make a concession concerning that because that didn't

24 involve the inter-creditor issues involving Mr. Bogdanoff's

25 client.  We don't think there's anything there, but if it

34

1  turns out we're wrong, the DIP lenders and the prepetition

2  lenders say we ought to get replacement liens on it, it's

3  not encumbered in favor of anybody else in any event.

4         And, avoiding powers, I think that's the universe.

5  Our -- we have sympathy for what Mr. -- what Mr. Klausner

6  raised.   The problem with gutting marshaling is that means a

7  lot.   That could mean things such as the DIP lenders or the

8  prepetition lenders would face all sorts of arguments that

9  are abhorrent to any lender, that when a chunk of undisputed

10  collateral is sold, that they've got to hold off and look to

11  see if some other asset is going to be sold later on.   We

12  can't live with that.

13         What we have proposed and what's reflected in the

14  order that hasn't been filed with the Court but was

15  discussed in conversations this morning and we're prepared

16  to offer it up is that if any of those assets that were not

17  of the type that was part of the collateral package is sold

18  or realized upon, the proceeds can be held in escrow and

19  subject to a later determination as to whether or not we had

20  a diminution in value such that liens attached to it, and

21  that -- that avoids the issue.   We can't credit bid on any

22  assets of that sort, but I think we're talking about a

23  fairly limited universe.

24         Our concern with the language that was in the

25  order that the Debtors filed is that it dealt with this

35

1 issue I just mentioned, that it inadvertently wreaked havoc

2 with us with respect to our basic collateral package, and

3 that's why we fashioned the solution that we suggested.  So

4 I think we can get to Mr. Klausner's objective.  We just

5 don't think the language he proposes or that the Debtor

6 proposes does it.

7         Let me be on a roll here for a second.  Item

8 number two about an event or default triggered on an attempt

9 to locate replacement DIP financing, we're fine with the

10 language.  There's no disagreement.  Paragraph number three,

11 automatic relief from the stay, we're fine with that

12 language too.  There's no disagreement on that.  We heard,

13 your Honor, that you were going to give us what we wanted as

14 far as the five-day notice and getting the relief from stay,

15 but I told my clients that if people request a hearing,

16 you're going to have a hearing.  That's what it says, and

17 that's fine with us.  It is what it is, and whether we like

18 it or not, that's what your Honor ruled.  So we're fine with

19 that language.

20         Number -- paragraph number four, payment of lender

21 professional fees.  And let me -- let me give you the lay of

22 the land here.  There was a discussion at the hearing last

23 week where Mr. Klausner expressed a concern about getting

24 invoices, and he made the telling point which I agreed at

25 the time that how on earth did Mr. Shinderman and I allocate

36

1  the time we spend here today between whether or not we're

2  representing the SPA lenders worried about their cash

3  collateral or the DIP lenders.  There are disconnects

4  between the composition of those groups, but let's not

5  impose an obligation on the lenders and the professional

6  fees.  It's impossible and just inviting litigation down the

7  road.

8         We made a major concession that's reflected in the

9  order that the Debtors proposed that I want to make sure the

10 Court understands, and that is it provides that none of

11 these fees are going to get paid in the ordinary course, as

12 Mr. Klausner said.  None of them will get paid in that time.

13 It's only on maturity that any of these fees get paid.  And

14 at that point in time, they get paid out of whatever assets

15 are realized, which is a self-defining proposition as to

16 whether or not the lenders are over-secured or under-

17 secured.  We can't get blood out of a stone.  And even if we

18 got blood out of a stone, all we would be doing would be to

19 be applying money -- there's a limited quantity of money our

20 clients are going to get.  We'd be applying money that

21 they'd get to professional fees instead of interest or

22 principal, and that's just taking out of one pocket and

23 giving it to the other.

24         So we can't live with the suggestion that the

25 Committee proposed that it's only the fees that are

37

1  specifically allocated to the DIP financing.  They get paid

2  mainly because remember, we only get paid anything at the

3  maturity date.  But in order to avoid angels on the head of

4  a pin, we are also willing to agree that only fees incurred

5  after the consent date are eligible even for this provision,

6  and for fees that were incurred prior to the -- to the

7  filing of the involuntary petition, we think that they're

8  owed under the documents, but we're not going to try to

9  determine that in this order.

10        MR. KLAUSNER:  You mean petition date, don't you?

11        MR. LOGAN:  No.  I mean the consent date.  Excuse

12  me.  I'm sorry, Gary.  Thank you.  Mr. Klausner is a

13  wonderful human being.  I meant the petition date, the

14  involuntary petition date.

15        Item number -- so that's the debate on item number

16  four.  On item number five, this is probably more of a word

17  smithing issue than anything else, and it really goes --

18  gets into the concern we have that we don't do something

19  inadvertent through language of this sort which adversely

20  affects the kind of plain vanilla replacement liens on

21  inventory accounts receivable and the other kinds of assets

22  that were part of the collateral package but which roll over

23  time, change over time.  And, therefore, 552 causes lenders

24  to need to be careful about that.

25        We could probably work on the wording on paragraph

38

1  number five.  The way it's drafted here -- and we just saw

2  this when we walked into court.  It doesn't work because it

3  doesn't deal with the 552 issue, but I think probably the

4  right answer is the one I mentioned at the outset with

5  respect to paragraph number one.  And Ms. Rinehart and I

6  spent some brain cells this morning writing something that

7  says there's a universe of collateral that we wouldn't have

8  had but for the Court's order and we're not talking about

9  types of collateral that would have been part of the

10 collateral package but for 552, and writing that took some

11 effort, and I didn't say it very well here, but that's the

12 concept, and with respect to that kind of collateral, we

13 really aren't in agreement.  There's probably not that much

14 of it, quite honestly.  But with respect to that kind of

15 collateral, I think the right solution is to, if it ever

16 generates proceeds, put them in escrow and we can determine

17 later whether or not we've suffered sufficient adequate

18 protection, sufficient diminution to the use of the

19 collateral that it should go to us or it should go to the

20 unsecured creditors, and I -- it's a far more elegant

21 solution and avoids the inadvertent destruction of some of

22 the more basic rights the lenders have which was probably

23 not the intent but the language doesn't.

24         With respect to on the top of page four, ATMD

25 Acquisition Corp., the business deal we offered up was that

39

1 we would make a special exception for the IP sub.  If I can

2 find actually the real name of it, it's Pay By Touch

3 Checking Resources, Inc.  That's only because of the issue

4 with Mr. Bogdanoff's client.  We were clear and we remain

5 clear that to the extent that there is a diminution in the

6 value of the collateral by virtue of the Debtor's use of it

7 and the replacement liens that we get on sort of the core

8 collateral package are not sufficient, the prepetition

9 lenders have got to get a lien on everything.  Otherwise,

10 they wouldn't -- they're probably not going to get adequate

11 protection anyway, and this little subsidiary probably

12 doesn't have much in the way of assets, and so we're arguing

13 about -- quite frankly, I don't know.  I probably shouldn't

14 either of us be spending your time on this one.  So let me

15 move on.

16         On the challenge period, the way Mr. Klausner

17 expressed it is probably okay, but that's not what's written

18 here.  We were asked to extend the challenge period to April

19 1, and at least my clients are willing to do that, and agree

20 that the committee can ask for further extensions, and the

21 Court may grant them or we may grant them consensually.

22 There's a quid pro quo related to credit bidding that's part

23 of an overall package that I'm going to turn to next.

24         We had often a wonderfully academic debate among

25 the lawyers as to how this applies to the gap debt.  I'm

40

1  going to agree with him again -- I guess that's three now --
2  that the Court put its blessing on gap loans that went to
3  Solidus, the parent company, and the Court provided that
4  irrespective of whether we went through the state law UCC
5  procedure, the liens to secure that debt as against Solidus
6  were granted, validated, et cetera.

7        We think it's absolutely inappropriate to bring
8  this about.  That would undercut the integrity of this
9  Court's order.  Mr. Klausner's right that because the
10 subsidiaries were not before the Court at the time of the
11 gap hearing, we relied on state law in order to perfect our
12 liens with respect to the subsidiaries.  At least my clients
13 had no problem with his investigation looking at the
14 subsidiaries.  But we do have a very fundamental problem
15 with him looking at something that's already been blessed by
16 the Court and subject to the Court's order, and I think
17 that's what he said, but that's not what's written here.

18       Probably the most critical issue we've got is his
19 credit bid issue.  At least when we were at the hearing last
20 -- most critical issue vis-a-vis the Committee.  By far the
21 most critical issue is Mr. Bogdanoff's issue.

22       When we were here at the last hearing, we were
23 quite clear that as part of a lot of concessions we made,
24 such as not taking liens on the assets that Mr. Bogdanoff
25 and the Committee wanted to try to keep unencumbered, and in

41

1 order to accommodate liquidity requests that we not charge
2 fees or interest during the time, that we -- that we give
3 them review periods, an extended review period, and just as
4 an overall accommodation, we were clear -- at least I hope
5 we were clear that the lenders would be entitled to credit
6 bid, and the first several grants of the proposed order
7 reflected that.  And, indeed, the Debtor's proposed order I
8 think is fine on that subject.

9        The Committee came back, quite frankly, this
10 morning and said, "Well, we didn't really mean that.  We
11 meant that we won't attack your right to credit bid based
12 upon objections to the claims, but if we come up with
13 another argument as to why you shouldn't credit bid, we
14 reserve that."

15        Unfortunately, that's a fundamental business issue
16 for my clients and I believe Mr. Shinderman's clients, that
17 part of his overall package was if we go to an auction or
18 capital raise and they're selling assets, Bankruptcy Code
19 Section 363(k) says that a secured creditor has the right to
20 credit bid.  The Court could rule otherwise, but we want
21 certainty -- and that's part of the adequate protection that
22 we insisted on for the use of cash collateral and being
23 primed by the DIP loans, and that's part of the adequate
24 protection by the package for the DIP lender.  We hope we
25 don't have to credit bid.  A lot of the dates -- and I

42

1  always think they're kind of interesting about this very

2  topic -- nobody credit bids unless they think the third

3  party is paying too little.  If some third party is going to

4  offer $150,000,000 for this asset and we think that's a good

5  price, we're going to take the $150,000,000.  But if

6  somebody's trying to take it for a song, the estate's better

7  off if another dollar or $10,000,000 of our debt is

8  satisfied, and that's a very important fact.

9       We think that gutting the ability of the senior

10  lenders to credit bid would adversely affect that whole

11  process, and so it's an important part of the package, and

12  we do think that it's important that the order do say that

13  we have the right to credit bid.

14       I've mentioned that the 800-pound gorilla is the

15  issue involving Whorl.  Let me just talk about that.  The

16  lenders here have advanced a little bit over $8,000,000

17  under the interim order.  They've got a borrowing request

18  submitted by the Debtor to advance slightly more than $1.7

19  million on Monday.  And I get told every time I have a

20  conference with my clients that they thought the interim

21  order provided that they had liens on the assets of the IP

22  subsidiary and that was an important determinant for them to

23  advance the money that they've advanced.

24       We pointed out in the letter that we submitted

25  this morning that's indeed what the interim order says, that

43

1  at least to the extent that money is advanced, the

2  collateral package that the Court granted would not be

3  undone.  Now, this is something that's near and dear to Mr.

4  Bogdanoff's client.  I'm sure we're going to hear a lot

5  about it.

6          We made some serious concessions so that the SPA

7  debt is not going to have a claim against the assets of IP

8  subsidiary.  And, parenthetically, let's remember as far as

9  we know, there are no creditors of IP subsidiary.  And the

10 issue is really between Mr. Bogdanoff's client and our

11 clients, Mr. Shinderman's and mine, as to the value related

12 to that company, because the stock is pledged to both of us.

13 We think his lien is invalid.  He strongly disagrees.  But

14 it's not an issue that really affects the unencumbered --

15 the unsecured creditors, not unless they could invalidate

16 both of our liens, which maybe they could, but that is a

17 remote prospect I think.

18          And it was very important to us to focus on the

19 fact that whatever arguments Mr. Bogdanoff has with respect

20 to an inter-creditor agreement that existed prepetition, it

21 only related to the SPA debt.  The DIP debt is very

22 different than the SPA debt.  The Ninth Circuit has made

23 that point in the Sun Runner case we mentioned in the

24 letter.  The composition of the lender groups are different,

25 and I can tell you firsthand because Plainfield has all of

44

1  the $50,000,000 second lien debt in the SPA facility and has
2  about 30 percent of the DIP loans, we had some fairly heated
3  discussions because the DIP lender's interests are
4  materially different than the SPA lender's interests,
5  particularly the different tranches.  And I'll tell
6  something out of school.  Before the interim hearing, Mr.
7  Shinderman and I weren't speaking to each other because of
8  those issues.  We've kissed and made up.  But they really
9  aren't different.  That's my only point, that the DIP
10 facility and the SPA facility really are different --
11 different instruments, and whatever rights Mr. Bogdanoff's
12 client had, Whorl had with respect to the SPA facility are
13 totally irrelevant to the DIP facility.  And, indeed, inter-
14 creditor agreements often do address what the senior lenders
15 can do in the context of the DIP facility.
16         The other creditor agreement between Plainfield
17 and the senior SPA lenders does exactly that, and we give
18 the citation to where that -- that document is in the
19 record.  The inter-creditor agreement with Whorl is
20 conspicuously silent on that issue.  Whorl did not try to
21 put any limits on what could be done via a DIP facility.
22 And, as a result, it's absolutely appropriate for the DIP
23 lenders and it's only going to be to the extent of the DIP
24 loans, get a lien on the assets of the IP subsidiary.
25         Your Honor was obviously interested in this at the

45

1  last hearing and took testimony from Mr. Lumsden.   Mr.

2  Bogdanoff and I heard it very differently.   I heard Mr.

3  Lumsden testify that there were substantial direct and

4  indirect benefits that went to the IP subsidiary by virtue

5  of the DIP financing.   Without the DIP financing, the

6  companies that used the IP subsidiary's intellectual

7  property wouldn't function.   Customers would transition to

8  other technology.   There were centralized services that were

9  provided by the parent company of the IP subsidiary, and

10  there also were going to be some direct moneys, fairly small

11  in context, but some direct moneys downstream to the IP

12  subsidiary to pay patent renewal fees and things of that

13  sort.

14      That reflects why it's very common and why it's

15  central here that lenders that are making loans to a family

16  of companies of this sort, new money, new $13.5 million, it

17  which is out the door already, get a lien against all the

18  available assets, and these assets are available.   If the

19  DIP loan is repaid, which I sure hope it is, through perhaps

20  a sale of another non-core asset, it gets paid and we don't

21  have any liens against the IP subsidiary.

22      But a central element of the business deal from

23  the perspective of our clients -- and, quite frankly, your

24  Honor, I thought your Honor had basically ruled in our favor

25  on this at the last hearing, was that we get a lien on the

46

1  assets of the IP subsidiary.  This is not the kind of

2  technical word smithing issue that we were sent out not in

3  the hall but back to our offices to work on.  But Whorl

4  persists in it, and I'm sure your Honor will hear Mr.

5  Bogdanoff out, but I just got to underscore that this is the

6  800-pound gorilla or the elephant that's in the room.  This

7  issue is central to our clients.  We thought it had been

8  argued fully at the last hearing.  We think that the

9  provisions of the order on this point got to stand.

10       The other issues with Mr. Klausner's client, as I

11  mentioned, about half of them were already there.  The

12  others we got a disagreement on how we deal with the small

13  unencumbered assets that -- previously unencumbered assets,

14  whether or not we escrow them or we adopt something that

15  imposes marshaling.  From our perspective, the concept's

16  fine.  It's just that when you -- you plan on marshaling, it

17  opens up a whole new can of worms.  But I think with some

18  direction from your Honor we could word -- well, we've

19  already tried to wordsmith that.  And, like I said, I spent

20  some substantial brain cells -- I have a few left -- but

21  spent some substantial brain cells trying to write a fairly

22  complicated concept, and that's reflected in our order.

23       At that point I -- I have nothing further to say.

24       THE COURT:  Thank you, Mr. Logan.

25       MR. SHINDERMAN:  Your Honor, Mark Shinderman,

47

1  Munger, Tolles, and Olson, on behalf of Plainfield.  First

2  of all, in case my wife gets the transcript, I want to

3  assure her I've kissed nobody but her in the last 10 years

4  we've been married.  When Mr. Logan said we weren't talking,

5  it lasted all of 10 minutes.  We agreed on four points,

6  agreed to disagree on four points, and he showed me where I

7  was wrong, and I apologized.  So it really wasn't that big

8  of a deal.

9         What's interesting about this case, your Honor, is

10 you have some fabulous lawyers here, and the discussions

11 that take place early morning, late night, throughout the

12 day over the last week have been fascinating.  And I

13 underscore for me the importance of defining these things

14 with precision, that instead of leaving things open to

15 varying interpretations, we really knocked them down to a

16 certainty, which causes some of the drafting problems we've

17 had.  I don't want any provision to be the subject of a

18 further discussion two, three, four weeks hence.  Shame on

19 us for doing that given the amount of talent in the room.

20        So I'll go through the same list and the same

21 order in a second.  Again, without argument, I just want to

22 remind everybody when Mr. Klausner talks about deal change,

23 the deal was struck between the lenders and the Debtor and

24 approved by your Honor on an interim basis.  The deal change

25 that's being sought here, with the exception of Mr.

48

1 Bogdanoff's client and the clarification of Mr. Kreller's

2 client, is a deal change.  And it's a deal change that we

3 have for the Committee that has representatives other than

4 Whorl who hold less than $1,000,000 of claims of an

5 undetermined creditor body which may or may not be out of

6 the money.

7          Against that backdrop as we talked about last

8 week, we have very substantial money at risk as he drew to

9 $150,000,000 as a post-petition lender of our pro rata share

10 of the $13,000,000 and use of cash collateral.  As we said

11 last week, we put our money where our mouth is, and we've

12 assessed the risk and the reward and the timing, and all

13 those issues that the Committee's very concerned about we're

14 very concerned about as well, except we put our money at

15 risk.

16          It's against those backdrops that I want to

17 identify -- go through those points.  Marshaling, I want to

18 break the marshaling concept into two pieces.  There's

19 adequate protection claims, and then there is our DIP loan

20 lien claims.  The concept that I tried to describe last week

21 was when we put out lien value in the form of a DIP loan, we

22 need to make sure there's collateral to cover that loan, the

23 DIP loan, the new advance.  Because the assets were

24 substantially encumbered prepetition, there's not a lot of

25 places to go.  There's the avoidance actions, and there's

49

1 the assets to which we either had improperly perfected or
2 never had a lien in the first place, like the Whorl assets.
3         So for the DIP loan we need a DIP lien.  With
4 respect to the adequate protection claims, we don't know
5 standing here today whether or not we will have any
6 diminution claims that would be supported and secured by the
7 adequate protection claims -- adequate protection liens.  So
8 when we look at marshaling, I want to make a difference
9 between those claims for which we have a real lien supported
10 by consideration and those which we won't know for some time
11 the diminution.
12        So with respect to marshaling, I think we've got
13 it mostly right, but I want a further clarification.  To the
14 extent all we have in an asset is an adequate protection
15 lien of indeterminate value today but the proceeds of the
16 sale of that collateral can, subject to arguments at a later
17 date, be held in a segregated account pending further
18 resolution of the case.  I hate to use the word marshaling
19 because it implies a lot of things, but we'll call that the
20 marshaling concept.
21        So, for example, if as DIP loan is paid off and
22 the only lien the lenders have in the avoidance actions is
23 an adequate protection lien of an indeterminate value and we
24 receive one dollar on the avoidance actions, the Committee
25 should be able to come in here and say don't apply that

50

1 dollar yet because your diminution claim may be zero, just

2 with some indeterminate value until the end of the case.

3         But if they said that our DIP loan is outstanding,

4 it's very important that that serve as collateral.  So as

5 long as our DIP loan is outstanding and we get paid on the

6 avoidance action, then it should be applied to the DIP loan,

7 and this is particularly important with respect to other

8 assets.

9         Your Honor, because we're advancing new money

10 against the same old collateral base, we need to be able to

11 look to new assets for the DIP loan.  Adequate protection is

12 different.

13        So the clarification I give to what was said

14 before, to make sure we're precise, is we're willing to

15 agree, as Mr. Logan suggested, that to the extent all we

16 have on an asset is an adequate protection lien, that

17 marshaling right argument should be preserved with all the

18 rights to object to it.

19        The second issue was the DIP loan, whether or not

20 seeking approval of a DIP loan constitutes an event of

21 default.  And, again, you know, I didn't disclose something

22 here that people might not have realized, but I want to make

23 sure we've got absolute precision.  The Debtor could bring

24 in a new DIP loan if he so chooses on a junior non-primed

25 basis, but then it becomes an issue of the continued use of

51

1  cash collateral because, your Honor, all we have at risk
2  here is not just our DIP loan but the continuing use of our
3  assets, our collateral base, which as we know from testimony
4  is deteriorating over time.
5          So while the company can't theoretically go out
6  and get a junior DIP loan not priming any of the existing
7  liens, it doesn't resolve the cash collateral issue.  It
8  doesn't mean we have an automatic extension of dates.  Quite
9  to the contrary, the package, as Mr. Logan has pointed out,
10  was carefully negotiated to balance time, risk,
11  consideration, and one of the things we have in the
12  milestones is certain time frames, and those apply to cash
13  collateral as well as the DIP loan.
14          The third point is relief from stay.  Your Honor,
15  we all agree to that.  The lenders fees I want to put a
16  slightly finer point on what Mr. Logan said.  As I indicated
17  last week, to me, whether or not we're talking about cash
18  collateral or a DIP loan, we're talking about post-petition
19  financing.  If the Debtor was not able to prevail on the use
20  of post-petition cash collateral, it would just be to borrow
21  more money on a debt basis.  So when Mr. Logan and I sat
22  down to negotiate with one another and with the Committee
23  and with the Debtor, we're talking about the bundle of
24  rights that provides post-petition financing to the Debtor.
25  True, something that was with respect to prepetition liens

52

1  and collateral and debt, but it all goes to post-petition

2  financing, which is why Mr. Logan's suggestion is not only

3  practical but is justified as a matter of law.  Everything

4  we have done since the commencement of the bankruptcy case

5  to this point has dealt with financing of the post-petition

6  operations of the Debtor.

7            So, therefore, to the extent that we have fees

8  that were incurred, they won't be paid now.  They will only

9  be paid upon the liquidity events or the determination of

10  incident of default, however it's defined, should be those

11  fees that were spent post-petition.  It would be impossible,

12  as Mr. Logan points out, to say, you know, in this one-hour

13  conference that we spent 20 minutes talking about cash

14  collateral and 40 minutes talking about DIP or not.  Again,

15  it all goes to post-petition financing of the Debtor's

16  operations.

17            The fifth point ties back to the first point, that

18  the -- whether or not we're talking about adequate

19  protection lien versus a DIP lien and otherwise previously

20  unencumbered assets.  So the same comments apply.

21            The challenge deadline, I'm not sure I disagree or

22  that my client disagrees with Mr. Logan's client here

23  terribly much, but the challenge deadline was an absolute

24  very important negotiated point, one of the key points that

25  we negotiated with the Debtor from our perspective on the

53

1  interim basis and the final basis.  And it was precisely as

2  Mr. Logan pointed out because we wanted the certainty that

3  when we stepped forward to bid a credit bid to collect our

4  collateral at the end of this process, that we would have

5  the right to do so.  So, as Mr. Logan said, the trade-off

6  there is not that we care whether or not the objection

7  deadline goes from February 15th to March 15th or some other

8  date that the Court may approve, but that in consideration

9  for that it must be absolutely clear that the creditor --

10  the secured creditors can credit bid their claims.  If it

11  later turns out that our claims were not properly perfected,

12  invalid, that we didn't have $150,000,000, the secured claim

13  was only $140,000,000, we'd have to disgorge $10,000,000 of

14  value somehow if we purported to credit bid $150,000,000.

15          That we're not trying to prejudice, but it has to

16  be absolutely clear that notwithstanding what every -- the

17  credit objection deadline may be, we have the right to

18  credit bid.  So, again, Mr. Logan has it absolutely right

19  that we need to tie it together.

20          The bid deadline, again, is important because

21  these loans have been out there a long time.  The -- we

22  anticipate, you know, people raise an issue of holding this

23  up.  We don't want to have that problem.  It was carefully

24  negotiated so that the Committee in the exercise of good

25  judgment and in good faith and mindful of Rule 9011 and

54

1 Federal Rule 11, if they want to bring a challenge to the

2 claim, they can do so, but they better have a good basis to

3 do it.  And, again, we're willing to trade it off only in

4 consideration for clarity on the credit bid.

5         With respect to the Whorl assets, I have very

6 little to add to Mr. Logan other than he talked about how

7 there's $8,000,000 already extended on the DIP loan and

8 another $1.7 million request.  That's in addition to the

9 millions of dollars in cash collateral that's been consumed

10 during the pendency of the case so far.  And so, again, it

11 underscores the importance of looking to all collateral

12 sources to make sure that the additional risk that the

13 prepetition lenders are taking post-petition for the benefit

14 of the estate as a whole is not a unilateral one-sided risk.

15         Going through the last points, your Honor, your

16 Honor's noted on many occasions this was a desperate

17 situation, that the lenders came up and threw a life

18 preserver and the life preserver was given with the idea

19 that this was going to end at some time.  It wasn't that we

20 were going to throw a life preserver to see where we were in

21 60 days and then look at in another 60 days and then another

22 60 days.  That wasn't the risk or the calculus that was

23 presented to your Honor from the get go or went into the

24 thinking of the lenders.

25         So while we have made substantial progress and the

55

1  discussion has been very spirited and very intellectual,

2  there are some very real points that your Honor still needs

3  to resolve with precision.  We could draft whatever is

4  ordered, but we need to make it clear what is -- and, again,

5  this is a package that if the lenders don't get what they

6  require at a minimum, they're not obligated to continue to

7  file.

8          THE COURT:  Thank you, Mr. Shinderman.

9          Mr. Bogdanoff?

10          MR. BOGDANOFF:  Your Honor, you asked for clarity

11  and a pointed presentation.  I know you've gotten a lot of

12  issues, and I think there is an agreement on everybody on

13  this side of the table that the issues that have been raised

14  by Whorl are of paramount importance.  They're of paramount

15  importance to my client.

16          We began raising these issues a long time ago, and

17  I expressed to you at the last hearing how personally

18  distressing to me what has unfolded insofar as what these

19  lenders have been trying to do has been.  I don't believe --

20  certainly I didn't hear the Court rule on the issues that

21  were raised by Whorl at the last hearing.  The Court's

22  remarks at the end of the hearing did not pertain to those

23  issues.  But, fundamentally, what we have seen is that these

24  lenders took an entity, Pay By Touch Checking Resources,

25  Inc. -- and I'll call it the IP sub -- that we've now been

56

1  told and was disclosed just shortly before we were before
2  you last week had no creditors, no operations, no employees,
3  and that entity was put into bankruptcy.  Why?  So that
4  these lenders could try to use the bankruptcy process to
5  perform an end run around my client's contractual rights.
6  They are, you know, literally trying to gut a security
7  interest that Whorl has in the stock of this entity by
8  taking a security interest in the assets of this entity.
9          If Mr. Logan is right and my client doesn't have a
10 perfected interest in the stock, then why is he advocating
11 so forcefully for a security interest in the assets.  It
12 doesn't make sense.  So that's the first point.
13         The second point, your Honor, and separate and
14 apart from the inter-creditor issues is that the record, the
15 evidence before you does not support under any circumstances
16 rendering the IP sub and its assets jointly and severally
17 liable on a 13 and a half million dollar facility.
18         Now, the letter that Mr. Logan sent to you this
19 morning expressed various views concerning the first issue
20 which is the inter-creditor rights between Whorl and these
21 lenders, and I want to put that issue in the proper
22 framework with a view toward assisting you.  Nothing in the
23 DIP motion that was originally filed -- and there's been no
24 amendment -- requested any adjudication of our respective
25 inter-creditor rights.  Those rights, as I indicated -- as

57

1  we indicated in our objection, as I indicated here from the

2  podium last week, exists and may be enforced.

3          Now, if Mr. Logan is correct that the actions of

4  his client and the other lenders is not a breach and the

5  Court enters the order, whatever order that is submitted --

6  I'm not 100 percent sure what's going to come out of today

7  -- the lenders will have plenty opportunity to defend their

8  position in a court of law.

9          My goal has been from day one to try to avoid that

10 inter-creditor litigation.  With respect to the comments

11 that Mr. Logan made concerning the inter-creditor agreement,

12 as I pointed out at the last hearing under Section 510(a) of

13 the Bankruptcy Code, Section 524, even by negative

14 implication Section 1129(b), inter-creditor agreements are

15 fully enforceable in a case under Title 11.  The Sun Runner

16 case which he brought to your Honor's attention this morning

17 actually has nothing to do with the issue this afternoon.

18          Sun Runner involved a Debtor's motion under

19 Section 365 to assume an agreement that the Ninth Circuit

20 felt determined was a financial accommodation and was, by

21 its terms, non-assumable.  And so the Ninth Circuit said

22 that Section -- since Section 365 has nothing to do with the

23 -- specifically disclaims the ability to assume a financial

24 accommodation, if there is to any relief sought, it must

25 be sought under Section 364.  That doesn't mean that Section

58

1  364 abrogates other provisions of the Code such as 510.

2         So the point is, your Honor, that my client has

3  these contractual rights.  I've explained in a letter

4  earlier this week to Mr. Shinderman and Mr. Logan why it is

5  under the Biopay consent, the subordination agreement, it is

6  very clear to me that what they are doing is a breach of

7  contract, and we will be pursuing our rights as we are

8  entitled to.

9         But the point for your Honor in connection with

10 this motion is that the record does not support the approval

11 of a guarantee liability and a pledging of assets against

12 the IP sub to the tune of 13 and a half million dollars.

13 The evidence that was presented at the hearing last week

14 that was elicited at your Honor's suggestion from Mr.

15 Lumsden, Mr. Lumsden testified that he didn't know who the

16 officers or directors of the IP sub were or whether that

17 board -- its board had even approved this transaction.  The

18 offer that was made, the evidentiary presentation was that

19 another entity that is owned by Solidus, Pay By Touch Check

20 Cashing, uses a portion of the IP sub's intellectual

21 property and that that entity, based upon the projections,

22 is projected to borrow under this DIP facility $696,000.

23 That's the argument they made.  They said there may be a

24 benefit to the IP sub if Pay Checking is successful in

25 selling its assets and is engaged in -- and that entity

59

1  apparently is engaged in a marketing effort.  That was the
2  evidence that was presented.
3         There was no evidence that Pay By Touch Checking
4  is paying the IP sub for the use of the intellectual
5  property and, if so, on what basis.  No evidence that the
6  marketing effort has succeeded or borne any fruit.  Mr.
7  Lumsden disclaimed on the witness stand any estimate and, in
8  fact, any ability to estimate the incremental costs that are
9  borne by Solidus in supporting this other entity.  Again,
10 this has nothing to do with the IP sub.
11        So the fundamental point that we presented to your
12 Honor in the letter that we sent yesterday afternoon was
13 that with regard to the Debtor in Possession financing,
14 insofar as the IP sub is concerned, the amount of liability
15 on the DIP financing should be limited to the actual
16 necessary benefit conferred on that entity as determined by
17 a court.
18        The reason why we say a court is that we have
19 filed a motion to dismiss the IP sub case based largely on
20 what came out at the last hearing.  So I don't know which
21 court will ultimately resolve that issue, but what we've
22 said is the burden should be on these lenders since they
23 haven't -- since neither the Debtor nor the lenders have met
24 their burden to date, the burden should be on them to try to
25 impress liability on that IP sub.

60

1          And what they want to do is to automatically

2  render the IP sub jointly and severally liable to the tune

3  of 13 and a half million dollars.  Now, there were

4  statements made by both counsel that $8,000,000 has been

5  advanced under an interim order.  The Court indicated, as I

6  pointed out at the last hearing, that that was an interim

7  approval.  The pleading that was filed by the Debtor on the

8  morning of the final hearing was that $14,500 had been

9  advanced, they represented to the Court, to the IP sub for

10 patent renewals and patent preservation, $14,500 of the

11 $8,000,000.

12          There was a representation that an additional

13 $25,000 would likely be needed.  My client has offered to

14 provide that financing.  My client is fully prepared to

15 reimburse the lenders the $14,500 on the same terms that we

16 proposed in our opposition insofar as the IP sub is

17 concerned.

18          So, your Honor, the record doesn't support this.

19 Now, in our letter to you of yesterday afternoon, we had

20 some suggested language with respect to two recitals.  I

21 should state, your Honor, that our fundamental and

22 overwhelming point to you is that the Court's order on this

23 financing insofar as the IP sub should be limited to actual

24 necessary benefit conferred on that -- on that entity.  But

25 we also pointed out that they have put into the order

61

1 findings, for example, in recital F that unsecured financing
2 is unavailable.  We know that that's not true, at least
3 insofar as the IP sub is concerned.

4        They've put in findings that the IP sub, because
5 they've used the word "debtors" which includes the IP sub,
6 has an immediate and critical need to borrow.  The record
7 just doesn't support that.  We've also pointed out in our
8 original objection that there was no basis for a finding,
9 that the lenders have acted in good faith.  Insofar as the
10 IP sub is being required to be a party to this financing, we
11 contested it.  We put that issue in front of your Honor in
12 our timely-filed objection.  There has not been a single
13 affidavit by a lender before you establishing a basis for a
14 good-faith finding insofar as the IP sub is concerned, and
15 the Debtor's pleadings that were filed on the morning of the
16 hearing essentially said that the reason why that they did
17 this was that the lenders demanded it.  We don't think that
18 that's good faith.

19        Finally, your Honor, again, it's -- it is our
20 objective to avoid inter-creditor litigation, and we
21 suggested that the order approving this financing should
22 contain the same paragraph that was included in the gap
23 funding order concerning the parties' inter-creditor
24 agreement.  And we're certainly prepared to honor our end of
25 that bargain.

62

1          So, your Honor, I understand that this may be

2   important.  It's certainly been presented to you as being

3   important to the lenders.  It is critically important to my

4   client.  That's why I've been marching up here, and my

5   client's been spending time and dollars addressing this

6   issue.  So we would ask that with regard to the form of

7   order that the Court interlineate the changes that we have

8   requested in my letter dated January 24th, 2008 to the

9   Court.

10          Thank you, your Honor.

11          THE COURT:  Thank you, Mr. Bogdanoff.

12          Mr. Kreller?

13          MR. KLAUSNER:  Your Honor, honestly, I didn't know

14  we were -- I'm sorry.  I thought he said Klausner.

15          THE COURT:  Kreller.

16          MR. KRELLER:  You will probably have another

17  chance, Gary, at some point --

18          MR. KLAUSNER:  That's okay.

19          MR. KRELLER:  -- in the afternoon or again.

20          MR. KLAUSNER:  Very well.

21          MR. KRELLER:  Your Honor, I'll try and be brief,

22  and then I'll let you decide whether we're ahead or behind

23  from where we started a few hours ago.

24          Your Honor, I think it's important backdrop before

25  I begin my comments to note once again the S and H

63

1  Noteholders that I represent, they are unsecured creditors
2  of the Debtors, but they are also secured creditors of the
3  non-debtor S and H entities.  And many of my comments and my
4  concerns have been addressed to ensure that the order does
5  nothing to -- to merge the non-debtor entities into the
6  protections and the obligations undertaken under this order.
7  They're non-debtor entities.  To the extent there are
8  existing agreements that are binding upon them and the non-
9  debtor borrowers and the other lenders here, those
10 agreements should govern and applicable non-bankruptcy law
11 should govern.
12        And part of my job here is to try to defend that
13 non-bankruptcy turf from the reach of this order.  And so I
14 approach a number of these issues with that in mind.
15        As I said at the outset of the hearing, a number
16 of the issues that I've raised I've been told are non-issues
17 and should be taken care of in the drafting.  Again, I'm
18 comforted by that.  Things like my creditors are not being
19 primed by anything here on their collateral, my creditors --
20 the borrowers, the non-debtor entities are not granting
21 adequate protection claims or liens, the fact that the non-
22 bankruptcy documents and law govern the relationships
23 between my creditors and their non-debtor borrowers and
24 between my creditors and the lenders to the extent they are
25 creditors of the non-debtor entities.

64

1          And, lastly, your Honor, there should be nothing
2    in the order that in any way impairs the ability of the S
3    and H Noteholders to challenge transactions entered into by
4    the S and H borrowers, including the purported issuance of
5    guarantees to the prepetition lenders pre-bankruptcy and the
6    apparent decision by the S and H non-debtor entities here to
7    enter into guarantees of the DIP financing.
8          All of those are likely to be resolved outside the
9    boundaries of this Court, and my goal here is to make sure
10   that this order doesn't impair my client's rights to do
11   that.
12         Now, I have been told by Mr. Logan that that was
13   not the intention, and I take him at his word on that, but
14   we do need to come to an order that actually resolves those
15   issues in that fashion, and none of the orders that I've
16   seen to date either as circulated by the Debtor or as
17   circulated by the lenders properly addresses those issues
18   and properly delineates between what happens to Debtors
19   under this order and what happens to non-debtors under this
20   order.  A lot of that may be drafting, and I hope that's the
21   case, and I'm going to stop on those issues now in the hopes
22   that we'll have an opportunity to address my comments.  I
23   provided the lenders with a comprehensive markup that I
24   think accomplishes what I want on those points, and if we
25   can come to agreement on that, we won't need to spend a lot

65

1  more time in front of you on those issues.

2          I do have two issues that I do think are in

3  dispute.  One is an issue that's very similar to the issue

4  that you've heard from Mr. Bogdanoff on, and that is, your

5  Honor, a -- these non-debtor S and H entities are being

6  asked to guarantee jointly and severally 13 and a half

7  million dollars of DIP financing of which according to the

8  Debtor's own budget, they will only use approximately

9  $967,000 of.

10         Now, I will tell you I'm not sure how you get to

11  the point of them borrowing $967,000, because, frankly, the

12  support sheet that -- the work sheet that stands behind the

13  budget actually shows -- if you look at the S and H specific

14  line items, it shows cash receipts for each month of the DIP

15  period, December, January, and February, total cash receipts

16  by S and H far in excess of total cash disbursements by the

17  S and H entity, in one month to the tune of $700,000 to the

18  positive, January nearly $350,000 to the positive, and

19  February to the tune of $310,000 to the positive.

20         So I'm not quite sure how you make the leap of

21  $1,000,000 in borrowing needed for an entity that's well

22  over $1,000,000 positive when you look at the supporting

23  detail behind the budget.

24         That being said, your Honor, if the S and H

25  entities are borrowing and consuming funds under the DIP

66

1  financing, we don't have a problem with them being liable

2  for the funds that they use.  But $1,000,000 worth of

3  borrowing should not translate into 13 and a half million

4  dollars of liability.  Plain and simple.  Your Honor, these

5  are non-debtor entities, and yet what the DIP lenders are

6  proposing to do here is formulate a financing under which

7  they can send $1,000,000 down to these entities and take 13

8  and a half million dollars back.  That's 12 and a half

9  million dollars out of these non-debtor companies, of which

10  my clients are creditors, significant creditors.  That is

11  just an inappropriate result, your Honor, and this DIP order

12  should limit that, and if it doesn't limit that, at a

13  minimum it needs to provide my clients with the ability,

14  unencumbered by this order, to challenge any of these

15  transactions inside or outside this court.

16         Your Honor, that's -- I've gone through that

17  without calling it marshaling.  That's really where the

18  marshaling aspect comes in.  That's what it boils down to.

19  You're borrowing -- these non-debtor entities are borrowing

20  $1,000,000 and have become obligated for 13 and a half, and

21  that's an inappropriate result here, your Honor.

22         The last issue I would raise is in paragraph 46 of

23  the order that was proposed by the Debtors last night, and I

24  apologize.  I'm sure there was confusion.  I imagine all of

25  us are carrying around multiple versions of orders and black

67

1 lines in our briefcases, but I'll paraphrase paragraph 46.

2 It essentially says that if any affiliate of the Debtor that

3 has not yet filed for bankruptcy subsequently files for

4 bankruptcy, it immediately and automatically becomes a

5 capital D Debtor for purposes of this DIP financing order.

6 It immediately and automatically becomes obligated on the

7 DIP financing under the terms of this DIP order, and it

8 immediately and automatically grants all of the protections

9 to the lenders that the now existing Debtors have granted to

10 the lenders.

11          Your Honor, in essence, this provision would

12 obviate the need for -- say, for example, one of the S and H

13 entities filed for bankruptcy a month from now.  The effect

14 of this provision would be the moment the petition was

15 filed, that entity, without notice and a hearing to its

16 creditors, without a moment spent in front of a judge in

17 wherever that case was filed, this -- your final order here

18 would become binding on that entity, and it would be

19 granting adequate protection claims and liens and it would

20 be securing DIP financing with liens on all of its assets in

21 ways that no one -- no one would ever have had a chance to

22 deal with.

23          Your Honor, that, I submit to you, is a completely

24 inappropriate and baseless request in the order.  In fact,

25 it probably violates due process at a minimum.  And so, your

68

1  Honor, among the comments that I've provided to the lenders
2  is that that paragraph be stricken, and I would request that
3  to the extent you're looking at an order today to sign, and
4  I have no idea what that order would look like at this
5  point, but that provision clearly is another provision that
6  should come out.
7            THE COURT:  Thank you, Mr. Kreller.
8            MR. KRELLER:  Thank you.
9            THE COURT:  Mr. Johnston.
10           MR. JOHNSTON:  Well, your Honor, you've been
11  hearing a lot of the arguments I've been hearing for the
12  last few days and weeks, and they're all well made and
13  forcefully made, and I'm not sure that there's actually a
14  right answer to a lot of these imponderables.  There are a
15  few certainties, and one of the certainties is the over-
16  arching need.  I'm not going to -- I'm not going to
17  reiterate that.  That is of the record.  No one's disputed
18  that.  There was a reference made earlier to a draw request
19  that's pending for money on Monday.  The Debtors need it.
20           Mr. Shinderman was correct in at least one regard
21  I think.  Because these issues can be argued well on all
22  sides, we are at a point where with respect to the handful
23  of open issues -- and I do think it is a handful of open
24  issues -- guidance from the Court is needed.  With that
25  guidance, I'm very confident that the words on the paper

69

1 will resolve themselves, and we can go on and figure out
2 what to put down on paper to implement your Honor's orders,
3 but there are at least a couple of points where the parties
4 are at loggerheads.

5 　　　　One of those is -- the biggest I guess is the
6 issue with respect to Pay By Touch Checking Resources, also
7 known as IP sub as people have been calling it. You heard
8 Mr. Logan and Mr. Shinderman tell you that obtaining a lien
9 on the assets of that entity to secure the DIP financing was
10 a critical component of these lenders' decision to put new
11 money at risk in the enterprise.

12 　　　　We have to take them at face value for that. So
13 you heard the counterpoint from Mr. Bogdanoff as an argument
14 that this was all a scheme to encumber previously
15 unencumbered assets for the benefit of the lenders. Well,
16 as things now stand, the encumbrance is solely with respect
17 to new money going into the enterprise, not with respect to
18 providing any protection with respect to existing debt. I
19 think that's an important distinction to make.

20 　　　　You heard about the arguments that Mr. Bogdanoff
21 has now made, that Whorl has now made in the context of a
22 motion to dismiss the case for IP sub. Those issues are
23 coming. They'll be joined soon, and your Honor will have a
24 decision to make as to whether or not that entity is
25 properly in bankruptcy.

70

1          The argument that IP sub has no need I think is a
2    misleading one.  It was implied that because IP sub has no
3    employees, it has no operations, that it has no need other
4    than maybe the $14,000 or the $25,000.  Well, I would
5    submit, your Honor, that the evidence is to the contrary and
6    the evidence in the form of what Mr. Lumsden testified, and
7    the upshot of Mr. Lumsden's testimony I think is that this
8    entity couldn't survive without regard to the operations of
9    its affiliates.  If you assume, as I think you have to on
10   the state of this record, that without the DIP financing the
11   other debtor affiliates go away, cease to exist, that in any
12   assessment will have a material and direct impact on IP sub,
13   on Pay By Touch Checking Resources.  Pay By Touch Checking
14   Resources has no employees.  So who administers the
15   intellectual property?  Who pays the fees?  Who actually
16   operates the business that implements this intellectual
17   property that sustains its value?  It's the other debtors,
18   and it's the other debtors who are using the Debtor in
19   Possession financing.
20          So I think it's an unusual argument to suggest
21   that one must look on a Debtor by Debtor by Debtor basis as
22   to actual dollars received to assess whether or not the
23   collateral protections being given as a package for a loan
24   to many debtors together are appropriate.  I would suggest
25   that any requirement like that would run contrary to almost

71

1  every Debtor in Possession financing that I've seen
2  involving a multi-debtor enterprise.  And, frankly, it would
3  run contrary to most corporate financing out there that
4  involves an enterprise with more than one debtor.  Lenders
5  are not willing to subject themselves to flyspecking, for
6  lack of a better word, saying, okay, this entity got $100
7  and this entity got $50, so you can only look to the
8  collateral of the $50 entity for $50.
9          That's IP sub in a nutshell I think.  I'm
10 sympathetic to the concerns raised by Whorl.  I'm
11 sympathetic to the concerns that the protections negotiated
12 in the prepetition agreements are being diminished by virtue
13 of the Debtor in Possession financing.  As I indicated in
14 the pleadings we filed in response to the objections,
15 frankly, couldn't find any law on the subject that says that
16 in a content -- in a case like this, that the prepetition
17 rights or prohibitions of a creditor as to the Debtor
18 somehow trump what the Court can order in the context of a
19 Debtor in Possession financing.  I think there aren't cases.
20 There aren't cases that address a fact situation like this,
21 and I would submit that very frequently courts approve
22 Debtor in Possession financing that run directly contrary to
23 covenants in a Debtor's prepetition debt documents.  That
24 happens all the time.  Bankruptcy is a different universe.
25 Debtor in Possession financing is a different universe.

72

1          And in large part, the same comments apply almost
2   in reverse or in mirror image to the concerns raised by Mr.
3   Kreller.  No question about it, I think everyone agrees that
4   the non-bankruptcy rights of the S and H Noteholders as
5   against the non-debtors are and should be completely
6   preserved.  The order -- there's a new paragraph in the
7   order specifically directed to Mr. Kreller's clients, and I
8   think it does everything that he asks for.  I think he wants
9   to see that paragraph and then specific changes within the
10  order.  I don't have a problem with that.
11          The concept everyone agrees with.  But, as I
12  mentioned at the last hearing, he wants to go beyond that
13  with respect to S and H, and he wants to have it both ways.
14  What he wants to say is the S and H Noteholders should not
15  be limited in any way by the four corners of this order as
16  to their rights against the non-debtors.  And, again, we
17  agree with that.
18          But then he wants to say but your Honor should
19  specifically put in this order that any money borrowed by
20  the non-debtors pursuant to this facility or that any
21  obligation of the non-debtors pursuant to this facility
22  should be limited to the dollars borrowed.
23          Well, you can't have it both ways.  Either the
24  rights of his clients as against the non-debtors are going
25  to be governed by this order or they're not.  He wants

73

1 special protections by this order but none of the burdens.

2 I would submit that that's inappropriate.

3          And the concern that he raised regarding paragraph

4 46, frankly, is a new one, that -- that was not in his

5 original objection.  I learned of it yesterday for the first

6 time.  Frankly, I think it's -- I understand the concern,

7 and I think there's some language that we can work on that

8 ensures that the non-bankruptcy rights as against S and H

9 are preserved, and to the extent that any of the S and H

10 entities become debtors in this case, then the Court and the

11 parties in interest should have the opportunity to revisit

12 those rights, and they should not be automatically granted.

13          Those were the notes I took in response to the

14 various comments that have been made.  I think with respect

15 to Mr. Klausner's points, the parties should be pretty

16 close.  As I heard the comments, there's a lot of agreement

17 in concept, but there is disagreement I guess with respect

18 to -- let me look at my notes here.  On the marshaling

19 concept there's disagreement with respect to whether or not

20 all marshaling rights should be reserved or whether it

21 should be limited to the new adequate protection liens as

22 Mr. Shinderman suggested.  I think that's an issue for your

23 Honor to decide.

24          With respect to the event of default under the --

25 under the DIP facility, if the Debtors obtain a replacement

74

1 loan, as your Honor knows, that's an issue of critical

2 importance to the Debtors.  If the Debtors can obtain a

3 replacement DIP to buy themselves some more time, not on a

4 priming basis, but one that pays off the existing DIP, we're

5 going to do it.  Mr. Shinderman said that he didn't want to

6 be prejudiced in respect of his rights to cash collateral.

7 There's nothing in this order that would prejudice him that

8 way.  All that the suggested language says is that it's not

9 an event of default under the credit agreement for us to

10 seek to obtain a replacement DIP.  That should not be

11 controversial.

12        The issue regarding lender professional fees

13 really does seem to me to be a tempest in a teapot.  The

14 lenders are either over-secured or they're not.  If they're

15 over-secured, they're entitled to get their professional

16 fees to the extent that they're reasonable.  If they're not

17 over-secured, there's only going to -- if they're under-

18 secured, there's only going to be a limited pool of assets.

19 So long as they're secured, it's going to go to them.

20 They're going to get it, and whether they call it a

21 professional fee or whether they call it a return in

22 principle, I don't think makes a great deal of difference.

23 So that seems to be an issue that should be surmountable.

24        On the right to challenge the gap debt, I think

25 there's a resolution there.  I think I heard it, that Mr.

75

1  Logan was absolutely correct when we were in here with
2  respect to the gap, your Honor blessed the obligations and
3  liabilities of the only entity that was then before the
4  Court, which was Solidus.  To the extent that there is some
5  viable challenge for the gap debt for the other entities
6  that are now debtors but then weren't, that should be
7  preserved by this order, and I think I heard an agreement on
8  that.  We just need to wordsmith it.
9          And on the credit bid rights, I think the lenders
10 have it right here.  They are agreeing to give up the
11 certainty of having the challenge deadline pass by the time
12 February 29 roles around, by the time that we may be having
13 a sale of these businesses, in exchange for getting some
14 certainty that, yes, they could actually credit bid if it
15 comes to that.  Now, they'll have to give the money back if
16 there's ultimately a successful challenge, but it doesn't
17 seem to me to be too much of a stretch to -- to have
18 everyone agree that there won't be quibbling about their
19 right to credit bid.
20         There's an express provision in the language in
21 the order that says that notwithstanding the agreement that
22 the lenders have the right to credit bid, all parties are
23 reserving the rights to challenge or object to the sale.
24 Any concerns I would think regarding a credit bid or
25 something in that respect would be brought up in an

76

1  objection to the sale.  So, again, this seems like really a

2  nonsubstantive issue.  It seems like a fair concession to

3  give to the lenders to agree to a pretty lengthy extension

4  of the challenge deadline.

5            So those are my thoughts, your Honor.

6            THE COURT:  Thank you, Mr. Johnston.

7            MR. JOHNSTON:   Thank you.

8            THE COURT:  Mr. Klausner?

9            MR. KLAUSNER:  Yes.  I guess the best laid plans,

10 I thought I was just going to tell you where we were and

11 take a break, but as long as everybody's arguing, I just

12 have a very quick response, and then I would suggest we take

13 a break and see if we can resolve some of these things.

14           I just wanted to talk about very briefly this

15 credit bid issue and the payment of professional fees in

16 connection with the prepetition debt, because in both of

17 those instances, the --

18           THE COURT:  I'm sorry.  What's the first issue?

19           MR. KLAUSNER:  The credit bid --

20           THE COURT:  Okay.

21           MR. KLAUSNER:  -- issue, and the second issue is

22 the professional fees incurred with regard to the

23 prepetition as opposed to the post-petition debt.

24           In both of these instances, your Honor, neither of

25 these rights or interests that the lenders are now

77

1   requesting, neither of them were before the Court in the

2   proposed financing.  They weren't set forth in the interim

3   order.  They're not in the financing documents.  They were

4   not set forth in the proposed final order that we were

5   arguing about last week.  These are both new provisions.

6   These are new rights that the lenders are seeking as a

7   result of our having been in negotiations with them.

8           Not only are they new, neither are rights to which

9   they're entitled.  If you look at the issue of payment of

10  the prepetition fees or fees incurred on prepetition debt,

11  there's a statutory provision, 506, which essentially says

12  that they're only going to be entitled to those fees if

13  they're over-secured.  There's no issue at the moment,

14  there's no evidence at the moment that they're over-secured.

15  We don't know that.

16          But what will happen is the following.  Let's

17  assume there is an avoidance action that produces $1,000,000

18  of recovery.  Let's assume it produces $15,000,000 of

19  recovery.  The lenders will take the position that under the

20  DIP facility they're entitled to the proceeds of that

21  avoidance action, which is correct.  But not only would they

22  be entitled to the $13.5 million that they're owed and not

23  only would they be claiming any fees incurred as

24  representatives of post-petition lenders, they would also be

25  able to make a demand to be paid their fees on account of

78

1  the prepetition lien or their prepetition claim, to which

2  they're not entitled.

3        So they'd be able to take an unencumbered asset,

4  something they didn't have a claim to previously, and

5  recover against it even though they may prove to be under-

6  secured.  It may well be that they don't have sufficient

7  collateral to pay for their prepetition claim in full.

8  Nevertheless, by virtue of this order, you will have allowed

9  them to recover potentially hundreds of thousands of dollars

10  of fees for services rendered in connection with their

11  prepetition claim.

12        Now, I understand that there's a complexity

13  because the same lenders are both the post-petition lenders

14  and the prepetition lenders.  But the fact that the

15  prepetition lenders have chosen to make a post-petition loan

16  doesn't change the law.  There's still -- that doesn't mean

17  -- because they've made a post-petition loan, it doesn't

18  mean they're now entitled to be paid something on a

19  prepetition debt that the law doesn't allow them to be paid

20  on, especially from an unencumbered asset.  So clearly this

21  is something new, wasn't before the Court before, and

22  they're not entitled to it.

23        Secondly, on the credit bid, again, there's

24  nothing that we -- we're not doing anything at the moment to

25  prevent the lenders from asserting their right to a credit

79

1 bid.  What they're asking you to do today is to grant them

2 or confirm to them a right to credit bid.  That was not in

3 requested before, was not in the 100 pages of financing

4 documents, was not in the interim order, was not in the

5 proposed final order.  They are essentially coming to court

6 now and saying we want something that we may not even be

7 entitled to legally.

8           We're not suggesting they shouldn't be entitled to

9 it.  We're just suggesting that the issue has to be left

10 open to be determined at some later date when it's relevant.

11 All this order says is that -- let me back up.  What they

12 originally told you last week was that if we had some

13 dispute about their claim, they didn't want the dispute to

14 prevent them from bidding the let's call it $150,000,000,

15 from showing up at an auction and bidding $150,000,000, and

16 if it turned out that we had a dispute and it was correct,

17 they'd have to disgorge, and the answer was fine.

18           But there was no discussion at that time about

19 conveying to them a right to a credit bid that they might

20 not otherwise have, and the only thing we're doing is we're

21 keeping that issue open as it should be as a matter of law.

22 There's no justification for them to be granted something to

23 which they're not entitled to legally, and I'm not

24 suggesting they're not entitled to it.  I'm just suggesting

25 that this order shouldn't be granting that to them.  And all

80

1 we've done in the proposed language is to say that to the
2 extent they have that right, it won't be affected by the
3 fact that there may be a dispute about their claim.

4          And if they're suggesting that granting them --
5 granting them this right or confirming to them this right is
6 a quid pro quo for moving the challenge deadline back six
7 weeks, it's an unreasonable request in exchange for moving
8 the challenge deadline to what might be a reasonable period
9 of time.  February 15 was never a reasonable date to
10 challenge $150,000,000 of prepetition financing this
11 extraordinarily complex.  The only thing we requested was to
12 have a reasonable time to take a look at the documents, do
13 some due diligence and understand whether there's a basis to
14 challenge, and all we suggest, we suggested a 60-day
15 extension.  We've been arguing about whether it should be 60
16 or 30 or 45, but in exchange for what we want, which is
17 simply a reasonable period of time to challenge their
18 prepetition claim, we shouldn't be giving them any
19 additional rights.

20          So that's all.  Those are my responses on those
21 two issues, and I think the balance of these things I really
22 would like to talk to counsel about and see if we can make
23 some progress.

24          THE COURT:  Thank you, Mr. Klausner.

25          MR. LOGAN:  Your Honor, let me -- I'm not going to

81

1  be arguing anything, but I just want to make a couple of

2  suggestions, one to make sure we don't over-burden the

3  process with things which aren't at issue.  Mr. Kreller

4  raised the issue about paragraph number 46 in the order.  I

5  hadn't even focused on it until he mentioned it in court.

6  We can strike that.  The intention really is not to do

7  anything through this Court with respect to the S and H

8  entities.  Mr. Johnston got it -- phrased it exactly

9  correctly, and that ought to be pure and pristine.  I'm sure

10 we can wordsmith so there's nothing in this order that

11 affects one way or another what ever his state law rights

12 are, and paragraph 46, I agree -- I haven't focused on it

13 before -- shouldn't be in there, and we'll strike that.

14       THE COURT:  That being the case, perhaps Mr.

15 Kreller could go home.  It sounds like everything else has

16 been agreed to.  I suppose he'd like to stick around and see

17 what the order looks like.

18       MR. KRELLER:  Your Honor, if you're granting me my

19 objection on the basis that the S and H entities should only

20 be liable for that amount they borrow, I'm happy to take

21 that and go home.  Otherwise, we do have that issue, and we

22 still have drafting issues I think that need to implement

23 some of the other what I believe are agreements.

24       THE COURT:  I think I agree with the sentiments

25 that you've expressed, Mr. Kreller.  I think there is

82

1 perhaps room for some word smithing before I sign an order.

2        MR. KRELLER:  Well, then I'm happy to stick around

3 and wordsmith as much as need be.

4        MR. LOGAN:  And that's very helpful, your Honor.

5 And that gets me to my other suggestion.  I really do think

6 that highly qualified, very competent lawyers who spent the

7 better part of the last several days trying to wordsmith,

8 the trouble is that on a couple of really fundamental

9 issues, going out in the hall is not going to help.  I love

10 going out in the hall, and I love talking to these folks,

11 and I like them, but it's not going to advance the ball, and

12 I think Mr. Johnston's absolutely right.  We need a ruling,

13 and then we can wordsmith.

14        THE COURT:  Okay.  Well, I think what I would like

15 to say at this point before we take a break -- I guess there

16 are two things.  Number one, I think we ought to talk about

17 scheduling and who's going to do what and how we're going to

18 get that done and if we're going to get that done before the

19 sun's probably going down shortly.  We ought to figure out

20 some kind of schedule that we can work around or work

21 toward.

22        On -- on what has constantly been referred to as

23 the big issue, Whorl, Mr. Bogdanoff, with all due respect, I

24 come to the conclusion that IP sub is an integral part of

25 the bankruptcy process.  It is a Debtor.  Beyond what Mr.

83

1  Lumsden said in his testimony last week, Mr. Lumsden has

2  submitted other declarations that express I think rather

3  forcefully the prefiling circumstances of Solidus, the

4  integrated nature of the borrowing negotiations, the

5  difficult -- or difficulty of the negotiations, and has

6  expressed the view that the package is important,

7  notwithstanding the fact that these are jointly administered

8  cases and the lenders have expressed quite forcefully the

9  importance of what they've negotiated with the Debtor and

10 what they've accomplished on an incremental basis with me in

11 the gap period and in the interim order, and I'm persuaded

12 that those things are vital and essential to the opportunity

13 that's been extended by the lenders to the Debtor on a very

14 short-term basis with very specific objectives in mind.

15         I come to the conclusion that I have to accept the

16 lenders' position with respect to IP sub, that that's the

17 appropriate solution.  Having said that, it seems to me that

18 the question is how are we going to get from here to an

19 order that you folks will want me to sign this afternoon.

20 It sounds like the best way again is for you folks to put

21 your heads together and for me to go do something else for a

22 little bit.  But I'm open to suggestions, and I would like

23 some kind of a time table.  I have only personal commitments

24 this evening, but I'd like to be able to plan a little bit

25 and call home and give my wife a little bit of a heads-up.

84

1          MR. LOGAN:  Your Honor -- and you can blame --
2   blame it on me, tell your wife that -- I blame it on you all
3   the time when my wife complains.
4          THE COURT:  That's fair.
5          MR. LOGAN:  And it's tough too.  Your Honor, I
6   think as far as timing is concerned, there are a handful of
7   issues between us and the Committee, and as far as Mr.
8   Bogdanoff's issue, I think we've already got the drafting
9   done on that, and we've got alternative drafts that deal
10  with what we're calling the marshaling issue and the
11  professional fee issue.  I think those are the essential
12  ones really.  You know, we could argue more about them if we
13  wanted to or -- but, again, I think if -- I need to -- we
14  need to ask you for direction on the marshaling and on the
15  professional fee issue.  Like I said, we are prepared to
16  agree on the professional fees that, one, they're only paid
17  at the maturity date and so interim issues really don't
18  matter.  And, two, we'll limit it to the fees incurred after
19  the petition date.  They disagree with that, but I think we
20  need direction.
21         And on the marshaling issue, we certainly -- and
22  we've got a draft that I keep mentioning I lost brain cells
23  drafting but that says that anything that's realized on
24  account of an asset of the type that wasn't part of the
25  prepetition collateral package with respect to the -- Mr.

85

1  Shinderman's right, the DIP's different, but with respect to

2  the adequate protection liens, we'll hold that in escrow,

3  and we can argue about who gets it and who doesn't get it,

4  but it's just a fundamental problem for our clients to say

5  that we're subject to marshaling, because that -- quite

6  frankly, that guts all the issues about whether or not we

7  can look --

8              THE COURT:  That sounds reasonable to me.

9              MR. KLAUSNER:  Well, your Honor, we're going to

10 suggest that there should be an order that says that they're

11 subject to marshaling.  The only thing he said is that

12 there's nothing that would preclude a party from asking the

13 Court at the appropriate time to require marshaling.  That's

14 all we've requested, and I do think there's language we may

15 be able to agree to.  This escrow arrangement and referring

16 to types of collateral I think is more confusing than it

17 needs to be.  So I think we may be able to work on the

18 marshaling issue.  I think on the issue of the fees for

19 prepetition services and the credit bid, it might be helpful

20 if we had -- I'm sorry?

21             MR. LOGAN:  Yeah, the credit bid I forgot that.

22             MR. KLAUSNER:  Yeah, the issue of the credit bid

23 probably would be helpful to get some insight.  The issue of

24 whether they should be paid, these were determined properly

25 before when I said ordinary course, and I didn't mean to

86

1  suggest ordinary course as much as I meant without having to

2  come into court.  But the question of whether they should be

3  entitled to be paid for prepetition services I think is kind

4  of a legal issue that you can give us your views on as well

5  as the prepetition fees, and I think the marshaling one I'd

6  like to talk to Mr. Logan.  I have some suggestions.

7          THE COURT:  My views on the prepetition

8  professional fees is that Mr. Klausner is right.  You either

9  get them or you don't depending on what the collateral sales

10 were, what the recovery is.  And I don't think an order will

11 change that.

12         So I think Mr. Klausner's solution is the most

13 elegant one, to -- to treat that differently, treat that in

14 a way that's respectful of what the given is.

15         MR. SHINDERMAN:  And, your Honor, I'm not going to

16 argue that point.  We've heard you, and we're not trying to

17 argue -- I'm talking about procedure.  I disagree with Mr.

18 Klausner, whose opinion I respect.  I -- we're not --

19 preserving the right to make a marshaling argument later is

20 precisely what's not acceptable to us.  It's preserving the

21 rights to escrow, the adequate protection.  So, as Mr. Logan

22 suggested, we could go in the hall and go through this

23 again, but I think if we go through those issues one by one

24 against the backdrop -- this is what we negotiated.  To the

25 extent the Court does not feel comfortable ordering what was

87

1 negotiated because it's persuaded by the Committee, the

2 Court should say I'm not going to order that, and I think

3 then we could figure out how to draft, but I think we should

4 just go very simply maybe after a short bathroom break, to

5 go issue by issue and just tell us what you don't fee

6 comfortable in the package that was already negotiated.

7          THE COURT:  Okay.  All right.

8          MR. KLAUSNER:  The other issue is the credit bid.

9          THE COURT:  Well, the credit bid as well is what

10 it is, and I don't think the order should really alter the

11 credit bid rights that exist.  They can be exercised, but I

12 don't know that you need an order to make that so.  And I'm

13 persuaded by Mr. Klausner's argument which hasn't been

14 answered.  It really didn't come up until after last week's

15 hearing or during last week's hearing.

16          MR. KLAUSNER:  I think that's helpful.  I think if

17 we take a break now it would probably be productive would be

18 my view.

19          THE COURT:  Okay.

20          MR. JOHNSTON:  I agree.

21          THE COURT:  All right.

22          MR. JOHNSTON:  Your Honor, I have the orders from

23 the uncontested maters.  May I approach with those?

24          THE COURT:  I'm sorry.  Which order do you have?

25          MR. JOHNSTON:  The three uncontested matters that

88

1  I addressed --

2          THE COURT:  Yeah, sure.

3          MR. JOHNSTON:  -- at the very beginning of the

4  hearing --

5          THE COURT:  Sure.

6          MR. JOHNSTON:  -- hours ago.

7          THE COURT:  Would somebody send word in every once

8  in a while how much time you need?  I don't mind waiting,

9  but I'd just like to know where you are.

10         MR. JOHNSTON:  Yes, your Honor.

11      (Proceedings recessed briefly.)

12         MR. JOHNSTON:  I can report progress, your Honor,

13 and we are back to request a ruling with respect to three

14 issues, and then I think we will readjourn to the conference

15 room to do word smithing on issues with respect to which --

16         THE COURT:  Okay.

17         MR. JOHNSTON:  -- people have agreed.

18         The three issues, as I understand them, are,

19 number one, the lenders have requested a provision in the

20 order that provides that with respect to the post-petition

21 obligations, a ruling that says in no event shall any of the

22 post-petition lenders be subject to the equitable doctrine

23 of marshaling or similar doctrine with respect to the

24 collateral or otherwise.  That issue has been hashed over

25 and over.  This relates to the DIP financing.

89

1          The lenders say, you know, in no event should they

2    be subject to marshaling.  The committee believes that they

3    want to reserve the right to attempt to marshal should it

4    become appropriate.

5          Issue number two relates to Mr. Kreller and the S

6    and H Noteholders, and it relates to the extent of the S and

7    H entities' obligations or the borrowed funds.  You'll

8    recall the issue here was whether or not the non-debtor S

9    and H entities should be liable for the full $13.5 million

10   in terms of the commitment, the guarantee of a DIP

11   financing, subject, of course, to reserving all of -- all of

12   Mr. Kreller's clients' non-bankruptcy rights against these

13   non-bankruptcy entities or whether this issue should itself

14   state that the liability of the S and H entities are limited

15   strictly to amounts borrowed by those entities.  There was

16   some confusion as to what your Honor meant when you said

17   earlier that you agreed with Mr. Kreller's sentiments or

18   something to that effect, whether it applied to that point,

19   which is actually pretty fundamental business point that I

20   had addressed earlier.

21          THE COURT:  Okay.

22          MR. JOHNSTON:  And the last point, as I understand

23   it, is in light of your Honor's ruling on credit bid rights

24   and not guaranteeing to the lenders the right to credit bid

25   in this order, whether the challenge deadline should remain

90

1 at April 1 or whether it should revert back to February

2 15th.  Those are the three issues.  The rest will be

3 resolved through drafting, and once we have a ruling on

4 those issues, those will be resolved through drafting.

5          THE COURT:  Okay.  I assume you want these right

6 now.

7          MR. JOHNSTON:  Yes.

8          THE COURT:  The first ruling is April 1.

9          MR. JOHNSTON:  Okay.

10          THE COURT:  I think April 1 is reasonable.  Well,

11 the -- the order as I saw it said -- the order and the

12 letters expressed a range of views on that subject, and what

13 I gleaned from the order and the letters was that there's

14 flexibility, certainly a need and I'm persuaded by what Mr.

15 Klausner had to say last week and what Mr. Klausner said

16 today, February 1 -- February 15, I thought that was long

17 gone.  I thought we were at March 15.  So it's only a

18 question of March 15 or April 1 in my mind as of today.  And

19 it seems to me that April 1 is a reasonable accommodation

20 for the Committee under the circumstances.

21          And I also saw in the drafts I believe the

22 Debtor's draft the subject to further extension or further

23 request, and it seems to me that I think the relief from

24 stay result we've come to -- if there's a problem, obviously

25 we're going to have to talk about it and work through that.

91

1  I don't think there should be a firm and fixed deadline that

2  cuts everybody's rights off --

3          MR. JOHNSTON:  Okay.

4          THE COURT:  -- under these circumstances on this

5  short time frame.

6          I'm not sure on Mr. Kreller's -- on the point you

7  asked me about how I -- how I muddled the thought, and I

8  didn't mean to muddle anything and cause anybody any

9  unnecessary grief just because of my poor choice of words.

10          What I did today was specifically I read Mr.

11  Kreller's letter when I got it, and I thought what Mr.

12  Kreller said in paragraphs one, two, three, four -- and four

13  were -- he concluded in bold face after each of the

14  paragraphs I don't think this is disputed, and it seemed to

15  me that I agreed with what Mr. Kreller had to say there, and

16  then pointed out this last item was disputed.  I'm sorry,

17  not the last item but item number five was disputed.

18          MR. JOHNSTON:  Right.

19          THE COURT:  And item number six --

20          MR. JOHNSTON:  And item number six has been

21  resolved by virtue of the lenders' concession.  So we are

22  down to the issue identified as number five in his letter.

23          THE COURT:  Right.  So we're on nu8mber -- so it's

24  on number five where I've messed up I take it?

25          MR. JOHNSTON:  Just the parties are asking for --

92

1 for clarity.

2      THE COURT:  Okay.  Well, number one, I was taken

3 by the fact that Mr. Kreller was not -- in item number five

4 he said here's the problem and we'd like solution A, B, or

5 C.  And my reaction when I read it was, well, maybe there's

6 another solution, and essentially it gets back to the

7 discussion when Mr. Lumsden was on the witness stand, how he

8 allocated, said, well, I don't know.  We'd have to figure

9 that out.

10      And it seems to me the same problem arises with

11 respect to the point that Mr. Kreller raised in his letter,

12 that it shouldn't be just funds that were paid on account of

13 S and H, but it should also include a responsibility with

14 respect to a reasonable allocation of overhead and other

15 Debtor or originated expenditures on behalf of the entity.

16      MR. JOHNSTON:  And as a consequence, what we had

17 suggested was that this order just not decide that issue,

18 but it's been agreed that because these entities are not

19 debtors, the obligations of these entities with respect to

20 this Debtor governed by non-bankruptcy law.  If there's an

21 argument under non-bankruptcy law that these Debtors -- that

22 the guarantee they've executed are not enforceable or should

23 only be enforceable in a limited extent, the S and H holders

24 reserve all those rights.  That is how the Debtors and the

25 lenders have proposed to deal with this issue.

93

1          THE COURT:  Mr. Kreller?

2          MR. KRELLER:  Your Honor, I'll say it again as

3  simply as I can say it.  In essence, what the DIP lenders

4  are trying to do and the Debtors are trying to do with

5  respect to their non-debtor subsidiaries I suppose are that

6  the Debtors would be trying to impose this upon their

7  affiliates.  But, be that as it may, this really comes down

8  to a very simple issue, that these entities are borrowing

9  approximately $967,000.  I don't know what's allocated in

10 there or not allocated in there.  I don't know that it's my

11 burden to find that out, but I assume that Mr. Lumsden

12 budget accounted for some allocation of payroll of those

13 entities.  I don't know whether they have their separate

14 employees so that the payroll comes right out of that, but

15 it seems to me that any meaningful budget would.

16          And on that basis, your Honor, I think that the

17 budget should be used as the property for figuring out what

18 is borrowed by the non-debtor entities, and that should be

19 the extent of their liability.  Again, they're quarreling --

20 it appears they're borrowing $967,000 in exchange for

21 becoming obligated on 13 and a half.  Your Honor, that just

22 does not seem like an appropriate result.  If it turns out

23 that there's more funds that actually make their way down to

24 S and H or pay S and H obligations, that I believe is an

25 accounting exercise that could be worked out, and if we

94

1  don't peg it to a specific number, I don't think it needs to

2  be limited to $1,000,000 or $967,000.  I think it can be

3  they are obligated for whatever of the funds they actually

4  consume, and the Debtors should be able to track that fairly

5  readily through an accounting.

6           THE COURT:  Although in the end it's a question of

7  fact.

8           MR. KRELLER:  In the end it is a question of fact,

9  your Honor, but there's -- I don't think there's anything

10 that would preclude you from determining that down the road

11 and the DIP lenders then going to the S and H lenders and

12 saying this is the amount of funds you owe us based upon the

13 amount of DIP funds you used.  There's nothing that

14 prejudices anyone at this point in time if that's the

15 result.

16          MR. JOHNSTON:  Two points, your Honor.  One, what

17 Mr. Kreller's asking you to do is what Mr. Bogdanoff asked

18 you to do with respect to IP sub, and I think your Honor

19 correctly declined that invitation.

20          And, number two, as I mentioned in the argument

21 previously, Mr. Kreller is actually going one step further

22 and asking you to -- to do two things, one, to say that the

23 S and H entities are not burdened in any way by the

24 protections given to the lenders in respect to the different

25 Debtors because he argued and we agreed those S and H

95

1  entities are not Debtors.  So they're not subject to the

2  various provisions of this order, and we're in the process

3  in the conference room of making sure that that's crystal

4  clear in the order.

5          But then he turns around and asks you to give a

6  special protection to these two subsidiaries and no others

7  in respect of the borrowed funds.  That seems inappropriate

8  to me.

9          MR. LOGAN:  And, your Honor, just from our

10 perspective, we're not asking the Court to rule that the

11 guarantees given by the S and H subs are valid.  We're not

12 arguing -- asking the Court to do anything with respect to

13 those.  That's a matter that the management of S and H

14 subsidiaries has decided to do, and it's governed by state

15 law, and Mr. Kreller has whatever rights he has.  We just

16 think, like Mr. Johnston said, we take at heart Mr.

17 Kreller's point that since these are non-debtors they

18 shouldn't be in the order, and that's what we're striving to

19 do, and we think Mr. Kreller's efforts to put into the order

20 a limitation on the guarantee is internally inconsistent and

21 inappropriate.

22         We agree with his concept.  That's why we struck

23 the infamous paragraph 49 and why we -- why we agreed that

24 there's just nothing in this order that primes him or just

25 affects one way or another whatever those rights are.  They

96

1  are what they are.

2        MR. KRELLER:  Your Honor, I disagree obviously

3  with Mr. Johnston and Mr. Logan.  In fact, the non-debtor

4  entities are being burdened by this financing.  They're

5  being burdened to the tune of 13 and a half million dollars

6  of guarantee obligations if you approve it as such, and I'm

7  both concerned having clients as a creditor of the non-

8  debtor entities having those kinds of obligations imposed

9  upon the S and H entities, and I'm also concerned that --

10 that your approval of this order in this fashion is going to

11 be asserted as this Court's tacit approval of the guarantees

12 and of the full liability of the S and H entities, and I

13 come to that through my -- through the record.  I come to

14 that through my examination of all the drafts of the orders.

15        So, again, your Honor, and I think -- I think

16 we've all argued this point from all sides, and I think we'd

17 simply ask you for a ruling.  But, again, my fundamental

18 point is this ultimately has the result of obligating non-

19 debtors for 13 and a half million dollars of DIP financing

20 that -- under which they're not receiving nearly that amount

21 of benefit.

22        THE COURT:  I guess on this one I'm leaning

23 heavily towards the Debtor among others.  I don't know.

24 Without looking at two alternative provisions, it's hard for

25 me to come down on your side on this one, Mr. Kreller.  And

97

1  it may be when I see some -- their final language and your

2  final language, I might --

3          MR. KRELLER:  Well, your Honor, I --

4          THE COURT:  -- have a different viewpoint.

5          MR. KRELLER:  Your Honor, I think their language

6  would be nothing.  I don't think there is any language, and

7  I think my language would be that the obligations of the S

8  and H entities under the guarantee to the DIP lenders is

9  limited to the actual amount of DIP financing funds consumed

10 by the S and H entities.

11         MR. LOGAN:  Actually, your Honor, our language

12 would be -- we'd probably say it, thanks to Mr. Kreller,

13 several times -- that nothing in the order appears -- which

14 is there's just nothing in this order that validates those

15 entities or does anything with them.  They're non-debtors

16 and just outside the --

17         THE COURT:  That sounds pretty strong to me, Mr.

18 Kreller.

19         MR. KRELLER:  Your Honor, perhaps if that's how

20 the order to date had read I could take some comfort in

21 that.  Maybe we'll get there.

22         THE COURT:  Okay.  Well, I'll look at the language

23 when you folks are ready to have me look at the language.

24         MR. LOGAN:  We'll make sure it says that, your

25 Honor.

98

1          THE COURT:  Okay.

2          MR. KRELLER:  Thank you, your Honor.

3          THE COURT:  All right.

4          MR. KLAUSNER:  Your Honor, with regard -- I was

5  going to point you to some language, but I just realized

6  it's not in the order in front of you.

7          THE COURT:  Okay.  I have the sense on the

8  marshaling plan that -- I guess I'm confused, but what I

9  read before the hearing suggested to me that if you take out

10  the word "marshaling" the solution that was crafted sounded

11  pretty good.  So I'm -- I think I'm inclined to say it's not

12  marshaling that's the problem.  It's -- it's what the

13  solution that you're seeking is, and that doesn't seem to be

14  a problem.  So if marshaling is a killer for lenders, it

15  seems to me that if we focus on the solution to the problem,

16  maybe we get around it.

17          MR. LOGAN:  Let me see if I can help orient your

18  Honor.  I think it's important to differentiate between the

19  SPA debt and the DIP debt.  With respect to the SPA debt, we

20  had a lot of discussion about marshaling or concepts like

21  marshaling, and at the end of the day, we --

22          THE COURT:  You did.  I didn't.

23          MR. LOGAN:  People did.  Very honorable people

24  did.  And at the end of the day, we are in sync with the

25  Committee that with respect to the SPA debt, we can fashion

99

1  some language because we're talking about non-recyclable

2  assets.  We're not talking about inventory or accounts

3  receivable where we get replacement liens.  We're talking

4  about avoidance powers, this -- I can never remember -- the

5  ATM Direct subsidiary which supposedly is a shell and

6  anything we don't know about.  That's all we're talking

7  about.

8          And we were able to fashion some language to deal

9  with that that basically says -- we're actually going to use

10  my language I spent so much time and I'm very proud of to

11  try to define what those things are, but they get put off

12  into escrow and nobody grabs them.

13          The issue is now on the DIP, purely on the DIP,

14  and the language that the parties were -- parties are

15  agreeable on just how that works with the exception of this

16  marshaling concept, and this gets back to the heart of the

17  issue for Mr. Shinderman to my clients, and it goes to the

18  issue concerning Mr. Bogdanoff's clients also.

19          If we are required to marshal or if that's even

20  preserved, basically when the Court has given with one hand

21  and taken away with the other hand on just the bundle of

22  collateral that the DIP lenders have -- we're only talking

23  about the DIP, only $13.5 million of the DIP -- and that's

24  why we think it important -- the Committee disagrees -- that

25  with respect to the DIP, DIP only, that the DIP lenders can

100

1   look to whatever assets are realized on the DIP, because

2   that's the collateral package they wanted, and they're not

3   going to be required to marshal.

4         I appreciate that he's saying that nothing in here

5   would say that we have to marshal, but from a DIP lender's

6   perspective -- and I can tell you this is -- I've never seen

7   a DIP loan that didn't have this in it, that when you look

8   to your collateral package, you want to make sure that all

9   the pieces of that collateral are available to repay the

10  debt, and if one of them gets sold first, it's realized on

11  first, you're not forced to let that chunk of collateral go

12  away and look to others, which is really what marshaling in

13  essence does.  So that's why it's important to us.  From

14  their perspective, they want to preserve the argument that

15  we ought to let that collateral go away and look to other

16  pieces of the collateral package.  But, again, it's purely

17  for the DIP, and that's why it's important to us that if

18  we're going to have a DIP package with a collateral base and

19  Mr. Bogdanoff lost on his argument, we don't want to -- as

20  enjoyable as the argument was, we don't want to have to

21  revisit it.  We want to be able to say that the DIP itself

22  can look to whatever the collateral is on the DIP, and if

23  one piece of it sold early, so be it.

24         MR. KLAUSNER:  Just so -- so you understand what

25  we're talking about, there's one sentence we're fighting

101

1  over, and basically it says the following.  In no event

2  shall any of the post-petition lenders be subject to the

3  equitable doctrine of marshaling or similar doctrine with

4  regard to the collateral or otherwise.

5          So what we're focused on is an express provision

6  that makes it impossible for us to request under any facts

7  and circumstances either marshaling or similar equitable

8  doctrine.

9          That language is unacceptable to us, and we don't

10 want it in the order.  If it's out of the order, it doesn't

11 mean there's marshaling.  It doesn't even mean we'll make a

12 motion to request it or some other remedy.  It simply means

13 that we're not precluded from coming into court based upon

14 some set of facts and circumstances that we think warrant

15 your consideration of the issue.

16          THE COURT:  So you're just asking for me to delete

17 one sentence?

18          MR. KLAUSNER:  The one I just read you, right.

19 It's not even a sentence.  It's actually part of a sentence.

20 I can live with the other part of the sentence.  It's just

21 that the phrasing "and in no event shall any of the post-

22 petition lenders be subject to the equitable doctrine of

23 marshaling or similar doctrine with regard to the collateral

24 or otherwise."  Yeah, I mean, we're fine taking that out.

25 We just don't want to be precluded.

102

1          So we would be -- so that's our suggestion, and

2   that's what we're asking.

3          THE COURT:  Okay.  And why -- if the lenders want

4   this, why shouldn't they --

5          MR. KLAUSNER:  Because there may be a situation

6   where there's some money available that the Debtor needs to

7   pay bills or to operate its business that it's desperate

8   for, and it may be that we could convince you -- let's

9   assume for the sake of argument that there's an avoidance

10  action that could be brought and there could be a settlement

11  relatively quickly and somebody's willing to pay the estate

12  $1,000,000, and it may well be that the budget that's been

13  previously negotiated is not quite sufficient for the

14  Debtor's operations.  Well, here's $1,000,000 of free and

15  clear money that might be available to pay some bills or to

16  pay some expenses which we don't have the right to demand

17  from the lenders.  They gave us a budget.  We're stuck with

18  it.

19         Well, the -- and the lenders are going to say,

20  hey, you got that $1,000,000.  That's terrific.  Turn it

21  over to me because we're owed -- we have our post-petition

22  debt, we have our loan outstanding.  We're entitled to be

23  paid.

24         Our position is hold it a second.  We've got a

25  sale teed up of the IP sub, and that sale is going to

103

1 produce $20,000,000.  You're going to get paid $20,000,000

2 next month.  However, in the meantime, we need this

3 $1,000,000.  So we'd like to ask the Court to let us use

4 this $1,000,000 and to make you wait until we get the IP sub

5 sold which is pending, and all of this is in my imagination,

6 but it's not out of the realm of possibility.  In fact, it

7 may well happen.

8          So all we're suggesting is let us come into court

9 and ask you for that relief.  You might say no, that

10 $1,000,000 preference recovery is going to be applied to

11 their DIP.  I'm going to let them do it.  I'm not going to

12 let them wait two weeks or three weeks or a month for you to

13 sell the IP sub.  We understand that, but we just want the

14 opportunity to be down here and ask you to make a decision.

15 That's all we're seeking.

16          THE COURT:  Okay.

17          MR. LOGAN:  I'll be short.  And just in the

18 hypothetical that Mr. Klausner gave, when the lenders agree

19 to advance the 13 and a half million dollars quid pro quo is

20 that if any of the collateral does generate money, they get

21 it.  Otherwise, the collateral, they didn't really get the

22 collateral.  And his hypothetical is an interesting one,

23 probably not real likely to happen, but if it did happen,

24 that would be great.  That would reduce the Debtor's

25 borrowing cost under the DIP.  It wouldn't reduce any

104

1  liquidity they have.  But they -- otherwise, the lender --

2  the DIP lenders -- remember, we're only talking about the

3  DIP lenders -- just don't have really the collateral that

4  supports the DIP facility because every time anything

5  generates cash, Mr. Klausner is going to reserve the right

6  to come in and say, "Your Honor, I generated cash and it's

7  part of their collateral, but I ought to -- you ought to

8  force them to hold off from getting that."  That just -- I

9  understand why he wants it, but it so undercuts the basic

10  collateral package for the DIP lenders.  That's why, while

11  it's a short phrase, it's a critically important phrase to

12  the DIP lenders.

13       MR. SHINDERMAN:  In addition, your Honor, there is

14  a DIP budget that governs the conduct of this business with

15  a very favorable and healthy variance in the aggregate, and

16  the whole idea was that we were going to lend the user cash

17  collateral consistent with the budget.  But if the Debtor is

18  needing even more money, he shouldn't be allowed to look to

19  our collateral to use more than that which we've already

20  agreed.

21       As we said at the very outset at the very first

22  hearing, there is a risk here.  It may be the case that the

23  existing collateral is not enough to support prepetition

24  debt, let alone the post-petition debt.  So to tie that up

25  and keep funneling it into the business undermines the very

105

1 protection we've negotiated for to take some risk.

2          THE COURT:  Lenders win.

3          MR. SHINDERMAN:  Sorry?

4          THE COURT:  Lenders win.

5          MR. JOHNSTON:  Your Honor, I do think we're now

6 down to the point -- thank you for the guidance and

7 direction on all of that.  We're now down to the point where

8 we can sit around the conference table, and hopefully

9 somebody with better handwriting than me can address some of

10 these points.

11          Before you leave the bench, however, I did want to

12 turn to a non-DIP related issue just regarding scheduling.

13 Because, your Honor, as your Honor is aware, we are

14 operating in compliance with the milestones and a critical

15 milestone is comiung up at the end of this month both with

16 respect to the non-core businesses and the core businesses,

17 what I would like to do is attempt to reserve some time on

18 your Honor's calendar both in the beginning of February and

19 near the end of February to set some hearings with respect

20 to asset sales and bidding procedures.

21          In particular, if your Honor has time available on

22 February 5th or February 6th, I would like to get a hearing

23 date or a hearing on sale procedures with respect to the

24 sales of one or more of the non-core businesses.  Local Rule

25 2081 provides for a hearing on bidding procedures with at

106

1 | least five days notice.  Pursuant to the milestones, we'd be
2 | filing a motion to approve bidding procedures and a sale by
3 | the 31st.  So the 5th or the 6th would give us the five or
4 | six days notice.
5 |         THE COURT:  The 6th would be best, and I would
6 | suggest -- there are a number of time slots I could give
7 | you, but 10:30 would be the easiest from my standpoint,
8 | unless you feel that this hearing is going to take an
9 | extensive amount of time.  If it was -- if it were to take a
10 | lot of time, I think I'd rather give you another time slot.
11 |         MR. JOHNSTON:  I'd rather err on the safe side I
12 | think and take a time slot that while, as I sit here today I
13 | don't know whether there will be controversies.  There have
14 | been controversies in this case, and I would like to carve
15 | out a sufficient amount of time.
16 |         THE COURT:  Okay.  2:00 o'clock.
17 |         MR. JOHNSTON:  Okay.  Thank you.
18 |         THE COURT:  February 6, 2:00 o'clock.
19 |         MR. JOHNSTON:  And then I'd like to reserve some
20 | time out near the end of February for several hearings with
21 | respect to the non-core businesses and potentially the core
22 | business for hearings to approve a sale, to ratify results
23 | of an auction, and I'd like to get a few different dates
24 | because there are a lot of different moving parts, and there
25 | are at least three ongoing sale processes with respect to

107

1 the different core business -- or non-core businesses.   Plus

2 there's a whole core business that's currently being

3 marketed, and they may all be -- it may make sense to all do

4 them on the same day.   It may make sense to do them on

5 different days.   Right now the processes are kind of

6 staggered and certain businesses are ahead of others.   So,

7 if possible, I'd like to get a hearing near the end of the

8 week of February 18th, preferably either the 21st or 22nd,

9 and then a hearing at the beginning of the next week,

10 preferably the 25th or 26th, and then a hearing on Friday,

11 the 29th.   I realize that's a lot of time on your Honor's

12 calendar.   We may not need all those hearing dates, but if

13 those dates are available, I'd like to reserve a little bit

14 of time.

15          THE COURT:   I need a one-minute break to go get

16 another calendar.

17          MR. JOHNSTON:   Okay.   Thank you.

18       (Proceedings recessed briefly.)

19          THE COURT:   The first time was the 21st or 22nd?

20          MR. JOHNSTON:   Correct.

21          THE COURT:   The 21st.   And shall we say 2:00

22 o'clock?   Well, we could say 11:00 o'clock or 2:00 o'clock.

23          MR. JOHNSTON:   I would prefer 2:00 o'clock I

24 think.

25          THE COURT:   2:00 o'clock.

108

1          MR. JOHNSTON:  Okay.

2          THE COURT:  2/21, 2:00 o'clock.  Okay.  What's the

3 next time?

4          MR. JOHNSTON:  Either Monday the 25th or Tuesday,

5 the 26th.

6          THE COURT:  And tell me again the subject of that

7 hearing.

8          MR. JOHNSTON:  Both the subject of that hearing

9 and the one on the 21st will be sale -- hearings to approve

10 the sale of one or more non-core businesses.  And if your

11 Honor's calendar is full those days, I realize I'm asking

12 for a tremendous amount of time here --

13          THE COURT:  No, that's okay.  I was going to make

14 another suggestion, but February 25 at 2:00 would be fine.

15          MR. JOHNSTON:  Thank you.  And then -- then the

16 last request would be a for a hearing on the last day of the

17 month, Leap Day, the 29th.  That would be for a hearing to

18 deal with the core business.  If worse comes to worse, that

19 will be an auction of the core business.

20          THE COURT:  That might be a lengthy hearing I

21 assume.

22          MR. JOHNSTON:  If it transpires, I suspect it

23 would be a very lengthy hearing.  I'm hopeful that it will

24 not transpire, but we need to start, you know, moving the

25 deck chairs to do what we can.

109

1          THE COURT:  Well, (a) I can -- I will accommodate
2   you.  I won't set anything else on that day, and we can set
3   it at 9:00.  We can set it at 10:00 or any other time that
4   is convenient for you folks.
5          MR. JOHNSTON:  9:00 a.m. would be fabulous.
6          THE COURT:  Okay.
7          MR. JOHNSTON:  Thank you very much for that.
8          THE COURT:  Sure.
9          MR. BOGDANOFF:  Your Honor, as I indicated
10  previously, we filed a motion to dismiss the IP sub case.
11  We self-calendared it for February 20th at 10:30.  We
12  received a call from your courtroom deputy indicating that
13  you wanted to discuss the calendaring of that motion, and so
14  that's why I'm here.
15         THE COURT:  What if we move that to February 21st
16  at 2:00?
17         MR. BOGDANOFF:  I'm sorry, your Honor?
18         THE COURT:  How about February 21st at 2:00?
19         MR. BOGDANOFF:  Perfect.
20         MR. JOHNSTON:  Okay.  That will conclude our
21  business.  I think we'll go back -- I hope it will conclude
22  our business.  We'll go back and write as quickly as we can.
23  I realize it's Friday now at 4:20 and I do not want to keep
24  your Honor here any minute longer than necessary.  So --
25         THE COURT:  Well, my only concern is when you --

110

1 when the white smoke is ready to emerge, if you could just

2 let me know.

3         MR. JOHNSTON: We will.

4         THE COURT: Give me a little advance warning so I

5 can phone home and make arrangements.

6         MR. JOHNSTON: Okay. Thank you, your Honor.

7         MR. BOGDANOFF: Your Honor, I'm not going to be

8 able to return back if we are back on the record. I think

9 the issues that my client has addressed have been dealt

10 with.

11         THE COURT: All right.

12         MR. BOGDANOFF: Not satisfactorily, but

13 certainly --

14         THE COURT: As best we could. Thank you, Mr.

15 Bogdanoff.

16         MR. BOGDANOFF: Well, I would take issue with

17 that, but they've been addressed.

18         THE COURT: Reasonable minds can differ.

19         ALL: Thank you, your Honor.

20         THE COURT: Okay. Thank you.

21     (Proceedings recessed briefly.)

22         THE COURT: Sure, we can do that.

23         MR. JOHNSTON: Okay. If I could trouble -- then

24 -- then what we will do is I'll have word processing staff

25 put this in -- put all the changes into a nice clean

*Briggs Reporting Company, Inc.*

111

1  document, circulate it to counsel, and then upload the order

2  on Monday so that there will be a clean copy that isn't all

3  interlineated.  But in the meantime, if we could get a copy

4  of this order signed so that there could be a funding on

5  Monday, we would appreciate that.

6          THE COURT:  Okay.  Well, there are three things

7  that go on.  (a) signing is number one.  (b) filing is

8  number two, and docketing is number three.  You need --

9          MR. JOHNSTON:  If that happens on Monday morning,

10 that's all fine.

11         THE COURT:  Okay.  So you just want to take away

12 the rough copy and clean it up over the weekend?

13         MR. JOHNSTON:  Yes.  I'd like to leave you with

14 the original, take away a copy.

15         THE COURT:  Yeah.

16         MR. JOHNSTON:  Clean it up over the weekend.  If

17 you could put in motion the entry of this order so that

18 that's not delayed by all the word processing, then we'll

19 submit a -- after this order is signed, we'll submit a

20 superseding copy.

21         MR. KLAUSNER:  Would it make sense to -- since

22 it's not going to be entered until Monday anyway, would it

23 make more sense to wait -- let the judge sign this one and

24 wait until we have the printed clean copy for them to use

25 that as an entered copy?

112

1    THE COURT:  Yeah, we can have it entered first

2  thing Monday morning or as soon as you get the clean copy

3  here on Monday.

4    MR. JOHNSTON:  That's fine.  I can get a clean

5  copy in your hands on Monday morning.

6    THE COURT:  It might look better on the record.

7    MR. JOHNSTON:  It would.  It would look better.

8    MR. KLAUSNER:  If we could just get a ruling from

9  you that you are granting this order, we can submit to you

10  the written version on -- or printed version on Monday.

11    THE COURT:  Yeah.

12    MR. LOGAN:  Your Honor, I think we can accommodate

13  that.  I guess what I would like is to have your Honor sign

14  this interlineated order just in case something untoward

15  happens and we have disagreements down the road, but I think

16  as far as actually entering it on the docket --

17    MR. KLAUSNER:  I don't know if we can take it with

18  us once the judge signs it.

19    MR. LOGAN:  A copy, a copy, Gary.

20    THE COURT:  We --

21    MR. KLAUSNER:  I just thought the record might be

22  a little bit muddled.  You're going to have to enter this

23  order, though, right, and then you'll enter a --

24    THE COURT:  Not necessarily.

25    MR. KLAUSNER:  -- superseding one?  Then you'll

113

1 just sign this one and --

2　　　　THE COURT:  What you need to know today is that I

3 have signed it and that we will replace it with a clean

4 order on Monday.

5　　　　MR. JOHNSTON:  Precisely.

6　　　　THE COURT:  But on Monday, rather than docket this

7 order, we'll docket the clean order.

8　　　　MR. JOHNSTON:  Perfect.

9　　　　THE COURT:  So --

10　　　　MR. KLAUSNER:  Okay.

11　　　　THE COURT:  I suppose I don't need to even read

12 this order.

13　　　　MR. JOHNSTON:  Well --

14　　　　THE COURT:  If I need to read it, it's going to

15 take a little while.  I mean, I've read several versions of

16 it.  So --

17　　　　MR. JOHNSTON:  We need to know I think by Monday

18 morning that this form of order is acceptable.  So --

19　　　　THE COURT:  Yeah.

20　　　　MR. JOHNSTON:  -- I think that's -- I don't --

21　　　　THE COURT:  Well, you can wait around right now or

22 you can call back on Monday morning.  That's up to you.

23　　　　MR. KLAUSNER:  I'd be happy to call back on Monday

24 morning.

25　　　　MR. LOGAN:  Your Honor, as your Honor said, you've

114

1  read all kinds of versions of this.  Mr. Johnston is right.

2  Counsel have signed off on it.  I'm not going to tell your

3  Honor what you have to do, but it seems to me that it should

4  be fairly straightforward to make sure the order gets

5  entered.  If there's any problem with it, please do let us

6  know because there will have to be funding on Monday, but I

7  can't fathom that.

8              THE COURT:  Yeah.

9              MR. JOHNSTON:  I agree.

10             THE COURT:  Yeah.

11             MR. KLAUSNER:  Fine with us.

12             MR. JOHNSTON:  If I may approach.

13             THE COURT:  Let me just say every once in a while

14 I sign an order that I shouldn't have signed, and -- but I

15 have the authority to vacate an order that I shouldn't have

16 signed.  So I can replace it with a better one.  But in this

17 situation I find it hard to imagine that I'm going to

18 disagree with what you guys have worked out this afternoon.

19             MR. JOHNSTON:  The revisions all reflect the

20 discussions on the record today.

21             THE COURT:  Yeah.

22             MR. JOHNSTON:  It's safe to say that.

23             THE COURT:  Today, last week.

24             MR. JOHNSTON:  Yes, right, in the briefs, in the

25 letters.

115

1              THE COURT:  Yeah.

2              MR. JOHNSTON:  So, if I may approach, I'll --

3              THE COURT:  Sure.

4              MR. JOHNSTON:  -- hand you this, and if I could

5    prevail upon chambers to get a photocopy, I'll take back the

6    photocopy and make a clean version and send it in on Monday

7    morning.

8              THE COURT:  If you want to hang around for a

9    minute --

10             MR. JOHNSTON:  I will.

11             THE COURT:  -- we will do that together.

12             MR. JOHNSTON:  Okay.  Thank you.

13             THE COURT:  The rest of you don't have to hang

14   around if you don't want to.  If you wish to, you can hang

15   around with us.

16             ALL:  Thank you, your Honor.

17             THE COURT:  Mr. Johnston, I have one other

18   problem.

19             MR. JOHNSTON:  Yes.

20             THE COURT:  But it's just -- I can talk to you

21   about this separately.

22             MR. JOHNSTON:  Okay.

23             THE COURT:  The rest of you don't have to stay.

24             ALL:  Thank you, your Honor.

25             THE COURT:  The first thing I'll do is take care

116

1 | of the order.

2 |        MR. JOHNSTON:   Thank you.

3 |     (Proceedings concluded.)

4 |

5 |        I certify that the foregoing is a correct

6 | transcript from the electronic sound recording of the

7 | proceedings in the above-entitled matter.

8 |

9 | _Holly Martins_____          _2/7/08_____

10 | Transcriber                    Date

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

EXHIBIT B

EXECUTION VERSION

ASSET SALE AND PURCHASE AGREEMENT

BETWEEN

SOLIDUS NETWORKS, INC.,

PAY BY TOUCH CHECKING RESOURCES, INC.,

INDIVOS CORPORATION,

CHECKELECT, INC.,

ATMD ACQUISITION CORP.

AND

SEVEN ACQUISITION SUB, LLC,

AS SELLERS,

AND

YT ACQUISITION CORPORATION

Dated as of March 28, 2008

669172.06

# TABLE OF CONTENTS

**Page**

1.   CONVEYANCE OF THE ACQUIRED ASSETS: ................................................ 2

    1.1   Acquired Assets Transaction ................................................................ 2

2.   NO ASSUMPTION OF LIABILITIES ........................................................... 5

3.   ACQUIRED ASSETS; PERSONNEL MATTERS; TRANSFERRED
EMPLOYEES .................................................................................................. 5

    3.1   Business Employees ............................................................................. 5

    3.2   Cooperation .......................................................................................... 6

    3.3   No Third Party Rights .......................................................................... 6

4.   PURCHASE PRICE: ...................................................................................... 6

    4.1   Purchase Price ...................................................................................... 6

    4.2   Allocation of Purchase Price ............................................................... 6

5.   REPRESENTATIONS AND WARRANTIES: ................................................ 7

    5.1   Representations and Warranties of Sellers .......................................... 7

    5.2   Representations and Warranties of Solidus .......................................... 9

    5.3   Representations and Warranties of Purchaser ...................................... 10

    5.4   Survival of Representations, Warranties and Covenants of Sellers and
Purchaser .............................................................................................. 11

6.   CONDITIONS TO CLOSING: ....................................................................... 11

    6.1   Conditions to Obligations of Sellers and Purchaser ........................... 11

    6.2   Conditions to Obligations of Purchaser .............................................. 11

    6.3   Conditions to Obligations of Sellers ................................................... 12

7.   CLOSING: ...................................................................................................... 12

    7.1   The Closing .......................................................................................... 12

    7.2   [Reserved] ............................................................................................ 12

    7.3   Sellers' Deliveries ............................................................................... 12

    7.4   Purchaser's Deliveries ......................................................................... 13

    7.5   Possession ............................................................................................ 13

8.   CERTAIN ADDITIONAL COVENANTS: ..................................................... 13

    8.1   Bankruptcy Actions: ............................................................................ 13

    8.2   Registrations, Filings and Consents; Further Actions ......................... 13

    8.3   Operation of the Business Pending Closing: ....................................... 14

# TABLE OF CONTENTS
(continued)

|  |  |  |
|---|---|---|
| 8.4 | Access to Records and Properties of Sellers | 14 |
| 8.5 | Post-Closing Covenants | 14 |
| 8.6 | Consumer User Data Covenants | 17 |
| 8.7 | Communications with Customers and Suppliers | 17 |
| 9. | TERMINATION: | 18 |
| 9.1 | Termination | 18 |
| 9.2 | Notice of Termination | 18 |
| 9.3 | Procedure and Effect of Termination | 18 |
| 10. | OTHER TAX MATTERS: | 19 |
| 10.1 | Tax Returns for Pre-Closing Period | 19 |
| 10.2 | Tax Returns for Post-Closing Period | 19 |
| 10.3 | Straddle Period | 19 |
| 10.4 | Cooperation | 19 |
| 10.5 | Tax Elections | 20 |
| 11. | MISCELLANEOUS: | 20 |
| 11.1 | Bulk Sales Laws | 20 |
| 11.2 | Notices | 20 |
| 11.3 | Assignment | 22 |
| 11.4 | Entire Agreement | 22 |
| 11.5 | Waiver | 22 |
| 11.6 | Severability | 22 |
| 11.7 | Amendment | 23 |
| 11.8 | Expenses | 23 |
| 11.9 | Third Parties | 23 |
| 11.10 | Headings | 23 |
| 11.11 | Counterparts | 23 |
| 11.12 | Governing Law | 23 |
| 11.13 | Public Announcements | 23 |
| 11.14 | Sales or Transfer Taxes | 23 |
| 11.15 | Venue and Retention of Jurisdiction | 23 |

669172.06

**TABLE OF CONTENTS**
(continued)

**Page**

11.16  Risk of Loss ........................................................................................... 23

11.17  Dispute Resolution ................................................................................ 24

11.18  No Right of Setoff .................................................................................. 24

11.19  Limitation on Damages .......................................................................... 24

11.20  Sellers' Obligations ............................................................................... 24

669172.06

ASSET SALE AND PURCHASE AGREEMENT

THIS ASSET SALE AND PURCHASE AGREEMENT (this "*Agreement*") dated as of March 28, 2008, is entered into by and among YT Acquisition Corporation, a Delaware corporation (the "*Purchaser*"), SOLIDUS NETWORKS, INC., a Delaware corporation, dba Pay By Touch, afka Pay by Touch Solutions ("*Solidus*"), PAY BY TOUCH CHECKING RESOURCES, INC., a Delaware corporation ("*PBTCR*"), INDIVOS CORPORATION, a Delaware corporation ("*Indivos*"), CHECKELECT, INC., a Wisconsin corporation ("*CheckElect*"), ATMD ACQUISITION CORP., a Delaware corporation ("*ATMD*"), and SEVEN ACQUISITION SUB, LLC, a Delaware limited liability company ("*Seven*" and together with Solidus, PBTCR, Indivos, CheckElect and ATMD, collectively the "*Sellers*" and each a "*Seller*"). Certain capitalized terms in this Agreement are defined on Schedule A.

RECITALS

A.      On October 31, 2007, an involuntary chapter 11 bankruptcy petition was commenced against Solidus in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, (the "*Bankruptcy Court*") case number 07-20027-TD (the "*Solidus Bankruptcy Case*"). On December 14, 2007, Solidus consented to the entry of an order for relief. Solidus is the owner of PBTCR, Indivos, CheckElect, ATMD and Seven.

B.      On December 14, 2007, PBTCR, Indivos, CheckElect, ATMD and Seven each filed voluntary petitions (together with the Solidus Bankruptcy Case, the "*Bankruptcy Case(s)*") for relief under Chapter 11 of Title 11, U.S.C. §§101 *et seq.* (as amended) (the "*Bankruptcy Code*"), in the Bankruptcy Court, case numbers 07-21773, 07-21772, 07-21768, 07-21783 and 07-21777, respectively. Pursuant to the Bankruptcy Court's December 17, 2007 Order Directing Joint Administration of Debtors' Cases and Estates Pursuant to Bankruptcy Rule 1015(b), the Bankruptcy Cases are jointly administered with, but not substantively consolidated with, the Solidus bankruptcy case.

C.      On February 13, 2008, the Bankruptcy Court entered an order (I) approving bidding procedures for the sale of the Acquired Assets, (II) approving the form and manner of notice, (III) scheduling auction and sale hearing, and (IV) approving procedures for determining Cure Amounts (the "*Bidding Procedures Order*").

D.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 of the Bankruptcy Code, Sellers desire to sell to Purchaser assets, property and interests, and Purchaser desires to make such purchase, subject to the conditions set forth in this Agreement.

E.      The Creditors' Committee has withdrawn any objection to the transactions contemplated by this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be

1

669172.06

legally bound hereby, the Parties agree:

1.   **CONVEYANCE OF THE ACQUIRED ASSETS:**

**1.1   Acquired Assets Transaction.** Upon the terms and subject to the conditions set forth in this Agreement, at Closing Sellers shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from Sellers, free and clear of all Liens except for Permitted Liens, all of the assets and properties described in Section 1.1.1 below (collectively, the "*Acquired Assets*"), other than the Excluded Assets (defined in Section 1.1.2).

**1.1.1   Acquired Assets.** The Acquired Assets consist of all of each Seller's rights, title and interest, as of the Closing Date, in and to all of each Seller's assets, property and interests, wherever located (other than Excluded Assets), including: all Personal Property, Real Property, permits, Inventory, Administrative Assets, Owned Intellectual Property and Licensed Intellectual Property (including Trademark Rights in all Product names), all goodwill of the Sellers relating to the Business, all third party rights of any of the Sellers, all of each Seller's rights in the assets identified on **Schedule 1.1.1**, and the following:

**A.   Cash and Cash Equivalents.** All cash, including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date, commercial paper, certificates of deposit and other bank deposits, register cash, petty cash, cash equivalents, and any security or similar deposits made by or on behalf of any Seller with landlords or other contracting parties under the Contracts, in each case to the extent transferable and not subject to prior existing security deposits, letters of credit or other similar existing security interests of third parties.

**B.   Causes of Action.** Any known or unknown rights, demands, claims, credits, allowances, rebates, causes of action or rights of set-off (other than against the Sellers) that any Seller may have against any third party, including in relation to or in connection with any Taxes (collectively, "*Third Party Claims*"); provided, however, that the Third Party Claims shall exclude (1) Excluded Third-Party Claims (as defined in Section 1.1.2.I), and (2) Preference Or Avoidance Claims (as defined in Section 1.1.2.E).

**C.   Receivables.** Accounts Receivable, payment intangibles and all causes of action relating or pertaining to the foregoing.

**D.   Insurance.** Except as set forth in Section 1.1.2.C, any rights and benefits under insurance policies of the Sellers, including any rights under any director & officer insurance policies.

**E.   Improvements.** Any improvements (collectively, the "*Improvements*") located on the Real Property, to the extent of any Sellers' ownership interest in such Improvements.

**F.   Tax Refunds.** Any claim, right or interest of any Seller in or any refund, rebate, abatement or other recovery or credits for all Taxes of any kind, together with any interest due thereon or penalty rebate arising therefrom.

2

**G.    S&H Marketing.**  All of the outstanding capital stock of S&H Marketing, Inc., a Delaware corporation ("*S&H Marketing*").

**H.    Loyalty Acquisition Sub.**  All of the outstanding membership interests of Loyalty Acquisition Sub, LLC, a Delaware limited liability company ("*Loyalty*").

**I.    PBT Singapore.**  All of the outstanding capital stock of Pay By Touch Singapore PTE. Ltd. ("*PBT Singapore*") and, to the extent transferable under applicable Laws, the Singapore User Data.

**J.    Personnel and Medical Records.**  So far as legally permissible under applicable data protection, medical confidentiality or other applicable Laws (including with a Transferred Employee's written consent), Purchaser will be provided originals or copies of all work and payroll histories, personnel and medical records of each Transferred Employee.

**1.1.2    Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets shall not include the following, (collectively, the "*Excluded Assets*"):

**A.    Bailed Assets.**  Any machinery, equipment, tools and Inventory owned by any other third party listed in SCHEDULE 1.1.2.A ("*Third Party Bailed Assets*").

**B.    Personnel and Medical Records.**  All work and payroll histories, personnel and medical records of employees and former employees of Sellers for whom a record exists in Sellers' possession at the time of Closing, except to the extent specifically assumed in Section 1.1.1.J with respect to a Transferred Employee.

**C.    Insurance Proceeds.**  Insurance proceeds, claims and causes of action with respect to or arising in connection with (i) any Contract which is not assigned to the Purchaser at the Closing, (ii) any item of tangible or intangible property not acquired by Purchaser or (iii) any Excluded Third-Party Claims.

**D.    Privileged Information and Materials.**  Information and materials protected by the attorney-client privilege and for which there is no reasonable means to provide such information or materials that preserves such privilege; provided that no such excluded information and materials is material to the Business, and provided that such materials are listed with reasonable specificity to permit confirmation of the existence of privilege on SCHEDULE 1.1.2.D hereto.

**E.    Certain Rights.**  All of the rights and claims of Sellers available to Sellers under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing (the "*Preference Or Avoidance Claims*"); provided, however, that Preference Or Avoidance Claims shall not include any affirmative causes of action that any Seller may have against any Continuing Employees; and provided further, however, that notwithstanding the foregoing the Sellers shall retain all rights (including all rights under section 502(d) of the Bankruptcy Code) to assert

Preference Or Avoidance Claims as counterclaims, affirmative defenses or rights of set-off against claims made by any Continuing Employee against the Sellers' bankruptcy estates.

      **F.**    **Books and Records**. Each Seller's corporate minute books, stock transfer books, corporate seal of each Seller and any other books and records relating to their organization and existence or exclusively to the Excluded Assets.

      **G.**    **U.S. Consumer Privacy Data.**  All User Data used in or relating to the Solidus Business (but not the Loyalty Business or the S&H Business), other than the Singapore User Data.

      **H.**    **Excluded Securities.**  All shares of capital stock or membership interests, as the case may be, of (I) each of the Sellers, (II) Pay By Touch Payment Solutions, LLC ("***PBTPS***") and (III) Pay By Touch Processing, Inc. ("***PBTP***").

      **I.**    **Excluded Third-Party Claims.** Any known or unknown rights, demands, claims, credits, allowances, rebates, causes of action or rights of set-off that any Seller may have against any current or former director, officer, professional or Affiliate of any Seller (collectively, "***Excluded Third-Party Claims***"); provided, however, that the Excluded Third-Party Claims shall not include any such known or unknown rights, demands, claims, credits, allowances, rebates, causes of action or rights of set-off that any Seller may have against any Continuing Employees (except to the extent, but solely to the extent, arising from actions taken or omitted by Continuing Employees in their capacity as a past or present officer or director of any of the Sellers), other than counterclaims, affirmative defenses or rights of set-off against claims made by any Continuing Employee against the Sellers' bankruptcy estates.

      **J.**    **Other Excluded Assets.**  All assets sold pursuant to the Non-Core Asset Sale Orders.

      **K.**    **Cogent.**  (i) That certain Supply Agreement dated May 6, 2005 between Cogent Systems, Inc. ("***Cogent***") and Solidus (the "***Cogent Supply Agreement***") and Solidus's rights thereunder, and (ii) all Cogent Information.

      **1.1.3**  **Post-Closing Asset Deliveries.**  Should Sellers or Purchaser, in their reasonable discretion, determine that books, records, proceeds or other Acquired Assets are still in the possession of any Seller after the Closing, Sellers shall promptly deliver them to Purchaser at no cost to Purchaser. Should Sellers or Purchaser, in their reasonable discretion, determine after the Closing that books, records, proceeds or other Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to Sellers at no cost to Sellers other than reimbursing Purchaser's reasonable out-of-pocket costs.

      **1.1.4**  **Pro-rations.**  Rent, utilities and other items of expense and income relating to or attributable to the Acquired Assets shall be prorated between Sellers and Purchaser as of the Closing Date. All such obligations due in respect of periods prior to the Closing Date shall be paid in full or otherwise satisfied by Sellers, and all obligations due in respect of periods on and after the Closing Date shall be paid in full or otherwise satisfied by Purchaser. Rent shall be prorated on the basis of a thirty (30) day month. After the Closing Date, Purchaser and Sellers shall cooperate in calculating any of the pro-rations under this Section 1.1.4.

4

**A. Further Assurance.** The parties will use commercially reasonable efforts to determine the amounts of the above pro-rations and settle such amounts at Closing. To the extent that, within 120 days after Closing, Sellers, on the one hand, or Purchaser, on the other hand, receive any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, Sellers or Purchaser shall, as soon as practicable but no later than 90 days after Closing, send any such bill or invoice to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, Purchaser may pay all amounts shown to be due thereon, and may invoice Sellers for all amounts owed by Sellers thereunder, and in such case Sellers shall reimburse such amounts.

Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within 45 days after the end of the month in which a bill or invoice is sent to a Party (or Affiliate thereof); *provided, however*, that the disputed portion of any such item shall be paid within 45 days after the final determination thereof on an item-by-item basis. When Purchaser makes a payment to a third party which is required to be reimbursed to Purchaser by Sellers, the reimbursement payment shall be considered the repayment of an advance.

**1.1.5 Instruments of Transfer.** The sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Purchaser provided herein by Purchaser shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in Section 7.2 and Section 7.3.5 below and such other instruments as may reasonably be requested by Purchaser or Sellers. None of the foregoing documents shall increase in any material way the obligations imposed by this Agreement upon Sellers or Purchaser.

**2.     NO ASSUMPTION OF LIABILITIES.** Notwithstanding anything to the contrary in this Agreement or any of the transactions contemplated thereby, at and as of the Closing, Purchaser shall not assume, agree to pay, perform or discharge when due, or be liable with respect to, any debt, obligation, duty, liability or responsibility of the Sellers of any nature or kind whatsoever, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability.

**3.     ACQUIRED ASSETS; PERSONNEL MATTERS; TRANSFERRED EMPLOYEES.**

**3.1     Business Employees.** Each employee and consultant of Sellers who performs services for the Business is referred to herein as a "***Business Employee***". Sellers have delivered or made available to Purchaser true and correct copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials relating to Transferred Employees, including all Company Employee Plans.

**3.1.1** Sellers recognize that Purchaser intends to make offers of employment to certain Business Employees of Sellers, on terms and conditions of employment that may be different from those provided by Sellers, and that it is uncertain how many Business Employees that Purchaser will extend such offers of employment and how many Business Employees will accept employment with Purchaser. Set forth on Schedule 3.1.1 is a list of each Business Employee that Purchaser may consider (in its sole discretion) offering employment after the Closing. Each such Business Employee who (a) is listed on Schedule 3.1.1 and (b) accepts Purchaser's offer of employment, if any such offer is made, and commences employment with

669172.06

the Purchaser as of the Closing shall be referred to herein as a "***Transferred Employee***". Purchaser's offer of employment described in Section 3.1.1 will not include any obligation by Purchaser to pay, reward or otherwise compensate any Transferred Employee for any back pay, wages, salary, accrued vacation, paid time off, commission or bonus that was earned or accrued on or prior to the Closing Date. Notwithstanding anything herein to the contrary, the decision whether to offer employment to any Business Employee, if at all, and the terms and conditions of such offers of employment, if any, shall be determined by Purchaser in its sole discretion and in accordance with applicable law.

       **3.1.2**    Nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms and conditions of employment of the Transferred Employees after the Closing.

       **3.1.3**    Sellers shall provide Purchaser access to employee personnel files to the extent required pursuant to Section 1.1.1.J.

    **3.2**    **Cooperation.**    Sellers and Purchaser will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their respective obligations under this Article 3.

    **3.3**    **No Third Party Rights.**    No provision of this Agreement confers rights or remedies upon any person, including Transferred Employees, other than the Parties.

**4.**    **PURCHASE PRICE:**

    **4.1**    **Purchase Price.**    Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall consist of: (i) cash in the amount of $4,400,000 (the "***Cash Consideration***"), which Cash Consideration will constitute full satisfaction of the Carve-Out, and (ii) a credit bid of $50,000,000 of the secured debt issued pursuant to the DIP Agreement and SPA pursuant to Section 363(k) of the Bankruptcy Code (the "***Credit Bid***"). The final aggregate purchase price, as so determined, is referred to herein as the "***Purchase Price***".

       **4.1.1**    **Delivery of Purchase Price.**    At the Closing, Purchaser shall pay to Sellers, an aggregate amount equal to the Cash Consideration (apportioned pursuant to the allocation referred to in Section 4.2), by wire transfer in immediately available funds to an account specified by Sellers.

    **4.2**    **Allocation of Purchase Price.**    $1,000,000 of the Purchase Price paid in the form of a credit bid of secured debt owed under the DIP Agreement shall be allocated to the assets of Pay By Touch Checking Resources, Inc. Otherwise, the Purchaser shall determine the allocation of the Purchase Price among the assets of the Business and the agreements provided herein for transfer of the Business to Purchaser, for all purposes (including financial, accounting and tax) (the "***Allocation***"). Purchaser and Sellers shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent

6

with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law. Sellers shall provide Purchaser and Purchaser shall provide Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

5.    REPRESENTATIONS AND WARRANTIES:

5.1    **Representations and Warranties of Sellers.** All information set forth in the Disclosure Schedules with respect to any clause of this Section 5.1 shall be deemed disclosed under and incorporated into any other clause of this Section 5.1 as to which it is reasonably apparent that such disclosure relates based solely on the language in such disclosure and such other clause. Sellers jointly and severally represent and warrant to Purchaser as follows:

5.1.1    **[Reserved].**

5.1.2    **Corporate Power; Due Authorization.** Each Seller has the corporate or limited liability company power and authority to execute and deliver this Agreement, subject to Bankruptcy Court approval, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement by each Seller and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of such Seller. Subject to the entry and effectiveness of the Sale Approval Order and this Agreement have been duly and validly executed and delivered by or on behalf of each Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser) each such agreement constitutes a legal, valid and binding agreement of such Seller, enforceable against each Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

5.1.3    **[Reserved].**

5.1.4    **[Reserved].**

5.1.5    **Title to Personal Property.** Upon entry by the Bankruptcy Court of the Sale Approval Order, Sellers shall transfer the Acquired Assets free and clear of any Lien, except as otherwise expressly indicated on SCHEDULE 5.1.5.A.

5.1.6    **Intellectual Property Assets:**

A.    SCHEDULE 5.1.6.A sets forth a true and complete list of (1) all Owned Intellectual Property included in the Acquired Assets for which any application has been filed with, or any registration, patent, certificate, or other similar authorization, approval or documentation has been issued by, any Governmental Entity, and (2) all material Licensed Intellectual Property included in the Acquired Assets. To Sellers' Knowledge there are no material impediments to the ability of any Seller under applicable Laws to maintain in effect or

7

renew its rights in and to the Owned Intellectual Property included in the Acquired Assets. To Sellers' Knowledge there are no material impediments to the ability of any Seller under applicable Law to grant to Purchaser, by license or assignment, the rights to the Licensed Intellectual Property included in the Acquired Assets as contemplated in this Agreement.

**B.**    To Sellers' Knowledge, Sellers are conducting the Business and using the Acquired Assets in a manner that does not violate the intellectual property right of another Person and no Claim has been made or threatened by any third party against any Seller for Intellectual Property infringement or misappropriation, and no Seller has made or threatened any Claim against any third party for Intellectual Property infringement or misappropriation, except as set forth in SCHEDULE 5.1.6.B.

**C.**    Sellers have not granted any license, sublicense or other permission to use the Owned Intellectual Property included in the Acquired Assets to any third party, except as set forth on SCHEDULE 5.1.6.C.

**D.**    Except as set forth on SCHEDULE 5.1.6.D: (1) all Owned Intellectual Property included in the Acquired Assets is owned solely and exclusively by Sellers, and all Licensed Intellectual Property is used by Sellers pursuant to valid, subsisting license agreements; and (2) upon entry by the Bankruptcy Court of the Sale Approval Order, Sellers shall transfer the Owned Intellectual Property included in the Acquired Assets free and clear of any encumbrances thereon and shall transfer all of Sellers' rights to the Licensed Intellectual Property included in the Acquired Assets.

**5.1.7   Insurance.** SCHEDULE 5.1.7 contains a complete and correct list, in all material respects, of all material policies of insurance included in the Acquired Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder. All such policies are outstanding and in full force and effect and the Sellers have timely paid all premiums related thereto.

**5.1.8   Compliance with Permits.** All Permits that are necessary or appropriate for the conduct of the Business as Currently Conducted, and for the ownership and operation of the Acquired Assets have been duly obtained, are in full force and effect, and there are no proceedings pending that may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit, except in each case as would not have, individually or in the aggregate, or reasonably be expected to result in a Material Adverse Effect. The Sellers are in compliance with all Permits in all material respects. The execution, delivery and performance of, and compliance with, this Agreement by Sellers will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.9   Brokers.**    Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

**5.1.10 No Violations.**    Neither the execution, delivery or performance of this Agreement by Sellers, nor the consummation by Sellers of the Sale, nor compliance by Sellers

8

with any of the provisions hereof, will, with or without the passage of time or the giving of notice: (a) result in any breach of any provisions of the articles of incorporation, bylaws, certificate of formation operating agreement or similar document of any Seller; (b) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which any Seller is a party or by which its properties or assets may be bound or affected; (c) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to any Seller or to any of its properties or assets; or (d) result in the creation or imposition of any Lien other than Permitted Liens on any asset of Sellers, except in the case of clauses (b), (c) and (d) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that: (1) would not individually or in the aggregate have or reasonably be expected to result in a Material Adverse Effect; or (2) are excused by or unenforceable as a result of the filing of the Bankruptcy Case or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.11 [Reserved]**.

**5.1.12 Absence of Other Representations or Warranties.** Except for the representations and warranties expressly set forth in Section 5.1 or 5.2 of this Agreement, Sellers make no representations or warranties, express or implied, with respect to the Acquired Assets, the sale of the Acquired Assets, and in particular but without limitation, Sellers make no representations with respect to any plan(s) of Purchaser for the future conduct of the Business. For the avoidance of doubt, no warranty or representation is given with respect to the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement, or on any projected volumes of the Business, all which were produced only for information purposes; except that with respect to any projections provided by Sellers to Purchaser or to Jefferies for inclusion in the Jefferies offering materials, Sellers created such projections in good faith and based on assumptions that Sellers believed to be reasonable at the time they were created.

**5.2    Representations and Warranties of Solidus.**

**5.2.1 S&H Marketing Stock.** Solidus represents and warrants to the Purchaser that all outstanding shares of S&H Marketing capital stock are owned by Solidus and included in the Acquired Assets. No Person has any option, warrant or other right to purchase from S&H Marketing, or require S&H Marketing to issue, any additional shares or any other rights to acquire S&H Marketing capital stock.

**5.2.2 Loyalty Membership Interest Sale.** Solidus represents and warrants to the Purchaser that all outstanding units of membership interests in Loyalty are owned by Solidus and included in the Acquired Assets. No Person has any option, warrant or other right to purchase from Loyalty, or require Loyalty to issue, any additional membership interests or any other rights to acquire Loyalty membership interests.

669172.06

**5.2.3   PBT Singapore Stock Sale.**   Solidus represents and warrants to the Purchaser that all outstanding shares of PBT Singapore capital stock are owned by Solidus and included in the Acquired Assets.   No Person has any option, warrant or other right to purchase from PBT Singapore, or require PBT Singapore to issue, any additional membership interests or any other rights to acquire Loyalty membership interests.

**5.3   Representations and Warranties of Purchaser.**   Purchaser warrants and represents to Sellers as follows:

**5.3.1   Corporate Data.**   Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to own, lease and operate its properties and assets.

**5.3.2   Corporate Power; Due Authorization.**   Purchaser has the corporate power and authority to execute and deliver this Agreement to perform its obligations hereunder and to consummate the transactions contemplated herein.   The execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Purchaser.   This Agreement is, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of Sellers), valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.3.3   No Violations.**   Neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated herein, nor compliance by Purchaser with any of the provisions hereof, will: (a) require Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person, except for consents, approvals, actions, filings or notices, the lack of which would not have or reasonably be expected to result in a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement; (b) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Purchaser's properties or assets, which would have or reasonably be expected to result in a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

**5.3.4   Brokers.**   Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

**5.3.5   Solvency.**   Upon the consummation of the transactions contemplated by this Agreement, immediately following closing, Purchaser will have or will have access to sufficient capital to operate the Business in accordance with the Purchaser's intended plans (it being understood that Purchaser will have no obligation to continue all or any portion of the Business as a going concern).

669172.06

**5.3.6  Availability of Funds.**  Purchaser will have available, as of the Closing Date, sufficient cash in immediately available funds to pay the Cash Consideration.

**5.3.7  Compliance with Law.**  Except with respect to those violations that would not reasonably be expected to result in the issuance of an Order materially restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement, Purchaser is in material compliance with all Laws applicable to it.

**5.4  Survival of Representations, Warranties and Covenants of Sellers and Purchaser.**  The representations and warranties made by Sellers and Purchaser in this Agreement or any other document delivered to Purchaser hereunder or thereunder shall survive the execution and delivery of this Agreement and through the Closing, but shall not survive, and shall terminate at, the Closing.  The covenants made by Sellers and Purchaser in this Agreement shall survive the Closing.

**6.    CONDITIONS TO CLOSING:**

**6.1  Conditions to Obligations of Sellers and Purchaser.**  The respective obligations of each Party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1  No Law, Judgments, etc.**  No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect.

**6.1.2  Sale Approval Order**.  The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed as of the Closing Date.

**6.2  Conditions to Obligations of Purchaser.**  The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

**6.2.1  Accuracy of Representations and Warranties.**  Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Sellers contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except for inaccuracies that, in the aggregate, have not had and would not reasonably be expected to result in, a Material Adverse Effect.

**6.2.2  Performance of Covenants.**  All covenants and obligations contemplated hereby to be performed by Sellers on or before the Closing shall have been performed in all respects.

11

**6.2.3   Payment from Non-Core Asset Sales.** The lenders under the DIP Agreement shall have received any proceeds from the sale of assets to which they are entitled pursuant to the Non-Core Asset Sale Orders.

**6.3   Conditions to Obligations of Sellers.**  Except as otherwise permitted by this Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**6.3.1   Accuracy of Representations and Warranties.**  The representations and warranties of Purchaser contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), other than any inaccuracies that do not, in the aggregate, have a material adverse effect on Purchaser.

**6.3.2   Performance of Covenants.**  All covenants and obligations contemplated hereby to be performed by Purchaser on or before the Closing shall have been performed in all material respects.

**6.3.3   Delivery of Cash Consideration.**  Purchaser shall have delivered to Sellers the Cash Consideration by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Sellers to Purchaser on the Closing Date..

**7.   CLOSING:**

**7.1   The Closing.**  Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "*Closing*") of the transactions contemplated hereby shall take place at the offices of Cooley Godward Kronish LLP, 101 California Street, Fifth Floor, San Francisco, California at 10:00 a.m. on the seventh Business Day or such shorter period as the Purchaser may determine in its sole discretion, after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.

**7.2   [Reserved]**

**7.3   Sellers' Deliveries.**  At the Closing, Sellers shall deliver to Purchaser the following, in proper form for recording where appropriate:

**7.3.1**   An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Sections 6.2.1 and 6.2.2 have been fulfilled.

**7.3.2**   Certified copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement, including the Sale Approval Order.

**7.3.3**   Duly executed bill of sale transferring the Acquired Assets to Purchaser, substantially in the form attached hereto as **SCHEDULE 7.3.3**.

669172.06

**7.3.4**    All stock certificates evidencing all of the outstanding shares of capital stock of S&H Marketing, S&H Subsidiary and PBT Singapore, duly endorsed for transfer or accompanied by a duly executed stock power or other appropriate instrument of assignment and transfer in a form reasonably satisfactory to Purchaser.

**7.3.5**    An assignment and assumption agreement, in a form reasonably satisfactory to the Purchaser, evidencing the sale, transfer and conveyance all of the outstanding membership interests in Loyalty.

**7.3.6**    The written resignation, effective as of the Closing, of each director and manager, as the case may be, of S&H Marketing, S&H Subsidiary, Loyalty and PBT Singapore in a form reasonably satisfactory to Purchaser.

**7.3.7**    Appropriate receipts.

**7.4**    **Purchaser's Deliveries.**    At the Closing, Purchaser shall deliver to Sellers, in proper form for recording where appropriate:

**7.4.1**    The Cash Consideration, pursuant to and in accordance with, Section 4.1.1.

**7.4.2**    An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Sections 6.3.1 and 6.3.2 have been fulfilled.

**7.5**    **Possession**.    Right to possession of the Acquired Assets shall transfer to Purchaser on the Closing Date.   Sellers shall transfer and deliver to Purchaser on the Closing Date or as promptly as practicable thereafter, such keys, passwords, combinations, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full occupation and control of the Acquired Assets, and shall also make available to Purchaser at Sellers' then existing locations all documents in Sellers' possession that are required to be transferred to Purchaser by this Agreement.

**8.**    **CERTAIN ADDITIONAL COVENANTS:**

**8.1**    **Bankruptcy Actions:**

**8.1.1**    Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

**8.1.2**    This Agreement is subject to approval by the Bankruptcy Court.

**8.2**    **Registrations, Filings and Consents; Further Actions.**    Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially

13

reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable including, using their commercially reasonable efforts to cause the satisfaction of all conditions to Closing. In furtherance of the foregoing, to the extent that any of the assets of the Business (other than Excluded Assets) are owned by any direct or indirect subsidiary of Solidus that is not party to this Agreement, Solidus shall use its reasonable best efforts cause such subsidiary to transfer such assets to the Purchaser pursuant to the terms of this Agreement.

**8.3    Operation of the Business Pending Closing:**

**8.3.1**    Sellers shall promptly notify Purchaser if any Seller becomes aware of the occurrence of any event or circumstance that would reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2, 6.2.1, 6.2.2 or 6.2.3 hereof not to be satisfied including any event or circumstance that, upon the occurrence of such event or circumstance, causes or would reasonably be expected to cause any representation or warranty of Sellers to be untrue in any material respect at the time of the occurrence of such event or condition.

**8.3.2**    Purchaser shall promptly notify Sellers if Purchaser becomes aware of the occurrence of any event or circumstance that would reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.3.1 hereof to be satisfied including any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Purchaser to be untrue in any material respect at the time of the occurrence of such event or condition.

**8.4    Access to Records and Properties of Sellers**.   From and after the date of this Agreement until the Closing Date, Sellers shall, upon reasonable advance notice, afford to Purchaser, Lenders and each of their respective debt and equity financing sources, and each of their respective officers, independent public accountants, counsel, lenders, consultants and other representatives who shall be bound as "Representatives" under the confidentiality agreements heretofore signed by Purchaser, reasonable access during normal business hours to the Acquired Assets and all records pertaining to the Acquired Assets or the Business.

**8.5    Post-Closing Covenants.**   From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

**8.5.1   Books and Records and Litigation Assistance From and After Closing:**

**A.**    Purchaser, for itself and on behalf of its Affiliates, agrees to use commercially reasonable efforts to preserve and keep books, records, computer files, software programs and any data processing files delivered to Purchaser by Sellers and their Affiliates pursuant to the provisions of this Agreement for a period of not less than two years from the Closing Date, or for any longer period as may be required of the Business by any applicable Law at Purchaser's sole cost and expense. During such period, Purchaser shall: (1) provide Sellers with reasonable access to such documents and information as necessary, consistent with past practice, to complete the accounting books and records of the Business as of December 31, 2008;

14

and (2) provide Sellers reasonable access to such books and records as may be reasonably required by Sellers in connection with (a) the Bankruptcy Case, (b) the Excluded Third Party Claims, (c) the Preference Or Avoidance Claims, (d) any legal proceedings against or governmental investigations of Sellers and their Affiliates or (e) any Tax examination, audit or appeal of Taxes of Sellers and their Affiliates, the Business or the Acquired Assets during such period. Sellers shall promptly reimburse Purchaser for the reasonable out-of-pocket expenses incurred in connection with any request by Sellers to make available records pursuant to the foregoing sentence. In the event Purchaser wishes to destroy or dispose of such books and records after one year from the Closing Date, it shall first give not less than 30 days' prior written notice to Sellers, and Sellers shall have the right, at their option, upon prior written notice given to Purchaser within 20 days of receipt of Purchaser's notice, to take possession of said records within 30 days after the date of Purchaser's notice to Sellers hereunder, all at the Sellers' expense.  Notwithstanding the foregoing, the Purchaser need not supply the Sellers with any information pursuant to this Section 8.5.1.A which Purchaser is under a legal obligation not to supply or take any action which would constitute a waiver of attorney-client, attorney work product or other privilege.

      **B.**     Purchaser, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by applicable Law for the periods for a period of not less than two (2) years from the Closing Date; (ii) make available documents and records delivered to it by Sellers reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if, after taking reasonable precautions, making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Sellers of the existence of such privileged documents); and (b) Sellers will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); and (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods during regular business hours so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim.

      **C.**     As long as each Seller remains in existence, each Seller, as applicable will, and will cause its Affiliates to, provide Purchaser and its representatives access to any books, documents and records (including tax returns, files, papers and related items) retained by Sellers and relating to the legitimate business and tax compliance needs of the Purchaser or any of its Affiliates for any period. Upon Purchaser's request, and at Purchaser's expense, Sellers shall provide Purchaser with copies of Sellers' corporate minute books, stock transfer books, and any other books and records relating to its organization and existence, other than books and records related to the Bankruptcy Case, the Excluded Assets or materials that are subject to the attorney-client, attorney work product or other privilege.

      **8.5.2  Payment and Collections.**  Sellers shall take such action as may be reasonably necessary to segregate payments made or collections or proceeds received on behalf of Purchaser or to which the Purchaser is entitled after Closing (including any collections or proceeds received in connection with the matters set forth in clauses (a) through (e) of Section

8.5.5), and Purchaser shall take such action as may be reasonably necessary to segregate payments made or collections or proceeds received on behalf of Sellers after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement. To the extent that any such collections are received after Closing in any form (including checks or other negotiable instruments payable to the other Party), Sellers or Purchaser, as appropriate, shall promptly take all necessary action to transfer such collections to the appropriate Party (including by endorsement of such checks or instruments). Sellers shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Sellers with respect to such items.

       **8.5.3   Intellectual Property Transition Rights.**  Sellers will have a license to continue to use any corporate name and Administrative Assets included in the Acquired Assets and bearing any trademark, service mark, trade name or related corporate name included in the Acquired Assets solely in connection with the Bankruptcy Case and the matters contemplated by this Agreement. Sellers agree to execute a license agreement regarding such permitted use if requested to do so by Purchaser.

       **8.5.4   Privacy Policy.**  The Purchaser will maintain those privacy policies of the Sellers in existence as of the Closing Date to the extent required by applicable Law.

       **8.5.5   Purchaser Release.**  As of the Closing, Purchaser, on its own behalf and on behalf of its Affiliates, including each Lender (the "***Purchaser Releasors***"), hereby waives, sets aside, discharges, settles, compromises and releases any and all claims, causes of action, rights or remedies of any kind or nature, which any such Purchaser Releasor has, may have or could have asserted against any of the Sellers and their affiliated debtors and with respect to any distribution from the estates of the Sellers and their affiliated debtors after the Closing, other than (a) with respect to any Liens, claims (including any Priority Claims), causes of action, rights or remedies of any kind or nature of the Purchaser Releasors with respect to the capital stock and assets of PBTP and PBTPS, (b) with respect to any sale, transfer, conveyance, lease or other disposition of capital stock and assets of PBTPS and PBTP, in one or more related or unrelated transactions (the "***Payment Sales***"), whether by sale, collection or otherwise, any proceeds from such sale, transfer, conveyance, lease or other disposition to which any Purchaser Releasor may be entitled pursuant to order of the Bankruptcy Court, *less* expenditures made by any Seller to fund the business and operations of PBTPS and PBTP after February 29, 2008, net of any revenues during such period (such net expenditures not to exceed $350,000 in the aggregate), (c) with respect to any proceeds from the sale of assets to which any Purchaser Releasor may be entitled to pursuant to the Non-Core Asset Sale Orders, (d) with respect to claims against and liens on the assets of S&H Marketing, S&H Subsidiary and PBT Singapore and the outstanding capital stock of S&H Marketing, S&H Subsidiary and PBT Singapore and the outstanding membership interests of Loyalty, (e) with respect to any proceeds received from any sale, transfer, conveyance, lease or other disposition by the Sellers pursuant to Section 8.6.2 of this Agreement of the PBT Singapore User Data, (f) the right of Purchaser to receive a prompt distribution from the Sellers' estates of 50% of any and all Distributable Litigation Proceeds and (g) rights created or expressly preserved under this Agreement; provided, however, that Purchaser shall have no control over the prosecution or settlement of any Preference Or Avoidance Claims or Excluded Third-Party Claims, except that Purchaser shall have standing to object to any Priority Claims.

**8.5.6    Sellers Release.**  As of Closing, each of the Sellers and their direct and indirect subsidiaries, on behalf of themselves and their estates (the "***Seller Releasors***"), hereby waive, set aside, discharge, settle, compromise and release any and all claims, causes of action, rights or remedies of any kind or nature, which they have, may have or could have asserted against any of Purchaser, Holdings, the Lenders or any of their respective direct or indirect Affiliates, shareholders, partners or members or the former or present officers, directors, employees, attorneys, financial advisors or other professionals of Purchaser, Holdings, the Lenders or their Affiliates (the "***Releasees***"); provided, however, that the foregoing release shall exclude all rights created or expressly preserved under this Agreement.

To the extent that either of the foregoing releases in Sections 8.5.5 or 8.5.6 are releases as to which Section 1542 of the California Civil Code or similar provisions of other applicable law applies, it is the intention of each of the Purchaser Releasors and the Seller Releasors, respectively, that such release shall be effective as a bar to any and all causes of action of whatsoever character, nature in kind, known or unknown, suspected or unsuspected, herein and above specified to be so barred.  In furtherance of this intention, each of the Purchaser Releasors and the Seller Releasors hereby expressly waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the California Civil Code or similar provisions of other applicable law, and acknowledge that Section 1542 of the California Civil Code provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

**8.6    Consumer User Data Covenants.**

**8.6.1    User Data.**  The Sellers will use their commercially best efforts to destroy all User Data (other than the PBT Singapore User Data) as promptly as practicable following the date hereof.

**8.6.2    PBT Singapore User Data.**  The Sellers shall promptly after the date hereof and prior to the Closing segregate all PBT Singapore User Data from all other User Data held by the Sellers as promptly as practicable and, upon consummation of the transactions contemplated hereby, and to the extent permitted by applicable Laws, transfer the PBT Singapore User Data to the Purchaser.  If and to the extent that any applicable Laws restrict the ability of the Sellers to transfer the PBT Singapore User Data to the Purchaser as contemplated by this Agreement, Sellers shall, for a period of six (6) months following the Closing Date, promptly take any commercially reasonable action requested by the Purchaser, to the extent permitted by applicable Laws, to sell, transfer, convey, lease or otherwise dispose of the PBT Singapore User Data for and on behalf of Purchaser; provided that any such actions requested by the Purchaser to be taken by the Sellers shall be at the sole cost and expense of the Purchaser, which shall pay in advance such costs and expenses if requested to do so by the Sellers.

**8.7    Communications with Customers and Suppliers.**  Prior to the Closing, upon reasonable request of the Purchaser, Sellers shall permit Purchaser to contact and communicate

669172.06

with any of the Business' customers, suppliers and others with whom it has material commercial dealings. The Purchaser and Sellers shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, at the request of Purchaser, meetings and correspondence with such customers, suppliers, and other third parties to ensure such orderly transition.

9.    TERMINATION:

9.1    **Termination.**  Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

9.1.1    **By Either Party:**

A.    By mutual written consent of Sellers and Purchaser.

B.    Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order.

C.    Provided the terminating Party is not in default of its obligations under this Agreement, by either Sellers or Purchaser if the Closing shall not have occurred by April 7, 2008.

D.    Provided that the terminating Party is not in default of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before March 31, 2008 (the "***Termination Date***") or such Sale Approval Order is subject to a stay or injunction.

9.1.2    **By Sellers.**  By Sellers, if (a) any condition to the obligations of Sellers set forth in Section 6.1 or Section 6.3 shall have become incapable of fulfillment other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition or compliance with such agreement is not waived by Sellers or (b) there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement, that results in a failure of a condition set forth in Section 6.1 or Section 6.3, and which breach cannot be cured within seven Business Days after giving of written notice by Sellers to Purchaser of such breach (provided that Sellers are not then in breach of this Agreement).

9.1.3    **By Purchaser.**  By Purchaser, in its sole discretion, at any time, for any reason or no reason.

9.2    **Notice of Termination.**  In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

669172.06

**9.3    Procedure and Effect of Termination.**    In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and the transactions contemplated by this Agreement shall terminate (subject to the provisions of this Article 9) and will thereafter become void and have no further force and effect and except for those provisions that expressly survive the termination of this Agreement, all further obligations of the Sellers and Purchaser to each other under this Agreement will terminate without further obligation or liability of Sellers or Purchaser to the other (other than with respect to breaches, if any, of this Agreement prior to such termination), except that in the event of default by Sellers under this Agreement after entry of the Sale Approval Order, each Party shall be entitled to all of its remedies at law and in equity.    In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

## 10.    OTHER TAX MATTERS:

**10.1    Tax Returns for Pre-Closing Period.**    Sellers will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing. Purchaser shall make available to Sellers (and to Sellers' accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Sellers to prepare these Tax Returns. Sellers will make all payments required with respect to any such Tax Return.

**10.2    Tax Returns for Post-Closing Period.**    Purchaser will be responsible for the preparation and filing of all Tax Returns for the Acquired Assets for all periods for which Tax Returns are due after the Closing.    Purchaser shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets pertaining to: (a) any period beginning after the Closing Date; and (b) the portion of any Taxes for which Purchaser is liable as determined in accordance with Section 10.3 below.

**10.3    Straddle Period.**    For purposes of this Article 10 and Section 2.3, whenever it is necessary to allocate the liability for Taxes for a Straddle Period, the determination of the Taxes of the Business for the portion of the Straddle Period ending at the end of the Closing Date (the "Pre-Closing Portion") and the portion of the Straddle Period beginning after the Closing Date (the "Post-Closing Portion") will be determined by assuming that the Straddle Period consisted of two taxable years or periods, one of which ended at the close of business on the Closing Date and the other of which began at the beginning of the day after the Closing Date, and items of income, gain, deduction, loss or credit related to the Acquired Assets and the Business for the Straddle Period will be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books associated with the Business were closed at the end of the Closing Date; provided, however, that all real property taxes, personal property taxes, ad valorem obligations and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets for a Straddle Period shall be apportioned between Sellers and Purchaser as of the Closing Date based on the number of days of such taxable period up to and including the Closing Date and the number of days of such taxable period following the Closing Date. Sellers shall be liable for the proportionate amount of such taxes that is attributable to the

period up to and including the Closing Date; Purchaser shall be liable for the proportionate amount of such taxes that is attributable to the period following the Closing Date.

**10.4    Cooperation.**  Sellers and Purchaser will cooperate in connection with: (a) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (b) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets.  Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to Purchaser.

**10.5    Tax Elections.**  Sellers shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.  At the election of the Purchaser, the parties shall treat the transactions contemplated by this Agreement as a reorganization described in Section 368(a)(1)(G) of the Code, and shall not take any contrary position with a taxing authority or on a tax return.

**11.    MISCELLANEOUS:**

**11.1    Bulk Sales Laws.**  Sellers and Purchaser hereby waive compliance by Sellers with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**11.2    Notices.**  All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to Purchaser at the address set forth on the signature page hereto and to Sellers at the address set forth below (or at such other address as the intended recipient shall have specified in a written notice given to the other party hereto):

|                    |                                      |
|--------------------|--------------------------------------|
| **If to any Seller:** | SOLIDUS NETWORKS, INC.<br>c/o Solidus Networks, Inc.<br>101 Second Street, Suite 1100<br>San Francisco, CA 94105<br>Attn: General Counsel<br>Fax No.: (415) 371-5685 |
| With a copy to:    | HENNIGAN, BENNETT & DORMAN LLP<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, California 90017<br>Attn: Joshua M. Mester<br>Fax No.: (213) 694-1234 |
| With a copy to:    | COOLEY GODWARD KRONISH LLP<br>101 California Street, Fifth Floor<br>San Francisco, CA 94111 |

20

Attn: Kenneth L. Guernsey
Fax No.: (415) 693-2222

With a copy to:  **STUTMAN, TREISTER & GLATT P.C.**
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Gary E. Klausner
Fax No.: (310) 228-5788

**If to Purchaser:**   **YT ACQUISITION CORPORATION**
c/o OZ Management LP
9 West 57th Street, 13th Floor
New York, New York 10019
Attn: Joel Frank, CFO
Fax No.: (212) 790-0460

With a copy to:   **OZ MANAGEMENT LP**
9 West 57th Street, 13th Floor
New York, New York 10019
Attn: Joel Frank, CFO
Fax No.: (212) 790-0460

**DENARIUS TOUCH, L.L.C.**

c/o Farallon Capital Management, LLC
One Maritime Plaza, Suite 2100
San Francisco, CA 94111
Attn: Raj Patel
Fax No.: (415) 421-2133

**PLAINFIELD ASSET MANAGEMENT LLC**
55 Railroad Avenue, Plaza Level
Greenwich, CT 06830
Attn: Monitoring Group
Attention: Thomas X. Fritsch, General Counsel
Fax No.: (203) 302-1779

**HIGHBRIDGE INTERNATIONAL LLC**
c/o Highbridge Capital management, LLC
9 West 57th street, 27th floor
New York, NY 10019
Attn: Ari J. Storch
       Adam Chill
Fax No.: (212) 751-0755

**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square

21

New York, NY 10036
Attn: Ilan Nissan
    Douglas Freeman
Fax No.: (212) 326-2061

**O'MELVENY & MYERS LLP**
400 South Hope Street
Los Angeles, CA 90071
Attn:  Ben H. Logan
Fax No: 213-430-6407

**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue
35th Floor
Los Angeles, California 90071-1560
Attn: Mark H. Kim
Fax: (213) 683-5144

    **11.3    Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.  Notwithstanding the foregoing, the Purchaser may assign this Agreement and all of its rights and obligations hereunder, to any Affiliate of the Purchaser or any of its Affiliates of successors (the "***Permitted Purchaser Assignee***") without the consent of the Sellers, in which case, the term "Purchaser" hereunder shall mean the Permitted Purchaser Assignee, unless the context requires a different meaning.

    **11.4    Entire Agreement.**  This Agreement represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof, except for any agreement, understandings, arrangements, covenants, representations or warranties between any of the Lenders (in their capacity as such) and the Sellers, including the DIP Agreement, the SPA or the Secured Notes.

    **11.5    Waiver.**  Any waiver by Sellers or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein. Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

669172.06

**11.6    Severability.** Should any provision, or any portion thereof, of this Agreement for any reason be held illegal, invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such illegal, invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held illegal, invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**11.7    Amendment.** This Agreement may be amended modified or supplemented only in writing duly executed by all the parties hereto.

**11.8    Expenses.** Except as otherwise provided herein, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**11.9    Third Parties.** Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement, except for (x) the rights granted to each of the Lenders and each of their respective debt and equity financing sources pursuant to Section 8.4 and (y) any of the Releasees in Section 8.5.6.

**11.10    Headings.**    The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**11.11    Counterparts.** More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**11.12    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of California and, to the extent applicable, the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**11.13    Public Announcements.** Sellers and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**11.14    Sales or Transfer Taxes.** All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser, unless waived pursuant to an order of the Bankruptcy Court.

23

**11.15  Venue and Retention of Jurisdiction.**  All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

**11.16  Risk of Loss.**  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets, or the Business shall be borne exclusively by Sellers; provided, however, that Purchaser shall be entitled to receive any insurance proceeds payable therefore.

**11.17  Dispute Resolution.**  Sellers and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within 30 days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand for formal dispute resolution (the "*Notice*") and specify therein in reasonable detail the nature of the dispute.  Within 15 business days after receipt of the Notice, the receiving party shall submit to the other a written response. The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within 15 business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 11.17 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, the Parties agree not to commence any litigation actions until the expiration of 90 days after the date of the Notice, and all such actions are subject to Section 11.15 above.

**11.18  No Right of Setoff.**  Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder against any amounts owed hereunder by such Persons to the other party hereto or any of such other party's Affiliates.

**11.19  Limitation on Damages.**  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 11, IN NO EVENT SHALL PURCHASER OR SELLERS BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

**11.20  Sellers' Obligations.**  The liability of the Sellers hereunder shall be joint and several.  Where in this Agreement provision is made for any action to be taken or not taken by any of the Sellers, Sellers jointly and severally undertake to cause such Seller to take or not take such action, as the case may be.

24

669172.06

**[Remainder of Page Intentionally Left Blank]**

25

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers.

**SELLERS:**                                    **PURCHASER:**

**SOLIDUS NETWORKS, INC.**                       **YT Acquisition Corporation**

By: _____                   By: _____
Print Name: _Thomas Lumsden_                     Print Name:  Boaz Sidikaro
Title: _____CRO_____                             Title:  Sole Director



**PAY BY TOUCH CHECKING RESOURCES, INC.**

By: _____
Print Name: _Thomas Lumsden_
Title: _____CRO_____

**INDIVOS CORPORATION**

By: _____
Print Name: _Thomas Lumsden_
Title: _____CRO_____

669172.06

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers.

SELLERS:                                    PURCHASER:

SOLIDUS NETWORKS, INC.                      YT Acquisition Corporation

By: _____                By: _____
Print Name: _____                Print Name: Boaz Sidikaro
Title: _____                Title:  Sole Director

PAY BY TOUCH CHECKING RESOURCES, INC.

By: _____
Print Name: _____
Title: _____

INDIVOS CORPORATION

By: _____
Print Name: _____
Title: _____

[Asset Sale and Purchase Agreement]

CHECKELECT, INC.

By: _____
Print Name: _____
Title: _____

ATMD ACQUISITION CORP.

By: _____
Print Name: _____
Title: _____

SEVEN ACQUISITION SUB, LLC

By: _____
Print Name: _____
Title: _____

669172.06

# LIST OF SCHEDULES

| SCHEDULE DESIGNATION | SCHEDULE DESCRIPTION |
|---|---|
| A | Certain Defined Terms |
| 1.1.1 | Acquired Assets |
| 1.1.2.A | Bailed Assets |
| 1.1.2.D | Privileged Information and Materials |
| 3.1.1 | Potential Transferred Employees |
| 5.1.5.A | Title to Personal Property |
| 5.1.6.A | Intellectual Property |
| 5.1.6.B | Intellectual Property Litigation Claims |
| 5.1.6.C | Rights Granted to Third Parties |
| 5.1.6.D | Free and Clear Owned Intellectual Property |
| 5.1.7 | Insurance |
| 7.3.3 | General Assignment and Bill of Sale |

SCHEDULE A

DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"*Accounts Receivable*" means all trade accounts receivable and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of products or services delivered to customers, all other accounts or notes receivable and the full benefit of all security for such accounts or notes and any claim, remedy or other right related to any of the foregoing.

"*Acquired Assets*" means the assets referred to in Section 1.1.1.

"*Administrative Assets*" means all books, records and other administrative assets of Sellers used in connection with the Business, including but not limited to advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files.

"*Affiliate*" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of more than 50% of the shares or other equity interest having power to elect directors or persons performing a similar function.

"*Agreement*" means this Asset Sale and Purchase Agreement, including its Schedules.

"*Allocation*" means allocation of the Purchase Price, as described in Section 4.2.

"*Bankruptcy Case(s)*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Code*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Rules*" means the United States Federal Rules of Bankruptcy Procedure.

"*Bidding Procedures Order*" shall have the meaning set forth in the Recitals.

"*Business*" means the Solidus Business, the S&H Business and the Loyalty Business, taken as a whole.

"*Business Day*" means any day other than a Saturday, a Sunday or a day on which banks in Los Angeles, California are authorized or obligated by law or executive order to close.

"***Business Employees***" shall have the meaning set forth in Section 3.1.

"***Carve-Out***" shall have the meaning set forth in numbered paragraph 14 of the Final Order authorizing DIP financing, filed and entered with the Bankruptcy Court on January 28, 2008.

"***Claims***" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"***Closing***" shall have the meaning set forth in Section 7.1.

"***Closing Date***" means the date of Closing.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Cogent Information***" shall mean Trade Secrets of Cogent and other confidential and proprietary information of Cogent provided to Solidus pursuant to the terms of (and solely for use under) the Cogent Supply Agreement, including "Confidential Information" as defined in the Cogent Supply Agreement.

"***Company Employee Plans***" means all compensation or employee benefit plans, programs, policies, agreements or other arrangements, whether or not "employee benefit plans" (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), providing cash- or equity-based incentives, health, medical, dental, disability, accident or life insurance benefits or vacation, severance, retirement, pension or savings benefits, that are sponsored, maintained or contributed to (or required to be sponsored, maintained or contributed to) by Sellers, the Company, Loyalty, S&H Marketing or S&H Subsidiary for the benefit of employees, directors or consultants employed by, or providing services to, any such entity, including all employment agreements or arrangements providing compensation, vacation, severance or other benefits to any such employee, director or consultant.

"***Continuing Employees***" means (a) any Transferred Employee or (c) any past or present officer, director or employee of S&H Marketing, S&H Subsidiary or Loyalty.

"***Contracts***" mean all written or material oral purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, Real Property Leases, Other Leases, product warranty or service agreements and other commitments, agreements and undertakings of any nature, including quotations and bids outstanding on the Closing Date to which any Seller is a party.

"***Copyrights***" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by statutes, international treaties or conventions; (ii) moral rights (including rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications for registration thereof; (v) copies, files and

tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"*Creditors' Committee*" means that certain committee of creditors holding unsecured Claims appointed by the United States Trustee pursuant to 11 U.S.C. §1102(a) on December 29, 2007.

"*Currently Conducted*" means as currently conducted and as conducted during the six month period preceding the date of this Agreement.

"*Denarius*" means Denarius Touch, L.L.C.

"*DIP Agreement*" means that certain Senior Secured Superpriority Debtor in Possession Credit and Guaranty Agreement, as amended from time to time.

"*Disclosure Schedules*" means, collectively, the Schedules to Sellers' Representations and Warranties contained in Section 5.1.

"*Distributable Litigation Proceeds*" means the portion, if any, of any and all proceeds collected from Preference Or Avoidance Claims or Excluded Third-Party Claims, net of any allowed costs of prosecution and collection (including fees and costs of counsel, other professionals and experts engaged to prosecute such actions), that exceeds, in the aggregate, the sum of (i) $4 million, plus (ii) the amount, if any, by which any and all cash received by the Sellers' estates (including the Cash Consideration) from any source other than Preference or Avoidance Claims and Excluded Third Party Claims is less than the amount required to pay in full the sum of (x) administrative claims allowed under Bankruptcy Code Section 507(a)(2) that are unpaid on the Closing ("Administrative Claims") in an amount not to exceed $2.9 million, and (y) the amount of priority claims allowed under the provisions of Bankruptcy Code Section 507 other than Section 507(a)(2) ("Priority Claims").

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excluded Assets*" shall have the meaning set forth in Section 1.1.2.

"*Final Order*" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"*Governmental Entity*" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"*Highbridge*" means Highbridge International LLC.

"*Including*" means, whether or not initially capitalized, including without limitation.

"*Intellectual Property*" means all Patent Rights, Trademark Rights, Copyrights, Software, Technical Documentation, Trade Secrets and Know-How.

"*Inventory*" means all goods, materials, work-in-process, packaging, stores, stock, supplies, and other inventory owned by any Seller, wherever located.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

"*Know-How*" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"*Laws*" means laws, ordinances, decrees, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"*Leased Real Property*" means the real property leased by any of the Sellers, together with, to the extent leased by any of the Sellers, all buildings and other structures or facilities currently or hereafter located thereon, all fixtures, systems, equipment and items of Personal Property of the Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"*Legal Requirement*" shall mean any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, Order, edict, decree, proclamation, treaty, convention, rule, regulation, permit, ruling, directive, pronouncement, requirement (licensing or otherwise), specification, determination, decision, opinion or interpretation that is, has been or may in the future be issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"*Lenders*" means Och-Ziff, Denarius, Plainfield and Highbridge, and/or any or their respective successors and Affiliates.

"*Licensed Intellectual Property*" means Sellers' rights with respect to all Intellectual Property licensed or sublicensed to Sellers from any Person.

"*Lien*" means any lien, encumbrance, charge, claim, pledge, security interest, conditional

669172.06

sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance or interest of any nature whatsoever (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"*Loyalty Business*" means the business operated by Loyalty as of the date of this Agreement.

"*Material Adverse Effect*" means any change or changes in, development, condition, circumstance or effect on, the Business or the Acquired Assets that has or have a material adverse effect on the business, assets, properties, condition, financial or otherwise, or results of operations of the Business or the Acquired Assets taken as a whole, other than: (a) any act or omission of Sellers taken with the prior written consent of the Purchaser; (b) any action taken by Sellers or Purchaser or any of their respective representatives specifically required by the terms of this Agreement; (c) changes in general business or economic conditions; (d) changes in conditions affecting the industry and markets in which the Business generally operates (except to the extent that such changes in conditions have had a materially disproportionate effect on the Sellers, the Business or the Acquired Assets, as compared to other Persons in the industry and markets in which the Business generally operates, and then only to the extent of the difference in effect); (e) changes resulting from the filing of the Bankruptcy Case or from any action required by the Bankruptcy Court; (f) the engagement by the United States in hostilities pursuant to a declaration of war; (g) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (h) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; or (i) any adverse change in or effect on the Business or the Acquired Assets that is cured in all material respects by Sellers before the Closing Date.

"*Non-Core Asset Sale Orders*" means Bankruptcy Court: (a) Order (I) Authorizing Sale of Assets Related to the ATM Direct Business Free and Clear of Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Exempting Such Sale and Assignment from any Stamp Tax or Similar Tax and (IV) Granting Related Relief, entered February 26, 2008 Docket No. 422 and (b) Order (I) Authorizing Sale of Assets of Pay By Touch Check Cashing, Inc. and Pay By Touch Checking Resources, Inc. Free and Clear of Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, (III) Exempting Such Sale and Assignment from any Stamp Tax or Similar Tax and (IV) Granting Related Relief, entered February 29, 2008 Docket No. 447.

"*Notice*" shall have the meaning set forth in Section 11.17.

"*Och-Ziff*" means OZ Master Fund, Ltd., OZ Financial Investors, Inc. and OZ Financial Investors II, Inc., and any successor thereto and/or their respective Affiliates.

"*Ordinary Course of Business*" means, with respect to the Business, the ordinary course of business consistent with custom and practice of the Business from and after the Petition Date or to the extent consistent with orders issued in the Bankruptcy Case.

"*Other Leases*" means all agreements in which any Seller is a lessee thereunder, including equipment leases, leases for Personal Property or Intellectual Property, rental agreements, licenses, contracts and similar arrangements.

"*Owned Intellectual Property*" means all Intellectual Property in and to which any Seller holds, or has a right to hold, in whole or in part, right, title and interest.

"*Owned Real Property*" means the real property owned by the Sellers, together with all buildings and other structures currently or thereafter located thereon, and all easements, licenses, rights and appurtenances relating to the foregoing.

"*Party*" or "*Parties*" means Purchaser and/or Sellers.

"*Patent Rights*" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including without limitation any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents, and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"*Permits*" means all permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to any Seller, S&H Marketing, S&H Subsidiary or Loyalty.

"*Permitted Lien*" means Liens of Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders, all of which will be released on or prior to the Closing of the Sale.

"*Person*" means any individual, corporation, partnership, limited liability company, association, joint venture, estate, trust, firm, other enterprise or other entity or organization.

"*Personal Element*" means a natural person's full name (or last name if associated with an address), telephone number, email address, Unique Identifying Number, photograph, financial account information, biometric identifying information, or any other information, alone or in combination, that allows the identification of a natural person.

"*Personal Property*" means all tangible personal property owned by any Seller, including, production machinery, equipment, related spare parts, business machines, computer hardware, office furniture and fixtures, in-factory vehicles, trucks and other tangible personal property, whether located at the Premises, at the place of business of a vendor, or customer or elsewhere.

"*Petition Date*" shall mean December 14, 2007.

"*Plainfield*" means Plainfield Asset Management LLC.

"*Post-Closing Portion*" shall have the meaning set forth in Section 10.3.

"*Pre-Closing Portion*" shall have the meaning set forth in Section 10.3.

"*Premises*" means the offices leased for the Business at 101 Second Street, Suite 1100, San Francisco, California 94105.

"*Proceeding*" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"*Product*" shall mean all products manufactured, marketed or sold and all services sold exclusively by the Business.

"*Purchase Price*" means the payment referred to in Section 4.1.

"*Purchased Intellectual Property*" means all Owned Intellectual Property and Licensed Intellectual Property listed in Schedule 5.1.6.A.

"*Real Property*" means all Owned Real Property and Leased Real Property.

"*Real Property Leases*" means all leases relating to the Leased Real Property.

"*Release*" shall mean any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching or migration on or into the Environment or into or out of any property.

"*S&H Business*" means the business operated by S&H Marketing and S&H Subsidiary as of the date of this Agreement.

"*S&H Subsidiary*" means The Sperry & Hutchinson Company, Inc.

"*Sale*" means the sale of the Acquired Assets in accordance with the Sale Approval Order.

"*Sale Approval Order*" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to the Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens assumed by Purchaser pursuant to Article 2, if any.

"*Sale Motion*" means the motion filed with the Bankruptcy Court on February 8, 2008, as amended, seeking entry of the Sale Approval Order.

"*Secured Notes*" means those certain Senior Secured Notes due 2008 under the SPA.

669172.06

"*Sellers' Knowledge*" means the actual knowledge of Solidus' Chief Financial Officer, Chief Operating Officer, Chief Restructuring Officer and Chief Technology Officer.

"*Singapore User Data*" means the User Data used in or relating to the business of PBT Singapore.

"*Software*" means computer software and programs, including source code, object code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"*Solidus Business*" means the processing of biometrically enabled transactions at checkout and the delivery of personalized offers to consumers at store entrances, the settlement of redeemed coupons at checkout and any other business operated out of the Premises, but excluding the businesses of PBTP and PBTPS.

"*SPA*" means that certain Amended and Restated Securities Purchase Agreement, dated as of December 6, 2005, as amended from time to time.

"*Straddle Period*" means any taxable period that begins on or prior to the Closing Date and ends after the Closing Date.

"*Tax Return*" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"*Tax(es)*" means any tax or similar governmental charge, impost or levy whatsoever (including, federal, state, local or foreign income, franchise, transfer taxes, use, gross receipts, value added, employment, unemployment insurance, excise, ad valorem, property, withholding, payroll, social contribution, social security, customs duty, workers' compensation, minimum or windfall profit taxes, transfer fees or other tax of the same or similar nature), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof, and any such amounts imposed by contracts, as a transferee or as a result of being a member of a combined, consolidated, unitary or similar tax group.

"*Technical Documentation*" means all documented technical information currently in the files of the Sellers used in connection with the Business

"*Termination Date*" shall have the meaning set forth in Section 9.1.1.D.

"*Third Party Bailed Assets*" shall have the meaning set forth in Section 1.1.2.A.

"*Trade Secrets*" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically,

electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas; formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"***Trademark Rights***" means: (i) trademarks, trade names, service marks, devices, designs, icons, logos, slogans, domain names, IP addresses, and any other indicia of origin, source or sponsorship; (ii) all good will associated with any of the foregoing; (iii) all registrations and applications for registration of any of the foregoing; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"***Transferred Employees***" shall have the meaning set forth in Section 3.1.1.

"***Unique Identifying Number***" means an identifier uniquely associated with a person such as a social security number, driver's license number, passport number or customer number, but excluding an identifier which is randomly or otherwise assigned so that it cannot reasonably be used to identify the person.

"***United States***" means the 50 states and the District of Columbia of the United States of America.

"***User Data***" means: (i) all data that contains a Personal Element, (ii) known, or reasonably inferred information or attributes about a user or identifier, and (iii) all derivatives and aggregations of (i) and (ii), including user profiles.

**SCHEDULE 1.1.1**

**Acquired Assets**

- the Owned Intellectual Property identified on **SCHEDULE 5.1.6.A**;
- all capital stock of WinWin Corporation held by Solidus (minority stake);
- the tangible Personal Property located at the Premises, other than Third Party Bailed Assets;
- all Personal Property owned by or leased to a Seller in connection with the Business located at any outsource partner's location;
- all prepaid Inventory held by any Affiliate of a Seller primarily for use in the Business, provided that such Affiliate has been paid in full or been assigned the corresponding receivable by such Seller;
- the "Loyalty Suite" software owned by Seven;
- the assets identified on **ANNEX I** hereto; and
- the following assets:

| Name | Type |
|---|---|
| NAC | Hypercom NAC 7800 |
| Paytrans 1 | Dell PowerEdge 1750 |
| Paytrans 3 | Dell PowerEdge 1650 |
| Paytrans 4 | Dell PowerEdge 1550 |
| Paytrans 5 | Dell PowerEdge 1550 |
| hdprpaydb01 | Dell PowerEdge 6650 |
| Payments3 | Dell PowerEdge 6650 |
| hdprpayweb01 | Dell PowerEdge 2650 |
| bcheckfserv | Dell PowerEdge 2650 |
| NIP | TNS Box |
| hypercomview | Dell Dimension 4550 |
| hypercom | Dell Dimension 2400 |
| bcheckdemo | Dell Dimension XPS R450 |
| vericentre | Dell Dimension XPS R400 |
| CheckWeb | Dell PowerEdge 2550 |
| bchecksdb | Dell PowerEdge 2550 |
| hdadmon01 | Dell PowerEdge 1800 |
| BioComm | Dell PowerEdge 2300 |

**ANNEX I**

**Acquired Assets**

| ASSET ID | Asset Class ID | Asset Description | Location ID | Asset Quantity |
|---|---|---|---|---|
| 1000-1 | CE-5 | PowerEdge 2600 Dell Servers | CALIFORNIA | 3 |
| 1001-1 | OE-3 | Dell Laptops X200 Notebooks | CALIFORNIA | 2 |
| 1002-1 | CE-5 | PowerEdge 2600 Dell Servers | CALIFORNIA | 2 |
| 1003-1 | SW-2 | Oracle Database | CALIFORNIA | 1 |
| 1003-2 | SW-1 | Oracle DataBase Server Software Updates | CALIFORNIA | 1 |
| 1004-1 | OE-3 | Dell Latitude X200 Notebooks | CALIFORNIA | 2 |
| 1005-1 | OE-3 | Dell Latitiude X200 Notebooks | CALIFORNIA | 2 |
| 1006-1 | OE-3 | Dell Latitude X200 Notebooks | CALIFORNIA | 2 |
| 1007-1 | OE-3 | Dell Latitude X200 Notebooks | CALIFORNIA | 4 |
| 1008-1 | OE-3 | Dell Latitude X200 Notebooks | CALIFORNIA | 2 |
| 1009-1 | OE-3 | Dell Latitude X200 Notebooks | CALIFORNIA | 2 |
| 1010-1 | CE-5 | VPN System Multilayer Switch | CALIFORNIA | 1 |
| 1010-2 | CE-5 | VPN System Multilayer Switch | CALIFORNIA | 1 |
| 1010-3 | CE-5 | VPN System Ethernet Routers | CALIFORNIA | 1 |
| 1010-4 | CE-5 | VPN System WAM Card | CALIFORNIA | 1 |
| 1010-5 | CE-5 | VPN System Warranty | CALIFORNIA | 1 |
| 1010-6 | CE-5 | VPN System Warranty | CALIFORNIA | 1 |
| 1011-1 | CE-5 | VPN System and Firewall Bundles | CALIFORNIA | 1 |
| 1012-1 | OE-3 | Dell Inspiron 5150 | CALIFORNIA | 1 |
| 1013-1 | CE-5 | PowerEdge 2600 Dell Server | CALIFORNIA | 1 |
| 1014-1 | CE-5 | PowerEdge 2600 Dell Server | CALIFORNIA | 1 |
| 1015-1 | F&F-5 | PBT Kiosk | CALIFORNIA | 1 |
| 1015-2 | F&F-5 | Plasma TV for Tradeshow Booth | CALIFORNIA | 1 |
| 1015-3 | F&F-5 | Tradeshow Booth Modifications | CALIFORNIA | 1 |
| 1018-1 | OE-3 | Dell XGA D600 Notebooks (2) | CALIFORNIA | 2 |
| 1019-1 | CE-5 | Net Backup Data Enterprise Server V5.0 | CALIFORNIA | 1 |
| 1021-1 | SW-1 | Ascert Test Strips | CALIFORNIA | 1 |
| 1022-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 5 |
| 1023-1 | OE-3 | Dell Latitude D600 Notebooks | CALIFORNIA | 5 |
| 1024-1 | OE-3 | Dell Inspiron 1100 Notebooks | CALIFORNIA | 4 |
| 1025-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 4 |
| 1026-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 8 |
| 1027-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 3 |
| 1028-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 3 |
| 1029-1 | CE-5 | Cisco 3600 2 port | CALIFORNIA | 6 |
| 1030-1 | OE-3 | Dell Latitude X300 Notebooks 1.2 GHZ | CALIFORNIA | 4 |
| 1031-1 | CE-5 | CISCO Catalyst Ethernet Switch | CALIFORNIA | 1 |
| 1032-1 | OE-3 | Dell Latitude D600 Notebooks | CALIFORNIA | 4 |
| 1033-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 6 |
| 1034-1 | F&F-5 | Tackable Panels | CALIFORNIA | 13 |
| 1035-1 | F&F-5 | Worksurfaces and Support | CALIFORNIA | 31 |
| 1036-1 | F&F-5 | Tackable Panels | CALIFORNIA | 24 |
| 1037-1 | F&F-5 | Steel Cabinets / Desk Single Pedestal | CALIFORNIA | 34 |
| 1038-1 | CE-5 | Air Conditioner Server | CALIFORNIA | 1 |
| 1039-1 | CE-5 | Dell Power Edge 2161 Console Switch | CALIFORNIA | 1 |
| 1040-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 6 |
| 1041-1 | OE-3 | Dell Latitude X300 Notebooks | CALIFORNIA | 7 |
| 1042-1 | OE-3 | Dell Inspiron 1150 Notebooks | CALIFORNIA | 5 |
| 1043-1 | F&F-5 | Office Chairs and Drawers | CALIFORNIA | 1 |
| 1044-1 | CE-5 | APC Battery  Universal Power Supply | CALIFORNIA | 1 |
| 1045-1 | OE-3 | Dell OptiPlex GX 280 Small Desktop To PC | CALIFORNIA | 4 |
| 1046-1 | CE-5 | Dell PowerEdge 1750 Servers | CALIFORNIA | 5 |
| 1047-1 | SW-1 | Cognos Software | CALIFORNIA | 1 |
| 1048-1 | CE-5 | APC Battery Back Up Power Supply | CALIFORNIA | 1 |
| 1049-1 | OE-3 | Dell Latitude D600 Notebooks | CALIFORNIA | 2 |
| 1050-1 | OE-3 | Dell OptiPlex GX 280 Ultra Small Form PC | CALIFORNIA | 2 |
| 1051-1 | F&F-5 | Mid Back Leather Genuine Exec. Chairs | CALIFORNIA | 11 |
| 1053-1 | OE-3 | Dell Latitude D600 Laptops | CALIFORNIA | 10 |
| 1054-1 | OE-3 | Dell Latitude X300 Laptops | CALIFORNIA | 15 |
| 1055-1 | CE-5 | Dell PowerEdge 1650 Server Chassis | CALIFORNIA | 4 |
| 1056-1 | CE-5 | Cisco Catalyst Switch | CALIFORNIA | 2 |
| 1057-1 | CE-5 | Dell 1750 Servers | CALIFORNIA | 2 |
| 1058-1 | SW-3 | Great Plains Multi Dimensional Analysis | CALIFORNIA | 1 |
| 1058-2 | SW-3 | GP National Account Module Tax | CALIFORNIA | 1 |

| | | | | |
|---|---|---|---|---|
| 1059-1 | SW-3 | Great Plains National Account Module | CALIFORNIA | 1 |
| 1059-2 | SW-3 | GP National Accounts Module Tax | CALIFORNIA | 1 |
| 1060-1 | CE-5 | CISCO PIX Security Audit Firewall | CALIFORNIA | 1 |
| 1061-1 | CE-5 | Dell PowerEdge Servers 1650 | CALIFORNIA | 2 |
| 1062-1 | CE-5 | Cisco Catalyst 6000 Flex WAN Module | CALIFORNIA | 1 |
| 1063-1 | OE-3 | CISCO IP Phones & Servers | CALIFORNIA | 1 |
| 1063-2 | OE-3 | Cisco VOIP Phone Sytem Installation | CALIFORNIA | 1 |
| 1064-1 | CE-5 | Ports & Switches for TASQ | CALIFORNIA | 2 |
| 1065-1 | CE-5 | CISCO 3750 48 Port Switch | CALIFORNIA | 2 |
| 1066-1 | OE-3 | Dell Latitude eX300 Series Module | CALIFORNIA | 7 |
| 1067-1 | OE-3 | Dell Latitude X300 Notebook | CALIFORNIA | 1 |
| 1067-2 | OE-3 | Dell Latitiude X300 Notebook | CALIFORNIA | 1 |
| 1068-1 | CE-5 | Dell PowerEdge 2850 Server | CALIFORNIA | 1 |
| 1069-1 | OE-3 | Dell Latitude D610 Notebooks | CALIFORNIA | 6 |
| 1070-1 | CE-5 | Dell Power Edge 2850 Server | CALIFORNIA | 1 |
| 1071-1 | OE-3 | Latitude D610 Notebooks | CALIFORNIA | 10 |
| 1073-1 | CE-5 | Dell PowerEdge Severs 1650 | CALIFORNIA | 6 |
| 1074-1 | CE-5 | Cisco Routers 10/100 Base T | CALIFORNIA | 2 |
| 1075-1 | OE-3 | IBM Thinkpad Laptops | CALIFORNIA | 10 |
| 1076-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |
| 1077-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |
| 1078-1 | OE-3 | Cisco IP Phones | CALIFORNIA | 30 |
| 1079-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |
| 1080-1 | OE-3 | Dell OptiPlex SX280 Desktop Computers | CALIFORNIA | 4 |
| 1081-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |
| 1082-1 | CE-5 | CISCO Ethernet Switches | CALIFORNIA | 4 |
| 1082-2 | CE-5 | CISCO Switches WAN Interface Card | CALIFORNIA | 1 |
| 1082-3 | CE-5 | CISCO Switches WAN Interface Card | CALIFORNIA | 1 |
| 1083-1 | F&F-5 | SF Office 101 Second St Furniture | CALIFORNIA | 86 |
| 1084-1 | F&F-5 | SF Office 101 Second St Furniture | CALIFORNIA | 2812 |
| 1085-1 | CE-5 | Xeon Nocona Base Server 3.06 | CALIFORNIA | 1 |
| 1086-1 | CE-5 | CISCO Systems Catalyst WS-X6348 | CALIFORNIA | 2 |
| 1087-1 | CE-5 | CISCO Systems Catalyst WS-X6348 | CALIFORNIA | 2 |
| 1089-1 | OE-3 | Dell Latitude D610 | CALIFORNIA | 20 |
| 1090-1 | OE-3 | Lenovo Thinkpads | CALIFORNIA | 6 |
| 1091-1 | F&F-5 | Woodtech Credenza 20"x72"x96" | CALIFORNIA | 4 |
| 1092-1 | SW-3 | Great Plains - Inentory Module | CALIFORNIA | 1 |
| 1092-2 | SW-3 | Great Plains Business Portal | CALIFORNIA | 1 |
| 1092-3 | SW-3 | Great Plains MBS Plan A | CALIFORNIA | 1 |
| 1093-1 | OE-3 | HP Color Laserjet 2600n | CALIFORNIA | 5 |
| 1093-2 | OE-3 | HP Laserjet 2420dn | CALIFORNIA | 6 |
| 1093-3 | OE-3 | HP Color Laserjet 4650dn | CALIFORNIA | 2 |
| 1094-1 | F&F-5 | Conference Chairs | CALIFORNIA | 38 |
| 1094-2 | F&F-5 | Conference Chairs | CALIFORNIA | 38 |
| 1095-1 | CE-5 | Dell Power Edge 2850 Servers | CALIFORNIA | 4 |
| 1096-1 | SW-3 | FRx Forecaster Web Based Budgeting Tool | CALIFORNIA | 1 |
| 1096-10 | SW-3 | GP eConnect Core & Distribution | CALIFORNIA | 1 |
| 1096-11 | SW-3 | MBS Plan A Annual Enhancement | CALIFORNIA | 1 |
| 1096-12 | SW-3 | GP Professional/Standard Seat License | CALIFORNIA | 6 |
| 1096-13 | SW-3 | Microsoft GP Licenses | CALIFORNIA | 10 |
| 1096-2 | SW-3 | FRx Foecaster 50 user pack | CALIFORNIA | 50 |
| 1096-3 | SW-3 | MBS FRx Webport Base Package (10 users) | CALIFORNIA | 10 |
| 1096-4 | SW-3 | MBS FRx Webport Additional 10 User Block | CALIFORNIA | 10 |
| 1096-5 | SW-3 | GP Revenue/Expense Deferral Module | CALIFORNIA | 1 |
| 1096-7 | SW-3 | Great Plains Sales/Work Order | CALIFORNIA | 1 |
| 1096-8 | SW-3 | Rockton Software - Auditor Base Package | CALIFORNIA | 1 |
| 1096-9 | SW-3 | Rockton Software -Auditor Seat License | CALIFORNIA | 12 |
| 1097-1 | CE-5 | Dell PE 1650/1750 Server Rapid Rail Kit | CALIFORNIA | 5 |
| 1098-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 20 |
| 1100-1 | OE-3 | Dell UltraSharp 1905FP Flat Panels | CALIFORNIA | 25 |
| 1101-1 | OE-3 | Dell UltraSharp 1905FP Flat Panels | CALIFORNIA | 6 |
| 1102-1 | OE-3 | CISCO IP Phone 7960 | CALIFORNIA | 15 |
| 1104-1 | CE-5 | Dell Base Server 3.06 Xeon | CALIFORNIA | 1 |
| 1105-1 | CE-5 | Cisco Module & Routers for Tolt Support | CALIFORNIA | 1 |
| 1106-1 | OE-3 | IBM Thinkpad Laptop | CALIFORNIA | 5 |
| 1107-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |
| 1108-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 10 |

| | | | | |
|---|---|---|---|---|
| 1109-1 | CE-5 | Dell Seagate SCSI Server Hard Drives | CALIFORNIA | 4 |
| 1110-1 | OE-3 | Dell Latitude D810 Laptops | CALIFORNIA | 5 |
| 1111-1 | CE-5 | Dell 2850 Server | CALIFORNIA | 1 |
| 1112-1 | SW-3 | EmailXtender - Mail Archive Software | CALIFORNIA | 1 |
| 1113-1 | CE-5 | San Software/Hardware for EMC Storage | CALIFORNIA | 1 |
| 1114-1 | OE-3 | Dell Latitude D610 Laptops | CALIFORNIA | 20 |
| 1115-1 | OE-3 | Dell Optiplex GX620 Desktops | CALIFORNIA | 15 |
| 1116-1 | CE-5 | Switches & Interfaces for TASQ/KCS | CALIFORNIA | 2 |
| 1117-1 | SW-3 | Track It Enterprise Software Licences | CALIFORNIA | 5 |
| 1118-1 | SW-3 | Multi-ICE v2.2 Windows Hardware Debugger | CALIFORNIA | 1 |
| 1119-1 | F&F-5 | Server Cabinets | CALIFORNIA | 6 |
| 1120-1 | CE-5 | Base T Uplinks Ethernet Switch | CALIFORNIA | 5 |
| 1121-1 | LH - 2ND ST | Conference Room Audio Visual Equipment | CALIFORNIA | 1 |
| 1122-1 | LH - 2ND ST | Security System SF | CALIFORNIA | 1 |
| 1123-1 | LH - 2ND ST | Conference Room Audio Visual Equipment | CALIFORNIA | 1 |
| 1125-1 | LH - 2ND ST | 101 2nd St Contruction Management | CALIFORNIA | 1 |
| 1125-10 | LH - 2ND ST | SF Contruction - 101 Second St | CALIFORNIA | 1 |
| 1125-11 | LH - 2ND ST | SF Contruction - 101 Second St | CALIFORNIA | 1 |
| 1125-12 | LH - 2ND ST | SF Contruction - 101 Second St | CALIFORNIA | 1 |
| 1125-2 | LH - 2ND ST | 101 2nd St Contruction Management | CALIFORNIA | 1 |
| 1125-3 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-4 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-5 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-6 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-7 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-8 | LH - 2ND ST | Richard Pollack Architecture & Design | CALIFORNIA | 1 |
| 1125-9 | LH - 2ND ST | SF Contruction - 101 Second St | CALIFORNIA | 1 |
| 1126-1 | SW-3 | MATLAB Software | CALIFORNIA | 1 |
| 1126-2 | SW-3 | MATLAB Software | CALIFORNIA | 1 |
| 1127-1 | SW-3 | Equity Edge Software | CALIFORNIA | 1 |
| 1128-11 | F&F-5 | Conference Room Chairs | CALIFORNIA | 26 |
| 1129-1 | SW-3 | Mercury Software License | CALIFORNIA | 100 |
| 1130-1 | SW-3 | Perforce Software License | CALIFORNIA | 50 |
| 1130-2 | SW-3 | Perforce Software License | CALIFORNIA | 6 |
| 1130-3 | SW-3 | Perforce SW Licenses | CALIFORNIA | 7 |
| 1131-1 | SW-3 | TripWire Licenses | CALIFORNIA | 16 |
| 1132-1 | SW-3 | Great Plains Enterprise Server License | CALIFORNIA | 1 |
| 1133-1 | EQUIP - IN LANE | Piggly Wiggly - 125 Kits of In Lane | | 125 |
| 1134-1 | EQUIP - IN LANE | SuperValu - 464 Kits of In Lane Deployed | | 464 |
| 1135-1 | EQUIP - IN LANE | SuperValu - 22 Kits of In Lane Deployed | | 22 |
| 1136-1 | EQUIP - KIOSKS | SuperValu - 1 Kit of Kiosks | | 1 |
| 1137-1 | EQUIP - IN LANE | SuperValu - 84 Kits of In Lane Deployed | | 84 |
| 1138-1 | EQUIP - IN LANE | SuperValu - 65 Kits of In Lane Deployed | | 65 |
| 1139-1 | EQUIP - IN LANE | Piggly Wiglgy - 17 Kits on In Lane | | 17 |
| 1140-1 | EQUIP - KIOSKS | SuperValu - 8 Kits of Kiosks Deployed | | 8 |
| 1141-1 | EQUIP - KIOSKS | SuperValu - 1 Kit of Kiosk Deployed | | 1 |
| 1142-1 | EQUIP - IN LANE | SuperValu - 17 Kits of In Lane Deployed | | 17 |
| 1143-1 | EQUIP - IN LANE | SuperValu - 3 Kits of In Lane Deployed | | 3 |
| 1144-1 | EQUIP - KIOSKS | SuperValu - 1 Kit of Kiosks Deployed | | 1 |
| 1145-1 | EQUIP - KIOSKS | SuperValu - 38 Kits of Kiosks Deployed | | 38 |
| 1146-1 | EQUIP - IN LANE | SuperValu - 711 Kits of In Lane Deployed | | 711 |
| 1147-1 | EQUIP - KIOSKS | Albertson's - 1 Kit of Kiosks Deployed | | 1 |
| 1148-1 | EQUIP - IN LANE | Albertson's - 16 Kits In Lane Deployed | | 16 |
| 1151-1 | EQUIP - IN LANE | SuperValu - 1,070 Kits In Lane Deployed | | 1070 |
| 1152-1 | EQUIP - KIOSKS | SuperValu - 63 Kits of Kiosks Deployed | | 63 |
| 1153-1 | EQUIP - KIOSKS | Coborn's - 2 Kits of Kiosks Deployed | | 2 |
| 1154-1 | EQUIP - IN LANE | Coborn's - 47 Kits of In Lane Deployed | | 47 |
| 1155-1 | EQUIP - IN LANE | Harris Teeter - 10 Kits In Lane Deployed | | 10 |
| 1156-1 | EQUIP - IN LANE | SuperValu - 741 Kits of In Lane Deployed | | 741 |
| 1157-1 | EQUIP - KIOSKS | SuperValu - 38 Kits of Kiosks Deployed | | 38 |
| 1158-1 | EQUIP - KIOSKS | SuperValu - 5 Kits of Kiosks Deployed | | 5 |
| 1159-1 | EQUIP - KIOSKS | Albertson's - 1 Kit of Kiosks Deployed | | 1 |
| 1160-1 | EQUIP - IN LANE | Albertson's - 23 Kits In Lane Deployed | | 23 |
| 1161-1 | EQUIP - KIOSKS | Coborn's - 1 Kit of Kiosks Deployed | | 1 |
| 1162-1 | EQUIP - IN LANE | Coborn's - 38 Kits of In Lane Deployed | | 38 |
| 1163-1 | SW-3 | Vignette Licenses | CALIFORNIA | 1 |
| 1164-1 | CE-3 | Dell Remote Console Switch | CALIFORNIA | 1 |

| | | | | |
|---|---|---|---|---:|
| 1165-1 | CE-3 | Dell PE11750 Server | CALIFORNIA | 2 |
| 1166-1 | CE-3 | Dell PE8450 Server | CALIFORNIA | 1 |
| 1167-1 | CE-3 | Varari Blade Server Chasis | CALIFORNIA | 1 |
| 1168-1 | CE-3 | Dell PE2850 Server | CALIFORNIA | 2 |
| 1169-1 | CE-3 | Cisco System Catalyst | CALIFORNIA | 2 |
| 1170-1 | OE-3 | Cisco IP Phones | CALIFORNIA | 15 |
| 1171-1 | CE-3 | Cisco Router 7204VXR | CALIFORNIA | 2 |
| 1172-1 | OE-3 | Cisco IP Phone | CALIFORNIA | 30 |
| 1173-1 | OE-3 | Cisco IP Phone | CALIFORNIA | 20 |
| 1174-1 | SW-3 | Cognos Software License | CALIFORNIA | 13 |
| 1175-1 | SW-3 | Microsoft GP License | CALIFORNIA | 15 |
| 1175-2 | SW-3 | MicroSoft FRx License | CALIFORNIA | 15 |
| 1175-3 | SW-3 | Microsoft MBS Plan A | CALIFORNIA | 15 |
| 1175-4 | SW-3 | Rockton Software | CALIFORNIA | 15 |
| 1176-1 | CE-3 | Cisco Catalyst | CALIFORNIA | 3 |
| 1177-1 | SW-3 | Adobe Creative Suite Lic | CALIFORNIA | 5 |
| 1178-1 | SW-3 | Cisco Unity UM | CALIFORNIA | 50 |
| 1179-1 | SW-3 | Microsoft Smartlist Builder | CALIFORNIA | 1 |
| 1179-2 | SW-3 | Microsoft Act Level Security | CALIFORNIA | 1 |
| 1179-3 | SW-3 | Microsoft GP Enhancement | CALIFORNIA | 1 |
| 1180-1 | OE-3 | IBM Laptops | CALIFORNIA | 5 |
| 1181-1 | CE-3 | Dell PE Server | CALIFORNIA | 1 |
| 1182-1 | CE-USED | Dell PE Server | CALIFORNIA | 1 |
| 1183-1 | CE-USED | Dell PE Server | CALIFORNIA | 2 |
| 1184-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1185-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1186-1 | OE-3 | IBM Laptops | CALIFORNIA | 5 |
| 1187-1 | OE-3 | Dell Laptop | CALIFORNIA | 20 |
| 1188-1 | CE-3 | Dell PE Server | CALIFORNIA | 1 |
| 1189-1 | OE-3 | Dell Desktops | CALIFORNIA | 4 |
| 1190-1 | CE-3 | Cisco Port Voice Blades | CALIFORNIA | 2 |
| 1191-1 | SW-3 | PGP Desktop Pro License | CALIFORNIA | 20 |
| 1192-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1194-1 | LH - 2ND ST | SF 11th FL Elevator Security | CALIFORNIA | 1 |
| 1195-1 | OE-3 | Dell Desktops | CALIFORNIA | 3 |
| 1196-1 | OE-3 | IBM Laptops | CALIFORNIA | 5 |
| 1197-1 | OE-3 | IBM Laptops | CALIFORNIA | 5 |
| 1198-1 | CE-3 | Dell HD & HotSwap Trays | CALIFORNIA | 6 |
| 1199-1 | CE-3 | Dell Server & Equipment | CALIFORNIA | 1 |
| 1200-1 | CE-3 | Dell Server | CALIFORNIA | 1 |
| 1201-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1202-1 | LH - 2ND ST | SF 11th FL Sensors | CALIFORNIA | 7 |
| 1203-1 | CE-3 | Verari Systems Blade Server Equipment | CALIFORNIA | 66 |
| 1203-2 | CE-USED | Verari Systems Blade Server Equipment | CALIFORNIA | 1 |
| 1204-1 | EQUIP - IN LANE | Piggly Wiggly - 125 In Lane -Freight/Tax | | 125 |
| 1205-1 | EQUIP - IN LANE | Piggly Wiggly - 464 In Lane -Freight/Tax | | 464 |
| 1206-1 | EQUIP - IN LANE | SuperValu - 22 In lane - Freight/Tax | | 22 |
| 1207-1 | EQUIP - KIOSKS | SuperValu - 1 Kiosk - Freight/Tax | | 1 |
| 1208-1 | EQUIP - IN LANE | Piggly Wiggly - 17 In Lane -Freight/Tax | | 17 |
| 1209-1 | EQUIP - IN LANE | SuperValu - 149 In Lane - Freight/Tax | | 149 |
| 1210-1 | EQUIP - KIOSKS | SuperValu - 8 Kiosks - Freight/Tax | | 8 |
| 1211-1 | EQUIP - IN LANE | SuperValu - 17 In Lane - Freight/Tax | | 17 |
| 1212-1 | EQUIP - KIOSKS | SuperValu - 1 Kiosk - Freight/Tax | | 1 |
| 1213-1 | EQUIP - IN LANE | SuperValu - 3 In Lane - Freight/Tax | | 3 |
| 1214-1 | EQUIP - KIOSKS | SuperValu - 1 Kiosk - Freight/Tax | | 1 |
| 1215-1 | EQUIP - IN LANE | SuperValu - 711 In Lane - Freight/Tax | | 711 |
| 1216-1 | EQUIP - KIOSKS | SuperValu - 38 Kiosks - Freight/Tax | | 38 |
| 1217-1 | EQUIP - IN LANE | SuperValu - 1,070 In Lane - Freight/Tax | | 1070 |
| 1218-1 | EQUIP - IN LANE | Albertsons - 16 In Lane - Freight/Tax | | 16 |
| 1219-1 | EQUIP - IN LANE | Coborns - 47 In Lane - Freight/Tax | | 47 |
| 1220-1 | EQUIP - IN LANE | Harris Teeter - 10 In Lane - Freight/Tax | | 10 |
| 1221-1 | EQUIP - KIOSKS | Albertsons - 1 Kiosk - Freight/Tax | | 1 |
| 1222-1 | EQUIP - KIOSKS | Coborns - 2 Kiosks - Freight/Tax | | 2 |
| 1223-1 | EQUIP - KIOSKS | SuperValu - 64 Kiosks - Freight/Tax | | 64 |
| 1224-1 | EQUIP - IN LANE | SuperValu - 741 In Lane - Freight/Tax | | 741 |
| 1225-1 | EQUIP - IN LANE | Albertsons - 23 In Lane - Freight/Tax | | 23 |
| 1226-1 | EQUIP - IN LANE | Coborns - 38 In Lane - Freight/Tax | | 38 |

| 1227-1 | EQUIP - KIOSKS | Albertsons - 1 Kiosk - Freight/Tax | | 1 |
|---|---|---|---|---|
| 1228-1 | EQUIP - KIOSKS | Coborns - 1 Kiosk - Freight/Tax | | 1 |
| 1229-1 | EQUIP - KIOSKS | SuperValu - 43 Kiosk - Freight/Tax | | 43 |
| 1230-1 | SW-3 | MagicDraw UML 10.5 | CALIFORNIA | 6 |
| 1231-1 | SW-3 | OnDeCC Intranet Software | CALIFORNIA | 1 |
| 1231-2 | SW-3 | OnDeCC Enhancement | CALIFORNIA | 1 |
| 1231-3 | SW-3 | OnDeCC Enhancement | CALIFORNIA | 1 |
| 1232-1 | CE-3 | MiniZap TEST Simulator | CALIFORNIA | 1 |
| 1233-1 | SW-3 | HP OpenView Select Fed Ent | CALIFORNIA | 1 |
| 1233-2 | SW-3 | HP OpenView Select Fed Pre | CALIFORNIA | 8 |
| 1234-1 | SW-3 | Track-IT Enterprise | CALIFORNIA | 2 |
| 1234-2 | SW-3 | Track-IT Enterprise Edition | CALIFORNIA | 1 |
| 1235-1 | CE-3 | Dell Servers | CALIFORNIA | 1 |
| 1236-1 | CE-3 | Cisco Routers | CALIFORNIA | 2 |
| 1237-1 | SW-3 | Microsoft GP Collection | CALIFORNIA | 1 |
| 1238-1 | OE-3 | Cisco IP Phone | CALIFORNIA | 30 |
| 1239-1 | CE-3 | UPS System | CALIFORNIA | 2 |
| 1240-1 | SW-3 | VersaTest License | CALIFORNIA | 3 |
| 1241-1 | OE-3 | Infocus Projectors | CALIFORNIA | 2 |
| 1242-1 | SW-3 | Oracle Database Enterprise | CALIFORNIA | 16 |
| 1243-1 | CE-3 | Cisco Router Bundle | CALIFORNIA | 1 |
| 1244-1 | CE-3 | Cisco Routers & Equipment | CALIFORNIA | 10 |
| 1245-1 | SW-3 | Patchlink Update | CALIFORNIA | 500 |
| 1246-1 | CE-3 | Ingrian i321 DataSecure Platform | CALIFORNIA | 25 |
| 1246-2 | CE-3 | Ingrian i321 DataSecure | CALIFORNIA | 2 |
| 1246-3 | CE-3 | Ingrian i321 DataSecure | CALIFORNIA | 2 |
| 1246-4 | CE-3 | Ingrian i321 DataSecure | CALIFORNIA | 2 |
| 1247-1 | CE-3 | Citrix Netscaler Application | CALIFORNIA | 4 |
| 1248-1 | SW-3 | ADP HR Implementation-HRB | CALIFORNIA | 1 |
| 1248-2 | SW-3 | ADP HR Implementation-HRB | CALIFORNIA | 1 |
| 1249-1 | OE-3 | InFocus Projectors | CALIFORNIA | 2 |
| 1250-1 | CE-3 | Cisco Router | CALIFORNIA | 2 |
| 1251-1 | OE-3 | Dell Desktops | CALIFORNIA | 4 |
| 1252-1 | OE-3 | Dell Desktops | CALIFORNIA | 4 |
| 1253-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1254-1 | OE-3 | Dell LCD Monitors | CALIFORNIA | 15 |
| 1255-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1256-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1257-1 | OE-3 | Dell MiniTower Workstations | CALIFORNIA | 3 |
| 1258-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1259-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1260-1 | CE-3 | Dell Server | CALIFORNIA | 1 |
| 1261-1 | OE-3 | Dell Desktops | CALIFORNIA | 3 |
| 1262-1 | OE-3 | Dell Port Replicators | CALIFORNIA | 10 |
| 1263-1 | OE-3 | Dell Monitors | CALIFORNIA | 6 |
| 1264-1 | OE-3 | Dell Laptops | CALIFORNIA | 15 |
| 1265-1 | OE-3 | Dell Port Replicators | CALIFORNIA | 25 |
| 1266-1 | CE-3 | Cisco Router | CALIFORNIA | 1 |
| 1267-1 | SW-3 | Red Hat Ent. Linux | CALIFORNIA | 28 |
| 1268-1 | OE-3 | IBM Laptops | CALIFORNIA | 1 |
| 1268-2 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1268-3 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1269-1 | CE-3 | Cisco Router | CALIFORNIA | 2 |
| 1270-1 | CE-3 | Server | CALIFORNIA | 135 |
| 1271-1 | CE-3 | Intrusin Prevention Appl | CALIFORNIA | 1 |
| 1272-1 | CE-3 | EMC 2U Media Server | CALIFORNIA | 1 |
| 1273-1 | OE-3 | Apple Macbooks | CALIFORNIA | 2 |
| 1274-1 | CE-3 | Dell Servers | CALIFORNIA | 6 |
| 1275-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1276-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1277-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1278-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1279-1 | OE-3 | Dell MiniTowers | CALIFORNIA | 3 |
| 1280-1 | CE-3 | Dell Servers | CALIFORNIA | 1 |
| 1281-1 | OE-3 | Dell Port Replicators | CALIFORNIA | 20 |
| 1282-1 | CE-3 | Dell Rackmount PDUs | CALIFORNIA | 11 |
| 1283-1 | CE-3 | Dell Server | CALIFORNIA | 1 |

| | | | | |
|---|---|---|---|---:|
| 1284-1 | CE-3 | Dell Hard Drives | CALIFORNIA | 8 |
| 1285-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1286-1 | CE-3 | Dell Server | CALIFORNIA | 2 |
| 1287-1 | CE-3 | Dell Server | CALIFORNIA | 2 |
| 1288-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1289-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1290-1 | CE-3 | Dell Hard Drives | CALIFORNIA | 8 |
| 1291-1 | SW-3 | Microsoft GP RMA | CALIFORNIA | 1 |
| 1292-1 | SW-3 | Solidworks Office Prof | CALIFORNIA | 1 |
| 1293-1 | CE-3 | Cisco Switch | CALIFORNIA | 3 |
| 1294-1 | OE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1295-1 | CE-3 | Cisco Router | CALIFORNIA | 5 |
| 1296-1 | OE-3 | Dell LCD Flat Panels | CALIFORNIA | 20 |
| 1297-1 | CE-3 | Dell Storage Arrays | CALIFORNIA | 2 |
| 1298-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1299-1 | OE-3 | IBM Laptops | CALIFORNIA | 3 |
| 1300-1 | SW-3 | Perforce Software License | CALIFORNIA | 6 |
| 1300-2 | SW-3 | Perforce Software License | CALIFORNIA | 7 |
| 1300-3 | SW-3 | Perforce Software License | CALIFORNIA | 7 |
| 1302-1 | CE-3 | Cisco Switch | CALIFORNIA | 2 |
| 1303-1 | OE-3 | Dell Port Replicators & LCD | CALIFORNIA | 20 |
| 1304-1 | OE-3 | Cisco IP Phones | CALIFORNIA | 15 |
| 1305-1 | CE-3 | Dell Servers | CALIFORNIA | 4 |
| 1305-2 | CE-3 | Dell Servers | CALIFORNIA | 2 |
| 1306-1 | CE-3 | Cisco Switch | CALIFORNIA | 1 |
| 1307-1 | CE-3 | Citrix NetScaler Applications | CALIFORNIA | 2 |
| 1307-2 | CE-3 | Citrix NetScaler Applications | CALIFORNIA | 1 |
| 1308-1 | CE-3 | Cisco Routers | CALIFORNIA | 12 |
| 1309-1 | OE-3 | Dell Laptops | CALIFORNIA | 2 |
| 1310-1 | OE-3 | IBM Laptop | CALIFORNIA | 1 |
| 1311-1 | CE-3 | Cisco Router Bundles | CALIFORNIA | 4 |
| 1312-1 | CE-3 | Cisco Router Bundles | CALIFORNIA | 10 |
| 1313-1 | OE-3 | NEC Projector | CALIFORNIA | 1 |
| 1314-1 | OE-3 | Dell Laptops | CALIFORNIA | 2 |
| 1315-1 | OE-3 | Dell Laptops | CALIFORNIA | 2 |
| 1316-1 | OE-3 | IBM Laptop | CALIFORNIA | 1 |
| 1317-1 | OE-3 | IBM Laptop | CALIFORNIA | 1 |
| 1318-1 | SW-3 | IBM Tivoli Application | CALIFORNIA | 1 |
| 1319-1 | CE-3 | Cisco Router Bundles | CALIFORNIA | 2 |
| 1320-1 | CE-3 | Cisco Router Bundles | CALIFORNIA | 2 |
| 1321-1 | OE-3 | Apple MacBook | CALIFORNIA | 1 |
| 1322-1 | OE-3 | Toshiba Laptop | CALIFORNIA | 1 |
| 1323-1 | CE-3 | Cisco Catalyst | CALIFORNIA | 1 |
| 1324-1 | OE-3 | IBM Laptop | CALIFORNIA | 1 |
| 1325-1 | OE-3 | Dell Laptops | CALIFORNIA | 2 |
| 1326-1 | CE-3 | Dell Servers | CALIFORNIA | 3 |
| 1326-2 | CE-3 | Dell Servers | CALIFORNIA | 2 |
| 1327-1 | CE-3 | Dell Server | CALIFORNIA | 1 |
| 1328-1 | CE-3 | Dell Server | CALIFORNIA | 1 |
| 1329-1 | CE-3 | Cisco Servers & Switches | CALIFORNIA | 12 |
| 1330-1 | CE-3 | IBM POS Hardware | CALIFORNIA | 1 |
| 1331-1 | OE-3 | IBM Laptops | CALIFORNIA | 2 |
| 1332-1 | OE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1333-1 | CE-3 | Servers | CALIFORNIA | 5 |
| 1334-1 | CE-3 | Servers | CALIFORNIA | 19 |
| 1335-1 | CE-3 | Servers | CALIFORNIA | 40 |
| 1336-1 | CE-3 | Servers | CALIFORNIA | 4 |
| 1338-1 | LH - 2ND ST | Biometric Readers 11th & 15th Floor | CALIFORNIA | 7 |
| 1339-1 | LH - 2ND ST | Bosch Cameras (6) | CALIFORNIA | 6 |
| 1340-1 | LH - 2ND ST | Reception & Executive Area Construction | CALIFORNIA | 1 |
| 1341-1 | SW-3 | Sharepoint Oracle Linux Tier A | CALIFORNIA | 4 |
| 1341-2 | SW-3 | Shareplex Oracle Linux Tier B | CALIFORNIA | 2 |
| 1341-3 | SW-3 | Shareplex Oracle Non Prod Linux Tier A | CALIFORNIA | 2 |
| 1341-4 | SW-3 | Performasure Management Server License | CALIFORNIA | 1 |
| 1341-5 | SW-3 | Performasure Websphere Agent Per CPU Lic | CALIFORNIA | 4 |
| 1341-6 | SW-3 | Jprobe Suite Node Locked for Aix License | CALIFORNIA | 10 |
| 1341-7 | SW-3 | Toad for Oracle License | CALIFORNIA | 37 |

| | | | | |
|---|---|---|---|---|
| 1341-8 | SW-3 | Toad for Oracle Xpert W DBA Module | CALIFORNIA | 4 |
| 1342-1 | SW-3 | ARM RealView Multi-ICE 2.2 | CALIFORNIA | 1 |
| 1343-1 | CE-3 | DSF 400 A3 Barracuda Spam Firewall | CALIFORNIA | 1 |
| 1343-2 | CE-3 | BSF 400A-H3 Barracuda Spam Firewall | CALIFORNIA | 2 |
| 1344-1 | OE-3 | Dell Lattitude D620 Laptop | CALIFORNIA | 10 |
| 1345-1 | OE-3 | IBM Lenovo T60P Laptop | CALIFORNIA | 1 |
| 1346-1 | OE-3 | IBM Lenovo R60E Laptop | CALIFORNIA | 4 |
| 1347-1 | OE-3 | Dell PowerEdge 2850 Server | CALIFORNIA | 1 |
| 1348-1 | OE-3 | Dell Latitude D620 Laptop | CALIFORNIA | 2 |
| 1349-1 | OE-3 | Dell 1907FP 19" LCD UltraSharp | CALIFORNIA | 20 |
| 1350-1 | OE-3 | Dell Latitude D620 Laptop | CALIFORNIA | 10 |
| 1351-1 | OE-3 | Dell Latitude D620 Laptop | CALIFORNIA | 10 |
| 1352-1 | SW-3 | Cisco Unity Messaging System User Licens | CALIFORNIA | 100 |
| 1353-1 | SW-3 | ManageEngine OpManager Prof Edition | CALIFORNIA | 1 |
| 1353-2 | SW-3 | Spotlight for Oracle-1 Server-Linux OS | CALIFORNIA | 1 |
| 1353-3 | CE-3 | APC RM PDU Switched 0U 208V-20A-21 | CALIFORNIA | 2 |
| 1354-1 | OE-3 | Dell Latitude D620 Laptop | CALIFORNIA | 5 |
| 1355-1 | OE-3 | Dell Optiplex 745 Minitower | CALIFORNIA | 5 |
| 1356-1 | CE-3 | Dell PowerEdge 2850 Server | CALIFORNIA | 2 |
| 1357-1 | F&F-5 | Office Furniture-Drawer/Bookcase/Chair | CALIFORNIA | 23 |
| 1358-1 | OE-3 | Dell Latitude D620 Laptop | CALIFORNIA | 20 |
| 1359-1 | OE-3 | Dell Optiplex 745 Minitower | CALIFORNIA | 5 |
| 1360-1 | OE-3 | Dell Advanced Port Replicator | CALIFORNIA | 20 |
| 1361-1 | CE-3 | Dell PowerEdge 6850 Server | CALIFORNIA | 2 |
| 1361-2 | CE-3 | Dell PowerEdge 2850 Server | CALIFORNIA | 1 |
| 1362-1 | SW-3 | Perforce Software License | CALIFORNIA | 7 |
| 1364-1 | CE-3 | IP Angel 400 Intrusion Detection Applian | CALIFORNIA | 3 |
| 1365-1 | CE-3 | Cisco PIX-515-FO-BUN/PA-2T3 Port | CALIFORNIA | 2 |
| 1366-1 | CE-3 | Dell PowerEdge 2850 Servers | CALIFORNIA | 2 |
| 1367-1 | CE-3 | Cisco 2821-SRST-K9 Router | CALIFORNIA | 1 |
| 1368-1 | OE-3 | Apple Macbook Pro 17 in 2.3 | CALIFORNIA | 1 |
| 1369-1 | F&F-5 | Workstations & Furniture | CALIFORNIA | 18 |
| 1370-1 | F&F-5 | Mid-Back Swivel Base Task Chairs | CALIFORNIA | 15 |
| 1372-1 | OE-3 | Delll Latitude D420 Laptop | CALIFORNIA | 10 |
| 1373-1 | OE-3 | IBM Lenovo X60 Laptop | CALIFORNIA | 2 |
| 1374-1 | OE-3 | Dell Latitude D420 Laptops | CALIFORNIA | 10 |
| 1375-1 | OE-3 | Dell Latitude D420 Laptops | CALIFORNIA | 10 |
| 1376-1 | OE-3 | Cisco VOIP Phones | CALIFORNIA | 20 |
| 1377-1 | OE-3 | Dell Latitude D620 Laptops | CALIFORNIA | 5 |
| 1378-1 | OE-3 | Dell Optiplex 745 Desktops | CALIFORNIA | 3 |
| 1379-1 | OE-3 | IBM Lenovo X60 Laptops | CALIFORNIA | 2 |
| 1380-1 | OE-3 | Dell Advanced Port Replicator | CALIFORNIA | 20 |
| 1381-1 | OE-3 | Dell 19" LCD Digital Monitors | CALIFORNIA | 20 |
| 1382-1 | OE-3 | Dell Latitude D620 Laptops | CALIFORNIA | 3 |
| 1384-1 | SW-3 | Ap Test Manager Software | CALIFORNIA | 10 |
| 1385-1 | SW-3 | IBM Profile Stage Enterprise Editions | CALIFORNIA | 1 |
| 1385-2 | SW-3 | IBM Profile Stage Enterprise Edition | CALIFORNIA | 1 |
| 1385-3 | SW-3 | IBM Information Services Director | CALIFORNIA | 1 |
| 1385-4 | SW-3 | IBM Webspere Datastage | CALIFORNIA | 1 |
| 1385-5 | SW-3 | IBM Websphere Quality Stage | CALIFORNIA | 1 |
| 1386-1 | IUS | Roles and Permissions Management | | 1 |
| 1386-2 | IUS | Roles and Permissions Management | | 1 |
| 1387-1 | IUS | Store Locator 2.0 | | 1 |
| 1387-2 | IUS | Store Locator 2.0 | | 1 |
| 1388-1 | IUS | Loyalty Card Revisions | | 1 |
| 1388-2 | IUS | Loyalty Card Revisions | | 1 |
| 1389-1 | IUS | DDA Certegy | | 1 |
| 1389-2 | IUS | DDA Certegy | | 1 |
| 1389-3 | IUS | DDA Certegy | | 1 |
| 1390-1 | IUS | Code  Restructuring for Operations | | 1 |
| 1390-2 | IUS | Code  Restructuring for Operations | | 1 |
| 1390-3 | IUS | Code  Restructuring for Operations | | 1 |
| 1390-4 | IUS | Code  Restructuring for Operations | | 1 |
| 1391-1 | IUS | ACH Fed Table Validation | | 1 |
| 1392-1 | IUS | Country Selection Page | | 1 |
| 1392-10 | IUS | DavidBrummy Software Inc. | | 1 |
| 1392-11 | IUS | DavidBrummy Software Inc. | | 1 |

| | | | |
|---|---|---|---|
| 1392-12 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-2 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-3 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-4 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-5 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-6 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-7 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-8 | IUS | DavidBrummy Software Inc. | 1 |
| 1392-9 | IUS | DavidBrummy Software Inc. | 1 |
| 1393-1 | IUS | UK Direct Debit Email | 1 |
| 1393-2 | IUS | UK Direct Debit Email | 1 |
| 1393-3 | IUS | UK Direct Debit Email | 1 |
| 1393-4 | IUS | UK Direct Debit Email | 1 |
| 1394-1 | IUS | Paycore Upgrades | 1 |
| 1395-1 | IUS | Merchant Boarding Tool | 1 |
| 1395-2 | IUS | Merchant Boarding Tool | 1 |
| 1395-3 | IUS | Merchant Boarding Tool | 1 |
| 1395-4 | IUS | Merchant Boarding Tool | 1 |
| 1395-5 | IUS | Merchant Boarding Tool | 1 |
| 1395-6 | IUS | Merchant Boarding Tool | 1 |
| 1395-7 | IUS | Merchant Boarding Tool | 1 |
| 1395-8 | IUS | Merchant Boarding Tool | 1 |
| 1396-1 | IUS | ACH 3.0 - Bal ACH / Cut Message and Conf | 1 |
| 1396-2 | IUS | ACH 3.0 - Bal ACH / Cut Message and Conf | 1 |
| 1396-3 | IUS | ACH 3.0 - Bal ACH / Cut Message and Conf | 1 |
| 1396-4 | IUS | ACH 3.0 - Bal ACH / Cut Message and Conf | 1 |
| 1397-1 | IUS | Merchant Hierarchy Boarding UI | 1 |
| 1397-2 | IUS | Merchant Hierarchy Boarding UI | 1 |
| 1397-3 | IUS | Silver Start Development Group | 1 |
| 1397-4 | IUS | Silver Start Development Group | 1 |
| 1397-5 | IUS | Silver Start Development Group | 1 |
| 1397-6 | IUS | E2ESP | 1 |
| 1397-7 | IUS | E2ESP | 1 |
| 1397-8 | IUS | E2ESP | 1 |
| 1398-1 | IUS | Cogent Re-architecture | 1 |
| 1398-2 | IUS | Cogent Re-architecture | 1 |
| 1398-3 | IUS | Cogent Re-architecture | 1 |
| 1398-4 | IUS | Cogent Re-architecture | 1 |
| 1398-5 | IUS | Cogent Re-architecture | 1 |
| 1399-1 | IUS | Paycore 4.0 (New Merchant Core) | 1 |
| 1399-2 | IUS | Paycore 4.0 (New Merchant Core) | 1 |
| 1399-3 | IUS | Paycore 4.0 (New Merchant Core) | 1 |
| 1400-1 | IUS | Core Services APIs Using MDA | 1 |
| 1400-2 | IUS | Core Services APIs Using MDA | 1 |
| 1400-3 | IUS | Core Services APIs Using MDA | 1 |
| 1401-1 | IUS | DDA | 1 |
| 1401-2 | IUS | DDA | 1 |
| 1401-3 | IUS | DDA | 1 |
| 1401-4 | IUS | DDA | 1 |
| 1401-5 | IUS | DDA | 1 |
| 1402-1 | IUS | Billing Interface (Albertsons) | 1 |
| 1402-2 | IUS | Billing Interface (Albertsons) | 1 |
| 1402-3 | IUS | Billing Interface (Albertsons) | 1 |
| 1402-4 | IUS | Billing Interface (Albertsons) | 1 |
| 1403-1 | IUS | Billing Interface (SV & PIG) | 1 |
| 1403-2 | IUS | Billing Interface (SV & PIG) | 1 |
| 1403-3 | IUS | Billing Interface (SV & PIG) | 1 |
| 1403-4 | IUS | Billing Interface (SV & PIG) | 1 |
| 1403-5 | IUS | Billing Interface (SV & PIG) | 1 |
| 1404-1 | IUS | BioPay Integration & Interoperability | 1 |
| 1404-2 | IUS | BioPay Integration & Interoperability | 1 |
| 1404-3 | IUS | BioPay Integration & Interoperability | 1 |
| 1404-4 | IUS | BioPay Integration & Interoperability | 1 |
| 1405-1 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-10 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-2 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-3 | IUS | iPAS (KCS & In Lane) | 1 |

| | | | |
|---|---|---|---|
| 1405-4 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-5 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-6 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-7 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-8 | IUS | iPAS (KCS & In Lane) | 1 |
| 1405-9 | IUS | iPAS (KCS & In Lane) | 1 |
| 1406-1 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1406-2 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1406-3 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1406-4 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1406-5 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1406-6 | IUS | 4690 ECR Pass Through - IBM | 1 |
| 1407-1 | IUS | PBT Kiosk 2.0 | 1 |
| 1407-2 | IUS | PBT Kiosk 2.0 | 1 |
| 1407-3 | IUS | PBT Kiosk 2.0 | 1 |
| 1408-1 | IUS | Client Appliance | 1 |
| 1408-10 | IUS | Client Appliance | 1 |
| 1408-11 | IUS | Client Appliance | 1 |
| 1408-12 | IUS | Client Appliance | 1 |
| 1408-13 | IUS | Client Appliance | 1 |
| 1408-14 | IUS | Client Appliance | 1 |
| 1408-15 | IUS | Client Appliance | 1 |
| 1408-2 | IUS | Client Appliance | 1 |
| 1408-3 | IUS | Client Appliance | 1 |
| 1408-4 | IUS | Client Appliance | 1 |
| 1408-5 | IUS | Client Appliance | 1 |
| 1408-6 | IUS | Client Appliance | 1 |
| 1408-7 | IUS | Client Appliance | 1 |
| 1408-8 | IUS | Client Appliance | 1 |
| 1408-9 | IUS | Client Appliance | 1 |
| 1409-1 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-2 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-3 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-4 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-5 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-6 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-7 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-8 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1409-9 | IUS | Multi-Tiered Software Distribution Capab | 1 |
| 1410-1 | IUS | ABS Co-Branding | 1 |
| 1410-2 | IUS | ABS Co-Branding | 1 |
| 1411-1 | IUS | Sagem Sensor Integration | 1 |
| 1411-2 | IUS | Sagem Sensor Integration | 1 |
| 1411-3 | IUS | Sagem Sensor Integration | 1 |
| 1411-4 | IUS | Sagem Sensor Integration | 1 |
| 1411-5 | IUS | Sagem Sensor Integration | 1 |
| 1411-6 | IUS | Sagem Sensor Integration | 1 |
| 1412-1 | IUS | Common Java Crypto Library | 1 |
| 1412-2 | IUS | Common Java Crypto Library | 1 |
| 1413-1 | IUS | E2ESP Offshore Development | 1 |
| 1413-2 | IUS | E2ESP Offshore Development | 1 |
| 1413-3 | IUS | E2ESP Offshore Development Team | 1 |
| 1413-4 | IUS | E2ESP Offshore Development Team | 1 |
| 1413-5 | IUS | E2ESP Offshore Development Team | 1 |
| 1413-6 | IUS | E2ESP 9/14/06 | 1 |
| 1414-1 | IUS | Roy Thomas Consulting | 1 |
| 1414-10 | IUS | Cluster Inc SmartShop Software | 1 |
| 1414-11 | IUS | Cluster Inc 9/30/06 | 1 |
| 1414-12 | IUS | Hobbes Enterprise | 1 |
| 1414-13 | IUS | Hobbes Enterprise | 1 |
| 1414-14 | IUS | Hobbes Enterprise | 1 |
| 1414-15 | IUS | Hobbes Enterprise | 1 |
| 1414-16 | IUS | Hobbes Enterprise | 1 |
| 1414-17 | IUS | Hobbes Enterprise | 1 |
| 1414-18 | IUS | Hobbes Enterprise | 1 |
| 1414-19 | IUS | Hobbes Enterprise | 1 |
| 1414-2 | IUS | Roy Thomas Consulting | 1 |

| | | | | |
|---|---|---|---|---|
| 1414-20 | IUS | Hobbes Enterprise | | 1 |
| 1414-3 | IUS | Cluster Inc Smartshop System Development | | 1 |
| 1414-4 | IUS | Roy Thomas Consulting | | 1 |
| 1414-5 | IUS | Roy Thomas Consulting | | 1 |
| 1414-6 | IUS | Cluster SmartShop System Development | | 1 |
| 1414-7 | IUS | Cluster Inc Smartshop System Development | | 1 |
| 1414-8 | IUS | Roy Thomas Consulting | | 1 |
| 1414-9 | IUS | Roy Thomas Consulting | | 1 |
| 1415-1 | IUS | Anirudh Joshi Consulting | | 1 |
| 1416-1 | CE-3 | Inspection Microscope  - Sensor Failure | CALIFORNIA | 1 |
| 1417-1 | EQUIP - SERVERS | Cisco Routers | | 5 |
| 1422-1 | SW-3 | Caliber Analyst | CALIFORNIA | 5 |
| 1423-1 | CE-3 | Cisco ASA | CALIFORNIA | 1 |
| 1423-2 | CE-3 | ASA 5510 Sec Plus License | CALIFORNIA | 1 |
| 1424-1 | CE-3 | Cisco Catalyst | CALIFORNIA | 2 |
| 1424-2 | CE-3 | Cisco ASA | CALIFORNIA | 1 |
| 1424-3 | CE-3 | Cisco Catalyst | CALIFORNIA | 2 |
| 1424-4 | CE-3 | CAT6500 AC Power Supply | CALIFORNIA | 4 |
| 1424-5 | CE-3 | Smartnet WLAN Controller | CALIFORNIA | 1 |
| 1424-6 | CE-3 | 3COM 1000 Base-T SFP | CALIFORNIA | 2 |
| 1424-7 | CE-3 | ASA 5520 Appliance | CALIFORNIA | 1 |
| 1426-1 | CE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1427-1 | CE-3 | Cisco Router | CALIFORNIA | 2 |
| 1428-1 | CE-3 | Cisco Routers | CALIFORNIA | 7 |
| 1429-1 | SW-3 | Cisco Secure ACS | CALIFORNIA | 4 |
| 1430-1 | CE-3 | Cisco WLAN | CALIFORNIA | 1 |
| 1430-2 | CE-3 | Cisco LWAPP | CALIFORNIA | 6 |
| 1431-1 | OE-3 | Dell Desktops | CALIFORNIA | 2 |
| 1432-1 | CE-3 | Cisco IP Phones | CALIFORNIA | 20 |
| 1433-1 | CE-3 | Dell Server | CALIFORNIA | 1 |
| 1434-1 | IUS | CAE | | 1 |
| 1434-10 | IUS | Xoriant Corporation | | 1 |
| 1434-11 | IUS | Xoriant Corporation | | 1 |
| 1434-12 | IUS | Xoriant Corporation | | 1 |
| 1434-13 | IUS | Xoriant Corporation | | 1 |
| 1434-14 | IUS | CAE | | 1 |
| 1434-15 | IUS | Xoriant Corporation | | 1 |
| 1434-16 | IUS | Xoriant Corporation | | 1 |
| 1434-17 | IUS | Xoriant Corporation | | 1 |
| 1434-18 | IUS | Xoriant Corporation | | 1 |
| 1434-19 | IUS | Xoriant Corporation | | 1 |
| 1434-2 | IUS | CAE | | 1 |
| 1434-20 | IUS | CAE | | 1 |
| 1434-21 | IUS | CAE | | 1 |
| 1434-22 | IUS | CAE | | 1 |
| 1434-23 | IUS | CAE | | 1 |
| 1434-24 | IUS | CAE | | 1 |
| 1434-25 | IUS | CAE | | 1 |
| 1434-3 | IUS | CAE | | 1 |
| 1434-4 | IUS | CAE | | 1 |
| 1434-5 | IUS | Xoriant Corporation | | 1 |
| 1434-6 | IUS | Xoriant Corporation | | 1 |
| 1434-7 | IUS | Xoriant Corporation | | 1 |
| 1434-8 | IUS | CAE | | 1 |
| 1434-9 | IUS | Xoriant Corporation | | 1 |
| 1435-1 | IUS | BioPay In Store Web Enrollment (ISWE) | | 1 |
| 1435-2 | IUS | BioPay In Store Web Enrollment (ISWE) | | 1 |
| 1435-3 | IUS | BioPay In Store Web Enrollment (ISWE) | | 1 |
| 1436-1 | IUS | Xoriant Corporation 9/26/06 | | 1 |
| 1436-10 | IUS | Xoriant Corporation | | 1 |
| 1436-11 | IUS | Xoriant Corporation | | 1 |
| 1436-12 | IUS | Xoriant Corporation | | 1 |
| 1436-13 | IUS | Xoriant Corporation | | 1 |
| 1436-14 | IUS | Xoriant Corporation | | 1 |
| 1436-15 | IUS | Xoriant Corporation | | 1 |
| 1436-2 | IUS | Xoriant Corporation 9/26/06 | | 1 |
| 1436-3 | IUS | Xoriant Corporation 9/26/06 | | 1 |

| | | | |
|---|---|---|---|
| 1436-4 | IUS | Xoriant Corporation 9/30/06 | 1 |
| 1436-5 | IUS | Xoriant Corporation 9/30/06 | 1 |
| 1436-6 | IUS | Xoriant Corporation | 1 |
| 1436-7 | IUS | Xoriant Corporation | 1 |
| 1436-8 | IUS | Xoriant Corporation | 1 |
| 1436-9 | IUS | Xoriant Corporation | 1 |
| 1437-1 | IUS | Store Locator 1.0 | 1 |
| 1437-2 | IUS | Store Locator 1.0 | 1 |
| 1437-3 | IUS | Store Locator 1.0 | 1 |
| 1437-4 | IUS | Vignette 9/30/06 (PDS-67,PDS-91, PDS-92) | 1 |
| 1437-5 | IUS | Vignette 9/30/06 (PDS-67,PDS-91, PDS-92) | 1 |
| 1437-6 | IUS | Vignette 9/30/06 (PDS-67,PDS-91, PDS-92) | 1 |
| 1437-7 | IUS | Vignette 9/30/06 (PDS-67,PDS-91, PDS-92) | 1 |
| 1438-1 | IUS | Web 1.75 (WES 3.0) | 1 |
| 1438-2 | IUS | Web 1.75 (WES 3.0) | 1 |
| 1439-1 | IUS | Shell / Petroleum POC | 1 |
| 1439-10 | IUS | Tim Beattie Associates | 1 |
| 1439-11 | IUS | Tim Beattie Associates | 1 |
| 1439-12 | IUS | Shell / Petroleum POC | 1 |
| 1439-13 | IUS | Tim Beattie Associates | 1 |
| 1439-14 | IUS | Tim Beattie Associates | 1 |
| 1439-15 | IUS | Tim Beattie Associates | 1 |
| 1439-16 | IUS | Gilbarco Biometric CRIND SW Modification | 1 |
| 1439-17 | IUS | Shell / Petroleum POC | 1 |
| 1439-18 | IUS | Shell / Petroleum POC | 1 |
| 1439-19 | IUS | Shell / Petroleum POC | 1 |
| 1439-2 | IUS | Shell / Petroleum POC | 1 |
| 1439-20 | IUS | Shell / Petroleum POC | 1 |
| 1439-21 | IUS | Shell / Petroleum POC | 1 |
| 1439-22 | IUS | Shell / Petroleum POC | 1 |
| 1439-23 | IUS | Shell / Petroleum POC | 1 |
| 1439-24 | IUS | Shell / Petroleum POC | 1 |
| 1439-25 | IUS | Shell / Petroleum POC | 1 |
| 1439-3 | IUS | Tim Beattie Associates 8/31/06 | 1 |
| 1439-4 | IUS | Shell / Petroleum POC | 1 |
| 1439-5 | IUS | Shell / Petroleum POC | 1 |
| 1439-6 | IUS | Tim Beattie Associates | 1 |
| 1439-7 | IUS | Tim Beattie Associates | 1 |
| 1439-8 | IUS | Shell / Petroleum POC | 1 |
| 1439-9 | IUS | Tim Beattie Associates | 1 |
| 1440-1 | IUS | Limits Logic Enhancements | 1 |
| 1440-2 | IUS | Limits Logic Enhancements | 1 |
| 1440-3 | IUS | Limits Logic Enhancements | 1 |
| 1441-1 | IUS | PBT Java 3.0 New MIF Integration - MDA & | 1 |
| 1441-2 | IUS | PBT Java 3.0 New MIF Integration - MDA & | 1 |
| 1442-1 | IUS | ePOD Kiosk 1.6 | 1 |
| 1442-2 | IUS | ePOD Kiosk 1.6 | 1 |
| 1442-3 | IUS | ePOD Kiosk 1.6 | 1 |
| 1443-1 | IUS | PBT Client Libraries for PBT East | 1 |
| 1443-2 | IUS | PBT Client Libraries for PBT East | 1 |
| 1443-3 | IUS | PBT Client Libraries for PBT East | 1 |
| 1444-1 | IUS | Citibank SG (WES 3.1) | 1 |
| 1444-2 | IUS | Citibank SG (WES 3.1) | 1 |
| 1444-3 | IUS | Citibank SG (WES 3.1) | 1 |
| 1445-1 | IUS | Web 3.1 (WES 3.1) | 1 |
| 1445-2 | IUS | Web 3.1 (WES 3.1) | 1 |
| 1445-3 | IUS | Web 3.1 (WES 3.1) | 1 |
| 1446-1 | IUS | JCE-based Crypto Library Integration (WE | 1 |
| 1446-2 | IUS | JCE-based Crypto Library Integration (WE | 1 |
| 1446-3 | IUS | JCE-based Crypto Library Integration (WE | 1 |
| 1447-1 | IUS | ACH-BATCH new functionality for ACH OPS | 1 |
| 1448-1 | IUS | Autobill - New Merchant - Merchant 129 - | 1 |
| 1448-2 | IUS | Autobill - New Merchant - Merchant 129 - | 1 |
| 1449-1 | IUS | Rollout of Corporate Intranet by Marketi | 1 |
| 1449-2 | IUS | Rollout of Corporate Intranet by Marketi | 1 |
| 1449-3 | IUS | Rollout of Corporate Intranet by Marketi | 1 |
| 1450-1 | IUS | Vignette POC | 1 |

| | | | | |
|---|---|---|---|---|
| 1450-2 | IUS | Vignette POC | | 1 |
| 1450-3 | IUS | Vignette POC | | 1 |
| 1451-1 | IUS | WES 3.2 | | 1 |
| 1451-2 | IUS | WES 3.2 | | 1 |
| 1452-1 | IUS | ACH-BATCH Release: Call to WSS is remove | | 1 |
| 1452-2 | IUS | ACH-BATCH Release: Call to WSS is remove | | 1 |
| 1453-1 | IUS | Autobill - New Merchant - Merchant 130 S | | 1 |
| 1453-2 | IUS | Autobill - New Merchant - Merchant 130 S | | 1 |
| 1453-3 | IUS | Autobill - New Merchant - Merchant 130 S | | 1 |
| 1454-1 | IUS | Autobill - New Merchant - Merchant 131 - | | 1 |
| 1454-2 | IUS | Autobill - New Merchant - Merchant 131 - | | 1 |
| 1454-3 | IUS | Autobill - New Merchant - Merchant 131 - | | 1 |
| 1455-1 | IUS | Autobill - New Merchant - Merchant 132 - | | 1 |
| 1455-2 | IUS | Autobill - New Merchant - Merchant 132 - | | 1 |
| 1455-3 | IUS | Autobill - New Merchant - Merchant 132 - | | 1 |
| 1456-1 | IUS | Autobill - New Merchant - Merchant 139 - | | 1 |
| 1456-2 | IUS | Autobill - New Merchant - Merchant 139 - | | 1 |
| 1456-3 | IUS | Autobill - New Merchant - Merchant 139 - | | 1 |
| 1457-1 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-2 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-3 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-4 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-5 | IUS | Cogent Extraction Server NRE | CALIFORNIA | 1 |
| 1457-6 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-7 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1457-8 | IUS | BioPay Integration & Interoperability Pr | | 1 |
| 1458-1 | IUS | Hobbes 1.0 | | 1 |
| 1458-2 | IUS | Hobbes 1.0 | | 1 |
| 1458-3 | IUS | Hobbes 1.0 | | 1 |
| 1458-4 | IUS | Hobbes 1.0 | | 1 |
| 1458-5 | IUS | Hobbes 1.0 | | 1 |
| 1459-1 | IUS | PBT Java Server 3.0.1 | | 1 |
| 1459-2 | IUS | PBT Java Server 3.0.1 | | 1 |
| 1459-3 | IUS | PBT Java Server 3.0.1 | | 1 |
| 1460-1 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-10 | IUS | Amigo | | 1 |
| 1460-11 | IUS | Amigo | | 1 |
| 1460-2 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-3 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-4 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-5 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-6 | IUS | Order Fulfillment Interface - Amigo | | 1 |
| 1460-7 | IUS | Amigo | | 1 |
| 1460-8 | IUS | Amigo | | 1 |
| 1460-9 | IUS | Amigo | | 1 |
| 1461-1 | IUS | Autobill - Release 2.1.1 | | 1 |
| 1461-2 | IUS | Autobill - Release 2.1.1 | | 1 |
| 1461-3 | IUS | Autobill - Release 2.1.1 | | 1 |
| 1461-4 | IUS | Autobill - Release 2.1.1 | | 1 |
| 1461-5 | IUS | Autobill - Release 2.1.1 | | 1 |
| 1466-1 | CE-3 | IBM Laptops | CALIFORNIA | 3 |
| 1467-1 | CE-3 | Dell Laptops | CALIFORNIA | 5 |
| 1468-1 | CE-3 | IBM Laptops | CALIFORNIA | 1 |
| 1469-1 | CE-3 | IBM Laptop | CALIFORNIA | 1 |
| 1470-1 | CE-3 | Cisco Sup Engines | CALIFORNIA | 6 |
| 1470-2 | CE-3 | Cisco Flex Wan | CALIFORNIA | 2 |
| 1470-3 | CE-3 | Cisco Catalyst | CALIFORNIA | 2 |
| 1470-4 | CE-3 | Cisco T3 Adapter | CALIFORNIA | 2 |
| 1470-5 | CE-3 | Cisco Blades | CALIFORNIA | 6 |
| 1471-1 | CE-3 | NCR SuperValu System | CALIFORNIA | 1 |
| 1473-1 | CE-3 | Rackable 1U C1000 Chassis | CALIFORNIA | 35 |
| 1474-1 | CE-3 | Dell Laptops | CALIFORNIA | 10 |
| 1475-1 | CE-3 | Dell PE1950 Server | CALIFORNIA | 1 |
| 1476-1 | SW-3 | Jive Forum Silver | CALIFORNIA | 1 |
| 1477-1 | IUS | Corp Web Site | | 1 |
| 1477-2 | IUS | Corp Web Site | | 1 |
| 1477-3 | IUS | Corp Web Site | | 1 |

| | | | |
|---|---|---|---|
| 1478-1 | IUS | Web Enrollment Redesign (WES 3.2) | 1 |
| 1478-2 | IUS | Web Enrollment Redesign (WES 3.2) | 1 |
| 1478-3 | IUS | Web Enrollment Redesign (WES 3.2) | 1 |
| 1479-1 | IUS | HSM Configuration (WES 3.2.1, CSR Admin | 1 |
| 1479-2 | IUS | HSM Configuration (WES 3.2.1, CSR Admin | 1 |
| 1479-3 | IUS | HSM Configuration (WES 3.2.1, CSR Admin | 1 |
| 1480-1 | IUS | Whole Foods NBS (CSR Admin 3.3) | 1 |
| 1480-2 | IUS | Whole Foods NBS (CSR Admin 3.3) | 1 |
| 1480-3 | IUS | Whole Foods NBS (CSR Admin 3.3) | 1 |
| 1481-1 | IUS | Web Wallet Admin (WWA) 1.0 | 1 |
| 1481-2 | IUS | Web Wallet Admin (WWA) 1.0 | 1 |
| 1481-3 | IUS | Web Wallet Admin (WWA) 1.0 | 1 |
| 1482-1 | IUS | iBoard | 1 |
| 1482-2 | IUS | iBoard | 1 |
| 1482-3 | IUS | iBoard | 1 |
| 1482-4 | IUS | iboard 2.0 | 1 |
| 1482-5 | IUS | iboard 2.0 | 1 |
| 1482-6 | IUS | iboard 2.0 | 1 |
| 1482-7 | IUS | iboard 2.0 | 1 |
| 1482-8 | IUS | iboard 2.0 | 1 |
| 1483-1 | IUS | Store Locator | 1 |
| 1483-2 | IUS | Store Locator | 1 |
| 1483-3 | IUS | Store Locator | 1 |
| 1484-1 | IUS | Roles and Permissions Management for Kio | 1 |
| 1484-10 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-11 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-12 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-13 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-2 | IUS | Roles and Permissions Management for Kio | 1 |
| 1484-3 | IUS | Roles and Permissions Management for Kio | 1 |
| 1484-4 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-5 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-6 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-7 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-8 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1484-9 | IUS | Roles and Permissions for Kiosk Operator | 1 |
| 1485-1 | IUS | Merchant Boarding UI (iBoard) | 1 |
| 1485-2 | IUS | Merchant Boarding UI (iBoard) | 1 |
| 1486-1 | IUS | Continuous Web Testing Framework and Env | 1 |
| 1486-2 | IUS | E2ESP | 1 |
| 1486-3 | IUS | Continuous Web Testing Framework and Env | 1 |
| 1486-4 | IUS | Continuous Web Testing Framework and Env | 1 |
| 1486-5 | IUS | E2ESP | 1 |
| 1486-6 | IUS | E2ESP | 1 |
| 1487-1 | IUS | Enterprise Build and Release System | 1 |
| 1487-2 | IUS | Enterprise Build and Release System | 1 |
| 1487-3 | IUS | Enterprise Build and Release System | 1 |
| 1488-1 | IUS | Enterprise Automated Deployment System | 1 |
| 1488-2 | IUS | Kornher Associates, Inc. | 1 |
| 1488-3 | IUS | Kornher Associates, Inc. | 1 |
| 1488-4 | IUS | Enterprise Automated Deployment System | 1 |
| 1488-5 | IUS | Kornher Associates, Inc. | 1 |
| 1488-6 | IUS | Enterprise Automated Deployment System | 1 |
| 1488-7 | IUS | Kornher Associates, Inc. | 1 |
| 1488-8 | IUS | Kornher Associates, Inc. | 1 |
| 1489-1 | IUS | Healthcare - Enrollment Offering | 1 |
| 1489-2 | IUS | Healthcare - Enrollment Offering | 1 |
| 1489-3 | IUS | Healthcare - Enrollment Offering | 1 |
| 1490-1 | IUS | Cross Channel (Non Web portion) | 1 |
| 1490-2 | IUS | Cross Channel (Non Web portion) | 1 |
| 1491-1 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-2 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-3 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-4 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-5 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-6 | IUS | PBT Kiosk 2.0 | 1 |
| 1491-7 | IUS | PBT Kiosk 2.0 | 1 |

| | | | | |
|---|---|---|---|---|
| 1491-8 | IUS | PBT Kiosk 2.0 | | 1 |
| 1491-9 | IUS | PBT Kiosk 2.0 | | 1 |
| 1492-1 | IUS | Mayo Clinic | | 1 |
| 1492-10 | IUS | Mayo Clinic | | 1 |
| 1492-2 | IUS | Mayo Clinic | | 1 |
| 1492-3 | IUS | Mayo Clinic | | 1 |
| 1492-4 | IUS | Objective Tech Consulting SC5000 App | CALIFORNIA | 1 |
| 1492-5 | IUS | Mayo Clinic | | 1 |
| 1492-6 | IUS | Mayo Clinic | | 1 |
| 1492-7 | IUS | Mayo Clinic | | 1 |
| 1492-8 | IUS | Mayo Clinic | | 1 |
| 1492-9 | IUS | Mayo Clinic | | 1 |
| 1493-1 | IUS | SDMines Health Care Initiative | | 1 |
| 1493-2 | IUS | SDMines Health Care Initiative | | 1 |
| 1493-3 | IUS | SDMines Health Care Initiative | | 1 |
| 1494-1 | IUS | Autobill - New Industry - Oil & Gas - RD | | 1 |
| 1494-2 | IUS | Autobill - New Industry - Oil & Gas - RD | | 1 |
| 1494-3 | IUS | Autobill - New Industry - Oil & Gas - RD | | 1 |
| 1495-1 | IUS | Sagem Verifinger Conversion Library -Pha | | 1 |
| 1495-2 | IUS | Sagem Verifinger Conversion Library -Pha | | 1 |
| 1495-3 | IUS | Sagem Verifinger Conversion Library -Pha | | 1 |
| 1496-1 | IUS | PJS 3.2 Release | | 1 |
| 1496-2 | IUS | PJS 3.2 Release | | 1 |
| 1497-1 | IUS | Blackstone Technology Group, Inc. | | 1 |
| 1498-1 | IUS | Blackstone Technology Group, Inc. | | 1 |
| 1499-1 | IUS | Xoriant Corporation | | 1 |
| 1499-2 | IUS | Xoriant Corporation | | 1 |
| 1499-3 | IUS | Xoriant Corporation | | 1 |
| 1499-4 | IUS | Xoriant Corporation | | 1 |
| 1499-5 | IUS | Xoriant Corporation | | 1 |
| 1499-6 | IUS | Xoriant Corporation | | 1 |
| 1499-7 | IUS | Xoriant Corporation | | 1 |
| 1500-1 | IUS | Blackstone Technology Group, Inc. | | 1 |
| 1501-2 | IUS | Blackstone Technology Group, Inc. | | 1 |
| 1503-3 | IUS | Blackstone Technology Group, Inc. | | 1 |
| 1505-1 | CE-3 | 20 Flat Panel Monitors | CALIFORNIA | 20 |
| 1506-1 | CE-3 | 5 Dell 620 Laptops | CALIFORNIA | 5 |
| 1507-1 | CE-3 | 10 D420 Laptops | CALIFORNIA | 10 |
| 1508-1 | CE-3 | 10 D620 Laptops | CALIFORNIA | 10 |
| 1509-1 | CE-3 | 3 Optiplex Minitower | CALIFORNIA | 3 |
| 1510-1 | CE-3 | 2 Optiplex Sm Form Factor | CALIFORNIA | 2 |
| 1511-1 | CE-3 | HP Laser Jet Printer | CALIFORNIA | 8 |
| 1512-1 | CE-3 | 1 Apples 23 Inc LCD | CALIFORNIA | 1 |
| 1513-1 | SW-3 | Network Monitoring Software | CALIFORNIA | 100 |
| 1514-1 | CE-3 | TrueMe Wellington Bank Server | LUNDY | 1 |
| 1518-1 | LH - 2ND ST | 101 2nd Street Construction | CALIFORNIA | 1 |
| 1518-2 | LH - 2ND ST | 101 2nd Street Construction | CALIFORNIA | 1 |
| 1518-3 | LH - 2ND ST | 101 2nd Street Construction | CALIFORNIA | 1 |
| 1518-4 | LH - 2ND ST | 101 2nd Street Construction | CALIFORNIA | 1 |
| 1519-1 | CE-3 | 10 D420 Laptops | CALIFORNIA | 10 |
| 1520-1 | EQUIP - SERVERS | Petroleum Vertical Servers | | 5 |
| 1520-2 | EQUIP - SERVERS | Petroleum Vertical Servers | | 5 |
| 1521-1 | CE-3 | 560 Mission St Firewall | CALIFORNIA | 1 |
| 1522-1 | IUS | Cogent iPas NRE | CALIFORNIA | 1 |
| 1522-2 | IUS | iPAS | | 1 |
| 1522-3 | IUS | iPAS | | 1 |
| 1522-4 | IUS | iPAS | | 1 |
| 1522-5 | IUS | iPAS | | 1 |
| 1522-6 | IUS | iPAS | | 1 |
| 1522-7 | IUS | iPAS | | 1 |
| 1523-1 | IUS | NCR ePod Application Development | | 1 |
| 1523-2 | IUS | NCR Development Upgrade | | 1 |
| 1524-1 | CE-3 | RSA Tokens-Support Employees | CALIFORNIA | 100 |
| 1525-1 | CE-3 | 10  Dell D620 Laptops | CALIFORNIA | 10 |
| 1526-1 | CE-3 | 10 Dell D420 Laptops | CALIFORNIA | 10 |
| 1527-1 | SW-3 | Shareplex for Oracle Linux Tier B | CALIFORNIA | 1 |
| 1528-1 | OE-3 | 30 Cisco IP Phones | CALIFORNIA | 30 |

| | | | | |
|---|---|---|---|---|
| 1529-1 | OE-3 | 4 Cisco Conference Phones | CALIFORNIA | 4 |
| 1530-1 | CE-3 | Dell Poweredge Server | CALIFORNIA | 1 |
| 1531-1 | CE-3 | 1 Dell Poweredge Server | CALIFORNIA | 1 |
| 1532-1 | CE-3 | Cisco 3560 Catalysts | CALIFORNIA | 3 |
| 1532-2 | CE-3 | Cisco Transceivers | CALIFORNIA | 20 |
| 1533-1 | SW-3 | Softrax Enterprise Edition Licenses | CALIFORNIA | 1 |
| 1533-2 | SW-3 | SOFTRAX ENTERPRISE EDITION LIC-ADDITION | CALIFORNIA | 1 |
| 1534-1 | SW-3 | Ambiron Server license 51-100 | CALIFORNIA | 10 |
| 1535-1 | SW-3 | Ambiron- Appl License Non Prod | CALIFORNIA | 15 |
| 1536-1 | CE-3 | Leased Servers - Dell PowerEdge 1950 | CALIFORNIA | 2 |
| 1538-1 | CE-3 | Dell D620 Dell Laptops | CALIFORNIA | 3 |
| 1539-1 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-2 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-3 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-4 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-5 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-6 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-7 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-8 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1539-9 | IUS | HOBBES 2.0 Server Side Loyalty | | 1 |
| 1540-1 | IUS | Casselman - Billing Project | | 1 |
| 1540-2 | IUS | Casselman - Billing Project | | 1 |
| 1540-3 | IUS | Casselman - Billing Project | | 1 |
| 1540-4 | IUS | Casselman - Billing Project | | 1 |
| 1540-5 | IUS | Casselman - Billing Project | | 1 |
| 1540-6 | IUS | Casselman - Billing Project | | 1 |
| 1541-1 | IUS | Infonox Release 1 | | 1 |
| 1541-2 | IUS | Infonox Release 1 | | 1 |
| 1541-3 | IUS | Infonox Release 1 | | 1 |
| 1542-1 | IUS | Req. iboard 2.1 to production | | 1 |
| 1542-2 | IUS | Req. iboard 2.1 to production | | 1 |
| 1542-3 | IUS | Req. iboard 2.1 to production | | 1 |
| 1542-4 | IUS | Req. iboard 2.1 to production | | 1 |
| 1542-5 | IUS | Req. iboard 2.1 to production | | 1 |
| 1542-6 | IUS | Req. iboard 2.1 to production | | 1 |
| 1543-1 | IUS | KCS 4.2 | | 1 |
| 1543-2 | IUS | KCS 4.2 | | 1 |
| 1544-1 | IUS | KCS 4.3 | | 1 |
| 1544-2 | IUS | KCS 4.3 | | 1 |
| 1544-3 | IUS | KCS 4.3 | | 1 |
| 1545-1 | IUS | CAE Console | | 1 |
| 1545-2 | IUS | CAE Console | | 1 |
| 1545-3 | IUS | CAE Console | | 1 |
| 1545-4 | IUS | CAE Console | | 1 |
| 1545-5 | IUS | CAE Console | | 1 |
| 1545-6 | IUS | CAE Console | | 1 |
| 1546-1 | IUS | Web Services Architecture - New Enrollme | | 1 |
| 1546-2 | IUS | Web Services Architecture - New Enrollme | | 1 |
| 1546-3 | IUS | Web Services Architecture - New Enrollme | | 1 |
| 1547-1 | IUS | Hobbes & Infonox Integration | | 1 |
| 1547-2 | IUS | Hobbes & Infonox Integration | | 1 |
| 1547-3 | IUS | Hobbes & Infonox Integration | | 1 |
| 1547-4 | IUS | Hobbes & Infonox Integration | | 1 |
| 1547-5 | IUS | Hobbes & Infonox Integration | | 1 |
| 1547-6 | IUS | Hobbes & Infonox Integration | | 1 |
| 1549-1 | EQUIP - IN LANE | SuperValu Jan06 Inventory Clearing | SUPERVALU | 1 |
| 1549-2 | EQUIP - IN LANE | SuperValu JAN06 Inventory Clearing - 2 | SUPERVALU | 1 |
| 1550-1 | EQUIP - IN LANE | Green Hills JAN06 Inventory Clearing | GREEN HILLS | 1 |
| 1550-2 | EQUIP - IN LANE | Green Hills JAN06 Inventory Clearing - 2 | GREEN HILLS | 1 |
| 1551-1 | EQUIP - IN LANE | Coborn's JAN06 Inventory Clearing | COBORNS | 1 |
| 1551-2 | EQUIP - IN LANE | Coborn's JAN06 Inventory Clearing - 2 | COBORNS | 1 |
| 1552-1 | EQUIP - IN LANE | SuperValu FEB06 Inventory Clearing | SUPERVALU | 1 |
| 1552-2 | EQUIP - IN LANE | SuperValu FEB06 Inventory Clearing - 2 | SUPERVALU | 1 |
| 1553-1 | EQUIP - IN LANE | Coborn's FEB06 Inventory Clearing | COBORNS | 1 |
| 1553-2 | EQUIP - IN LANE | Coborn's FEB06 Inventory Clearing - 2 | COBORNS | 1 |
| 1554-1 | EQUIP - IN LANE | Green Hills FEB06 Inventory Clearing | GREEN HILLS | 1 |
| 1555-1 | EQUIP - IN LANE | Coborn's MAR06 Inventory Clearing | COBORNS | 1 |

| | | | | |
|---|---|---|---|---|
| 1555-2 | EQUIP - IN LANE | Coborn's MAR06 Inventory Clearing - 2 | COBORNS | 1 |
| 1555-3 | EQUIP - IN LANE | Coborn's MAR06 Inventory Clearing - 3 | COBORNS | 1 |
| 1556-1 | EQUIP - IN LANE | Harris Teeter MAR06 Inventory Clearing | HARRIS TEETER | 1 |
| 1557-1 | EQUIP - IN LANE | SuperValu MAR06 Inventory Clearing | SUPERVALU | 1 |
| 1557-2 | EQUIP - IN LANE | SuperValu MAR06 Inventory Clearing - 2 | SUPERVALU | 1 |
| 1558-1 | EQUIP - IN LANE | Green Hills MAR06 Inventory Clearing | GREEN HILLS | 1 |
| 1559-1 | EQUIP - IN LANE | Piggly Wiggly MAR06 Inventory Clearing | PIGGLY WIGGLY | 1 |
| 1560-1 | EQUIP - IN LANE | Coborn's APR06 Inventory Clearing | COBORNS | 1 |
| 1561-1 | EQUIP - IN LANE | Green Hills APR06 Inventory Clearing | GREEN HILLS | 1 |
| 1562-1 | EQUIP - IN LANE | Harris Teeter APR06 Inventory Clearing | HARRIS TEETER | 1 |
| 1562-2 | EQUIP - IN LANE | Harris Teeter APR06 Inventory Clearing 2 | HARRIS TEETER | 1 |
| 1563-1 | EQUIP - IN LANE | Piggly Wiggly MAY06 Inventory Clearing | PIGGLY WIGGLY | 1 |
| 1564-1 | EQUIP - IN LANE | SuperValu MAY06 Inventory Clearing | SUPERVALU | 1 |
| 1565-1 | EQUIP - IN LANE | Green Hills MAY06 Inventory Clearing | GREEN HILLS | 1 |
| 1567-1 | SW-3 | MAY07 Windows Patchlink Renew | CALIFORNIA | 1 |
| 1568-1 | EQUIP - IN LANE | MidCounties FEB06 Inventory Clearing | MIDCOUNTIES | 1 |
| 1569-1 | SW-3 | WebSphere Application Server Monitoring | LUNDY | 1 |
| 1569-3 | SW-3 | WebSphere Foundation Processor Licenses | LUNDY | 1 |
| 1570-1 | CE-3 | Cisco Port Ethernet Switch and Cords | CALIFORNIA | 1 |
| 1571-1 | IUS | KCS iPAS | | 1 |
| 1571-2 | IUS | KCS iPAS | | 1 |
| 1571-3 | IUS | KCS iPAS | | 1 |
| 1572-1 | IUS | KCS VLAN | | 1 |
| 1572-2 | IUS | KCS VLAN | | 1 |
| 1572-3 | IUS | KCS VLAN | | 1 |
| 1573-1 | IUS | Web Services Architecture | | 1 |
| 1573-2 | IUS | Web Services Architecture | | 1 |
| 1573-3 | IUS | Web Services Architecture | | 1 |
| 1574-1 | IUS | sTunnel | | 1 |
| 1574-2 | IUS | sTunnel | | 1 |
| 1574-3 | IUS | sTunnel | | 1 |
| 1575-1 | IUS | Salesforce SP 1.0 | | 1 |
| 1575-2 | IUS | Salesforce SP 1.0 | | 1 |
| 1575-3 | IUS | Salesforce SP 1.0 | | 1 |
| 1576-1 | IUS | Corp Site 1.1.1 | | 1 |
| 1576-2 | IUS | Corp Site 1.1.1 | | 1 |
| 1576-3 | IUS | Corp Site 1.1.1 | | 1 |
| 1577-1 | IUS | Corp Site 1.1.2 | | 1 |
| 1577-2 | IUS | Corp Site 1.1.2 | | 1 |
| 1577-3 | IUS | Corp Site 1.1.2 | | 1 |
| 1578-1 | IUS | CSR Admin 3.6 | | 1 |
| 1578-2 | IUS | CSR Admin 3.6 | | 1 |
| 1578-3 | IUS | CSR Admin 3.6 | | 1 |
| 1578-4 | IUS | CSR Admin 3.6 | | 1 |
| 1578-5 | IUS | CSR Admin 3.6 | | 1 |
| 1579-1 | IUS | CSR Admin 3.5 | | 1 |
| 1579-2 | IUS | CSR Admin 3.5 | | 1 |
| 1579-3 | IUS | CSR Admin 3.5 | | 1 |
| 1580-1 | IUS | CSR Admin 3.5.1 | | 1 |
| 1580-2 | IUS | CSR Admin 3.5.1 | | 1 |
| 1580-3 | IUS | CSR Admin 3.5.1 | | 1 |
| 1581-1 | IUS | iBoard 2.2 | | 1 |
| 1581-2 | IUS | iBoard 2.2 | | 1 |
| 1581-3 | IUS | iBoard 2.2 | | 1 |
| 1582-1 | IUS | Store Locator 1.1 | | 1 |
| 1582-2 | IUS | Store Locator 1.1 | | 1 |
| 1582-3 | IUS | Store Locator 1.1 | | 1 |
| 1582-4 | IUS | Store Locator 1.1 | | 1 |
| 1583-1 | IUS | WWA 1.2.1 | | 1 |
| 1583-2 | IUS | WWA 1.2.1 | | 1 |
| 1583-3 | IUS | WWA 1.2.1 | | 1 |
| 1584-1 | IUS | IBOCS | | 1 |
| 1584-2 | IUS | IBOCS | | 1 |
| 1584-3 | IUS | IBOCS | | 1 |
| 1585-3 | IUS | CSR Admin 3.6 | | 1 |
| 1586-1 | IUS | CAE-Engine | | 1 |
| 1586-2 | IUS | CAE-Engine | | 1 |

| | | | | |
|---|---|---|---|---|
| 1586-3 | IUS | CAE-Engine | | 1 |
| 1586-4 | IUS | CAE-Engine | | 1 |
| 1587-1 | IUS | CSR Admin 3.4 | | 1 |
| 1587-2 | IUS | CSR Admin 3.4 | | 1 |
| 1587-3 | IUS | CSR Admin 3.4 | | 1 |
| 1588-1 | IUS | TrueMe 1.0 | | 1 |
| 1588-2 | IUS | TrueMe 1.0 | | 1 |
| 1589-1 | IUS | ACH Batch | | 1 |
| 1589-2 | IUS | ACH Batch | | 1 |
| 1589-3 | IUS | ACH Batch | | 1 |
| 1590-1 | IUS | Online :: Browser Helper Object | | 1 |
| 1590-2 | IUS | Online :: Browser Helper Object | | 1 |
| 1590-3 | IUS | Online :: Browser Helper Object | | 1 |
| 1590-4 | IUS | Online :: Browser Helper Object | | 1 |
| 1591-1 | IUS | Online :: IIS Plugin Integration for SAM | | 1 |
| 1591-2 | IUS | Online :: IIS Plugin Integration for SAM | | 1 |
| 1591-4 | IUS | Online :: IIS Plugin Integration for SAM | | 1 |
| 1592-1 | IUS | PBT Appliance | | 1 |
| 1592-2 | IUS | PBT Appliance | | 1 |
| 1593-1 | IUS | Mini-KCS agent | | 1 |
| 1593-2 | IUS | Mini-KCS agent | | 1 |
| 1594-1 | IUS | Online :: TME CSR 1.0 | | 1 |
| 1595-1 | IUS | Web :: CSR Admin 3.7 | | 1 |
| 1596-1 | IUS | Web :: WES 3.6 | | 1 |
| 1596-2 | IUS | Web :: WES 3.6 | | 1 |
| 1597-1 | IUS | CSR Admin 3.6.1 | | 1 |
| 1598-1 | IUS | Web Wallet Admin 1.2 | | 1 |
| 1599-1 | IUS | Hobbes 2.0 Release A: CSR Admin 3.6 | | 1 |
| 1600-1 | IUS | Web :: WWA 1.4 | | 1 |
| 1601-1 | IUS | PBT-CAE | | 1 |
| 1602-1 | OE-3 | 560 Mission Access Card Reader | CALIFORNIA | 1 |
| 1602-2 | SW-3 | 101 2nd Sec Sys Sftwre Upgrade | CALIFORNIA | 1 |
| 1603-1 | SW-3 | Versa Test Licenses 6/7-6/6/08 | CALIFORNIA | 1 |
| 1604-1 | SW-3 | SW Configuration Set Up/Infrastructure | CALIFORNIA | 1 |
| 1604-2 | SW-3 | SW Configuration Set Up/Infrastructure | CALIFORNIA | 1 |
| 1605-1 | EQUIP - IN LANE | (4) PILOT STORES IN LANE - PIGGLY WIGGLY | | 1 |
| 1606-1 | EQUIP - IN LANE | (4) ENROLLMENT STATIONS - PIGGLY WIGGLY | | 1 |
| 1607-1 | EQUIP - IN LANE | SHIPPING AND INSTALL FOR PIGGLY WIGGLY | | 1 |
| 1608-1 | EQUIP - IN LANE | BLOCKUSTER EOT: YR 2003 | | 1 |
| 1609-1 | EQUIP - IN LANE | THRIFTWAY EQUIP ON TRAIL | | 1 |

SUMMARY                          1/30/2008   6:22:44 PM
Pay By Touch
Inventory Control
Use GL Posting Date      Yes          As of:      12/14/2007

| Site | Item Number | Quantity | Description |
|---|---|---|---|
| MINAIK | 070-0001 | 3,307 | TOUCHCHIP SENSOR |
| MINAIK | 070-0002 | 4,768 | CONTROLER |
| MINAIK | 130-0012 | 130 | PLAS,SIGN DISPLAY W/ BROCHURE HOLDER,8.5" x 11" |
| MINAIK | 130-0013 | 55 | BOTTOM ENCLOSURE BLACK |
| MINAIK | 720-0024 | 778 | LBL,WHITE,1.25"x2.75",ZEBRA PRINTER |
| Inventory Value for Site: | MINAIK | 9,038.00 | |
| | | | |
| NCR | 000-0008 | 244 | HW,PADLOCK<BRASS,25mm |
| NCR | 085-0008-00 | 72 | CSD 301-06 |
| NCR | 090-0018 | 51 | PBT,SENSOR,COGENT CSD301 & APP,ePOD |
| NCR | 090-0021 | 107 | PBT,ENROLLMENT TERMINAL,ePOD,NCR 7402 |
| NCR | 090-0024 | 251 | PBT,ePOD,ENCLOSURE & SIGNAGE |
| NCR | 100-0015 | 36 | ID SCANNER W/ USB CABLE |
| NCR | 130-0008 | 497 | PLAS, BROCHURE HOLDER., Clear |
| NCR | 140-0015 | 211 | MET,ePOD KIOSK,PEDESTAL BASE STANDARD |
| NCR | 140-0016 | 234 | MET,ePOD KIOSK,PRINTER BLANK SPACER ASSEMBLY |
| NCR | 150-0001 | 180 | TOOL,SCREWDRIVER,TORX,T16 TAMPER RESISTANT (36277) |
| NCR | 150-0002 | 109 | TOOL,SCREWDRIVER,TORX,T25 TAMPER RESISTANT (36281) |
| NCR | 150-0003 | 109 | PBT ENROLLMENT KIOSK TECH CARD |
| NCR | 300-0003 | 255 | CBL, CAT5E 350MHZ, UNSHIELDED, 25' GRAY |
| NCR | 400-0010 | 193 | BC,SYMBOL DS6608,SCANNER,GUN, 2D/1D Black |
| NCR | 400-0011 | 121 | BC,SYMBOL DS6608,SERIAL CABLE, Straight |
| Inventory Value for Site: | NCR | 2,670.00 | |
| | | | |
| PBT | 000-0007 | 8 | #N/A |
| PBT | 000-0008 | 73 | HW,PADLOCK<BRASS,25mm |
| PBT | 000-0017 | 255 | HW,PADLOCK<BRASS,25mm |
| PBT | 000-0018 | 7 | HW, KEYS FOR PADLOCK PBT 000-0008 (PAIR) |
| PBT | 070-0003 | 72 | SENSOR MODULE,SAGEM,CBM OEM 1300 |
| PBT | 080-0003 | 11 | SENSOR, CAPACITIVE FINGER,UPEK,TCRU,80" USB-A CORD |
| PBT | 080-0005 | 100 | SENSOR,SAGEM MSO200 SERIAL W/ POWER SUPPLY |
| PBT | 080-0013-00 | 18 | SENSR,SAGEM,MSO OEM,PLASTIC PLATEN |
| PBT | 080-0014-00 | 723 | SENSR,SAGEM,MSO OEM,GLASS PLATEN |
| PBT | 085-0004-00 | 13 | READER,SAGEM MSO200,METAL HOUSING,GLASS PLATEN |
| PBT | 085-0008-00 | 3 | CSD 301-06 |
| PBT | 090-0001 | 15 | PBT,FINGER SENSOR,DIGITAL PERSONA |
| PBT | 090-0002 | 1 | CBL,DIGITAL PERSONA FINGER SENSOR,USB,71";  5006-001 |
| PBT | 090-0004 | 5 | PBT,PC,SMALL FORM FACTOR, UNDER COUNTER MOUNT |
| PBT | 090-0008 | 39 | PBT,SENSOR ASSEMBLY WITH HSG,CBL,LBL,BASE PLATE (MOUSE STYLE) |
| PBT | 090-0009 | 5 | PBT,SENSOR/STAND ASSEMBLY-VERIFONE EVEREST, 4 5" TALL |
| PBT | 090-0010 | 64 | PBT,PC,PBT APPLIANCE,NORHTEC MICROSERVER HP |
| PBT | 090-0012 | 4 | PBT,INGENICO II ENROLLMENT STATION ASSEMBLY |
| PBT | 090-0013 | 5 | PBT,SENSOR/STAND ASSEMBLY-EN1000, 6" TALL for piggly Cen |
| PBT | 090-0016 | 51 | ASSY,SENSOR,CX30,IPAS,UPEK,W/PWR & CABLES |
| PBT | 090-0017 | 1 | PBT,SENSOR/STAND ASSEMBLY-HYPERCOM ICE 6000 |
| PBT | 090-0018 | 14 | PBT,SENSOR,COGENT CSD301 & APP,ePOD |
| PBT | 090-0019 | 11 | PBT,FINGER SENSOR,CAPACITIVE |
| PBT | 090-0021 | 5 | PBT,ENROLLMENT TERMINAL,ePOD,NCR 7402 |
| PBT | 090-0025 | 9 | ASSY, Sensor, PX30, IPAS, Optical |
| PBT | 090-0029 | 148 | PBT, FINGERSENSOR, RDX 360 |
| PBT | 090-0034 | 5,000 | PBT,FINGER READER,ON-LINE, PBT-BRANDED EIKON (TRUE ME SENSOR) |
| PBT | 100-0002 | 7 | POS,INGENICO EN-TOUCH 1000,TOUCH SCREEN,2 TRACK READER |

| | | | |
|---|---|---|---|
| PBT | 100-0003 | 12 | POS, INGENICO PWR SUPPLY, EN-CHECK 2500 AND EN-TOUCH 1000 |
| PBT | 100-0004 | 4 | POS,INGENICO, REMOTE CONNECTOR BLOCK (RCB) |
| PBT | 100-0005 | 9 | POS,INGENICO EN-CHECK 2500 MICR CHECK READER |
| PBT | 100-0006 | 7 | POS INGENICO CABLE TOUCH 1000 AND EN-CHECK 2500 TO RCB |
| PBT | 100-0007 | 8 | POS,VERIFONE EVEREST PLUS TERMINAL |
| PBT | 100-0008 | 14 | POS,VERIFONE EVEREST PLUS DONGLE |
| PBT | 100-0009 | 14 | POS,VERIFONE EVEREST AC ADAPTER |
| PBT | 100-0010 | 300 | POS, VERIFONE EVEREST OVERLAY, GENERIC |
| PBT | 100-0014 | 4 | POS,VERIFONE CABLE,PIN PAD TO PRINTER (DIN8M TO DIN8M) |
| PBT | 100-0015 | 4 | ID SCANNER W/ USB CABLE |
| PBT | 100-0016 | 4 | POS,VERIFONE 3760 TERMINAL |
| PBT | 100-0017 | 2 | POS,VERIFONE SC5000 Pinpad |
| PBT | 100-0039-00 | 24 | POS,PAPER REFILL,PM KIOSK |
| PBT | 120-0007 | 388 | MISC,PBT SCANSHELL CALIBRATION SHEET,7.25"x3.375" |
| PBT | 120-0008 | 838 | MISC,PBT SCANSHELL CALIBRATION SHEET,7.25"x3.375" |
| PBT | 130-0008 | 15 | PLAS, BROCHURE HOLDER., Clear |
| PBT | 140-0014 | 122 | MET,MOUNTING BRKT, PBT APPLIANCE,MICROSERVER HP |
| PBT | 140-0019 | 9 | MET,TILT/SWIVEL STAND,L4100/IOE6000,CAPACITIVE SENSOR |
| PBT | 140-0039 | 5 | MET,MOUNTING BRACKET,COUNTER-TOP,ENS 367-0579 & 367-0762 |
| PBT | 140-0043 | 12 | MET,MOUNTING BRACKET,COUNTER-TOP,ENS 367-0579 & 367-0762 |
| PBT | 150-0001 | 1 | TOOL,SCREWDRIVER,TORX,T15 TAMPER RESISTANT (36277) |
| PBT | 150-0002 | 15 | TOOL,SCREWDRIVER,TORX,T25 TAMPER RESISTANT (36281) |
| PBT | 150-0003 | 139 | PBT ENROLLMENT KIOSK TECH CARD |
| PBT | 200-0006 | 3 | PWR,SURGE PROTECTOR |
| PBT | 300-0003 | 15 | CBL, CAT5E 350MHZ, UNSHIELDED, 25' GRAY |
| PBT | 300-0004 | 404 | CBL CAT5e, 350mhz, Unshielded, 10', GRAY |
| PBT | 300-0005 | 6 | CBL,CAT5e,350Mhz,UNSHIELDED,7',GRAY |
| PBT | 300-0012 | 10 | CBL,DB9 FEM TO DIN9 MALE,SERIAL RS232, VERIFONE, 2 METER (03018-02) |
| PBT | 300-0013 | 5 | CBL,VERIFONE 03018-005,DB9 FEM TO DIN9 MALE |
| PBT | 300-0016 | 163 | CBL,USBAMALE(ST)TOUSBBMALE(RA),12',BLK |
| PBT | 300-0018 | 9 | CBL,DB9F-RJ45,VERIFONE,OMNI 7000 to PC AT,1M (05602-00) |
| PBT | 300-0020 | 18 | CBL,VERIFONE 26264-04,DB9F-RJ45,3750,4M |
| PBT | 300-0021 | 109 | CBL,RJ45-DB9,SC 5000,1M |
| PBT | 300-0028 | 52 | USB Type A - Type A Extension Cable |
| PBT | 300-0029 | 17 | Type A - Type B USB Cables |
| PBT | 300-0030 | 11 | CBL, USB A MALE TO RAW-END, 3 FT |
| PBT | 300-0032 | 43 | CBL, USB 2.0 TYPE A MALE/ TYPE B MALE, 10 FT |
| PBT | 400-0007 | 8 | Symbol DS6608 High Density, Multi-Interface. Color: White (Scanner Only) |
| PBT | 400-0008 | 13 | SCANNER CABLE |
| PBT | 400-0010 | 10 | BC,SYMBOL DS6608,SCANNER,GUN,2D/1D Black |
| PBT | 400-0011 | 29 | BC,SYMBOL DS6608,SERIAL CABLE, Straight |
| PBT | 720-0034 | 1,750 | LBL,PART ID FLAG,NETWORK CABLE |
| PBT | 720-0035 | 2,000 | LBL,PART ID FLAG,USB FINGER SENSOR CABLE |
| PBT | 720-0036 | 2,000 | LBL,PART ID FLAG,UCB POWER CABLE |
| PBT | 720-0037 | 2,750 | LBL,PBT LOGO,APPLIANCE |
| PBT | 910-0001 | 4 | REV 2: KIT IN-LINE TRAINING SENSOR- mechanical sample only |
| PBT | 950-0023R | 8 | ASSY,PEDESTAL ASSEMBLY FOR ENROLLMENT KIOSK |
| PBT | R-090-0010 | 400 | PBT,PC,PBT APPLIANCE,NORHTEC MICROSERVER HP |
| Inventory Value for Site: | PBT | 19,243.00 | |
| TASQ | D00-0007 | 464 | #N/A |
| TASQ | 000-0006 | 2 | HW,PADLOCK<BRASS,25mm |
| TASQ | 080-0003 | 9 | SENSOR, CAPACITIVE FINGER,UPEK,TCRU,60" USB-A CORD |
| TASQ | 085-0004-00 | 98 | READER,SAGEM MSO200,METAL HOUSING,GLASS PLATEN |
| TASQ | 090-0001 | 2 | PBT,FINGER SENSOR,DIGITAL PERSONA |

| TASQ | 090-0004 | 3 | PBT,PC,SMALL FORM FACTOR, UNDER COUNTER MOUNT |
| TASQ | 090-0009 | 28 | PBT,SENSOR/STAND ASSEMBLY-VERIFONE EVEREST, 4.5" TALL |
| TASQ | 090-0010 | 2,576 | PBT,PC,PBT APPLIANCE,NORHTEC MICROSERVER HP |
| TASQ | 090-0011 | 52 | PBT,SENSOR/STAND ASSEMBLY-VERIFONE EVEREST, 8" TALL |
| TASQ | 090-0012 | 2 | PBT,INGENICO 8 ENROLLMENT STATION ASSEMBLY |
| TASQ | 090-0017 | 32 | PBT,SENSOR/STAND ASSEMBLY-HYPERCOM ICE 6000 |
| TASQ | 090-0029 | 1,977 | PBT, FINGERSENSOR, RDX 380 |
| TASQ | 100-0002 | 8 | POS,INGENICO EN-TOUCH 1000,TOUCH SCREEN,2 TRACK READER |
| TASQ | 100-0003 | 14 | POS, INGENICO PWR SUPPLY, EN-CHECK 2500 AND EN-TOUCH 1000 |
| TASQ | 100-0004 | 4 | POS,INGENICO, REMOTE CONNECTOR BLOCK (RCB) |
| TASQ | 100-0005 | 38 | POS,INGENICO EN-CHECK 2500 MICR CHECK READER |
| TASQ | 100-0006 | 7 | POS INGENICO CABLE TOUCH 1000 AND EN-CHECK 2500 TO RCB |
| TASQ | 100-0016 | 34 | POS,VERIFONE 3750 TERMINAL |
| TASQ | 120-0007 | 1,386 | MISC,PBT SCANSHELL CALIBRATION SHEET,7.25"x3.375" |
| TASQ | 120-0008 | 286 | MISC,PBT SCANSHELL CALIBRATION SHEET,7.25"x3.375" |
| TASQ | 130-0009-00 | 4 | PLAS,VERTICAL SIGN HOLDER,OPEN TOP, 4"X6" |
| TASQ | 130-0010 | 389 | PLAS,SIGN DISPLAY W/ BROCHURE HOLDER,8.5" x 11" |
| TASQ | 130-0020 | 86 | PLAS,SENSOR SKIRT W/ THUMBSCREW |
| TASQ | 140-0013 | 33 | STND,TILT/SWIVEL,1.5" DIA TUBE,4.5" HT,INGENICO |
| TASQ | 140-0014 | 853 | MET,MOUNTING BRKT, PBT APPLIANCE,MICROSERVER HP |
| TASQ | 140-0017 | 40 | MET,TILT/SWIVEL STAND,EVEREST,CAPACITIVE SENSOR |
| TASQ | 140-0018 | 90 | MET,TOP PLATE,EVEREST,CAPACITIVE SENSOR |
| TASQ | 140-0019 | 3 | MET,TILT/SWIVEL STAND,L4100/ICE6000,CAPACITIVE SENSOR |
| TASQ | 140-0020 | 4 | MET,TOP-PLATE,L4100/ICE6000,CAPACITIVE SENSOR |
| TASQ | 140-0022 | 75 | MET,WEDGE STAND,L4100/ICE6000,CAPACITIVE SENSOR |
| TASQ | 140-0023 | 70 | MET,SENSOR ARM FOR WEDGE,L4100/ICE6000,CAPACITIVE SENSOR |
| TASQ | 140-0024 | 65 | MET,TILT-SWIVEL STAND,NO TOP PLATE,2"DIA x 5.3"HT |
| TASQ | 140-0026 | 5 | MET,TOP PLATE,ENTOUCH 1000,CAPACITIVE SENSOR |
| TASQ | 140-0027 | 11 | MET,TILT/SWIVEL STAND & 8" EXT ARM,EVEREST,CAPACITIVE SENSOR |
| TASQ | 140-0030 | 96 | MET,MOUSE BASE,CAPACITIVE SENSOR |
| TASQ | 140-0031 | 19 | MET,TOP PLATE,EVEREST,IPAS 1.0 |
| TASQ | 140-0032 | 59 | MET,TILT-SWIVEL STAND,HYPERCOM,BASE PLATE |
| TASQ | 140-0034 | 10 | MET,FINGERPRINT READER STAND,BLACK |
| TASQ | 140-0039 | 16 | MET,MOUNTING BRACKET,COUNTER-TOP,ENS 387-0579 & 367-0762 |
| TASQ | 140-0040 | 4 | MET,MOUNTING BRACKET,COUNTER-EDGE,ENS 367-0561 |
| TASQ | 140-0041 | 15 | MET,MOUNTING BRACKET, INLANE,ENS 387-0924 HYVEE |
| TASQ | 140-0042 | 16 | MET,MOUNTING BRACKET, WEDGE ,ENS 387-0926 HYVEE |
| TASQ | 140-0043 | 1 | MET,MOUNTING BRACKET,COUNTER-TOP,ENS 387-0579 & 367-0762 |
| TASQ | 140-0044 | 35 | MET,MOUNTING BRACKET,COUNTER-EDGE,ENS 367-0561 |
| TASQ | 140-0046-00 | 52 | MET,UPR CLAMPING BRACKET,UCB TO GRN CAN |
| TASQ | 140-0053-00 | 52 | MET,LWR MOUNTING BRACKET,UCB TO GRN CAN |
| TASQ | 145-0003-00 | 20 | KIT,STAND, ASSY ENS, FOOD LION |
| TASQ | 145-0004-00 | 5 | STND,OMNI 7000,DOROTHY LANE |
| TASQ | 150-0001 | 7 | TOOL,SCREWDRIVER,TORX,T15 TAMPER RESISTANT (36277) |
| TASQ | 150-0002 | 36 | TOOL,SCREWDRIVER,TORX,T25 TAMPER RESISTANT (36281) |
| TASQ | 150-0003 | 113 | PBT ENROLLMENT KIOSK TECH CARD |
| TASQ | 150-0005-00 | 39 | TOOL,SDRIVER,PHILLIPS,#2,100MM/x216MM |
| TASQ | 200-0003 | 4,269 | Surge Protector |
| TASQ | 200-0004 | 39 | PWR,CORD,UK PLUG,13A FUSE,8FT |
| TASQ | 200-0007 | 5 | CAPP POWER SUPPLY |
| TASQ | 200-0010 | 147 | NORHTEC POWER SUPPLY |
| TASQ | 300-0004 | 427 | CBL CAT5E, 350mhz, Unshielded, 10', GRAY |
| TASQ | 300-0005 | 36 | CBL,CAT5e,350Mhz,UNSHIELDED,7',GRAY |
| TASQ | 300-0012 | 45 | CBL,DB9 FEM TO DIN9 MALE,SERIAL RS232, VERIFONE, 2 METER (03018-02) |
| TASQ | 300-0013 | 59 | CBL,VERIFONE 03018-005,DB9 FEM TO DIN9 MALE |
| TASQ | 300-0014 | 300 | CBL,USB EXTENSION, M/F, 6 FT (SF Cable) |

| TASQ | 300-0016 | 730 | CBL,USBAMALE(ST)TOUSBBMALE(RA),12'.BLK |
|------|----------|-----|-----------------------------------------|
| TASQ | 300-0018 | 611 | CBL,DB9F-RJ45,VERIFONE,OMNI 7000 to PC AT,1M (05602-00) |
| TASQ | 300-0020 | 1 | CBL,VERIFONE 26264-04,DB9F-RJ45,3750,4M |
| TASQ | 610-0005 | 461 | DOC,INSTALLATION GUIDE,TRANSACTION, DIAL-UP |
| TASQ | 610-0006 | 495 | DOC,USER GUIDE,ENROLLMENT,DUALCOM |
| TASQ | 610-0008 | 496 | DOC,WELCOME/INSTRUCTIONS,BUK |
| TASQ | 760-0001 | 3 | HEADER, Kiosk, "Piggly Wiggly" |
| TASQ | 770-0002-00 | 460 | DOC,ASSY,SINGLE LANE |
| TASQ | 790-0005 | 15 | KIT,MARKETING,STAND-ALONE TRANSACTIONS,VERIFONE |
| TASQ | 800-0003 | 8 | SW,WINDOWSXPELICENSEWITHCOASTICKER |
| TASQ | R-090-0010 | 807 | PBT,PC,PBT APPLIANCE,NORHTEC MICROSERVER HP |
| Inventory Value for Site: | TASQ | 16,741.00 | |
| | | | |
| TOLT | 000-0008 | 58 | HW,PADLOCK<BRASS,25mm |
| TOLT | 090-0010 | 445 | PBT,PC,PBT APPLIANCE,NORHTEC MICROSERVER HP |
| TOLT | 090-0018 | 29 | PBT,SENSOR,COGENT CSD301 & APP,ePOD |
| TOLT | 090-0029 | 319 | PBT, FINGERSENSOR, RDX 360 |
| TOLT | 100-0015 | 22 | ID SCANNER W/ USB-CABLE |
| TOLT | 130-0008 | 65 | PLAS, BROCHURE HOLDER., Clear |
| TOLT | 150-0001 | 101 | TOOL,SCREWDRIVER,TORX,T15 TAMPER RESISTANT (36277) |
| TOLT | 150-0002 | 72 | TOOL,SCREWDRIVER,TORX,T25 TAMPER RESISTANT (36281) |
| TOLT | 150-0003 | 140 | PBT ENROLLMENT KIOSK TECH CARD |
| TOLT | 300-0003 | 21 | CBL, CAT5E 350MHZ, UNSHIELDED, 25' GRAY |
| TOLT | 400-0010 | 57 | BC,SYMBOL DS6606,SCANNER,GUN,2D/1D Black |
| TOLT | 950-0021 | 50 | EPOD 7402's |
| Inventory Value for Site: | TOLT | 1,377.00 | |
| | | | |
| XPEREX | 090-0035 | 99 | PBT,LOYALTY KIOSK, BASE UNIT |
| XPEREX | 100-0039-00 | 312 | POS,PAPER REFILL,PM KIOSK |
| Inventory Value for Site: | XPEREX | 411 | |
| | | | |
| | Totals: | 51,478.00 | |

SCHEDULE 1.1.2.A

**Bailed Assets**

Two SuperValu routers

Two First Premier Bank routers

Two Hyvee routers

SCHEDULE 1.1.2.D

**Privileged Information and Materials**

None.

SCHEDULE 3.1.1

**Potential Transferred Employees**

Ajay Amlani
Nabil Aref
Daniel Corwin
Suzanne Ever
Tennielle Goff
DA Griscom
Rob Horde
Peter Lee
Robert Orlovic
Colin Ma
Mark Persily
Tom Quinn
Daniel Rivera
Sabry Tozin
Neil Watson
Steven Wong
Jane Yaeger

SCHEDULE 7.3.3

## GENERAL ASSIGNMENT AND BILL OF SALE

**THIS GENERAL ASSIGNMENT AND BILL OF SALE** ("*Bill of Sale*") is being executed and delivered as of _____, 2008 (the "*Effective Date*"), by Solidus Networks, Inc., a Delaware corporation, Pay By Touch Checking Resources, Inc., a Delaware corporation, Indivos Corporation, a Delaware corporation, CheckElect, Inc., a Wisconsin corporation, ATMD Acquisition Corp., a Delaware corporation and Seven Acquisition Sub, LLC, a Delaware limited liability company (collectively, "*Sellers*"), to and for the benefit of YT Acquisition Corporation, a Delaware corporation ("*Purchaser*")

### RECITAL

Purchaser and Sellers have entered into that certain Asset Sale and Purchase Agreement dated as of _____, 2008 (as the same may from time to time be amended, modified, supplemented or restated, the "*Purchase Agreement*"). Capitalized terms used but not defined in this Bill of Sale are defined in the Purchase Agreement.

### AGREEMENT

Sellers, intending to be legally bound, agree as follows:

1.      As of the Effective Date, Sellers hereby sell, transfer, assign convey and deliver to Purchaser all Acquired Assets, including all of Sellers' rights, titles and interests in, relating to and under the Acquired Assets with all the benefits and advantages to be derived therefrom, to have and to hold, unto Purchaser, its successors and assigns, to and for its use and benefit forever.

2.      Notwithstanding the foregoing, the Sellers will retain and not transfer, and Purchaser will not purchase or acquire, the Excluded Assets.

3.      Nothing contained in this Bill of Sale shall be deemed to limit any right or obligation of Purchaser under the Purchase Agreement.

4.      This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to conflict of laws principles. Section 11.12 of the Purchase Agreement shall be deemed applicable to this Bill of Sale.

5.      This Bill of Sale and all of the provisions hereof shall be binding upon Sellers and inure to the benefit of Purchaser and its successors and assigns. The Purchaser may assign this Bill of Sale and all of its rights and obligations hereunder to an Affiliate of the Purchaser, or to any Permitted Purchaser Assignee without the consent of the Sellers.

*[Signature page follows.]*

NY1:1732047.1

**IN WITNESS WHEREOF**, Sellers have executed this General Agreement and Bill of Sale as of the date first written above:

**ASSIGNORS:**

**SOLIDUS NETWORKS, INC.**

By: _____
Print Name: _____
Title: _____

**CHECKELECT, INC.**

By: _____
Print Name: _____
Title: _____

**PAY BY TOUCH CHECKING RESOURCES, INC.**

By: _____
Print Name: _____
Title: _____

**ATMD ACQUISITION CORP.**

By: _____
Print Name: _____
Title: _____

**INDIVOS CORPORATION**

By: _____
Print Name: _____
Title: _____

**SEVEN ACQUISITION SUB, LLC**

By: _____
Print Name: _____
Title: _____

**SOLIDUS NETWORKS, INC.**
**DISCLOSURE SCHEDULE**
**March __, 2008**

This Disclosure Schedule (the "*Schedule*") is delivered in connection with that certain Asset Sale and Purchase Agreement dated as of March __, 2008 (the "*Agreement*") by and among YT Acquisition Corporation, Solidus Networks, Inc., a Delaware corporation, Pay By Touch Checking Resources, Inc., a Delaware corporation, Indivos Corporation, a Delaware corporation, CheckElect, Inc., a Wisconsin corporation, ATMD Acquisition Corp., a Delaware corporation, and Seven Acquisition Sub, LLC, a Delaware limited liability company. Capitalized terms used but not defined herein shall have the same meanings given them in the Agreement.

No reference to or disclosure of any item or other matter in this Schedule shall be construed as an admission or indication that such item or other matter is material. With respect to any third party claims, no disclosure in this Schedule relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

The section numbers in this Schedule correspond to the clauses of Section 5.1 of the Agreement; *provided, however*, that any information disclosed herein under any clause herein shall be deemed to be disclosed and incorporated herein with respect to any other clause of Section 5.1 of the Agreement as to which it is reasonably apparent that such disclosure relates based solely on the language in such disclosure and such other clause.

This Disclosure Schedule is qualified in its entirety by reference to the specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, any representation or warranty of the Sellers, except as and to the extent expressly provided in the Agreement. The fact that any item of information is contained in this Disclosure Schedule shall not be construed to mean that such information is required to be disclosed by the Agreement.

References to any document do not purport to be complete and are qualified in their entirety by the document itself. The bold-faced headings contained in this Schedule are included for convenience only, and are not intended to limit the effect of the disclosures contained in this Schedule or to expand the scope of the information required to be disclosed in this Schedule.

SCHEDULE 5.1.5.A

**Title to Personal Property**

None.

Schedule 5.1.6.A

**Intellectual Property**

(a) Registered and Pending Owned Intellectual Property

# OWNER: SOLIDUS NETWORKS, INC.

## PATENTS AND APPLICATIONS

| NAME | COUNTRY OF FILING | APPLICATION TYPE | REG./APP. NUMBER | REG. DATE |
|---|---|---|---|---|
| A Method and System for Distributing and Redeeming Targeted Offers to Customers | United States | Patent Application | 20070162337 | N/A |
| A Method and System for Distributing and Redeeming Targeted Offers to Customers | WO | Patent Application | N/A | N/A |
| A Method of Distributing Information Via Mobile Devices and Enabling its Use at a Point of Transaction | United States | Provisional Patent Application | N/A | N/A |
| A System for Individual Control and Analysis of Personal Information and the Monetization Thereof | United States | Provisional | N/A | N/A |
| An Apparatus and Methods for Testing Biometric Equipment | United States | Provisional Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Canada | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | China | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Europe | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Mexico | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | United States | Patent Application | 20040073510 | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | WO | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Brazil | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Korea | Patent Application | N/A | 3/10/05 |

| | | | | |
|---|---|---|---|---|
| Automated Method and Exchange for Facilitating Settlement of Transactions | Costa Rica | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Europe | Patent | _006783 | 4/28/06 |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Hong Kong | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Indonesia | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Israel | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Japan | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | New Zealand | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Serbia | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | Singapore | Patent | 200407744-2 | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | South Africa | Patent Application | N/A | N/A |
| Automated Method and Exchange for Facilitating Settlement of Transactions | United Arab Emirates | Patent Application | N/A | N/A |
| Electrostatic Discharge Structure for a Biometric Sensor | United States | Patent Application | N/A | N/A |
| Electrostatic Discharge Structure for a Biometric Sensor | WO | Patent Application | N/A | N/A |
| High-precision customer-based targeting by individual usage statistics | United States | Provisional Patent Application | N/A | N/A |
| Method And System For Providing Biometric Authentication At A Point-Of-Sale Via A Mobile Device | United States | Patent Application | 20080046366 | N/A |
| Method And System For Providing Biometric Authentication At A Point-Of-Sale Via A Mobile Device | WO | Patent Application | N/A | N/A |
| Method and System for Providing Householding Information to Multiple Merchants | United States | Patent Application | 20070282677 | N/A |

| | | | | |
|---|---|---|---|---|
| Method and System for Providing Householding Information to Multiple Merchants | WO | Patent Application | N/A | N/A |
| Method and System for Providing On-Line Authentication Using Biometric Data | WO | Patent Application | N/A | N/A |
| Method and System for Providing On-Line Authentication Using Biometric Data | United States | Patent Application | 20070198435 | N/A |
| Method of Distributing Information Via Mobile Devices and Enabling Its Use at a Point of Transaction | United States | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumer or Specific Consumer Groups | WO | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumer or Specific Consumer Groups | Canada | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumer or Specific Consumer Groups | Europe | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumer or Specific Consumer Groups | Japan | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumer or Specific Consumer Groups | Mexico | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumers On-Line and In-Stores | WO | Patent Application | N/A | N/A |
| Process for Creating and Disseminating Marketing Initiatives to Specific Consumers or Specific Consumer Groups | United States | Patent Application | 20060111977 | N/A |
| Secure Data Entry and Visual Authentication | United States | Patent | 6,209,104 | 3/27/01 |
| Secure Data Entry Using Images and Voice | United States | Provisional Patent Application | N/A | N/A |

| System and Architecture for merchant integration of a biometric payment system | United States | Patent Application | 20070288320 | N/A |
|---|---|---|---|---|
| System and Architecture for merchant integration of a biometric payment system | WO | Patent Application | N/A | N/A |
| System and Method for Decoupling Identification from Biometric Information in Biometric Access Systems | WO | Patent Application | N/A | N/A |
| System and Method for Decoupling Identification from Biometric Information in Biometric Access Systems | United States | Patent Application | 20070038863 | N/A |

## TRADEMARKS AND APPLICATIONS

| DIAN JIU TONG | China | Trademark Application | N/A | N/A |
|---|---|---|---|---|
| Hand Logo | Singapore | Registered Trademark | T0614173E | 7/14/2006 |
| Hand Logo | United States | Trademark Application | N/A | N/A |
| Hand Logo | Singapore | Registered Trademark | T0614164F | 7/14/2006 |
| Hand Logo | Singapore | Trademark Application | N/A | N/A |
| PAY BY TOUCH | South Korea | Registered Trademark | 115069 | 4/13/2005 |
| PAY BY TOUCH | Mexico | Registered Trademark | 846751 | 8/16/2004 |
| PAY BY TOUCH | Mexico | Registered Trademark | 846752 | 8/16/2004 |
| PAY BY TOUCH | United Kingdom | Registered Trademark | 2407219 | 8/24/2007 |
| PAY BY TOUCH | France | Registered Trademark | 63431678 | 5/30/2006 |
| PAY BY TOUCH | Brazil | Registered Trademark | 826134513 | 8/21/2007 |
| PAY BY TOUCH | Brazil | Registered Trademark | 826134505 | 9/11/2007 |
| PAY BY TOUCH | Canada | Registered Trademark | TMA696922 | 9/20/2007 |
| PAY BY TOUCH | China | Trademark Application | N/A | N/A |
| PAY BY TOUCH | China | Trademark Application | N/A | N/A |
| PAY BY TOUCH | European Council | Registered Trademark | 4893491 | 2/14/2007 |
| PAY BY TOUCH | Germany | Trademark Application | N/A | N/A |
| PAY BY TOUCH | Singapore | Registered Trademark | T0610965C | 6/6/2006 |
| PAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PAY BY TOUCH | Spain | Registered Trademark | 2713855MO | 7/20/2007 |
| PAY BY TOUCH (and Design) | Canada | Trademark Application | N/A | N/A |
| PAY BY TOUCH and Design | Mexico | Registered Trademark | 863435 | 12/14/2004 |
| PAY BY TOUCH and Design | Japan | Registered Trademark | 4867604 | 5/27/2005 |
| PAY BY TOUCH and Design | Singapore | Registered Trademark | T0614183B | 7/14/2006 |
| PAY BY TOUCH and Design | European Council | Registered Trademark | 182423-0001 | 5/24/2004 |
| PAY BY TOUCH and Design | European Council | Registered Trademark | 3449626 | 9/2/2005 |
| PAY BY TOUCH and Design | Mexico | Registered Trademark | 838635 | 6/18/2004 |
| PAY BY TOUCH and Design | United Kingdom | Registered Trademark | 2364024 | 10/14/2005 |
| PAY BY TOUCH and Design | Mexico | Registered Trademark | 651542 | 4/13/2004 |
| PAY BY TOUCH and Design | Singapore | Registered Trademark | T0614177H | 7/14/2006 |
| PAY BY TOUCH and Design | Singapore | Trademark Application | N/A | N/A |

| | | | | |
|---|---|---|---|---|
| PAY BY TOUCH and Hand Logo | United States | Registered Trademark | 3177796 | 11/28/2006 |
| PAY BY TOUCH and Hand Logo | China | Trademark Application | N/A | N/A |
| PAY BY TOUCH and Hand Logo | China | Trademark Application | N/A | N/A |
| PAY BY TOUCH and Hand Logo | China | Trademark Application | N/A | N/A |
| PAY BY TOUCH and Hand Logo | United States | Registered Trademark | 3233866 | 4/24/2007 |
| PAY-BY-TOUCH | United States | Registered Trademark | 3117460 | 7/18/2006 |
| PAYSECURE | United States | Trademark Application | NA | NA |
| PAYTOUCH | United States | Trademark Application | N/A | N/A |
| PEI BI TE | China | Trademark Application | N/A | N/A |
| PIE BI DA | China | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Hong Kong | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | United States | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Benelux | Registered Trademark | 790683 | 1/31/2006 |
| PLAY BY TOUCH | Macao | Trademark Application | N019973 | 4/7/2006 |
| PLAY BY TOUCH | Macao | Trademark Application | N019974 | 4/7/2006 |
| PLAY BY TOUCH | Macao | Trademark Application | N019975 | 4/7/2006 |
| PLAY BY TOUCH | Canada | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | China | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | China | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | China | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | European Council | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Japan | Trademark Application | 5048578 | 5/18/2007 |
| PLAY BY TOUCH | Philippines | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | Singapore | Registered Trademark | T0523498E | 11/21/2005 |
| PLAY BY TOUCH | Singapore | Trademark Application | N/A | N/A |
| PLAY BY TOUCH | United Kingdom | Registered Trademark | 2406882 | 12/14/2007 |
| SUO LI DA | China | Trademark Application | N/A | N/A |
| TOUCHPAY | United States | Trademark Application | N/A | N/A |
| TrueMe | Canada | Trademark Application | N/A | N/A |
| TRUEME | Mexico | Registered Trademark | 986834 | 5/30/2007 |
| TRUEME | Mexico | Registered Trademark | 990790 | 6/28/2007 |
| TRUEME | Singapore | Registered Trademark | T0704761I | 3/5/2007 |
| TRUEME | Singapore | Trademark Application | N/A | N/A |
| TRUEME | United Kingdom | Registered Trademark | 2448276 | 9/14/2007 |
| TrueMe | United States | Trademark Application | N/A | N/A |
| TrueMe | European Union | Trademark Application | N/A | N/A |
| U logo | United States | Trademark Application | N/A | N/A |
| YOU and U logo | United States | Trademark Application | N/A | N/A |
| YOU logo | United States | Trademark Application | N/A | N/A |
| YOU TECHNOLOGY and U logo | United States | Trademark Application | N/A | N/A |
| ZI FU QING | China | Trademark Application | N/A | N/A |

# OWNER: INDIVOS CORPORATION

| NAME | COUNTRY OF FILING | APPLICATION TYPE | REG. /APP. NUMBER | REG. DATE |
|---|---|---|---|---|
| Anti-Fraud Biometric Scanner That Accurately Detects Blood Flow | United States | Patent | 5,737,439 | 4/7/98 |
| Association of Finger Pores and Macrofeatures for | United States | Patent | 6,591,002 | 7/8/03 |
| Association of Finger Pores and Microfeatures For Identification of Individuals | United States | Patent | 6,411,728 | 6/25/02 |
| System and Method for Tokenless Biometric electronic scrip | United States | Patent Application | 20060107069 | N/A |
| Biometric Financial Transaction System and Method | United States | Patent Application | 20020019811 | N/A |
| Data Entry Pad | United States | Patent | D425,873 | 5/30/00 |
| Pressure Sensitive Biometric Input Apparatus | United States | Patent | 6,131,464 | 10/17/00 |
| Processo biométrico sem indicação magnética para processar transmissões eletrônicas, e, dispositivo de sistema de computador para processamento biométrico sem indicação magnética de transmissões eletrônicas | Brazil | Patent Application | N/A | N/A |
| Rewards System and Method Biometric Tokenless Electronic | United States | Patent | 6,980,670 | 12/27/05 |
| System and Method for Processing Tokenless Biometric Electronic Transmissions using an Electronic Rule Modile Clearinghouse | Canada | Patent Application | N/A | N/A |
| System and Method for Processing Tokenless Biometric Electronic Transmissions using an Electronic Rule Modile Clearinghouse | Hong Kong | Patent Application | N/A | N/A |
| System and Method for Processing Tokenless Biometric Electronic Transmissions using an Electronic Rule Modile Clearinghouse | Japan | Patent Application | N/A | N/A |
| System and Method for Processing Tokenless Biometric Electronic Transmissions using an Electronic Rule Modile Clearinghouse | WO | Patent Application | N/A | N/A |

| | | | | |
|---|---|---|---|---|
| SYSTEM AND METHOD FOR PROCESSING TOKENLESS BIOMETRIC ELECTRONIC TRANSMISSIONS USING AN ELECTRONIC RULE MODULE CLEARINGHOUSE | Mexico | Patent | 224359 | 11/22/04 |
| Tokenless Biometric ATM Access System | Hong Kong | Patent Application | N/A | N/A |
| Tokenless Biometric ATM Access System | Brazil | Patent Application | N/A | N/A |
| Tokenless Biometric ATM Access System | United States | Patent | 6,154,879 | 11/28/00 |
| Tokenless Biometric ATM Access System | Mexico | Patent | 233337 | 1/5/06 |
| Tokenless Biometric ATM Access System | United States | Patent | 5,764,789 | 6/9/98 |
| Tokenless Biometric Authorization of Electronic Communications | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Check Transaction | Brazil | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Check Transaction | Canada | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Check Transaction | Hong Kong | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Check Transaction | Mexico | Patent | 228347 | 6/7/05 |
| Tokenless Biometric Electronic Check Transactions | United States | Patent | 6,230,148 | 5/8/01 |
| Tokenless Biometric Electronic Check Transactions | United States | Patent | 6,581,042 | 6/17/03 |
| Tokenless Biometric Electronic Check Transactions | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Debit and Credit Transacitons | Europe | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Debit and Credit Transactions | Brazil | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Debit and Credit Transactions | Canada | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Debit and Credit Transactions | Mexico | Patent | 224362 | 11/22/04 |
| Tokenless Biometric Electronic Debit and Credit Transactions | United States | Patent | 6,269,348 | 7/31/01 |
| Tokenless Biometric Electronic Debit and Credit Transactions | Japan | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Debit and Credit Transactions | United States | Patent | 6,662,166 | 12/9/03 |
| Tokenless Biometric Electronic Debit and Credit Transactions | WO | Patent Application | N/A | N/A |

| | | | | |
|---|---|---|---|---|
| Tokenless Biometric Electronic Financial Transactions via a Third Party Identicator | United States | Patent | 6,879,966 | 4/12/05 |
| Tokenless Biometric Electronic Financial Transactions via a Third Party Identicator | United States | Patent | 6,950,810 | 9/27/05 |
| Tokenless Biometric Electronic Rewards System | Europe | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | Hong Kong | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | Mexico | Patent | 231988 | 11/9/05 |
| Tokenless Biometric Electronic Rewards System | Brazil | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | Canada | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | Japan | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Rewards System | United States | Patent | 6,012,039 | 1/4/00 |
| Tokenless Biometric Electronic Stored Value Transactions | United States | Patent | 6,192,142 | 2/20/01 |
| Tokenless Biometric Electronic Transactions Using an Audio Signature to Identify the Transaction Processor | United States | Patent | 6,920,435 | 7/19/05 |
| Tokenless Biometric Electronic Transactions Using An Audio Signature To Identify The Transaction Processor | United States | Patent | 6,397,198 | 5/28/02 |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Brazil | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Canada | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Hong Kong | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Japan | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Mexico | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Transactions Using Audio Signature | Europe | Patent Application | N/A | N/A |

| | | | | |
|---|---|---|---|---|
| Tokenless Biometric Transaction Authorization Method and System | United States | Patent | 5,870,723 | 2/9/99 |
| Tokenless Biometric Transaction Authorization System | United States | Patent | 5,838,812 | 11/17/98 |
| Tokenless Electronic Transaction System | United States | Patent Application | 20070291996 | N/A |
| Tokenless Electronic Transaction System | United States | Patent | 6,985,608 | 1/10/06 |
| Tokenless Electronic Transaction System | United States | Patent | 6,366,682 | 4/2/02 |
| Tokenless Electronic Transaction System | United States | Patent | 6,594,376 | 7/15/03 |
| Tokenless Identification of Individuals | United States | Patent | 5,805,719 | 9/8/98 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Brazil | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Japan | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Canada | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Russian Federation | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | United States | Patent | 5,613,012 | 3/18/97 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Mexico | Patent | 205149 | 11/12/01 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Australia | Patent | 13524/00 | 11/7/02 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Austria | Patent | AT0254315E | 11/15/03 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Belgium | Patent | 912959 | 11/12/03 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | China | Lapsed | CN1542680A | 11/3/04 |

| | | | | |
|---|---|---|---|---|
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | China | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Denmark | Patent | DK0912959T3 | 3/15/04 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Europe | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Finland | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | France | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Germany | Patent | DE69630713T2 | 12/2/04 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Ireland | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Italy | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Japan | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Japan | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Japan | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Luxembourg | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Monaco | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Netherlands | Patent | 96916498.7 | N/A |

| | | | | |
|---|---|---|---|---|
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Portugal | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Russian Federation | Patent | 2263348 | 10/27/05 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Sweden | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Switzerland | Patent | 912959 | 11/12/03 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | United Kingdom | Patent | 96916498.7 | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | United States | Patent | 7,152,045 | 12/19/06 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | WO | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Spain | Patent | ES2213774T3 | 9/1/04 |
| Tokenless Security System for Authorizing Access To A Secure Computer System | United States | Patent | 5,615,277 | 3/25/97 |
| Use Sensitive Identification System | United States | Patent | 5,802,199 | 9/1/98 |
| Use Sensitive Tokenless Identification System | WO | Patent Application | N/A | N/A |
| System and Method for Tokenless Biometric Electronic Scrip | United States | Patent Application | 20060107069 | N/A |
| Tokenless Biometric Electronic Transactions Using an Audio Signature to Identify the Transaction Processor | United States | Patent Application | 20050203841 | 9/15/05 |
| Biometric Tokenless Electronic Rewards System and Method | United States | Patent Application | 20060083408 | 4/20/06 |
| Tokenless Biometric Electronic Financial Transactions via a Third Party Identicator | United States | Patent Application | 20050187843 | 8/25/05 |

| | | | | |
|---|---|---|---|---|
| A System and Method for Processing Tokenless Biometric Electronic Transmissions Using an Electronic Rule Module Clearinghouse | United States | Patent Application | 20050144133 | 6/30/05 |
| System and Method for Processing Tokenless Biometric Electronic Transmissions Using an Electronic Rule Module Clearinghouse | United States | Patent Application | 20050289058 | 12/29/05 |
| Biometric electronic scrip | United States | Patent Application | N/A | 5/18/06 |
| System and Method for Processing Tokenless Biometric Electronic Transmissions Using An Electronic Rule Module Clearinghouse | United States | Patent Application | N/A | 5/18/06 |
| Tokenless Electronic Transaction System | United States | Patent | 7,248,719 | 7/24/07 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | United States | Patent Application | 20030105725 | N/A |
| System and Method for Processing Tokenless Biometric Electronic Transmissions using an Electronic Rule Module Clearinghouse | United States | Patent Application | N/A | N/A |
| Tokenless Financial Access System | United States | Patent | 7,319,987 | 1/15/08 |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | United States | Patent Application | N/A | N/A |
| Tokenless Biometric ATM Access System | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Automated Teller Machine Access System | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Electronic Stored Value Transactions | WO | Patent Application | N/A | N/A |
| Tokenless Biometric Transaction Authorization Method and System | WO | Patent Application | N/A | N/A |
| Tokenless Electronic Transaction System | WO | Patent Application | N/A | N/A |
| Tokenless Identification System for Authorization of Electronic Transactions and Electronic Transmissions | Hong Kong | Patent Application | N/A | N/A |
| Identification of Individuals from Association of Finger Pores and Macrofeatures | WO | Patent Application | N/A | N/A |

## TRADEMARKS AND APPLICATIONS

| MARK | COUNTRY | TYPE | REG. NO./SERIAL NO. | REG. DATE |
|------|---------|------|---------------------|-----------|
| INDIVOS | United States | Trademark Application | 76280782 | N/A |
| INDIVOS | European Council | Registered Trademark | 2517829 | 10/10/2003 |

# OWNER: PAY BY TOUCH CHECKING RESOURCES, INC.

## PATENTS AND APPLICATIONS

| Title | Country | Patent No. | Publication No. |
|---|---|---|---|
| System and Method for Biological Authorization for Financial Transactions | United States | NA | 20040034598 |
| System and Method for Biological Authorization for Financial Transactions | United States | NA | 20030061172 |
| System and Method for Automated Binning and Automatic Data Entry of Centralized Returns | United States | NA | 20040078311 |
| System and Method for Verifying Identity | United States | NA | NA |
| System and Method for Biometric Authorization of Age-Restricted Transactions Conducted at an Unattended Device | United States | NA | 20040153421 |
| System and Method for Enrolling in a Biometric System | United States | NA | NA |
| System and Method for Registering Augmenting Information in a Biometric System | United States | NA | NA |
| System and Method for Enrolling in a Biometric System | United States | NA | NA |
| System and Method for Delaying Payment Processing for Biometrically-Initiated Financial Transactions | United States | NA | NA |
| System and Method for Biometrically-Initiated Refund Transactions | United States | 7,082,415 | NA |
| System and Method for Upgrading Biometric Data | United States | NA | NA |
| System and Method for a Biometric Tab | United States | NA | NA |
| System and Method for Providing A Line of Credit | United States | NA | NA |
| System and Method for Activating Financial Tokens Via Biometric Recognition | United States | NA | NA |
| System and Method for Enrolling in a Biometric System | United States | NA | NA |
| A System and Method for Dispensing Value | United States | NA | NA |
| System and Method for Employing User Information | United States | NA | NA |
| System and Method for Authorizing Background Checks | United States | NA | NA |

| Title | Country | Patent No. | Publication No. |
|---|---|---|---|
| A System and Method for Stand-In Processing | United States | NA | NA |
| A System and Method for Negotiable Instrument Cashing System Incentives | United States | NA | NA |
| A System and Method for Purchase Benefits at a Point of Sale | United States | NA | NA |
| A System and Method for Enhancing the Functionality of a User Record in a Biometric System | United States | NA | NA |
| A System and Method for Tracking a Mobile Worker | United States | 7,004,389 | NA |
| A System and Method for Providing Non-Biometric Access to Users of a Biometric Authorization System | United States | NA | NA |
| System and Method for Background Checks and Access Control | United States | NA | NA |
| System and Method for Renting a Vehicle | United States | NA | NA |
| A System and Method for Categorizing Transactions | United States | NA | NA |
| A System and Method for Categorizing Transactions | United States | NA | NA |
| System and Method for Offering In-Lane Periodical Subscriptions | United States | NA | NA |
| System and Method for Biometric Signature Authorization | United States | NA | NA |
| System and Method for Providing Supplementary Restaurant Services | United States | NA | NA |
| System and Method for Operating a Parking Facility | United States | NA | NA |
| System and Method for Prepaid Biometric Redemption Accounts | United States | NA | NA |
| System and Method for Biometrically-Initiated Refund Transactions | United States | NA | NA |
| Fraud Deterrence System for Unattended Financial Token Transactions | United States | NA | NA |
| System and Method for Verifying Identity | United States | NA | NA |
| A System and Method for Tracking a Mobile Worker | United States | NA | NA |
| System and Method for Biometric Authorization for Financial Transactions | United States | NA | 20060265602 |

| Title | Country | Patent No. | Publication No. |
|---|---|---|---|
| System and Method for Biometric Authorization for Financial Transactions | United States | NA | 20030061172 |
| A System and Method for Encouraging Use of a Biometric Authorization System | United States | NA | NA |
| System and Method for Transferring Biometrically Accessed Redemption Rights for Products and Services | United States | NA | 20070288319 |
| System and Method for Biometric Authorization for Age Verification | United States | NA | 20030177102 |
| System and Method for Transferring Biometrically Accessed Redemption Rights for Products and Services | United States | NA | NA |
| A System and Method for Encouraging Use of a Biometric Authorization System | United States | NA | NA |

## TRADEMARKS

| Mark | Country | Class | App. No. | Reg. No. |
|---|---|---|---|---|
| B BIOPAY & Design  | United States | 45 | 78754183 | 3145568 |
| BACCESS | United States | 9, 45 | 76520533 | 2944558 |
| BCHECK | United States | 36 | 78134416 | 2745314 |
| BIOBUCKS | United States | 36 | 78185124 | 2818478 |
| BIOPAY | United States | 42 | 75824850 | 2488937 |
| BIOPAY | United States | 45 | 78455826 | 3053587 |
| BIOPAY (stylized)  | United States | 45 | 78470279 | 3053738 |
| BIOPAY PAYCHECK SECURE & Design  | United States | 9, 45 | 78768576 | 3217340 |
| BIOPAY | Canada | 45 | NA | NA |
| BIOPAY[1] | Mexico | 42 | 888162 | 6/24/05 |

---

[1] The owner listed is BioPay, LLC.

| THE SMART SECURE WAY TO PAY | United States | 36 | 78134405 | 2745313 |
|---|---|---|---|---|

**COPYRIGHTS**

Registration Number: TXu-1-186-971
Title: BioPay payments.
Description: Computer program.
Note: Printout only deposited.
Claimant: acBioPay, LLC
Created: 2004
Registered: 24Jun04
Special Codes: 1/B

Registration Number: TXu-1-260-381
Title: BioPay in-store Web enrollment user manual.
Description: 108 p.
Claimant: acBioPay, LLC
Created: 2005
Registered: 30Aug05
Special Codes: 1/B

## OWNER: SEVEN ACQUISITION SUB, LLC.

### PATENTS AND APPLICATIONS

| NAME | COUNTRY OF FILING | APPLICATION TYPE | REG./APP. NUMBER | REG. DATE |
|---|---|---|---|---|
| High-Precision Customer-Based Targeting by Individual Usage Statistics | United States | Patent Application | 20050010472 | N/A |

**(2) Following is a list of Owned Intellectual Property licensed from other sources:**

| *Assignor* | *IP Material* | *Effective Date* |
|---|---|---|
| Electro Check, Inc. | Trademark #2488937 - "BioPay" | 6/20/2001 |

The Sellers are a party to the following license agreements:

| | | |
|---|---|---|
| Adobe | Acrobat | Tool for preparing WYSIWIG documents |
| AllAround Automations | PL/SQL Developer (50 Users) | Oracle Database Development and Query Tool |
| Apache | Apache Web Server | Web Server for RT Ticket |
| Attachmate/WRQ | Reflection | Terminal Emulation / FTP Client |
| Best Practical | RT (Request Tracker) 3.6.5 | Issue tracking software |
| BlackBerry | Blackberry Enterprise Server | Blackberry Server |
| Check Point | NGX R62 | Firewall administration |
| Cisco | Cisco ACS | Access Control Server |
| Cisco | VPN client | Remote Access |
| Citrix | Citrix | Citrix Server |
| Component Art | Web.UI 2006.1 for ASP.NET | ASP.NET components |
| Computer Associates | CA Erwin Modeling Suite | Database Modeler, Process Modeler |
| Dovico | Timesheet | Time tracking software |
| Embarcadero Technologies | DBArtisan | Oracle Database Administration Tool |
| EVault | EVault | EVault Disk-to-Disk Backup |
| GFi | GFi Landguard | File Integrity Software |
| HP | HP-Tru-64 | Operating system software |
| Hummingbird | Exceed, Secure Shell | Terminal Emulation, SSH |
| Imail | IMAIL 2006 | SMTP Server |
| Imperva | Websphere Secure | Application-layer Firewall and Intrusion Prevention System |
| Ingrian | DataSecure | Encrypt sensitive data. (Sensitive data is defined as card numbers.) |
| Ipswitch | WS_FTP Pro | FTP software |
| KeePass | KeePass Password Safe | Encrypted Password Database |
| Kiwi Enterprises | Cat Tools | Cisco device configuration collection, archival and reporting |
| Linux | Linux OS | Operating System |
| Linux | Redhat Linux | Linux Server |
| Microsoft | SQL Server | Standard DBMS for Windows |
| Microsoft | Visual Studio Team Editions | Developer / Tester / Architect suites for .NET application development |
| Microsoft | Exchange | Corporate e-mail |
| Microsoft | Office | Standard software suite |
| Microsoft | Project | Project Management |
| Microsoft | Visio | Design and documentation |

| | | |
|---|---|---|
| Microsoft | Windows 2003 Server | Standard Server OS |
| Microsoft | Windows Terminal Server | Remote System Access |
| Microsoft | Windows XP | Standard desktop operating system |
| Mozilla | Firefox | Alternate web browser |
| Mozilla | FileZilla FTP Server/Client | FTP Server/Client |
| MYSQL | MySql | MySql |
| Oracle | Oracle DBMS | Relational DBMS for HP-UX |
| PatchLink | Update | Software updates |
| Persists | Asp Email sender | VB Component for sending email from classic ASP |
| PGP | PGP Desktop | Encryption of inbound / outbound sensitive files (non-Production use) |
| PuTTY | PuTTY | SSH client |
| Quest | Toad | Oracle system management |
| Radionics | ReadyKey | Badge server |
| code4ward | Royal TS | Terminal Services Client |
| RSA | RSA SecurID | Two-factor authentication |
| Snort | Snort 2.6.1 | Intrusion detection service |
| Roxio | Roxio Easy Cd Creator | CD / DVD burning software |
| Sterling Commerce | Connect:Direct | Used to transmit files to and from FDR / Merrick |
| Sun | Java RTE | Runtime engine |
| Symantec | Anti-Virus Enterprise | AV management for Windows sytems |
| Symantec | Backup Exec | Data backup / archival / recovery |
| Symantec | Ghost | Workstation / Server imaging for system management / deployment |
| TeraTerm | TeraTerm | Telnet, SSH client |
| TripWire | TripWire | File Integrity Software |
| VMWare | VMWare Server | Virtual Server mangement |
| VMWare | VMWare ESX Server | Virtual Server mangement |
| VNC | VNC Client | XWindows Client |
| What's Up Gold | What's Up Gold Premuim 11 | Systems/Network monitoring |
| WinMerge | WinMerge | Visual text file differencing and merging tool |
| winscp400 | winscp400 | SFTP Client |
| WinZip | WinZip | File compression / encryption |
| Wireshark | Network Protocol Analyzer, Notepad ++ | Reviewing network captures |

The Sellers are also parties to the following agreements related to Intellectual Property rights:

| Name of Document | Party 1 | Party 2 | Date |
|---|---|---|---|
| Addendum to NCR Master Agreement | Solidus Networks Inc | NCR Corporation | 12/20/2005 |
| Agreement | TASQ Technology Inc | Pay By Touch | 7/2/2004 |
| Agreement on Assignments of Work | Vignette Enterprises | Solidus Networks Inc | 6/1/2006 |

| Name of Document | Party 1 | Party 2 | Date |
|---|---|---|---|
| Alliance Agreement | Retalix Inc. | Solidus Networks Inc | 9/20/2005 |
| Business Development Agreement | Solidus Networks Inc | Accenture LLP | 10/21/2005 |
| Commercial Application & Maintenance Agreement | MCI Worldcom | BioPay LLC | 3/30/2001 |
| Compatible Product Development & Marketing Agreement | Solidus Networks Inc | Verifone Inc | 5/6/2005 |
| Consulting Agreement | PBT Payment Solutions | Oracle Consulting | date unknown |
| Consulting Agreements | Solidus Networks, Inc. | Better Buy Design | Feb-06 |
| Consulting Agreements | Solidus Networks, Inc. | eSmart Solutions | Jan-06 |
| Contractor Agreement | Kornher Associates | Solidus Networks | 8/14/2006 |
| Contractor Agreement | Blackstone Consulting | Solidus Networks | 9/13/2006 |
| Contractor Agreement | Exadel Inc | Solidus Networks | 9/13/2006 |
| Corporate Master Agreement | Vignette Enterprises | Solidus Networks Inc | 12/31/2005 |
| Development Purchase and Services Agreement | Solidus Networks Inc | Xperex Corporation | 11/30/2005 |
| DSI Dealer Agreement | Solidus Networks Inc | Data Systems Inc. | 5/17/2006 |
| General | AT&T/SBC | Solidus Networks, Inc. | Dec-05 |
| General | Verizon | Solidus Networks, Inc. | Mar-06 |
| General | ARIN | Solidus Networks, Inc. | May-06 |
| General | Carrolton Bank | Solidus Networks, Inc. | Dec-05 |
| General | PULSE Network | Solidus Networks, Inc. | May-05 |
| General | FiServ | Solidus Networks, Inc. | Jan 2005; Aug 2005 |
| General | Iron Mountain | Solidus Networks, Inc. | Nov-05 |
| General | 123Domains | Solidus Networks, Inc. | Dec-05 |
| General | Omnis Domain | Solidus Networks, Inc. | Jan-06 |
| General Terms and Conditions for Employee Brokerage Services Gilbarco | E*trade Financial | Pay By Touch | 10/5/2005 |
| HP Customer Agreement | Hewlett Packard | Solidus Networks Inc | 4/25/2006 |
| ICA | Solidus Networks Inc | Pixometrix Inc (Jalili) | 11/16/2005 |
| IDEO Services Agreement | Ideo | Solidus Networks Inc | 12/21/2005 |
| Kiosk Administrator's License | St Clair Interactive | | |
| Kiosk Roles and Permissions Project | Entology | PBT Business Systems | 5/15/2006 |

| Name of Document | Party 1 | Party 2 | Date |
|---|---|---|---|
| Letter Agreement - Interim Negotiation Letter | Solidus Networks Inc | IBM | 9/12/2006 |
| Master Installation Services Agreement | Solidus Networks Inc | SAM Group Inc. | 11/13/2005 |
| Master License Agreement | Title Software Inc | Solidus Networks Inc | 3/31/2006 |
| Master Services Agreement | Channelforce Inc | Pay By Touch | 10/26/2005 |
| Master Services Agreement | World Class International | Solidus Networks Inc | 10/26/2005 11/17/2006 |
| Master Services Agreement | Arrow Electronics, Inc. | Solidus Networks, Inc. | |
| Merchant Agreements | Solidus Networks Inc | JPaul | Apr-06 |
| Merchant Agreements | Solidus Networks Inc | 2CheckOut.com | 3/29/2006 |
| NCR Master Agreement | Solidus Networks Inc | NCR Corporation | 11/7/2005 |
| PartnerWord Software Usage Attachment | IBM | | unsigned web based terms and conditions |
| Patent Acquisition Agreement | Solidus Networks Inc | Reza Jalili (as Seller) | 11/16/2005 |
| PBT Services Agreement | Solidus Networks Inc | Bridge Design Inc. | 8/29/2006 |
| PBT Services Agreement | Solidus Networks, Inc. | Koster Group | unsigned by Koster Group signed by PBT on 8/9/06 |
| PBT Solutions Referral and Support Agreement | Solidus Networks Inc | A3 Solutions | 6/26/2006 |
| Project Agreement and Estimage | Solidus Networks Inc | Nyquist Design | 2/10/2006 |
| Purchase Order Form | Extrade Financial | Pay By Touch | 10/5/2005 |
| Sagem Morpho | Value Added Reseller Agreement | Solidus Networks, Inc. | 1/26/2007 |
| Service Provider Agreement | Friedman & Associates | Solidus Networks Inc | 1/18/2006 |
| Softrax Software License and Services Agreement | Softrax Corporation | Solidus Networks, Inc. | 7/31/2006 |
| Software License | GWI | Solidus Networks, Inc. | Aug-06 |
| Software License | GFI | Solidus Networks, Inc. | Jul-06 |
| Software License | IPSwitch | Solidus Networks, Inc. | Mar-06 |
| Software License | Verisign | Solidus Networks, Inc. | Apr-06 |
| Software License | Mosaic Software | Solidus Networks, Inc. | Nov 2005; Sept 2006 |
| Software License | Red-Gate SQL tools | Solidus Networks, Inc. | Mar-06 |
| SOW for Services | IBM | Pay By Touch | 12/8/2002 |

| Name of Document | Party 1 | Party 2 | Date |
|---|---|---|---|
| Stored Value Card Services Agreement | WildCard Systems Inc. | Solidus Networks Inc | ** not yet signed by WildCard Systems Inc. |
| Supply Agreement | Solidus Networks Inc | Cogent Systems Inc | 5/6/2005 |
| Support/Maintenance | Solidus Networks, Inc. | NEC Maintenance | Apr-06 |
| Support/Maintenance | Solidus Networks, Inc. | Dallas Security Systems | |
| Support/Maintenance | Solidus Networks, Inc. | Internet Security Systems | Dec-05 |
| Support/Maintenance | Solidus Networks, Inc. | Complete Power Technologies | May-06 |
| Support/Maintenance | Solidus Networks, Inc. | Morse-Watchman | Jul-06 |
| Support/Maintenance | Solidus Networks, Inc. | DELL | Dec-05 |
| Support/Maintenance | Solidus Networks, Inc. | HP | Aug-06 |
| Support/Maintenance | Solidus Networks, Inc. | TrustWave | Aug-06 |
| Support/Maintenance | Solidus Networks, Inc. | TD Industries | Sep-05 |
| Support/Maintenance | Solidus Networks, Inc. | Simplex Grinnel | Sep-05 |
| Teaming Agreement | NorthTec | Pay By Touch | 3/8/2004 |
| Technology Evaluation Agreement | Digital Persona Inc. | Solidus Networks Inc | 5/5/2006 |
| Vendor Agreement | DSS | Solidus Networks, Inc. | Sep-05 |
| Vendor Services Agreement | Solidus Networks Inc | Studio RED Inc. | 8/12/2006 |
| Vendor Services Agreement | Solidus Networks Inc | Broad Street Software Group | 9/18/2006 |
| Vignette Products & Services Enterprise License Schedule | Vignette Enterprises | Solidus Networks Inc | 12/30/2005 |

See Settlement Agreement and Release among Solidus and certain of its other subsidiaries, Biometric Payment Solutions, Inc., certain equityholders of Biometric Payment Solutions, Inc. and certain lenders to Solidus.

The Sellers are parties to the following additional licenses:

| | | |
|---|---|---|
| Acrobat<br>Adobe Systems Incorporated<br>345 Park Avenue<br>San Jose, CA 95110-2704 | Tool for preparing WYSIWIG documents | Software License |

| HP-Tru-64<br>Hewlett-Packard Company<br>3000 Hanover Street<br>Palo Alto, CA 94304-1185 USA | Operating system software | Software License |
|---|---|---|
| RT (Request Tracker) 3.6.5<br>Best Practical Solutions, LLC<br>PO Box 441333<br>Somerville, MA 02144 | Issue tracking software | Software License |
| Web.UI 2006.1 for ASP.NET<br>ComponentArt Inc.<br>511 King Street West, Suite 400<br>Toronto, Ontario M5V 1K4<br>Canada | ASP.NET components | Software License |

SCHEDULE 5.1.6.B

**Intellectual Property Litigation Claims**

All litigation against the Sellers is automatically stayed pursuant to Section 362 of the Bankruptcy Code.

Reference is made to the Whorl Claim.

(A) *Indivos Corp. v. Ned Hoffman, Excel Innovations, Inc. d/b/a Excel Corp.,* AAA Case No. 74 199 00671 03 SAT (pending); (B) *Excel Innovations, Inc., v. Indivos Corp. and Solidus Networks, Inc.,* Case No. 03-03125, (N.D. CA, pending) (In its First Amended Complaint, Excel Innovations, alleges patent infringement, claims that it owns the patents and that the patents were never transferred to Indivos, and seeks reversion of the underlying patents pursuant to allegations of improper assignment of the patent rights. In its partial summary judgment order, the court adjudicated in favor of defendants Excel's claims of improper assignment of the patent rights and found that Indivos and Solidus, not Excel, own the patents. In July 2006, Indivos and Solidus also filed a motion for terminating sanctions against Excel on the grounds that it and Hoffman deliberately fabricated, altered, concealed and destroyed evidence and committed forgery and perjury. The presiding Magistrate Judge has issued a report to the presiding District Judge recommending dismissal of Excel's claims with prejudice as a sanction for its discovery misconduct. Excel has objected to the recommendation, and the presiding Judge took the recommendation and Excel's objections under advisement. As a result of Solidus' bankruptcy, in January 2008, the Court stayed further proceedings on Excel's claims, including the motion for sanctions, pending Solidus' bankruptcy. Excel also filed cross-counterclaims against defendants in the case which it then moved to dismiss; these alleged declaratory relief with respect to ownership of the patents, breach of contract and fraud, and sought rescission of any agreements relied upon by Indivos or Solidus as the basis for their ownership of the patents. The court granted with prejudice Excel's motion to dismiss its own cross-counterclaims. Excel's remaining claims thus seek compensatory and treble damages arising from defendants' purported infringement and, were it to pursue an appeal, Excel could seek reversion of the underlying Indivos patents.) (this case is referred to as the "***Indivos Patent Case***"); (C) *In re Excel Innovations, Inc.,* Case No. 04-53874-ASW11 (U.S. Bankr'y Ct., N.D. CA, San Jose Div., pending) (bankruptcy action by Excel Innovations, Inc., of which Ned Hoffman is a major investor); (D) *Indivos Corporation and Solidus Networks, Inc. v. Excel Innovations, Inc.,* (U.S. Bankr'y Ct., N.D.CA, Adv. Proc. No. 06-5048, filed March 24, 2006) (Excel filed a third-party complaint against Larry Ginsburg, David Mendelsohn and Hal Silen alleging, among other things, specific performance, breach of contract, breach of fiduciary duty and accounting irregularities. Ginsburg, Mendelsohn and Silen are sued in their capacity as co-trustees of the June 16, 2000 Voting Trust and Standstill Agreement that Ned Hoffman and Excel entered into with Smart Touch (later renamed Indivos), Solidus will indemnify these co-trustees conditioned upon the trustees' seeking indemnification from Ned Hoffman pursuant to terms of the Voting Trust and Standstill Agreement); and (E) *Excel Innovations, Inc. v. Indivos Corporation, Solidus Networks, Inc. and US Bank National Association aka US Bank,* (U.S. Bankr'y Ct., N.D.CA, Adv. Proc. No. 04-5217, filed June 18, 2004 (In the complaint, Excel seeks payment of stock proceeds it each claims is due as a result of the Solidus' acquisition of Indivos. We have answered Excel's adversary complaint for payment of stock proceeds, asserting affirmative defenses of, among other things, setoff and recoupment. On February 17, 2006, Excel filed a summary judgment motion, requesting turnover of the stock proceeds. In April 2006, the Bankruptcy Court denied in operative part Excel's motion and refused Excel's request that it order us to turn over the stock proceeds to Excel. The case is currently stayed pending resolution of the Indivos Patent Case).

On October 5, 2006, Solidus received a letter from FusionArc alleging that Solidus is infringing FusionArc's U.S. patent no. 6,928,546 (the "'***546 Patent***"). On October 31, 2006, FusionArc filed suit in the U.S. District Court for the Northern District of California claiming that Solidus is infringing

FusionArc's patent. See FusionArc, Inc. v. Solidus Networks, Inc., No. 3:06-cv-06760-EDL (N.D. CA, filed October 31, 2006, pending). Solidus filed an Amended Answer, Affirmative Defenses and Counterclaims on December 21, 2006, which in part denies infringement and alleges that FusionArc's patent is invalid and unenforceable. The parties have been engaged in document discovery on issues related to FusionArc's allegations and the validity and unenforceability of the '546 Patent, engaged in mediation pursuant to the Court's order to resolve the dispute, and agreed to stay proceedings pending expected issuance of additional patent claims by FusionArc. Solidus is awaiting FusionArc's decision to reinitiate the lawsuit.

Solidus issued patent notification letters to various companies, including BioPay, LLC, Biometric Access Corporation and Agilysis, Inc..

In the ordinary course of business, Solidus may discover third party patent applications that, it believes, interferes with Solidus's own patent portfolio. In such circumstances, Solidus may attempt to provoke an interference at the United States Patent Office by filing patent applications.

During the course of business, Solidus may receive communication from third parties regarding partnership or sale opportunities with respect to Owned Intellectual Property. Recent such communications include communications from LML Payment Systems, Inc. and Vigilos.

As part of its monitoring activities, Solidus regularly identifies third parties that may be infringing, misappropriating or otherwise violating Owned Intellectual Property and depending upon the circumstances assesses the appropriate business actions to be taking in light of investigations. Solidus currently has several of such analyses ongoing. Solidus has sent notification letters to various companies, including BioPay, LLC (whose assets have now been acquired by a subsidiary of Solidus), Biometric Access Corporation and Agilysis, Inc.

On December 13, 2007, Solidus received a letter from Green Hills Farm Store which is demanding Solidus to cease and desist in using Green Hills' name or otherwise referencing Green Hills and/or data and other information generated from Green Hills' operations in any its materials provided for marketing and potential investors. Solidus is currently evaluating matter before preparing a response to the letter.

See Settlement Agreement and Release among Solidus and certain of its other subsidiaries, Biometric Payment Solutions, Inc., certain equityholders of Biometric Payment Solutions, Inc. and certain lenders to Solidus.

SCHEDULE 5.1.6.C

**Rights Granted to Third Parties**

In connection with the disposition of Solidus' "PayCheck Secure" business, Solidus intends to grant the purchaser of such business a non-exclusive, perpetual, irrevocable, fully-paid right and license to any and all Intellectual Property in which Solidus or PBTCR have United States rights, to conduct such business as it is presently being conducted. Solidus may enter into similar licenses with the purchasers of certain of Solidus' other businesses.

Solidus previously granted to Sperry & Hutchinson Company, Inc., its indirect wholly-owned subsidiary, a license to use certain of Solidus' Intellectual Property in connection with the SmartShop program (the "SmartShop Intellectual Property") during a pilot program at a particular retailer. The license has since expired.

Solidus grants to customers nonexclusive licenses to use certain of its software in the ordinary course of business.

SCHEDULE 5.1.6.D

**Free and Clear Owned Intellectual Property**

Whorl, LLC (fka BioPay, LLC) has claimed a Lien on the stock in PBTCR owned by Solidus, and has asserted that, as a result of rights allegedly held pursuant to a Pledge Agreement with Solidus, Whorl holds the sole right to vote the stock of PBTCR. Whorl has filed a motion to dismiss the bankruptcy case of PBTCR on the grounds, among others, that PBTCR was not authorized to file a petition under the Bankruptcy Code as a consequence of Whorl's alleged rights to vote the stock of PBTCR. On February 26, 2008, the Bankruptcy Court denied Whorl's motion (Docket No. 420). Whorl has appealed the Bankruptcy Court's decision to the Bankruptcy Appellate Panel of the Ninth Circuit. If the Bankruptcy Appellate Panel reverses the decision of the Bankruptcy Court, the Debtors may not have authority to direct the transfer of the assets held by PBTCR pursuant to this Agreement (referred to herein as the "***Whorl Claim***").

In connection with the Indivos Patent Case, were it to pursue an appeal, Excel could seek reversion of the underlying Indivos patents.

**SCHEDULE 5.1.7**

**Insurance**

Solidus has domestic package, automobile, umbrella, worker's compensation, international automobile, foreign voluntary worker's compensation, errors and omissions, directors and officers and employee practices liability insurance policies with coverage customary for companies similarly situated to Solidus. Solidus has obtained replacement D&O insurance coverage for the period November 1, 2007 through November 1, 2008, the premium for which must be paid within 20 days of invoice.

EXHIBIT C

**EFiled: Nov 16 2007  3:28PM EST**
**Transaction ID 17135691**
**Case No. 3308-VCS**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

PLAINFIELD SPECIAL SITUATIONS   )
MASTER FUND LIMITED,            )
                                )
            Plaintiff,          )
                                )
    v.                          )        C.A. No. 3308-VCS
                                )
SOLIDUS NETWORKS INC. d/b/a     )
PAY BY TOUCH,                   )
                                )
            Defendant.          )

**AMENDED ORDER APPOINTING PROVISIONAL
CUSTODIAN PENDENTE LITE OVER SOLIDUS NETWORKS INC.**

For the reasons stated by the Court on the record at the office conference of

Friday, November 9, 2007, IT IS HEREBY ORDERED:

1.      During the pendency of this action pursuant to 8 Del. C. § 225, and

given the business exigencies facing Solidus Networks Inc. during this period,  Thomas

Lumsden of FTI Consulting is hereby appointed as provisional custodian *pendente lite*

(the "Custodian"), as an agent of the Court, to take possession and control of Solidus

Networks Inc. and its subsidiaries and affiliates (the "Company"), and its business,

operations and assets (the "Assets"), to temporarily administer and manage the Assets,

and to operate the Company's business, as further provided herein.

2.      This order supplements the Status Quo Order entered on October

23, 2007 (the "Status Quo Order", attached to this Order as Exhibit A), which Status Quo

Order remains in full force and effect.

3.      The Custodian is authorized to retain, remove and/or terminate any

and all counsel for the Company.  The entry of this Order shall not preclude the Company

or Potter Anderson & Corroon LLP ("PAC") from seeking a supplemental order approving the retention of PAC as counsel for the Company.

4.      The bond and residency requirements of Court of Chancery Rules 149 and 150 are hereby waived. The Custodian's appointment shall be effective immediately, continue until further Court order, and shall terminate upon entry of a final judgment in this action (Del. Ch., C.A. No. 3308-VCS).

5.      Unless and until otherwise ordered by the Court, the Company and its officers, directors, agents, servants, subsidiaries, affiliates, parent corporation, employees, attorneys, advisors and all persons acting in concert or participation with any of them, and each of their successors and assigns, shall cooperate with the Custodian to carry out the provisions of this Order and shall accept the instructions of the Custodian with respect to the Company and the Assets and shall act with and under the supervision, consent and instruction of the Custodian with respect to the same and, in so doing, are to abide by the terms of the Status Quo Order.  The Custodian shall have the authority to retain and/or terminate employees, attorneys, or other agents.

6.      Unless expressly delegated or approved by the Custodian, the Custodian shall have the sole authority to authorize and approve (a) all expenditures of company funds; (b) selling, leasing or otherwise disposing of any Assets of the Company; (c) any loans, advances or investments of any kind or nature; (d) entering into, or committing the Company to enter into, any guarantees, and (e) causing or committing the Company to incur any debt or otherwise to become liable to any party for any reason. The Custodian shall also have the authority to withdraw or transfer funds from the Company's banks or other financial accounts.

7.      Unless expressly delegated or approved by the Custodian, all other persons, officers, employees and/or agents of the Company are enjoined from engaging in any of the activities listed in the foregoing paragraph 6, including authorizing, approving, or making any expenditures of Company funds and/or withdrawing or transferring any funds from the Company's bank or other financial accounts.

8.      The actions of the Custodian shall be deemed to be the official actions of the Company. The Custodian shall have the authority to bind the Company regarding agreements, including financing and business agreements with third parties.

9.      The Custodian may take such action and incur, at the expense of the Company and/or the Assets, such costs and charges, and make such disbursements as may be actually necessary for taking possession and control of the Assets, preserving the Assets, operating the Company's business in the ordinary course, and implementing the provisions of this Order.

10.      In the event that the Custodian determines that it is in the best interest of the Company to take any action other than in the ordinary course of business and/or which would be subject to the Status Quo Order, the Custodian shall first provide three (3) business days written notice to the Court and the parties to this action. No such notice shall be required if both plaintiff and a majority of Arthur J. Petrie ("Petrie"), Alex Hern ("Hern") and John Rogers ("Rogers") (the "Directors") shall consent to the action; provided, however, that each of the Directors shall be given no less than 24 hours advance written notification of any such action to which the Directors may be asked to consent by majority vote.

3

11.     The Custodian may take any actions reasonably necessary to implement the provisions of this Order including, but not limited to, applying to the Court for any order that may be necessary or appropriate to enable the Custodian to properly fulfill or implement the Custodian's duties pursuant to this Order. The Custodian shall report to and communicate with the Directors such information as may be necessary or appropriate or reasonably requested by the Directors.

12.     The Custodian shall be entitled to receive from the Company reasonable compensation and reimbursement of expenses actually incurred, upon submission of billing statements by the Custodian and subject to approval of the Court.

13.     The Custodian shall be entitled to receive from the Company all documents, and shall be entitled to review such documents,  including documents that may be deemed confidential, proprietary, or privileged, including all communications from or to present or former counsel to the Company or its board of directors.

14.     The Custodian shall not have liability to the Company or any person for acts taken by it in good faith pursuant to this Order.

15.     Subject to consulting with the Directors (whose views shall not be binding on the Custodian), the Custodian shall direct all aspects of all litigation in which the Company is a party or has an interest (including all prosecution, defense, answers, responses, motions, stipulations, and settlements), and such litigation shall include this Action and the involuntary bankruptcy proceedings pending in California captioned *In re Solidus Networks*, Inc, Case No. 2:07-20027-TD, *and In re John Patrick Rogers*, Case No. 07-20029-TD. The Custodian shall not have the power to "file an answer that admits the relief sought, and moots" this Action unless "two of the three [Directors] authorize

4

[such] answer at a vote," and notice and an opportunity to intervene is provided to the interested parties. (Transcript at 52-53).

16.    All individuals and entities who receive notice of this Order, and anyone acting on behalf of any of them, shall be and hereby are, restrained and enjoined from doing any act whatsoever that is contrary to or inconsistent with the relief herein provided.

17.    Defendant shall answer the Verified Complaint by Monday, November 26, 2007, unless the Custodian requests that additional time be granted and the Court grants such request.

18.    The Custodian, plaintiff and any party that might intervene in this action shall cooperate in discovery, including providing discovery on shortened deadlines in order to complete discovery in a reasonable time prior to trial.

19.    Trial in this action shall be held Friday, December 21, 2007, starting at 9:30 a.m. in Wilmington, DE.

20.    The Court shall retain jurisdiction to consider any application that the Custodian may make for the Court's assistance, and/or to make such modifications, amendments, or additions to this order as may be necessary or appropriate upon the application of any interested party and for good cause shown. By accepting the appointment, or by serving as Custodian, the Custodian shall be deemed to have submitted himself to the personal jurisdiction of this Court for purposes of this action.

Dated: November 0, 2007

_____
Vice Chancellor Strine

832365

5

EFiled: Nov 16 2007 11:11AM EST
Transaction ID 17122608
Case No. 3308-VCS

# EXHIBIT A



**GRANTED**      EFiled: Oct 23 2007 12 38P̶
                 Transaction ID 16777471
                 ~~Case No. 3308-VCS~~

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

PLAINFIELD SPECIAL SITUATIONS ) 
MASTER FUND LIMITED, )
                                  )
            Plaintiff,            )
                                  )
    v.                            )    C.A. No. _____
                                  )
SOLIDUS NETWORKS INC. d/b/a       )
PAY BY TOUCH,                     )
                                  )
            Defendants.           )

### STATUS QUO ORDER

This ___ day of October, 2007, the Court, having been presented with Plaintiff's Motion for Entry of a Status Quo Order, IT IS HEREBY ORDERED, that:

Until such time as a final, non-appealable order is entered regarding Plaintiff's claims pursuant to 8 *Del. C.* § 225, Defendant Solidus Networks Inc. d/b/a Pay by Touch and its subsidiaries, its officers, agents, employees, stockholders, and representatives (collectively "Solidus"), and all other persons acting in concert or participating with Solidus, shall not, except upon (a) order of the Court, (b) prior written consent of Plaintiff, or (c) seven (7) days written notice to Plaintiff's counsel:

1.      Enter into, or agree to, any transaction, contract or agreement or any series of related transactions, contracts or agreements, the value of which (*i.e.*, (a) the gross amount payable to Solidus, (b) the gross amount payable by Solidus, (c) an appraised value of an asset transferred by Solidus or (d) the book value of a transferred asset on Solidus's books) exceeds $25,000, including, without limitation, any financing agreement or asset sale or purchase agreement;

2. '    In any way, transfer, encumber, pledge, loan, or otherwise dispose of, directly or

indirectly, any interest in any of the assets of Solidus except as is necessary to run the business of Solidus on a day-to-day basis in the ordinary course and consistent with past practice;

3.    In any way, induce or encourage any employee, officer or director of Solidus to alter his or her employment with Solidus or cause Solidus to change the positions, responsibilities or compensation of senior management, or make any payments to such persons other than their compensation as in effect prior to October 17, 2007;

4.    Alter, destroy or remove any files, documents, computer equipment, books, records, proprietary information or other assets or property of Solidus from the offices of Solidus;

5.    Amend or modify any articles of incorporation, agreements, bylaws or other governing documents of Solidus, or otherwise alter the corporate structure or board composition of Solidus, including the formation of, or merger with, any other corporate entity;

6.    Issue, or propose issuance of, any securities, debt instruments, shares of capital or preferred stock of any class, options, warrants, convertible securities or other rights of any kind to acquire any shares of capital stock of, or any other ownership interest in, Solidus;

7.    Split, combine, convert or reclassify any outstanding shares of Solidus, or pay any dividends or distributions to shareholders;

8.    Redeem, purchase or otherwise acquire or offer to redeem, purchase or otherwise acquire any shares of its capital or preferred stock;

9.    Take any action or engage in any transaction out of the ordinary course of business, including, without limitation the dissolution of Solidus or the commencement of a voluntary bankruptcy case under the United States Bankruptcy Code;

10. Cause Solidus to make payment to counsel for John Rogers or employ or be represented by any counsel whose retention has not been authorized at a duly called meeting of Solidus's board of directors or by a unanimous written consent of the members of Solidus's board of directors (who, solely for purposes of this provision, shall consist of John Rogers, Arthur Petrie, Jack Penrod, Alex Hern, and Kevin Roberts – all of whom were considered to be directors by John Rogers on October 20, 2007); or

11. Cause Solidus to institute or prosecute any legal proceedings other than in this Court.

I it should ultimately be determined that persons John Rogers claims to have authority to act on behalf of Solidus lack such authority, in addition to any other remedies available at law or equity, John Rogers and persons acting in concert with him may have financial liability to Solidus for any expenditures they cause Solidus to incur without proper authority.

IT IS FURTHER ORDERED that the Delaware Court of Chancery shall retain jurisdiction to make such modifications, amendments, or additions to this order as may be necessary or appropriate upon the application of any interested party and for good cause shown.

_____
Chancellor/Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 16775444 |
| **Current Date:** | Oct 23, 2007 |
| **Case Number:** | 3308-VCS |
| **Case Name:** | Plainfield Special Situations Master Fund Limited vs Solidus Networks Inc et al |

/s/ Judge Leo E Strine