UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WALTER BEINECKE, III, EAGLIS
ALTERNATIVE INVESTMENTS I, LLC,
GEOFFREY T. FREEMAN, GRAHAM
GUND, HENRY A. JORDAN, JENNIFER C.
McNEIL,  J. STUART MOORE, and CARL
NOVOTNY, TRUSTEE of the S&H
NOMINEE TRUST,

　　　　　　　　Plaintiffs,

　　　　　-against-

S&H MARKETING, INC. f/k/a S&H
GREENPOINTS, INC., and THE SPERRY
AND HUTCHINSON COMPANY, INC.,

　　　　　　　　Defendants.

08 Civ. 2483 (GBD)

**ELECTRONICALLY FILED**

**DECLARATION OF PETER HERRICK
IN SUPPORT OF DEFENDANTS'
MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR ABSTENTION AND
REMAND**

---

I, Peter Herrick, pursuant to 28 U.S.C. §1746, declare and state as follows:

1.　　　　I am an attorney with the law firm O'Melveny & Myers LLP, attorneys for

Defendants S&H Marketing, Inc. f/k/a S&H Greenpoints, Inc. ("S&H"), and The Sperry and

Hutchinson Company, Inc. ("Sperry").  I submit this Declaration in support of Defendants'

Memorandum of Law In Opposition to Plaintiffs' Motion for Abstention and Remand, dated

April 22, 2008 (the "Opposition Brief").  All terms used in this Declaration are intended to have

the same meanings set forth in the Opposition Brief.

2.　　　　Attached hereto as Exhibit D is a true and correct copy of the transcript of the

February 25, 2008, hearing before the Honorable Thomas Donovan, United States Bankruptcy

Judge, Case No. 07-BK-20027-TD, captioned *In re Solidus Networks, Inc*., and currently

pending in the Central District of California.

3.    Attached hereto as Exhibit E is a true and correct copy of the Opinion and Order of the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York, dated April 21, 2008, in *In re Refco, Inc. Securities Litigation*, Case No. 07 Civ. 11604, denying the plaintiff's motion for abstention and remand.

Dated: New York, New York
   April 22, 2008

By: _____
    Peter Herrick

EXHIBIT D



**FILED**

**MAR 1·8 2008**

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY          Deputy Clerk

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| In Re: | ) Case No. LA07-20027-TD |
| | ) |
| SOLIDUS NETWORKS, INC., | ) Los Angeles, California |
| | ) Monday, February 25, 2008 |
| Debtor. | ) 9:30 a.m. |
| | ) |

HRG RE DEBTOR'S MOTION FOR
ORDER (1) AUTHORIZING SALE OF
ASSETS OF PAY Y TOUCH PAYMENT
SOLUTIONS LLC AND PAY BY TOUCH
PAYMENTS, INC. FREE AND CLEAR
OF LIENS, CLAIMS, AND
ENCUMBRANCES, (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES IN
CONNECTION THEREWITH, (III)
EXEMPTING SUCH SALE AND
ASSIGNMENT FROM ANY STAMP TAX
OR SIMILAR TAX AND (IV)
GRANTING RELATED RELIEF

HRG RE DEBTORS' MOTION FOR
ORDER (I) AUTHORIZING SALE OF
ASSETS OF PAY BY TOUCH CHECK
CASHING, INC. AND PAY BY TOUCH
CHECKING RESOURCES, INC. FREE
AND CLEAR OF LIENS, CLAIMS,
AND ENCUMBRANCES, (II)
AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND
UNEXPIRED LEASES IN CONNECTION
THEREWITH, (III) EXEMPTING
SUCH SALE AND ASSIGNMENT FROM
ANY STAMP TAX OR SIMILAR TAX
AND (IV) GRANTING RELATED
RELIEF

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        --oOo--

4   In Re:                    )  Case No. LA07-20027-TD
                              )
5   SOLIDUS NETWORKS, INC.,   )  Los Angeles, California
                              )  Monday, February 25, 2008
6          Debtor.            )  9:30 a.m.
    _____    )
7

8                             HRG RE DEBTOR'S MOTION FOR
                              ORDER (1) AUTHORIZING SALE OF
9                             ASSETS OF PAY Y TOUCH PAYMENT
                              SOLUTIONS LLC AND PAY BY TOUCH
10                            PAYMENTS, INC. FREE AND CLEAR
                              OF LIENS, CLAIMS, AND
11                            ENCUMBRANCES, (II) AUTHORIZING
                              THE ASSUMPTION AND ASSIGNMENT
12                            OF CERTAIN EXECUTORY CONTRACTS
                              AND UNEXPIRED LEASES IN
13                            CONNECTION THEREWITH, (III)
                              EXEMPTING SUCH SALE AND
14                            ASSIGNMENT FROM ANY STAMP TAX
                              OR SIMILAR TAX AND (IV)
15                            GRANTING RELATED RELIEF

16                            HRG RE DEBTORS' MOTION FOR
                              ORDER (I) AUTHORIZING SALE OF
17                            ASSETS OF PAY BY TOUCH CHECK
                              CASHING, INC. AND PAY BY TOUCH
18                            CHECKING RESOURCES, INC. FREE
                              AND CLEAR OF LIENS, CLAIMS,
19                            AND ENCUMBRANCES, (II)
                              AUTHORIZING THE ASSUMPTION AND
20                            ASSIGNMENT OF CERTAIN
                              EXECUTORY CONTRACTS AND
21                            UNEXPIRED LEASES IN CONNECTION
                              THEREWITH, (III) EXEMPTING
22                            SUCH SALE AND ASSIGNMENT FROM
                              ANY STAMP TAX OR SIMILAR TAX
23                            AND (IV) GRANTING RELATED
                              RELIEF
24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

HRG RE DEBTORS' MOTION FOR
ORDER (I) AUTHORIZING SALE OF
ASSETS RELATED TO THE ATM
DIRECT BUSINESS FREE AND CLEAR
OF LIENS, CLAIMS, AND
ENCUMBRANCES, (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES IN
CONNECTION THEREWITH, (III)
EXEMPTING SUCH SALE AND
ASSIGNMENT FROM ANY STAMP TAX
OR SIMILAR TAX AND (IV)
GRANTING RELATED RELIEF

CONT'D HRG RE MOTION OF WHORL,
LLC

(1) TO DISMISS BANKRUPTCY CASE
OF PAY BY TOUCH CHECKING
RESOURCES, INC. AND

(2) TO VACATE ORDERS ENTERED
IN CASE

HRG RE MOTION FOR ORDER (A)
APPROVING SETTLEMENT AGREEMENT
RELATING TO BIOMETRIC PAYMENT
SOLUTIONS, INC.; AND (B)
AUTHORIZING TRANSFER OF PATENT
RIGHTS FREE AND CLEAR OF LIENS
IN CONNECTION THEREWITH

iii

```
 1                              CONT'D HRG RE MOTION OF
                                BIOMETRIC PAYMENT SOLUTIONS
 2                              FOR ORDER (I) DETERMINING THAT
                                DEBTOR LACKS BENEFICIAL
 3                              INTEREST IN CERTAIN PATENT
                                RIGHTS, (II) COMPELLING
 4                              ABANDONMENT THEREOF, (III) TO
                                THE EXTENT NECESSARY, AMENDING
 5                              /FINAL ORDER AUTHORIZING
                                EMERGENCY FINANCING (IV) TO
 6                              THE EXTENT NECESSARY, AMENDING
                                THE INTERIM ORDER AUTHORIZING
 7                              EMERGENCY FINANCING IN THE
                                CHAPTER 11 PROCEEDING, AND (V)
 8                              TO THE EXTENT NECESSARY,
                                OBJECTION TO THE FINAL ORDER
 9                              AUTHORIZING EMERGENCY MOTION
                                IN THE CHAPTER 11 PROCEEDING
10

11                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE THOMAS DONOVAN
12                 UNITED STATES BANKRUPTCY JUDGE

13 APPEARANCES:

14 For the Debtor:          JAMES O. JOHNSTON, ESQ.
                            JOSHUA M. MESTER, ESQ.
15                          Hennigan, Bennett & Dorman
                            865 South Figueroa Street
16                          Suite 2900
                            Los Angeles, California 90017
17                          (213) 694-1030

18                          STEVE ZELINGER, ESQ.
                            101 Second Street, Suite 1100
19                          San Francisco, California
                             94105
20                          (415) 281-2212

21 For the Creditors Committee:  GARY KLAUSNER, ESQ.
                            Stutman, Treister & Glatt
22                          1901 Avenue of the Stars
                            12th Floor
23                          Los Angeles, California 90067

24

25
```

iv

1 APPEARANCES:  (cont'd.)

2 For OZ/Denarius:              KAREN RINEHART, ESQ.
                               BEN H. LOGAN, ESQ.
3                              O'Melveny & Myers, LLP
                               400 South Hope Street
4                              Los Angeles, California 90071
                               (213) 430-6407
5

6 For Whorl, LLC:              DAVID M. STERN, ESQ.
                               LEE R. BOGDANOFF, ESQ.
7                              Klee, Tuchin, Bogdanoff
                                 & Stern, LLP
8                              1999 Avenue of the Stars
                               Thirty-Ninth Floor
9                              Los Angeles, California 90067
                               (310) 407-4070
10

11 For Plainfield:             TODD J. ROSEN, ESQ.
                               Munger, Tolles & Olson, LLP
12                             355 South Grand Avenue
                               35th Floor
13                             Los Angeles, California 90071
                               (213) 683-9222
14

15 For Biometrics:             PAUL COUCHOT, ESQ.
                               Winthrop & Couchot
16                             660 Newport Center Drive
                               Suite 400
17                             Newport Beach, California
                                 92660
18                             (949) 720-4115

19 For Delwood:                JOHN W. MILLS, ESQ.
                               Kilpatrick & Stockton
20                             1100 Peachtree Street
                               Suite 2800
21                             Atlanta, Georgia 30309
                               (404) 815-6183
22

23

24

25

v

1  APPEARANCES: (cont'd.)

2  For Highbridge:              JENNIFER DUMAS, ESQ.
                                Stroock, Stroock & Lavan
3                               2029 Century Park East
                                Suite 1800
4                               Los Angeles, California 90067
                                (310) 556-5800
5

6  For Farrallon:              KENNETH GUERNSEY, ESQ.
                                Cooley, Godward, Kronish, LLP
7                               101 California Street
                                5th Floor
8                               San Francisco, California
                                  94111
9                               (213) 694-1052

10  For Monroe Parkway:         SCOTT KREIN, ESQ.
                                Krein Law Firm
11                              4000 Genessee Place
                                Suite 117
12                              Prince William, Virginia
                                  22192
13                              (703) 580-8377

14  For Oracle:                 ALEXANDRA RHIM, ESQ.
                                Buchalter, Nemer
15                              333 Market Street
                                25th Floor
16                              San Francisco, California
                                  94105
17

18  For Merrick Bank:           PATRICK IVIE, ESQ.
                                PETER GURFEIN, ESQ.
19

20  For Visa:                   KELLY WOODRUFF, ESQ.

21  For Phoenix Check Cashing:   BRIAN DAVIDOFF, ESQ.

22

23

24

25

vi

| | |
|---|---|
| Court Recorder: | Wanda Toliver |
| | Pat Pennington |
| | United States Bankruptcy Court |
| | Edward R. Roybal Federal |
| | Building |
| | 255 East Temple Street |
| | Los Angeles, California 90012 |
| | (213) 894-5011 |
| | |
| Transcriber: | Briggs Reporting Company, Inc. |
| | 6336 Greenwich Drive, Suite B |
| | San Diego, California 92122 |
| | (310) 410-4151 |

vii

1                       I N D E X

2   WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

3   Thomas Lumsden            --      106      140       147

4   Jonathan Wallace          --      151      179        --

5   John McNally              --      181      198        --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1   LOS ANGELES, CALIFORNIA MONDAY, FEBRUARY 25, 2008 9:30 AM

2   _____--oOo--

3        (Call to order of the Court.)

4             THE COURT: Solidus.

5             MR. JOHNSTON:  Good morning, your Honor.  Jim

6   Johnston of Hennigan, Bennett and Dorman, on behalf of the

7   Debtors.  My partner, Joshua Mester, is here as well, and

8   Thomas Lumsden, the chief restructuring officer, is here,

9   although I believe he may be out in the hallway right now.

10            THE COURT:  Okay.

11            MR. LOGAN:  Good morning, your Honor.  Ben Logan

12  of O'Melveny and Myers.  Karen Rinehart of our office is

13  with me.  We are here on behalf of Oz Master Fund Limited

14  and Denarius Touch.

15            THE COURT:  Thank you.

16            MR. ROSEN:  Good morning, your Honor.  Todd Rosen

17  from Munger, Tolles, and Olsen, on behalf of Plainfield.

18            THE COURT:  Thank you.

19            MR. HILTON:  Good morning, your Honor.  Larry

20  Hilton of Hewitt and O'Neil on behalf of Verizon Business

21  Solutions.

22            THE COURT:  Thank you.

23            MR. COUCHOT (Telephonic):  Good morning, your

24  Honor.  On the telephone Paul Couchot, Winthrop Couchot, on

25  behalf of Biometrics.

2

1          MR. KLAUSNER:  Good morning, Judge Donovan.  Gary

2 Klausner, Stutman, Treister, and Glatt, appearing on behalf

3 of the Official Committee of Unsecured Creditors.

4          THE COURT:  Thank you.

5          MR. BOGDANOFF:  Good morning, your Honor.  Lee

6 Bogdanoff and David Stern, members of Klee, Tuchin,

7 Bogdanoff, and Stern, appearing on behalf of Whorl, LLC, and

8 I'm here in court this morning as well with Mr. Timothy

9 Robinson, who is the managing member of Whorl.

10          THE COURT:  Thank you.

11          MS. DUMAS (Telephonic):  Good morning, your Honor.

12 Jennifer Dumas, appearing telephonically, Stroock and

13 Stroock and Lavan, representing Highbridge.

14          THE COURT:  I'm sorry.  I couldn't understand your

15 name.

16          MS. DUMAS:  That's okay.  My name is Jennifer

17 Dumas, D-U-M-A-S.

18          THE COURT:  Thank you.

19          MR. IVIE:  Good morning, your Honor.  Patrick --

20          THE COURT:  Just one second.  I try to keep track

21 of these things.

22          MR. IVIE:  Thank you.  Good morning, your Honor.

23 Patrick Ivie on behalf of Merrick Bank.  I'm here with Peter

24 Gurfein as well.  I believe he's out in the hallway.

25          THE COURT:  Thank you.

3

1          MR. GUERNSEY (Telephonic):  Good morning, your

2  Honor.  On the telephone, Kenneth Guernsey of Cooley,

3  Godward, Kronish, corporate counsel for Solidus Networks.

4          THE COURT:  Thank you.

5          MR. ZELINGER (Telephonic):  Good morning, your

6  Honor.  Steve Zelinger, general counsel of Solidus Networks.

7          THE COURT:  Thank you.  I think we have all the

8  appearances we're going to have maybe.

9          MR. KREIN (Telephonic):  Your Honor, Scott Krein

10  appearing by telephone for Monroe Parkway, LLC.

11          THE COURT:  Thank you.

12          MS. RHIM:  Good morning, your Honor.  Alexandra

13  Rhim of Buchalter, Nemier, on behalf of Oracle.

14          THE COURT:  Thank you.

15          MS. WOODRUFF:  Good morning.  Kelly Woodruff, your

16  Honor, from Farella, Braun & Martel on behalf of Visa USA.

17          THE COURT:  Thank you.  Anybody else?

18          All right.  Mr. Johnston?

19          MR. JOHNSTON:  Almost jumped the gun there, your

20  Honor.  We have four matters on calendar today.  There's a

21  matter to approve the settlement with Biometric Payment

22  Solutions.  There are motions to approve the sale of the ATM

23  Direct and Paycheck Secure Assets, and there's the motion by

24  Whorl, LLC to dismiss the Chapter 11 case of Debtor Pay By

25  Touch Checking Resources, Inc.

4

1        There was a fifth item scheduled for today, which
2 was the motion to approve the sale at the Pay By Touch
3 Payments Assets.  But, as your Honor is aware, we have
4 adjourned that hearing.

5        The motion regarding the Biometirc Payment
6 Solutions settlement is unopposed, and I will propose to
7 address that first.  Although several precautionary
8 objections were filed, the motion regarding the ATM Direct
9 sale also was substantively unopposed, as we'll explain, and
10 I would propose to take that next.

11        Following those, I would propose that we move into
12 the interesting part of the agenda.  After the ATM Direct
13 sale, I would propose that we take up Whorl's motion to
14 dismiss before addressing the Paycheck Secure sale.  The
15 reason being, as your Honor is aware, that some of the
16 assets of Paycheck Secure belong to Pay By Touch Checking
17 Resources, which is the Debtor's -- the Debtor whose case
18 Whorl seeks to dismiss.

19        And then, if the Court determines that it's not
20 appropriate to dismiss the case of Checking Resources, we
21 can turn to the Paycheck Secure.  That is a lengthy agenda,
22 and I will want to jump into it quickly, but with your
23 Honor's indulgence, I did want to at least get your Honor up
24 to speed on the developments that have occurred over the
25 last couple of days since we were here with respect to the

5

1 asset sales.

2          THE COURT:  Okay.  I guess in addition to what's

3 on our calendar, I just received the papers from Merrick

4 asking for a TRO today or soon.

5          MR. JOHNSTON:  And I got those papers as I was

6 sitting at my desk at 9:30 on Friday night, right after we

7 concluded the Paycheck Secure auction.  I haven't been

8 served with any notice, but I am prepared to address that,

9 and I would suggest that we do that at the conclusion of the

10 hearing today.

11          THE COURT:  Okay.

12          MR. JOHNSTON:  Your Honor, pursuant to the bidding

13 orders you signed a few weeks ago, we received bids for the

14 ATM Direct and Paycheck Secure assets last Tuesday night.

15 As we'll explain when we get to those agenda items, based on

16 the bids received, three parties were invited to participate

17 in an auction for ATM Direct, and two parties were invited

18 to participate in an auction for the Paycheck Secure assets,

19 with each auction scheduled for last Friday.

20          We started that process at about 10:00 a.m. on

21 Friday and didn't adjourn until after 9:00 p.m., but I am

22 happy to report that both auctions were successful and the

23 Paycheck Secure auction in particular featured some pretty

24 spirited bidding through 12 or 13 rounds of bidding.  We did

25 file very earlier this morning for the record some papers

6

1  associated with each sale, including a report by Mr. Lumsden

2  of the auction which contained a transcript of the

3  proceedings, declarations from the prevailing bidders and

4  the like, and we will walk your Honor through those

5  materials when we get to the individual agenda items.

6          THE COURT:  Okay.

7          MR. JOHNSTON:  As your Honor is aware, there was a

8  third auction scheduled to be held last week for the Pay By

9  Touch Payments business.  The Debtors did not receive

10  qualifying bids by the bid deadline.  So we have adjourned

11  that auction and sale hearing while we consider appropriate

12  next steps.

13          So, with that, barring any preliminary questions,

14  would propose that we take the Biometric Payment Solutions

15  settlement first.

16          THE COURT:  Okay.

17          MR. JOHNSTON:  Thank you.

18          This is a motion to approve a settlement between

19  the Debtors, Biometric Payment Solutions, or BPS and its

20  principals and the various secured lenders in this case.

21  Your Honor will recall that BPS filed a motion in the very

22  first days of these cases seeking a determination that BPS

23  was, in fact, a beneficial owner of certain patents and

24  related rights that it had transferred to the Debtors in

25  2005.  The settlement agreement fully resolves that motion

7

1  and all of the other related controversies and disputes

2  among the parties.  It provides for the Debtors to transfer

3  to BPS the patent rights at issue which are defined in the

4  documents as the transfer patents.

5          That transfer will be free and clear of any liens

6  and claims, and the Debtor's secured lenders have agreed to

7  release their security interest in the transfer patents to

8  accommodate that transfer.  In exchange, BPS has agreed to

9  grant back to the Debtors a non-exclusive license to the

10 transferred patents.  The terms and conditions of that

11 license were heavily negotiated, and they're set forth in

12 the form of the license that was attached as Exhibit B to

13 the settlement agreement.  I won't try to summarize them now

14 except to note one valuable feature is that the license is

15 transferrable by the Debtors to one or more acquirers of any

16 assets of the Debtors that utilize Biometric information.

17         And this, in fact, turns out to be a valuable

18 component of the settlement for the estates.  These license

19 rights were included as part of the Paycheck sale -- assets

20 sale that we'll discuss later today, and the license rights

21 were an asset that the prevailing bidder valued and sought

22 to acquire.

23         And, finally, there will be a full mutual release

24 included in the settlement of the Debtors, the BPS parties,

25 and the lenders.  As we set forth in our motion, the Debtors

8

1  believe that this settlement is a fair resolution of the

2  controversies over the transferred patents and it is in the

3  best interest of the estates.  It resolves the question of

4  ownership of the transferred patents while ensuring that the

5  estates have a right to use those patents and to transfer

6  that right in connection with the sale of its assets.  It

7  avoids what would have been costly and time-consuming

8  litigation, and it frees the estate from what could have

9  been substantial multi-million dollar claims by BPS.

10          There were no objections to this motion.  So I

11  won't belabor the issues any further.  I'd ask your Honor if

12  you have any questions, and, otherwise, I would submit.

13          THE COURT:  I have no questions.  That's fine.

14          MR. JOHNSTON:  Okay.

15          THE COURT:  Thank you.

16          MR. COUCHOT:  Thank you, your Honor.  This is Paul

17  Couchot, your Honor, and with your permission I would like

18  to -- the motions approved, I would like to (indiscernible)

19  on them.

20          THE COURT:  Okay.  Thank you, Mr. Couchot.

21          MR. COUCHOT:  Thank you very much.

22          THE COURT:  The motion is granted.

23          MR. COUCHOT:  Thank you, Mr. Johnston.

24          MR. MILLS:  Your Honor, my name is John Mills

25  representing the bidder or the purchaser on the next item.

9

1  I came to this late and wasn't able to make my appearance

2  earlier.

3              THE COURT:  Okay.  Thank you.

4              MR. MILLS:  Representing Acuwood.

5              MR. JOHNSTON:  And, your Honor, regarding

6  Biometric Payments, we will lodge a form of order in due

7  course on that.

8              THE COURT:  Okay.

9              MR. JOHNSTON:  The next proposed agenda item is

10  the motion to sell the ATM Direct assets, and for that my

11  partner, Mr. Mester, will give a presentation.

12              MR. MESTER:  Good morning, your Honor.  Joshua

13  Mester of Hennigan, Bennett and Dorman on behalf of the

14  Debtors.

15              THE COURT:  Good morning.

16              MR. MESTER:  I'm here to present the ATM Direct

17  sale motion to you.  Before I get into the sale itself, I

18  thought it would be best to describe briefly what the ATM

19  Direct business is.  The ATM Direct business operated by

20  Solidus Networks consists of a series of patents and

21  proprietary intellectual property that provide for secure

22  online transactions utilizing a debit card.

23              One of the applications of this technology is a

24  software program that allows a customer to use a virtual pen

25  pad in making a debit card purchase in an online merchant

10

1  website.  And it has other related applications that provide

2  for secure verification of the identity of purchasers as

3  well as similar ATM transactions.

4          When we were last before your Honor on February

5  6th to consider bidding procedures, we had a fair amount of

6  activity in the ATM Direct sale.  After the Court entered

7  its bidding procedures order, we served a basic notice

8  package that consisted of a notice of the sale hearing, the

9  sale motion for the ATM Direct sale that had all the

10  appropriate exhibits, including the asset purchase

11  agreement, list of contracts, and list of parties asserting

12  alleged liens in the assets.  It had a copy of your bidding

13  procedures order and a copy of the bidding procedures

14  themselves.  That basic package was served on approximately

15  250 interested parties, both parties requesting special

16  notice and parties that were identified by the Debtors as

17  interested in purchasing the assets.

18          In addition, we also served a notice to parties to

19  contracts of the proposed assumption and assignment of their

20  contracts, along with the associated cure amount that the

21  Debtors had scheduled for each contract.

22          Finally, we published notice of the sale in

23  conjunction with the other two proposed sales in the Wall

24  Street Journal as well as in an online trade publication

25  called Cardforum.com.

11

After providing all the appropriate notices, we received bids on the bid deadline.  We received three bids before the bid deadline, the first of which was from Acculink, LLC, who in the end has become the prevailing purchaser.  Acculink's initial bid was $600,000 in cash. The second bid we received was from p2p Cash Licensing Corporation.  P2p's bid was for $1,000,000 in cash.  And the final bid we received before the bid deadline was for ATM Direct Acquisition Corp in the amount of $250,000 in cash and a note in the amount of $750,000 to be paid over the course of 24 months.

After the bid deadline, we did receive another bid.  We received a bid from an entity called Deep Creek Management.  The bid came in I seem to recall well after 5:00 o'clock on the eve of the auction.  After further consideration of the bid, which was a bid that barely met the minimum bid requirements and was not accompanied with the requisite deposit or financial information, the Debtors determined to not invite Deep Creek Management to participate in the auction.

At the auction, the Debtors presented the three bidders, ATM Direct Acquisition Corp., p2p, and Acculink with marked-up copies of the asset purchase agreements that each bidder had submitted.  These marked-up versions of the asset purchase agreements contained all the revisions that

12

1  the Debtors found to be acceptable in the bid submitted by

2  each of the bidders.  At approximately 10:16 on the morning

3  of Friday, the 22nd, Mr. Lumsden commenced the auction by

4  advising each of the bidders what the ground rules were

5  going to be for the auction and how the process would play

6  out.  Thereafter, the Debtors, along with counsel for the

7  Creditors Committee and counsel for certain of the post-

8  petition lenders, participated in individual needs with each

9  of the bidders.

10         During those meetings, we discussed the comments

11 on the proposed asset purchase agreements, what was

12 acceptable, what was not, the contracts that would be

13 assumed and assigned, and other terms of their bids.

14         As that process proceeded, the conversations with

15 ATM Direct Corporation, we advised ATM Direct that their bid

16 would need to be an all cash bid instead of a cash and note

17 consideration package.  At that point in time, ATM Direct

18 declined to proceed with the auction.

19         We had further conversations with both p2p and

20 with Acculink, and during the course of those further

21 conversations, p2p declined to participate in the auction.

22 At that point in time, the Debtors had agreed upon an asset

23 purchase agreement with Acculink that was acceptable to the

24 Debtors and also acceptable to Acculink.  The auction

25 proceeded whereby the Debtors accepted the Acculink bid

13

1 which had a purchase price of $600,000 in cash.

2        Over the course of the weekend we finalized the

3 asset purchase agreement with Acculink.  This morning we

4 submitted a fully executed asset purchase agreement along

5 with a black-lined that reflects all the changes that were

6 made to the asset purchase agreement against the original

7 form that was submitted by the Debtors when they filed the

8 sale motion.

9        We've also filed today the declaration of Mr. Tom

10 Lumsden which goes through and attests to the proceedings

11 with the auction as well as a transcript of the proceedings.

12 It was also Mr. Lumsden's opinion that the purchase price

13 obtained for the ATM Direct assets is fair, reasonable, and

14 maximizes the value of the estate.

15        In addition, we filed the declaration of Ms. Debra

16 Daugherty, who is the manager of Acculink.  Ms. Daugherty's

17 declaration attests to the good-faith nature of the

18 negotiations between the Debtors and Acculink but also

19 demonstrates that Acculink has the financial capability to

20 consummate the transaction and perform under the executory

21 contracts.  Their non-expired lease is to be assigned as

22 part of the sale.

23        And, finally, we submitted an amended Exhibit D to

24 the sale motion.  Exhibit D to the sale motion consists of

25 the executory contracts, non-expired leases that the Debtors

14

1  propose to assume and assign.

2          The amended Exhibit D that was filed this morning

3  is shorter than the original Exhibit D.  We removed

4  contracts that Acculink did not wish to take as part of the

5  sale, and the amendment to Exhibit D I think will address at

6  least two of the objections that were received at the sale.

7  We received three objections to the ATM Direct sale, the

8  first being from Whorl.  And as I read the Whorl objection,

9  it applies to all the sales, but only to the extent that the

10  sale is purporting to sell assets of Debtor Pay By Touch

11  Checking Resources.  It is evident from the executed asset

12  purchase agreement that's been filed that the ATM Direct

13  sale does not involve any assets of Debtor Pay By Touch

14  Checking Resources at all.  That should be enough to satisfy

15  the Whorl objection.

16          The next objection we received was from Cogen.

17  Cogen's objection is largely founded upon whether or not the

18  ATM Direct sale involves an assignment of contracts with

19  Cogen.  Again, the amended Exhibit D that we filed this

20  morning, along with the asset purchase agreement,

21  demonstrates there are no Cogen agreements to be assumed and

22  assigned as part of that sale.

23          Finally, we have the objection from Verizon

24  Business.  We did list a Verizon contract on the original

25  version of Exhibit D to the sale motion.  As a result of the

15

1  negotiations with Acculink, however, that agreement is no

2  longer on the amended Exhibit D and is not proposed to be

3  assumed and assigned as part of this sale.  We advised

4  counsel for Verison of this on Sunday by E-mail and believe

5  that that should resolve Verizon's objection as it pertains

6  to the ATM Direct sale.

7           We prepared a revised proposed form of order, but

8  I'll take that up to the extent that there are any parties

9  that need to address this sale first.

10          THE COURT:  Okay.  I have no questions about

11 anything you've said so far.  I have received most of the

12 papers.  I haven't seen the black-lined.  I've seen --

13          MR. MESTER:  I have a copy of the black-lined to

14 hand up to your Honor this morning.

15          THE COURT:  I've seen everything else, and I'm

16 satisfied.

17          MR. MESTER:  May I approach, your Honor?

18          THE COURT:  Sure.  Thank you.

19          MR. MESTER:  Your Honor, we would propose to

20 submit a form of order later this afternoon with the

21 appropriate envelopes and notices of entry.

22          THE COURT:  Okay.  Very good.  Thank you.

23          MR. MESTER:  Thank you, your Honor.

24          MR. JOHNSTON:  So, your Honor, that will bring us

25 to the Whorl motion to dismiss, and Mr. Bogdanoff gets to

16

1  that first on this one.

2          THE COURT:  Okay.  I should make a preliminary

3  announcement that I've -- I've read I think just about all

4  the papers that got here on Friday on anything on today's

5  agenda, and I've read the Whorl papers and the responses and

6  the replies and the amended supplemental, et cetera, more

7  than once.

8          MR. BOGDANOFF:  Thank you, your Honor.  That was

9  actually going to be my first question of the Court.

10          Your Honor, Lee Bogdanoff on behalf of Whorl, the

11  Movant.  This motion concerns Pay By Touch Checking

12  Resources, Inc., which our motion refers to and I think the

13  parties generally refer to it as the IP Sub.

14          The motion requests that the Court dismiss the IP

15  Sub Chapter 11 case on two independently sufficient grounds.

16  The first is that the case must be dismissed for lack of

17  jurisdiction because the filing was not legally authorized,

18  and the second is that the case should be dismissed because

19  it was not filed in good faith as that term has been defined

20  in the law both in the Ninth Circuit and elsewhere.

21          The first ground is mandatory.  It goes to the

22  Court's jurisdiction.  The second ground that is good faith

23  is not jurisdictional, but the standard for what constitutes

24  lack of good faith is, as I noted, well established, and the

25  law in the Ninth Circuit is that if you find that the case

17

1  was not filed in good faith, you must dismiss the case.

2          Now, turning to the first ground, which, as I have

3  described, is jurisdictional, the reason why this Court I

4  would submit must dismiss the IP Sub case is because the

5  filing was not lawfully authorized.  The case law has long

6  recognized that in order for a corporation to be eligible to

7  file a petition under Section 301(a) of the Bankruptcy Code,

8  it has to be authorized to do so under state law.

9          In 1945, the Supreme Court in <u>Price v. Gerny</u>, held

10 that if the filing is not properly authorized, the Court --

11 and I quote -- "has no alternative but to dismiss the

12 petition."  Now, the IP Sub is a Delaware corporation whose

13 eligibility, therefore, is governed by Delaware law.  So we

14 have to look to Delaware law.

15         Now, your Honor, at page seven of the Debtors'

16 objection, the Debtors accurately excerpt from cases arising

17 in Delaware and elsewhere that state, and I quote:

18             "It is the board of directors, not the

19             shareholders, who authorize the filing

20             of bankruptcy."

21         We have no disagreement with that statement.  But

22 we're here, your Honor, on this particular ground because

23 the board of directors of the IP Sub did not authorize the

24 IP Sub to file bankruptcy.  Rather, the only purported

25 authorization that was given was given by the Solidus board,

18

1  which is the parent of the IP Sub, which is a separate

2  corporation and a shareholder of the IP Sub.

3          Now, your Honor, I refer the Court to Exhibit G to

4  our motion, which is the Chapter 11 petition for the IP Sub.

5  And that document contains a resolution entitled certificate

6  of resolution of board of directors of Solidus Networks,

7  Inc., a Delaware Corporation, authorizing filings of

8  petitions under Chapter 11 of the Bankruptcy Code.  The

9  resolution recites, and I quote:

10          "That at a meeting of the board of

11          directors of the corporation held on

12          December 13 of last year, the following

13          resolutions were approved and duly

14          enacted."

15          The corporation is defined as Solidus Networks,

16  Inc., dba Pay By Touch, a Delaware Corporation.  So that's

17  Solidus' board.  It's very clear that the board that met to

18  authorize the filing of the IP Sub and all the other

19  entities was the Solidus board of directors.

20          Now, on what basis did the Solidus board through

21  its board of directors attempt to authorize the Chapter 11

22  filing of the IP Sub?  What the resolution that we've

23  appended to our motion says is that Mr. Lumsden is

24  "authorized and empowered by the Solidus board in the name

25  of solidus," and I quote, "and the following wholly-owned

19

1  subsidiaries of the corporation, that is, of Solidus, of

2  which the corporation is the sole shareholder."  And then

3  the resolution identifies the IP Sub and some other

4  subsidiaries to commence Chapter 11 cases.

5          So it's very clear that the basis upon which the

6  Solidus board purported to place the IP Sub chapter into

7  Chapter 11 is Solidus' capacity as the sole shareholder of

8  that entity.  Stated differently, rather than obtain a

9  resolution of the board of directors of the IP Sub, Solidus

10 took it upon itself in its capacity as the shareholder of

11 the IP Sub to authorize the filing.

12         Now, that Chapter 11 petition was filed on

13 December 14, 2007.  As we have demonstrated I believe

14 conclusively, for at least five months preceding that

15 filing, my client, that is, Whorl, held the exclusive proxy

16 for the stock of the IP Sub, and what that means is that

17 Solidus did not have the power or the right to act in its

18 capacity as the shareholder of the IP Sub to put the IP Sub

19 into bankruptcy.  That shareholder right was held by Whorl

20 and had been for many months.

21         This means, your Honor, that when the Solidus

22 board acted in its capacity as the shareholder of the IP Sub

23 to place it into bankruptcy, it lacked the legal authority

24 to do so because the legal authority to vote and consent was

25 rested in Whorl.

20

1           Now, why is this correct?  In January of 2006,

2    Whorl, Solidus, and the IP Sub entered into a pledge

3    agreement that is attached as Exhibit B to our motion.

4    Under that agreement, as the Court by now is well familiar,

5    Whorl obtained a pledge of the stock in the IP Sub.  Now, as

6    is customary in many stock pledges, I would say routine,

7    this pledge agreement provides that Solidus' right to vote

8    or otherwise get consent as to the IP Sub stock continues

9    only up until the occurrence of an event of default under

10   the pledge agreement.

11          Section six of the pledge agreement says what

12   Solidus can and can't do before an event of default.  And

13   let me quote.  It says:

14               "So long as no event of default has

15               occurred and shall be continuing,

16               pledger, that's Solidus, shall have the

17               right from time to time to vote and get

18               consents with respect to the pledged

19               collateral or any part thereof for all

20               purposes not inconsistent with the

21               provision of the pledge agreement,

22               provided, however, that no vote shall be

23               cast and no consent shall be given which

24               would have the effect of impairing the

25               position of the interest of the pledgee,

21

1          that's whorl, in respect of the pledged

2          collateral."

3          Now, the flip side of that, therefore, is that

4 upon the occurrence of an event of default, Whorl held the

5 right to vote and to give consent as to the IP Sub stock.

6 Section 7.2 of the pledge agreement is very clear that upon

7 the occurrence of an event of default, which is a defined

8 term, Whorl is "authorized and empowered" to exercise the

9 voting rights with respect to the pledged collateral, and I

10 quote, "and to otherwise act with respect to the pledged

11 collateral as though pledgee that's Whorl, were the outright

12 owner thereof, pledger, Solidus, hereby irrevocably

13 constituting and appointing pledgee, the proxy, and

14 attorney, in fact, of pledger, Solidus, with the full power

15 of substitution which appoint is coupled with an interest to

16 take all actions permitted hereunder or otherwise permitted

17 under law.

18          So on the occurrence of an event of default, Whorl

19 held the proxy as to the IP Sub stock, and that right vested

20 upon the occurrence of an event of default.  Now, under

21 Delaware law, it is the general rule that a stockholder of

22 record can vote the shares obviously.  That rule is subject

23 to an exception where a party holds a valid, unrevoked

24 proxy.  Delaware law provides -- and here I'm quoting from

25 the Eliason case, which is cited at page 14 of our brief:

22

1        "The grant of an irrevocable proxy to

2        vote completely divests the

3        owner/grantor of voting power."

4        That case also says that a proxy is evidence of an

5  agent's authority to vote shares owned by another, and we've

6  cited several Delaware cases at page 14 of our brief stating

7  that a proxy gives the holder the right to vote and to

8  exercise consents.  Among them, the <u>Kirkland</u> case, again,

9  cited at page 14 of our brief, which indicates that the

10  proxy holder has full authority to act as the proxy.

11        So long before Solidus purported to act in its

12  capacity as the shareholder to put the IP Sub into

13  bankruptcy, Whorl, not Solidus, held the proxy to vote and

14  to give consent as to those shares.  Now, again, stepping

15  back.  What triggered this voting right?

16        Now, section 7.1 of the pledge agreement, as I

17  said, defines what an event of default is, and an event of

18  default is in turn cross-referenced to the promissory notes

19  issued to Whorl by Solidus, and under the promissory notes,

20  an event of default occurred where Solidus "fails to pay its

21  debts generally as they become due."

22        As set forth in Exhibit B to our motion by letter

23  dated June 27, 2007, Whorl sent written notice that an event

24  of default had occurred under the Whorl secured note, and as

25  a result of Solidus' failure to pay its debts generally as

23

1   they became due.  That notice was never challenged by

2   Solidus.

3          Now, it is clear, your Honor, and the objections

4   point this out, that the pledge agreement conferred upon

5   Whorl additional rights.  Whorl could compel Solidus and the

6   IP Sub to register the IP Sub in Whorl's name.  And, in

7   fact, Whorl made demand for that in late October, late

8   September of 2007.

9          Whorl had the right to begin effectuating the sale

10  of the IP Sub stock.  Whorl had the right to replace board

11  of directors of the IP Sub entity.  It could have done many

12  things, your Honor, but none of those things is relevant to

13  this motion.  What is relevant is that as of at least June

14  of 2007, it was Whorl that held the right to vote and to

15  give consents as to the stock of the IP Sub, not Solidus,

16  and Solidus could not take action in its capacity as the

17  shareholder as it purported to do in effectuating the file.

18         Now, again, stepping back, how do we know that

19  Solidus was not paying its debts generally as they came due?

20  Well, first of all, neither of the objections cite to any

21  evidence contesting Whorl's position which was presented to

22  Solidus in June of 2007 that this was, in fact, the case.

23  Mr. Lumsden's declaration is silent on this matter.  There

24  is no evidence contesting -- no evidence contesting --

25  there's argument, but there's no evidence contesting the

24

1 notice and the acceleration about -- that occurred

2 approximately eight months ago.

3         Now, we don't think anyone could reasonably

4 contest it, but it was contested, and so the record would be

5 crystal clear -- so that the record would be crystal clear,

6 we've submitted both publically and under seal evidence that

7 establishes I believe overwhelmingly that Solidus was not

8 generally paying its debts as they came due in June of 2007

9 and each month thereafter until an involuntary bankruptcy

10 was filed against Solidus on that very basis.

11        Now, I'm not going to get into the specifics of

12 the documentation that we have submitted under seal, but

13 suffice it to say that Solidus' schedules filed last week

14 show approximately $24.6 million of unpaid trade

15 liabilities.  The documentary evidence that we've submitted

16 shows that this indebtedness -- roughly this indebtedness

17 was owed by at least May of last year, not to mention

18 impending and actual defaults on payroll.

19        We've also submitted, even though the bar date has

20 not yet arrived, proof of claim after proof of claim, and we

21 didn't just select any proofs of claim.  We selected proofs

22 of claim that by their terms showed when the debt came due.

23 There was an invoice which said -- you know, dated in

24 February that said payment is due in 30 days, February of

25 2007.  These invoices go back all the way to 2006, and they

25

1  are many.

2        So I pointed out Solidus did not contest the

3  involuntary filing which was based -- premised on Solidus

4  not paying its debts generally as they came due.  And, in

5  fact, the evidence that was presented to your Honor in

6  November of last year, just after the company became a

7  subject of the involuntary from Mr. Siegler in his

8  declaration was that payroll had been past due for three

9  weeks and that the company was "in arrears" with respect to

10  important non-payroll expenses.  Those are his words.

11        When Plainfield, which is joined in the objections

12  was in front of the Delaware Chancery in October of 2007,

13  they advised the Delaware Chancery, and we've submitted this

14  in the record, that Solidus was in default to creditors, and

15  I quote, "for a prolonged period of time."

16        Now, as we pointed our in our reply, to the extent

17  the standard under Section 303(h)(1) of the Bankruptcy Code,

18  which says that an involuntary can be commenced where a

19  Debtor is not paying its debts generally as they come due,

20  to the extent the standard of the Courts applying that

21  language which is very similar to the language of the pledge

22  agreement is looked to, again, there really can't be any

23  question but that Solidus was not generally paying its debts

24  as they came due.

25        The Ninth Circuit in the <u>Focus Media</u> case which

26

1    we've cited, says that you look to a totality of

2    circumstances, and it requires more than "merely

3    establishing the existence of a few unpaid debts."

4            What we have here, your Honor, is that Solidus was

5    habitually in default to those debts that were coming due,

6    i.e., its trade and its employees.  Now, in its objection,

7    OZ asserts that Solidus must have been paying its debts as

8    they came due under the standard because it didn't miss a

9    payment to the senior lenders.  But the standard under the

10   pledge agreement is the failure to pay debts as they came

11   due, not to pay debts that might come due in the future.

12   And we have submitted to the Court documentation which shows

13   that the Debtor, Solidus, in fact, defesed, prepaid the

14   interest that was to come due to the senior lenders.  You

15   may remember that.  The lenders obtained as part of the DIP

16   financing package the right to access that money.  And, in

17   fact, your Honor, we've again submitted the documents.

18   There were no interest payments that came due during the

19   time frame that we're talking about.

20           Also I think it's significant, Exhibit B to OZ's

21   own opposition contains a letter dated October 15, 2007

22   which is filed -- which was sent by Bank of New York as

23   agent for the lenders to Solidus in which the lenders

24   declare that Solidus is in default on the senior lender

25   debt, but the letter states, and I quote:

27

1           "The agent is not accelerating the

2           obligations now."

3           So they didn't -- the debt wasn't due even though

4     the lenders could have made it due by their own choosing

5     based upon the documentation that they've submitted to your

6     Honor.

7           So, your Honor, I think under any standard, again,

8     going through the pieces here, an event of default occurred

9     under the pledge agreement at least during the summer of

10    last year.  And, by the way, to the extent the Debtor was

11    not paying its debts generally in June of last year, we've,

12    again, submitted evidence to show that the amount of

13    indebtedness that the Debtor was not paying habitually

14    increased up through the filing of the involuntary.

15          This was an automatic vesting of a proxy based

16    upon the occurrence in the event of default.  So if it

17    didn't occur in June, it certainly occurred between June and

18    the filing.

19          Now, as a result, again, going through these

20    steps, the default occurs, the proxy right is triggered.

21    Solidus is, therefore, divested of its right to act in its

22    capacity as the shareholder, and when the Solidus board

23    purported to authorize the filing -- to cause the bankruptcy

24    filing of the IP Sub on December 14th, it did so in

25    violation of Whorl's right and, more importantly, without

28

1  corporate authority.

2         Now, I want to briefly respond to some of the

3  arguments made in opposition to -- to this presentation.

4  The first argument is by the lenders, and their position is

5  that, well, what we did in accelerating violated the terms

6  of the subordination agreement between Whorl and the

7  lenders.  This is an ultimate irony that they would be

8  making this contention in light of their actions.  But apart

9  from that irony, your Honor, it is true that there is a

10 subordination agreement.  It's attached as Exhibit D to our

11 motion, and it does generally prohibit Whorl from taking

12 actions in respect of Solidus, no question about that.  But

13 the subordination expressly excludes from the definition of

14 enforcement action which is the provision that I talked

15 about that generally cuffs Whorl's hands, it says that

16 enforcement action shall not include the exercise of any

17 right or remedy by the payee, that is Whorl, under the

18 pledge agreement.  The pledge agreement is appended to the

19 subordination agreement.  It's referenced and incorporated

20 into the subordination agreement.

21         The definition of the term "distribution" under

22 the subordination agreement likewise carves out any recovery

23 received by Whorl in respect of its enforcement action under

24 the pledge agreement.  The pledge agreement authorized

25 Whorl, as I took the Court through, to declare the debt due

29

1  as a predicate to the exercise of enforcement remedies.  The

2  pledge agreement specifically authorized what we did.  And,

3  in fact, enforcement action is carved out from the

4  prohibition under the subordination agreement.  So what

5  Whorl did was permitted by the subordination agreement.

6        Now, both Solidus and the lenders cite to the

7  November 16, 2007 amended order appointing provisional

8  custodian pen dente lite over Solidus Networks, Inc., which

9  is Exhibit A to the Debtors' opposition.  That was issued by

10 the Delaware Chancery, and their position is he didn't need

11 board resolution.  Mr. Lumsden was authorized to file a

12 bankruptcy for the IP Sub, by that order.  And, your Honor,

13 that argument is wrong and flies in the face of the Solidus

14 board resolution that I quoted from earlier, and before I

15 run out of steam here, I need to take a little water.

16        Again, Exhibit G to the motion, which is the

17 resolution of the board of directors of Solidus, and what

18 does the board of directors of Solidus say on December 13th,

19 that Thomas Lumsden, custodian of the corporation, is hereby

20 authorized and empowered on behalf of and in the name of the

21 corporation to execute and verify or certify a petition

22 under Chapter 11 of the Bankruptcy Code and to cause the

23 same to be filed in the United States Bankruptcy Court for

24 the Central District at such time as such officer executing

25 the same shall determine and in such form or forms as such

30

 1   officer may approve.

 2           So it was the board of directors that under

 3   December 13th of 2007 purported to authorize and empower Mr.

 4   Lumsden to cause Solidus and Solidus in its capacity as the

 5   shareholder of the IP Sub to put the IP Sub into bankruptcy.

 6   The very resolution that started this bankruptcy case I

 7   think clearly indicates that it was the board, pursuant to

 8   the resolution, however infirm it was -- and we maintain

 9   that it was infirm -- that sought to authorize Mr. Lumsden

10   to file the bankruptcy.

11           Now, if the custodian order authorized and

12   empowered Mr. Lumsden to cause the bankruptcy filings, there

13   would have been no reason for the resolution to exist.  More

14   importantly, your Honor, by its own terms, the resolution is

15   an admission that it is the board that hereby authorized and

16   empowered the filing.

17           The reason why Solidus proceeded in this fashion

18   is exactly where I started with this presentation.  The

19   fundamental power to file a bankruptcy rests with the board

20   of directors.  The custodian order did not divest the board

21   of authority to commence a bankruptcy, didn't do that.

22           Now, just, again, reviewing what has been said

23   about the custodian order, the custodian order says a lot of

24   very detailed things about what Mr. Lumsden could do, but

25   what the custodian order does not say is that he can file a

31

1 bankruptcy without going to the board of directors.  It

2 doesn't say that.

3        Now, the record does show, your Honor -- and this

4 is also attached to the custodian order of November 16th,

5 that on October 23, 2007, the Delaware Court issued a status

6 quo order that enjoined Solidus and its subsidiaries from

7 taking actions outside of the ordinary course of business,

8 including the commencement of a bankruptcy case.  The

9 November 16, 2000 order set up a procedure if the custodian

10 determined to take actions outside of the ordinary course of

11 business.  He had to give three days notice, but if he

12 obtained Plainfield's consent in two of the three directors,

13 he didn't have to give that notice.

14        Nothing in that order, however, allowed Mr.

15 Lumsden to then bypass the board of directors should he

16 determine that a bankruptcy filing was advantageous.  In

17 other words, the November 16 order by its terms created a

18 hurdle that Solidus had to surmount in order to file

19 bankruptcy.  Mr. Lumsden had to either give the notice or

20 get the consent in order to be relieved of the prohibition

21 under the October 23 order.

22        Then, when he did that, the order no longer

23 prohibited a bankruptcy filing, but the order itself did not

24 authorize Mr. Lumsden to bypass the board of directors.

25 Once he surmounted that hurdle, he had to go to the board.

32

1  And, in fact, that's exactly what he did based upon the

2  resolution.  But you don't have to even look just to the

3  resolution to draw that conclusion.  Mr. Lumsden's

4  declaration, which was filed on the very first day of the

5  case, it's dated December 14, 2007, at page three and four

6  he goes through this, and then he says, and I quote:

7            "As reflected in the certificate of

8            resolution attached here to as Exhibit

9            D" -- which is the resolution I've been

10           quoting from -- "on December 13, 2007,

11           the board of directors of Solidus, which

12           is the sole shareholder of the other

13           Debtors, authorized Solidus to consent

14           to the entry of an order for relief and

15           the filing of the voluntary Chapter 11

16           cases for the Debtors."

17           So that's his own testimony, your Honor.  I might

18  add, your Honor, that there was nothing certainly in the

19  custodian order that purported to, could or did divest Whorl

20  of its rights which vested many many months before.  Now,

21  the lenders suggest that -- and I believe the Debtor also

22  chimes in on this, that we are collaterally attacking the

23  Delaware Chancery order.  The point, your Honor, is two.

24  First of all, the Delaware Chancery orders did not authorize

25  Mr. Lumsden to file a bankruptcy.  They created hurdles that

33

1 he then had to clear in order to go to the board which I

2 think, by all parties' admission, is the entity that

3 authorizes a filing.

4        So, to say that we're collaterally attacking the

5 order begs the question as to what that order provides, and

6 I'm just reading the order as well as the evidence that was

7 submitted by the Debtor.

8        Secondly, your Honor, the Delaware chancery has

9 had occasion in other cases to address whether a filing for

10 bankruptcy is authorized.  And we cited at page 13 of our

11 motion  case called Prosser v. Betty Brooks.  That was a

12 case involving a party's prospective contention raised

13 before the Delaware Chancery that a bankruptcy filing by a

14 Debtor would violate a shareholder agreement, and the

15 Delaware Chancery held that it was the wrong court to take

16 that argument to.

17        The Court held, and I quote:

18        "It, therefore, appears reasonably

19        probable that this Court does not have

20        jurisdiction to prohibit the corporation

21        from availing itself of the Federal

22        Bankruptcy Laws.  The Bankruptcy Court,

23        however, undoubtedly could grant a

24        request by Plaintiffs to dismiss the

25        bankruptcy petition if it found that the

34

1            action had not been properly authorized

2            on behalf of the corporation because the

3            directors failed to abstain from the

4            consideration of the matter if they were

5            required to do so by the agreement."

6        So the point of the Delaware Court was take your

7    complaint to the Bankruptcy Court, which is what we have

8    done.  Don't go to the Delaware Court.

9        The Debtor has cited the Eighth Circuit case of

10   Kenahan v. Heritage Press to support its collateral attack

11   argument, but in that case, the party that was seeking to

12   dismiss the challenge was challenging the validity of the

13   State Court judgment.  The validity of the October and

14   November Delaware orders that were entered here is not at

15   issue.  So that case is not dispositive.

16       Now, your Honor, third, the Debtors argue that the

17   filing was -- and here I'm going to quote -- "effectively

18   authorized" because Mr. John Rogers is a member of the

19   Solidus board and he's also the director of the IP Sub

20   board.  So the argument is that the IP Sub effectively

21   authorized the filing because Mr. Rogers voted as a member

22   of the Solidus board to authorize the filing.

23       But the IP Sub board, your Honor, did not

24   authorize the filing effectively or otherwise.  The only

25   action that was taken by the Solidus board was purportedly

35

1  based upon its status as the shareholder of the IP Sub.  Mr.

2  Rogers is a member of the Solidus board, and he voted on the

3  Solidus resolution, but there was no resolution by the IP

4  Sub board.

5          And, to this day, the Debtor has not furnished a

6  resolution by the IP Sub board in a reparative effort or

7  otherwise.

8          Now, your Honor, there's a compelling, I would

9  submit, explanation as to why the Debtor has been unable to

10 procure a resolution of the IP Sub board.  There is not, I

11 would submit, a well advised board of directors in the

12 United States that would meet and authorize a bankruptcy

13 filing for an entity that had no creditors, as to which the

14 exclusive right to vote the stock in that entity was held by

15 a third party that had not authorized the filing.

16         I think I'm also -- would also remind the Court

17 that under the pledge agreement to which the IP Sub was a

18 party, there was a flat prohibition against taking actions

19 which would have the effect of impairing Whorl's interests

20 in respect of the IP Sub stock.  So Solidus -- the IP Sub

21 was by design a special purpose entity as to which there was

22 only one third party stakeholder, and that was -- that is

23 Whorl.  The board of directors at a minimum of the IP Sub

24 had and has a fiduciary duty to Whorl.  And that is why the

25 IP Sub board has not met -- has not authorized the filing.

36

1          Now, as we've cited, your Honor, in the cases,
2 there is no such thing as effective authorization.  A board
3 either meets and authorizes a filing or it doesn't.  The IP
4 Sub board did not meet and did not authorize the filing.
5 We've cited to two cases, In re Giggles Restaurant, which
6 involved the proxy which the party said, well, you know,
7 that kind of authorized the board to vote, and the Court
8 said no, it didn't, and dismissed the case.  Audubon
9 Quartet, another case which was a ratification, the argument
10 was, well, you know, it was sort of ratified, and the Court
11 looked at the requirements and said that that's not what
12 happened.
13          Now, the Debtors finally argue -- I guess I should
14 say initially argue that Whorl as a creditor of Solidus is
15 without standing to move to dismiss.  And we've pointed out,
16 your Honor, that, first of all, under virtually every case
17 that has been decided of recent vintage, courts have
18 recognized that any party in interest has standing to move
19 to dismiss.  And, secondly, Whorl is not just a creditor of
20 Solidus.  It is a creditor of Solidus, but it is also a
21 party to a direct contract with the IP Sub and Solidus that
22 was violated.  In other words, we're arguing that it is our
23 rights that have been trampled, and I think it's clear, your
24 Honor, that we have a pecuniary stake and standing at a
25 minimum to raise this issue.

37

1          So the Court never acquired jurisdiction over this

2   Debtor, and, as a result, this case has to be dismissed.

3   And, as I indicated, that is not a matter of discretion.

4          Now, your Honor, the second and independent ground

5   for dismissal is that the IP Sub case was not filed in good

6   faith as that standard has been adopted by the Courts.  And

7   because Debtors rarely, if ever, admit to their lack of good

8   faith, courts look to a totality of circumstances to make

9   that determination.

10          Your Honor, this is a textbook case for dismissal

11   for lack of good faith.  I don't believe that you will find

12   a single reported case -- I've looked.  I haven't -- in

13   which the Court has found good faith where the Debtor had no

14   creditors as of the petition.  There are cases, and we've

15   cited, for example, the <u>FJD</u> case out of Nevada, where the

16   Court stated that the absence of unsecured creditors has

17   also been recognized as evidence that a Chapter 11 petition

18   has not been filed in good faith.  But here there were no

19   creditors.

20          Chapter 11 is supposed to be a collective

21   proceeding.  And by definition, collective means creditors.

22   And where there are none, there shouldn't be a collective

23   proceeding.

24          Now, case law also says that Chapter 11 should not

25   be filed where they involve a two-party dispute.  The <u>Ravick</u>

38

1    court case out of the bankruptcy -- the District of New

2    Jersey, where Debtor's reorganization effort essentially

3    involves a two-party dispute resolvable in State Court and a

4    filing of the -- under the Bankruptcy Code is intended to

5    frustrate the legitimate efforts of creditors to enforce

6    their rights against the Debtor, dismissal for cause is

7    warranted.

8           And that's what this case has been from day one.

9    This is a two-party dispute between Whorl and the lenders.

10   The IP Sub case not only had no creditors but it conducted

11   no operations, which, again, under the FJD case, is an

12   indicia of lack of good faith.  And this was all -- this

13   wasn't by accident.  This entity was set up as a special

14   purpose vehicle to house the intellectual property sold by

15   Whorl to Solidus.  It was set up so that it would conduct no

16   operations.  And, in fact, that's why Whorl agreed to take a

17   pledge of the stock in the IP Sub as its collateral.  And so

18   now what's happened is that its assets have been pledged,

19   put into bankruptcy.  Its assets have been pledged under the

20   guise of a reorganization.

21          Is there a reorganization for the IP Sub?  Well,

22   we now know the answer.  The answer is no.  What the Debtors

23   are proposing if you deny this motion, they're not proposing

24   to keep the IP Sub as part of the Debtor's operations.  What

25   they're proposing to do is to sell the IP Sub's assets, most

39

1  of them, outside of the plan of reorganization under Section

2  363 of the Bankruptcy Code to current management.

3          And they're going to take that money from that

4  sale and use it to pay down the Debtor in Possession

5  financing that was approved post-petition.

6          Now, in response to this, the Debtors and the

7  lenders try to portray this, my arguments as just a rehash

8  of the Debtor in Possession financing.  Now, it is true,

9  your Honor, that sometimes parties delay unduly in moving to

10  seek dismissal, and we cited those cases.  The cases that we

11  have cited have indicated that a party moves timely if it

12  delays for as much as three months.  In bringing a motion to

13  dismiss here, the case was filed on December 14th.  The

14  motion was filed on January 24.  Whorl has filed a timely

15  motion.

16          Many cases before the Court can adjudicate a

17  dismissal for lack of good faith, the Debtor obtains relief.

18  But as long as the motion is filed timely, and here it was,

19  the Court is required to consider whether the case was filed

20  in good faith as established under the law.

21          I should point out, your Honor -- and I did

22  emphasize this to the Court at the various hearings -- that

23  the dismissal motion was on file before the Court approved

24  the Debtor in Possession financing on a final basis.  I made

25  it very clear in my presentation to the Court that that

40

1  issue would be heard at a later date, but I wanted it to be

2  recognized and stated in the record what was clear on the

3  docket that this was coming.

4       Again, Mr. Johnston and I had no disagreement over

5  this point.  At page 69 of the January 25 transcript which

6  was the hearing on the final Debtor in Possession financing,

7  Mr. Johnston said, and I quote:

8           "You heard about the arguments that Mr.

9           Bogdanoff has now made, that Whorl has

10          now made in the context of a motion to

11          dismiss the case for the IP Sub.

12          They'll be joined soon, and your Honor

13          will have a decision to make as to

14          whether or not that entity is properly

15          in bankruptcy."

16      And that's why we're here today.  Now, they also

17  make much of your comment, your conclusion at the January 25

18  hearing that the IP Sub was "integral" to the bankruptcy

19  process.  That was at page 82 of the transcript.  But what

20  they don't highlight is what you said next, and let me quote

21  it.  What you said was:

22          "I come to the conclusion that the IP

23          Sub is an integral part of the

24          bankruptcy process.  It is a Debtor.

25          The question today is whether the IP Sub

41

1          should have been and can remain a

2          Debtor."

3          Now, the Court went on to describe the integrated

4    nature of the DIP negotiations that the lenders have

5    expressed quite forcefully, the importance of what they have

6    negotiated so far, and that the Court had to accept the

7    lender's position with respect to the IP Sub financing.

8    That is all true.  Those were findings of the Court.

9          The Court I believe felt compelled to accept the

10   lender's position with respect to the financing, but with

11   regard to the Debtor's eligibility, the IP Sub's eligibility

12   for filing, that issue certainly was not before the Court.

13   The Court did, indeed, find that the financing was in good

14   faith, but that does not address whether the case was filed

15   in good faith.  That issue was not before the Court.  An

16   entity that has no creditors, set up as a special purpose

17   entity to hold intellectual properties, conducts no

18   business, cannot possibly be a Debtor in good faith under

19   the case law.

20          Now, the lenders who are the only parties really

21   affected by this dismissal knew what they were doing.  They

22   knew they were taking a pledge under the Debtor in

23   Possession financing from an entity that had no creditors

24   and that was a special purpose entity.  And whether the IP

25   Sub stayed in bankruptcy is in the best interests of the

42

1 other Debtors or the creditors of the other estates as the

2 lenders allege, is completely irrelevant.  The test is

3 whether the case belongs in Chapter 11 on its own merits

4 based upon the four corners of that entity.  The test is

5 measured as to each Debtor, not collectively.

6          Now, your Honor, we have cited to the Court ample

7 authority to support the proposition that dismissal and

8 vacating prior orders go hand in hand.  Vacator and

9 dismissal go hand in hand.  Dismissal and vacator is

10 required if the Court determines that the case was

11 improperly filed.  If you didn't have jurisdiction to

12 preside over the case, you didn't have jurisdiction to enter

13 orders.

14          Now, in the context of a dismissal for lack of

15 good faith as a matter of equity and common sense, your

16 Honor, we believe that vacator is, likewise, appropriate,

17 and we cited to the Court the Ninth Circuit case of <u>Nash v.</u>

18 <u>Kester</u>, which involved a Chapter 13 case which expressly

19 stands for the proposition that a dismissal was intended to

20 undo what happened during the bankruptcy case.  This is a

21 case which should never have been filed.

22          Your Honor, had this case not been filed, Whorl as

23 the proxy holder certainly would have taken the actions that

24 I described before that it could have taken to protect its

25 interests.  But now look at what's happened.  The IP Sub was

43

1  put into bankruptcy even though it had no creditors and was

2  specially set up as collateral for my client's loan.  It's

3  been rendered liable on a massive Debtor in Possession

4  financing because the lenders insisted on it.

5          Now if this case stays in Chapter 11 and the Court

6  overrules my objection and considers the motion to sell and

7  overrules our objection to that, the assets -- most of the

8  assets of that entity will be sold with the proceeds going

9  to the lenders.  Unfortunately, all of the assets of that

10  entity will be gone as will be the money.  My client will be

11  left with essentially an empty shell.  And this is, I would

12  submit, about as egregious as it gets.

13          I believe the Court has given these Debtors the

14  benefit of every doubt.  The time has come, I would submit,

15  your Honor, to give my client the benefit of its rights, and

16  there are two grounds, and they lead to one direction, and

17  that is dismissal of the IP Sub bankruptcy case.

18          Thank you, your Honor.

19          THE COURT:  Thank you, Mr. Bogdanoff.

20          Mr. Johnston.

21          MR. JOHNSTON:  Thank you, your Honor.

22          At the outset, I think it's important to put these

23  issues into context by considering just what Whorl's

24  interests are in these cases.

25          Whorl is a creditor of Solidus Network.  It's not

44

1  a creditor of IP Sub, does not have a lien on the assets of

2  IP Sub.  Whorl is not a shareholder of IP Sub.  At best,

3  Whorl has a lien on Solidus' ownership interest in IP Sub.

4  Whorl does not own those shares.  It is not foreclosed on

5  them.  It is only an alleged secured creditor of Solidus

6  with an alleged interest in an asset of Solidus.  Yet Whorl

7  does not ask for dismissal of Solidus' bankruptcy case, only

8  IP Sub's case.

9        So I'd ask what does Whorl hope to gain by having

10 IP Sub's bankruptcy case dismissed?  It can't be to protect

11 its claim against IP Sub because it doesn't have one.  It

12 can't be to protect its interest in the assets of IP Sub

13 because it doesn't have any.  It can't be to preserve an

14 ongoing relationship with IP Sub's business because IP Sub

15 doesn't have an operating business, and Whorl doesn't have

16 any relationship with it.

17       Now, I'd submit that what Whorl wants is to

18 dismiss IP Sub's case as a way to gain leverage to get a

19 greater recovery on its claim against Solidus.  It wants to

20 be able to stop the sale of Paycheck Secure which was

21 auctioned for $4.2 million in cash at the auction last

22 Friday.  It wants to be able to stop the sale or disposition

23 of the core business which used the assets of IP Sub that

24 are not being sold as part of the Paycheck sale, Paycheck

25 Secure sale.  It wants to reverse the approved Debtor in

45

1   Possession financing.

2          I'd submit that this is anything but a two-party

3   dispute between Whorl and the lenders as has been suggested.

4   What I just outlined are critical things that the Debtors

5   have accomplished and need to accomplish in these cases, and

6   that's why we led our objection with the standing argument.

7   Whether you call it standing or simply a justified

8   skepticism at the motives of non-shareholders who seek to

9   rely on corporate authorization as grounds for a motion to

10  dismiss a bankruptcy case, the Courts have been extremely

11  reluctant to give weight to arguments made by parties who

12  have stood in shoes similar to those now occupied by Whorl.

13         In a nutshell, Whorl is not seeking to vindicate

14  shareholder rights.  It wants to increase its recovery on a

15  claim against Solidus.  There's nothing wrong with that

16  motivation as far as it goes, but it doesn't give Whorl

17  standing to complain about alleged technical deficiencies in

18  IP Sub's corporate governance.

19         As the Court in the John Nicks Chrysler Plymouth

20  case that we cited in our brief noted:

21             "The courts do not favor a creditor's

22             motion to dismiss a corporate bankruptcy

23             on the ground that the filing was not

24             properly authorized by the directors.

25             The creditor may not be trying to

46

1           protect the rights of shareholders."

2           So it is here.  Whorl's obviously not trying to

3    protect Solidus' rights as a shareholder of IP Sub.  It's

4    looking out for its own claim against Solidus.  Why should

5    it be able to assume the mantle of a shareholder to assert

6    that IP Sub's board didn't properly meet and authorize the

7    filing, which is basically what Whorl's argument boils down

8    to?

9           I think that's a particular powerful point when

10   you think about how easy it would have been for Whorl to

11   protect itself with respect to IP Sub if it had so desired.

12   Whorl could have negotiated to make IP Sub an obligor on the

13   note.  Whorl could have taken a security interest in the

14   assets of IP Sub.  Whorl could have insisted that IP Sub be

15   governed by a board of management independent from Solidus.

16   It did none of that.

17           If the desire was to make IP Sub a bankruptcy

18   remote entity or, as Mr. Bogdanoff said this morning, a

19   special purpose vehicle, Whorl failed miserably.  There are

20   ways to do that.  This structure did not accomplish that.

21   Nothing in Whorl's prepetition documents even purport to bar

22   IP Sub from the courthouse door.

23           The Court in the Gucci case that we cited held

24   that in determining whether a creditor has standing to seek

25   a dismissal, the Court should consider whether the party

47

1  raising the challenge has a stake in the case sufficient to

2  entitle it to be heard, taking into account the policies

3  underlying the principles it invokes and the scope of

4  protections intended to be afforded by the policies.

5           I submit if you do that here, Whorl does not have

6  standing to invoke the principles of corporate governance

7  designed to protect IP Sub's shareholder, Solidus, in an

8  effort to further Whorl's interests in asserting a claim

9  against Solidus.

10          But I am, of course, prepared to discuss the

11  merits, and I'd like to turn to that now.  First and

12  foremost, we believe that there's no question that the

13  Delaware Chancery Court's custodian order empowered Mr.

14  Lumsden to file a case on behalf of IP Sub.  Whorl argues

15  that you have to look to Delaware law to determine

16  authorization and we couldn't agree more.  What better

17  source of Delaware law than Delaware's own chancery courts?

18          In the custodian order, the Chancery Court

19  appointed Mr. Lumsden as:

20               "Provisional custodian pendite lite, as

21               an agent of the Court to take possession

22               and control of Solidus Networks, Inc.

23               and its subsidiaries and affiliates and

24               its business and operations and assets

25               to temporarily administer and manage the

48

1          assets and to operate the company's

2          business as further provided herein.

3          That's paragraph one of the custodian

4          order."

5          IP Sub, of course, is a subsidiary and affiliate

6  of Solidus.  As a consequence, by the custodian order, Mr.

7  Lumsden was vested with possession and control of IP Sub.

8  The custodian order goes on to provide that Mr. Lumsden's

9  actions as custodian "shall be deemed to be the official

10  actions of the company."  And, again, the company is defined

11  to include IP Sub.

12          And it provides that IP Sub shall accept the

13  instructions of Mr. Lumsden with respect to IP Sub and the

14  assets.  That's paragraph eight of the custodian order.

15  This grant of authority to take possession and control of IP

16  Sub includes the authority to file a Chapter 11 case for

17  that entity.  I just have to part company with Mr. Bogdanoff

18  here.  I think this language is broad and all-encompassing.

19  It certainly includes the ability to file.

20          And Mr. Bogdanoff agreed this morning that the

21  validity of the custodian order is not in question.  That

22  was a valid order issued by the Chancery Court.  And I'd

23  submit that it's revealing that Whorl completely ignored the

24  custodian order and its 21-page motion and then spent only

25  two pages in its 23-page reply.  The only thing that we

49

1  heard in the reply and again heard this morning was that the

2  custodian order -- and this is quoting from Whorl's reply

3  brief -- expressly circumscribes Mr. Lumsden's authority

4  with respect to matters outside the ordinary course of

5  business without appropriate board approval.  That's at page

6  nine of their reply.  And it cited paragraph 10 of the

7  custodian order for that proposition, and you heard some

8  discussion about paragraph 10 this morning.

9          Paragraph 10 of the custodian order does no such

10  thing.  To the contrary, what paragraph 10 does is

11  specifically empower Mr. Lumsden to act without board

12  authority.  I think it's important, so I'd like to read the

13  relevant passage.  Paragraph 10 states:

14          "In the event the custodian determines

15          that it's in the best interest of the

16          company to take any action other than in

17          the ordinary course of business and/or

18          which would be subject to the status quo

19          order, the custodian shall first provide

20          three business days written notice to

21          the Court" -- the Court being the

22          Chancery Court -- "and the parties to

23          this action.  No such notice shall be

24          required if both Plaintiff" -- meaning

25          Plainfield -- "and a majority of Arthur

50

1          Petrie, Alex Hearn, John Rogers shall

2          consent to the action."

3          In other words, the order empowers Mr. Lumsden to

4  act outside of the ordinary course of business or to take

5  actions otherwise prohibited by the Chancery Court's status

6  quo order even over the objection of the three designated

7  individuals, provided that notice is given.

8          And that notice provision then can be waived by

9  the consent of two of those three individuals.  This doesn't

10 limit Mr. Lumsden to actions only with board approval.  It

11 does the opposite.  And what happened here was that Mr.

12 Lumsden got the consent of the three named individuals and

13 the Solidus board, so he was able to act without giving that

14 notice.

15         The fact that he took that step in no way

16 diminished the authority granted to him by the custodian

17 order.  And I think in regard to the custodian order, the

18 parallel to the situation involving Plainfield's alleged

19 rights with respect to its pledge of shares is striking.

20 Your Honor will recall that the Chancery Court issued the

21 custodian order specifically in response to a dispute over

22 the validity and enforceability of a pledge of shares.  In

23 this case it was a pledge of Solidus shares in favor of

24 Plainfield.

25         Unlike Whorl, Plainfield actually had attempted to

51

1  vote and act upon the shares by trying to remove some

2  members of the Solidus board.  Despite that, in the

3  custodian order, the Chancery Court suspended whatever

4  rights Plainfield had to both the pledged shares and

5  empowered Mr. Lumsden to act.  It's clear that that same

6  power empowered Mr. Lumsden to act on behalf of IP Sub

7  notwithstanding whatever rights Whorl may have possessed

8  with respect to IP Sub's shares.

9          So I'd submit, your Honor, that the custodian

10 order should be the end of the story.  The Chancery Court

11 entered an order that authorized Mr. Lumsden to do exactly

12 what he did in this case, and Whorl's arguments regarding

13 the alleged irrevocable pledge and its alleged vested rights

14 are academic at best.  But as we explained in our papers,

15 I'll submit that they're also wrong.

16          Regarding corporate authorization, Whorl argues

17 that it had the sole and exclusive right to both Solidus'

18 shares in IP sub and that as a result, IP Sub could not file

19 a bankruptcy case without Whorl's consent.  To assess this,

20 I think it's instructive to look at what actually happened

21 or, probably more importantly, what did not happen prior to

22 the petition date.  Whorl did not foreclose on the IP Sub

23 shares.  Whorl did not take possession of those shares.  It

24 did not attempt to vote those shares.  It did not attempt to

25 replace the board of directors of IP Sub.  Whorl did not

52

1  even inform IP Sub that it believed it had voting rights

2  over the shares.  It did nothing whatsoever in respect of

3  the alleged vested rights that we heard so much about today.

4       So whatever rights Whorl had in the shares, it

5  didn't do anything, and because Whorl did not act, none of

6  Whorl's alleged rights stood in the way of the bankruptcy

7  filing.  If Whorl held the alleged rights that it says it

8  had, it could have replaced IP Sub's board of management

9  which then could have prevented a bankruptcy filing setting

10  aside the custodian order for a minute, but Whorl didn't do

11  that, and because it didn't do that, Whorl didn't have any

12  power to stop IP Sub's filing.

13       In this regard we cited two cases in our brief

14  that I think are pretty much directly on point.  The first

15  is the Protho Express case out of the Middle District of

16  Tennessee where a pledgee of stock of the Debtor moved to

17  dismiss the bankruptcy case on the ground that the Debtor

18  did not have authority to file its petition, exactly what

19  Whorl has done here.

20       Unlike Whorl, the pledgee actually had attempted

21  to vote the shares and install a new board of directors who

22  presumably would not have authorized a bankruptcy filing.

23  Following that vote, the Debtor's old board of directors

24  authorized the filing of a case and then filed the petition,

25  and the Bankruptcy Court denied the motion to dismiss after

53

1 finding that the pledgee had not given proper notice of a

2 shareholder meeting in which it elected the new board.

3        So, in other words, even though the pledgee

4 actually had the authority to vote the shares and to replace

5 the board and the fact that the pledgee was opposed to the

6 bankruptcy case, the bankruptcy petition was authorized

7 because the pledgee had not validly acted before the

8 petition date.

9        The Country Estates case from the District of

10 Massachusetts reached the same result.  In fact case, the

11 pledgee of the Debtor's shares also attempted to vote the

12 pledged shares to remove the Debtor's assisting directors.

13 After that vote, the Debtor's former directors, the ones who

14 the pledgee sought to oust, authorized the filing of a

15 bankruptcy case.  And the Court denied the pledgee's motion

16 to dismiss on the grounds that the pledgee's attempted

17 removal of the former directors was defective.

18        Here again, although the pledgee actually

19 attempted to act on its pledge, unlike Whorl, the filing was

20 authorized.

21        I think that's compelling authority on the facts

22 here.  Whatever Whorl's rights were prepetition, it chose

23 not to exercise those rights.  Under the Protho Express and

24 Country Estates, IP Sub retained the right to file in the

25 face of the unexercised rights.

54

1          In its papers Whorl attempted to distinguish those

2   two cases by asserting that they didn't apply because there

3   was no corporate action by the board of IP Sub to authorize

4   the filing.  And you heard that again here.  I'd submit

5   that's not true.  Here you have corporate action in the form

6   of Mr. Lumsden's direction in accord with the custodian

7   order and in the form of the consent of the only person who

8   was the director of IP Sub, Mr. Rogers, who authorized the

9   filing of a bankruptcy case for each and every one of these

10  Debtors.  That's what Mr. Lumsden's resolution says.

11         Finally, it is worth spending a moment on whether

12  Whorl actually had any vested rights under the pledge

13  agreement to begin with.  And here I'd submit that Whorl's

14  argument proves too much.  Its position is that it had

15  bested irrevocable voting rights that gave it an absolute

16  veto over any and all corporate action of IP Sub without

17  having to give a single notice or take a single action.  The

18  only basis for this alleged veto right was Whorl's failure

19  to pay its debts as they became due.  I'd submit that's a

20  truly amorphous standard about which reasonable minds could

21  differ.  Notably, Whorl's alleged default did not arise due

22  to any payment default to Whorl itself or to any other

23  objectively verifiable default by Solidus.

24         And what Whorl asserts is that it had these secret

25  vested rights which it didn't have to notify anybody about

55

1 and which related to what's essentially a subjective

2 standard that it could hold in its back pocket until

3 whenever it chose to wield them.

4            I think that doesn't make sense.  Whorl at least

5 needed to notify IP Sub of its belief that Whorl and not

6 Solidus held the right to vote the shares.  It didn't

7 happen.  There was a lot of ink spilled and time spent this

8 morning on the topic of whether Solidus was, in fact -- was

9 or was not paying its bills as they became due and, hence,

10 whether Solidus was, in fact, in default under the Whorl

11 note.

12           Mr. Bogdanoff is right we didn't take a position

13 on that question.  In large part it's because Mr. Lumsden

14 wasn't there over the summer, and without investigating, he

15 can't say what was happening four or five months before his

16 appointment.  There's no question that by the time the end

17 of October rolled around, the company was not paying its

18 debts as they became due.  We were here on an involuntary

19 petition and the company hadn't made its payroll for a long

20 period of time.

21           But I submit that whether Solidus was or was not

22 paying its debts is largely beside the point.  Our point is

23 simply that Whorl can't just lob in a letter to Solidus, not

24 IP Sub, and not identify which debts allegedly are unpaid

25 and not say that Whorl now claims the exclusive and sole

56

1 right to vote the shares of IP Sub and not ever try to vote

2 their shares or exercise those rights, not saying anything

3 at all to IP Sub, and then expect to be able to assert a

4 veto right over every corporate action that IP Sub later

5 takes.  It doesn't work that way.

6          So on the authority to file, we'd submit, your

7 Honor, that the custodian order authorized Mr. Lumsden to

8 file the case, and even setting that aside, there was proper

9 corporate authority here.

10          Regarding good faith, I won't spend long on this

11 point.  Whorl's arguments in its papers, not so much today,

12 was largely premised on the contention that it was bad faith

13 for the lenders to seek a lien on the assets of IP Sub in

14 connection with the DIP financing.  Your Honor did already

15 rule on this issue in connection with the DIP financing and

16 a finding of bad faith on that ground would contradict the

17 express provisions of the DIP order which Whorl has already

18 appealed.

19          Our argument is not that the motion to dismiss is

20 untimely.  It's simply on this point that the Court has

21 already considered and decided the issue of whether it was

22 appropriate or inappropriate to secure the DIP financing

23 with the assets of IP Sub.  And the other alleged grounds of

24 bad faith associated with the filing do not ring true.

25          IP Sub may not have ongoing operations or

57

1  creditors.  We believe it doesn't.  But the record

2  establishes that it did have a need for financing that could

3  only be provided through a Debtor in Possession financing.

4  The record shows that value of IP Sub is maximized through a

5  sale of the Paycheck Secure assets which do include some but

6  not all of the IP Sub assets.  That's a sale that could be

7  accomplished perhaps exclusively, certainly most effectively

8  and efficiently through the bankruptcy case, and these are

9  legitimate purposes for a Chapter 11 case, and we'd submit

10  that these legitimate purposes serve to reconfirm the good

11  faith of the IP Sub filing.

12          So we'd submit, your Honor, that there is no cause

13  or grounds to dismiss the IP Sub case and would ask that you

14  deny the motion.

15          THE COURT:  Thank you, Mr. Johnston.

16          MR. JOHNSTON:  Thank you.

17          THE COURT:  Mr. Logan?

18          MR. LOGAN:  Thank you, your Honor.

19          Your Honor, I agree with the vast vast majority of

20  what Mr. Johnston said, and, indeed, he stole a substantial

21  portion of my thunder.  So I'll be briefer than I otherwise

22  would have been.  I do disagree with him on one point that I

23  will come back to later, and I can't stand or sit silent

24  after Mr. Bogdanoff accused me of knowing what I'm doing.

25  I'm going to order a copy of that transcript just for my

58

1  wife if nothing else.

2        I think the starting point is the jurisdictional

3  issue, and that is essentially focuses on the custodian

4  order.  And on this point I couldn't agree more with Mr.

5  Johnston that the custodian order granted Mr. Lumsden

6  authority to file a bankruptcy petition on behalf of all of

7  the Debtors, including IP Subsidiary, and I think all we

8  really need to do is go back to that point in time, and that

9  was one of the first -- perhaps the first matter before your

10 Honor.

11       At the point in time, there was great confusion

12 over the composition of the board of directors of the

13 Debtors.  Plainfield took certain positions.  Existing --

14 the existing chairman of the board of Solidus took other

15 positions, and the Court correctly concluded that that sort

16 of dispute was squarely within the expertise and

17 jurisdiction of the Chancery Court.  And whereas in most

18 cases where you have these sort of issues about whether or

19 not these sort of questions about whether or not a

20 bankruptcy filing was authorized under Delaware law, one

21 looks to the more normal general principles.

22       Here we have a specific order from the Chancery

23 Court that not only deals with the question at issue but

24 deals with the specific facts at issue.  It had to do with

25 these Debtors, including an IP subsidiary.  And after your

59

1  order -- after your Honor granted relief from the stay to

2  let the Chancery Court action proceed, the Chancery Court

3  entered the custodian order.  And, as Mr. Johnston pointed

4  out, in paragraph one it states quite clearly that Mr.

5  Lumsden as custodian had authority to take control of all of

6  the Debtors, including the IP Subsidiary.  So not just the

7  assets, to take control of IP Subsidiary.

8         It goes on to say in paragraph number -- number

9  five that the directors and officers of each of these

10 entities, including IP Subsidiary, was to accept

11 instructions from Mr. Lumsden as custodian.  So the

12 directors of IP Subsidiary were to take direction from Mr.

13 Lumsden.  It says in paragraph number eight that Mr. Lumsden

14 is an officer of the Chancery Court.  He has special

15 authority.  He has, if you will, greater powers and greater

16 jurisdiction than a normal board of directors because of the

17 highly unusual fact situation we found ourselves in.

18        And paragraph 10 I think, as Mr. Johnston pointed

19 out, really really answers the question.  And paragraph 10,

20 from having been involved at the time, was essential to the

21 senior lenders.  It really answered the question about what

22 would happen with respect to the involuntary bankruptcy

23 petition that had been filed, who had jurisdiction to deal

24 with that, who had jurisdiction to consent to a voluntary

25 petition or file voluntary petitions on behalf of the other

60

1  entities.

2          Paragraph 10 of the custodian order says that any

3  actions outside the ordinary course of business by the

4  company or any of its subsidiaries, including IP Subsidiary

5  may be taken by the custodian if either he provided notice

6  which would get the parties involved in that litigation to

7  go into the Chancery Court, or if he obtained the consent of

8  three named individuals, and they are Arthur Petrie, John

9  Rogers, and Alex Hearn.  They are short titled as the

10 directors, and the reason they were short titled as the

11 directors is because at the point in time their status of

12 who were the directors was very much at issue.  These folks

13 were not the directors that were selected by Plainfield.

14 They were not the directors on the existing board.  They

15 were a subset of the people who may have been the directors

16 of the company.  For better or worse, there was great

17 confusion about that issue.  And Vice Chancellor Strine

18 decided that Mr. Lumsden could take actions outside the

19 ordinary course of business if he provided at least three

20 business days notice to these three human beings.

21          That intersected with a corresponding provision of

22 the prior status quo order which in paragraph nine provided

23 that the companies could not file a voluntary petition --

24 actually, I ought to read the exact language.  It said that

25 they could not take actions outside the ordinary course of

61

1 business, the same sort of language we found in paragraph 10

2 of the custodian order.  They could not take any action or

3 engage in any transaction out of the ordinary course of

4 business, including without limitation the dissolution of

5 Solidus or the commencement of a voluntary bankruptcy case

6 under the United States Bankruptcy Code.

7          The intersection of paragraph 10 of the custodian

8 order and paragraph nine of the prior status quo order made

9 it crystal clear, certainly to us, that Mr. Lumsden had

10 authority to act on behalf of any of these entities,

11 including the IP Subsidiary to file a voluntary bankruptcy

12 case, so long as he either provided notice to the parties so

13 that he could argue before the Chancery Court or he obtained

14 the consent of the three named individuals who are short

15 titled the directors, even though they weren't the directors

16 in the more normal sense.

17          In Mr. Lumsden's first day declaration, which is

18 docket number 100, he made -- and we pointed this out in our

19 papers -- he made very clear that he obtained that consent,

20 something that he reiterated in his declaration that was

21 filed in connection with this motion.  But Mr. Lumsden

22 indicated in that declaration that he provided the three

23 business days' notice required by paragraph 10 of the

24 custodian order, and we submit that that really ends the

25 jurisdictional inquiry.  Mr. Lumsden had authority to act on

62

1  behalf of IP Subsidiary, just as he had authority to act on

2  behalf of Solidus and every other Debtor in these cases.

3          That's really the stopping point.  The Court

4  really need not go further, but since a substantial amount

5  of time was spent on it, let me at least spend briefly with

6  the other issues, and that has to do -- jurisdictional

7  issues -- and that has to do with whether or not Whorl had

8  sole rights to vote the stock of IP Subsidiary.  Again, I

9  submit that is totally irrelevant because it didn't vote the

10 stock of IP Subsidiary.  It didn't replace the directors of

11 IP Subsidiary.  They didn't do anything except take an

12 action that was prohibited by the inter-creditor agreement

13 with my clients.  On June 24 they filed a notice that they

14 were accelerating their debt based upon this supposed

15 inability to pay debts as they became due.  That wasn't

16 copied to my clients.  My clients had an inter-creditor

17 agreement with Whorl which prohibited it from taking

18 enforcement actions.  The definition of enforcement action

19 specifically includes in (c) acceleration of the

20 subordinated debt.  Could not be clearer that Whorl cannot

21 take an action to accelerate the subordinated debt while my

22 client's debt was outstanding.  Yet that is the only action

23 that they purported to take.

24          Mr. Bogdanoff argues that the entirety of what's

25 in (c) was granted by a later provision that allowed them to

63

1  take actions under the pledge agreement.

2       At best there's ambiguity, but I think that under

3  a normal reading of the documents, when it is clear and very

4  specific that acceleration of the subordinated debt is

5  prohibited, trying to shoehorn a gutting of the entirety of

6  that by arguing that they could take actions under the

7  pledge agreement and the pledge agreement allowed them to

8  accelerate the subordinated debt violates basic maxims of

9  statutory and contractual interpretation.  But, again, it's

10  only relevant for one issue, and it's circular on that

11  issue.

12       The issue is whether or not Solidus in June of

13  2007 or even a later point in time prior to the filing of

14  the voluntary cases on December 14 was certainly not paying

15  its debts as they become due.  And here's where I part

16  company with Mr. Johnston.  The cases that interpret that

17  sort of language, as Mr. Bogdanoff pointed out, require the

18  Court to look to the totality of the situation, and I have

19  been in cases where we have litigated whether or not an

20  involuntary filed by trade creditors typically for leverage

21  satisfies that standard which is a very subjective and

22  amorphous standard where the Ninth Circuit tells us we have

23  to look at the totality of the situations, whether or not

24  that standard is satisfied, when the lion's share of the

25  corporation's debt is not in payment default.  There's a

64

1 very big distinction and key distinction between payment

2 default and other default where the entities haven't

3 accelerated.

4        Here Solidus had approximately 250 to 300 million

5 dollars of institutional debt, the largest part of it owed

6 to my clients and Mr. Rosen's clients, a substantial portion

7 of it owed to Whorl, and other portions owed to the S and H

8 Noteholders who have had an active part in this case.  My

9 clients very consciously, even though they had defaults and

10 they had the language in their notes just like Whorl cites

11 to about generally not paying their debts as they become

12 due, consciously did not accelerate the debt.  The October

13 2007 notice that Mr. Bogdanoff referred to and that we

14 attached to our papers notified the Debtors, then not

15 bankruptcy Debtors, but notified these entities that they

16 were in default but consciously didn't accelerate, did not

17 try to exercise any remedies it was in notice of default.

18        Whorl was prohibited from accelerating its debt

19 under the form of our inter-creditor agreement, under the

20 terms of our inter-creditor agreement.  S and H didn't

21 accelerate its debt.  If the Court needed to resolve whether

22 or not Solidus and IP -- well, whether or not Solidus was

23 generally paying its debts as they become due as alleged by

24 Whorl, there would be a fairly substantial trial.  That's

25 what would have happened on the involuntary, and we fully

65

1 reserve the right because it's not just Mr. Johnston's

2 question, we fully reserve the right to assert that that was

3 not the case, that Solidus was, when one looks at the

4 totality of the situation, not in payment default on the

5 majority of its debt and, indeed, it's very ironic that Mr.

6 Bogdanoff referred to some December 2006 assertions that

7 Solidus was in default on certain invoices.

8        If we had that sort of trial, we would get into

9 evidence that would demonstrate that some -- from that point

10 forward, Solidus raised substantial additional equity.  It

11 had equity raises all throughout 2006 and, indeed, through a

12 good part of 2007 where its financial condition and its

13 equity or lack of equity was changing over time.  The real

14 point is that generally not paying your debts as they become

15 due is not something that one can simply decide quickly on a

16 motion.  That's why we have trials for involuntary

17 petitions.

18        And we reserved the right then, we reserve the

19 right now that if that were the key issue, we could very

20 well, take the position totally contrary to Mr. Bogdanoff's

21 client.  The point is that one cannot just take at face

22 value their bald assertion that the company was not paying

23 its debts as they became due.  We don't think that's true.

24 But even if they were correct, it's irrelevant for two

25 reasons.  It's irrelevant because even if they were right,

66

1  they didn't purport to remove the board of directors of IP

2  Subsidiary.  And it's secondly irrelevant because even if

3  they had, the custodian order could not be clearer that Mr.

4  Lumsden, notwithstanding more normal corporate governance,

5  was authorized to act on behalf of all these entities, and

6  that's what he did.

7          Second issue is good faith.  Like Mr. Johnston,

8  we're not asserting that Whorl filed its motion to dismiss

9  the IP Subsidiary case in an untimely fashion.  In fact,

10 that never even occurred to me, even though maybe I know

11 what I'm doing, but that one had not occurred to me.  But

12 the substantive argument they make is that it was bad faith

13 for IP Subsidiary to file a bankruptcy proceeding because

14 it's a stand-alone entity, had no creditors until the DIP

15 facility went into place.  And on that issue it's clearly

16 not a two-party dispute, and it is clearly something that

17 your Honor on your Honor's own initiative elicited testimony

18 on and made a number of very explicit findings, and those

19 findings demonstrated that IP Subsidiary is just not a

20 stand-alone entity.  One cannot put on blinders and say this

21 is a little subsidiary that happened to have been owned by

22 Solidus and was totally independent.  It's not.  It owns

23 some intellectual property that obtains a lot of its value

24 from the operations of the other entities.  As your Honor

25 concluded, it gets direct value from the actions of the

67

other entities.  And your Honor made a conclusion that the

IP Subsidiary should appropriately be obligated on the

Debtor in Possession financing the grant liens to secure

that -- that financing, and I would submit it was just not

simply because my clients wanted it that your Honor probed

as to whether or not that was appropriate and concluded it

was appropriate, concluded that these were integrated

entities and made a finding, granted an order that provided

that the IP subsidiary is now obligated on the approximately

$13,000,000 of Debtor in Possession financing.  And at

heart, what Mr. Bogdanoff is trying to do is to undo that

order.  Let's be honest.  That's what this is really about,

and it isn't just an issue between my clients and Mr.

Bogdanoff's clients, because in so doing he is,

understandably, trying to wreak havoc.

        If the motion is granted, the sale of the Paycheck

Secure business can't go forward, and the Paycheck Secure

business largely consists of operations and business assets

that aren't owned by IP Subsidiary.  They're owned by other

Debtors, but in order for that to operate, they need the IP

that is owned by the IP Subsidiary, which once again

illustrates the integrated nature of these companies.

        And if Mr. Bogdanoff succeeds, the estates will be

damaged because the sale that was conducted at the auction

last week can't go forward.  Creditors of all of the

68

1 entities will be harmed.  The bidders who won the auction

2 will be harmed.  My clients will be harmed, but I submit

3 that it's far broader than my clients.  The estates will be

4 harmed.  And, in addition, if Mr. Bogdanoff is successful in

5 dismissing the IP Subsidiary bankruptcy case, not only would

6 we have pure chaos or damage to the overall bankruptcy

7 process, but we would have fascinating issues that I'm going

8 to part company with him very greatly on what the

9 consequences would be.  He argues that if the IP Subsidiary

10 bankruptcy case was dismissed, the Court's order approving

11 the Debtor in Possession financing agreement in effect would

12 be vacated.

13          Paragraph 31 of that order is crystal clear that

14 the Court's order concerning the granting of liens and

15 guarantees against IP Subsidiary and the other provisions of

16 the Debtor in Possession financing will survive dismissal of

17 any of the Chapter 11 cases, conversion of the cases, or

18 granting of the sort of motion Mr. Bogdanoff made, and it's

19 only appropriate because, otherwise, again, no Debtor in

20 Possession financing lender would have any certainty

21 regarding whether or not the protections it afforded were

22 solid, could be reversed by the Bankruptcy Court, and that's

23 why that sort of provision is found in the Debtor in

24 Possession financing order.

25          If Mr. Bogdanoff thinks the Debtor in Possession

69

1   financing order is incorrect or his client does, the right

2   avenue is to appeal, which he's taken, and when we are

3   before the Bankruptcy Appellate Panel, we will point to

4   364(e) and say again the policy is not to undo these sort of

5   orders because, otherwise, no one will ever extend Debtor in

6   Possession financing.

7           That's technically an issue for another day, but I

8   think we have to acknowledge the fact that what Mr.

9   Bogdanoff's client is really trying to do is probably now

10  for the fifth time ask your Honor to reconsider whether or

11  not the IP Subsidiary should guarantee the debt incurred

12  under the Debtor in Possession financing facility, and your

13  Honor has addressed that issue, and at heart that is what

14  this dispute is all about, plus, as Mr. Johnston pointed

15  out, in an effort -- I don't want to impute bad faith or

16  improper motives but in an effort to try to increase the

17  leverage for Whorl in the Chapter 11 cases, but in a fashion

18  that is technically incorrect and would rebound to the

19  detriment of the estates very badly.

20          Thank you, your Honor.

21          THE COURT:  Thank you, Mr. Logan.

22          Mr. Rosen?

23          MR. ROSEN:  Thank you, your Honor.  I'll be brief.

24  I think Mr. Logan and Mr. Johnston covered various

25  independent reasons why the motion should be denied.

70

1  However, I juts wanted to very briefly reiterate the issue

2  with respect to the custodian order and the authority of Mr.

3  Lumsden to fil the petitions.

4          The -- the Delaware Court in crafting an order

5  specifically had a few conditions upon which Mr. Lumsden

6  could take actions outside the ordinary course of business,

7  and it included having the three named individuals who were

8  former directors of Solidus approve as well as Plainfield.

9          The action of the board of directors of Solidus

10  included those three directors.  They authorized Mr. Lumsden

11  to make the filing as did Plainfield consent, and I think --

12  this is at paragraph 10 of the Delaware order, and I think

13  there is probably as far as you have to go.  Mr. Lumsden

14  clearly had the consent, and Mr. Bogdanoff reads into that

15  order an initial hurdle that then has to go to the board of

16  the IP Sub.  But, in fact, there is on requirement that

17  there be some formalistic separate order of the -- excuse me

18  authorization of the board of the IP Sub.  All Mr. Lumsden

19  needed was the authorization of those three people and

20  Plainfield, which he had.  And for that independent reason

21  alone, I think it's clear that there was those

22  authorizations and the motion should be denied.

23          Thank you, your Honor.

24          THE COURT:  Thank you.

25          Mr. Bogdanoff?

71

1          MR. BOGDANOFF:  Thank you, your Honor.

2          First of all, your Honor, the -- Mr. Johnston

3    began by addressing the issue of standing, but he really

4    started with the issue of my client's motives, and my

5    client's motives I think have been -- we've worn them I

6    think on my sleeve on a number of hearings.  Our goal -- our

7    motive here is to enforce our rights, the rights that we

8    bargained for with this Debtor and with the other lenders

9    pursuant to an inter-creditor agreement.  And those rights

10   included the right to enforce the pledge agreement.  And the

11   pledge agreement, as I indicated, contains a very specific

12   demarcation of power with regard to the IP Sub stock that

13   leads up to the point of an event of default and then

14   changes when an event of default occurs.

15          There was nothing done under cover of darkness.

16   There was a notice of default that was sent to the Debtor.

17   In accordance with the noticed provisions of the pledge

18   agreement, the pledge agreement was appended to the

19   subordination agreement.  The notice was given in accordance

20   with its terms.  There's been no contention to the contrary.

21   And to suggest that somehow this is being -- what we're

22   doing was done under cover of darkness, without notice,

23   without adequate notice, that we were kind of laying in the

24   woods is belied by the plain language of the pledge

25   agreement which said certain things happen automatically

72

1 when a default occurs.

2          The default was -- default notice was given many

3 many months ago, was not contested, and I suspect that there

4 were a lot of lawyers on behalf of Solidus and its various

5 affiliates that were very familiar with the terms of the

6 pledge agreement and the rights that my client bargained to

7 obtain.

8          So it is just -- you know, to try to cast

9 aspersions on our motives when all we are doing is asking

10 the Court to enforce our rights as we have been previously

11 before your Honor is just plain wrong.  To suggest that

12 really this is some grandiose effort to "gain leverage" you

13 know, get a leg up over other parties really I think ignores

14 the legal and contractual rights that my client has and is

15 seeking to enforce.

16          With regard to the specific question on standing,

17 your Honor, the -- it is, you know, absolutely we think

18 clear under the law in the Ninth Circuit.  We cited the

19 Hasso v. Mozsgai case.  It's the In Re Sierra Financial

20 Services case, that standing is established where a party

21 has a direct pecuniary interest in the outcome of a

22 proceeding.  That's the general proposition.

23          We've also cited numerous cases applying Section

24 1109 where a creditor -- where the sole basis for asserted

25 standing is the status as a creditor.  Here we're not just a

73

1  creditor appearing before your Honor.  We are the party

2  whose rights were violated.  There can be no more

3  fundamental predicate to standing than that.

4          With regard to the custodian order, I really -- I

5  believe that what has happened is that there has been an

6  effort made well after the fact to manufacture authority for

7  Mr. Lumsden to file the IP Sub bankruptcy from that order

8  when, in fact, what he said in his declaration that Mr.

9  Logan referred to shortly after the filing occurred,

10 actually I believe within moments of the filing, is that the

11 certificate of resolution of Solidus authorized Solidus to

12 consent to the entry of an order for relief and the filing

13 of the voluntary Chapter 11 cases for the Debtors, and I

14 highly suspect that that paragraph was drafted by counsel.

15         So there was -- not only is the resolution

16 consistent with what I've been saying, but Mr. Lumsden's

17 declaration is consistent.  He specifically testifies that

18 it was the board of directors of Solidus that authorized

19 Solidus to consent to the order and the filing of the

20 voluntary cases for the Debtor.

21         The order itself that has been referenced could

22 have declaratively and simply stated that Mr. Lumsden may

23 cause Solidus and its subsidiaries to file bankruptcy cases

24 without the consent of the board of directors.  It didn't

25 say that.  It doesn't say that.

74

1          As I indicated, there was an injunction against
2    the filing of the bankruptcy.  There was a notice provision
3    specified in paragraph 10 that Mr. Lumsden testified on the
4    first day of the case that he complied with, and then he
5    went to the board of directors because it's the board of
6    directors that authorizes a filing, nobody else.

7          The -- we have been contrasted in this regard with
8    Plainfield, and the argument has been made, well, Plainfield
9    did -- you know, attempted to vote put in -- install
10    directors at Solidus, and that is correct, and we did not,
11    and that is correct.

12          But the point is that both the pledge agreement --
13    and we've submitted this to your Honor, the pledge agreement
14    that Plainfield obtained and the pledge agreement that Whorl
15    obtained specifically provides for the automatic vesting of
16    consent and voting rights upon the occurrence of default.
17    It is the exact right that Plainfield asserted.

18          Had the IP Sub board met and gained and authorized
19    a filing, I would not be standing here.  The IP Sub board
20    did not meet, did not convene, and did not authorize a
21    bankruptcy filing.  The only basis for the filing was the
22    actions of Solidus in its capacity as shareholder of the IP
23    Sub.  That's what they said in their resolution.  That's
24    what Mr. Lumsden testified to moments after the filing, and
25    that was something that Solidus was not authorized to do and

75

1  is not authorized to do as we stand here today.

2          So the order that has been bandied about so much

3  by counsel doesn't provide what counsel has been telling

4  you, and the best evidence of that is the very declaration

5  that I suspect was prepared by counsel which says the

6  opposite.

7          With regard to the two cases that Mr. Johnston

8  referred to, the Country Estates Nursing Home case and the

9  Protho Express case, those cases both involved disputes

10 between competing boards of directors and rights of parties

11 to install directors at competing slates through proxies.

12 That's not the issue here.

13         I am not standing here and maintaining to you that

14 Whorl installed directors.  We didn't.  So those cases are

15 not -- are not relevant.

16         Likewise, the suggestion that Mr. Rogers, you

17 know, somehow effectively authorized the filing, your Honor,

18 they've had months and months to convene the board and to

19 try to make some reparative effort, some sort of

20 ratification of this filing by the IP Sub board.  They

21 haven't.  They haven't, and I think I explained to you why I

22 highly suspect that has not occurred and never will.

23         With regard to the question of paying debts

24 generally, Mr. Logan said that, you know, he reserves the

25 right to contest that.  I'm at a loss to understand that.

76

1   We filed a motion which specified the evidentiary basis upon

2   which we maintained that the Debtor was not paying its debts

3   generally as they came due.  The time for objecting to that

4   motion and submitting evidence in accordance with the local

5   rules has passed.  There's no reservation.  There's nothing

6   to reserve at this point.

7           Mr. Johnston indicated that the Debtor has not

8   taken a position on the bald assertion that the Debtor was

9   not paying its debts generally as they came due, and the

10  reason why that you've been told is that, well, Mr. Lumsden

11  wasn't there.  Well, Mr. Lumsden is an accountant, and I

12  think accountants are there through the documents, and I

13  think he is perfectly capable if there was any basis

14  whatsoever to contest that Solidus was not paying its debts

15  generally as they came due, he most assuredly would have

16  presented that testimony as an accountant to your Honor, and

17  it's just disingenuous to suggest that he couldn't because

18  he wasn't there.

19          And I should also point out that his first day

20  declaration talks about a lot of things that proceeded his

21  appointment.

22          With regard to Mr. Logan's comments about the debt

23  and what was due and what was not due, as I indicated and as

24  the plain language of the pledge agreement provides, the

25  question was whether Solidus was generally paid its debts as

77

1   they came due, the debts that came due, and the fact that

2   there was other debt out there that had not come due, the

3   evidence here is clear that there was -- his client did not

4   accelerate the debt so it didn't come due -- is not

5   relevant.  The relevant point is that the Debtor was in

6   gross, gross default on the debts that generally were coming

7   due.  The evidence on this literally is undisputed.

8           With regard to the question of good faith, the

9   suggestion is, as I said, that, you know, we're just trying

10  to reargue the Debtor in Possession financing and this is

11  all about undoing the Debtor in Possession financing.  This

12  is all about undoing something that shouldn't have happened

13  in the first place, and that is a bankruptcy filing for an

14  entity that had no creditors and conducted no operations and

15  that was set up pursuant to an inter-creditor agreement

16  between my client and the lenders with an allocation of

17  priority as between them.  And what we have here is an

18  effort to sidestep that contractual process, not to give my

19  client a leg up but to give them a leg up.  That's really

20  what's happening, and my point is simply let the parties

21  rest on their non-bankruptcy contractual and legal rights

22  and let them have at it.

23          I think it's also interesting, your Honor, for all

24  the talk about the so-called harm that will befall the other

25  estates.  Two points.  First, if there is harm that would

78

1 befall other estates, that is not relevant to this estate.

2 But, secondly, if there was this dramatic harm that was

3 going to befall the estates if you denied this motion,

4 wouldn't the Creditors Committee have weighed in?

5          Yes, a debtor can file -- can file a case and

6 effectuate a Section 363 sale, a debtor, a debtor that

7 belongs in Chapter 11 can do so.  Your Honor, again, these

8 are two separate arguments, but they really do kind of go

9 together.

10          There was a bundle of rights that my client

11 bargained for that it seeks to enforce, and those rights

12 resulted in an entity that didn't just sort of appear by

13 happenstance.  It's an entity that appeared in a very

14 specific form, with no creditors, with a pledge, with an

15 inter-creditor agreement between two stakeholders conducting

16 no operations, and now we find it in bankruptcy, and we're

17 now in the verge of a request by that Debtor and the other

18 Debtors to strip it of its assets under the auspices of

19 Chapter 11.  Two arguments, as I said, I think they made in

20 the same direction that this case does not belong in Chapter

21 11, shouldn't have been filed, and the Court should dismiss

22 it.

23          Thank you, your Honor.

24          THE COURT:  Thank you.

25          Anything further?  Mr. Logan?

79

1          MR. LOGAN:  Your Honor, I'll be very brief, in a

2  part because what I'm going to say is going to deal with

3  issues that I think are really really secondary with one

4  exception.  The one exception is following the contours of

5  paragraph 10 of the custodian order.  And in paragraph 10 of

6  Mr. Lumsden's first day declaration, docket number 100, he

7  testified that he followed that.  He followed that with

8  respect, among other things, to authorization of the Debtor

9  in Possession financing.

10          We had exactly the same sort of issue in closing

11  the Debtor in Possession financing agreement as to whether

12  or not we required resolutions of boards of directors and

13  concluded we didn't.  It wasn't clear that there were boards

14  of directors at the time that this happened, and the

15  custodian order was very clear in paragraph 10 that Mr.

16  Lumsden, once he followed the process outlined in paragraph

17  10 of providing notice, could act on behalf of all these

18  entities, and I think that really starts and ends the

19  inquiry.

20          And it's with some trepidation I'm going to spend

21  a few minutes, just a few minutes talking about things that

22  really aren't necessary for the Court to address, and that

23  has to do with whether or not the Debtor, Solidus, was

24  generally paying its debts as they became due.  Mr.

25  Bogdanoff made references to submitting evidence and the

80

1 like.  If that were the issue that was relevant, we'd have a

2 trial.  We wouldn't have a motion.  We would have live

3 witnesses.  It would be substantial evidence submitted and

4 introduced before the Court, getting into issues that would

5 be fascinating but really are irrelevant, which is why we

6 didn't load up the record with a lot of contrary evidence.

7         And on the legal principle that Mr. Bogdanoff

8 articulated, I'm going to part company with him very

9 severely, and I think just an example would illustrate the

10 reason why his argument doesn't hold water.  His basic

11 premise is that the only question is is the Debtor paying

12 the small universe if it's small of debts that are presently

13 due.  And if one buys that argument, a Debtor would be

14 subject to an involuntary bankruptcy petition if it missed

15 one invoice, if that was the only invoice that was due on

16 the date.

17         That's not the standard.  The Ninth Circuit says

18 one looks to the totality of the circumstances, and I

19 certainly have litigated this in connection with

20 involuntaries that were filed in an effort to delay a

21 prepackaged bankruptcy filing, for example, and there the

22 Courts that have endorsed the totality of the circumstances

23 work very strongly and give substantial weight to what the

24 major institutional creditors in a case have done, and if

25 they have the right to accelerate but they haven't

81

1  accelerated, that is a very telling point.  So I think if

2  one were to get into this issue which is irrelevant, the

3  fact that my clients consciously did not decide to

4  accelerate their debt, the fact that if Whorl accelerated it

5  would be circular because the only basis they cited for

6  accelerating their debt was the company was generally not

7  paying their debts as they become due, and that's only true

8  if folks like Whorl could accelerate, and in addition, that

9  would have violated the very express terms of the

10 subordination agreement with my client, and, further, that S

11 and H did not accelerate.

12        But, again, your Honor, I think all of that is

13 irrelevant, which is why I was hesitant to stand up in the

14 first place because the central issue is answered by the

15 custodian order.  Mr. Lumsden had authority to act on behalf

16 of these Debtors, including the IP Subsidiary, and it's

17 telling that your Honor also endorsed that in each one of

18 the DIP orders.  There's a provision, an order -- order and

19 paragraph that says Mr. Lumsden is designated as chief

20 restructuring officer for each of the Debtors, including IP

21 Subsidiary.  He is a person that was selected by the

22 Chancery Court proceeding.  We had a highly unusual

23 corporate governance system.  There's no question about

24 that, and that highly unusual corporate governance system

25 that was adjudicated before the Chancery Court pursuant to

82

1   your Honor's order granting relief from the automatic stay

2   to let the Court with particular expertise about Delaware

3   Corporate law answers the question here, and in that respect

4   the Chancery Court order granted Mr. Lumsden to take certain

5   actions on behalf of the company, including actions outside

6   the ordinary course, as long as he provided notice to three

7   named individuals.  The record is clear that he gave that

8   notice.  That's the only question that should be before the

9   Court today.

10              Thank you.

11              THE COURT:  Thank you, Mr. Logan.

12              MR. BOGDANOFF:  Your Honor, may I briefly respond

13  to that?

14              THE COURT:  Sure.

15              MR. BOGDANOFF:  Thank you.

16              THE COURT:  You're the movant.  You get the last

17  word.

18              MR. BOGDANOFF:  Okay.

19              THE COURT:  Whenever that might come.

20              MR. BOGDANOFF:  Yeah.  Okay.  Let's try to make

21  this quick.  You just heard for the first time -- I've never

22  heard this -- that, well, the IP Sub board may not have

23  existed and the lenders, therefore, determined that they

24  could proceed with the DIP financing without it based upon a

25  Bankruptcy Court order.

83

1          That's the first time I've heard the suggestion

2    that the reason why they don't have a board resolution of

3    the IP Sub board is that maybe the board didn't exist.

4    That's the first time that that's been suggested.  And,

5    actually, if it's true -- I don't know if it's true -- if it

6    is true, I think it explains partially why the Debtor did

7    what it did in purporting to act but through the Solidus

8    board to authorize the filing of the IP Sub and serves only

9    to highlight the inappropriateness of its effort to act in

10   that fashion.

11         With regard to the paying of debts as they came

12   due, the notion that there was a small universe of debts

13   that were not due when this event of default occurred is

14   virtually absurd based upon the documentary evidence that we

15   have submitted from a board presentation made that's been

16   submitted into evidence and the progression of failure to

17   pay debt as it came due.  It wasn't just a few debts.  It

18   was not only employees -- not only cycle after cycle of

19   payrolls, but virtually every trade payable was in default,

20   and that number accelerated as the time progressed.

21         With regard to the DIP financing order and it

22   indicating that Mr. Lumsden is authorized to execute the DIP

23   agreement, to implement the DIP agreement, again, that all

24   presupposes that Mr. -- that the IP Sub which was made a

25   party to the DIP financing order and is presently a Debtor

84

1  in Possession should be, and it shouldn't.

2           Thank you, your Honor.

3           THE COURT:  Mr. Johnston?

4           MR. JOHNSTON:  I have no argument, your Honor.  I

5  just wanted to make sure that the record is clear Mr.

6  Lumsden's declaration in support of our objection to the

7  motion at paragraph six indicates that John Rogers was the

8  sole director of IP Sub as of December 14th, 2007.  So the

9  lender speculations notwithstanding, it's the Debtor's

10 position that IP Sub did have a board of directors

11 consisting of a single person on the petition date.

12          MR. LOGAN:  And I'll really be quick.  Your Honor,

13 if I said it, I didn't mean -- I don't think I said that the

14 lenders took the position there was no board of IP

15 Subsidiary.  That's not the issue.  The custodian order

16 provided an override of normal corporate governance and

17 authorized Mr. Lumsden to sign the DIP agreement.

18 Independent of what the DIP order said, the custodian order

19 said that he could take all actions outside the ordinary

20 course of business on behalf of all of these entities as

21 long as he gave three days' notice to three named

22 individuals.

23          He did.  There was an IP Subsidiary board, that's

24 right.  But the custodian order made it very clear that he

25 could execute the DIP agreement without a board resolution

85

 1 from the IP Subsidiary just as it made it very clear that he

 2 could file a voluntary bankruptcy for the IP Subsidiary

 3 without a board resolution of the board of IP Subsidiary.

 4 Just a clarification.

 5         MR. BOGDANOFF:  And I will get the last word,

 6 maybe, maybe on this round.

 7         Your Honor, as many times as they say it, the

 8 Delaware order did not provide that Mr. Lumsden could file a

 9 bankruptcy without going to the board of directors, which is

10 exactly what he did.  I keep saying it over and over again,

11 but being the fine lawyers that I know they are, had -- had

12 they wished to make that clear, they would have provided for

13 it in the order, and it doesn't say that, and they didn't

14 act as if it said that.

15         THE COURT:  Thank you, Mr. Bogdanoff.

16         Well, I've -- I made substantial notes as I read

17 the extensive papers that I received on this motion by both

18 sides, and I'm struck a little by the fact that today's

19 argument seems to come down to issues as framed by Mr.

20 Bogdanoff at the outset of today's hearing and responses

21 that were directed to that, and it seems -- I don't know

22 whether anybody intended to deviate from the arguments made

23 in their papers.  I don't think Mr. Bogdanoff has.  I think

24 perhaps the lenders have deviated a bit, but maybe only to

25 the extent they felt it was necessary to speak today.

86

1        Having said that, it seems to me that what we have
2 in the evidence on this motion is a conclusory June 27
3 letter from Whorl declaring a default, no further action on
4 Whorl's part until late October, no action on Whorl's part
5 to replace the board or take any action in pursuit of its
6 asserted rights under the pledge.

7        And then we got into the Plainfield Rogers or
8 Plainfield Solidus lawsuit in the Delaware Chancery Court
9 and the involuntary bankruptcy proceeding here on I guess
10 Solidus and voluntary by Mr. Rogers with the relief from
11 stay motion in which the matter of who was in charge was --
12 went back to the Delaware Chancery Court, and it seems to me
13 that between the status quo order which was the first order
14 issued restricting conduct on the part of Solidus and Rogers
15 and other people at Solidus, after relief from stay we have
16 the custodian order which quite clearly vests in Mr. Lumsden
17 all authority with respect to Solidus and its affiliates and
18 subsidiaries which are thereafter referred to throughout the
19 custodian order under the term "the company."

20        It seems to me that the resolution filed in
21 connection with the Solidus decision to consent to the
22 conversion of this case to a voluntary Chapter 11 was
23 consistent with the custodian order.  It seems to me that
24 the Solidus decision -- the Lumsden decision to file
25 voluntary petitions on behalf of IP Sub and the other

87

1    affiliates, subsidiaries, were all consistent with the

2    Delaware Court order and/or a recognition of or compatible

3    with Mr. Lumsden's authority under that order to act on

4    notice or with the approval of two out of three members of

5    the board and that so far as the record here shows, he did

6    so.

7            So it seems to me that while I suppose that the

8    papers talk about many technical failures under what are a

9    series of rather complex agreements between a number of

10   parties, I would say we have here anything but simply a two-

11   party dispute.  We have at least three different kinds of

12   parties, lenders, Debtors, and Whorl at a minimum.  It seems

13   to me this case -- these cases were filed in good faith.

14   The case law talks about many kinds of problems that lead to

15   a dispute over good faith and the cases talk about cases

16   that come out both ways.

17           As a bankruptcy judge, it's probably true that

18   more Chapter 11 cases that I see get dismissed somewhere

19   along the line because they're not going anywhere.  But this

20   case, it seems to me, is very different from a case that I

21   would consider dismissing on bad faith grounds or lack of

22   good faith grounds because it seems to me that from day one,

23   as an involuntary, that there were important issues that

24   were presented by the parties and that those issues have

25   evolved into our present situation with a number of

88

1  voluntary Chapter 11 cases, all designed to either keep the

2  Solidus entities afloat or to find a better solution as

3  promptly as possible to preserve the maximum value for all

4  concerned.

5          It seems to me that those two matters, the -- Mr.

6  Lumsden's authority and the substantial substantive

7  bankruptcy purposes that are being pursued in these cases is

8  conclusive that the Whorl motion should be denied today.

9          I suppose at the same time it seems that given the

10 nature of the agreements, given the nature of the

11 investment, that the disputes will probably never end until

12 there is a trial somewhere down the line to sort out some of

13 the rights that have been asserted here and some of the

14 claims of wrongdoing can be tried and resolved in a full

15 evidentiary hearing.

16         So I think that's all I'm going to say on this

17 matter at this point except that I guess it's unusual.  This

18 is the first motion that's come on full notice, and that's

19 -- I thought that would be -- give me a breather, but it did

20 not.

21         So it is now 10 minutes to 12:00, and I wonder,

22 I'm -- I'm prepared to sit here probably longer than anybody

23 else is because this is my home, but would you folks like to

24 take a break?

25         MR. JOHNSTON:  I think that makes sense, your

89

1  Honor.

2          THE COURT:  Okay.  When would you like to come

3  back?

4          MR. JOHNSTON:  1:00 o'clock.

5          THE COURT:  Okay.

6          MR. JOHNSTON:  Take a lunch break.

7          THE COURT:  1:00 o'clock, 1:00 o'clock it is.

8          MR. JOHNSTON:  And, your Honor, with respect to

9  Whorl, what I would propose to do is just lodge an order

10 indicating that the motion is denied for the reasons set

11 forth on the record today.

12         THE COURT:  Yes.  I would like to add one thing to

13 my reasons with respect to the denial of Whorl's motion, and

14 that is that my ruling, although it is an attempt to address

15 the specific issues that are presented by the Whorl motion,

16 my conclusions are really broader than that in that they

17 reflect my history in this case from October when I first

18 saw it as an involuntary, and with the concern expressed

19 about the Delaware proceeding.  So it seems to me that there

20 has been a continuum of action on Solidus' part followed by

21 Plainfield and Oz Master and Denarius and then with the

22 entry into the case of Mr. Lumsden that has given a focus

23 and the control and action on the Debtor's part that seems

24 to me to be productive action.  At least it's leading

25 towards the possibility of some better outcomes than the

90

1  alternatives.

2         I'll see you at 1:00 o'clock.

3      (Proceedings recessed to reconvene.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

<u>AFTERNOON SESSION</u>

--oOo--

THE COURT:  Mr. Johnston.

MR. JOHNSTON:  Thank you, your Honor.  Thank you for the break.

The next item on the agenda for the day is the motion to approve the sale of the Debtor's Paycheck Secure assets.  This is a business that consists of the assets of Debtor Pay By Touch Check Cashing and some of the assets of Debtor Pay By Touch Checking Resources or IP Sub as we've discussed today that are used in cashing checks and related enterprises.

Basically what Paycheck Secure does is it tracks an individual's check cashing activity by his or her fingerprints, which enables the check cashing merchant to assess the trustworthiness of the check cashing transaction. The system has been shown to reduce fraud by as much as 90 percent, and it also significantly improves the speed and efficiency of Check Cashing transactions.  It's currently installed in more than 2000 merchant locations across the country.

As we discussed at the hearing to approve bidding procedures, the Debtors have marketed their Paycheck Secure business since December of last year.  They developed and prepared a 29-page confidential information memorandum

92

1 regarding the business, formally contacted over 18 potential

2 strategic and financial buyers, 15 of whom executed

3 confidentiality agreements and received the confidential due

4 diligence materials.  The Debtors established the data room

5 from which interested parties could conduct due diligence,

6 and they had one-on-one due diligence discussions with

7 various interested parties.

8          The Debtors, however, did not receive satisfactory

9 proposals in their initial marketing phase.  As a result,

10 they determined that the value of the Paycheck Secure assets

11 under the circumstances would be maximized by proceeding to

12 a sale conducted by auction without a designated lead or

13 stocking horse bidder.

14          Your Honor approved bidding and sale procedures to

15 that effect, and the Debtors gave notice in the manner

16 approved in the sale procedures order, among other things,

17 as reflected in the proofs of service and proofs of

18 publication now on file.  The Debtors served a complete

19 package of materials consisting of the sale motion, notice

20 of the hearing and bidding procedures, the sale procedures

21 order, and a copy of the bidding procedures on the special

22 notice list and other parties required to be served by the

23 Court's prior order limiting notice.  They served a notice

24 of the sale and auction on all of the known creditors of

25 Debtor Pay By Touch Check Cashing and Debtor Pay By Touch

93

1  Checking Resources, although, as we talked about earlier, we

2  don't believe there are any, but we did file -- we did serve

3  the notice on everybody who had even filed a proof of claim

4  in those cases, even though the proofs of claim appear to be

5  asserted against other Debtors.

6        The Debtors published a notice in the <u>Wall Street</u>

7  <u>Journal</u> and in the online trade publication called Card

8  Forum.com, and they served a notice on the several parties

9  to contracts that would be assumed and assigned to the buyer

10 in connection with the sale, with notification of proposed

11 cure amounts for the contracts.

12       February 19th, last Tuesday, was the deadline

13 under the bidding procedures for the submission of bids.  On

14 that day the Debtors received two bids.  One was from an

15 entity called Remit Gate, LLC, which made an offer to

16 purchase the Paycheck Secure assets for $3,000,000 in cash.

17 The Remit Gate bid was accompanied by a deposit of $150,000,

18 a marked asset purchase agreement, and evidence of financial

19 commitment to purchase the assets, including a brokerage

20 account statement from one of the buyers.

21       The other bid was from Phoenix Check Cashing,

22 Inc., which submitted an offer to purchase the assets for

23 $2.5 million in cash plus a $500,000 note payable in 120

24 days after closing with security of the business's accounts

25 receivable plus a $500,000 unsecured note payable on 120

94

1 days after closing with adjustments based on performance of

2 the business.  The Phoenix bid was also accompanied by a

3 marked asset purchase agreement and a deposit of $150,000.

4          Last Friday, February 22nd, the Debtors conducted

5 the auction for the business.  Both Remit Gate and Phoenix

6 participated, and the auction was transcribed by a court

7 reporter.  A full transcript of the auction is attached as

8 Exhibit 1 to the declaration of Mr. Lumsden which we filed

9 this morning.

10          At the outset of the auction, the Debtors advised

11 the bidders of the manner in which the auction would be

12 conducted and the ground rules.  We then went off the record

13 and spent a number of hours separately with each bidder

14 going over the terms and conditions of their proposed asset

15 purchase agreement and the accompanying schedules, and we

16 ultimately reached agreement on the forms of asset purchase

17 agreement that were acceptable to each bidder and that

18 served as the template on which the bids at the auction

19 would be made.

20          Mr. Klausner and Ms. Rinehart participated in the

21 process on behalf of the Creditors Committee and the Oz

22 Denarius lenders respectively.

23          Just after 6:00 p.m., we went back on the record

24 and opened the bidding at $3,000,000 in cash, with bid

25 increments of $100,000.  Ultimately, after 12 rounds of

95

1  bidding, sometime after 9:00 p.m., Phoenix prevailed with a

2  winning bid of $4.2 million in cash, and Remit Gate was

3  selected and agreed to be the backup bidder at $4.1 million

4  in cash.

5        We spent the weekend finalizing the Phoenix asset

6  purchase agreement.  There are still a few T's to cross and

7  I's to dot.  We intend to submit that agreement either today

8  or later tomorrow morning.  In addition to that

9  documentation, we filed declarations of Mr. Lumsden

10 regarding the conduct of the auction and of various

11 representatives of Phoenix to establish adequate assurance

12 of future performance and the good-faith nature of the

13 negotiations.

14        On that latter point, the declarations filed

15 disclose that Phoenix management and/or investor group

16 include current members of the management team of Paycheck

17 Secure, specifically George Rice, who is the general manager

18 of Pay By Touch Check Cashing, Inc. and John McNally, the

19 vice president of Information Technology of Pay By Touch

20 Check Cashing, Inc.

21        The Phoenix group also includes -- and this is

22 disclosed -- John Dorsey, who's a former vice president of

23 Solidus Networks.  His employment concluded I believe in

24 June of 2007.  We believe and Mr. Lumsden has declared that

25 despite those connections, the negotiations with Phoenix

96

1  were at arm's length and, in fact, they were occasionally

2  quite adversarial.  The arm's-length nature of the

3  negotiations and ultimately the result in the case were

4  facilitated by the involvement of counsel for the Creditors

5  Committee and the lenders as well as the highly competitive

6  bid made by Remit Gate which is an entity with no

7  affiliations or relationships with the Debtors and the open

8  auction process run for the assets.

9          Ultimately, your Honor, we believe that the record

10 establishes and it is the Debtor's business judgment that

11 the asset purchase agreement and the purchase price agreed

12 upon with Phoenix represents the highest and best value for

13 the estates for these assets, those assets that comprise the

14 Paycheck Secure business.

15          There were a number of objections filed, your

16 Honor, and I think all have been resolved with the exception

17 of the objection filed by Whorl.  First, Verizon Business

18 Global filed an objection.  Verizon is a potential contract

19 counter-party with some of the contracts that may have been

20 assumed and assigned in connection with the sale.  We have

21 informed Verizon that none of its contracts are to be

22 assumed and assigned in connection with this sale, that

23 they'll be removed from the schedules to the asset purchase

24 agreement, and Verizon, thus, has no objection.

25          Similarly, Monroe Parkway, LLC was a -- is a party

97

1   to a contract that the Debtors initially proposed to assume

2   and assign in connection with the sale.  We've informed

3   Monroe that we no longer seek to assume and assign its

4   contract pursuant to this sale.

5           Cogent Systems objected.  It was in the same

6   position, potentially a party to a contract that may have

7   been assumed and assigned in connection with the sale.

8   We've informed Cogent that its contract is not part of this

9   sale and we do not seek to assume and assign it through this

10  sale.  And, finally, oracle also a party to a contract that

11  may have been assumed and assigned in connection with a

12  sale, we no longer seek to assume and assign any contract

13  with Oracle pursuant to the sale, and I misspoke.  There's

14  one other one besides Whorl.  There was an objection filed

15  by Capital Retail Solutions.  It is a party to a contract

16  that, in fact, we do seek to assume and assign.  Capital

17  Retail Solutions' sole objection to the sale was its cure

18  amount.  We had listed a cure amount of $36,827.57, and

19  Capital Retail claimed a cure amount of $183,697.67.  Their

20  counsel was here earlier today and over the break I informed

21  them that the Debtors are still looking at the cure amount

22  issue.  We have agreed to escrow the full amount of the

23  asserted cure which is $183,697.67, and to the extent we

24  can't get a resolution consensually on what the appropriate

25  amount of the cure is, we will notice up a hearing by motion

98

1  for a determination before the Court, and with that Capital

2  Retail Solutions had no objections to the sale proceeding.

3          That brings me to the Whorl objection.  Whorl's

4  first objection was a lack of jurisdiction on the grounds

5  that IP Sub is not properly a Debtor in the bankruptcy case,

6  and we've covered that ground this morning, and I won't

7  revisit it.  IP Sub is properly a Debtor in the bankruptcy

8  case and appropriately seeks to sell its assets pursuant to

9  Section 363.

10          Next, IP Sub argues that there's no benefit to the

11  estate of IP Sub -- excuse me -- Whorl argues that there's

12  no benefit to the estate of IP Sub because the sale will

13  either inure to the benefit of Whorl or the secured lenders.

14  This is the two-party dispute argument.  I see that as

15  largely or completely an attempt to fight over the proceeds

16  of the sale here.  What we've agreed to do, and this is set

17  forth in our moving papers in the proposed form of order, is

18  to escrow the proceeds of sale.  These proceeds will not go

19  to the lenders absent a further order of the Court.  So

20  there's no prejudice in that regard.

21          Whorl next objected to any attempt by the lenders

22  to credit bid for the assets of IP Sub, and the lenders did

23  not attempt to credit bid for the assets of IP Sub.  Whorl

24  also objected to the proposed assumption and assignment of

25  the lease for the Herndon premises.  That was the same issue

99

1  raised by the Monroe Parkway contract counter-party.  As I

2  indicated earlier, the Debtors no longer seek to assume and

3  assign that lease in connection with the sale.

4       Those were the four objections raised in Whorl's

5  substantive objection.  It also filed a supplemental

6  objection where it indicated that it did not know the

7  identities of the bidders at issue, that it reserved its

8  rights to question the good faith of any prevailing bidder.

9  So I don't know if Whorl intends to continue to pursue that

10 objection or not.

11      With that, that was my presentation on the sale.

12 We do think it was a tremendous outcome for the estate.  The

13 bidding increased the price from $3,000,000 to $4.2 million.

14      THE COURT:  Thank you, Mr. Johnston.

15      MR. JOHNSTON:  Thank you.

16      THE COURT:  Mr. Stern?

17      MR. STERN:  Thank you, your Honor.  David Stern,

18 Klee, Tuchin, Bogdanoff and Stern on behalf of Whorl.  In

19 response to Mr. Johnston's last question, the answer is,

20 yes, we do intend to pursue it.  We were handed, as I

21 believe your Honor was earlier today some declarations.  We

22 believe that those declarations can properly support perhaps

23 the initial direct testimony subject to objection but that

24 any of those people whose testimony is being offered by

25 declaration as their -- in effect as their direct testimony

100

1  should be available for cross examination, and we would

2  propose to proceed with cross examination of the witnesses

3  that the Debtor wishes to put forward in support of its good

4  faith determination.

5          We would like to request that in accordance with

6  Federal Rule of Evidence 615 that all witnesses other than

7  that one who is testifying be excluded from the Court during

8  the course of the testimony of any witness and that there

9  also be an ancillary order from your Honor prohibiting the

10 conferring with any witness during the course of his or her

11 testimony, again, until that testimony is concluded.

12 Obviously we want to avoid, you know, coaching during breaks

13 and things like that, and, finally, that we would ask that

14 no one be permitted to discuss with any excluded witness the

15 testimony of any other witness until that witness has

16 actually testified because otherwise, you're just, you know,

17 opening the back windows while you're closing the door, and

18 you want to avoid that.

19         So, with that, we would simply ask that the Debtor

20 put on what proof it wants to put on.  We would ask that any

21 witnesses be excluded other than the one testifying and go

22 forward from there.

23         THE COURT:  All right.  And I will make a

24 preliminary order as you've requested, Mr. Stern.

25         MR. STERN:  Thank you, your Honor.

101

1        MR. DAVIDOFF:  Good afternoon, your Honor.  Brian

2   Davidoff, Rutter, Hobbs and Davidoff appearing on behalf of

3   Phoenix Check Cashing, the successful bidder.  Your Honor I

4   take it has seen the declarations that have been filed.  I

5   don't know if your Honor's seen them.  In any event --

6        THE COURT:  I have, but I read a lot of stuff this

7   morning.

8        MR. DAVIDOFF:  I'm sure you have, your Honor.

9        THE COURT:  So you're going to have to remind me

10  or I need a minute to put my papers together so I can follow

11  where you're going.

12        MR. DAVIDOFF:  I do agree that the declaration

13  should be regarded as the testimony in chief, at least on

14  this issue.  I do want the Court to be aware that there are

15  of the declarations filed, Mr. McNally is one of the

16  gentlemen who's filed declarations.  He is present in court

17  here today as is Mr. Wallace.  Mr. McNally is a member of

18  the management team of the Pay By Touch division of Solidus

19  who can address the issue of the good faith.  Mr. Wallace is

20  more from an investment side.  I'm not sure whether the

21  intention is to examine him as well.  He doesn't directly

22  tie into the good faith issue.

23        The other gentleman whose declarations have been

24  filed, they're in Virginia.  They were here on Friday for

25  the -- for the auction, but they had to go back, and they

102

1  are in Virginia.  To the extent that the Court is going to

2  require their testimony, I would ask that there be a short

3  adjournment so that their testimony can be taken, but I'm

4  hopeful that after listening to Mr. McNally that that won't

5  be necessary.

6          THE COURT:  Okay.

7          MR. STERN:  Your Honor, just so it's clear then,

8  we -- it appears that there were three declarations that

9  were presented to you of witnesses who are not available

10  today, Valentine, Dorsey and Rice.  Is that correct, Mr.

11  Davidoff?

12          MR. DAVIDOFF:  That's correct.

13          MR. STERN:  I would ask that those declarations

14  then not be admitted at this point.  Obviously if this

15  proceeding is adjourned and reconvened, we'll deal with it

16  then, but I would ask that they not be admitted at this

17  point.

18          MR. DAVIDOFF:  Your Honor, I think counsel's --

19  the procedure under the Local Rule is that if live testimony

20  is going to be taken, the Court may adjourn the hearing for

21  the purposes of admitting live testimony.  Normally these

22  things are done on declaration evidence.

23          THE COURT:  And normally when we call for live

24  testimony, notice is required.  Here the time was short.  I

25  can appreciate that the request is made appropriately, but

103

1  time is short, and now the witnesses are in Virginia.  So I

2  think we have to look for some alternate means of dealing

3  with that, and I'm not sure that I would exclude the

4  declarations because there's nothing improper about them.

5  It's just that they are received subject to cross

6  examination.

7         MR. STERN:  I'd only point out that we did file

8  supplement last week prior to the auction indicating that we

9  did want to examine any witnesses who were being -- who were

10 going to be offered on the issue of good faith.  I can't say

11 we served Mr. Davidoff.  I don't know that we even knew he

12 was in the case at that point, but we did serve the parties.

13 I believe Mr. Johnston would undoubtedly confirm that he

14 received that particular document.

15        It appears that those people were here on Friday.

16 They could choose to go back to Virginia.  That's their

17 business.  They will decide what to do with their own time.

18 I would just simply say that we did everything we could do

19 to make sure that anyone who's going to be testifying here

20 today whether via declaration or live would be, in fact,

21 here for cross examination, and I -- again, I'm not going to

22 try to explain why they're not here, and they may have good

23 and sufficient reasons, but I don't think your Honor should

24 consider that testimony absent an opportunity for cross

25 examination.

104

1            THE COURT:  Okay.

2            MR. JOHNSTON:  And what I would suggest, your

3   Honor, we do is that Whorl be given the opportunity to cross

4   examine those declarants who are here today to the extent it

5   sees fit.  The other declarants who are not present in the

6   courtroom today very well may be available by telephone.  I

7   don't know if your Honor ever takes testimony by telephone.

8   That could be set up either for this afternoon or for the

9   coming days.  I would also --

10           THE COURT:  Let me stop you on that.  I haven't to

11  date, but I'm amenable to considering it.  So that's a

12  possibility.  We could also do it by video with a little bit

13  of logistics -- time out for logistics.  We can't do it in

14  this courtroom, but there's another courtroom where we can.

15           MR. JOHNSTON:  And it also may be that your Honor

16  concludes after hearing the testimony from the witnesses who

17  are here today that the additional evidence set forth in the

18  declarations of the witnesses who are not here is largely

19  superfluous and not necessary for you to rule upon the

20  motion.

21           THE COURT:  Yeah.  I agree with what you had to

22  say, Mr. Johnston, and I don't disagree with what Mr. Stern

23  has to say.  So what I would suggest is we proceed and do

24  what we can today.

25           MR. STERN:  No objection to that, your Honor.

105

1        THE COURT:  Okay.  But I do want to get my papers

2   in front of me.

3        MR. STERN:  Might I just inquire from Mr. Johnston

4   who the first witness is going to be?

5        THE COURT:  Sure.

6        MR. JOHNSTON:  Well, what I'm going to do is I'm

7   -- the three declarations that we have in support of the

8   sale with declarants who are present are Mr. Lumsden, Mr.

9   McNally, and Mr. Wallace.  We will submit those declarations

10  as the direct testimony of the three witnesses.  Should

11  Whorl seek to cross any of them, you may do so in the order

12  you see fit.

13       MR. STERN:  Okay.  We'll let your Honor get the

14  material in front of you, and we'll go from there.

15       THE COURT:  I thought I had this all neatly

16  arranged, but I don't seem to find it.

17       MR. JOHNSTON:  We do have an extra set of those

18  declarations, your Honor, if you --

19       THE COURT:  That would help me right now as a

20  temporary matter.

21       MR. STERN:  Just so you can look at the ones that

22  are -- that are pertinent in the order if you want to do

23  that, they offer them in sort of -- three names in an order,

24  and I'm probably going to take them in that order.  I'll do

25  Lumsden first, McNally second, and Wallace third.  So

106

1 Wallace and McNally can know that they're going to have to

2 leave the courtroom once Lumsden takes the stand, and your

3 Honor will know as well.

4          THE COURT:  Okay.

5          MR. JOHNSTON:  Are you ready to proceed?

6          THE COURT:  I'm ready.

7          MR. JOHNSTON:  Okay.  We would call Thomas

8 Lumsden.

9          THOMAS LUMSDEN - DEBTOR'S WITNESS - SWORN

10          THE CLERK:  Please be seated.  State your name for

11 the record.

12          THE WITNESS:  My name is Thomas Lumsden.

13                    CROSS EXAMINATION

14 BY MR. STERN:

15 Q    Good afternoon, Mr. Lumsden.  I'm David Stern.  How are

16 you?

17 A    Good afternoon.

18 Q    I'm going to be asking you some questions on behalf of

19 Whorl, and if I'm unclear at any point, please clarify for

20 me, and I will try to be as clear as I can be.

21     With respect to the sale of assets that is at issue

22 here today, are you familiar with the assets that are being

23 sold?

24 A    Reasonably so, yes.

25 Q    Can you briefly describe what assets are being sold or

107

1  proposed to be sold to the successful bidder, Phoenix Check

2  Cashing?

3  A    The assets represent the tangible and intangible assets

4  associated with the business known as Paycheck -- Paycheck

5  Secure, essentially is a check cashing business which

6  utilizes biometric authentication with computer terminals in

7  -- at one point it was over 2,000 locations.  It may be

8  around 1500 locations at this time as best I can determine,

9  and it also includes -- and that -- those assets are owned

10  by the Debtor, Pay By Touch Check Cashing, Inc., and also we

11  would transfer and license some technology specifically

12  related to the check cashing business that is owned by Pay

13  By Touch Checking Resources, Inc.

14  Q    Pay By Check Resources -- Check Resources, Inc. -- I'll

15  get that out yet.  Pay By Touch Check Resources, Inc. is the

16  one that we've also referred to as IP Sub, correct?

17  A    Well, it's actually the name is Pay By Touch Checking

18  Resources, Inc.

19  Q    Checking Resources.

20  A    And an earlier hearing there was a reference to IP Sub,

21  although Solidus has a number of IP Subs.

22  Q    I'll refer to that one as Resources.  I think that's

23  probably easier, isn't it?

24  A    That's how we usually try to define it ourselves.

25  Q    What assets of resources are being sold?

108

1  A    Well, there is a transfer of one patent issued, and I

2  think it's six other -- one patent issued and four

3  applications for patents issued and then a license for two

4  other patents that are applications.

5  Q    And that's what -- in terms of resources, those are the

6  assets that are proposed to be sold to Phoenix, correct?

7  A    Either sold or licensed to Phoenix Check Cashing, Inc.

8  Q    Are they going to be licensed or -- I'm sorry.  You

9  indicated there's a patent, four applications and two

10 licenses, right?

11 A    Yes, that's my recollection.

12 Q    Is the patent being proposed to be sold to Phoenix?

13 A    I believe it's to be transferred, yes.

14 Q    Okay.  Transferred and sold, are we talking about the

15 same thing?  I want to make sure.  I'm not a patent lawyer.

16 A    Neither am I.

17 Q    So but in your understanding, it's being transferred

18 outright.  No rights are being retained by Resources after

19 it's being transferred, right?

20 A    That's my understanding.

21 Q    Okay.  The four applications, are those being

22 transferred outright?

23 A    Yes, that's my understanding.

24 Q    Okay.  Two licenses, are those being transferred

25 outright?

109

1   A    I think they're just going to be licensed.

2   Q    So the licenses are being sublicensed in some fashion?

3   Is that what you're saying?

4   A    I believe so, yeah.

5   Q    So Resources is going to continue to hold the license,

6   those two licenses, but it's going to sublicense them in

7   some fashion to Phoenix, is that correct?

8   A    That's my -- well, there are patent applications that

9   are held by Checking Resources, and I believe they're being

10  licensed as opposed to transferred, but I could be wrong.

11  Q    Okay.  In terms of the assets being transferred from

12  Resources, have you secured an appraisal from any third

13  party as to the value of those assets?

14  A    No, I have not.

15  Q    Did you attempt to secure an appraisal as to the value

16  of those assets?

17  A    Not at this time.

18  Q    Do you intend to?

19  A    As part of the asset sales plans, it was our intention

20  that we would have to go through and determine an allocation

21  of value between the two estates, and until that time we

22  would escrow the funds.

23  Q    So you believe it necessary to allocate the assets that

24  are being received to get an appraisal of the assets at some

25  point, is that correct?

110

1          MR. JOHNSTON:  Your Honor, I'd object here.  This

2   line of questioning, and I've given him a lot of leeway,

3   goes beyond the scope of what Whorl requested and notified

4   the parties that it would seek to take testimony on.

5   Whorl's pleading indicates that to the extent the Debtor's

6   request a good-faith finding, Whorl requests the opportunity

7   to cross examine those representatives of the purchaser and

8   any other Debtors -- any other witnesses that the Debtors

9   may offer to support their request for such a finding.

10          I do not think that an allocation of sale proceeds

11  is relevant to that line of inquiry.

12          THE COURT:  My understanding is consistent with

13  what Mr. Lumsden just said.

14          MR. STERN:  I'm actually not going to the point of

15  allocation.  I'm going to the point of appraisal.  I just --

16  BY MR. STERN:

17  Q    Mr. Lumsden, I just want to make sure I understood and

18  then I'll get off that subject.  As I understood it, you do

19  intend to do an appraisal for purposes of allocation,

20  correct?

21  A    I don't know if we'll get a formal appraisal or if

22  we'll use some other means of allocating.

23  Q    You have been involved with various of the Debtors

24  since approximately mid November of 2007, correct?

25  A    That's correct.

111

1  Q    And during that time you've attempted to gain a

2  familiarity with the assets at the various Debtors, correct?

3  A    Yes, I have.

4  Q    And during that time which I guess figuring roughly is

5  about three months, have you attempted to secure an

6  appraisal of any of the assets of any of the Debtors?

7            MR. JOHNSTON:  I object again, your Honor.  This

8  is going beyond the scope of what they said they were going

9  to seek cross examination for.

10           THE COURT:  Sustained.

11 BY MR. STERN:

12 Q    During the three months plus that you've been involved

13 with the Debtors, have you sought to obtain an appraisal of

14 any of the assets that are being proposed to be sold to

15 Phoenix?

16 A    That would be the business and assets of Paycheck

17 Secure and the associated IP?

18 Q    Whatever is being -- whatever you're proposing to sell

19 today to Phoenix, those assets.

20 A    We have not obtained any outside appraisals for that.

21 We've essentially both had discussions internally and with

22 some outside bankers as far as what the range of values

23 might be.

24 Q    What kind of discussions internally?

25 A    Well, we've essentially run financial projections and

112

1 tried to assess what we believe the potential for growth in

2 the business and what the range of values might be on a

3 discounted cash flow basis.

4 Q    Who are the we that you're talking about?

5 A    It includes the VP of finance, VP of business strategy

6 and sales, myself, Mariam Gozzy, the managing director, with

7 FTI, and some of the staff accountants --

8 Q    And you said --

9 A    -- at Pay By Touch.

10 Q    And you've also spoken with some bankers?

11 A    Yes.

12 Q    With whom?

13 A    Both with Jeffries as well as some other outside

14 bankers within FTI and outside.

15 Q    And who did you talk to at Jeffries?

16 A    Tom Carlson, Sundiep Sahandja, Adrian Fitch -- Adam

17 Fitch.

18 Q    Did you ever ask them how much it would cost to get an

19 appraisal of the assets that are being sold here today?

20        MR. JOHNSTON:  I object, your Honor.  Again, this

21 is going well beyond the scope of what they said they were

22 going to seek to cross examine the witnesses about.  We've

23 not heard any tie whatsoever to the issue of a good faith

24 finding.

25        THE COURT:  Overruled.

113

BY MR. STERN:

Q     Did you attempt to ascertain how much it would cost to get an appraisal from Jeffries?

A     No, I did not, not for those assets.

Q     Did you attempt to ascertain how long it would take someone from Jeffries to do an appraisal?

A     Well, first of all, let me correct something.  Jeffries was not engaged as our investment banker on these particular assets.  So the discussions I was having with him was really of a general nature discussing the marketplace and the multiples of pricing that might be employed in such assets. So, no, I did not discuss with him both either the timing or the pricing of performing the appraisal because that was not their scope of work.

Q     Did you discuss with anyone internally at FTI how long it would take to get an appraisal of the assets that are being sold here today?

A     No, I didn't.

Q     You said that you developed cash flow projections or models.  I forget.  Do you recall what you said?

A     Yeah.  Well, we have cash -- we have financial projections for the businesses, and we essentially perform discounted cash flow evaluations for those businesses.

Q     Did you do a discounted cash flow analysis of the business that -- let me reword that.  Excuse me.  Taking the

114

1  assets you're selling today, did you try to compute what the

2  -- what the cash flow would be on those assets going

3  forward?

4  A     Yes, we do have projections.

5  Q     And who did those projections?

6  A     Well, actually, they were put together by company

7  personnel both representatives of Paycheck Secure as well as

8  the parent, Solidus Networks.

9  Q     Did the -- did any of the principals of the Phoenix

10  bidder assist in putting together those projections?

11  A     No doubt they had a hand because some of them were tied

12  in with the existing business plans of the business.

13  Q     And on a going-forward basis, what did those

14  projections show to be the future cash flow from the

15  business that is being sold today?

16  A     Well, I can't recall off the top of my head, but

17  presently the business is running a deficit cash flow, and

18  it -- the projections show a gradual recovery as volume

19  increases and the company is able to get back into the

20  market for financing the equipment installations that is

21  involved in this business.

22  Q     Did you attempt to computer what the discounted cash

23  flow value would be for the businesses being sold -- the

24  business that's being sold today?

25  A     Yeah, we have ranges of values in mind.

115

1  Q    And we is who again?

2  A    We being myself, the VP of the strategy and sales, and

3  the VP of finance.

4  Q    Did you ever commit any of those values to paper?

5  A    I can't recall.

6  Q    And what was the range of values that you had in mind?

7  A    Let's see if I can remember.  I think we were -- we

8  looked at it both from a DCF standpoint and from multiples

9  of revenue.  I think our sense is that this -- because it's

10 a negative cash flow in the near term, we believe that --

11 and hope that it would sell for one times revenue.

12 Q    And revenue, that was in the nature of $5.5 million, is

13 that correct?

14 A    That's approximately correct.

15 Q    So that was sort of the, if you will, the quick and

16 dirty of where you hoped it would sell?

17 A    Yes.

18 Q    In terms of conversations with bidders, I think Mr.

19 Johnston indicated that in order to market this, someone at

20 the Debtor located I believe he said 18 strategic and

21 financial potential buyers.  Is that consistent with your

22 recollection?

23 A    Yes, it is.

24 Q    And how were those buyers or prospective buyers chosen?

25 A    We have a number of individuals who have been very

116

1  active in their payments business and also the Biometric

2  Payments side of the business.  We also discussed names with

3  Jeffries and with various other parties at FTI as far as who

4  might be out there.  So we compiled a listing of what we

5  believe were both competitors as well as investors who have

6  expressed interest in this type -- or range of businesses.

7  Q    And we, again, is just the people at FTI or is it

8  people also at the company?

9  A    Primarily the company.

10 Q    And, again, who were the people at the company by name?

11 A    A.J. Armani who's the vice president of sales and

12 business strategy, Matthew Pierson who's the VP of finance.

13 Also Ula Adams participated who's the chief operating

14 officer.  Robert Siegler who's the vice president of finance

15 or, rather, Robert Siegler is the chief financial officer.

16 Then I also spoke with Keven Schultz who's an investment

17 banker with FTI and also spoke with representatives at

18 Jeffries to see what other names they could identify for us.

19 Q    Did you actually ever employ Jeffries to assist in the

20 marketing of the assets that are being sold today?

21 A    No, we did not.

22 Q    Did you ever employ any outside investment banker to

23 assist in the marketing of the assets that are being sold

24 today?

25 A    Not for these assets.

117

1  Q    You did, however, for other assets, is that correct?

2  A    That's correct.

3  Q    Did you believe Jeffries didn't have the adequate

4  expertise to help you with the -- the assets being sold

5  today?

6          MR. JOHNSTON:  I object, your Honor.  This is --

7  again, has nothing to do with the requested good faith

8  finding, the good faith of the Debtors in selling the

9  Phoenix Check Cashing and Phoenix Check Cashing purchasing.

10          THE COURT:  Overruled.

11  BY MR. STERN:

12  Q    Do you recall my question, sir?

13  A    Yes.  Actually, it had nothing to do with Jeffries'

14  capabilities.  We had already started the sale process and

15  put together the confidential information memorandums before

16  Jeffries was formally engaged to serve as the investment

17  bankers associated with what we call the core assets.  So,

18  therefore, we are already out of the gate marketing this

19  business, and, frankly, it's a relatively small business,

20  and I was tasking Jeffries and their team with a much larger

21  scale of assets to market.  So we felt that we could

22  adequately cover it ourselves.

23  Q    Now, in terms of the prospective bidders, how many

24  actually bid for these assets?

25  A    Well, we talked to a number of individuals who were

118

1  submitting various numbers along the way, but when it came

2  down to the bid -- the formal bid deadline, which I believe

3  was February 19th, we received I believe two -- two bids.

4  Q    One by a company called Remit Gate and one by Phoenix,

5  is that correct?

6  A    That's correct.

7  Q    Was Remit Gate on the original group of 18 buyers that

8  were chosen as potential strategic or financial buyers to

9  whom you marketed the business?

10 A    Yes, they were.

11 Q    And were they known as Remit Gate at that point or were

12 they known as something else?

13 A    I think we have them listed as Delwood, which is the --

14 one of the investment companies.

15 Q    And how did you get their name?

16 A    They have an interest in the payments business, and I

17 can't recall whether we contacted them or they contacted us.

18 Q    Now, in terms of the two bids, did Remit Gate and

19 Phoenix both bid on the same set of assets?

20 A    Largely.  I believe the only real distinction was two

21 licenses of intellectual property that Phoenix Check

22 Cashing, Inc. representatives identified as being additional

23 licenses they believed they would need to operate the

24 business.

25 Q    So they had two -- if you look at the bundle of assets

119

1  that were being bid for, Remit Gate was bidding for one set,

2  and Phoenix was bidding for one set plus two licenses?

3  A    I think that's the largest distinction, yes.

4  Q    Any other distinction in terms of the assets that they

5  were bidding for?

6  A    There may have been.  I just can't recall right now.

7  Q    This one you do recall, however?

8  A    Yes, because I was active in negotiating that.

9  Q    In terms of those two licenses, did you attempt to

10 determine the value of those two licenses, the fair market

11 value of one or both of those licenses?

12 A    No, not individually.

13 Q    Did you at all ask Remit Gate whether or not they would

14 increase their bid if you gave them those two additional

15 licenses?

16 A    Yes, we did.

17 Q    What did they say?

18 A    No.  It was -- essentially their bid was -- their

19 original bid included those licenses.

20 Q    So they thought their bid included those licenses,

21 although you just said I thought they didn't?

22 A    Well, no.  I'm not sure if you understand the process.

23 We issued a standard form asset purchase agreement and

24 standard form schedules containing the listing of assets and

25 contracts that we would be willing to sell as part of an

120

1   asset purchase agreement transaction.  When parties made

2   their bids, they marked up the asset purchase agreement,

3   obviously submitted the dollar amount of their bid along

4   with other appropriate documentation.  And in the case of

5   Phoenix check cashing, they also identified a couple of

6   additional -- three additional licenses of technology that

7   they sought as part of the bid.

8   Q    Okay.  I guess I'm still not understanding, and maybe

9   the Court is and I'll move on, but I thought you said that

10  when you approached Remit Gate about adding those licenses,

11  they said those were already included in what they were

12  bidding for.  Did I miss something?

13  A    Yes.  The bid that they've submitted included the

14  schedules associated with the additional three licenses that

15  they were seeking.  So we negotiated that point.

16  Q    Okay.  So let me get this straight.  Were the bids that

17  Remit Gate submitted and the bids that -- the bid that

18  Phoenix submitted for the same assets or not for the same

19  assets?

20  A    We were offering the same business.  However, buyers --

21  some buyers identified certain assets that they wanted and

22  obviously certain liabilities they would be willing to

23  assume.  So each -- generally, each buyer's package was a

24  bit unique.

25  Q    Now, last week, when the auction took place, it took

121

1  place at Mr. Johnston's law office, correct?

2  A    Yes.  Hennigan, Bennett, and Dorman.

3  Q    And at that particular time counsel for Phoenix asked

4  to disqualify Remit Gate from bidding, is that correct?

5  A    Yes, I believe you did so.

6  Q    And what did you recall was the basis upon which they

7  sought to disqualify Remit Gate from bidding?

8  A    I'm not sure the details that he gave at the hearing.

9  I previously received a letter from Phoenix Check Cashing

10  outlining what they believed was a conflict of interest or a

11  sharing of bidding strategy that may have occurred.

12  Q    Did you inquire into what kind of sharing of bidding

13  strategy had occurred between Remit Gate and Phoenix?

14  A    Well, we essentially received the letter from Phoenix.

15  I reviewed it with counsel.  We then had conversations with

16  Remit Gate outlining the allegations, and we received a

17  response back from Remit Gate.

18  Q    Is it your understanding that Phoenix had entered into

19  some kind of non-circumvention agreement or something like

20  that with Remit Gate?

21  A    I don't have any understanding of that.

22  Q    Okay.  Do you have any understanding as to whether or

23  not Remit Gate and Phoenix ever entered into any contract of

24  any kind?

25  A    I'm not aware of any such contract.

122

1  Q    At the -- attached to your affidavit that is submitted

2  as your direct testimony there's a transcript of the bidding

3  procedures of last Friday.  Have you had a chance to review

4  that transcript?

5  A    Yes.

6  Q    In your view, did that accurately transcribe what

7  actually was said during the course of the sale proceedings?

8  A    Yes, I believe it did.

9  Q    Okay.  If I could -- I don't know if you have it front

10 of you or not.

11 A    I do not.

12 Q    I don't have an extra.  I only got the one I got.  So

13 perhaps one of your counsel could hand it.  So you don't

14 have to read the whole thing, I'm referring to the

15 transcript which is an exhibit to your declaration, and it's

16 at page nine of that transcript.

17 A    Okay.  I'm on page nine.

18 Q    Okay.  You see the -- the section that begins on page

19 16, Mr. Davidoff?

20 A    Line 16?

21 Q    Line 16, yes.

22 A    Yes, I do.

23 Q    And Mr. Davidoff says:

24          "All right.  Just so it doesn't come as

25          a surprise to anybody, we do object to

123

```
 1            Remit Gate's participation.  We think
 2            it's inappropriate.  We think they
 3            violated a non-circumvention agreement.
 4            We're making that known to you, and
 5            we'll obviously be making it known to
 6            the Bankruptcy Court."
 7      Do you see that?
 8  A    Yes, I do.
 9  Q    Do you recall Mr. Davidoff making such a statement in
10  your presence?
11  A    Yes, I was there.
12  Q    Do you know what non-circumvention agreement he was
13  referring to?
14  A    No.
15  Q    Did you ever ask?
16  A    No.
17  Q    Would it be important to you if the two bidders had
18  some kind of agreement between each other?
19  A    I had seen a letter that had been submitted by Phoenix
20  check cashing the day of -- a couple of days before,
21  outlining what they believed was, you know, alleged transfer
22  of information.  I received a letter I guess a couple of
23  days before that Phoenix Check Cashing had submitted to
24  Remit Gate, and it outlined allegations of a potential
25  transfer of some bidding knowledge or what have you from --
```

124

1  from Phoenix Check Cashing to Remit Gate.  That's as much as

2  I know.

3  Q    Okay.  But Mr. Davidoff did say something about a non-

4  circumvention agreement last Friday, correct?

5  A    Yes.

6  Q    No question about that.  Wouldn't it concern you as a

7  fiduciary that your two bidders had some kind of agreement

8  with each other?

9  A    Well, yes, it would if it were the case or I had other

10 evidence of it.  We did contact Remit Gate.  I received

11 information from Remit Gate to my satisfaction that that was

12 not the case.

13 Q    So you had Phoenix saying there was an agreement and

14 Remit Gate saying there was no agreement, is that correct?

15 A    Well, the only reference to agreement I saw was in this

16 transcript and at the hearing.

17 Q    I understand, and I'm trying to find out what you did

18 in order to determine whether the only two bidders who were

19 showing up at the sale had some kind of an agreement?

20 A    I had contacts.  I'd spoke with Remit Gate and asked

21 them about the issue.  I also had my counsel speak with

22 Remit Gate and had obtained satisfaction that we believed

23 that was not the case.

24 Q    They believed what was not the case, they didn't have

25 an agreement?

125

1  A    That they -- yeah.  Well, I don't believe there was any

2  being an obstruction or tampering with the open bidding

3  process.

4  Q    But you didn't explore what this -- this non-

5  circumvention agreement referred to, fair statement?

6  A    Fair statement.

7  Q    During the course of the -- I notice that at some point

8  the transcript stops and there's like four hours of non-

9  transcribed proceedings.  During the course of that, did you

10 have any private discussions with any representatives of

11 Phoenix?

12 A    Yes.

13 Q    Did you and any of the Phoenix representatives have any

14 discussion as to whether or not they had given adequate

15 support to the sale process for these assets?

16 A    At the -- on the day of the hearing or when are you

17 referring to?

18 Q    Well, let's just -- let's be more general.  I think

19 that's a fair question.  One of the representatives of

20 Phoenix is John McNally, correct?

21 A    Yes.

22 Q    McNally's also a vice president of information of

23 resources, right?

24 A    Yeah, VP information and technology of Check Cashing.

25 Q    Of Check Cashing.  Did you and he ever have a

126

1  discussion at any time as to whether or not he was

2  adequately supporting the sale process for the assets that

3  are being sold here today?

4  A    I had discussions with John McNally along the way

5  during the sale process, and we essentially made sure that

6  he was available to speak with potential bidders and provide

7  information to assist those bidders in the due diligence

8  process.

9  Q    Early on in the process, very shortly after bankruptcy

10 was filed, you received a letter from George Rice about

11 asking you to waive conflicts of interest, right?

12 A    That's correct.

13 Q    And Rice basically disclosed that he and potentially

14 others were going to be bidders for these assets and he

15 recognized that as a member of Debtor's management, he had

16 duties to maximize the price, and as a bidder, he wanted to

17 minimize the price, right?

18 A    Well, there was an inherent conflict of interest, and,

19 yes, he did make that disclosure, and we acknowledged his

20 participation with I believe it was going to be WWC Capital.

21 Q    And did you make any similar agreements with any of the

22 other principals of the successful bidder, Phoenix?

23 A    No.  It was just with George Rice who was the general

24 manager of Paycheck Secure.

25 Q    Did you ever have any discussions with him as to

127

1 whether or not he was adequately supporting the sale efforts

2 that you were involved in?

3 A    Do you mean did I challenge whether he was?  I don't

4 understand your question.

5 Q    I'm not even saying challenge, just inquire as to

6 whether or not he was adequately supporting the sale

7 efforts.

8 A    Well, we talked about performing due diligence, and we

9 said that we expect you to make yourselves available and be

10 open and -- and communicative with respect to the business.

11 Q    And what did you do to assure that he was, in fact,

12 being open and communicative with respect to the business?

13 A    Well, we have various other people in the company that

14 are familiar with the business that were involved in dealing

15 with the potential buyers for this business.  We also put

16 together a confidential information memorandum that was

17 predicated upon past information as well as forecasts for

18 the business that is reviewed by both people at Paycheck

19 Secure but also people outside of Paycheck Secure who were

20 familiar with the business, and then we made sure that all

21 contact with the potential bidders was conducted through the

22 San Francisco office of Solidus Networks.

23 Q    When you say there was a due diligence -- or counsel

24 said there was due diligence room set up, was that an actual

25 room or was it a virtual due diligence room?

128

1  A    I think it was more of a virtual room whereby people

2  would ask for information and we would send it to them.  We

3  didn't have a website set up or anything like that.

4  Q    Okay.  So it wasn't a secure website per se?  It was

5  just an on request type of thing?

6  A    Yes.

7  Q    Did any of those people go to your knowledge to meet

8  with any of the employees of the Debtors in Herndon,

9  Virginia?

10  A    I can't recall.

11  Q    Do you know whether or not any of the representatives

12  of Remit Gate went to meet with the representatives of the

13  Debtor in Herndon?

14  A    I don't know.

15  Q    Did you ever ask Mr. Rice whether any prospective

16  bidders had come to Herndon?

17  A    No, I did not have that conversation with him.

18  Q    Did he ever report to you that any prospective bidders

19  had come?

20  A    Not that I know of.

21  Q    Did you ever ask him directly whether or not he and --

22  whether or not, excuse me, he or Phoenix had any agreement

23  of any kind with Remit Gate?

24  A    Repeat your question.

25  Q    Did you ever ask George Rice -- let me just stop for a

129

1  second.  George Rice was in Mr. Johnston's office on Friday,

2  correct?

3  A    Yes, he was.

4  Q    Did you ever ask him directly whether or not he and

5  Remit Gate had any agreements of any kind?

6  A    No.  Mr. Rice was bidding with WWC Capital.

7  Q    Right.  Did you ask him whether or not he or Phoenix or

8  anyone else with which he was affiliated had any agreement,

9  whether called a non-circumvention agreement or not with

10  Remit Gate?

11  A    No, I don't recall I do.

12  Q    Was John Dorsey at the auction on Friday?

13  A    I'm not sure I know who John Dorsey is.

14  Q    Okay.  Was John McNally at Mr. Johnston's office on

15  Friday?

16  A    Yes, he was.

17  Q    Did you ever ask Mr. McNally whether any bidders had

18  come to Herndon, Virginia to look at the business?

19  A    No, I did not.

20  Q    Did you ever ask Mr. McNally whether he had any

21  agreement with Remit Gate?

22  A    No, I did not.

23  Q    Did you ever ask Mr. McNally if he knew what Mr.

24  Davidoff meant when he said "We think they violated a non-

25  circumvention agreement?"

130

1  A    Did I ask Mr. -- I'm sorry.  Repeat your question.

2  Q    Did you ever ask John McNally whether he knew what Mr.

3  Davidoff was referring to when he said that Remit Gate had

4  violated a non-circumvention agreement?

5  A    No, I didn't ask John McNally that.

6  Q    Did you ever ask Mr. Davidoff what he meant by that?

7  A    I don't recall asking Mr. Davidoff that.

8  Q    Did you ever ask John McNally what his personal belief

9  was as to the value of the assets being sold to them?

10  A    No, I did not.

11  Q    Did you ever ask Mr. Rice if he had any opinion as to

12  what the value of the assets that were being sold -- were

13  being sold to them?

14  A    No, I did not.

15  Q    As part of learning about this business, did you

16  investigate why these Debtors are in bankruptcy?

17  A    Yes.

18  Q    When did you do that investigation?

19  A    Well, I'm the one that put them into bankruptcy.  So

20  I --

21  Q    I guess I didn't mean it quite that way.  I'm asking

22  why they were in financial distress.

23  A    And are you referring to Checking Resources or Check

24  Cashing Company?

25  Q    Let's talk about the Debtors generally.  Did you do any

131

1  investigation as to what financial distress -- why they were

2  in financial distress?

3  A    Yes.

4  Q    And what did you conclude?

5  A    I concluded that this -- well, the parent company,

6  which is a company that essentially was trying to launch a

7  Biometric Payment and personalized marketing business was

8  still what I'd call a late state startup, and it had not

9  generated sufficient revenues to cover any of its costs, had

10 a very high fixed cost basis, anticipating very large volume

11 of transactions, but it ran out of funds and wasn't watching

12 its spending carefully.  So it -- the credit market shifted.

13 It also wasn't watching its funds, too high a fixed cost,

14 and it just ran into basically a liquidity wall.

15 Q    Sounds like the old story they just didn't have the

16 revenues that they had anticipated and they were running

17 costs beyond the level that they should have been.  Is that

18 sort of what you're saying?  I don't want to -- I just want

19 to get it simple.  That's why I was trying to do that, but

20 I'm not trying to reframe your statement.  I'm sorry.

21 A    Was that a question?

22 Q    That is a question.  Is it just simply -- were there --

23 had they projected certain revenues that they weren't

24 meeting?

25 A    That's correct.

132

1   Q    And were they projecting costs and they were going

2   above them?

3   A    No.  Costs were probably in line with what they

4   projected.

5   Q    But the revenues were not?

6   A    That's correct.

7   Q    Did you attempt to determine who, if anyone, was

8   responsible for the revenues being lower than expected?

9        MR. JOHNSTON:  Your Honor, objection.  As I

10  understand this line of inquiry, he's talking about Solidus

11  Networks, the parent company, and the financial performance

12  of the parent company, which has, as I stand here today,

13  very little.

14       THE COURT:  I'll sustain the objection.

15       MR. JOHNSTON:  Thank you.

16  BY MR. STERN:

17  Q    I want to try to narrow it down.  In terms of revenues,

18  were any of the principals of Phoenix Check Cashing or

19  whatever the -- Check Cashing, that's the name of the

20  company.  Were any of the principals of Phoenix Check

21  Cashing at all charged with helping to either generate or

22  project revenues for the company?

23  A    Well, two of the participants of Phoenix Check Cashing,

24  both George Rice and John McNally, were active with two of

25  the senior managers in the business of Paycheck Secure.  So

133

1  in their roles and responsibilities, yes, they would be

2  involved in developing financial projections for the

3  business.

4  Q    So when you say that the revenues were not quite

5  meeting projections, those revenue projections had been

6  generated in whole or in part by McNally and Rice, correct?

7  A    Well, no.  I think you need to go back and review your

8  questions and my answers.  I was responding to questions you

9  were asking with regard to why the parent company, Solidus,

10 went into bankruptcy and its reasons.  You haven't asked me

11 yet the reasons for Paycheck Secure being put into

12 bankruptcy.

13 Q    What is the reason in your mind that Paycheck Secure

14 had financial difficulty?

15 A    It was -- one, I don't think it was being well managed.

16 It did not have -- it had a revenue stream that was

17 declining.  Part of the reason for that decline was the fact

18 that the liquidity problems at the parent were causing

19 liquidity problems down at the subsidiary of Pay By Touch

20 Check Cashing, Inc., which meant that the company couldn't

21 go out and finance equipment or purchase equipment to

22 complete installations.  So the installation revenue, which

23 made up about half of its business, was falling off.

24 Q    And when you say it wasn't being managed properly, who

25 were the managers of the Paycheck Secure business?

134

1  A    George Rice is the general manager, and there's a host

2  of probably 50 or 60 people that work there.

3  Q    Okay.  But Rice would be the head, if you will, for

4  want of a better term?

5  A    Well, it's also there's management at the parent, and

6  I'm also referring to the parent management in terms of

7  driving the business.

8  Q    How about McNally, would he be part of that management

9  also?

10  A    Well, he's in management team as the VP of IT.  I'm not

11  sure exactly how much input he had in operations or

12  financial performance of the company.

13  Q    Speaking of Mr. Rice, did he have a competing business

14  called Rocket Payments?  Are you aware of that?

15  A    I am aware of a website named Rocket Payments.

16  Q    And did you ever inquire as to whether or not Mr. Rice

17  had any involvement with Rocket Payments?

18  A    Yes.

19  Q    Did he?

20  A    The Rocket Payments, as I understand it from

21  discussions with Mr. Rice, is a company that was started by

22  his wife.  It still appeared to be in a startup mode, and

23  his name was associated with it on the website, and when it

24  was brought to our attention, this had previously been

25  discussed with him, and then when it was brought up again to

135

1  my attention, I discussed with Mr. Rice and directed him to

2  remove himself from that business, which he indicated that

3  he did, and according to the website, it appears that he

4  did.

5  Q    Rocket Payments is a competitor of the Paycheck Secure

6  business?

7  A    No, it doesn't appear to be a direct competitor.  It's

8  in a similar line of business, but it's more of a consulting

9  company.

10 Q    And this is a business in which his wife had an

11 interest or has an interest?

12 A    I believe she still has an interest.

13 Q    Are they married?  When you say wife, I mean, it's not

14 like they're separated or anything, are they?

15 A    I don't know their marital relations.

16 Q    Okay.  But you've never been told that they were

17 divorced or anything?

18 A    Not to my knowledge.

19 Q    And when did that come to your attention?

20 A    Probably the January time frame.

21 Q    In terms of financing obtained by Phoenix Check

22 Cashing, did you inquire as to what the sources of financing

23 were for Phoenix Check Cashing?

24 A    Yes, we did.

25 Q    And what did you find out?

136

1  A    They were supported by WWC Capital and also by

2  individuals who were investors in WWC Capital.

3  Q    And did you attempt to inquire as to how much of an

4  economic stake the financiers were getting in the Phoenix

5  Check Cashing business on a going-forward basis?

6  A    How much of an economic stake who was getting?

7  Q    Let me step back.  As you understood it, WWC Capital

8  was doing the financing for the acquisition of the assets

9  being sold today, correct?

10  A    Yes.  I'm not sure whether it was Debtor equity

11  financing, but they were participating in the purchase.

12  Q    Did you inquire whether or not any members of current

13  management of any of the Debtors are getting any stake in

14  the business on a going-forward basis?

15  A    It was disclosed to me that both Mr. McNally and Mr.

16  Rice are participating in Phoenix Check Cashing.

17  Q    And what was disclosed to you as to the level of their

18  participation?

19  A    I can't recall.

20  Q    Were they getting anything beyond just a pro rata

21  interest based on how much they were actually putting into

22  the company in terms of money?

23  A    I don't know.

24  Q    Did you ever inquire?

25  A    I personally didn't inquire.

137

1           MR. STERN:  Give me just a second here, your

2  Honor.

3  BY MR. STERN:

4  Q     In terms of contact with bidders personally, other than

5  Remit Gate and Phoenix, did you have any personal contact

6  with any other bidder or prospective bidder for the

7  business?

8  A     Yes.

9  Q     How many?

10  A     Probably another three or four that I talked to.

11  Q     And when was the last time you spoke to any of them?

12  A     Probably would have been around the middle of February.

13  Q     Do you remember their names?

14           MR. JOHNSTON:  I object, your Honor, to the extent

15  that discussions with bidders were conducted under

16  confidentiality agreements.  I think Mr. Lumsden can answer

17  to the extent that bidders authorized him to disclose their

18  identity, but I don't want him to breach any confidentiality

19  agreements.

20           THE COURT:  Okay.

21           MR. STERN:  I don't have any problem with that.  I

22  was just --

23  BY MR. STERN:

24  Q     You do know who they were, I mean, just thinking back?

25  A     I can't remember some of the names.  Understand, I'm

138

1   selling about five or six different companies.  So in some

2   cases some bidders are interested in more than one company,

3   so going back and forth.

4   Q    Did any of the prospective bidders for the assets being

5   sold here today indicate to you why they were not going to

6   be bidding?

7   A    Sure.

8   Q    What did they say?  Can you give me examples of what

9   they said?

10  A    On some occasions they looked at the business and they

11  decided that that's not really a space that they want to be

12  in.  In other cases, they felt that the business was losing

13  money.  So, once again, not an area of interest.  Some cases

14  they felt they wouldn't -- they talked about pricing that

15  they would put on the business, and it was well below the

16  price that we were saying is a threshold.  So a variety of

17  reasons.

18  Q    Did any of them complain to you about the flow of

19  information from people in Herndon?

20  A    No, not in particular.

21  Q    Did you ever get any complaints at all from anyone that

22  they weren't getting adequate information from the people in

23  Herndon?

24  A    Well, understand in this kind of bidding process I get

25  complaints from just about everybody about the flow of

139

1  information, so --

2  Q    It goes with the territory.

3  A    It just is that the buyers want the information

4  yesterday and the people providing it are trying to run a

5  business and doing other things.  A lot of times the buyers

6  are, you know, not necessarily organized themselves and they

7  have multiple parties asking for the same information

8  several times.  So, yes, I received complaints on probably

9  every one of the businesses that we're trying to sell as far

10 as, you know, timeliness of information, can you get me

11 that, but I didn't get anything inordinately different about

12 Herndon versus other locations.

13 Q    And in connection with that, did you ever have a

14 conversation -- specifically on Friday of this past week,

15 did you have a conversation with Mr. McNally in which you

16 indicated to him that he had not been sufficiently

17 responsive and cooperative in the sale process?

18 A    Well, I challenged him on that.

19 Q    When was that?

20 A    On Friday, when we were negotiating various points.

21 Q    And what did you say to him about that?

22 A    I think I accused him of essentially not being as

23 responsive as I would have liked for him to have been.

24          MR. STERN:  No further questions at this time.

25          THE COURT:  Thank you.

140

1      Mr. Johnston?

2                  REDIRECT EXAMINATION

3  BY MR. JOHNSTON:

4  Q    Mr. Lumsden, is the Paycheck Secure business as we've

5  defined it making money right now?

6  A    No, it is not.

7  Q    Can you give the Court a rough estimate for how much

8  money that business is losing on a monthly basis?

9  A    Well, for about the two and a half month period under

10 the DIP loan, we projected it would utilize or lose about

11 600 and some odd thousand dollars.  I think we're a little

12 bit below that.  So we're probably losing around 150 to 200

13 thousand a month.

14 Q    Did that -- did those losses have an impact on the

15 Debtor's ability to sell the business?

16 A    Absolutely.

17 Q    Could you explain that?

18 A    Well, when you have a business that's losing money and

19 you decide it's not a business that you wish to invest in

20 for turning it around and building the business, you then

21 have the prospect of having to decide that I'm going to sell

22 or liquidate it, and it means that the quicker you can do

23 that, more cost effective way you can do that ultimately

24 should be better, you know, the better your proceeds.  It

25 was a business that was costing us cash.  We had limited

141

1  resources of funds, and so it was necessary to move it

2  quickly.  On top of that, when you're trying to sell a

3  business in that condition, you have a smaller market of

4  buyers who are interested in both looking at it as well as

5  questioning why is it losing money, is there something just

6  endemic in the business or is it just a cyclical item or is

7  there something easily turned around.  And so you have

8  buyers both questioning whether they should look at it.  You

9  have buyers questioning it from the standpoint of what's it

10  really worth, are we seeing a continual decline or is this

11  something that can be turned around easily enough.  So it

12  just makes it more difficult and certainly reduces the

13  number of buyers.  You don't get the pricing you'd like, and

14  it also means that, you know, you can't sit around and carry

15  it for a very long period of time.

16  Q    Thank you.  Mr. Stern made some reference to

17  allegations made by Phoenix with respect to Remit Gate.  Did

18  you -- did those allegations cause you to disqualify Remit

19  Gate from bidding?

20  A    No, they did not.

21  Q    Did Remit Gate indicate to you that those allegations

22  caused it not to bid?

23  A    No, by no means.

24  Q    Remit Gate, in fact, participated in the auction,

25  correct?

142

1  A    Yes.

2  Q    Based on your participation in the auction, do you

3  believe that those allegations or assertions in any way

4  caused Remit Gate to -- let me strike that.

5       Do you believe that those allegations or assertions in

6  any way caused Remit Gate to bid less than what Remit Gate

7  believed was the fair market value for these assets?

8  A    No, not at all.

9  Q    Remit Gate never told you that it was bidding less than

10 what it believed was the fair market value for the assets?

11 A    No.

12 Q    And, in fact, Remit Gate participated in a number of

13 rounds of bidding for these assets, correct?

14 A    Yes, all the way to the end.

15 Q    Have you ever run a sale process for assets before?

16 A    Yes, I have.

17 Q    How many times?

18 A    Fifteen to 20 times.

19 Q    Would you consider yourself experienced in selling

20 assets?

21 A    In the auction environment, yes.

22 Q    All right.  In your opinion, did the management team of

23 Paycheck Secure adequate support the sale process run for

24 the Paycheck Secure assets?

25 A    Yes, they did.

143

1  Q    Did Remit Gate's participation in the auction and

2  bidding have any bearing on your opinion that the bid made

3  by Phoenix Check Cashing represents the highest and best

4  price for these assets?

5  A    Very much so.

6  Q    Could you explain that, please?

7  A    Well, the participation and the bidding by Remit Gate

8  was very instrumental in both moving the bidding prices up

9  from $3,000,000 to ultimately $4.2 million, but even more

10 so, it was instrumental in getting Phoenix Check Cashing to

11 bid on an all cash basis without contingencies, which had

12 been a continual effort on their part to share the risk with

13 respect to certain of the assets being sold.

14 Q    And does Remit Gate have any connections or

15 affiliations with the Debtors?

16 A    None that I know of, and I also asked them before the

17 auction and while they were doing the due diligence process.

18         MR. JOHNSTON:  I have nothing further.

19         MR. DAVIDOFF:  Your Honor, if I might I have a few

20 questions for Mr. Lumsden before Mr. Stern responds.

21         MR. STERN:  I'm sorry.  They're a bidder.  I'm not

22 sure why they have standing to ask questions.  It would

23 appear to me that usually a bidder doesn't until they have

24 actually had their bid confirmed.

25         THE COURT:  Well, the question is whether they are

144

1 a good-faith bidder.  It seems to me Mr. Davidoff is

2 entitled.

3         MR. DAVIDOFF:  Thank you, your Honor.

4                 FURTHER CROSS EXAMINATION

5 BY MR. DAVIDOFF:

6 Q    Mr. Lumsden, I just had a few questions.  You mentioned

7 earlier on in questioning by Mr. Stern that you were hoping

8 that the business would go the purchase price of around $5.5

9 million, is that correct?

10 A    Yes.

11 Q    And is it correct that the minimum bid that you

12 accepted was as $3,000,000 bid?

13 A    That's correct.

14 Q    How did you come to that $3,000,000 number?

15 A    Well, we marketed the business as extensively as we

16 could over about a 45-day period of time.  We sought bids

17 from various buyers.  We received bids that seemed to

18 indicate a minimum clearing price of around $3,000,000 so

19 that when we went -- or we didn't find that we received any

20 bids that were firm to convert into a stocking horse bid, we

21 essentially went to the Court, asked for approval of bidding

22 procedures, and in those bidding procedures we indicated a

23 minimum bid threshold of $3,000,000.

24 Q    Did any of the members of the Phoenix Check Cashing --

25 excuse me -- the Phoenix team who approached the bidder or

145

1 who is the prevailing bidder, did they have any involvement

2 in establishing that $3,000,000 price?

3 A    No.  It was a price determined by myself and other

4 management team members at Solidus.

5 Q    Let me please direct your attention again to page nine

6 of the transcript which is an exhibit to your declaration.

7 A    Yes.

8 Q    And directing your attention to line three on, do you

9 see a statement by Mr. Johnston?

10 A    Yes.

11         THE COURT:  What page are you on?

12         MR. DAVIDOFF:  Your Honor, this is Mr. Lumsden's

13 declaration.  It's Exhibit I believe A.  It's the transcript

14 of the auction on Friday, and I'm on page nine.

15         THE COURT:  Okay.  Thank you.

16 BY MR. DAVIDOFF:

17 Q    And, again, directing your attention to Mr. Johnston's

18 statement on line three, page nine, do you see that?

19 A    Yes, I do.

20 Q    And was this the position of the Debtor in response to

21 the objection by Phoenix, my client, to object to Remit

22 Gate's participation?

23 A    Yes.

24 Q    In other words, that you simply went forward with the

25 auction in any event?

146

1  A    Well, we did contact Remit Gate when we received the

2  letter from Phoenix Check Cashing outlining their objection.

3  We had discussions with Remit Gate and received responses we

4  considered to be satisfactory and concluded the best next

5  stages was to move forward with the auction.

6  Q    Let me also direct your attention to the end of the

7  transcript.  I'm looking for that provision now, but do you

8  recall a request by you or your counsel asking whether or

9  not both parties thought the bidding process was fair?

10  A    Yes, I do.

11  Q    And do you recall what the answers were from both Remit

12  Gate and Phoenix?

13  A    I believe there was an affirmative answer given by each

14  party.

15  Q    And that's on page 24 of the transcript I believe,

16  bottom of 24, top of 25.  Is it correct, Mr. Lumsden, that

17  Mr. Rice came forward to you to disclose his interest in

18  acquiring the business without prompting by you?

19  A    Yes.

20  Q    So he made that disclosure known to you before you

21  sought out that information?

22  A    That's correct.

23  Q    And did you suggest to him that this letter or this

24  conflict waiver letter as it's called, did he produce that

25  to you without prompting by you or did you suggest that that

147

1 be necessary?

2 A    I can't recall who suggested it first, but I did want

3 to have his participation memorialized in a letter from him,

4 and then he requested that that serve as the release

5 confirmation that we would acknowledge that.

6 Q    Based upon your involvement in connection with the sale

7 of this business, do you believe that any members of the

8 Phoenix team in any way jeopardized the sale process vis-a-

9 vis other potential purchasers?

10            MR. STERN:  Objection speculation.

11            THE COURT:  Overruled.

12            MR. DAVIDOFF:  I'm asking him if he knows.

13            THE WITNESS:  No, I don't believe that's the case.

14            MR. DAVIDOFF:  Thank you.  I have no further

15 questions.

16                    RECROSS EXAMINATION

17 BY MR. STERN:

18 Q    Just a couple of points, Mr. Lumsden.

19            THE COURT:  Just one second, please.  Okay, Mr.

20 Stern.

21 BY MR. STERN:

22 Q    Mr. Lumsden, Mr. Davidoff referred to some confirmation

23 by the bidders as to the fairness of the process.  That was

24 before you actually broke off to have negotiations with them

25 to get the prices up, correct?

148

1  A    No.  That was at the conclusion of the auction.

2  Q    That was at the conclusion.  And so Remit Gate actually

3  confirmed at the conclusion, and Mr. Davidoff actually, if

4  you'll turn to page 25 of that transcript once again,

5  indicated that he still had an issue about Remit Gate's

6  participation, right?

7  A    Yes.

8  Q    And a Mr. Wallace said:

9          "We still have cause against Remit Gate

10         which we will pursue."

11     Right?

12 A    Yes, that's the way it reads.

13 Q    Do you know what he was referring to?

14 A    All I can -- at the time I heard that, all I could

15 assume it's the same objections outlined in a letter we

16 received before the auction.

17 Q    You also referred to the business raising about 150 to

18 200 thousand dollars per month, and that was in Mr.

19 Johnston's question.  Do you recall that?

20 A    Yes.

21 Q    When you say the business, does that -- the 150 to 200

22 thousand dollars a month, does that refer to Checking

23 Resources or the Paycheck Secure business?  Which one were

24 you referring to?

25         MR. JOHNSTON:  Object, your Honor.  This is a line

149

1  of inquiry that is identical to the line of inquiry that was

2  conducted first in connection with the DIP.  It's going to

3  an allegation of sale proceeds, and I think that's an issue

4  for another day.

5         THE COURT:  Sustained.

6         MR. STERN:  Your Honor, if I might be heard.  I'm

7  just picking up on Mr. Johnston's redirect examination and

8  asking him what he meant by his statement.  He said that

9  they were losing 150 to 200 thousand dollars a month.  I'm

10  just trying to find out who was losing it.  That's all.

11         THE COURT:  Okay.

12         MR. STERN:  If I might, may I proceed on that

13  basis?

14         THE COURT:  All right.

15  BY MR. STERN:

16  Q    When you refer to losing 150 to 200 thousand dollars a

17  month the business, what were you referring to?

18  A    The business of Paycheck Secure.

19  Q    Okay.  How much of that loss, if any, is allocable to

20  resources?

21         MR. JOHNSTON:  That's my objection, your Honor.

22  It's the same objection as before.  The allocation has

23  nothing to do with good faith.  That's not an issue for

24  today.

25         THE COURT:  I think that's correct, Mr. Stern.

*Briggs Reporting Company, Inc.*

150

1          MR. STERN:  Then I'll pass the witness, your

2   Honor.

3          THE COURT:  Okay.  Thank you.

4          MR. JOHNSTON:  And to confirm, your Honor, Mr.

5   Lumsden can remain in the court now that his testimony has

6   concluded?

7          MR. STERN:  Absolutely.  He can remain anyway as a

8   party.

9          THE COURT:  Thank you, Mr. Lumsden.

10                              (The witness was excused.)

11         MR. STERN:  Your Honor, could I just have a minute

12  before the next witness?

13         THE COURT:  Okay.  Sure.  Should we take five

14  minutes?

15         MR. STERN:  That will be good.  Thank you, your

16  Honor.

17         THE COURT:  Okay.

18     (Proceedings recessed briefly.)

19         MR. JOHNSTON:  We would call Jonathan Wallace.

20         THE COURT:  Okay.

21      JONATHAN WALLACE - DEBTOR'S WITNESS - SWORN

22         THE CLERK:  Please be seated and state your name

23  for the record.

24         THE WITNESS:  My name is Jonathan Wallace.

25  //

151

1                       CROSS EXAMINATION

2 BY MR. STERN:

3 Q    Okay.  A little change of direction here.  Mr. Wallace,

4 my name is David Stern.  I'm counsel for Whorl.  Good

5 afternoon.

6 A    Good afternoon.

7 Q    During the break that we just had, you conferred with

8 Mr. Davidoff, correct, you spoke with him?

9 A    No.  I spoke to him?  Yes.

10 Q    Yeah.  You were in a room together with him, that

11 counsel room right over there, is that correct?

12 A    That is correct.

13 Q    And the door was closed, correct?

14 A    Correct.

15 Q    You were in there, Mr. Davidoff was in there, and Mr.

16 McNally was in there, correct?

17 A    Correct.

18 Q    What did you discuss?

19 A    I didn't discuss anything with him.  I was on the cell

20 phone the whole time.

21 Q    Did Mr. McNally and Mr. Davidoff talk to each other?

22 A    Not that I could see.

23 Q    So they were just all three in the room, you were all

24 silent?

25 A    I was not.  I was talking on the phone.  I didn't hear

152

1  them talking.

2  Q    So you don't know whether they were talking or not?

3  A    I don't.

4  Q    But the three of you were all in that room behind

5  closed door?

6  A    We were.

7  Q    Were you present this past Friday at the auction held

8  in the Hennigan, Bennett, and Dorman Law Offices for the

9  assets that are being sold today?

10  A    I was.

11  Q    Were you present when Mr. Davidoff objected to the

12  participation in those sale proceedings of Remit Gate?

13  A    I was.

14  Q    Were you present when Mr. Davidoff indicated that he

15  believed that Remit Gate had violated a non-circumvention

16  agreement?

17  A    I was.

18  Q    Do you know what the non-circumvention agreement is?

19  A    Do I know what it is?  It's a legal agreement, yes.

20  Q    Describe it, please.

21  A    It was an agreement doing Phoenix Cash Checking, LLC

22  and Remit Gate -- well, excuse me -- and a partner we

23  considered to be an affiliate but it isn't clear name Mandin

24  Chef I believe, and it said that you will not seek to

25  circumvent our process of making a bid.  You will not seek

153

1   to enter a bid with another group or on your own behalf, and

2   that was in consideration of the information that we were

3   going to give them when he attended a meeting in our office.

4   Q    Our being who?

5   A    WWC Capital Group.

6   Q    Where was that meeting?

7   A    Reston, Virginia.

8   Q    And this is a written agreement -- I'm sorry.  The name

9   blew right by me, Mandin Chef?

10  A    Uh-huh.

11  Q    Is that a man or a woman?

12  A    It's a man.

13  Q    Okay.  It's an individual as opposed to an

14  organization?

15  A    Correct.

16  Q    C-H-E-F?

17  A    I don't know.

18  Q    Okay.  Did you ever meet Mr. Chef?

19  A    Yes.

20  Q    And there's actually a written agreement between

21  Phoenix and Mr. Chef, is that correct?

22  A    That's correct.

23  Q    Signed?

24  A    Yes.

25  Q    Multiple pages?

154

1   A    The -- you're asking about the non-circumvention

2   agreement which is only about a paragraph.  It accompanies a

3   confidentiality agreement which is one page as I recall.

4   Q    So this is an agreement between Phoenix and somebody

5   named Chef whereby Mr. Chef agreed not to bid on the assets

6   that are being sold here today?

7   A    That's right.

8   Q    And when was this agreement made?

9   A    I don't recall the exact date.

10  Q    Before or after the first of the year 2008?

11  A    After the first of the year.

12  Q    Okay.  Before or after February 1, 2008?

13  A    I believe it was about two weeks ago, so after.

14  Q    Today is what, the 25th.  So roughly sometime around

15  the 10th of the month more or less?

16  A    That's to the best of my recollection what it was.

17  Q    Okay.  Could be a week off.  I'm not trying to pin you

18  down on exactly what it is, but when -- when it was.  So

19  there's a one-page confidentiality agreement and then some

20  kind of --

21  A    Non-circumvention.

22  Q    -- non-circumvention agreement.  And who is Mr. Chef?

23  A    He's an individual.

24  Q    Is he -- okay.  Is he affiliated with any business?

25  A    I -- the one business I know he's affiliated is a

155

1 business called Harbor Payments.  He is the chief operating

2 officer.

3 Q    Chief operating officer of Harbor Payments.  And is

4 Harbor Payments somehow related to Remit Gate or was there

5 suspicion that they were?

6 A    There was a suspicion, yes.

7 Q    And what was the basis for that suspicion?

8 A    Because the principal officer of Harbor Payments is the

9 principal officer of Remit Gate.  The principal -- let me

10 correct that.  The CEO of Harbor Payments is the principal

11 officer to my knowledge of Remit Gate.

12 Q    And what's this person's name?

13 A    I'm sorry.  I don't recall.

14 Q    Okay.  But the person is the CEO of Harbor Payments.

15 What business is Harbor Payments in?

16 A    I don't recall exactly.  It wouldn't -- I mean, I

17 believe it's a merchant acquiring role, and I know that it

18 was bought by American Express for a substantial sum of

19 money.

20 Q    And were they -- was Harbor Payments somebody who was

21 to your knowledge interested potentially in bidding on the

22 assets being sold here today?

23 A    I have no knowledge if they were or not.

24 Q    What information was shared with Harbor Payments?  I'm

25 sorry, with -- I guess Mr. Chef would be the answer.  It

156

1   wouldn't be Harbor Payments.  What information was shared

2   with him?

3   A   A lot.  I mean, there's a full letter on this that was

4   received by Mr. Lumsden.  So but they were the financial

5   models that we were using to review what bid we would put in

6   as well as a five-year financial model of how we thought the

7   business could be run.  There was the business plan of the

8   MBA team.  There was a lot of technical information with

9   regard to how the system ran that -- you know, it's just

10  quite a bit of information.

11  Q   Was that information shared with Mr. Lumsden?

12  A   What do you mean?

13  Q   Well, you've indicated that there was a lot of

14  information shared with Mr. Chef, and I think you talked

15  about this --

16  A   The information that was mostly shared by us was our

17  bidding strategy, our maximum bid.  That's what we were

18  concerned about when, you know, we filed a letter of protest

19  with regard to Remit Gate being admitted.

20  Q   The information that you shared with Mr. Chef, was that

21  ever shared with Mr. Lumsden?

22  A   Never.  You know, I would not tell Mr. Lumsden my

23  maximum bid, no.

24  Q   Was the non-circumvention agreement shown to Mr.

25  Lumsden?

157

1  A    No.

2  Q    Did he ever ask for it?

3  A    Not to my knowledge.

4  Q    Did you ever offer it?

5  A    We referenced in our complaint that we had it, and my

6  partner handled that.  I do not believe he attached to the

7  complaint those documents, but I could be incorrect on that.

8  Q    When you say the complaint, that is a letter of

9  complaint to --

10 A    It was.

11 Q    Okay.  It wasn't actually like a complaint that you

12 file to start a lawsuit, right?

13 A    I wouldn't know the difference.

14 Q    Okay.  Have you -- to the best of your knowledge, has

15 Phoenix Check Cashing filed a lawsuit against Remit Gate?

16 A    No.

17 Q    Has it filed any lawsuit against Mr. Chef?

18 A    No.

19 Q    Does it intend to?

20       MR. DAVIDOFF:  Objection, your Honor.  That's

21 irrelevant to the question, and it goes to my client's

22 interest.  It's irrelevant to what's going on here.

23       THE COURT:  Sustained.

24 BY MR. STERN:

25 Q    There was also a confidentiality agreement you

158

1  indicated that you entered into or that Phoenix entered into

2  with Mr. Chef, right?

3  A    That's correct.

4  Q    Was that confidentiality agreement shared with Mr.

5  Lumsden?

6  A    No, but he knew about the existence of it, of course.

7  Q    Did he ever ask for it?

8  A    Not to my knowledge.

9  Q    Did you ever offer it?

10  A    Not to my knowledge.

11  Q    In terms of you mentioned that you had a bidding

12  strategy that you shared with Mr. Chef, correct?

13  A    That is correct.

14  Q    Who developed that bidding strategy?

15  A    WWC Capital Group.

16  Q    And since WWC Capital Group is probably an LLC or an

17  LLP, there must have been actual human beings involved in

18  developing that, right?

19  A    Yes.

20  Q    Who were the human beings who were involved in

21  developing it?

22  A    Primarily myself, my partner Michael J. Cromwell III,

23  and Jim McCabe, who is a senior associate at our firm.

24  Q    You also I think mentioned something about financial

25  models being shared with Mr. Chef, correct?

159

1  A    Uh-huh.

2  Q    Those included discounted cash flows and the like?

3  A    Yes, they did.

4  Q    And who were the individuals who were involved in

5  developing the financial models?

6  A    The same individuals I just mentioned to you at WWC

7  Capital Group were the primary developers of those models on

8  our side.  Of course, there were management team members

9  that participated in that also.

10 Q    And who were the management team members who

11 participated in the financial model development?

12 A    Primary George Rice, Don Bauernfeind and John Dorsey.

13 Q    Not Mr. McNally?

14 A    I think it would be -- he was involved but to a lesser

15 degree.

16 Q    And were any of those financial models to your

17 knowledge shared with Mr. Lumsden?

18 A    I hope not.

19 Q    Were they ever -- when I'm asking about Mr. Lumsden,

20 incidentally, if you shared it with his counsel -- I should

21 have been clear before.  Would there have been any

22 difference in your answer as to any of those prior questions

23 when I asked you whether you --

24 A    There would not have been any difference.

25 Q    Okay.  So you hope that the financial models were not

160

1 shared with Mr. Lumsden, and you don't believe they were, is

2 that a fair statement?

3 A    That is a fair statement.

4 Q    There was also you said a business plan.  Don't know

5 whether or not that's included with a financial model or

6 not, but it's just one of the things I noted.

7 A    Yes.

8 Q    Who developed the business plan?

9 A    The business plan was developed by the management team.

10 It talked about future direction for the business.

11 Q    And, again, to your knowledge, was that shared with Mr.

12 Lumsden or any of his representatives?

13 A    It was not, no.  Additionally, just to supplement my

14 statement, a term sheet describing the security that we were

15 forming was also shared with Mr. Mandin.  That term sheet

16 described the terms under which the capital would be

17 contributed to Phoenix.

18 Q    Then you also mentioned -- was that term sheet shared

19 with Mr. Lumsden?

20 A    No.

21 Q    At least not to your knowledge, correct?

22 A    Yes, not to my knowledge.

23 Q    And in terms of the technical information, what kind of

24 technical information -- and, again, I'm not asking you, you

25 know, to give me the formula for Coca Cola.  Just describe

161

1  it generally.

2  A    It was a general description of -- well, it was a

3  description of how the system worked and the components of

4  the system and I was not on the phone call when that was

5  shared.  That was a phone call between Mandin's people,

6  Mandin and Mr. McNally.

7  Q    Mandin is Mr. Chef?

8  A    Yes.

9  Q    Okay.  I just want to make sure I got the right people.

10  And, again, to the best of your knowledge, that technical

11  information was not shared with Mr. Lumsden or any of his

12  representatives, correct?

13  A    Right.

14  Q    And that was also developed both by people at WWC and

15  management, correct?

16  A    It was, yes.

17  Q    In terms of Phoenix Check Cashing, it is going to be,

18  if it's successful, the owner of all these assets that were

19  being sold last Friday, correct?

20  A    Yes.

21  Q    And what is the -- how are the economic interests of

22  Phoenix Check Cashing held?  Who has what percentage, if you

23  will, of the equity?

24  A    Well, I believe there was information disclosed in my

25  statement with regard to that.  I can try to repeat it, but

162

1  you could refer to it, but those individuals as quoted there

2  preferred stock in Phoenix.  I think I disclosed that WWC

3  Capital Group had a percentage ownership, that Woodbrook

4  Capital had a percentage ownership, that the management team

5  had a percentage ownership, and these are all as a director,

6  and two other individuals had percentage ownerships, and I

7  think that they all totaled up to about 80 percent.  So I

8  think I described the vast majority of the preferred capital

9  structure of the company.  The management team will get an

10  additional promote depending upon performance.

11 Q    Okay.  That was -- you see where I was going actually.

12 A    It's a lot more complicated than that, but --

13 Q    No.  I was -- I understand.  I'm not trying to get

14 complicated.  All I noticed was that if you added up the

15 percentages, they didn't add to 100, and the reason they

16 don't add up to 100 is because management will be getting

17 some equity just based on its being management, correct?

18 A    No, that is not correct.

19 Q    What would be the management incentive package?

20 A    They will get a 20 percent incentive provided that the

21 preferred gets its money back plus a preferred return.  I

22 don't recall.  I think it's a six percent preferred return.

23 In addition, we allowed them to enter the preferred with

24 their own money, which they did, and they, of course, get

25 the same economic terms that all the preferred gets.

163

1 Q    But they also get something extra for being management,

2 correct?

3 A    Yes.

4 Q    And what's the reason that they're getting something

5 extra for being management?

6 A    Because we want the business to do well.

7 Q    And is it also in recognition of their expertise with

8 this particular business and this set of assets?

9 A    I hope so.

10 Q    When did you first -- let me just take -- let's start

11 out with WWC.  Were you -- are you the person at WWC who was

12 the primary contact and primarily responsible for this

13 particular investment?

14 A    Both Mike Cromwell and I share that title, yeah.

15 Q    When did -- was the first contact about these assets,

16 did it come to you or Mike Cromwell or somebody else?

17 A    To me.

18 Q    And approximately when did that happen?

19 A    It was approximately the last week of December.

20 Q    And how did you learn about the business being -- or

21 the assets being for sale?

22 A    I received a call from Don Bauernfeind saying that it

23 was his understanding that these assets would become

24 available and that the management team would like to bid on

25 it, and we had several conversations in the, you know,

164

1  ensuing two months and wound up -- wound up bidding.

2  Q    Who is Mr. Bauernfeind, just to identify him?

3  A    I believe Don Bauernfeind is identified and there's a

4  statement from him I think.  He is going to be the chief

5  operating officer of Phoenix if we are successful.  He is an

6  individual obviously.

7  Q    And what was his involvement with the business at the

8  time you heard from him?

9  A    To my knowledge, none.

10 Q    And how had he learned about the business, if you know?

11 A    I don't.

12 Q    Is he ordinarily a business broker?

13 A    He is not.

14 Q    During the course of your investigation, did you do

15 some due diligence on this business?

16 A    Yes.

17 Q    And as a result of that due diligence, you spoke with

18 Mr. McNally, right?

19 A    Yes.

20 Q    You spoke to Mr. Rice, is that correct?

21 A    Yes.

22 Q    Did you speak to any other members of existing

23 management?

24 A    No.  Well, no.

25 Q    How did you go about determining your bidding strategy?

165

1   And I'm not asking you what it was.  I'm just asking you the

2   process about how you went about determining your bidding

3   strategy.

4   A    We sat in a room and we talked about it.  I really

5   don't know how to answer that question.  I mean, it's a

6   consensus discussion what would happen if this happened,

7   that happened, how can we make a return out of this

8   business.  It's hours and hours of conversations that I have

9   no idea how to summarize quickly for you.

10  Q    And who was in on these hours and hours of

11  conversations?

12  A    Jim McCabe, Mike Cromwell, myself, later in the process

13  the four management team members that we've identified were

14  also present.

15  Q    And just in terms of numbers of hours if you can

16  approximate, how many hours did the four members of the

17  management team spend involved in the due diligence process?

18  A    I don't know.  Do you mean in all discussions with us?

19  Do you mean our due diligence?  I don't know quite whose due

20  diligence process you're talking about.

21  Q    Well, you were describing a process whereby you did due

22  diligence in order to determine effectively how much you

23  could pay for this business and make a profit, right?

24  A    Right.

25  Q    And that process involved internal work at WWC,

166

1 correct?

2 A    Yes.

3 Q    But it also involved meeting with members of the

4 management team, McNally, Dorsey, Rice, and Bauernfeind --

5 and I hope I pronounced that right.

6 A    Bauernfeind.

7 Q    -- Bauernfeind -- it also involved working with them,

8 correct?

9 A    Yes.

10 Q    McNally, approximate number of hours that he was

11 involved in the -- in the due diligence process if you can

12 best estimate?

13 A    Fifty.

14 Q    Dorsey?

15 A    Twenty.

16 Q    Rice?

17 A    Thirty.

18 Q    Bauernfeind, how much?

19 A    Ten.

20 Q    Okay.  And those people were also involved in helping

21 to construct the financial models and the like for the

22 business on a going-forward basis, correct?

23 A    Yes.

24 Q    Did you ever attempt to appraise the assets that you

25 were purchasing?

167

1 A    Yeah, we -- that's the business valuation.  Of course

2 we tried to figure out the business valuation.

3 Q    Did you -- did you go outside WWC or did you have those

4 resources within?

5 A    We had them within.

6 Q    Okay.  And during what period or periods of time was

7 this due diligence process from start to finish?  When did

8 it go?

9 A    I think I mentioned to you I would say we got -- I

10 would say we got actively engaged in analysis the second

11 week of January, and, of course, it continued right up until

12 Friday.

13 Q    So we're roughly talking about a four or five week

14 period of active involvement until you actually bid?

15 A    Yeah.  I'd say, yeah, five weeks, yeah.

16 Q    Okay.  The initial bid that you made for the property

17 being sold was $3,000,000 -- it was $2.5 million cash.  How

18 much was it initially?  Let me just not -- let me not tell

19 you but you tell me.  What was the initial bid?

20 A    We tried to become the stocking horse.  We made an

21 initial bid of $2.25 million in cash as I recall -- yeah, in

22 cash.  We were told that that would be inadequate, and we

23 resubmitted a bid that had $2.25 million of cash plus

24 offered compensation for assets being acquired, receivables,

25 inventory, et cetera.  We valued that bid higher, but I

168

1  don't recall the exact number that we valued it at.

2  Q    In terms of the $2.25 million initial offer, who was

3  involved in formulating that particular offer?

4  A    All the same people that I've previously mentioned.

5  Q    And that would include McNally, Rice, and Dorsey,

6  correct, among others?

7  A    And Bauernfeind, yes.

8  Q    And Bauernfeind, among others?

9  A    Among others, correct.

10  Q    In terms of patents, applications, and licenses, how

11  did you go about determining which patents, applications,

12  and licenses you wanted to acquire?

13  A    We relied a lot on John McNally to tell us which ones

14  were necessary to operate the business.

15  Q    And did McNally indicate that any of the patents that

16  you were bidding for were valuable?

17        MR. DAVIDOFF:  Objection.  The question is vague

18  and ambiguous.

19        THE COURT:  Excuse me?

20        MR. DAVIDOFF:  The question is vague and

21  ambiguous, your Honor.  I don't know if the witness can

22  answer it.

23        THE WITNESS:  I can.  McNally never gave me a

24  value for the patents.

25  //

169

1 BY MR. STERN:

2 Q    Did he ever give you a range of values for the patents?

3 A    No.

4 Q    Did he tell you that the patents that you were

5 purchasing were patents you needed in order to conduct the

6 business, however?

7 A    There's actually a debate as to whether -- I mean,

8 there are obviously competitors in this business that do not

9 have that patent protection that operate the business and to

10 my knowledge have not been -- no one's tried to hinder their

11 operation of that business.  So there was that side of the

12 equation.  But we felt that we always faced risk of

13 litigation if we did not have the patents.  So they had

14 value to us, but I don't -- I don't have an exact number.

15 Q    And we're talking about patents -- we're talking about

16 both patents and applications as well as licenses, right?

17 A    Yeah.

18 Q    In terms of patents, you're acquiring the patents --

19 one patent I think outright, is that correct?

20 A    I don't believe so.  I think there's more than one

21 patent that's being acquired outright.

22 Q    Okay.  And how about applications as opposed to

23 patents, are you acquiring any of those?

24 A    I don't recall.

25 Q    How about licenses, you acquire any of those?

170

1 A     We have copyrights -- business licenses you mean?

2 Q     No.  I'm assuming intellectual property licenses,

3 licenses to -- to use -- it was -- again, let me not try to

4 play hide the ball on this one.  Mr. Lumsden had testified

5 -- you were obviously not here -- that there were a couple

6 of licenses that you were being -- that were going to the

7 purchaser and I was just trying to inquire as to whether or

8 not you understood anything like that?

9 A     Yeah, that's correct.  I mean, there are licenses

10 surrounding one set of IP that we will step into as part of

11 this.  I'm having trouble recalling the exact name of that

12 set of IP.  I should remember it, but I can't right at this

13 second.

14 Q     I notice in your -- in your declaration you indicated

15 where the money was coming from.  You said WWC  Fund has

16 committed $1.5 million.  Do you recall that?

17 A     I do.

18 Q     What's WWC Fund?

19 A     We have two private equity funds that we manage, WWC

20 Capital One and WWC Capital Fund II, and this would be money

21 coming from Capital Fund II.

22 Q     And that's money of third parties that WWC manages, is

23 that correct?

24 A     We had partner capital in there too.

25 Q     So it's partner and outside investors?

171

1  A    Correct.

2  Q    Woodbrook Capital is committing $1.6 million.  What is

3  Woodbrook Capital?

4  A    Woodbrook is a private equity fund, solely owned by

5  Earl Linahan.

6  Q    And where are they based?

7  A    They're based in Townsend, Maryland.

8  Q    And how did it come about that Woodbrook became

9  involved in the bid?

10  A    Woodbrook is a -- this is confidential I suppose.

11  Woodbrook is a limited partner in WWC Capital Fund.  We have

12  a long-standing relationship with Mr. Linahan, and he's

13  participated in a number of investments with us.

14  Q    Had he previously expressed any interest to your

15  knowledge in acquiring the assets that are being sold here

16  today?

17  A    No.

18  Q    Who's Michael Ali?

19  A    Michael Ali is a distributor that the management team

20  knew as a result of them being a distributor essentially of

21  the business.

22  Q    And he's committed $650,000 to that, correct?

23  A    Correct, yeah.

24  Q    What does a distributor do in this line of business?

25  A    They call on the individual stores, and they act

172

1  sometimes as an installer of the equipment, but they're a

2  sales channel.

3  Q    And you got to Mr. Ali through one of the management

4  representatives, is that correct?

5  A    We did, yes.

6  Q    Who actually had the contact, if you know?

7  A    I think they all know him.

8  Q    Okay.

9  A    But it was primarily John Dorsey.

10 Q    Are there any employees currently who work for the --

11 any of the Debtors who are also going to be employees of

12 Phoenix if you're the successful bidder?

13 A    Yes.  I think we've enumerated approximately 16 people.

14 Q    And how did you go about choosing which 16 people you

15 wanted to have work for you on a going-forward basis?

16 A    We relied on the management team.

17 Q    And how many employees are currently at the business to

18 your knowledge?

19 A    I don't know.

20 Q    Is 16 100 percent of the --

21 A    I believe there's a greater number.

22 Q    How many more?

23 A    I don't know.  I think there's been a lot of attrition.

24 Q    But these are the 16 that management told you were

25 folks you should have on a going-forward basis?

173

1  A    Yes.

2        MR. STERN:  I'll pass the witness at this time.

3  Thank you.

4        THE COURT:  Thank you.

5        Mr. Davidoff?

6        MR. DAVIDOFF:  Thank you, your Honor.

7                    FURTHER CROSS EXAMINATION

8  BY MR. DAVIDOFF:

9  Q    Mr. Wallace, did you have any prior contact with any of

10 the members of Phoenix Check Cashing before your involvement

11 with this transaction?

12 A    I did.

13 Q    And what was that relationship?

14 A    In addition to our private equity funds, our firm

15 started as an investment banking company, and we were

16 retained by Mr. Tim Robinson and I guess the other

17 shareholders of a company called Check Again, which he was

18 the primary owner of, and we were hired as investment

19 bankers.  We did agency work on behalf of that company and

20 sold it eventually to Pfiser.  I believe it was

21 approximately three years ago.

22 Q    And between that period and the efforts in connection

23 with this purchase, did you have any other relationship with

24 them?

25 A    I had occasional conversations with Don Bauernfeind,

174

1 but there was no other business relationship.

2 Q    When Mr. Bauernfeind contacted you regarding this

3 particular transaction, what were they looking to WWC for?

4 What did he say to you?

5 A    Money.

6 Q    And what did you regard your role, your being WWC's

7 role, in this transaction as?  What was your function?

8 A    We felt we could help develop a financial strategy for

9 the business.  We think we're very good at assessing values

10 of companies both now and hopefully in the future.  We feel

11 we're good at capital structures, making sure companies are

12 properly capitalized in the right mix of both debt and

13 equity in a company.  We feel we've had a very successful

14 track record, being good financial sponsors of companies of

15 this size and in this industry.

16 Q    So after you were contacted by Mr. Bauernfeind, what

17 was the next step from WWC's point of view?

18 A    At that point we decided that we needed to register our

19 interest with Mr. Lumsden, and we -- I believe we first

20 called Mr. A.J. Armani and told him that we were interested

21 in bidding.  We signed a confidentiality agreement with Pay

22 By Touch essentially that did enable us to get the

23 confidential memorandum.  We reviewed the confidential

24 memorandum.  It began our process of due diligence and

25 planning.

175

1  Q    When you say we registered our interest, who is we?

2  A    I believe the confidentiality agreement or NDA was

3  signed by WWC Capital Group, LLC.

4  Q    Did you disclose to Mr. Lumsden at that point, at your

5  initial conversations with him that you were affiliated with

6  some of the management team at Pay By Touch?

7  A    Yes.  In fact, I believe from the beginning we said we

8  were doing this in support of management's desire to acquire

9  the business.

10 Q    Now, in the normal course of arranging capital for an

11 acquisition, do you provide all the capital?  Do you

12 typically provide the capital internally or do you seek

13 third party investors?

14 A    Most of the deals in which we're a principal have

15 additional other principals or other funds involved,

16 sometimes individuals, sometimes other venture capital funds

17 or private equity funds.  Most of the time, we're not alone

18 in our deals.

19 Q    And in prior transactions, is it the normal course of

20 WWC to have confidentiality agreements with parties with

21 whom you're showing financial information?

22 A    It is.

23 Q    What was Mr. Mandin Chef's role as you understand it

24 going to be insofar as his contact with WWC Capital?

25 A    We were told that he was a knowledgeable person in the

176

1 industry and that the only role we anticipated him playing

2 was that of providing capital to the bid.  He told us early

3 on he was not interested in serving on the board.

4 Q    So was WWC looking to him as a potential capital

5 provider?

6 A    Yes.

7 Q    Did he, in fact, state to you that he was going to

8 provide capital to this potential acquisition?

9 A    He, in fact, said to us that subject to him checking

10 with his lawyers regarding the term sheet that he was good

11 for $1,000,000.

12 Q    At some point in time did that change?

13 A    It did, the next day.

14 Q    When are we talking about?

15 A    Saturday, a week ago today.

16 Q    So Saturday a week ago he --

17 A    I'm sorry.  Saturday -- a week ago Saturday.  So it was

18 approximately nine days ago.  Is my math right?  Yeah.

19 Q    So approximately nine days ago he had committed to

20 invest or that he was no longer an investor?

21 A    He withdrew.  He sent us an E-mail saying that he would

22 not go forward.

23 Q    And do I understand it correctly that it was sometime

24 prior to that time that you had signed with him a non-

25 circumvention --

177

1  A    Yes, correct.

2  Q    Why did you feel it necessary to have a non-

3  circumvention agreement with him?

4  A    Because we were going to share confidential bidding

5  strategy.  All of the, you know, our intellectual property

6  so to speak surrounding this deal, its chances of success,

7  our knowledge was going to be shared with him, and it was

8  going to give him a blueprint to bid for himself if he so

9  choose, and, of course, we felt that in consideration of

10  such knowledge and the opportunity to participate with us,

11  we had the right to ask him to only team with us and with

12  nobody else.

13  Q    Mr. Stern asked you on several occasions whether some

14  of this information that had developed was not shared with

15  Mr. Lumsden.  Do you recall that?

16  A    Yes, I do.

17  Q    And why is it that you didn't share this information

18  with Mr. Lumsden?

19  A    Because he had no right to it that I can see.  I mean,

20  I -- I think this is our proprietary information, our

21  intellectual property, our opportunity to develop an

22  advantage as a potential bidder.

23  Q    In your transactions, would you say that you generally

24  -- let me withdraw that question.  Does WWC act simply as a

25  capital provider or do you also act as operational

178

1  management in companies that you acquire?

2  A    We've never acted as operational managers, so only

3  capital.

4  Q    Do you typically sit on the board of directors?

5  A    Yes.

6  Q    So if it's an LLC, you would be a manager?

7  A    We generally do not invest in LLCs.  So it's C Corps,

8  and we're directors of the C Corp.

9  Q    And how do you obtain management in your transactions?

10  A    We incent them with salary bonus and stock options or

11  restricted stock, some type of an equity play, so that when

12  hopefully we do well, they do too.

13  Q    How important in WWC determination to participate in an

14  acquisition is management?

15  A    It's essential.  It -- we would not have bid on this

16  property if we didn't have a management team we had

17  confidence in or any other.

18  Q    Would have you gone into this particular transaction

19  with a different management team?

20  A    I don't know.

21  Q    You also mentioned in response to some questions from

22  Mr. Stern that you sought to be a stocking horse.  Do you

23  recall that discussion?

24  A    Yes, I do, yes.

25  Q    What is your understanding of a stocking horse?

179

1  A    Well, this is new to me, but apparently that's the bate

2  that's thrown out for other people to come and see if they

3  can top you, and you get some consideration in exchange,

4  some fee reimbursement, maybe a breakup fee, but you

5  negotiate the asset purchase agreement with the -- with the

6  custodian or Trustee of the Court, and then there's a period

7  of time where others can challenge the bid you put on the

8  table.  That's my understanding of it.

9  Q    And to whom did you make the stocking horse offer?

10 A    To Mr. Lumsden.

11        MR. DAVIDOFF:  I have nothing further.  Thank you,

12 your Honor.

13        THE COURT:  Mr. Johnston.

14        MR. JOHNSTON:  Just very briefly.

15                    REDIRECT EXAMINATION

16 BY MR. JOHNSTON:

17 Q    Do you know whether John Dorsey is currently employed

18 by Solidus Networks or any of the other Debtors?

19 A    It is my understanding that he is not.

20 Q    And I think you testified to this earlier, but I wasn't

21 clear.  Do you know whether Donald Bauernfeind is currently

22 employed by Solidus Networks or any --

23 A    Donald Bauernfeind is not employed by any of them.

24 Q    Did Mandin Chef's alleged breach of this non-

25 circumvention agreement cause Phoenix Check Cashing to not

180

1 participate in the auction that was held last Friday?

2 A    No.

3 Q    Did it cause Phoenix to bid less than what it otherwise

4 was prepared to pay for the Paycheck Secure assets?

5 A    No.

6 Q    In fact, Phoenix engaged in at least 12 rounds of

7 bidding with Remit Gate for these assets, correct?

8 A    I seem to recall that, yes.

9 Q    The bidding started at $3,000,000?

10 A    I seem to recall that, yes.

11 Q    And where did the bidding end?

12 A    Higher, $4.2 million.

13        MR. JOHNSTON:  Okay.  Thank you.

14        I have nothing further, your Honor.

15        MR. STERN:  No further questions.

16        THE COURT:  Thank you, Mr. Wallace.

17        THE WITNESS:  Thank you, your Honor.

18                            (The witness was excused.)

19        MR. STERN:  Just so it's clear, I now have no

20 objection to his remaining in the courtroom.

21        THE COURT:  Okay.  Thank you.

22        MR. JOHNSTON:  So we will call Jonathan McNally

23 next.

24        JONATHAN MCNALLY - DEBTOR'S WITNESS - SWORN

25        THE CLERK:  Please be seated and state your name

181

1 for the record.

2          THE WITNESS:  John McNally.

3                         CROSS EXAMINATION

4 BY MR. STERN:

5 Q    Good afternoon, Mr. McNally.  My name is David Stern,

6 and I'm counsel for Whorl.  I'll be asking you some

7 questions.

8 A    Okay.

9 Q    There's some mention at the auction last week, Friday

10 -- you were present at the auction on Friday afternoon,

11 correct?

12 A    That is correct.

13 Q    And there was a mention during the course of that

14 auction of something called a non-circumvention agreement.

15 Do you recall that mention?

16 A    As part of the auction process?

17 Q    Do you recall Mr. Davidoff at some point objecting to

18 the --

19 A    Yes.

20 Q    -- participation?  It would be easier if you wait for

21 my questions.  But you knew where I was going.  There was,

22 indeed, mention of a non-circumvention agreement, right?

23 A    Correct.

24 Q    And what was your understanding of the non-

25 circumvention agreement?

182

1  A    I don't quite understand.

2  Q    Let me make it a -- who was the non-circumvention

3  agreement with?

4  A    We have -- the non-circumvention agreement that was

5  discussed was with a Mandin Chief.

6  Q    And that's a Mr., right?

7  A    Mr. Mandin Chef.

8  Q    And who is Mr. Mandin Chef?

9  A    Mandin Chef was a potential investor in our Phoenix

10 Check Cashing plan to do the purchase.

11 Q    Is he currently the CEO of the company?

12 A    No.

13 Q    Is he currently affiliated with any company of which

14 you're aware?

15 A    He is affiliated with Harbor Payments.

16 Q    And what is Harbor Payments?

17 A    I'm not 100 percent sure what they actually do as a

18 business.

19 Q    Are they also involved in some type of check cashing

20 business?

21 A    Not that I'm aware of.

22 Q    And how did you know Mr. Chef?

23 A    He was introduced to me as a potential investor.

24 Q    By whom?

25 A    Gentleman's name was Tom Meredith.

183

1  Q     And who's Tom Meredith?

2  A     Tom Meredith is the president of a company called P2P

3  Cash.

4  Q     And what is P2P Cash?

5  A     P2P Cash, as I understand it, performs money movement

6  using the cell phone network.

7  Q     Is it considered a competitor of any of the Pay By

8  Touch companies?

9  A     I don't believe so.

10 Q     And Mr. Chef was, to your understanding, interested in

11 potentially being an investor in Phoenix Check Cashing?

12 A     That's correct.

13 Q     Did he ever explain to you why he was interested in --

14 in the assets that were being sold?

15 A     No more than just looking for opportunities for

16 investment.

17 Q     Did he -- was he interested because of the particular

18 nature of the assets?

19 A     None that he led me to believe.

20 Q     Did he indicate to you that he might be interested in

21 bidding against Phoenix Check Cashing for the assets?

22 A     No, that was never discussed.

23 Q     And is it correct both you and Mr. Chef signed a

24 confidentiality agreement?

25 A     That is correct.

184

1  Q    And you also signed something called a non-
2  circumvention agreement, correct?
3  A    That is correct.
4  Q    And the purpose of that was to reveal certain
5  information to him and to make sure that he would not bid
6  against you for these assets, correct?
7  A    Correct.
8  Q    And can you describe to me what information you shared
9  with Mr. Chef, if any, pursuant to the confidentiality
10 agreement?
11 A    We had an investor meeting where we discussed our
12 business model, business plan, our financials.
13 Q    What are you referring to when you say financials?
14 A    Our perceived projections of what we would need to run
15 the business for the next five years after a successful
16 purchase.
17 Q    And who had been involved in developing those
18 financials?
19 A    The entire management group as well as representatives
20 from WWC.
21 Q    And that included both you and Mr. Rice, correct?
22 A    That's correct.
23 Q    And it also included Mr. Valentine?
24 A    Yes.
25 Q    Mr. Dorsey?

185

1  A    Yes.

2  Q    Anyone else who's currently employed by any of the

3  Debtors?

4  A    A Karen Tuttle also provided some input to the

5  financial model.  I'm not sure whether she's still an

6  employee or not.

7  Q    Who's Karen Tuttle?

8  A    Karen Tuttle is a product person involved with the

9  Paycheck Secure product.

10 Q    And she either is or was an employee of one of the

11 Debtor companies?

12 A    That is correct.

13 Q    And at the time that she helped develop the financials,

14 was she at that time an employee of any of the Debtor

15 companies?

16 A    I'm not sure.  She does not report directly to me.

17 Q    And in terms of the business plan, who developed that?

18 A    Again, it was -- I mean, we all had our specific input,

19 some in specific areas of the business plan.

20 Q    You were involved?

21 A    I was involved.

22 Q    Dorsey was involved?

23 A    Mr. Dorsey was involved.

24 Q    Mr. Rice was involved?

25 A    That's correct.

186

1  Q    Mr. Bauernfeind?

2  A    Yes.

3  Q    Ms. Tuttle?

4  A    Ms. Tuttle as well.

5  Q    And in terms of the business mode, you've described

6  three things.  I'm not sure if we're just repeating the same

7  stuff.  But, again, what was the business model?

8  A    Business model and the business plan are to me the same

9  thing.

10  Q    And, again, same group of folks involved?

11  A    Same group of folks.

12  Q    In terms of the business model, business plan

13  financials, that package of information that you shared with

14  Mr. Chef, did you share that with Mr. Lumsden?

15  A    Not that I'm aware of.  I did not personally share it

16  with Mr. Lumsden.

17  Q    The information in that plan, though, was based upon

18  knowledge that you and others had from your experience

19  working at Pay By Touch, right?

20  A    It was based on our experiences at Biopay as well as

21  with Pay By Touch and some of the future numbers that were

22  produced by Pay By Touch for the sale and other wild guesses

23  as most business plans are.

24  Q    And Biopay was the company that was owned by Mr.

25  Robinson, correct?

187

1  A    Correct, as well as myself.

2  Q    Okay.  And it was the one that was sold to Solidus and

3  is sometimes -- its assets were put into that thing we now

4  call the IP Sub, right?

5  A    In my opinion it was put into Whorl.

6  Q    Okay.  But you -- nonetheless, the model that was

7  developed -- the models that were developed were based on

8  your experience at Biopay, at Pay By Touch as well as some

9  guesses?

10 A    And business school and, you know, all those other

11 things.

12 Q    Right.  And your understanding is you did not share

13 that with Mr. Lumsden, correct?

14 A    Correct.

15 Q    Did you ask anyone else to share it with Mr. Lumsden?

16 A    I did not.

17 Q    Did you ask anyone not to share it with Mr. Lumsden?

18 A    I did not.

19 Q    Was there a reason that you did not actively attempt to

20 share it with Mr. Lumsden?

21 A    No.

22 Q    Did you share it with any other prospective bidders for

23 the assets that are being sold here?

24 A    Yes.

25 Q    With whom?

188

1  A     Not bidders.

2  Q     I'm sorry.

3  A     I'm sorry.  Other potential investors into our group,
4  not bidders.

5  Q     Okay.  Investors into the Phoenix Group?

6  A     Potential investors in the Phoenix Group.

7  Q     How about with potential competitive bidders, others
8  who might be interested in bidding for these assets?

9  A     Not on purpose.

10  Q     Why not on purpose?

11  A     Well, at the time, if there was anybody we felt was a
12  competitor, obviously that's a different story.  We did not
13  -- everybody we shared the business plan in was perceived as
14  noncompetitors.  Let me answer it that way.

15  Q     And those who were competitors you did not share the
16  business plan with?

17  A     That we knew of, right.

18  Q     And, in fact, last Friday during the course of the
19  negotiations, you and Mr. Lumsden exchanged some heated
20  words relating to that, is that correct?

21  A     No, not relating to sharing information with potential
22  competitive bidders.

23  Q     You and Mr. Lumsden shared some heated words relating
24  to the marketing of this business, correct?

25              MR. DAVIDOFF:  Objection, your Honor.  It's

189

1 without foundation.

2           THE COURT:  I'll sustain that unless you can tell

3 me why.

4           MR. STERN:  Lumsden testified to it.

5           MR. JOHNSTON:  I object to that, your Honor.  That

6 misstates Mr. Lumsden's testimony.

7           MR. STERN:  My very last question was whether or

8 not they had some discussion and whether or not Mr. Lumsden

9 complained to Mr. McNally about something, and I recall very

10 well his answer was yes.

11          MR. JOHNSTON:  It was the about something that Mr.

12 Stern misstated.

13          THE COURT:  Can I take a moment.  Could you ask

14 your question again, please?

15          MR. STERN:  I will try to.

16 BY MR. STERN:

17 Q    Did you and Mr. Lumsden exchange any heated words on

18 Friday about your not being appropriately forthcoming in the

19 bidding process?

20 A    There was some indications to that, yes.

21 Q    When did that occur?

22 A    I don't -- it was a very long day.  I cannot actually

23 tell you exactly in the day that happened.

24 Q    Was it before or after you were the successful bidder?

25 A    It was before.

190

1  Q    Okay.

2  A    Yes.

3  Q    And, as best you can recall, what did the two of you

4  say concerning you not being forthcoming in the bidding

5  process?

6  A    It was directed around the knowledge of the specific

7  IP, and I was told that I am the technology person and I

8  should know this, and I responded that I am the technology

9  person and I built the technology that some of the IPs were

10  based on, but I did not write or file the IPs.

11  Q    Did you believe during that conversation that Mr.

12  Lumsden was angry at you about something?

13  A    There seemed to be grumpiness in the air, but it was a

14  very long day.

15  Q    And this related to the intellectual property, the

16  grumpiness during this particular confrontation?

17  A    This specific situation, yes.

18  Q    Did Mr. Lumsden ever inquire of you as to whether or

19  not you and other members of the management team had been

20  appropriately forthcoming in giving information to

21  prospective bidders?

22  A    No.

23  Q    He never asked you whether you were or weren't?

24  A    Restate the question, please.

25  Q    Do you recall his ever -- let me try to -- I wish I

191

1  could remember it.  I don't have a photographic mind.  Do

2  you remember his ever complaining to you that you were not

3  appropriately forthcoming in the bidding process?

4  A    No, not -- no.

5  Q    Did he ever ask you whether you were sharing

6  information with Phoenix that you were not sharing with

7  other prospective bidders?

8  A    No.

9  Q    But, in fact, you were sharing information with Phoenix

10 that you weren't sharing with other prospective bidders?

11 A    We shared all information we were asked.

12 Q    But you didn't volunteer information to others the same

13 way you did with Phoenix, correct?

14 A    Again, I don't really understand the question.  The

15 information -- give me some more insight on what you mean by

16 sharing information with Phoenix.

17 Q    You spent a lot of time sitting down with the members

18 of WW --

19 A    C.

20 Q    WWC.  I wanted to get that last letter right.  You

21 spent a lot of time with WWC in developing the bidding

22 strategy and the financial plans and the like, right?

23 A    As anyone would intending to buy a company.

24 Q    Absolutely.  You spent more time with them than you

25 spent with other competitive bidders, right?

192

1  A     I didn't spend any time with competitive bidders.

2  Q     Right.  You wanted Phoenix to win?

3  A     It was our hope to have Phoenix win, yes.

4  Q     And did any -- did any prospective bidders ever come to

5  the Herndon premises?

6  A     None.

7  Q     Did they ever call you?

8  A     Not directly.

9  Q     Well, how did they call you indirectly?

10 A     There was one call that Mr. Lumsden set up with a

11 potential bidder.

12 Q     Who was that potential bidder?

13 A     I believe their name was Lumadine.

14 Q     And how long were you on the phone with Lumadine?

15 A     I don't believe it was anything more than 15 minutes.

16 Q     Did you offer to provide them with the business plans

17 that you were developing in connection with WWC?

18 A     I did not.

19 Q     Did you offer to share with them the financials you

20 were developing?

21 A     Did not.

22 Q     Did you offer to make Karen Tuttle available to them to

23 help in developing your own business plans?

24 A     Did not.

25 Q     To your knowledge, did any other member of the

193

1  management team offer to work together with this company?

2  A    No.

3  Q    In order to have access to the technology at Pay By

4  Touch Checking, it's necessary to have -- to know passwords,

5  right?

6  A    Yes.

7  Q    If you don't know the pass code, you can't get into the

8  various programs, correct?

9  A    There are many security levels, yes.

10 Q    And you have access to those pass codes, correct?

11 A    Some of them.

12 Q    Did you ever tell anyone that if you didn't win, you'd

13 sabotage any of those programs?

14 A    In a joking way, yes.

15           MR. STERN:  No further questions.

16                   FURTHER CROSS EXAMINATION

17 BY MR. DAVIDOFF:

18 Q    Mr. McNally, describe for the Court, please, what was

19 your role at Pay By Touch?

20 A    I was in charge of the technology that was the former

21 Biopay technology of payroll, check cashing, software, some

22 systems as well as some payments-related systems and also

23 the integration of that -- those systems into the Pay By

24 Touch world.

25 Q    When did you formulate an idea that you wanted to be

194

1  part of the management team that would seek to acquire this

2  aspect of the business?

3  A    It was pretty late into that process for me.  I -- I

4  would say it was probably the September -- when the company

5  went bankrupt and it was -- there was a potential that it

6  might be for sale was when I started contemplating there

7  might be an opportunity to pick up the purchase of Paycheck

8  Secure or whatever other assets they might be, didn't really

9  know what other assets would be for sale at that point.

10 Q    And did you have conversations with anyone else at

11 management at Pay By Touch regarding your interest in doing

12 that?

13 A    We did.  Even prior to bankruptcy, George Rice and I

14 had discussions with Pay By Touch management about our

15 interest in being a purchaser if possible.

16 Q    And who would that Pay By Touch management be?

17 A    Discussions with Mike Orman and Ula Adams.

18 Q    And do you remember what their response was?

19 A    Both were very positive and said that we should start

20 working out a plan and a book.  Ula Adams actually even told

21 us to put together a book and get an offer, and we put

22 together a presentation and made an offer to him.

23 Q    Now, this offer and presentation that you're referring

24 to is the offer and presentation made to Mr. Lumsden or

25 prior to bankruptcy?

195

1  A    Prior to bankruptcy.  I can't -- let me answer that --

2  I can't correctly recall if it was we were in involuntary at

3  the time or it was just before.  I'm not 100 percent sure on

4  the dates.

5  Q    But this is some other offer and presentation other

6  than the offer and --

7  A    It was before the offer book was published.

8  Q    Okay.  Let me ask my question and you --

9  A    Okay.  Sorry.

10 Q    -- can answer so it comes out clear on the record.

11 After the bankruptcy was filed, do you recall whether you or

12 -- strike that question.

13     Who else in the management team with you have you

14 spoken to regarding your interest in acquiring the business?

15 In other words, who was going to be on your management team

16 to buy the company?

17 A    Initially it was John -- well, John's not part of the

18 management team.  It was Karen Tuttle, George Rice, and

19 myself.

20 Q    And was the three of you that had made this proposal at

21 or around the time of the bankruptcy filing so you could

22 potentially acquire the business?

23 A    No.  At that point Karen Tuttle had already been

24 dropped out and replaced with John Dorsey.

25 Q    After the company filed bankruptcy and Mr. Lumsden was

196

1  appointed as the chief restructuring officer, what was your

2  role in connection with providing information to assist the

3  company in its sales process?

4  A    Mostly just providing information when asked.

5  Q    What was told to you as to how you should assist the

6  company?

7  A    I don't think there was really any direction on what I

8  should do to assist the company.

9  Q    So when you were asked to provide information, how did

10 that occur?  Was it a telephone call to somebody?  Was it an

11 E-mail?

12 A    The majority of the time it was E-mails.  Although

13 there were sometimes a phone call or two.

14 Q    And these E-mails, were they specific E-mails to you or

15 to you and other people?

16 A    Typically, they were sent to a group of multiple areas

17 of the company, whether it's the Pay By Touch main office or

18 Herndon.  All questions were put in there, and it was

19 whoever can answer specific questions, please do.

20 Q    And what did you regard as your area of responsibility

21 to respond to?

22 A    Mostly just the technology and the hardware and

23 software related areas.

24 Q    Were several requests made either by telephone or E-

25 mail for you to respond to, technology informational

197

1  requests?

2  A    There was a fair -- you know, a half a dozen or so

3  requests that came in.

4  Q    Did you participate in the preparation by Solidus of a

5  sales presentation plan?

6  A    I did not.

7  Q    Now, in response to a question from Mr. Stern, he asked

8  you whether or not the information that had been developed

9  by your management team of WWC had been shared by Mr.

10 Lumsden.  Do you recall that?

11 A    Yes.

12 Q    Did you regard that information as confidential

13 information of the purchasing team?

14 A    Yes.

15 Q    Are you the -- these passwords that you have to access

16 certain portions of the Solidus system, are you the only

17 person who has access to those passwords?

18 A    No.

19 Q    Who else has access to them?

20 A    There's a network administrator and a database

21 administrator that have all the same passwords.

22 Q    So you all have the same passwords?  Even if you were

23 not to give a password, do they have these passwords?

24 A    To tell the truth, I've been so out of date and working

25 on so many other things, they probably have passwords I

198

1 don't even know anymore.

2        MR. DAVIDOFF:  I have nothing further.  Thank you,

3 your Honor.

4        MR. JOHNSTON:  Just very briefly so the record is

5 clear.

6                    REDIRECT EXAMINATION

7 BY MR. JOHNSTON:

8 Q    I believe you testified that before the bankruptcy you

9 approached -- or at least before Mr. Lumsden's arrival on

10 the scene, you approached two members of Solidus management

11 about possibly acquiring the business, and I know you

12 mentioned Ula Adams.  What was the other name you mentioned?

13 A    Mike Orman.

14 Q    Mike Orman.  Who is Ula Adams?

15 A    Ula Adams I believe he's currently the COO of Solidus.

16 Q    Does Ula -- is Ula Adams involved in the operation of

17 the Paycheck Secure business?

18 A    We certainly all report up to him in some capacity.

19 Q    But is he involved in the day-to-day operations?

20 A    No.

21 Q    Okay.  And who is Mike Orman?

22 A    Mike Orman, I believe his title is VP of operations.

23 Q    Of which entity?

24 A    Of Pay By Touch.

25 Q    Of Solidus Networks?

199

1  A    Correct.

2  Q    Was he involved in the day-to-day operations of the

3  Paycheck Secure business?

4  A    In some respect, yes.  He -- for a while there, I was a

5  direct report to Mike Gorman.

6        MR. JOHNSTON:  Okay.  I have nothing further.

7  Thank you.

8        MR. STERN:  I'll pass the witness, your Honor.

9        THE COURT:  Thank you.

10       Thank you, Mr. McNally.

11       THE WITNESS:  Thank you.

12                              (The witness was excused.)

13       MR. JOHNSTON:  Your Honor, may I have one minute

14 to confer with Mr. Davidoff?

15       THE COURT:  Sure.

16   (Pause.)

17       MR. JOHNSTON:  Your Honor, that leaves open the

18 question of the three additional declarations that were

19 offered in support of the motion.  I've gone through them,

20 and I believe that the testimony offered in those

21 declarations is in large part duplicative of the testimony

22 you heard today.  If your Honor would like to hear from the

23 additional witnesses regarding the good faith and arm's-

24 length nature of this transaction, we will make them

25 available.  My preference would be if your Honor is

200

1  satisfied on that point to not have these witnesses incur

2  the time and expense to fly out here to Los Angeles and do

3  that.

4           So I guess I'm looking for a little guidance from

5  your Honor on that point first, and there is one piece of

6  evidence that I would like to get into the record, and I

7  will ask Mr. Stern if he's willing to stipulate.  Otherwise,

8  I'd like to call Mr. Lumsden back to the stand, and that is

9  the letter that's attached as Exhibit 1 to Mr. Rice's

10 declaration.  You elicited some testimony on that from Mr.

11 Lumsden, but we didn't actually show him a copy.

12          MR. STERN:  I have no objection to that coming in.

13          MR. JOHNSTON:  Okay.

14          MR. STERN:  It can just come in.  You don't even

15 have to call him.

16          MR. JOHNSTON:  Okay.  That's what I was asking.

17          MR. STERN:  Yeah, there's a letter that there's no

18 dispute as to authenticity.  So we're not -- that's no

19 problem.

20          THE COURT:  Okay.  Well, my reaction to what you

21 say is I don't care one way or the other.  It's up to you,

22 and it's up to Mr. Stern, and it's up to Mr. Davidoff.  I'm

23 not going to insist on any witness flying anywhere.

24          MR. STERN:  I hate to kind of delay and waste, but

25 with result I certainly agree with that.  I think, you know,

201

1  the proponent and the Debtor wanted to make their case.

2  They made their case.  I think there's more than adequate

3  evidence of lack of good faith.  It's obviously their burden

4  to show good faith.  That's pretty clear.  The BAP has made

5  that clear.  I think even the Ninth Circuit has now taken

6  that position.  I don't think they have it.  I'm prepared to

7  argue why they don't.  I'm prepared to argue why it isn't

8  our burden.  I don't know how the stain can be removed

9  that's already on this process.  Hopefully you'll agree with

10 me there's a stain on the process.  If you don't, I don't

11 know that -- I don't know if the last three witnesses are

12 going to make any difference either.

13             So, you know, I think it's obviously, you know,

14 the burden of the proponent to either put it forward or not

15 put it forward.  I think they've chosen to put three

16 forward.  I think we ought to go on that basis.

17             Did I answer the question or did I evade it?

18             THE COURT:  No, you mostly evaded it.

19             MR. JOHNSTON:  Your Honor, we're prepared to close

20 the record as it is.

21             THE COURT:  Okay.  So the declarations will be

22 withdrawn for any purpose of proving good faith?

23             MR. JOHNSTON:  That's right, with the exception of

24 Exhibit 1 to the Rice declaration.

25             THE COURT:  Except to the Rice letter.

202

1          MR. STERN:  Right.  I have no objection to that

2   exhibit coming in.

3          THE COURT:  Is it a Rice letter or just Exhibit

4   1?J

5          MR. STERN:  Rice authenticates it in his

6   declaration.

7          THE COURT:  Okay.

8          MR. STERN:  I have absolutely no question that

9   that's the right exhibit, and it can come on in, but not the

10  declaration itself.

11         THE COURT:  All right.  Do you wish to argue good

12  faith now or do you wish to argue good faith later?

13         MR. JOHNSTON:  I wish to argue it now.  And I'll

14  just look at my nots.

15         I am at something of a loss because we never heard

16  a lack of good faith argument in connection with the sale

17  articulated.  Whorl's pleading was the supplemental

18  objection saying it reserved the right to cross examine the

19  witnesses on the issue of good faith, but I'm not exactly

20  sure what their theory is.  And, frankly, your Honor, if any

21  transaction is emblematic of good faith, this one is it.  In

22  fact, I think you had a perfect storm here that ensured that

23  despite the fact of a bidder that had the participation of

24  management, absolutely everything was done to make sure that

25  value was maximized here and that there was no taint in this

203

1  process associated with management participation.

2       What you heard today was an allegation that this

3  alleged special information or special knowledge of

4  management was given to a competitive bidder.  So you -- to

5  the extent that management had some inside information, it

6  gave it to the other party participating at the auction.

7  That basically ensured that the maximum price was received.

8       Layer on the fact that this was an open auction

9  process.  There was extremely widespread notice.  The

10 evidence shows that these allegations of a breach of a non-

11 circumvention agreement did not chill the bidding in any

12 way.  The bidder competing against the so-called management

13 team confirmed that the auction was conducted in good faith

14 and had no complaints about the process.  There was full

15 disclosure of management participation from day one.  The

16 auction was run by Mr. Lumsden, a court-appointed and

17 acknowledged and fair and neutral.  Mr. Lumsden put together

18 the offering materials.  He answered the bidding questions.

19 He ran the process.

20      To the extent that the argument regarding a lack

21 of good faith relates to the fact that the ultimate bidder

22 who prevailed in this fair and open process has management

23 participation, I think it absolutely and completely fails.

24 So I will sit down for now until I hear what their theory

25 actually is and reserve the right to respond.

204

1          Thank you.

2          MR. STERN:  I will confess that having examined

3    the three witnesses, though I don't completely remember

4    exactly everything they testified to, but I do have some of

5    the highlights, and I know your Honor has some good notes.

6          I used the word taint a moment ago, and I -- I

7    mean it.  The process is tainted.  The process was tainted

8    from the get-go.  Let's just sort of look at this.  We've

9    got a business that winds up in financial distress because

10   management is not able to achieve its projections and is not

11   able, willing, or conscious of the need to cut expenses, so

12   said Mr. Lumsden.  Fair summation I think.

13         And that's not an irrelevant factor.  There are a

14   series of cases that sort of go into why -- how you look at

15   this, and it's particularly not an irrelevant factor because

16   when you're having bidders who are the insiders, it's

17   important to look at the question as to why.  There's a good

18   Seventh Circuit case that goes into that.  It's a case

19   called Hower v. Molding Systems, 445 F.3rd 935.  The pen

20   cite is at 938 through 39.

21         And what that -- what the Court there said, the

22   Seventh Circuit there said is, you know, there may be

23   circumstances where sort of bad things happen.  Did you want

24   -- if you want to pull it up, I know you have access right

25   from the bench.  I'm happy to hold off.

205

1          THE COURT:  I don't.

2          MR. STERN:  Okay.

3          THE COURT:  I'm a low-tech person.

4          MR. STERN:  Okay.  Fine.  I'll let you get it

5     afterwards then.

6          There are circumstances where management comes in,

7     but when management executives run the car off the cliff,

8     it's just a little bit unseemly to have them come in and buy

9     the assets.

10         Now, let's just sort of look at the process.  Mr.

11    Lumsden comes from a very respected firm, and he's a very

12    respectable fellow.  But he didn't get an appraisal.  He did

13    have a back-of-the-envelope number.  It's kind of

14    interesting he had a back-of-the-envelope number.  He had a

15    one-time sales $5.5 million.

16         Now, there's sort of a vague rule of thumb out

17    there that says, you know, you want to look and see whether

18    or not the price is at least 75 percent, and this just about

19    makes it, but it's real close.  And so you've got, you know,

20    a barely adequate offer.  But, again, you don't have the

21    kind of appraisal -- I mean, here you have a business.

22    We're not selling, you know, the pipelines that -- you know,

23    that Enron sold or anything like that.  We're not looking at

24    those kinds of assets.  We're not looking at hundreds of

25    millions of dollars, but we are looking at millions of

206

1 dollars, and why you wouldn't go and do an appraisal,

2 particularly when you've got a management team that you know

3 from day one is on the other side of the table from you and

4 not really on the same side with you, I don't know.  I think

5 there's a lack of thoroughness that goes into that, and I

6 think that the failure to obtain adequate information about

7 the value of these assets is very problematic.

8          If you're going to have a deal with insiders and

9 it's going to be subjected to strict scrutiny -- and, by the

10 way, a great case on strict scrutiny is Judge Riddle's

11 decision in a case called <u>Wild Horse Enterprises</u>, 136 B.R.

12 830.  The most important cites are around 839 and on.  It's

13 a reasonably long decision, but it's a very well written

14 one, and it's been cited numerous times as sort of being the

15 benchmark for how you look at insiders.  So we know from day

16 one because we saw that -- we saw the letter that -- that

17 Mr. Johnston asked be admitted from December 17th.  From day

18 one you knew that this process was going to have the

19 insiders on the other side.  So you can't quite rely on them

20 for the full -- the full story or the full scoop.

21          We know they're not sharing the information with

22 Mr. Lumsden that they're sharing with their financiers.  So

23 at a minimum, at a minimum, you really have to kick the

24 tires and figure out how much this is worth.  That didn't

25 happen.  But he had a back-of-the-envelope number.  It was

207

1 $5.5 million, and we didn't get close to that.

2          So we've got that particular problem.  Then we've

3 got -- as I said, we've got management on the other side of

4 the table instead of on the same side of the table.  And

5 it's interesting.  Again, you look at that letter, and Mr.

6 Rice hits the nail on the head.  He says, you know, I'm kind

7 of torn here.  I'm management, and I'm supposed to get the

8 highest price.  I'm a bidder.  I want the lowest price.  I

9 want you, Mr. Lumsden, to say it's okay, that I can go

10 forward, not a bad idea to write that letter, but it does

11 illustrate the problem.

12          And it -- as you sort of heard the testimony come

13 out, it reminds me of the difference between having a

14 willing witness and an unwilling witness.  A willing witness

15 you sit down with, you talk with them.  You get the whole

16 scoop.  You get volunteered information as to what's really

17 going on, and when you put them up on the stand, comes out

18 great.  If you're pulling teeth, it's a lot tougher.

19          And to some extent, Mr. Lumsden found himself in a

20 situation in which you practically have to take the

21 depositions of the people on the other side.  If you ask him

22 just the right question, maybe it would give him just the

23 right information.  But I'm not sure that he asked the right

24 questions, and I'm not sure they would have given him the

25 information anyway, because as we heard from the financier,

208

1  you know, it would have been sort of over his dead body.

2  Yet this information was critically developed by management,

3  using management expertise, management time, and I think

4  these people were all along working and drawing the salaries

5  from Pay By Touch, and here they are spending 50 hours, 30

6  hours, 20 hours.  There's a lady named Tuttle.  She's

7  spending time.  And they're all -- they're all working

8  together to try to develop these projections, to figure out

9  what this business is worth, but they're doing it on their

10 own account.  They're not doing it for the benefit of the

11 Debtor.

12         So the notion -- we're not even at good faith yet

13 Where we're at is whether or not this sale is irreparably

14 tainted.  To be sure, there was some competition.  It seems

15 that the only reason there was competition was because an

16 attempt to snuff it out didn't work, and that in and of

17 itself was troubling, because what you heard from Mr.

18 Lumsden was that he heard about some kind of agreement, but

19 he didn't really pursue it, and it turns out there is an

20 agreement and there was lots of information that was shared.

21 And, you know, maybe it was a double double-cross.  I mean,

22 you know, first management is trying to keep a bidder away,

23 and they're going to say, oh, we were just interested in you

24 as a financier.  Sometimes they're just trying to keep them

25 away.  Sometimes they're just interested in them as a

209

1  financier, but whatever the reason is, they weren't -- the

2  only reason that these folks came and bid last Friday was

3  because the double-crossers got double-crossed.  And so what

4  you had was this agreement that I find problematic from the

5  get-go under 363(n), let alone under any of the rules of the

6  Court.

7          We find that they're sharing information and

8  developing information they're not sharing with Mr. Lumsden.

9  They may be sharing it with this prospective bidder who may

10 or may not have been involved.  They're trying to get this

11 particular bidder disqualified, and we even have evidence

12 that there's a level of dissatisfaction.  I mean, Mr.

13 Lumsden's here today.  He wants this deal approved.  But

14 when pressed, he did admit he had something of an angry

15 conversation with Mr. McNally.  Mr. McNally sort of

16 confirmed that.  It was a little bit, again, like pulling

17 teeth, but we did get it out of them.  Mr. McNally indicated

18 that he's "joked" about sabotaging things if he weren't the

19 successful bidder.

20         And so I ask at the end of the day, is this the

21 kind of process that we want to be emblematic of the

22 bankruptcy process, and I don't think it is.  I don't think

23 this was a fair sale.  I don't think this was a sale

24 designed to get the highest and best price.

25         There's a lot of -- apparently management was

210

1  interested in bidding on this for a long time.  It came out

2  as -- as Mr. McNally was testifying, it was going September,

3  October, maybe around the time of the involuntary.  This has

4  been in the works for a long time.  So you've got management

5  who's driven the company down or at least hasn't responded

6  properly when the company didn't do as well as it should.

7  You don't have an appraisal.  I'm not sure if it would

8  benefit this sale that's going to take place, but that's yet

9  another issue.  We don't really have much on the adequate

10 marketing of this.  It seems to have been done a little bit

11 in house, and what we ultimately have is a process that is

12 problematic because they're insiders involved.  You've got

13 -- you've got all the indicia of problematic conduct.

14 You've got this agreement.  You've got these "jokes."

15 You've got confrontations between the quasi-trustee and

16 management.  You've got management developing projections

17 that they're not sharing with others but they're doing it on

18 company time based on company information.

19          I don't know how much more you need to say this

20 one doesn't pass the smell test.  And, your Honor, this one

21 just doesn't pass the smell test.  If this one goes, then

22 there's not much of a smell test.

23          THE COURT:  Thank you.

24          MR. JOHNSTON:  Wow, your Honor.  Mr. Stern's quite

25 a conspiracy theorist.  I felt like I was listening to an

211

1  episode of the X Files.

2        Let's review the facts.  You have a business

3  that's losing hundreds of thousands of dollars a month.  You

4  have funding for the entire enterprise that's going to run

5  out in seven days.  You have the Debtors working around the

6  clock to prepare a very detailed set of offering materials

7  that went out seven days after the petition date.  I

8  remember what those seven days were like.  You have a

9  process that involves an auction that was open to all.  You

10 have Mr. Lumsden rejecting all of the stocking horse bids,

11 including a bid from management because it wasn't high

12 enough.  You have a period of extensive continued

13 negotiations that ultimately resulted in Mr. Lumsden saying

14 "We're going to go to a naked auction because no bidder has

15 yet come and put up enough money, including management."

16 And, ultimately, you have a process that results in 12

17 rounds of bidding that increases the initial bid which was

18 $3,000,000, higher than anything received to that date, and

19 bumps it up to $4.2 million.

20        That is the epitome of a way to test the value of

21 these assets.  And, your Honor, this isn't an insider case.

22 This isn't your typical management led buyout where no one

23 else is supervising the store.  You have Mr. Lumsden here.

24 You have Mr. Lumsden who came on the scene as a court-

25 appointed neutral in San Francisco running the process,

212

1  disclosing to everybody that some members of management of
2  one of these subsidiaries is interested in purchasing the
3  assets.  That's not what the insider cases that Mr. Stern
4  referred to are all about.  And I think there was a gross
5  misstatement of Mr. Lumsden's testimony.

6         You didn't hear him testify that he was
7  dissatisfied with management's participation.  Quite to the
8  contrary.  He specifically testified that he got the
9  information he received, that management cooperated, and
10 that the process was fair.

11        Regarding the angry conversation that Mr. Lumsden
12 had on Friday, I'm happy to say -- or probably not happy to
13 say that that's not an unusual occurrence.  I maybe have
14 five of those a day with Mr. Lumsden.  It's -- Mr. Lumsden
15 was negotiating to get the very highest price on the very
16 best terms he could under the circumstances, and that is
17 what we're bringing to your Honor today.  And I guess I
18 would leave with if this is really such a bad deal for the
19 estate and a good deal for management, where's Whorl?  Whorl
20 knows all about these assets.  It sold them to the Debtors.
21 If anybody knows what they're really worth, it's Whorl.
22 They could have stepped up to participate.

23        Thank you.

24        THE COURT:  Thank you.

25        MR. DAVIDOFF:  Your Honor, may I be heard on

213

1  behalf of the buyers?

2          THE COURT:  Yes.  Give me one moment, though, if

3  you would.  Mr. Davidoff?

4          MR. DAVIDOFF:  Thank you, your Honor.  I'll be

5  brief.

6          I must agree with Mr. Johnston.  I heard a lot of

7  theories but only partially supported by the facts.  The

8  facts are, your Honor, that what do you do when you're

9  trying to sell a company where management is involved?

10 That's the situation that you have here.

11         Too often I think this Court -- I know I have been

12 confronted with situations where it is management who wants

13 to buy the company who's involved in the sales process.

14 That is, as the Court has heard, clearly what not -- is not

15 what happened here.

16         While it is true that the management who are the

17 prevailing bidders were managing the company, the sales

18 process was not handled by them.  The solicitation for sales

19 was not handled by them.  While Mr. Stern talks about -- I

20 think he said inadequate information about the marketing

21 process, we know we heard from Mr. Lumsden's direct

22 testimony how he went out and solicited I think he said 18

23 potential bidders, how he spoke to several of them and how

24 ultimately it came down to two bidders at the bargaining

25 table.

214

1          Mr. Stern somehow castigates my clients for not

2   sharing confidential information that they as a buying team

3   have developed with the world at large.  That's just simply

4   inappropriate.  Your Honor knows that in the context of

5   buying a business people go out and raise capital.  That's

6   what my client did.  They shared information with a

7   particular investor.  Of course they asked that investor to

8   keep that information confidential.

9          To then say that somehow imbue that with a

10  distasteful view that they should have shared that

11  information with the world at large just simply misstates

12  the process.  That's just not how it works in real life,

13  your Honor.

14          Then Mr. Stern argues that Mr. Lumsden didn't get

15  an appraisal.  Well, first I ask is my client as the buyer

16  to be charged with that issue, even if that is an issue?

17  This is not a question that we're debating right now about

18  the adequacy of whether or not there was an appraisal but,

19  rather, whether or not my clients are entitled to a good

20  faith finding under Section 363(m) and whether they

21  conducted the purchase in good faith.

22          And I think the evidence before the Court is, yes,

23  they were involved with the business, but, yes, the evidence

24  also indicates that when requested they provided

25  information.  I don't think in the normal course of events

215

1  it could be expected that the folks who were involved, Mr.

2  McNally in particular, would be meeting with every

3  particular buyer.  In fact, as he says, those buyers were

4  not introduced to him, probably very much because of the

5  fact that he was management.  Obviously he spent more time

6  with his own purchasing team.

7          There was no attempt to hide this.  Disclosure was

8  made up front.  Too many times in the situations before your

9  Honor and in other situations the problem is that disclosure

10 is not made.  Here we've tried to do just the opposite.

11 Disclosure was made early on in the process, and we've tried

12 to make disclosure -- sufficient and adequate disclosure in

13 the declarations that have been filed with the Court.

14          So, in summary, your Honor, while there is much

15 theory that Mr. Stern argues about, I think when the Court

16 reviews the fact, the Court will find that my clients acted

17 appropriately.  They acted fairly.  They -- the fact that

18 they were part of management does not mean that they should

19 be penalized for being part of management.  Simply the

20 question for the Court is did they act fairly, did they act

21 at arm's length, and was the sale process conducted fairly.

22 I think the answer to all those questions is unquestionably

23 yes, your Honor.

24          THE COURT:  Thank you, Mr. Davidoff.

25          MR. STERN:  Your Honor, I will not ask for the

216

1 last word.

2          THE COURT:  Okay.

3          MR. STERN:  Where did he come from?

4          MR. LOGAN:  The back bench, your Honor, which is

5 not comfortable, but I was there for a reason, and it does

6 reflect some distance we have from this particular debate,

7 but we have a very substantial economic interest in insuring

8 that the estate maximizes the price realized on these

9 assets.

10          If Remit Gate or a third party offered more money,

11 we'd be delighted.  If somebody else -- if Whorl offered

12 more money, we'd be delighted.  And I think one needs to

13 step back and look at a couple of key facts that haven't

14 been discussed by anybody so far, with one or two minor

15 exceptions.

16          First off, Whorl filed an objection to the good

17 faith of this sale and tried to oppose this sale before it

18 knew how any of this would play out.  If Remit Gate had been

19 the winning bidder and had bid four times as much as the

20 winning bid here, Whorl would already object to the good

21 faith of the sale.  I think that tells us really what's at

22 issue here.  They don't want these assets sold.

23          If, in fact, my clients thought that the bids

24 being offered by Remit Gate or the winning bidder were

25 inadequate, we did have a right to credit bid, and we would

217

1 not let Remit Gate or a management team financed by outside

2 financial sources steal the assets at a song.  We had that

3 right.  We didn't exercise it.  I think that also tells the

4 Court and all the parties a tremendous amount about the

5 value realized.  It was not sold for a song.  Would we like

6 to get more?  You bet.  Were we fearful we were going to get

7 less?  You bet.

8        As Mr. Johnston said, the original stocking horse

9 bid offered by the winning bidder was not judged adequate by

10 Mr. Lumsden.  Mr. Lumsden played the process as we think a

11 neutral fiduciary should.  He didn't let management go in

12 with a stocking horse bid.  He did his utmost to maximize

13 competition.  He succeeded.  There were 12 rounds of bids,

14 and the bid price was bid up quite a bit.

15        Mr. Stern makes quite a bit out of the fact that

16 no formal appraisal was obtained.  Your Honor, I've been in

17 a lot of auctions.  I, quite, frankly, have very seldom seen

18 an appraisal obtained, and if the Debtors had sought to

19 obtain one here, I think we all would have complained that

20 that would be a waste of estate resources because appraisals

21 are -- I'll never remember the quote exactly, but there's a

22 great quote from a bankruptcy judge.  Appraisals are

23 guesses.  They're guesses compounded by assumptions,

24 compounded by whatever.

25        There's a reality of the marketplace, and the

218

1   reality of the marketplace with competition and 12 rounds of

2   bidding we think, particularly when buttressed by Whorl's

3   ability to participate if they think the price was

4   inadequate and my client's ability to participate through a

5   credit bid if we felt the price was inadequate, tells us

6   that for better or worse, $4.2 million is the best we can

7   get for this particular line of business.  It's a whole lot

8   better than we thought we were going to get three weeks ago,

9   four weeks ago.  It's a whole lot better than it looked like

10  we would get at the start of the auction on Friday.  And so

11  while it's not perfect, it is certainly a fair market price

12  and one that ought to be approved.

13         Mr. Stern makes a lot out of the fact that the

14  management team of the subsidiary, which, as Mr. Johnston

15  correctly points out, Mr. Davidoff correctly pointed out,

16  were not in charge of the auction process, which I think is

17  a very important point.  But the management team prepared

18  projections.  Of course they did.  Any bidder is going to

19  prepare projections, and if we require a bidder to share its

20  projections and its business plan with other bidders as a

21  sin quo non of a fair sale process, nobody will ever bid.

22         That is a world different than whether or not it's

23  a fair process.  It's a world different than whether or not

24  there was an auction that resulted in the sale price that we

25  think should be approved.  We think it should be approved

219

1 because the parties with an economic stake in the matter did

2 their utmost to maximize the sale price.  That's certainly

3 in my client's interest.  It's in the Creditors Committee's

4 interest.  It's in the Debtor's interest.  And if Whorl

5 prevails in opposing this sale and defeating this sale, it

6 will basically be a measurement that management of a

7 subsidiary can never participate in an auction process, and

8 that would be a result that would not rebound to any of our

9 benefit.  If that were the rule, we would have had Remit

10 Gate's bid at approximately $3,000,000, a lot of it soft.

11 We never would have had the auction process because there

12 were at least three potential bidders here, one Remit Gate,

13 one the winning bidder, and, of course, my client on a

14 credit bid.

15          And disabling a management led team with outside

16 financing to participate in an all cash offer would have

17 been a terrible mistake and a terrible mistake that my

18 clients would not have supported.

19          Thank you, your Honor.

20          THE COURT:  Thank you, Mr. Logan.

21          Mr. Stern.

22          MR. STERN:  The urge to speak is almost

23 overwhelming, but I'm going to resist it, your Honor.  Thank

24 you.

25          THE COURT:  All right.  Thank you.

220

1        I'll preface my remarks by saying I don't think

2   I've ever seen live testimony on this issue before.  I'[m

3   not even sure I've seen a serious dispute about this issue

4   before in my courtroom.  I have read the case law.  I didn't

5   read the case law this weekend.  This was not uppermost on

6   my mind as I was preparing for today's hearings.

7        I did read the testimony, the written testimony,

8   but I read it very hurriedly, and now we've had quite a bit

9   of time spent on examination of three witnesses, and there's

10  a fairly substantial record.

11       Based on the record as developed this afternoon, I

12  find no basis to conclude that the sale to Phoenix Check

13  Cashing was not in good faith or that Phoenix Check Cashing

14  is not a good faith purchaser.  For the reasons that have

15  been argued, it seems to me that Whorl argues the difficult

16  position the Debtors are in in selling these assets and

17  accurately describes the difficulty, but by contrast, it

18  seems to me that Mr. Lumsden and the Debtors have done all

19  they could do to try to deal with a very difficult situation

20  of a losing business and a very short fuse on available

21  funds to find a solution, and it seems to me that what I've

22  seen in this case from the outset is an effort to conserve

23  money, number one, because there isn't a whole lot of money

24  to go around to keep the doors open, and to approach the

25  possibilities that are available to the Debtors in a

221

1  rational way and with these assets that are on the block

2  today, it seems to me that it's reasonable for Mr. Lumsden

3  and the Debtors to make an internal decision as to the

4  reasonable value of the assets as any owner would do, as any

5  manager would do.  And it seems to me somewhat -- certainly

6  it would be costly for Mr. Lumsden to employ Jeffries to

7  appraise these assets and guide the sale process and in the

8  end I'm not sure that any of that effort would have produced

9  a better result.  It seems to me that a pretty good result

10  has been achieved pursuing the strategy that Mr. Lumsden

11  decided on and implemented, and it seems to me that he

12  implemented the strategy that he chose reasonably, that his

13  marketing was reasonable and extensive, that his efforts to

14  communicate with interested parties was extensive.  The fact

15  that he talked to 16 or 18 potential buyers is -- is --

16  seems to me to be a mark of a sensible approach, and then we

17  come down to the actual people who showed up at the table,

18  and it is true the people who showed up were the lenders and

19  Remit Gate and Phoenix.  Nobody else.  Phoenix showed up

20  hoping to be a stocking horse bidder, and Mr. Lumsden

21  rejected that approach in favor of an open auction approach,

22  which then produced significant improvement in the bidding

23  process and in the final result, a $1.2 million (sic)

24  winning bid with a one point -- a four point one backup bid.

25  Seems to me is pretty darn good under the circumstances.

222

1        And in listening to the testimony today, (a) and

2  the declarations I read this morning, as I say, hurriedly, I

3  didn't see anything irregular.  I didn't study the

4  transcript, but Mr. Stern has called our attention to a

5  couple of things in the transcript.  I don't find anything

6  that I read there this afternoon to be out of line or

7  suggestive of collusion or improper reading of the bidding.

8        I conclude that the evidence supports by a

9  preponderance the conclusion that the bidding was fair and

10  undertaken in good faith by the successful bidder and that

11  the successful bidder is entitled to a good faith finding.

12        MR. JOHNSTON:  Thank you very much, your Honor.

13        I'd like to make one clarification that Mr. Logan

14  brought to my attention as he's been want to do on previous

15  occasions, and then just address logistics regarding this

16  sale.  But the first clarification is earlier, when I was

17  giving my initial presentation on the motion, I had said

18  that the sale proceeds would be escrowed.  What we actually

19  proposed in the motion and the proposed order was that the

20  sale proceeds would be escrowed after satisfaction of the

21  DIP loan, and that is -- or the post-petition obligations

22  under the DIP loan, and so that is what the proposed order

23  we will lodge will continue to say.

24        Regarding logistics, what we would propose to do

25  is submit a revised form of order that reflects this

223

1  transaction and a revised asset purchase agreement.  It's

2  now 4:23, and so that won't happen today.  Hopefully it will

3  happen tomorrow or Wednesday.  We will preview it with the

4  interested parties.  Hopefully we will get every party's

5  assent.  To the extent that we don't, I'd like to use the

6  time we have reserved on Friday morning as a holding date to

7  come back to -- to deal with any issues with respect to the

8  order.  Frankly, I don't anticipate any.  The order that

9  we've been talking about with Phoenix is -- he was pretty

10  closely to the proposed form of order that was attached to

11  the motion itself.

12        One thing that we will be doing is we've been

13  going through the list of contracts to be assumed and

14  assigned to the buyers, and with Phoenix's consent, we

15  anticipate removing a number of those contracts as not

16  appropriately part of the sale, and we've discussed that

17  with them, and we just need to make some identification, and

18  we'll do that for the record.

19        MR. BOGDANOFF:  Your Honor, I just -- as I

20  understand it, the asset purchase agreement that is being

21  finalized is at variance with the form -- obviously with the

22  form that went with the motion, and I would only request

23  that a red-lined version be sent to me so that I could at

24  least see the agreement that is the subject of the order

25  that is to be presented and just to make sure that there's

224

1    nothing unusual that would affect my client's interest.

2           MR. JOHNSTON:  We intend to file answer a clean

3    and red-lined version of the asset purchase agreement.  And,

4    of course, we will give it to Mr. Bogdanoff as soon as it's

5    available.

6           MR. BOGDANOFF:  Yeah.  I mean, my only concern is

7    that you don't file that up with it in the order so that I

8    don't have an opportunity to take a look at it before the

9    order is submitted.

10           MR. JOHNSTON:  No.  I will serve you -- or I will

11    propose a form of order and asset purchase agreement before

12    we lodge it with the Court.

13           MR. BOGDANOFF:  Thank you.

14           And then the only other request I have, your

15    Honor, is with regard to this morning's motion, I request

16    that an order be expeditiously sent up on the dismissal.  I

17    think Mr. Johnston indicated that it was to be essentially a

18    one-paragraph denial and reference to the Court's findings,

19    but I would ask that that be submitted, you know, as

20    expeditiously as possible.  I don't want to wait, you know,

21    and have that order out there.  I think it's appropriate to

22    have the Court's order entered as soon as possible on that.

23           THE COURT:  Okay.

24           MR. JOHNSTON:  I'll prepare a proposed form of

25    order and preview it with you tomorrow.

225

1          MR. BOGDANOFF:  Thank you.

2          THE COURT:  Okay.

3          MR. JOHNSTON:  Your Honor, unfortunately, that

4  doesn't conclude our business because we do have the issue

5  of the Merrick TRO.  I would ask for a five-minute

6  adjournment because based on some conversations we've been

7  having in the breaks, I'm cautiously optimistic we may be

8  able to get this resolved.

9          THE COURT:  Sure.

10          MR. JOHNSTON:  Okay.  Thank you.

11     (Proceedings recessed briefly.)

12          MR. JOHNSTON:  We're back on the record?

13          THE COURT:  We're back on the record.

14          MR. JOHNSTON:  Okay.  Thank you, your Honor.  That

15  break was productive, and we do have an agreement with

16  Merrick and the other interested parties about what to do in

17  respect of the unhappy situation of the Pay By Touch

18  Payment's business.

19          THE COURT:  Okay.

20          MR. JOHNSTON:  As I mentioned earlier, the -- the

21  auction for Pay By Touch Payments did not go forward because

22  of the fact that no qualifying bids had been received.  That

23  did not mean by any stretch of the imagination that the

24  Debtors had put down their pencils and gone home.

25          The Debtors continue -- actually probably

1 redoubled their efforts to try to find a buyer, try to find

2 someone who could come in and take over these businesses.

3 We certainly recognize the potential harm that may befall

4 Merrick and others as a consequence of a shutdown.  We take

5 serious issue with many of the allegations that were made in

6 the pleadings, but that may be for another day.  For today,

7 Merrick has agreed to withdraw their request for a temporary

8 restraining order without prejudice.  The Debtors have

9 agreed to give Merrick at least five business days notice of

10 any intent to shut down the business that we've been calling

11 Pay By Touch Payments.  We've also agreed to commit to

12 discuss in good faith with Merrick and any other parties who

13 are willing to do so funding that may be provided to the

14 estates to assist with an orderly transition of the

15 customers of the Pay By Touch Payments to other platforms

16 should the Debtors ultimately decide to shut down the

17 business.

18        And we've also committed to operate the business

19 as long as we can to the extent that we have the funds to do

20 so.  That was what we had agreed with Merrick.  I think Mr.

21 Gurfein probably wants to confirm that, but the issue for

22 the TRO today is thereby taken care of.

23        THE COURT:  All right.  Thank you, Mr. Johnston.

24        Mr. Gurfein?

25        MR. GURFEIN:  Thank you, your Honor.  Peter

227

1  Gurfein, Akin, Gump, Strauss, Howard, and Feld for Merrick

2  Bank Corporation, and I -- and I want to join the other

3  counsel with thanking your Honor after a very long day to

4  remain and hear us.

5          We have agreed to withdraw the -- the TRO that's

6  before you.  We reserve the right, of course, to renew that

7  if it becomes necessary, but, as Mr. Johnston has stated, we

8  expect to in good faith negotiate a transition or wind down

9  period, and in the event the written notice is provided to

10  us in no less than five business days and we haven't been

11  able to reach that agreement, you may see us again.  We hope

12  that is not an eventuality that will occur.

13          We also wanted to make clear why it is that we are

14  here today, and I should note that Kelly Woodruff, counsel

15  to Visa, is also here and has asked to address the Court.

16  This is the third time I've been in court on this matter,

17  your Honor.  Each time it's with the same broken record, and

18  that is to see that the processing continues.  That's

19  Merrick's concern.  Merrick is the sponsoring bank for PBT

20  and in that capacity has an exposure for any liability that

21  PBT incurs to the Visa and Mastercard systems, and Ms.

22  Woodruff has asked for an opportunity also to address the

23  dire consequences that could befall each of the participants

24  in that processing system in the event there is not a smooth

25  transition to a new platform.

228

1        THE COURT:  Thank you.

2        MS. WOODRUFF:  Good evening, your Honor.  Kelly

3  Woodruff from Farella, Braun and Martel on behalf of Visa.

4  Thank you very much for your patience and hearing us today.

5        THE COURT:  Sure.

6        MS. WOODRUFF:  With me is the vice president

7  payment systems risk from Visa.  He submitted a declaration,

8  and he is also available to answer any questions if you

9  want.

10        Visa's interest in this is not economic.  We've

11  got no dog in this hunt so to speak economically.  Visa's

12  interest is in the preservation of the payments processing

13  system, Visa's name, its reputation, as well as the interest

14  of 10s of thousands of merchants who Visa understands would

15  be severely impacted if the system is shut off abruptly

16  without a nice soft landing.  So that is why Visa is here is

17  just to impress upon the Court that this is not just about

18  the business or about the bank.  It's really about 10s of

19  thousands, at least 70,000 merchants that we know of will be

20  impacted if there's an abrupt shut down of this business.

21        I also wanted to just clarify when Mr. Johnston

22  was itemizing the terms of the agreement, I believe he said

23  that the Debtors would provide five business days notice

24  before shutting down the processing business, and I just

25  confirmed with Mr. Johnston that the agreement was five

229

1  business days notice before shutting down either of the two

2  businesses, because the ISO business is also important to

3  Visa.

4        Really that's all I wanted to add was just nothing

5  more than Mr. Elliott put in his declaration and that we're

6  here to answer questions, and we will just thank the Court

7  for the time to emphasize that Visa's interest is really in

8  the preservation of the system.  We understand that it's to

9  everybody's benefit if they can sell these assets, get a new

10 processor in place, but that process also takes some time.

11 They'll need to get approved by a new sponsor as well as by

12 Visa.  So Visa's extremely concerned that there's an abrupt

13 shut down of these businesses, even five days notice.  If we

14 do receive the five days business notice, especially about

15 the processing business, we will expect to be back here

16 again seeking the TRO.

17       THE COURT:  Okay.  I guess I have two questions.

18 I guess my long-term question is what's the final outcome

19 that you're looking for here.  Does it take more than five

20 days?  Does it take three months or what to move the

21 business from one set of people to another set of people?

22       MS. WOODRUFF:  I'm not sure we can best answer

23 that.  My understanding, your Honor, is is that it takes

24 approximately -- that it will take approximately 90 days to

25 sufficiently wind this down.

230

1        THE COURT:  Okay.

2        MS. WOODRUFF:  And that is why it is so important

3  that if merchants are cut off basically cold turkey, many of

4  them will be left for weeks if not months with no ability to

5  process payment cards.  That would be Visa.  It would

6  presumably also be Mastercard, Discover, American Express,

7  whatever they happen to be processing, as well as not to

8  mention the impact that that would have on consumers,

9  especially in any travel industry business, hotels,

10  airlines, car rentals, where people are expecting to use

11  their Visa and then all of a sudden their preferred merchant

12  is unable to process that account.

13        So my understanding is is that it will take at

14  least 60 to 90 days to transition all of these merchants

15  off, and I believe that is why the bank and the Debtors have

16  agreed to work on an orderly transition plan that would

17  encompass that 90-day period, and Visa will participate in

18  those discussions to make sure that it meets their

19  requirements.

20        THE COURT:  Am I correct in assuming the burden is

21  probably on Merrick and Visa more than it is on the Debtor

22  here?

23        MR. GURFEIN:  To the extent --

24        THE COURT:  To find a solution?

25        MR. GURFEIN:  In terms of affecting the smooth

231

1  wind down, I think that's correct, your Honor, which is why

2  we're looking for as long a lead time as possible to give us

3  the opportunity to enter into and finalize that, but I -- in

4  talking about terms of transition and the length of time, I

5  don't want to forestall the prospect of a sale that could

6  transfer these assets in a shorter period of time to an

7  operator who's capable of continuing the processing, and I

8  think everyone --

9          THE COURT:  Which I assume would be an all-around

10 good outcome.

11         MR. GURFEIN:  All around win win for everyone if

12 we could accomplish that, your Honor.

13         THE COURT:  Yeah.  Okay.  Thank you.

14         Mr. Logan?

15         MR. LOGAN:  Which is a perfect segue into what I

16 wanted to say, your Honor.  From my client's perspective,

17 the main problem with some of the dialogue of late is it's

18 so focused on a shut down transitioning of the business.  We

19 think that the parties' emphasis ought to be on exactly the

20 contrary, to redoubling the effort, as Mr. Johnston said, to

21 sell this business in the best manner possible, to realize

22 the maximum value for the estates and cause essentially no

23 disruption whatsoever to the other parties that Mr. Gurfein

24 was talking about.  And to do that I think we have to get

25 creative, and there are some issues I -- I don't know enough

232

1  about to comment intelligently other than to say that we've

2  got to make sure that people -- let me get real frank.

3       I mean, there are some issues about Merrick's

4  ability to approve potential bidders, and we want to make

5  sure that the parties work in the most constructive manner

6  possible to see that that's the focus of our activity rather

7  than spending time worrying about transition plans for a

8  shut down, because those are fallback plans if the worst

9  possible series of events happen.  I would far rather have

10  us spend the time and attention of the parties focusing on

11  the win win.  Let's sell the business.

12       THE COURT:  Thank you.

13       MR. GURFEIN:  I would second those comments, your

14  Honor.

15       THE COURT:  Thank you.

16       Mr. Johnston?

17       MR. JOHNSTON:  Just very briefly, your Honor.  We

18  kind of had the same reaction that I'm gathering your Honor

19  did to the papers, which is the notion of a mandatory

20  injunction ordering a Debtor to operate a business that's

21  losing half a million dollars a month, to keep it open for

22  three months or so where the Debtors don't have any cash to

23  begin with is I guess unprecedented would be the word that

24  leaps to mind.  And we certainly do not believe that there

25  are any grounds for a temporary restraining order now or in

233

1  the future.

2          Mr. Logan's words certainly are music to the

3  Debtor's ears.  If the lenders are willing to be

4  accommodating and perhaps, you know, fund a little longer,

5  if Merrick's willing to be accommodating and get some buyers

6  in the door, perhaps finance some buyers, all of that's

7  good, and I think everybody's a little bit scared now, and

8  ultimately that's probably good for the process.

9          When Mr. Gurfein told me he was going to put

10 briefly on the record his -- his side of the story I guess

11 in terms of the harm that would befall his client and the

12 harm that would befall Visa, I said that's fine, but if you

13 do that, I want to just give briefly the Debtor's side of

14 the story.

15         THE COURT:  Sure.

16         MR. JOHNSTON:  Which, first and foremost, we do

17 believe that the pleadings misstate the conversations that

18 occurred last Friday between Mr. Lumsden and myself and Mr.

19 Gurfein and his representative.  Mr. Lumsden did not say

20 that the business would be shut down tonight.  Merrick had

21 indicated an interest in putting in a proposal to buy the

22 business, had asked for a period of time, and it was far too

23 long given the circumstances under which the Debtors were

24 operating.  We said get something in by tonight.  If you

25 don't, all options are on the table, including a shut down.

234

1        But what's probably most troubling and one of the

2   reasons why we insisted that the -- as part of this deal

3   that was read on the record that the TRO motion be withdrawn

4   is that this public broadcasting of a false statement that

5   the Debtors were going to shut down the business has created

6   a panic out there, not least among the Debtor's customers.

7   You can be sure that no one's signing up for this business

8   now, and you can be sure that people are trying to flee the

9   business as quickly as possible.  That is the antithesis of

10  a value maximizing event, and the Debtors are very aggrieved

11  by what's happened, and we reserve all our rights in that

12  regard.

13          THE COURT:  Okay.

14          MR. JOHNSTON:  Thank you.

15          MR. GURFEIN:  I just want to add that I stand by

16  my declaration, and perhaps the Debtors should choose their

17  words more carefully.

18          MS. WOODRUFF:  Your Honor, I'm sorry, just point

19  that I left off before.  It's important, first of all,

20  regardless of how Visa learned of this information, which

21  we're not taking a position on who is right on that

22  conversation at all.  This was very much on Visa's radar

23  even before the conversation on Friday.  They're watching it

24  very carefully, and, of course, we're aware of the bidding

25  process going forward.  So -- but two things.  The process

235

1  of finding a new buyer, while that would be ideal and it

2  would be great for the estate obviously to maximize the

3  value to the estate.  It would be good for the merchants to

4  not have to go through a transition period at all, that

5  process does involve approval by both a sponsoring bank and

6  ultimately by Visa.  I can't speak for the sponsoring bank,

7  but I can speak for Visa.  Their two primary concerns are

8  financial strength so that we don't end up back here in

9  front of your Honor in another nine months with another

10 bankrupt processor and probably even more important is the

11 data security issue.  The processor that was processing this

12 platform prior to Pay By Touch had a data compromise, and so

13 that is an issue that's very important.

14          I have been advised that Visa could expedite, if

15 necessary, any approval process of a buyer should the

16 parties reach -- find a good buyer.  Normally the process

17 could take a couple of weeks.  We think that we could do it

18 in maybe 10 days.

19          So we just wanted to let your Honor know that as

20 well.

21          THE COURT:  Okay.

22          MR. JOHNSTON:  I think your Honor appreciates some

23 of the difficulties the estate has been facing with respect

24 to this business.

25          THE COURT:  Yes, indeed.

236

1          MR. JOHNSTON:  A 10-day approval process requires
2     10 days of funding, period, end of story.
3          THE COURT:  Yeah.  One thing I'd like somebody to
4     do.  This matter is not on our calendar today, and so to
5     make sure that it is properly reflected in the record, I
6     would ask that one of you put forth what this application
7     was, just the main features of the application and what it
8     asked for and what the resolution was.
9          MR. GURFEIN:  I suppose that falls --
10         THE COURT:  Normally it falls to the movant.
11         MR. GURFEIN:  If I may have a moment, your Honor.
12         THE COURT:  And I don't mean to argue it.  I mean
13    just to set the record straight.
14         MR. GURFEIN:  The matter before your Honor was
15    brought on by a notice of emergency motion for a temporary
16    restraining order and order to show cause filed by Merrick
17    Bank.  Merrick had sought --
18         THE COURT:  Filed when, Mr. Gurfein?
19         MR. GURFEIN:  I'm sorry?
20         THE COURT:  Filed when?
21         MR. GURFEIN:  Filed Friday evening on --
22         THE COURT:  The 22nd of February?
23         MR. GURFEIN:  22nd of February.
24         THE COURT:  Okay.
25         MR. GURFEIN:  And --

237

1          THE COURT:  I saw it for the first time this

2     morning.

3          MR. GURFEIN:  I believe chamber copies were

4     delivered around 8:00 a.m. this morning, your Honor.

5          THE COURT:  Yes.

6          MR. GURFEIN:  And the remedy that the motion

7     sought was an injunction prohibiting the shut down of the

8     Debtor's processing business under circumstances in which

9     Merrick Bank had offered to fund a reasonable transition

10    period and wind down in the event that there were no sale by

11    the Debtor of these assets.

12         THE COURT:  Okay.  I think that's enough, and I'm

13    happy to have the comments of all four parties who've

14    spoken.

15         MR. LOGAN:  Your Honor, just one final --

16    hopefully final comment.  People reserve their rights, and

17    one of the rights that my clients need to reserve has to do

18    with the 10-day period that counsel for Visa mentioned.

19    That may be Visa's view of how long the process takes, but

20    the Bankruptcy Court has a concept of adequate assurance of

21    future performance, and we need to fully reserve our right

22    that, indeed, we may think on a more expedited basis than

23    that we can find a better and provide adequate assurance of

24    future performance for Visa or for Merrick Bank.  Hopefully

25    we don't get into a dispute of that sort, but time is money

238

1  here.

2          Thank you.

3          THE COURT:  Okay.  Thank you very much.

4          ALL:  Thank you, your Honor

5      (Proceedings concluded.)

6

7          I certify that the foregoing is a correct

8  transcript from the electronic sound recording of the

9  proceedings in the above-entitled matter.

10

11  _____    _____

12  Transcriber                 Date

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                :

In re REFCO, INC. SECURITIES LITIGATION   :        07 MDL No. 1902 (GEL)
                                :

-------------------------------------------------------------x
-------------------------------------------------------------x
                                :

MARC S. KIRSCHNER, As Trustee of the Refco  :
Litigation Trust,                            :
                                :

         Plaintiff,               :
                                :        07 Civ. 11604 (GEL)
       -v-               :
                                :      **OPINION AND ORDER**

GRANT THORNTON LLP, MAYER BROWN,    :
ROWE & MAW, LLP, et al., ERNST & YOUNG  :
U.S. LLP, PRICEWATERHOUSECOOPERS   :
LLP, CREDIT SUISSE SECURITIES (USA) LLC  :
(f/k/a CREDIT SUISSE FIRST BOSTON LLC),  :
BANC OF AMERICA SECURITIES LLC,    :
DEUTSCHE BANK SECURITIES INC., PHILIP  :
R. BENNETT, SANTO C. MAGGIO, ROBERT  :
C. TROSTEN, TONE N. GRANT, REFCO   :
GROUP HOLDINGS, INC., LIBERTY CORNER  :
CAPITAL STRATEGIES, LLC, WILLIAM T.   :
PIGOTT, EMF FINANCIAL PRODUCTS, LLC,  :
EMF CORE FUND, LTD., DELTA FLYER   :
FUND, LLC, ERIC M. FLANAGAN, INGRAM   :
MICRO, INC., CIM VENTURES, INC.,     :
BECKENHAM TRADING CO., INC., ANDREW  :
KRIEGER, COAST ASSET MANAGEMENT,   :
LLC (f/k/a COAST ASSET MANAGEMENT LP), :
CS LAND MANAGEMENT, LLC, and      :
CHRISTOPHER PETITT,          :
                                :

        Defendants.            :
                                :
-------------------------------------------------------------x

Richard I. Werder, Jr., Michael B. Carlinsky,
Susheel Kirpalani, Sascha N. Rand, Quinn Emanuel
Urquhart Oliver & Hedges LLP, New York, NY,
for Plaintiff.

Philip D. Anker, Robert B. McCaw, Lori A. Martin,
John V.H. Pierce, Dawn M. Wilson, Michael L.
Feinberg, Ross E. Firsenbaum, Wilmer Cutler
Pickering Hale and Dorr LLP, New York, NY
for Defendants Credit Suisse Securities (USA) LLC
(formerly Credit Suisse First Boston LLC), Banc of
America Securities LLC, and Deutsche Bank
Securities Inc.

David E. Mollón, Bradley E. Lerman, Catherine W.
Joyce, Linda T. Coberly, Winston & Strawn LLP,
New York, NY, and Chicago, IL, for Defendant
Grant Thornton LLP.

James J. Capra, Jr., Orrick Herrington & Sutcliffe
LLP, New York, NY, for Defendant
PricewaterhouseCoopers LLP.

Craig D. Singer, John K. Villa, Michael S.
Sundermeyer, Thomas G. Ward, Williams &
Connolly LLP, Washington, DC, for Defendant
Mayer Brown LLP.

Anthony M. Candido, Joel M. Cohen, Clifford
Chance U.S. LLP, New York, NY, for Defendant
UK Limited Liability Partnership Mayer Brown
International LLP.

GERARD E. LYNCH, District Judge:

Plaintiff Marc S. Kirschner, in his capacity as Trustee of the Refco Litigation Trust,

originally filed this action in the Circuit Court of Cook County, Illinois, asserting claims under

Illinois state law against certain Refco insiders, professionals, and advisors for, *inter alia*, fraud,

breach of fiduciary duty, and malpractice.  Certain defendants (the "Removing Defendants"[1])

---

[1] The Removing Defendants are Credit Suisse Securities (USA) LLC, Bank of America
Securities LLC, Deutsche Bank Securities, Inc., Grant Thornton LLP, Mayer Brown LLP, Mayer
Brown International LLP, and PricewaterhouseCoopers LLP.

removed the action to the United States District Court for the Northern District of Illinois on the

ground that the case is "related to" Refco's Chapter 11 bankruptcy, 28 U.S.C. 1334(b); see id.

§ 1452(a),[2] and concurrently petitioned the Panel on Multidistrict Litigation ("MDL Panel") to

transfer the case to the United States District Court for the Southern District of New York, where

the Refco bankruptcy is pending, see In re Refco, Inc., No. 05-60006 (RDD) (Bankr. S.D.N.Y.).

The Trustee opposed the transfer petition and moved the Northern District of Illinois to remand

the action to Illinois state court, or in the alternative, to abstain.  Upon application by the

Removing Defendants, the Northern District of Illinois stayed proceedings pending the MDL

Panel's decision.  The MDL Panel subsequently transferred the action to this Court for

coordinated pretrial proceedings with the multitude of other Refco-related actions already

pending on the Court's docket.

The MDL Panel's transfer of this action to this Court effectively lifts the stay imposed by

the Northern District of Illinois.  This Opinion addresses the Trustee's pending motion to remand

for lack of subject matter jurisdiction, or in the alternative, to abstain under 28 U.S.C.

§§ 1334(c)(1) and (c)(2).  For the reasons stated below, the Trustee's motion will be denied.

## BACKGROUND

I.    **Events Leading to Refco's Bankruptcy**

Prior to its collapse in the fall of 2005, Refco was among the world's largest providers of

brokerage and clearing services in the international derivatives, currency, and futures markets.

---

[2] See California Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 103 (2d Cir. 2004) (noting that "removal under [§ 1452(a)], unlike removal under Section 1441(a), does not require the unanimous consent of the defendants").

(Compl. ¶ 56.[3])  Beginning in the late 1990s, members of Refco's senior management, with the

aid of certain of Refco's professionals and financial advisors (collectively, the "defendants"),

allegedly orchestrated a fraudulent scheme to artificially boost Refco's performance and conceal

Refco's true financial condition so that these senior executives, through the company's August

2004 leveraged-buy-out and August 2005 initial public offering ("IPO"), could cash out their

interests in Refco on lucrative terms.  (Id. ¶¶ 4-7, 32, 59-149.)  Defendants allegedly carried out

this scheme by "concealing substantial Refco trading losses and operating expenses, recording

hundreds of millions in fictitious Refco income, and funding Refco's operating expenses and

acquisitions with misappropriated customer assets."  (P. Mem. 2-3, citing Compl. ¶¶ 59-149.)

On October 10, 2005, just two months after its IPO, Refco announced that it had

discovered an undisclosed $430 million receivable due from an entity controlled by Refco's

CEO, Philip R. Bennett.  (Comp. ¶¶ 147-48.)  As a result, the company announced that its

financial statements for the preceding four years could no longer be relied upon.  (Id. ¶ 148.)

Following these disclosures, Refco's stock plummeted and was de-listed by the New York Stock

Exchange, leading to over $1 billion in lost market capitalization.  (Id. ¶¶ 148-49.)  On October

17, 2005, Refco Inc. and over twenty of its subsidiaries filed for protection under Chapter 11 of

Title 11 of the United States Code.  (See id. ¶¶ 32, 34.)

---

[3] All references to the complaint in this opinion are to the complaint originally filed in the
Circuit Court of Cook County, Illinois.  (Kirschner Decl. Ex. A.)  All factual allegations in the
complaint are assumed to be true for purposes of this motion.  See Merritt v. Shuttle, Inc., 245
F.3d 182, 186 (2d Cir. 2001).

## II.    The Refco Litigation Trust

On December 15, 2006, approximately fourteen months after Refco filed for bankruptcy, the United States Bankruptcy Court for the Southern District of New York confirmed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan").  (See Kirschner Decl. Exs. B, C.)  The Plan provided for the establishment of a Litigation Trust and the appointment of a Litigation Trustee to pursue such "claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any [Refco] Debtor or RCM [(Refco Capital Markets Ltd.)] may hold against any Person."  (Id. Ex. B § 1.112; see id. § 5.7(a).)

Pursuant to the Plan, all "Contributed Claims," defined as "any and all Litigation Claims of the Debtors, RCM or their estates," would be irrevocably transferred to the Litigation Trust on the effective date of the Plan.  (Id. Ex. B §§ 1.48, 5.7(b).)  In exchange, "the Litigation Trust Beneficiaries," who are the holders of allowed general unsecured claims against the Refco Debtors, would receive "Litigation Trust Interests," which would be allocated on the basis of the beneficiaries' allowed claims under the confirmed Plan.[4]  (Id. Ex. B § 5.7(b); see id. ¶¶ 10-11, 13, 15.)  The Plan expressly provided that "[u]pon transfer of the Contributed Claims to the

---

[4] Although the estate of RCM was originally listed as a Litigation Trust Beneficiary, the RCM plan administrator "irrevocably instructed the Litigation Trustee to distribute beneficial interests in the Litigation Trust directly to creditors of RCM," and thus no recoveries on the claims asserted by the Trustee in this case will be distributed to RCM creditors through the RCM estate.  (Kirschner Decl. ¶ 13 n.2.)

Litigation Trust, the Debtors, RCM, and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust."[5]  (Id. Ex. B § 5.7(b).)

The establishment of the Litigation Trust, plaintiff Marc S. Kirschner's appointment as Trustee of the Litigation Trust, the transfer of Contributed Claims to the Litigation Trust, and the allocation of Litigation Trust Interests to the Litigation Trust Beneficiaries, became effective on December 26, 2006.  (Id. ¶¶ 2, 9, 10.)

## III.    Procedural History

On August 21, 2007, nine months after the Plan was confirmed, the Trustee filed this action in the Circuit Court of Cook County, Illinois, asserting state-law claims against defendants for breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary duty and fraud, malpractice, and negligent misrepresentation.  As noted above, certain defendants removed the case to the federal district court in the Northern District of Illinois and simultaneously petitioned the MDL Panel to transfer the case to this Court.  The Trustee opposed the transfer petition and moved to remand the case on the ground that the federal court lacked subject matter jurisdiction over its purely state law claims.  See 28 U.S.C. § 1447(c).  The Trustee also asserted that even if the court had subject matter jurisdiction, abstention was both mandatory and warranted in the exercise of discretion under 28 U.S.C. § 1334(c).  Upon the Removing Defendants' motion, the Northern District of Illinois stayed the action pending the decision of the MDL panel.  On December 28, 2007, the MDL Panel transferred the action to

---

[5] Similarly, § 1.2(a) of the Litigation Trust Agreement provides that, as of the effective date of the Plan, RCM and the Refco Debtors "hereby transfer, assign, and deliver to the Litigation Trustee, without recourse, all of their respective rights, title, and interest in and to the Contributed Claims free and clear of any and all liens."  (Kirschner Decl. Ex. D § 1.2(a).)

this Court pursuant to 28 U.S.C. § 1407, thus effectively lifting the stay imposed by the Northern

District of Illinois and bringing the Trustee's motion to remand and/or abstain, to this Court's

consideration.[6]

**DISCUSSION**

The Trustee contends that (1) the Court lacks subject matter jurisdiction because the

claims asserted in this case are not "related to" the Refco bankruptcy within the meaning of 28

U.S.C. § 1334(b); and (2) even if jurisdiction exists, abstention is both mandatory and warranted

in the exercise of discretion pursuant to 28 U.S.C. § 1334(c).  These arguments will be addressed

in turn.

I.      **Subject Matter Jurisdiction**

        A.      Removal and Jurisdiction in Bankruptcy Cases

The party seeking removal of an action from state to federal court bears the burden of

proving federal jurisdiction.  See In re WorldCom, Inc. Secs. Litig., 293 B.R. 308, 316 (S.D.N.Y.

2003), citing Linardos v. Fortuna, 157 F.3d 945, 947 (2d Cir. 1998).  With regard to bankruptcy-

related claims, 28 U.S.C. § 1452(a) provides that "[a] party may remove any claim or cause of

action in a civil action . . . to the district court for the district where such civil action is pending,

if such district court has jurisdiction of such claim or cause of action under section 1334 of this

title."  28 U.S.C. § 1452(a); see Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 131-32

(1995) (Ginsburg, J., concurring) (finding that § 1452 was "meant to enlarge, not to rein in,

federal trial court removal/remand authority for claims related to bankruptcy cases").

---

[6] In conjunction with the pending motion, the parties have submitted both the briefing materials originally filed in the Northern District of Illinois and supplemental briefs addressing the applicable legal standards in light of the MDL Panel's transfer of the action to this Court.

The propriety of removal under § 1452(a) is predicated on the scope of federal jurisdiction under 28 U.S.C. § 1334, which provides, in relevant part:

> [N]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under title 11, or arising in or related to cases under title 11.*

28 U.S.C. § 1334(b) (emphasis added).  None of the parties contends that this action is a proceeding "arising under" Title 11 or "arising in" a Title 11 case.  Thus, the crux of the jurisdictional dispute is whether the Trustee's claims, which arise solely under Illinois state law, are sufficiently "related to" the Refco bankruptcy to establish federal jurisdiction.

1.    Applicable Legal Standard

As a threshold matter, the parties disagree as to whether the Second or Seventh Circuit's standard for "related to" jurisdiction governs this case.  The Second Circuit applies the expansive test for "related to" jurisdiction articulated by the Third Circuit in In re Pacor, Inc., 743 F.2d 984 (3d Cir. 1984), which has been adopted by the vast majority of other circuits, see In re WorldCom, 293 B.R. at 317 (noting that "[t]he dominant standard for 'related to' jurisdiction is that set forth by the Third Circuit in In re Pacor"); Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.6 (1995) (collecting cases).  Under Pacor:

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*  Thus, the proceeding need not necessarily be against the debtor or against the debtor's property.  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

8

In re Pacor, Inc., 743 F.2d at 994 (citations omitted); see In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992). The Seventh Circuit, in contrast, has explicitly rejected the "sweeping" Pacor test and established a more restrictive standard in which federal jurisdiction exists only where a dispute "affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors." In re FedPak Sys., Inc., 80 F.3d 207, 213-14 (7th Cir. 1996) (alteration in original) (internal quotation marks omitted).

The Trustee contends that the Court should apply "Seventh Circuit law" in this case because "[u]pon remand of this action to the Northern District of Illinois for trial, that court (or the Seventh Circuit in the context of any appeal) will have to reevaluate whether there is federal jurisdiction over the action under the Seventh Circuit's narrower 'related to' standard." (P. Supp. Mem. 2, 4.) According to the Trustee, even if this Court were to find subject matter jurisdiction under "Second Circuit law," "when this action is returned to the Northern District of Illinois for trial it will still be subject to remand to Illinois state court," and "[f]orcing the parties to conduct federal pretrial discovery without first determining that there is federal subject matter jurisdiction to try the action would be grossly inefficient and would substantially prejudice the parties." (Id. at 2, 4.) To support this contention, the Trustee cites the different evidentiary rules for fact depositions in federal court and Illinois state court and argues that "much of the federal discovery may be rendered inadmissible at trial in Illinois state court" should the case ultimately be remanded by the Northern District of Illinois. (Id. at 4 & n.4) Such an outcome, according to the Trustee, would undermine the MDL transfer statute's goal of promoting the "just and efficient conduct" of the transferred case. 28 U.S.C. § 1407(a).

9

Preliminarily, the issue of whether to apply Second or Seventh Circuit "law," as the Trustee frames it, is not a proper "choice of law" question.  Although it is meaningful to ask whether New York or Illinois state law governs a case — because New York and Illinois are distinct sovereignties, each with power to regulate transactions within the scope of its legislative jurisdiction as it sees fit — there is no such thing as "Second Circuit law" or "Seventh Circuit law" in this sense, as intermediate federal courts of appeals have no such sovereignty.  As the Second Circuit has put it, "[f]ederal courts comprise a *single* system applying a *single* body of law, and no litigant has a right to have the interpretation of one federal court rather than that of another determine his case."  Desiano v. Warner-Lambert & Co., 467 F.3d 85, 91 (2d Cir. 2007) (emphasis added), quoting Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) ("Although federal courts sometimes arrive at different constructions of federal law, federal law (unlike state law) is supposed to be *unitary*."  (emphasis added)).  References to "the law of this Circuit," while common and appropriate, are essentially figures of speech, reflecting the fact that federal courts are part of a hierarchy of precedential authority, in which lower courts are bound by the precedents of the appellate courts to which they are subject.  While these precedents may vary, due to human frailty and the occasional difficulty of interpreting the applicable laws, every federal court in the land is obliged to apply this "unitary" federal law, interpreted as best that court can in light of the precedents that bind it.  Menowitz, 991 F.2d at 40.

Moreover, "[t]his obligation does not change in the context of transferred cases." Desiano, 467 F.3d at 91.  The Second Circuit has specifically instructed that although district judges should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [they] can," a "transferee federal court" has an independent

10

obligation to "apply its [own] interpretations of federal law, not the constructions of federal law

of the transferor circuit." Id., quoting Menowitz, 991 F.2d at 40.  Indeed, if "a federal court

simply accepts the interpretation of another circuit without [independently] addressing the

merits, it is not doing its job." Id. (alteration in original), quoting Menowitz, 991 F.2d at 40.

There may be questions on which prudence dictates reference to the decisions of other

circuits.  Where, for example, as in cases transferred under the MDL process, a case will be

returned to the transferor court for trial, see Lexecon v. Milberg Weiss Bershad Hynes & Lerach,

523 U.S. 26, 40 (1998), it may make sense for the transferee court to consult the "law" of

another circuit to anticipate how the trial will be conducted, and to make rulings that will

facilitate such a trial.[7]  But this principle can have little application to a matter as fundamental as

subject matter jurisdiction.  A federal court is obligated to assure itself of its own jurisdiction,

*sua sponte* if necessary, and in doing so it must apply the law as it understands it, and as it is

bound by precedent.  The converse of the present situation illustrates the point: if the circuit with

authority over the transferor court took a broad view of a jurisdictional statute, it would be

extraordinary if a transferee court should accept jurisdiction of a case, where its own considered

view, after according respectful attention to the non-binding prior decision of an out-of-circuit

court, was that it lacked subject matter jurisdiction, simply because some other court erroneously

---

[7] The Trustee cites In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation, a case from this district which distinguished between pretrial and trial issues and held that "in the context of class certification and other issues inherently enmeshed with the trial," "the law of the transferor circuit controls." 241 F.R.D. 435, 441 (S.D.N.Y. 2007), cited at P. Supp. Mem. 4.  Even assuming *arguendo* that this distinction between pretrial and trial issues is correct, however, the MTBE court itself recognized that "pretrial issues such as whether the court has *subject matter* . . . jurisdiction over the action" are governed by "the law of the *transferee* circuit." Id. at 439 (emphasis added).

11

believed that jurisdiction was present.  The same would be all the more true if the circuit court

by whose precedents the transferee court was bound had authoritatively held that jurisdiction

was lacking under the circumstances.  In this case, it is the transferor circuit that takes the

narrower view of the jurisdictional question, but the need for this Court to undertake its own

inquiry of subject matter jurisdiction is no less necessary.

The Trustee argues that this Court must defer to the Seventh Circuit's views because,

when the case is returned to the Northern District of Illinois for trial, that court will, in turn, be

required to revisit the jurisdictional question, and it may then find itself obliged to remand the

case in light of Seventh Circuit precedent.  But it would be no more appropriate for this Court to

decline to exercise jurisdiction that it believes Congress has given it, and that has been properly

invoked by a litigant, because the Seventh Circuit has held to the contrary, than it would be for

this Court to find no jurisdiction out of anticipation that the particular district judge to whom the

case was assigned for trial might disagree with its ruling on a matter of first impression.

To do so, in fact, would be imprudent as well as conceptually inappropriate.  The

Trustee's claim that applying the Second Circuit's jurisdictional standard would be "grossly

inefficient" (P. Supp. Mem. 4) rests on the inherently dubious business of forecasting the future

course of litigation.  And indeed, the Trustee's prediction in this case is especially dubious.  Its

concerns are based fundamentally on the expectation that the case will be returned to the Seventh

Circuit for trial.  In the real world of litigation, upwards of 95% of civil cases *never* reach trial,

but are settled without a trial or otherwise resolved by the parties or the court.  See Stephen C.

Yeazell, The Misunderstood Consequences of Modern Civil Process, 1994 Wis. L. Rev. 631, 633

(observing that in 1990, "only 4.3% of the filed civil cases resulted in trials"); Marc Galanter,

12

The Hundred-Year Decline of Trials and the Thirty Years War, 57 Stan. L. Rev. 1255, 1259

(2005) (noting that in 2003, "only 1.7% of civil terminations occurred during or after trial").

And any experienced litigator knows that complex civil litigation of this particular sort even

more rarely requires trial.  It is a virtual certainty not only that these matters will, at some point,

settle, but that they will necessarily settle by virtue of some comprehensive resolution of all of

the claims pending against defendants in this matter, the vast majority of which are pending

before this Court.  Moreover, if the cases do proceed to trial someday, there is hardly a guarantee

that current Seventh Circuit precedent will provide the rule of decision by which the transferor

court will assess its jurisdiction at the trial stage.  The circuit conflict may by then be resolved by

the Supreme Court; the Seventh Circuit may, by *en banc* decision, bring its view into line with

that of the other circuits, or, by future panel decisions, refine its rule in a manner more favorable

to the position of the defendants here; facts may emerge that warrant a change of venue for trial;

or other litigation contingencies presently unforeseeable may in some other way alter the case.

All this Court can do is to decide the issue presently before it on the strength of the arguments

that appear most persuasive to it, based on the binding precedents that must shape its judgment.[8]

_____

[8] Moreover, the Trustee's allegedly practical concern about what would happen if the Northern District of Illinois did decide to remand the case for trial is singularly unpersuasive. The Trustee argues that the parties should not be compelled to conduct discovery under federal rules if the case will be tried under state rules of procedure.  It is hardly rare for parties to conduct discovery in one proceeding that will eventually be used in a trial in another matter in a different jurisdiction.  The bulk of discovery is conducted for purposes of information-gathering that will not be affected by the venue or rules governing a subsequent trial.  To the extent that depositions are expected to be used at trial in lieu of live testimony, it is easy enough for the depositions to be conducted in the manner necessary to meet the most conservative of potential trial rules.  Indeed, in its supplemental brief, the Trustee admits as much by acknowledging that if this action were remanded, "the Trustee still has every intention of coordinating discovery with the Refco-related actions pending in this Court, but would do so under the supervision of, and pursuant to procedures approved by, the Illinois state trial court in which the action would be

Accordingly, notwithstanding the Trustee's contention that "Seventh Circuit law" governs this case, this Court will undertake its own independent analysis of subject matter jurisdiction, informed by the precedents of the Second Circuit, to determine whether the Trustee's claims are sufficiently "related to" the Refco bankruptcy to establish federal jurisdiction.

### 2. "Related to" Jurisdiction

The Removing Defendants contend that "related to" jurisdiction exists in this case because: (1) the Trustee is the "representative" of the Refco Debtors' bankruptcy estates, on whose "behalf" he acts, and thus the resolution of this action, which seeks to recover more than $2 billion to distribute to the Refco Debtors' creditors, "will, most assuredly, affect those estates"; (2) defendant Grant Thornton LLP has filed a proof of claim in the Refco bankruptcy for unpaid fees, contribution, and indemnification, and "the outcome of this action will directly impact how much Grant Thornton and the other defendants will receive from the estates"; and (3) several of the defendants, who are former Refco executives, are seeking access to the Refco Debtors' directors and officers' liability insurance policies, which are treated in the Plan as property of the bankruptcy estates, to pay their defense costs.  (D. Mem. 2, 9-12.)  The Trustee asserts that none of these grounds provides a basis for federal jurisdiction.

As described above, the general test for "related to" jurisdiction under § 1334(b) examines whether the outcome of an action "might have *any conceivable effect* on the bankrupt estate."  In re Cuyahoga, 980 F.2d at 114 (emphasis added) (internal quotation marks omitted);

---

pending and tried."  (P. Supp. 4 n.4.)  If the Trustee can conduct effective discovery even after a remand to state court, there is no reason he cannot do so now.

see In re Pacor, 743 F.2d at 994.  Although the reach of the Pacor test is broad, it is not

"limitless," Celotex, 514 U.S. at 308, and some courts have held that federal jurisdiction "shrinks

once bankruptcy plan confirmation has occurred," Guccione v. Bell, No. 06 Civ. 492, 2006 WL

2032641, at *4 (S.D.N.Y. July 20, 2006); see In re General Media, Inc., 335 B.R. 66, 73

(S.D.N.Y. 2005).  The rationale for diminished federal jurisdiction post-confirmation rests on the

notion that a reorganized debtor is "emancipated" by confirmation and that "just like any other

corporation[,] it must protect its interests in the way provided by the applicable non-bankruptcy

law, without any special swaddling."  In re Boston Reg'l Med. Ctr., Inc., 410 F.3d 100, 106 (1st

Cir. 2005) (internal quotation marks omitted); see In re General Media, 335 B.R. at 73 ("'Since

the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and

to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly

as possible all leading strings which may limit and hamper its activities and throw doubt upon its

responsibility,'" quoting North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.,

143 F.2d 938, 940 (2d Cir. 1944)).

> Given the broad sweep of the Pacor test, courts have observed that

> applying the general [Pacor] rule without qualification after the
> confirmation of a reorganization plan easily could result in the
> bankruptcy court retaining jurisdiction of all cases affecting the
> reorganized debtor for many years thereafter.  This prospect not
> only would work an unwarranted expansion of federal court
> jurisdiction but also would unfairly advantage reorganized debtors
> by allowing such firms to funnel virtually all litigation affecting
> them into a single federal forum.

In re Boston Reg'l Med. Ctr., 410 F.3d at 106.  Accordingly, numerous courts both in this and

other circuits have held that "the scope of bankruptcy court jurisdiction diminishes with plan

confirmation."  In re Resorts Int'l, Inc., 372 F.3d 154, 165 (3d Cir. 2004); accord In re Pegasus

Gold Corp., 394 F.3d 1189, 1194 (9th Cir. 2005); Guccione, 2006 WL 2032641, at *4; In re

General Media, 335 B.R. at 73.

The First Circuit, however, has distinguished between reorganization plans and

liquidation plans, holding that in the latter scenario,

> when a debtor (or a trustee acting to the debtor's behoof)
> commences litigation designed to marshal the debtor's assets for
> the benefit of its creditors pursuant to a *liquidating* plan of
> reorganization, the compass of related to jurisdiction persists
> undiminished after plan confirmation.

In re Boston Reg'l Med. Ctr., 410 F.3d at 107 (emphasis added).  In a liquidation plan, "the

reorganized debtor's sole purpose is to wind up its affairs, convert its assets to cash, and pay

creditors a pro rata dividend."  Id. at 106.  Accordingly, the First Circuit has reasoned that "there

is much less reason to depart from the general [Pacor] rule for related to jurisdiction" when the

plan at issue is a liquidating plan because "the specter of endless bankruptcy jurisdiction and a

kindred concern about unfairly advantaging reorganized debtors" does not exist.  Id.

This case, which involves a liquidation plan, well illustrates the force of the First

Circuit's distinction.  The plaintiff here is not a reorganized corporation that has put its debts

behind it, but a Trustee whose function is virtually indistinguishable from that of the bankruptcy

estate itself: to gather the assets of a defunct debtor for distribution to its creditors.  See

Kirschner Decl. Ex. B § 5.7(b) (providing that "the Litigation Trustee shall be a representative of

the Estates . . . with respect to the Contributed Claims"); id. Ex. C ¶ 23 (specifying that the

Contributed Claims "shall be deemed asserted on behalf of each applicable Estate holding such

claim immediately prior to contribution," and that the Litigation Trustee "shall be deemed the

successor-in-interest to each of the Contributing Debtors").  To permit this litigation to escape

16

the usual test of federal jurisdiction would further none of the purposes underlying a more restrictive jurisdictional test in post-confirmation cases. Rather, it would permit creditors, through the vehicle of a post-confirmation litigation trust, to pursue potential assets in fragmented litigation, undermining the goal of unified administration of bankruptcy cases.

Several courts in this circuit have cited the First Circuit's approach approvingly, see, e.g., In re Cross Media Mktg. Corp., 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007); In re Agway, Inc., Adv. Pro. No. 04-80269, slip op. at 7-8 (Bankr. N.D.N.Y. Mar. 6, 2006); In re General Media, 335 B.R. at 73 n.7, but the Second Circuit has not yet addressed the issue squarely. Although the First Circuit's reasoning is persuasive, it is unnecessary for the resolution of this case to adopt its distinction between reorganization and liquidation plans because, even if federal jurisdiction is diminished post-confirmation, the Trustee's claims here are nevertheless still sufficiently "related to" the Refco bankruptcy to support jurisdiction.

According to the line of decisions holding that federal jurisdiction shrinks post-confirmation,

> a party invoking the bankruptcy court's post-confirmation
> jurisdiction must satisfy two requirements. First, the matter must
> have a close nexus to the bankruptcy plan or proceeding, as when a
> matter affects the interpretation, implementation, consummation,
> execution or administration of the confirmed plan and second, the
> plan must provide for the retention of jurisdiction over the dispute.

In re Kassover, 336 B.R. 74, 79 (S.D.N.Y. 2006); see Guccione, 2006 WL 2032641, at *4; In re General Media, 335 B.R. at 73; see also In re Resorts, 372 F.3d at 168-69. In this case, both requirements for post-confirmation jurisdiction are satisfied. With regard to the "retention of jurisdiction" requirement, it is undisputed that the Plan expressly preserves jurisdiction over any "causes of action by or on behalf of . . . the Litigation Trustee." (Kirschner Decl. Ex. B

17

§ 11.1(k)).  This action, moreover, clearly shares a "close nexus" to the Refco bankruptcy as the claims asserted in this case do not "belong[] to the litigation trust personally," In re Premium Escrow Servs., Inc., 342 B.R. 390, 399 (Bankr. D. Colo. 2006), but rather, are precisely those causes of action that were transferred by the Refco Debtors to the Litigation Trust pursuant to the Plan and the Litigation Trust Agreement.  Accordingly, the "implementation" and "execution" of the confirmed Plan are directly at issue as the very claims being prosecuted by the Trustee "arise under the Plan."  In re General Media, 335 B.R. at 73, 75; see In re Agway, slip op. at 9 (finding "sufficient nexus" for "related to" jurisdiction where, *inter alia*, "the Liquidating Trust was given the power to prosecute the action under the terms of the Debtor's Plan").  Any funds recovered by the Trustee in this case will be distributed to Refco's general unsecured creditors, thus further evidencing the "close nexus" between the Trustee's claims and the bankruptcy proceeding.  See In re Railworks Corp., 325 B.R. 709, 723 (Bankr. D. Md. 2005) (finding that "the implementation of the payment of unsecured creditors through claims prosecuted by the Litigation Trustee is precisely at issue, and falls squarely in the realm of limited jurisdiction that a bankruptcy court may hear"); see also In re Tyson, No. 03-41900, 2007 WL 2379624, at *3 (Bankr. S.D.N.Y. Aug. 17, 2007); In re Boston Reg'l Med. Ctr., 410 F.3d at 107; In re AstroPower Liquidating Trust, 335 B.R. 309, 325 (Bankr. Del. 2005).

The Trustee nevertheless contends that "related to" jurisdiction does not exist because, upon confirmation of the Plan, the Refco Debtors irrevocably assigned all of their causes of action to the Litigation Trust.  As a result, any recovery of funds will be distributed directly to the Litigation Trust Beneficiaries, not to the Refco Debtors, and thus adjudication of the claims cannot affect the Refco Debtors' estates.  The Trustee's arguments, however, are premised on the

Seventh Circuit's narrower standard for "related to" jurisdiction, which, as explained above, does not control here.[9]  In contrast to the Seventh Circuit's approach, which considers only whether a dispute "affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors," In re FedPak Sys., 80 F.3d at 213-14 (alteration in original) (internal quotation marks omitted), the applicable test in this case is significantly broader, examining whether the action has "a close nexus to the bankruptcy plan or proceeding," In re Kassover, 336 B.R. at 79; see Celotex, 514 U.S. at 308 (observing that "related to" jurisdiction encompasses "more than simple proceedings involving the property of the debtor or the estate").

Even accepting as true the Trustee's contention that no property of the Refco Debtors' estates will be affected by this action, that fact alone is not dispositive of the jurisdictional inquiry.  As described above, the Trustee's claims in this case are precisely those that were transferred to it by the Refco Debtors pursuant to the Plan and the Litigation Trust Agreement. The Trustee's claims thus "arise under the Plan," and prosecution of this action directly implicates the "implementation" and "execution" of the "confirmed plan [and] incorporated litigation trust agreement."  In re General Media, 335 B.R. at 73, 75 (internal quotation marks omitted).  Under the governing legal standard, these facts are sufficient to establish the "close nexus" required for post-confirmation jurisdiction.

---

[9] The Trustee's citation to two decisions by the bankruptcy court for the Northern District of Illinois, see In re Commercial Loan Corp., 363 B.R. 559 (Bankr. N.D. Ill. 2007); In re Federalpha Steel LLC, 341 B.R. 872 (Bankr. N.D. Ill. 2006), are thus inapposite because both decisions applied the Seventh Circuit's narrower standard for "related to" jurisdiction.

19

The Court's exercise of jurisdiction in this case, moreover, is entirely consistent with Congress's intent in enacting § 1344(b) "to grant *comprehensive* jurisdiction to the bankruptcy courts so that they might deal *efficiently and expeditiously with all matters* connected with the bankruptcy estate."  Celotex, 514 U.S. at 308 (emphasis added) (internal quotation marks omitted); see In re Boston Reg'l Med. Ctr., 410 F.3d at 105 ("Congress deliberately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with the *entire universe of matters* connected with bankruptcy estates." (emphasis added)).  The efficiency gains that result from asserting jurisdiction in this case are particularly striking in light of the multitude of other Refco-related actions currently pending before this Court, many of which involve many of the same parties and arise out of the same set of facts as those described in the Trustee's complaint.

In addition, as a practical matter, adopting the Trustee's position would effectively extinguish federal jurisdiction in all cases where a litigation trustee prosecutes claims specifically assigned to it by a confirmed bankruptcy plan.  See In re LGI, Inc., 322 B.R. 95, 104 (Bankr. D.N.J. 2005) (noting that "[d]efendants' overstated position would recharacterize the nature of a post-confirmation trust litigation so that every post-confirmation trust case would fail the 'close nexus' test by virtue of having an identity separate from the debtor's estate").  The legitimate function of a litigation trust is not to serve as a vehicle for escaping federal jurisdiction, but rather, to "allow a Chapter 11 debtor to focus preconfirmation on the more pressing needs of its reorganization or liquidation while deferring issues regarding . . . causes of action . . . until after confirmation of its plan."  Andrew M. Thau et al., Postconfirmation Liquidation Vehicles (Including Liquidating Trusts and Postconfirmation Estates): An Overview,

16 J. Bankr. L. & Prac. 201, 204 (April 2007); see id. at 205 (noting that post-confirmation

liquidation vehicles such as litigation trusts "serve to enable confirmation notwithstanding that

certain matters remain[] unsettled," including "the litigation of claims and/or the recovery . . . of

all of the debtor's . . . causes of action"); In re Resorts, 372 F.3d at 169 (observing that the

"Litigation Trust was created in part so that the Plan could be confirmed and the debtor freed

from bankruptcy court oversight without waiting for the resolution of the litigation claims").  It

is not at all surprising, then, that courts in both this and other circuits have recognized, contrary

to the Trustee's position, that "[l]itigation trusts, which serve a valid purpose in the bankruptcy

process, may continue long after a reorganization plan has been confirmed and the debtor has

emerged from bankruptcy[,] [a]nd yet bankruptcy jurisdiction may still obtain if there is

sufficient connection to the bankruptcy." In re Resorts, 372 F.3d at 164; accord In re

AstroPower Liquidating Trust  335 B.R. at 325; In re Railworks Corp., 325 B.R. at 723; Rahl v.

Bande, 316 B.R. 127, 134 (S.D.N.Y. 2004).

In sum, even assuming *arguendo* that federal jurisdiction diminishes post-confirmation,

the existence of a "close nexus" between the Trustee's claims and the Refco bankruptcy, coupled

with the Plan's express retention of jurisdiction over those claims, suffices to establish "related

to" jurisdiction in this case.[10]  Accordingly, the Trustee's motion to remand on the ground of lack

of subject matter jurisdiction must be denied.

---

[10] Accordingly, the Court need not address the Removing Defendants' alternative
arguments for jurisdiction.

## II.    Abstention

A.    Mandatory Abstention

The Trustee asserts that even if subject matter jurisdiction exists, abstention is required

by 28 U.S.C. § 1334(c)(2).  Section 1334(c)(2) provides, in relevant part:

> [u]pon timely motion of a party in a proceeding based upon a State
> law claim or State law cause of action, related to a case under title
> 11 but not arising under title 11 or arising in a case under title 11,
> with respect to which an action could not have been commenced in
> a court of the United States absent jurisdiction under this section,
> the district court *shall abstain* from hearing such proceeding if an
> action is commenced, and can be timely adjudicated, in a State
> forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (emphasis added).  A party seeking mandatory abstention under

§ 1334(c)(2) thus must demonstrate that:

> (1) the motion to abstain was timely; (2) the action is based on a
> state law claim; (3) the action is "related to" but not "arising in" a
> bankruptcy case or "arising under" the Bankruptcy Code; (4)
> Section 1334 provides the sole basis for federal jurisdiction; (5) an
> action is commenced in state court; [and] (6) that action can be
> "timely adjudicated" in state court.

In re Worldcom, 293 B.R. at 331.  "A party is not entitled to mandatory abstention if it fails to

prove any one of the statutory requirements."  Id.; see Mt. McKinley Ins. Co. v. Corning Inc.,

399 F.3d 436, 446-47 (2d Cir. 2005) (holding that mandatory abstention can be applied in a case

that has already been removed from state court).

In this case, mandatory abstention is not warranted because, as the Removing Defendants

correctly contend, the Trustee has not met its burden of proving that its claims can be

"timely adjudicated" in Illinois state court.  28 U.S.C. § 1334(c)(2).  The Trustee relies on the

declaration of a former judge of the Cook County Circuit Court, who states that it is his

22

"impression that cases assigned to the commercial calendar are, by and large, handled efficiently and expeditiously." (Schiller Decl. ¶ 9.) The Trustee also presents statistics showing that in recent years, the average time to trial in Cook County has dropped significantly and cites a case from this district which purportedly found that the average "time from filing to date of trial in the Cook County courts was only longer than the comparable period in the Northern District of Illinois by a matter of months." (P. Reply Mem. 13, quoting Bondi v. Grant Thornton Int'l, 322 B.R. 44, 50 (S.D.N.Y. 2005)).

As the Bondi court itself recognized, however, "[t]hese statistics . . . do not tell the whole story." 322 B.R. at 50. Whatever might be true in the general run of cases filed in Illinois state court, this action is clearly distinguishable, constituting "but one piece of a much larger, extremely complex litigation puzzle." Id. As this Court has explained:

> [Section] 1334(c)(2) is intended to require federal courts to defer to the state courts to handle lawsuits which, although "related to" a bankruptcy, can be promptly resolved in state court without interfering with the proceedings pending in the federal courts. That intention simply has no application to litigation of this sort, in which a case properly removed to federal court is intertwined with complex bankruptcy proceedings and equally complex securities class actions pending in federal court.

In re Global Crossing, Ltd. Sec. Litig., 311 B.R. 345, 349 (S.D.N.Y. 2003); see Bondi, 322 B.R. at 50; In re WorldCom, 293 B.R. at 331. Indeed, far from promoting "timely adjudicat[ion]" of the Trustee's claims, to remand this action to the Illinois state court "would simply complicate and slow down the resolution of those claims, as well as of the matters already pending before this Court." In re Global Crossing, 311 B.R. at 349 (alteration in original). For these reasons, mandatory abstention pursuant to § 1334(c)(2) is clearly unwarranted.

23

B.    Discretionary Abstention

Neither is discretionary abstention appropriate.  Section 1334(c)(1) provides that
"[n]othing in this section prevents a district court in the interest of justice, or in the interest of
comity with State courts or respect for State law, from abstaining from hearing a particular
proceeding . . . related to a case under title 11."  28 U.S.C. § 1334(c)(1).  Federal courts,
however, must be "sparing" in their exercise of discretionary abstention, Winstar Holdings, LLC
v. Blackstone Group L.P., No. 07 Civ. 4634, 2007 WL 4323003, at *5 (S.D.N.Y. Dec. 10, 2007),
because they possess a "virtually unflagging obligation . . . to exercise the jurisdiction given
them," Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976); see
id. at 813 (observing that federal courts may abstain only for a few "extraordinary and narrow
exception[s]").  Relevant considerations in determining whether to abstain pursuant to
§ 1334(c)(1) include "comity and federalism, judicial economy, and efficiency."  In re
Worldcom, 293 B.R. at 332.

In this case, "there is little basis to invoke comity to the state courts, and every reason to
invoke . . . federal jurisdiction."  Winstar, 2007 WL 4323003, at *5.  Although the Trustee's
claims are based entirely on Illinois state law, the state law claims are straightforward
common-law claims that do not involve arcane or idiosyncratic provisions of state law that
would "warrant abstention based on comity concerns."  In re Worldcom, 293 B.R. at 332; see
Rahl, 316 B.R. at 135.  As the case was promptly removed, moreover, Illinois state courts have
invested little or no time in the case.  See Winstar, 2007 WL 4323003, at *5.  This action also
shares a close relationship with the Refco bankruptcy proceeding as the claims being prosecuted
by the Trustee are the very causes of action that were assigned to it by the Refco Debtors

24

pursuant to the confirmed Plan. See supra at 17-21. Finally, as Judge Cote astutely observed in

a substantially similar case:

> it is beyond cavil that judicial economy and efficiency are best
> served by exercising the jurisdiction that so clearly exists. The
> MDL panel has consolidated scores of cases before this Court to
> promote the expeditious and efficient resolution of the claims
> arising from the collapse of WorldCom. The litigation is
> proceeding apace. Motions to remand . . . and to dismiss have
> been fully briefed, and . . . important discovery issues addressed.
> With the consolidation of the litigation in one court, the motion
> practice and discovery process can be managed to protect the
> rights of all parties and to preserve, to the extent possible, the
> maximum amount of assets for recovery by plaintiffs with
> meritorious claims.

In re Worldcom, 293 B.R. at 333. Given the "scores" of other Refco-related actions consolidated

by the MDL Panel and currently pending before this Court, the Trustee has advanced no

persuasive reason why a different outcome should result here. Id. Accordingly, the Trustee's

request for discretionary abstention under § 1334(c)(1) must be denied.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to remand, or in the alternative, to abstain, is

denied.

SO ORDERED.

Dated: New York, New York
April 21, 2008

GERARD E. LYNCH
United States District Judge

25