SULLIVAN & WORCESTER LLP
Andrew T. Solomon (AS 9200)
1290 Avenue of the Americas
New York, NY 10104
Tel. 212-660-3000
Fax 212-660-3001

*-and-*

Laura Steinberg (LS 0276), *pro hac vice*
Joshua L. Solomon (JS 5848), *pro hac vice*
One Post Office Square
Boston, MA 02109
Tel. 617-338-2800
Fax 617-338-2880
*Counsel to Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WALTER BEINECKE, III, EAGLIS ALTERNATIVE INVESTMENTS I, LLC, GEOFFREY T. FREEMAN, GRAHAM GUND, HENRY A. JORDAN, JENNIFER C. McNEIL, J. STUART MOORE, and CARL NOVOTNY, TRUSTEE of the S&H NOMINEE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>S&H MARKETING, INC. f/k/a S&H GREENPOINTS, INC. and THE SPERRY AND HUTCHINSON COMPANY, INC.,<br><br>Defendants. | 08- Civ. 2483 (GBD)<br><br>**ELECTRONICALLY FILED**<br><br>**DECLARATION OF JOSHUA L. SOLOMON** |

    1.    I am an associate with the law firm of Sullivan & Worcester LLP, counsel to plaintiffs in the above-captioned matter. I offer this declaration in support of plaintiffs' motion to remand this action.

2.      Attached hereto as <u>Exhibit A</u> is a true and accurate copy of a document entitled Notice of Supplemental Application and Supplemental Application for Amended Order Authorizing Expanded Employment of Cooley Godward Kronish LLP, as Special Counsel for the Debtors and Debtors in Possession, as I downloaded it from Pacer for the United States Bankruptcy Court, Central District of California.

3.      Attached hereto as <u>Exhibit B</u> is a true and accurate copy of a document entitled The Commercial Division of the Supreme Court of the State of New York: Celebrating a Twenty-First Century Forum for the Resolution of Business Disputes, dated Jan. 25, 2006, as I downloaded it from http://www.nycourts.gov/courts/comdiv/PDFs/ComDiv-Jan06.pdf.

4.      Attached hereto as <u>Exhibit C</u> is a true and accurate copy of a document entitled U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases, Terminated, by District and Method of Disposition, During the 12-Month Period Ending September 30, 2007, as I downloaded it from http://www.uscourts.gov/judbus2007/appendices/C05Sep07.pdf.

5.      Attached hereto as <u>Exhibit D</u> is a true and accurate copy of a document entitled Notice of Motion and Amended and Restated Motion for Order (I) Establishing Procedures and Deadlines for the Filing of Proofs of Claim and Interest; (II) Establishing Procedures and Deadlines for the Filing of Requests for Payment of Certain Administrative Expenses Incurred Through May 31, 2008; (III) Approving the Form and Scope of Notice of Such Procedures and Deadlines; and (IV) Authorizing the Appointment of Claims Agent, as I downloaded it from Pacer for the United States Bankruptcy Court, Central District of California.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 2008.

s/ Joshua L. Solomon_____
Joshua L. Solomon

# EXHIBIT A

1  COOLEY GODWARD KRONISH LLP
   KENNETH L. GUERNSEY (83549)
2  J. MICHAEL KELLY (133657)
   ROBERT L. EISENBACH III (124896)
3  101 California Street, 5th Floor
   San Francisco, CA 94111-5800
4  Telephone:  (415) 693-2000
   Facsimile:  (415) 693-2222
5  Email: kellyjm@cooley.com; reisenbach@cooley.com; and
   kleinergs@cooley.com
6
   Special Counsel for Debtors
7  SOLIDUS NETWORKS, INC., *et al.*

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12  In re                                    Chapter 11

13  SOLIDUS NETWORKS, INC., dba PAY BY        Case No. 07-20027-TD
    TOUCH (afka PAY BY TOUCH                  (Jointly Administered)
14  SOLUTIONS), a Delaware corporation, *et al.*[1],
                                             **NOTICE OF SUPPLEMENTAL APPLICATION
15             Debtors.                       AND SUPPLEMENTAL APPLICATION FOR
                                             AMENDED ORDER AUTHORIZING
16                                           EXPANDED EMPLOYMENT OF COOLEY
                                             GODWARD KRONISH LLP, AS SPECIAL
17                                           COUNSEL FOR THE DEBTORS AND DEBTORS
                                             IN POSSESSION**
18

19  **TO THE HONORABLE THOMAS DONOVAN AND INTERESTED PARTIES**:

20          **PLEASE TAKE NOTICE THAT** Solidus Networks, Inc., dba Pay by Touch (afka Pay

21  by Touch Solutions) ("Solidus"), and its affiliated debtors and debtors in possession herein

22  (collectively, "Debtors"), hereby submit this Supplemental Application for an amended order

23  ("Amended Order") authorizing the expanded employment of Cooley Godward Kronish LLP

24  ("Cooley") as special counsel as described herein.

25  ――――――――――――――
    [1]  The Debtors include the following entities: Solidus Networks, Inc., dba Pay By Touch, aka Pay By Touch Solutions, afka
26       BioPay, Pay By Touch Payment Solutions, LLC, afka EPX, afka Payment Acquisition Corporation, afka InterCept Payment
         Solutions, LLC, afka SPS Payments, LLC, afka IPS Solutions, LLC, afka iPay, afka Pay By Touch Solidus Merchant
27       Services, Pay By Touch Processing, Inc., afka CSSI Acquisition Corporation, afka Card Systems Solutions, Inc., Pay By
         Touch Check Cashing, Inc., Check Elect, Inc., Seven Acquisition Sub, LLC, afka Seven Street Software, Pay by Touch
         Checking Resources, Inc., Indivos Corporation, afka Smart Touch, Inc., afka Veristar Corporation, afka Indivos Acquisition
28       Corporation, CardSystems Payment Solutions, LLC, Maverick International Services, Inc., and ATMD Acquisition
         Corporation, afka ATMD Direct, afka ATM Online, Inc.

COOLEY GODWARD
KRONISH LLP                                  **NOTICE & APPLICATION RE RETENTION OF
ATTORNEYS AT LAW       1082018 v2/SF    1.    COOLEY GODWARD KRONISH LLP
SAN FRANCISCO                                 CASE NO. 07-20027-TD**

1    **PLEASE TAKE FURTHER NOTICE THAT,** pursuant to Local Bankruptcy Rule

2    2014-1(b), any response to or request for a hearing on the relief requested in this Supplemental

3    Application must be in the form required by Local Bankruptcy Rule 9013-1(a)(7) and filed with

4    the Bankruptcy Court and served upon Cooley as proposed special counsel for Debtors, at the

5    address set forth in the caption to this Supplemental Application, and upon the Office of the

6    United States Trustee for the Central District of California, at 725 South Figueroa Street, Suite

7    2600, Los Angeles, California 90017, <u>no later than fifteen (15) days from the date of service of</u>

8    <u>this Supplemental Application.</u> If there is no timely objection or timely request for hearing on the

9    requested relief, the Court may enter an order granting such relief without further notice or

10   hearing.

11        In support of this Supplemental Application, Debtors submit the accompanying

12   *Declaration of J. Michael Kelly in Support of Supplemental Application for Amended Order*

13   *Authorizing Expanded Employment of Cooley Godward Kronish LLP, as Special Counsel for the*

14   *Debtors and Debtors-in-Possession* (the "Supplemental Declaration"), and respectfully represent

15   as set forth below.

16                                  **INTRODUCTION**

17        Pursuant to that certain *Application For Order Authorizing Retention of Cooley Godward*

18   *Kronish LLP, As Special Counsel for the Debtors and Debtors-In-Possession* ("Original

19   Application") filed on January 7, 2008, the supporting *Declaration of Kenneth L. Guernsey*

20   ("Original Declaration") filed on that same date, and that certain *Order* granting the Original

21   Application ("Original Order") entered on January 31, 2008, Cooley was employed by Debtors as

22   special counsel pursuant to section 327(e) of title 11 of the United States Code (the "Bankruptcy

23   Code") for the purposes described in the Original Application and the Original Declaration.

24        Debtors now desire to employ Cooley in the additional capacity described below, which

25   may require further approval of this Court, thereby necessitating the filing of this Supplemental

26   Application.  In addition, this Supplemental Application and the Supplemental Declaration

27   contain a disclosure by Cooley of a new connection with the Debtors (unrelated to the proposed

28   expanded representation of the Debtors) pursuant to Bankruptcy Rule 2014, also set forth below.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF                    2.                    NOTICE & APPLICATION RE RETENTION OF
                                                        COOLEY GODWARD KRONISH LLP
                                                        CASE NO. 07-20027-TD

## BASIS FOR AND SCOPE OF EXPANDED REPRESENTATION

Cooley's general employment qualifications, prior representation of Debtors, and prior authorized services are described in detail in the Original Application and Original Declaration and are incorporated by reference herein to the extent relevant in support of this Supplemental Application. Cooley intends to continue to provide the prior authorized services on behalf of Debtors as is necessary or appropriate pursuant to the Original Order. *See* Supplemental Declaration, ¶ 4.

In addition, Debtors have requested that Cooley assist Debtor Solidus in connection with a recent subpoena that was served upon Solidus by the U.S. Attorney, which primarily requests information concerning certain financing transactions which occurred prior to these bankruptcy proceedings. The Debtors have requested that Cooley represent Debtor Solidus in connection with all matters relating to the U.S. Attorney's request for documents, including (i) counseling Solidus regarding the request and any subsequent investigation, (ii) communicating with the U.S. Attorney's office on Solidus' behalf and (iii) reviewing and preparing responsive materials (collectively, the "Additional Services"). Cooley is well qualified and in the best position to provide the Debtors with the Additional Services because (1) as Solidus' pre-bankruptcy corporate counsel, Cooley is familiar with the transactions relating to the U.S. Attorney's request, and (2) Cooley has special expertise in dealing with such matters. *See* Supplemental Declaration, ¶ 5.

Cooley has already been authorized pursuant to the Original Order to advise and assist Debtors with a wide variety of matters, including but not limited to corporate, securities, financings, intellectual property, employment, mergers and acquisitions, taxation, and real estate matters. *See Original Application*, ¶ 12, and *Original Order*. However, Cooley's representation of Debtors with respect to the Additional Services involves activities that were not contemplated at the time of the Original Application. Therefore, Debtors request that an Amended Order in substantially the form attached as **Exhibit A** hereto (but not yet formally submitted) be entered, expressly authorizing Debtors' employment of Cooley to advise and represent Debtor Solidus in connection with the Additional Services and any similar or related matters, pursuant to Section

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF                    3.                    NOTICE & APPLICATION RE RETENTION OF
COOLEY GODWARD KRONISH LLP
CASE NO. 07-20027-TD

1    327(e) of the Bankruptcy Code.

2    ## TERMS OF PROPOSED EXPANDED EMPLOYMENT

3    The general terms of Cooley's proposed expanded employment shall be the same as those

4    described in the Original Application, are incorporated by reference herein, and shall not be

5    repeated here. *See Original Application*, ¶¶ 12-17. The biography of an additional Cooley

6    partner expected to bill significant time in connection with the Additional Services, and his hourly

7    current rate, is attached as **Exhibit B** to the Supplemental Declaration; the biographies and then-

8    current rates of the other Cooley professionals expected to assist with this matter were attached as

9    **Exhibit A** to the Original Declaration.[2]  See Supplemental Employment Application, ¶ 6.

10    Debtors filed this Supplemental Application as soon as practicable after requesting Cooley

11    to render services in connection with the Additional Services, but in order to best represent

12    Debtors and protect all of their rights in connection with these critical matters, Cooley needed to

13    commence rendering certain services prior to the date hereof. Accordingly, Debtors request that

14    any order entered pursuant to this Supplemental Application provide that Cooley's employment

15    as to the Additional Services and the GRC Services be retroactively effective as of the date

16    Cooley needed to begin rendering such services, or approximately March 21, 2008. *See*

17    Supplemental Declaration, ¶ 7.

18    ## BANKRUPTCY CODE REQUIREMENTS

19    Section 327(e) of the Bankruptcy Code provides that a debtor-in-possession "may employ,

20    for a specified special purpose, other than to represent the [debtor-in-possession] in conducting

21    the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such

22    attorney does not represent or hold an interest adverse to the debtor or the estate with respect to

23    the matter on which such attorney is to be employed." Pursuant to the Original Order, Cooley

24    satisfied this standard and was employed pursuant to this provision to represent Debtors as special

25

---

26    [2]    As in the Original Application, the identification of particular professionals is not intended to be exhaustive. The services of other Cooley attorneys or paraprofessionals may be needed in connection with the prior authorized

27    services or the Additional Services, in the discretion of Debtors and Cooley. The hourly rates charged by Cooley Godward professionals differ based on, among other things, the professional's level of experience and the location of the office in which the professional is resident. Hourly rates may change from time to time in

28    accordance with Cooley Godward's established billing practices and procedures and with the prior approval of Debtors, in which case the new rates apply to all work performed thereafter.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF                                    4.

NOTICE & APPLICATION RE RETENTION OF
COOLEY GODWARD KRONISH LLP
CASE NO. 07-20027-TD

1  counsel in connection with the matters set forth in the Original Application. Although Cooley is

2  making an additional disclosure (described below) regarding a new matter unrelated to the

3  Additional Services, neither the Debtors nor Cooley are aware of any new facts that would affect

4  Cooley's eligibility to serve as special counsel. *See* Supplemental Declaration, ¶ 8. Debtors are

5  informed and believe that Cooley still satisfies the standards of Section 327(e) and thus meets the

6  Bankruptcy Code requirements for employment as to the Additional Services, as well as the

7  previously approved services.

8  **ADDITIONAL DISCLOSURE PURSUANT TO BANKRUPTCY RULE 2014**

9  In the Original Declaration, Cooley disclosed all of its then known connections with

10  parties in interest herein as required by Bankruptcy Rule 2014, and made its required disclosures

11  pursuant to Section 329 of the Bankruptcy Code. These connections were also described in the

12  Original Application, and are incorporated by reference herein. *See* Original Application, ¶¶ 18-

13  31, and Original Declaration, ¶¶ 11-25.

14  Recently, in March 2008, Cooley was engaged by S&H Marketing and The Sperry and

15  Hutchinson Company (collectively, "S&H"), to represent them in connection with the complaint

16  filed against them by Walter Beinecke, III ("S&H/Beinecke Litigation"), currently pending in the

17  Supreme Court of the State of New York. This matter is related to the Debtors because until late

18  March 2008, S&H was a wholly-owned subsidiary of Debtor Solidus -- though S&H is not and

19  never was a Debtor in this or any other bankruptcy proceeding. Moreover, as part of the recent

20  closing of the sale of certain of Debtors' assets (approved by this Court), the stock of S&H is now

21  held by a third party purchaser, and is no longer held by Debtor Solidus. Cooley's fees for this

22  matter have been or will be paid by S&H and/or the third party purchaser of the S&H stock, <u>not</u>

23  by any of the Debtors or their estates. Finally, the third party purchaser of the S&H stock is now

24  in the process of substituting its own counsel for Cooley, and so this representation is expected to

25  be very short lived. In any event, Cooley's representation of S&H has not been and will not be

26  adverse to the Debtors or their estates in any way. *See* Supplemental Declaration, ¶ 10.

27  Accordingly, this additional connection does not preclude either Cooley's prior authorized or

28  proposed expanded employment under Section 327(e) of the Bankruptcy Code.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF                    5.

NOTICE & APPLICATION RE RETENTION OF
COOLEY GODWARD KRONISH LLP
CASE NO. 07-20027-TD

1

**CONCLUSION**

2        WHEREFORE, Debtors respectfully request that this Court enter an amended order

3  substantially in the form of the proposed order attached as **Exhibit A** hereto (but not yet formally

4  submitted) (1) authorizing it to employ Cooley Godward Kronish LLP pursuant to Section 327(e)

5  of the Bankruptcy Code to represent Debtors with respect to the Additional Services, effective as

6  of the date Cooley needed to begin rendering such services (approximately March 21, 2008), *in*

7  *addition to* the matters described in the Original Application pursuant to the Original Order, on

8  the terms described in the Original Application, and (2) granting Debtors such other and further

9  relief as is just and proper.

10  Dated: April 9, 2008           SOLIDUS NETWORKS, INC., for itself and for
the other Debtors (of which Solidus Networks,

11                       Inc., is the 100% direct or indirect owner

12

13                       By:    /s/  Thomas E. Lumsden

14                       Name:  Thomas E. Lumsden
Title:   Chief Restructuring Officer

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF             6.        NOTICE & APPLICATION RE RETENTION OF
COOLEY GODWARD KRONISH LLP
CASE NO. 07-20027-TD

1                 __COMMENTS OF THE OFFICE OF THE UNITED STATES TRUSTEE__

2

3   (     )      The U.S. Trustee takes no position.

4   (     )      The U.S. Trustee has no objection.

5   (     )      The U.S. Trustee objects and requests a hearing.

6   (     )      An objection is raised as set forth below.

7

8 Comments:

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 Dated:                           Office of the U.S. Trustee

21

22                               By:_____

23                                      Attorney for the U.S. Trustee

24 Case Name:    In re Solidus Networks, *et al*.

25 Case Number: 07-20027-TD (Jointly Administered)

26 Title of Document:    __NOTICE OF SUPPLEMENTAL APPLICATION AND SUPPLEMENTAL
27 APPLICATION FOR AMENDED ORDER AUTHORIZING EXPANDED EMPLOYMENT OF COOLEY
GODWARD KRONISH LLP, AS SPECIAL COUNSEL FOR THE DEBTORS AND DEBTORS IN
POSSESSION__

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1082018 v2/SF                  7.        __NOTICE & APPLICATION RE RETENTION OF
COOLEY GODWARD KRONISH LLP
CASE NO. 07-20027-TD__

# EXHIBIT B

# THE COMMERCIAL DIVISION *of the* SUPREME COURT *of the* STATE *of* NEW YORK



## CELEBRATING A TWENTY-FIRST CENTURY FORUM *for the* RESOLUTION OF BUSINESS DISPUTES

JANUARY 25, 2006

# JUSTICES OF THE COMMERCIAL DIVISION
## *of the* SUPREME COURT OF THE STATE OF NEW YORK

**ALBANY COUNTY**
Hon. William E. McCarthy

**ERIE COUNTY**
Hon. Eugene M. Fahey

**KINGS COUNTY**
Hon. Carolyn E. Demarest

**MONROE COUNTY AND SEVENTH JUDICIAL DISTRICT**
Hon. Kenneth R. Fisher

**NASSAU COUNTY**
Hon. Leonard B. Austin
Hon. Ira B. Warshawsky
Hon. Stephen A. Bucaria

**NEW YORK COUNTY**
Hon. Herman Cahn
Hon. Helen E. Freedman
Hon. Bernard J. Fried
Hon. Ira Gammerman
Hon. Richard B. Lowe III
Hon. Karla Moskowitz
Hon. Charles E. Ramos

**QUEENS COUNTY**
Hon. Marguerite A. Grays
Hon. Orin R. Kitzes

**SUFFOLK COUNTY**
Hon. Elizabeth Hazlitt Emerson

**WESTCHESTER COUNTY**
Hon. Kenneth W. Rudolph

## MESSAGE FROM THE CHIEF JUDGE

O N NOVEMBER 21, 2005, many of New York's leading commercial law practitioners gathered at Lincoln Center for the Performing Arts for a unique celebration in honor of the tenth anniversary of the formation of the Commercial Division of the New York State Supreme Court. The evening's remarks, reprinted in the back of this booklet, attest to how thoroughly the Commercial Division has earned the confidence and respect of New York's commercial bar and business community.

The New York State courts have long been leaders in the formation and development of commercial law in the United States. In 1995, in the spirit of this great tradition, the New York courts embarked on a bold experiment of dedicating judges to hear complex business cases. A decade later, we celebrate the overwhelming success of our cutting-edge business court, the Commercial Division, a world-class forum for the resolution of business disputes befitting the Empire State's status as a global commercial and financial center.



Since its inception, the Commercial Division has literally transformed the reality and image of New York State's courts, handling a remarkable diversity of cases spanning the breadth of domestic and international business law, and embracing innovations that our litigants deserve and are increasingly learning to expect. Today, the Commercial Division operates in business centers across the Empire State – from the upstate cities of Albany, Buffalo and Rochester, to the boroughs of New York City, to the suburban economies of Nassau, Suffolk and Westchester Counties.

I commend Chief Administrative Judge Jonathan Lippman, the Presiding Justices of the Appellate Division, the Administrative Judges of the Division counties and the Justices of the Commercial Division throughout the State for their ceaseless support of the Commercial Division and its mission. My thanks, also, to the New York State Bar Association's Commercial and Federal Litigation Section for its very important past and continuing contributions to the Commercial Division's success, and for its part in hosting the wonderful tenth anniversary celebration at Lincoln Center.

I hope that this booklet helps to demonstrate why the Commercial Division is becoming the forum of choice for complex commercial disputes. I hope also that you will take a moment to visit us at *www.nycourts.gov/comdiv* to learn more about the advantages of the Commercial Division.

**JUDITH S. KAYE**
CHIEF JUDGE OF THE STATE OF NEW YORK

## MESSAGE FROM THE CHAIR OF THE NEW YORK STATE BAR ASSOCIATION COMMERCIAL AND FEDERAL LITIGATION SECTION

TEN YEARS AGO, CHIEF JUDGE JUDITH S. KAYE ESTABLISHED the Commercial Division of the New York State Supreme Court, with parts in New York and Monroe Counties. Since then, Commercial Divisions have spread to seven other counties. In the process, the Commercial Division has fundamentally changed the way commercial cases are litigated in the New York State courts, and has had a



major positive impact on commercial law in general and commercial litigators and litigants in particular. The Division has resolved numerous commercial cases of broad legal significance, helping to develop the fabric of our State's commercial law. Commercial litigators have experienced the application of specialized judicial expertise to their cases. Efficient case management has been enhanced by the level of attention that Commercial Division Justices and staff routinely devote to their caseloads. The court has used the most advanced technology to help handle its caseload effectively and to make it easier for lawyers to litigate in the Division. And, ADR programs have been launched which have provided additional resources to help settle commercial cases. As a result, commercial litigators now have the benefit of an attractive alternative to federal court in which to litigate their cases.

In honor of its ten year anniversary, the Commercial and Federal Litigation Section was privileged to host an anniversary celebration for the Commercial Division at Lincoln Center on November 21, 2005. We are quite pleased that this anniversary event is being memorialized for posterity in this publication. In addition, our Section will be presenting its annual Chief Judge Stanley Fuld Award to the entire Commercial Division bench at its Annual Meeting on January 25, 2006. Chief Judge Fuld made numerous contributions to the development of commercial law in New York. It is thus quite fitting for the Section to bestow this award on the jurists who have made the Commercial Division such a great success.

We congratulate the Commercial Division on its ten years of success and look forward to many more in the future.

**STEPHEN P. YOUNGER**
**Commercial and Federal Litigation Section**

## A BRIEF HISTORY OF THE COMMERCIAL DIVISION:
## A STUDY IN BENCH-BAR COLLABORATION

The Commercial Division evolved from an experiment that commenced on January 1, 1993, when four Justices of the Supreme Court were assigned to hear commercial cases in New York County. Their courtrooms were called Commercial Parts and the Justices were assigned cases involving contracts, corporations, insurance, the Uniform Commercial Code, business torts, bank transactions, complex real estate matters and other commercial law issues.

The New York State Bar Association's Commercial and Federal Litigation Section has played an important role in transforming this experiment into the present-day Commercial Division. Indeed, the idea behind the Commercial Division had its genesis in the Section's scholarly and comprehensive 1995 report, which studied the commercial parts initiative, deemed it highly successful and recommended that it be institutionalized on a Statewide basis. The Section's report advanced several reasons supporting the creation of a separate Statewide division of the New York courts to handle commercial matters, including New York's role as a center of commerce, which the Section believed would be enhanced by having a commercial court, and the unique attributes and complexity of commercial cases, which warrant specialized judicial treatment.

In response to the Section's report, Chief Judge Kaye created the Commercial Courts Task Force, headed by Hon. E. Leo Milonas and Robert L. Haig, Esq., to examine the Section's report and develop a blueprint for implementation. The Task Force determined that there should be established a Commercial Division of the Supreme Court in areas of the State where significant commercial litigation is conducted. On November 6, 1995, the Commercial Division officially opened its doors in New York and Monroe Counties. In its first year, 6,500 new cases were filed in New York County alone. Since then, the Division has expanded to Albany, Erie, Kings, Nassau, Suffolk, Westchester and Queens Counties, and throughout the Seventh Judicial District.

The State's business community, the commercial bar as a whole, and the Section in particular, have all responded enthusiastically to the Division. The Section referred to the Division as "a case study in successful judicial administration." The Division has received excellent reviews from the Wall Street Journal and the National Law Journal and from business leaders and business groups like the New York State Business Council.

The future of the Commercial Division looks equally bright, thanks in large part to the continued productive collaboration between the Judiciary and the Section. There can be no more significant example of this collaboration than the adoption by the Administrative Board of the Courts of statewide uniform rules governing the jurisdiction and procedures of the Commercial Division. The new rules provide for operational uniformity for all of the Commercial Division courts throughout the state and greater predictability of practice for the commercial bar. The new rules take the guesswork out of litigating in the Commercial Division by defining clearly what constitutes a Commercial Division case, as well as ensuring consistency regarding rules of practice throughout the state. The Section worked closely with the Commercial Division Justices to develop the new rules, which took effect January 17, 2006 as part of the Uniform Civil Rules of the Supreme and County Courts (22 NYCRR 202.70). They address key aspects of commercial litigation, including motion practice, electronic discovery, pre-trial conferences, temporary restraining orders and trial scheduling. They also delineate definitive requirements governing the cases that may be heard in the Commercial Division, including specific monetary thresholds for the nine Commercial Division courts throughout the state.

## GOALS UNDERLYING CREATION OF THE COMMERCIAL DIVISION

AS A LONG-TIME COMMERCIAL LITIGATOR, CHIEF JUDGE KAYE was aware that the New York courts needed to take a quantum leap forward to meet the unique legal needs of its large and sophisticated business community. Businesses were increasingly resorting to other forums — the federal courts, Delaware, private ADR — to avoid New York's overburdened state court system. The New York Judiciary had an obligation to address this disturbing trend and improve the courts' ability to resolve commercial disputes effectively and efficiently. In announcing the creation of the Commercial Division, Chief Judge Kaye set ambitious goals:

- to provide litigants in commercial matters with a justice system commensurate with New York's status as a world commercial and financial center and its historical role as a leading innovator in the field of commercial law;

- to enhance the State's business climate; and

- to create a laboratory for new courtroom technologies and innovative practices that could be exported to the rest of the State court system.

Ten years after formally opening its doors, the Division has improved all aspects of commercial case litigation.

## IMPROVED EFFICIENCY

ONE VERY IMPORTANT KEY TO THE COMMERCIAL DIVISION'S SUCCESS has been improved efficiency. The average overall length of time it takes to process "contract" actions — the majority of cases in the Commercial Division — has decreased significantly since 1992. For example, for cases in which a note of issue has been filed, the length of time between the filing of a request for judicial intervention (RJI) to disposition has been reduced from 920 days in 1992 to 703 days in 2004 — a reduction of 24%.



In cases in which no note of issue was filed, the length of time from RJI to disposition has fallen dramatically from 610 days to 311 days, a reduction of 49%.

Disclosure in complex commercial cases can be difficult, protracted and expensive. But in the

Commercial Division, the time required to complete discovery has been significantly reduced. The key has been the fusion of close judicial oversight with new and sophisticated computer technology. The Division brings to bear in each case vigorous and efficient case management. Discovery is managed closely, and deadlines are set and enforced, with due regard to the rights of the parties to obtain fair disclosure while minimizing expense and delay. The Commercial Division places special emphasis on scheduling preliminary conferences as early as possible. At these conferences, the court lays out a road map for the entire action, including timetables for discovery, dispositive motions and a target trial date. The court also orders parties, among other things, to stipulate to undisputed facts and identify witnesses and deposition testimony on which they will rely.

Assigned justices are able to track each case closely, enforce timetables and remain in firm control of the case's schedule through uniform case management software specially designed for this purpose. Each justice can run computerized reports on his or her pending caseload at regular intervals to ensure compliance with deadlines. Important complements to our case management efforts have been increased familiarity with commercial cases on the part of court clerks and various administrative measures designed to improve efficiency and offer specialized services.

The Commercial Division's alternative dispute resolution (ADR) program has also contributed greatly to efficient case processing. Many Commercial Division cases submitted to the ADR program are successfully settled. The result is speedier and less costly resolution of commercial disputes.

## INTEGRATING THE LATEST TECHNOLOGY

The Division utilizes the latest technology to assist in handling its caseload as efficiently as possible.

- The Division developed and pioneered case management software now in use throughout the State.
- The Division pioneered electronic filing of court papers beginning in 1999. This user-friendly, secure electronic filing system has been expanded to other case types and is now authorized in 16 counties, including in all of the Commercial Divisions.
- In Monroe County, the Division operates a calendar that can be answered electronically and permits filing of papers electronically and by fax.
- Commercial Division decisions are posted electronically promptly after their issuance at *www.nycourts.gov/comdiv*

Particularly noteworthy is the Courtroom for the New Millennium, located in the New York County Courthouse in lower Manhattan. Equipped with flat-panel video monitors for judges, jurors, witnesses and counsel, this innovative, high-tech courtroom has proven highly influential, exporting its court technologies to New York and beyond. The Courtroom for the New Millennium features:

- *REAL-TIME COURT REPORTING FACILITIES:* Instantaneous voice-to-text transcription.
- *ELECTRONIC TRANSCRIPTS:* Transcripts can be delivered securely by e-mail with enhanced viewing, mouse-click searching, and indexing capabilities.
- *PRESENTATION OF ELECTRONIC EVIDENCE:* Attorneys are able to present evidence to the judge and jury through a wireless communicator or in the form of digitized evidence on CD-ROM by video monitors conveniently placed around the courtroom.
- *AN INTERACTIVE "WHITEBOARD":* This replaces the conventional blackboard. Presentation of drawings or writings can be made in large format on video monitors in the courtroom using a sophisticated touch-sensitive screen.
- *TOUCH SCREEN MONITOR:* Located at the witness box, a monitor and connected light pen are used by witnesses to mark evidentiary exhibits for illustrative purposes.
- *ANIMATION:* Computer-generated animation can be displayed on monitors for the judge and jury by attorneys wishing to present animated explanations to supplement witness testimony.

## IMPACT ON THE REST OF THE COURT SYSTEM

BY REMOVING COMPLEX, PROTRACTED COMMERCIAL CASES from other court parts, the Commercial Division has eased caseloads in other trial parts, allowing them to function more efficiently. In addition, the Commercial Division's many successful innovations are being exported to other court parts. The automated case management program was quickly modified for use in specialized matrimonial parts, and is now available to all judges presiding over civil matters. Likewise, the Commercial Division's ADR program has served as a model for other court-annexed ADR programs around the State.

## COMMITMENT TO ONGOING REFORM AND IMPROVEMENT

IN OUR COMMITMENT to identify ways in which the Commercial Division can be further improved, the court system is conducting a series of focus groups designed to elicit public feedback concerning the operations, rules and procedures of the Commercial Division. Through these informal but intensive discussions, we will generate new ideas, identify gaps in service and assess the feasibility of transferring the "best practices" of the Commercial Division to other areas of the court system.

Two successful focus group sessions were held in December, 2005 – in New York and Nassau Counties, covering the Commercial Divisions of New York, Nassau, Suffolk, Kings and Westchester Counties. Another focus group took place in January, 2006 in Monroe County, covering the Commercial Divisions of the Seventh Judicial District and Erie County. Two additional focus group sessions will take place in February, 2006, in Albany and Onondaga Counties.

Each focus group (consisting of approximately 18 to 20 individuals) includes experienced commercial litigators, chief litigation counsel from major corporations, and Commercial Division Justices. These focus groups are being facilitated by Robert L. Haig, Esq. of Kelley Drye & Warren, LLP and former Co-Chair of the Commercial Courts Task Force. The focus group discussions cover a broad range of relevant topics, including Commercial Division rules, the role of the judge and court staff, ADR, technology, appeals and general performance evaluation. The focus groups will form the basis for a report and recommendations to be issued later in 2006.

## IMPROVED QUALITY OF DECISION MAKING

ANOTHER MEASURE OF THE COMMERCIAL DIVISION'S SUCCESS is the promotion of a body of decisional law that is drawing commercial litigants to the New York courts. The Commercial Division's small cadre of judges, because they specialize in commercial cases, can engage in the extended and detailed research and thinking that contribute to the coherent articulation and development of the law. The result is cutting-edge judicial expertise in business law.

The *Commercial Division Law Report*, issued four times annually in hard-copy and electronic editions, contains summaries of leading opinions of the Commercial Division Justices. The electronic version of the Report digests each case and contains a hyperlink to the full text of the decision. The Report, available on the Commercial Division's website (*www.nycourts.gov/comdiv*), embodies a comprehensive and accessible body of precedents reflecting the latest issues and trends in American commercial law.

### Shareholders' Action

Plaintiffs, seatholders in the New York Stock Exchange ("NYSE"), brought a shareholders' class action against NYSE and its Board of Directors in connection with the proposed merger of NYSE and defendant Archipelago, a fully automated electronic stock market. Plaintiffs sought an injunction against the proposed merger and asserted causes of action for breach of the fiduciary duty of loyalty, due care and good faith. Plaintiffs asserted that the proposed merger was tainted by conflicts of interest and was otherwise inequitable on the grounds that it, *inter alia*, unfairly withheld from NYSE seatholders an appropri-

ate distribution of shareholders' equity and provided financial windfalls to former Archipelago shareholders. Defendants moved to dismiss the complaint on the grounds that the claims only stated a derivative action and that plaintiffs therefore lacked standing to bring a direct action. The court found that plaintiffs had standing to assert direct causes of action for breaches of fiduciary duty and did not have to show differentiated harm. The court conducted an in-depth analysis of the law governing direct and derivative shareholder claims. The court also found that the business judgment rule was no bar to the action, as plaintiffs had sufficiently alleged a breach of fiduciary duty (*Higgins v The New York Stock Exchange, Inc.,* Index No. 601646/05, 10 Misc 3d 257 [N.Y. Co. 2005, Ramos, J.]).

### Restrictive Covenant/Forfeiture of Stock Options

Declaratory judgment action by plaintiff corporation to enforce restrictive covenant and rescind defendant ex-employee's exercise of stock options. Defendant exercised vested stock options several weeks prior to resigning and joining an entity which plaintiff considered a competitor. Plaintiff argued that it was entitled to rescission under the employee choice doctrine. Defendant argued that employee choice doctrine was inapplicable because the stock option agreement did not contain a forfeiture for competition clause, and that the proper legal inquiry for restrictive covenants was the "reasonableness" inquiry articulated in *BDO Seidman v. Hirschberg*, 93 NY 2d 382 [1999]. The court held summary judgment inappropriate since there were questions of fact concerning whether the new corporation was a competing entity within the meaning of the stock option agreement, and whether the consideration for the stock options was actually the employee's agreement not to compete for two years following termination of employment (*Lenel Systems Intl., Inc. v Smith,* Index No. 11302/04, 2005 NY Slip Op. 25501 [Monroe Co. 2005, Fisher, J.]).

### Class Action

Proposed class action involving allegations that defendant Pfizer, Inc. had violated General Business Law § 349 and had been unjustly enriched through an advertising campaign for its Listerine product which had previously been found misleading by a federal court. In connection with plaintiff's application for class certification under CPLR 901, the court found that the commonality requirement was not satisfied since questions of individual members' exposure to the allegedly deceptive advertisements would predominate and each of the claims would require individualized proof concerning the bases for liability, damages and unjust enrichment. With regard to the prerequisite that "the claims or defenses of the representative parties are typical of the claims or defenses of the class", the court found that plaintiff's claims were atypical because of her deposition testimony wherein she had stated that she did not recall seeing the misleading product ads. The court also found that given the lack of plaintiff's knowledge of the advertisements and her failure to show any injury, she had not shown that she would fairly and adequately protect the interests of the class (*Whalen v Pfizer, Inc.,* Index No. 6000125/05, 2005 NY Slip Op. 51779 [N.Y. Co. 2005, Lowe, J.]).

### Breach of License Agreement Regarding Television Broadcast Rights

Plaintiff, holder of exclusive rights to televise regular season Mets baseball games on pay television ("Pay TV rights"), brought suit seeking, *inter alia,* a permanent injunction enjoining defendant from negotiating with third parties for the Pay TV rights to Mets games. Prior to entering into negotiations with third parties, defendant had exercised a $54 million buyout option. Despite this buyout provision, plaintiff claimed that the contract required defendant to wait until November 1, 2005, when the contract and license were scheduled to terminate, before defendant could begin

negotiations with third parties. Plaintiff further claimed that defendant had breached the first negotiation/first refusal provisions of the license agreement. In dismissing the action, the court held that the buy-out provision was intended to permit early termination of the license agreement and that to interpret the provision as plaintiff contended would produce a result contrary to the reasonable expectations of the parties (*SportsChannel Associates v Sterling Mets, L.P.,* Index No. 63548/04 [N.Y. Co. 2004, Freedman, J.], aff'd, 2006 N.Y. Slip Op. 0006 [1st Dept. 2006]).

## Sealing of Documents

In consumer fraud action alleging that defendant's DVD players were incompatible with the DVD-Video standard and failed to play all DVDs in acceptable fashion, defendant moved pursuant to §216.1 of the Uniform Civil Rules of the Supreme Court and County Court to seal certain records produced in discovery and marked as confidential in a related California action. Defendant contended that these documents should be sealed as trade secrets since they revealed, *inter alia,* information about the design and testing of the DVD players and details about internal investigations. Plaintiff opposed the motion on the ground that New York does not recognize confidential documents as trade secrets. The court granted defendant's motion for a sealing order because: (1) confidential trade information may be protected from public dissemination under the holding of *M/O Crain Communications, Inc. v Hughes,* 135 AD2d 351 [1987]; and (2) plaintiff had already agreed to the documents' designation as confidential in the California action and plaintiff should be required to fulfill that promise now by not publicly disclosing those documents (*Eusini v Pioneer Electronics (USA) Inc.,* Index No. 4526/04 [Nassau Co. 2004, Warshawsky, J.]).

## Legal Malpractice

Plaintiff municipality instituted a legal malpractice action against defendant law firm, which had represented plaintiff in underlying breach of contract action. Plaintiff, which had been found liable in the amount of $32 million after trial, claimed that defendant had committed malpractice by failing to raise an absolute defense to the breach of contract action, namely, that the Town Supervisor was without authority to enter into Consent Agreement since he had not obtained a resolution from the Town Board so authorizing him. The court rejected defendant law firm's arguments that (1) there could be no finding of malpractice since it was under the belief that the Consent Agreement was properly authorized, and/or (2) the validity of the Consent Agreement was irrelevant since the Town would nevertheless have been liable under an alternate theory of recovery — unjust enrichment. The court declined to dismiss defendant's "sophisticated client" defense, whereby the chain of causation in malpractice may be broken by the client's strategic or negligent decision imposed upon counsel, since questions of fact remained as to whether Town Attorney had decided to forego absolute defense (*Town of North Hempstead v Winston & Strawn, LLP,* Index No. 019050/03 [Nassau Co. 2005, Bucaria, J.]).

## Breach of Contract/Fraud/Conversion

Action asserting claims for breach of contract, money had and received, fraud and deceptive business practices based on plaintiff's purchase of a car dealership. Plaintiff claimed that the documents provided to plaintiff during negotiations showed a net annual profit of $642,610 when in fact, there was actually a net loss of $63,398. Plaintiff further contended that defendants had inflated the customer lists. Plaintiffs suit against the managing member of defendant alleged causes of action for intentional interference with business relationship, conversion and negligent misrepresentation. The court dismissed the claims of fraud in the inducement and conversion based on the documentary evidence provided, including express provisions of the purchase agreement precluding such claims. The court also dismissed the cause of action asserted against defendant's managing agent for intentional interference with business relations, since

managing agent could not be held personally liable for acts made on behalf of limited liability company (*Recovery Racing, LLC v Sunrise Motors, LLC,* (Index No. 12834/04, 2005 NY Slip Op. 51951 [Nassau Co. 2005, Austin, J.]).

### Preliminary Injunction/Subject Matter Jurisdiction/Misappropriation of Confidential Information

Plaintiffs, holders of intellectual property rights to silicone gloves sold as "Hot Holder" oven mitts, brought suit to enjoin defendants' alleged unlawful misappropriation of plaintiffs' confidential information and proprietary design. Plaintiffs and defendants had entered into various agreements concerning defendants' development of molds to be used in the manufacture of silicone gloves, including a Confidentiality Agreement which prohibited defendants from, *inter alia,* using plaintiffs' trade secrets for their own purposes. Plaintiffs alleged that defendants subsequently marketed a "Two Hands" product virtually identical to plaintiff's Hot Holder gloves. The court rejected the argument that it lacked jurisdiction to hear what was essentially a patent infringement action and held that even though the action could have been brought in federal court, the court had jurisdiction since it was an action for breach of contract and misappropriation of trade secrets. The court granted plaintiffs' motion for a preliminary injunction, holding that plaintiffs had shown a likelihood of success on the merits since there was substantial evidence that defendants breached the confidentiality agreement and misappropriated trade secrets. The court further found that irreparable injury was presumed where trade secrets were misappropriated, and that a balance of equities tipped in plaintiffs' favor (*Sylmark Holdings Ltd. v Silicon Zone Intl. Ltd.,* 5 Misc 3d 285 [N.Y. Co. 2004, Cahn, J.]).

### Partnership/Dissolution/Winding Up/Accounting/Appointment of Receiver

Plaintiffs, heirs of a deceased limited partner's interest in a limited partnership involving the realty business, brought an action for dissolution and the winding up of the affairs of the limited partnership. The court granted plaintiffs' motion for summary judgment to the extent of directing dissolution and an accounting, but deferred decision as to appointment of a receiver. The court rejected defendants' argument that the amount owed to plaintiffs upon dissolution was controlled by Partnership Law §112(1)(c) and was, therefore, limited to the deceased limited partner's capital contribution of $1,200. Instead, the court held that the partnership agreement's provisions regarding the distribution of equity in the partnership upon dissolution controlled, and, therefore, plaintiffs were entitled to a 4% interest in the partnership's assets upon dissolution (*Polner v. Monchik Realty Co.,* 9 Misc3d 755 [N.Y. Co. 2005, Demarest, J.]).

### Beer Distribution/Donnelly Act/Tortious Interference With Contract

Plaintiffs, wholesale distributors of beer, brought suit against defendant competitor Manhattan Beer based on their claims that defendant had unlawfully attempted to compete with plaintiffs for brands and brand extensions that plaintiffs would have otherwise been legally entitled to distribute. Plaintiffs contended that distributors enter into contracts with brewers for exclusive beer distribution rights in certain geographic areas and that defendant used economic leverage to pressure brewers to breach distribution agreements with plaintiffs by not granting brand extensions. The court held that plaintiffs' complaint adequately alleged tortious interference with contract, tortious interference with prospective economic advantage, injurious falsehood, unfair competition, and unjust enrichment. With regard to the claim of unfair competition, the court found that the tort was not limited to cases dealing with infringement, dilution, or exploitation of proprietary information. However, the court dismissed the causes of action based on prima facie tort and the Donnelly Act violations because plaintiffs failed to allege with requisite specificity (1) who the alleged co-conspirators were, (2) the factual details supporting a claim of conspiracy, and (3) how

the alleged conspiracy had a negative impact on trade in a geographic market. Finally, the court found that the "Noerr-Pennington Doctrine" did not bar plaintiffs' causes of action (*Boening Bros., Inc. v Manhattan Beer Distributors, Inc.,* Index No. 29830/04 [Suffolk Co. 2005, Emerson, J.]).

## Comity/ Respect for Orders of Delaware Chancery Court

Plaintiff, Weinstein Enterprises, Inc. ("Weinstein") and plaintiffs holders of 66% of the company's stock, brought suit against defendants (past and present shareholders of Weinstein) based on their alleged tortious and fraudulent conduct which resulted in the sale of 34% of Weinstein's shares to Weinstein's fiercest competitor. The prior holders of the 34% of Weinstein's shares had brought a prior action in Delaware Chancery Court, which sought the right to inspect Weinstein's books and records in order to facilitate their sale of shares to third parties. That action resulted in a settlement, the terms of which were set forth in a Final Order and Judgment (the "FOJ"). In the New York action, plaintiffs alleged, *inter alia,* that they had been fraudulently induced to enter into the FOJ. Defendants moved to dismiss the action on the grounds that (1) it was baseless, (2) *forum non conveniens* required that the action be brought in Delaware, (3) the action was a collateral attack on the Delaware proceedings, and (4) based on the doctrine of comity, the Delaware Chancery Court was best equipped to handle the challenges to its FOJ. In dismissing the action on the grounds of comity, the court held that it was "not for this court in effect to vacate an order of another court in a different jurisdiction" and that while the complaint alleged claims other than direct attacks on the FOJ, it was impossible to parse out only those claims that impacted the FOJ (*Weinstein Enterprises, Inc. v Orloff,* Index No. 602497/04 [Sup. Ct. NY Co., Moskowitz, J.]).

## Contract Interpretation

Plaintiff and defendant entered into an agreement whereby plaintiff was to provide cable television programming to defendant's cable TV customers, consisting of classic movies. At issue on motions for summary judgment was the "content clause" of the parties' agreement. Defendant contended that plaintiff had changed the nature of its service materially and breached the content clause and agreement as a whole by reducing the number of older, black and white films shown in favor of recent, colored ones. The content clause provided that programming was to consist of "classic motion picture films" and related original programming. The court found key to the interpretation of the content provision an attached "representative sampling" of service programming, which circumscribed the scope of permitted programming. The court held that plaintiff, by significantly changing the mix of films, had materially breached the contract. Plaintiff argued that defendant had waived its rights regarding plaintiff's alleged breach by having renewed the original 1993 agreement in writing in 2000, but the court ruled that plaintiff failed to meet its burden of showing a knowing waiver since there was no question of fact that defendant was unaware of the breach at the time of the renewal (*American Movie Classics Co. v Time Warner Entertainment, L.P.,* Index No. 603625/03, NY Slip Op. 52081 [N.Y. Co. 2005, Fried, J.]).

## Contracts; suretyship; interpretation; surety's failure to investigate; extension of surety's obligations.

In this action on a surety bond, defendant insurance company sought rescission of the bond and a declaratory judgment based on plaintiff's alleged failure to disclose material facts about the financial status and dealings of the principal, which went bankrupt, and confidential payment agreements between plaintiff and the principal. The court declined to grant summary judgment on defendant's claim that plaintiff's obligation to timely notify the surety of these facts was a condition precedent to payment. The court found that the notification clause was ambiguous and could not be interpreted as a condition precedent. Nor did the court find an implied-in-fact condition precedent, as there is a preference for construing doubtful lan-

guage to embody a promise or constructive condition rather than an express condition, especially where there is increased risk of forfeiture by the obligee. The court noted that even if the clause had been unambiguous, plaintiff had raised an issue of fact as to its compliance with the notice provision. The court found defendant at fault for its lack of awareness, since these facts were ascertainable when defendant executed the bond, and the surety has the burden of inquiring into the principal's state of affairs. The court further held that the confidential payment agreements did not extend the maturity of the debt to plaintiff, but instead constituted leniency in enforcing the debt, to which defendant acquiesced. Thus, defendant failed to establish as a matter of law that plaintiff had a duty to disclose certain agreements with the principal before renewal, whereas plaintiff had shown as a matter of law that defendant had failed to request any information from plaintiff about the principal's financial condition before executing the bond (*National Fuel Gas Distrib. Corp. v Hartford Fire Ins. Co.*, Index No. 258/03 [Erie Co. 2005, Fahey, J.]).

## Insurance/Bad Faith Refusal to Honor

In an action to recover for losses sustained by near collapse of plaintiffs' building, defendants moved to dismiss the complaint on grounds, *inter alia*, that the action was barred by the policy's two year suit limitations clause, plaintiffs' loss occurred outside the policy's term, plaintiffs failed to comply with condition precedent requiring sworn proof of loss, and New York does not recognize cause of action for bad faith refusal to honor individual insurance claims. The court denied defendant's motion to dismiss, finding that the loss did not occur outside the policy period because defendant had extended the expiration date of the policy in its Notice of Nonrenewal. As to defendant's contention that the two year statute of limitations contained in the policy barred plaintiffs' action, the court found the provision requiring any lawsuit to be commenced within "2 years after the date on which the direct physical loss or damage occurred" was ambiguous and, therefore, unenforceable. Accordingly, the six year statute of limitations applied. As to sufficiency of the plaintiffs' proof of loss, the court found that the proof of loss form provided by defendants was not suitable and plaintiffs had no obligation to complete it. Moreover, plaintiffs' signature was found sufficient, as defendant did not advise its insureds that the signature on the form had to be legible to be effective. Finally, the court declined to dismiss plaintiffs' bad faith claims, finding that defendant's actions as to the deceptive expiration date in the Nonrenewal notice and in attempting to reject the proof of loss form were sufficient to sustain a claim of deceptive conduct under GBL § 349. The court held that to sustain a claim under GBL § 349, plaintiff need not show that defendant subjected its other insureds to similarly deceptive conduct (repetitive conduct with ramifications to the general public) as long as the transaction at issue was consumer-oriented (*Korn, Nathan v Fidelity & Guaranty Ins.*, Index No. 0601756/04 [N.Y. Co. 2004, Gammerman, J.]).

## Insurance Coverage

Declaratory judgment action brought by plaintiffs against their insurer and their insurance broker for property losses sustained to plaintiffs' products when they were rendered unfit for consumption due to introduction of certain ingredients not within the products' specifications. Defendants contended the losses sustained did not fall within the definition of physical damage and, therefore, were not covered. In denying defendants' motion for summary judgment, the court found that questions of fact surrounded the issue of whether the property losses fit within the definition of physical damage. The court further granted plaintiffs' motion for partial summary judgment to the extent that if in the future there were to be a finding of coverage, the proper measure of damages would be the regular cash selling price of those products as stock inventory and not, as defendants contended, the replacement cost, as they were not completed products (*Pepsico, Inc. v Winterthur International Ins. Co.*, Index No. 17053/01, 800 NYS2d 354 [West. Co. 2004, Rudolph, J.], aff'd 2005 NY Slip Op. 0110 [2nd Dept 2005]).

# TENTH ANNIVERSARY OF THE COMMERCIAL DIVISION
## *of the* SUPREME COURT OF THE STATE OF NEW YORK

### November 21, 2005 – 5PM to 7PM

### WALTER READE THEATER
### LINCOLN CENTER FOR THE PERFORMING ARTS

## SECTION WELCOME

### STEPHEN P. YOUNGER
CHAIR, COMMERCIAL AND FEDERAL LITIGATION SECTION
PATTERSON BELKNAP WEBB & TYLER LLP

ON BEHALF OF THE COMMERCIAL AND FEDERAL LITIGATION SECTION, I want to welcome you all to this evening's anniversary celebration. Ten years ago, our Chief Judge established commercial Divisions in New York and Monroe Counties. Since then, Commercial Divisions have spread to six other counties. This innovation has fundamentally changed how commercial matters are litigated in our State's courts.

Tonight's event is about honoring our Judges and the court personnel who have made the Commercial Division such a resounding success. I'd like to have everyone stand who is serving or has served in the Commercial Division – whether as a Commercial Division Judge, an Administrative Judge, a law secretary or a court clerk.

Let's give them all a round of applause.

Our Section has always had a special bond with the Commercial Division. It began with a report issued by our Section in January 1995 which recommended the formation of the Commercial Division. Following our Section's recommendation, Chief Judge Kaye formed a Task Force to study how to implement the Commercial Division. One of the people who was instrumental in working with the Task Force to establish the Commercial Division was our State's Chief Administrative Judge, Jonathan Lippman.

## UNIFIED COURT SYSTEM WELCOME

### HON. JONATHAN LIPPMAN
CHIEF ADMINISTRATIVE JUDGE OF THE NEW YORK STATE COURTS

GOOD EVENING. On behalf of the New York State Unified Court System, I want to welcome you to the tenth anniversary celebration of the Commercial Division of the Supreme Court.

We are so gratified that this impressive assembly of speakers and attendees – representing the leadership of New York State's legal and business communities – value the Commercial Division enough to be present this evening.

We are all here in this elegant setting tonight – for which I want to thank our hosts, Reynold Levy and Lesley Rosenthal – because in February 1995, our visionary Chief Judge, Judith Kaye, charged Leo Milonas and Bob Haig, as Chairs of the Commercial Courts Task Force, with developing the blueprint for a Commercial Division of the Supreme Court. Well, what they came up with was not a blueprint – it was a masterpiece!

Suffice to say that the Commercial Division has met and exceeded everyone's expectations -- the business sector, the Bar, and the Judiciary. And judging by the constant flow of national and international pilgrims to the Commercial Division every year, there can be no question that New York State has become

the international leader when it comes to business courts.

And we owe this lofty status to the outstanding efforts of so many good people, beginning with our hard-working cadre of Commercial Division Justices.

I want to take a moment now to recognize them. It used to be that we could identify them individually, but I'm afraid that we have become victims of our own success. Because of our constant expansion over the years and tonight's time constraints, I am going to ask all of them – current and former – to stand up right now so that we can give them all a great big round of applause.

I also could not leave here tonight without acknowledging the excellent work of our dedicated non judicial staff, so many of whom are here tonight. We couldn't have done it without them. Nor could we have done it without the incredible support we have received from the Bar, especially the New York State Bar Association and its Commercial and Federal Litigation Section.

In conclusion, I am so pleased that you took time from your busy schedules to be with us tonight, because what we are celebrating is important not just for the Judiciary, the corporations and the law firms represented here, but for all New Yorkers. There is a critical connection between the courts and the well being of the public and the state economy. We all know that litigation is a major cost of doing business, and the business community – and all New Yorkers – can only benefit when the courts are capable of handling business disputes in an efficient, cost-effective and reliable manner.

Once again, welcome . . . and thank you.

## WELCOME BY OUR HOSTS

### LESLEY FRIEDMAN ROSENTHAL
CHAIR-ELECT, COMMERCIAL AND FEDERAL LITIGATION SECTION
VP & GENERAL COUNSEL, LINCOLN CENTER FOR THE PERFORMING ARTS

IN ADDITION TO THE WELCOMES that Steve Younger and Chief Administrative Judge Lippman have extended to our Bar Association colleagues and distinguished members of the Bench, I would like to welcome to Lincoln Center, and to this distinguished Bar Association gathering, my fellow in-house attorneys and executives.

In-house counsel, perhaps more than anyone, control where commercial disputes are resolved, through forum selection clauses and choice of law provisions in the contracts that cross our desks on a daily basis. I personally cannot think of a better provision to incorporate into a contract than one entrusting any commercial disputes that may arise thereunder to the Commercial Division of the Supreme Court of this State, applying New York's well-developed commercial jurisprudence.

It was a privilege, as a young-ish lawyer and a commercial litigator, to be included as Secretary of the Commercial and Federal Litigation Section's 1994-95 Task Force that proposed the creation of the Commercial Division. Ten years later – now that I am a not-so-young-ish lawyer and a recovering commercial litigator – it remains a privilege to join with the leadership of this Section in the celebration of the tenth anniversary of the Commercial Division, and in the further realization in years to come of the promise of New York's Commercial Division.

As the mother of a fiercely independent nearly-ten-year-old myself, I look with considerable and ever-increasing admiration upon Chief Judge Kaye for her efforts to leave a lasting, positive imprint on the independent and largely self-directed entity that is New York's judiciary. Congratulations to Chief Judge Kaye, Chief Administrative Judge Lippman, and the members of the Commercial Division bench, past and present, for your outstanding accomplishments to date.

The Commercial Division is strongly supported by the business community, and that includes not-for-profit businesses in New York's cultural sector. The substantial economic activity generated by Lincoln Center alone - educational, cultural and performance operations - was estimated by the Economic Development Research Group in 2004 to contribute over $1.4 billion to the New York City metropolitan region economy.

Speaking of economic activity, the pleasure is mine to acknowledge once again the many law firm sponsors of this festive event.

Those of our guests here today who are in-house counsel no doubt have stories to tell about the colorful, brilliant, and demanding CEOs to whom you report. I can top that: my CEO, Reynold Levy, is in addition to all of those things, a lawyer. The combination of his educational achievements – in addition to his J.D. from Columbia Law School, he also holds a Doctorate in government and foreign affairs from the University of Virginia – and his many years of successful leadership at the highest levels of the private sector, as a former senior officer at AT&T, in the public sector both in New York City and the federal government, and in the not-for-profit sector as President of the International Rescue Committee -- would fully entitle him to second-guess my legal advice and judgment at every turn.  Despite the cautiousness that legal training can often imbue, Reynold Levy has catalyzed, and is spearheading, the single most important transformation of public performing arts space in the nation, the Redevelopment of Lincoln Center. I am overjoyed to introduce to you the President of Lincoln Center for the Performing Arts, Reynold Levy.

---

## REYNOLD LEVY
PRESIDENT, LINCOLN CENTER FOR THE PERFORMING ARTS

CHIEF JUDGE KAYE, CHIEF ADMINISTRATIVE JUDGE LIPPMAN, DISTINGUISHED COLLEAGUES, guests and friends, welcome to Lincoln Center.

When Mahatma Ghandi was asked what he thought of western civilization, he is reputed to have allowed as how he thought it would be a good idea.

From all sources (anonymous and otherwise) and by all accounts, the Commercial Division of the New York State Supreme Court is a good idea. And, on the occasion of its tenth anniversary, please add my voice to the chorus of congratulations reaching all those committed to the development of a body of commercial law in this State.

I know my colleague, Lesely Rosenthal, was instrumental in the recommendation to create this Commercial Division, yet another reason to be proud of her, and, no doubt, one reason you are assembled here at the largest and most consequential performing arts center in the world.

Other reasons occur to me. Some in this room have been known to tap dance from time to time, in and out of the courtroom. A few of you might teach Wynton Marsalis lessons in improvisation. And all of you seek a Commercial Division characterized by harmony, fluency and discipline – attributes prized by all twelve constituents of Lincoln Center.

Thank you for honoring us with your presence. Thanks especially to the thirteen law firms that are this evening's sponsors. Happy Holidays to you all.

---

## INTRODUCTORY REMARKS

---

## A. VINCENT BUZARD
PRESIDENT, NEW YORK STATE BAR ASSOCIATION

HARRIS BEACH PLLC

BEING HERE TONIGHT TO BE A PART OF THE CELEBRATION of the tenth anniversary of the Commercial Courts of New York is an extraordinary privilege. The celebration reminds me of my very enjoyable participation in the effort.

About ten years ago, Bob Haig called me and asked if I would serve on a special task force to formally establish commercial courts in this state and to expand commercial courts upstate – particularly to Rochester. Obviously, attempting to say no to Bob Haig is futile, and I did not want to say no in any event, so I accepted.

My participation in those meetings was my first exposure to the leadership of Judith Kaye and to such

people as Leo Milonas and Jonathan Lippman and the other eminent members of the committee. The committee was so eminent that I received a phone call from an opponent of commercial courts who said to me that "you are the only non-white-shoe lawyer on the committee." I did not think being called non-white-shoe was necessarily a compliment. I imagined my caller picturing me in a walk-up office over a liquor store on Main Street in Rochester, because in those days, while I did commercial litigation, as I still do, I had my own small firm.

From the start, I was pleased to find that the task force was not just a study group but an implementation committee, and that something was going to happen. The meetings were held in Judge Kaye's chambers on Park Avenue, so I would fly down in the afternoon and attend the 5:30 meetings. I think other people thought I just walked across the street or took the subway like they did. After the meetings, I would then go to the Cite restaurant for the wine dinner and then catch a cab and airplane back to Rochester late that night. I thought to myself, what a great committee!

My satisfaction came from the realization that we were accomplishing an important goal: the establishment of courts in this state dedicated to handling commercial disputes. Our work was not all smooth sailing, and there was some opposition in Rochester where the first upstate Commercial Court was to be located. However, when the announcement was made that Judge Tom Stander was to be the Commercial Court Judge, the opposition essentially disappeared, and the Court has been extremely successful in Rochester.

I don't know that any of us expected the effort to be so successful, with Commercial Courts now in most of the major cities of the state and an accepted fact of life -- efficiently, fairly, and knowledgeably resolving commercial disputes. The courts not only do justice, they contribute to the economic well-being of the Empire State.

My being here tonight is one of those remarkable coincidences that I could not have foreseen – that I would be President of the State Bar on this Tenth Anniversary Celebration so that I could participate here tonight. Thank you so much for including me, and congratulations to all those involved.

## KEYNOTE SPEAKER

### HON. JUDITH S. KAYE
#### CHIEF JUDGE OF THE STATE OF NEW YORK

IN THIS OFFICIAL SEASON — indeed this very week — of thanksgiving, I begin with thanks for so many things, including thanks to Lincoln Center for the Performing Arts (particularly to Lesley Rosenthal and Reynold Levy) and to the Commercial and Federal Litigation Section of the New York State Bar Association (particularly to Vince Buzard, Mark Alcott and Steve Younger) for hosting this elegant celebration. And thank you for putting me on stage at Lincoln Center. As a devoted fan of the opera, ballet, theater and movies—my husband, Stephen, and I are here very often—being onstage at Lincoln Center has been a lifetime dream of mine.

Then, too, there's a wonderful coincidence of timing in this evening's event: as you may (or may not) know, 2006 marks the centennial of the murder of Grace Brown, which was the basis of Theodore Dreiser's magnificent novel, *An American Tragedy*. That novel has inspired not only two films, but now also a brand new opera—called *An American Tragedy*—premiering right across the street at the Metropolitan Opera House in just ten days.

Here we are celebrating the tenth anniversary of what we can rightly proclaim *A New York Success*, or even more boldly *An American Success: the Commercial Division of the Supreme Court of the State of New York*. The link is plain as day, isn't it? Just think: in 90 years we might even be premiering at the Metropolitan Opera!

One can't help wondering where world events and 21st century technology will have taken us by the year 2095. What, for example, will this beautiful state-of-the-art theater be in the year 2095? Simply unimaginable.

By the same token, I doubt that anyone here would venture a prediction about what the Commercial Division might look like in 90 years. But I will make a prediction about its short-term future, which is that we will continue to be guided by two foundational principles that have guided us throughout the entire decade and brought us to this wonderful tenth anniversary celebration: first, an outstanding, dedicated judiciary (which deserves your applause), and second, our collaboration with the Bar (which has mine).

In fact, I know of no initiative in the State court system that has more greatly benefitted from a bench-bar collaboration than this one. It all began with a survey of lawyers who had actually litigated in four experimental Commercial Parts that had been established in Manhattan. Their rave reviews furnished the basis for a report by the Commercial and Federal Litigation Section of the State Bar proposing a permanent Commercial Division. Then came a joint bench/bar Commercial Division Task Force, co-chaired by the incomparable Leo Milonas and Robert Haig, to implement the Section's recommendations. From day one, our mutual objective was a justice system equal to New York's status as a commercial and financial center, and a leader in the development of commercial law.

What better evidence of the success of the Division than its growth from the original six parts--five in Manhattan, one in Rochester--to additional parts in Nassau, Kings, Westchester, Albany, Suffolk and Erie Counties. Only this month, we opened a Commercial Division in Queens County, and expect to have a third part in Nassau by January 1. We are absolutely delighted to see the concept of the Commercial Division replicated in other states, even other countries.

And those are not the only significant statistics. The efficiencies have been truly staggering--whether in reducing backlogs, or moving cases to resolution, or building a stable, comprehensive body of commercial law. In fact my favorite bedtime reading is *The Commercial Division Law Report*. Not exactly a popular publication at the newsstands — yet; but it does have a devoted readership, including the Chief Judge.

Our Commercial Division collaboration has also helped stimulate innovation in technology and case processing throughout the State courts. Indeed, just this morning, I attended the grand opening of our newest courthouse on Jay Street in Brooklyn — home to Supreme Court, Criminal Term, and the Family Court — where we have followed the model of the Courtroom for the New Millennium, developed by the Commercial Division. Today we are promoting the availability of decisions on the Internet, and e-filing. And maybe the very best evidence of all of our success together is the praise we hear from business leaders, especially those who in their agreements are designating the Commercial Division as their forum of choice.

I'm so proud, as a representative of the courts, to share today's program with the two keynoters following me: Mark Alcott, representing the Bar, and Louise Parent, representing the business community. This is indeed a fabulous collaboration in every sense.

While I can't predict the next 90 years, I can promise that we will continue the bedrock principle of collaboration in fine-tuning practices and procedures in the Commercial Division to better serve the public. Our newest effort will be Focus Groups to bring together the bench, bar and business community, to assure that we continue our strength and our success in serving the public.

I hope you will forgive me for concluding with a thought that's corny but does capture the spirit of tonight's celebration at Lincoln Center: the fact is we do make beautiful music together. As Steve Younger noted in opening this evening's program, the bench and bar together have changed commercial litigation practice in the New York State courts. We have provided an effective, attractive venue for business litigants. And we have improved the delivery of justice. Maybe not deserving of a full-length theatrical performance just yet, but definitely deserving of a great celebration.

My thanks to each and every one of you, most especially to our phenomenal judges and to our partners in the Bar for your role in the day-to-day performance of the Commercial Division of the New York State Supreme Court.

## KEYNOTE SPEAKER

### LOUISE M. PARENT
EXECUTIVE VICE PRESIDENT AND GENERAL COUNSEL,
AMERICAN EXPRESS COMPANY

GOOD EVENING. I am so pleased to be here tonight in my capacity as General Counsel of American Express, and to join in the celebration of the successes of the Commercial Division on the tenth Anniversary of its creation.

When my colleague asked if I would be interested in speaking at the tenth Anniversary celebration, I was somewhat hesitant at first — having had no personal experience litigating there myself. Thus, while American Express has been a party to a number of cases filed in the Commercial Division, the comments I have received concerning the benefits derived from litigating in the Commercial Division have been second-hand.

But when I heard that Chief Judge Kaye would be speaking it really became an easy decision. I can't tell you what a privilege it is for me to be standing here with Chief Judge Kaye. I've had the pleasure of working with the Chief Judge on a couple of occasions and I was awed by her graceful yet commanding style of leadership. She is someone who is able to influence people and build consensus in situations when there is not always a clear path.

And her leadership has done so much to revitalize New York's Court system through the implementation of revolutionary ideas, such as the Commercial Division, that are now used as models in States across America as well as in countries around the globe. Indeed, a study conducted by Philadelphia litigator Mitchell Back, chair of the committee on business courts of the American Bar Association's section of Business Law, ranked New York among the best commercial courts for its efficiency and expertise.

So let me tell you briefly what I like about the Commercial Division. First, it develops judicial expertise on complex commercial matters. Judges are selected who have a background in commercial litigation and, once selected, these judges hear only commercial cases.

Second, it's faster. The establishment of the division has reduced the time to resolve these types of cases by over 40% in New York County, and this reduces costs for everybody. And this is helpful to me personally because I work for a CEO who cares how much we spend on legal expenses. Some of the things that have made things faster are a solid ADR program that settles a high percentage of the cases sent to mediation. Procedural rules are designed to speed up the litigation process by ensuring that discovery is managed appropriately.

Third, and finally, by creating the Commercial Division, Chief Judge Kaye and Chief Administrative Judge Lippman have told corporations that New York State wants your business. New York has always had a large body of commercial jurisprudence because it is a hub of commercial activity and the Commercial Division, which handles 5,000 new cases each year in New York County alone, ensures that this body of jurisprudence grows in a clear and coherent manner.

As a result, I can say that New York is not one of those jurisdictions where I tremble at the thought of having to litigate.

I also understand that Chief Judge Kaye and Judge Lippman are looking to improve on the successes of the Division. Public input has been requested on the proposed Model Rules/Guidelines for the Commercial Division, and Commercial Division focus groups will convene over the next several weeks. I commend them for their willingness to be held publicly accountable.

The Commercial Division has responded to the business community's needs and it continues to strive to improve its provision of services. As general counsel to a Fortune 500 company, I thank you for your efforts and I congratulate you on your tenth anniversary.

## KEYNOTE SPEAKER

### MARK H. ALCOTT

PRESIDENT-ELECT, NEW YORK STATE BAR ASSOCIATION

PAUL WEISS RIFKIND WHARTON & GARRISON LLP

"NEW YORK IS THE CENTER OF WORLD COMMERCE, the headquarters of international finance, the home of America's leading businesses. As such, it strongly needs a modern, well-staffed, properly equipped forum for the swift, fair and expert resolution of significant commercial disputes".

Those words, written in 1995, introduced the Commercial and Federal Litigation Section's report proposing the creation of the Commercial Division, and served as the central rationale for that proposal.

The premise is as true today as it was ten years ago, if not more so. New York retains, and indeed has consolidated, its position at the epicenter of an increasingly globalized economy. New York financial institutions and capital markets are the source of industrial development, construction projects and jobs in every corner of the world. New York law continues to be the gold standard in cross-border transactions.

And today we have our "modern, well-staffed, properly equipped forum for the resolution of significant disputes" arising out of these transactions: the Commercial Division of the Supreme Court.

In my brief remarks this evening commemorating the tenth anniversary of that forum, I'd like to address two questions:

First: How did we get here?

Second: How are we doing, now that we're here?

The Commercial Division was conceived at a time when the stars were in unique alignment: by happy coincidence, governmental, judicial and professional leaders were unusually receptive to new ideas — and, in particular, this idea. A relatively new incumbent Republican governor; a relatively new Chief Judge, appointed by a Democratic governor; and a relatively new section of the State Bar Association — all independently arrived at a common perspective: it would be good for the state, good for the economy, good for the legal system, and good for the profession if our state courts were able to handle commercial disputes wisely and efficiently, and were perceived as such by the business community.

And so, encouraged by Chief Judge Kaye's remarks in her State of the Judiciary address, by the progress of the New York County Commercial Parts experiment, and by a receptive political climate, the Commercial and Federal Litigation Section initiated its study of "A Commercial Court for New York".

We faced two major political hurdles:

For one thing, there was the fear that a commercial court would be perceived as an elitist, Manhattan-centric entity that would divert needed resources from other parts of the judicial system.

But we built a thorough and powerful case for the proposition that a commercial court would benefit the state as a whole, not just a narrow segment.

Beyond that, there was the widely-held view that such a court could not be established without legislation, or perhaps even a constitutional amendment, neither of which was politically feasible.

But we advanced the idea of a Commercial Division within the Supreme Court, which could be created, staffed and supervised by the Chief Administrator of the Courts, without the need for enabling legislation.

Our proposal was an interesting idea that looked good on paper, but where should we go from there? How could we advance this proposal? Well, we had a secret weapon — Bob Haig, the legendary founder of our Section, a man who knows how to get things done. Bob loved our idea and our report, and he guided us to Chief Judge Kaye and Chief Administrative Judge Milonas.

I remember vividly my first meeting on the subject with Judge Kaye. She peppered me with questions and then said: "I'm going to appoint a special task force on this matter." "Terrific," I said; "a task force to study our proposal." "Not to study it," she said; "to implement it."

Few would have been bold enough to act so quickly and decisively, but Judge Kaye was. The task force, chaired by Judge Milonas and Bob Haig, and including many of us in this room, went to work, and in less than a year, the Commercial Division was up and running.

As that background demonstrates, the Commercial Division is the epitome of bench-bar cooperation, the quintessential example of what we can accomplish by working together. Sometimes we in the organized bar spend too much time grumbling in the trenches, focusing on what troubles us and what separates us from our judicial colleagues. The creation of the Commercial Division reminds us to climb to higher ground, and see the possibilities that are out there when bench and bar are united.

Now let me turn to the second question I put at the outset — the one that Mayor Koch always used to ask: "How are we doing?" And I say "we", because I believe that all of us — judges, counsel and litigants — have a stake in the success of the Commercial Division. "How are we doing?"

By all accounts, very well indeed:

- The Division continues to attract a large, significant body of cases; so litigants are voting with their feet.
- The Division has spread beyond its initial confines to include additional judges, additional parts and additional counties.
- The Division is serving as a role model for other states that want to emulate our approach.

So we have every reason to be positive about what we have wrought. Moreover, among the key features of the Commercial Division are its practice of maintaining an ongoing dialogue with practitioners, through advisory committees and other forms of outreach; and its process of self-evaluation, through such innovative techniques as the focus groups that will be conducted over the next several weeks. In other words, the Commercial Division itself periodically asks: "How are we doing?" This very healthy approach should eliminate complacency and precipitate changes and improvements where needed.

In going through this process, one thing should be kept in mind: The goal in creating the Commercial Division, as set forth in the opening lines of the report that I quoted at the outset, was to establish a forum for the "swift, fair and expert resolution of significant commercial disputes."

"Swift. Fair. Expert." How do we examine those standards?

"Swift" is easy to measure. We have timetables, deadlines, calendars, standards and goals. The rate of dispositions can be calculated; so can the time from commencement to trial.

"Expert" is somewhat harder to judge, but it can be done: by reviewing the quality of the Commercial Division's opinions and case law, for example, or by calculating the ratio of affirmances to reversals.

But "fair" is the most elusive of these standards. Except in extreme cases, such as the denial of due process (which is not going to happen in the Commercial Division), fairness is often a matter of perception – something in the eye of the beholder. But when the beholder is a Commercial Division litigant, perception is crucial, because the forum was created for the very purpose of assuring business litigants that their disputes will be adjudicated wisely and rationally. So while it is important that Commercial Division litigants be able to give an affirmative answer to the question "Was your case adjudicated swiftly?", it is equally important that they give affirmative answers to these questions: "Was your claim or defense dispassionately considered? Were your arguments duly examined and weighed? Did you have a full opportunity to be heard?"

Now I have not addressed what would normally be the final question – "Where do we go from here?" That is a question for another day.

But I have no doubt that the Commercial Division will continue to perform at a high level, continue to innovate and evolve, and continue to fulfill its mission; led by its very fine judges; inspired by those of its judges who have gone on to the Appellate Division, with our enthusiastic endorsement; and strongly supported by the business community and the New York State Bar Association.

# EXHIBIT C

**Table C-5.**
**U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases**
**Terminated, by District and Method of Disposition,**
**During the 12-Month Period Ending September 30, 2007**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **TOTAL** | 182,966 | 8.6 | 43,894 | 5.5 | 106,752 | 7.9 | 22,849 | 13.8 | 9,471 | 127.6 |
| DC | 1,897 | 9.0 | 637 | 7.5 | 1,201 | 9.2 | 31 | 23.5 | 28 | 38.2 |
| **1ST** | 5,052 | 9.0 | 2,018 | 5.8 | 2,051 | 8.8 | 816 | 16.6 | 167 | 27.3 |
| ME | 348 | 6.5 | 146 | 4.6 | 176 | 7.1 | 11 | 13.1 | 13 | 15.9 |
| MA | 2,718 | 8.4 | 1,360 | 6.1 | 918 | 8.3 | 343 | 18.3 | 97 | 29.4 |
| NH | 381 | 8.3 | 90 | 2.7 | 118 | 5.0 | 165 | 13.7 | 8 | - |
| RI | 496 | 8.2 | 194 | 6.3 | 192 | 7.9 | 99 | 11.1 | 11 | 25.7 |
| PR | 1,111 | 12.2 | 228 | 6.7 | 647 | 10.9 | 198 | 22.0 | 38 | 32.2 |
| **2ND** | 19,231 | 10.5 | 5,177 | 7.1 | 10,910 | 10.8 | 2,845 | 14.6 | 299 | 28.5 |
| CT | 2,032 | 10.5 | 1,239 | 7.6 | 648 | 14.8 | 84 | 23.1 | 61 | 32.4 |
| NY,N | 1,113 | 12.6 | 236 | 6.1 | 525 | 11.0 | 333 | 18.3 | 19 | 32.6 |
| NY,E | 5,124 | 10.8 | 1,030 | 7.3 | 2,891 | 9.3 | 1,121 | 14.4 | 82 | 31.8 |
| NY,S | 9,388 | 9.8 | 2,313 | 7.0 | 5,814 | 10.9 | 1,144 | 12.3 | 117 | 25.7 |
| NY,W | 1,308 | 14.0 | 321 | 8.8 | 817 | 14.0 | 157 | 22.6 | 13 | 50.8 |
| VT | 266 | 8.0 | 38 | 3.3 | 215 | 8.7 | 6 | - | 7 | - |
| **3RD** | 18,846 | 7.1 | 3,440 | 4.4 | 11,954 | 5.8 | 3,166 | 14.1 | 286 | 25.3 |
| DE | 609 | 12.5 | 69 | 4.1 | 488 | 12.5 | 23 | 30.1 | 29 | 30.3 |
| NJ | 5,442 | 7.6 | 1,932 | 5.4 | 2,028 | 5.4 | 1,414 | 14.7 | 68 | 30.8 |
| PA,E | 9,099 | 5.7 | 519 | 2.3 | 6,917 | 3.8 | 1,555 | 12.4 | 108 | 18.1 |
| PA,M | 1,394 | 7.6 | 412 | 4.9 | 875 | 7.7 | 67 | 20.4 | 40 | 24.5 |
| PA,W | 2,002 | 7.4 | 455 | 4.1 | 1,472 | 8.4 | 35 | 24.2 | 40 | 33.3 |
| VI | 300 | 20.3 | 53 | 15.4 | 174 | 18.4 | 72 | 30.3 | 1 | - |
| **4TH** | 11,975 | 7.4 | 3,212 | 5.5 | 7,433 | 7.8 | 1,142 | 9.0 | 188 | 19.4 |
| MD | 2,638 | 6.3 | 1,023 | 6.1 | 1,286 | 6.2 | 284 | 7.6 | 45 | 23.2 |
| NC,E | 919 | 10.3 | 407 | 8.1 | 496 | 11.4 | 9 | - | 7 | - |
| NC,M | 778 | 9.3 | 263 | 7.9 | 409 | 10.3 | 102 | 10.5 | 4 | - |
| NC,W | 980 | 7.5 | 321 | 10.2 | 535 | 3.6 | 109 | 17.6 | 15 | 21.5 |
| SC | 2,635 | 8.0 | 400 | 2.5 | 2,047 | 9.0 | 144 | 11.4 | 44 | 22.3 |
| VA,E | 2,062 | 4.8 | 425 | 3.5 | 1,163 | 4.5 | 440 | 7.3 | 34 | 9.5 |
| VA,W | 706 | 8.8 | 172 | 7.0 | 489 | 9.0 | 25 | 9.9 | 20 | 14.5 |
| WV,N | 395 | 12.1 | 138 | 10.4 | 238 | 12.6 | 12 | 18.2 | 7 | - |
| WV,S | 862 | 10.3 | 63 | 2.3 | 770 | 10.8 | 17 | 17.8 | 12 | 21.1 |

175

**Table C-5. (September 30, 2007—Continued)**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **5TH** | **28,070** | **11.0** | **4,680** | **6.1** | **13,494** | **7.3** | **3,150** | **11.2** | **6,746** | **127.6** |
| LA,E | 5,647 | 7.9 | 172 | 3.4 | 3,354 | 5.6 | 2,050 | 11.3 | 71 | 18.1 |
| LA,M | 7,037 | 127.6 | 359 | 6.0 | 306 | 10.4 | 30 | 24.7 | 6,342 | 127.6 |
| LA,W | 1,567 | 9.9 | 494 | 5.9 | 995 | 10.9 | 33 | 25.5 | 45 | 29.0 |
| MS,N | 681 | 12.4 | 128 | 6.9 | 414 | 11.3 | 113 | 16.5 | 26 | 23.4 |
| MS,S | 2,355 | 10.8 | 1,450 | 9.7 | 814 | 11.3 | 49 | 18.8 | 42 | 20.3 |
| TX,N | 2,799 | 6.8 | 94 | 7.8 | 2,658 | 6.6 | 5 | - | 42 | 19.2 |
| TX,E | 1,630 | 9.0 | 280 | 5.0 | 1,244 | 9.1 | 64 | 12.6 | 42 | 19.2 |
| TX,S | 4,054 | 6.6 | 1,012 | 3.7 | 2,213 | 6.5 | 749 | 9.7 | 80 | 18.4 |
| TX,W | 2,300 | 7.5 | 691 | 5.9 | 1,496 | 7.7 | 57 | 13.0 | 56 | 16.6 |
| **6TH** | **16,993** | **9.6** | **3,932** | **4.8** | **9,385** | **9.8** | **3,385** | **13.3** | **291** | **24.4** |
| KY,E | 1,380 | 9.4 | 146 | 6.2 | 1,200 | 9.4 | 15 | 20.3 | 17 | 19.2 |
| KY,W | 1,078 | 9.6 | 301 | 8.2 | 675 | 9.4 | 87 | 19.1 | 15 | 22.5 |
| MI,E | 3,856 | 8.3 | 847 | 3.8 | 1,278 | 9.2 | 1,456 | 13.1 | 75 | 24.6 |
| MI,W | 928 | 7.2 | 138 | 2.9 | 761 | 8.0 | 15 | 18.9 | 14 | 27.9 |
| OH,N | 4,772 | 10.0 | 963 | 3.8 | 2,913 | 15.0 | 855 | 9.9 | 41 | 16.0 |
| OH,S | 2,250 | 10.6 | 936 | 6.4 | 789 | 11.0 | 490 | 14.6 | 35 | 24.3 |
| TN,E | 1,015 | 12.4 | 169 | 6.6 | 391 | 9.0 | 419 | 16.1 | 36 | 25.6 |
| TN,M | 986 | 9.1 | 83 | 3.5 | 864 | 9.5 | 13 | 21.7 | 26 | 27.0 |
| TN,W | 928 | 11.9 | 347 | 10.2 | 514 | 11.4 | 35 | 27.2 | 32 | 29.8 |
| **7TH** | **12,654** | **7.5** | **3,763** | **5.1** | **7,083** | **7.6** | **1,617** | **11.7** | **201** | **25.5** |
| IL,N | 6,474 | 6.2 | 2,338 | 4.8 | 3,463 | 6.0 | 582 | 12.7 | 91 | 29.0 |
| IL,C | 663 | 9.1 | 258 | 7.7 | 376 | 9.4 | 10 | 22.1 | 19 | 23.0 |
| IL,S | 884 | 8.5 | 218 | 5.2 | 621 | 9.2 | 20 | 18.3 | 25 | 25.5 |
| IN,N | 1,203 | 10.6 | 278 | 6.8 | 526 | 10.6 | 380 | 13.4 | 19 | 22.6 |
| IN,S | 1,872 | 9.9 | 451 | 5.8 | 1,092 | 9.7 | 311 | 12.8 | 18 | 28.1 |
| WI,E | 1,051 | 8.2 | 168 | 3.5 | 789 | 8.9 | 79 | 14.6 | 15 | 30.7 |
| WI,W | 507 | 4.6 | 42 | 1.4 | 216 | 3.1 | 235 | 5.9 | 14 | 8.3 |
| **8TH** | **11,976** | **10.5** | **3,271** | **5.2** | **5,825** | **9.4** | **2,660** | **32.9** | **220** | **21.6** |
| AR,E | 1,171 | 12.7 | 227 | 10.3 | 885 | 12.7 | 4 | - | 55 | 19.9 |
| AR,W | 587 | 10.3 | 16 | 5.3 | 553 | 10.2 | 3 | - | 15 | 13.4 |
| IA,N | 447 | 9.0 | 50 | 4.4 | 379 | 9.0 | 5 | - | 13 | 20.9 |
| IA,S | 570 | 10.3 | 104 | 5.6 | 293 | 8.3 | 165 | 15.4 | 8 | - |
| MN | 4,614 | 13.7 | 1,269 | 2.6 | 897 | 7.3 | 2,414 | 34.4 | 34 | 25.8 |
| MO,E | 1,814 | 7.4 | 737 | 8.0 | 1,038 | 8.0 | 7 | - | 32 | 22.2 |
| MO,W | 1,475 | 8.5 | 707 | 7.8 | 741 | 8.9 | 10 | 24.5 | 17 | 21.9 |
| NE | 855 | 11.3 | 21 | 1.7 | 770 | 10.4 | 35 | 17.2 | 29 | 19.9 |
| ND | 175 | 10.6 | 60 | 8.2 | 106 | 10.9 | 3 | - | 6 | - |
| SD | 268 | 10.5 | 80 | 9.4 | 163 | 9.9 | 14 | 16.8 | 11 | 27.3 |

## Table C-5. (September 30, 2007—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **9TH** | **27,383** | **7.8** | **8,961** | **6.0** | **16,283** | **8.1** | **1,622** | **12.8** | **517** | **23.1** |
| AK | 290 | 9.1 | 78 | 6.0 | 207 | 10.0 | - | - | 5 | - |
| AZ | 2,031 | 9.9 | 758 | 8.3 | 1,188 | 10.3 | 32 | 25.9 | 53 | 31.2 |
| CA,N | 4,205 | 6.7 | 1,382 | 3.8 | 1,652 | 5.5 | 1,116 | 11.9 | 55 | 23.3 |
| CA,E | 2,118 | 9.3 | 872 | 7.1 | 1,180 | 10.5 | 28 | 19.1 | 38 | 32.4 |
| CA,C | 8,560 | 6.8 | 2,730 | 5.3 | 5,566 | 7.3 | 87 | 17.1 | 177 | 18.4 |
| CA,S | 2,033 | 5.9 | 389 | 4.6 | 1,490 | 6.3 | 120 | 7.4 | 34 | 24.6 |
| HI | 637 | 10.3 | 366 | 8.4 | 217 | 10.5 | 39 | 18.7 | 15 | 19.7 |
| ID | 401 | 11.5 | 27 | 4.0 | 331 | 10.7 | 27 | 17.8 | 16 | 26.6 |
| MT | 511 | 9.5 | 211 | 8.0 | 233 | 9.2 | 56 | 14.1 | 11 | 18.0 |
| NV | 1,618 | 9.6 | 658 | 9.0 | 880 | 9.6 | 57 | 10.9 | 23 | 35.8 |
| OR | 1,840 | 10.1 | 684 | 8.6 | 1,106 | 10.7 | 9 | - | 41 | 21.6 |
| WA,E | 495 | 8.1 | 149 | 5.4 | 306 | 7.9 | 28 | 13.6 | 12 | 24.2 |
| WA,W | 2,583 | 8.1 | 628 | 5.3 | 1,903 | 8.5 | 17 | 15.3 | 35 | 19.0 |
| GUAM | 24 | 7.0 | 14 | 5.2 | 6 | - | 4 | - | - | - |
| NMI | 37 | 10.3 | 15 | 8.0 | 18 | 11.1 | 2 | - | 2 | - |
| **10TH** | **7,821** | **8.6** | **1,384** | **5.1** | **5,003** | **8.0** | **1,249** | **12.5** | **185** | **23.3** |
| CO | 2,030 | 6.9 | 59 | 2.7 | 1,812 | 6.5 | 112 | 17.5 | 47 | 28.5 |
| KS | 1,127 | 8.6 | 321 | 6.5 | 665 | 8.1 | 109 | 17.5 | 32 | 23.4 |
| NM | 1,028 | 9.3 | 171 | 3.2 | 397 | 8.8 | 434 | 11.9 | 26 | 21.0 |
| OK,N | 686 | 10.4 | 74 | 3.3 | 581 | 10.9 | 19 | 17.9 | 12 | 19.5 |
| OK,E | 480 | 9.4 | 342 | 11.1 | 114 | 7.1 | 12 | 11.2 | 12 | 12.0 |
| OK,W | 1,154 | 8.0 | 309 | 3.5 | 422 | 6.7 | 407 | 11.6 | 16 | 16.8 |
| UT | 1,028 | 9.5 | 66 | 2.3 | 898 | 9.2 | 35 | 19.2 | 29 | 29.2 |
| WY | 288 | 12.4 | 42 | 7.3 | 114 | 82.7 | 121 | 10.3 | 11 | 15.4 |
| **11TH** | **21,058** | **6.7** | **3,429** | **4.4** | **16,130** | **6.6** | **1,166** | **13.6** | **343** | **19.9** |
| AL,N | 2,869 | 5.7 | 496 | 7.8 | 2,313 | 4.4 | 20 | 20.3 | 40 | 24.3 |
| AL,M | 791 | 10.0 | 234 | 7.0 | 462 | 9.9 | 74 | 16.3 | 21 | 15.8 |
| AL,S | 662 | 7.3 | 124 | 5.1 | 490 | 7.2 | 32 | 16.3 | 16 | 13.7 |
| FL,N | 896 | 7.5 | 244 | 6.1 | 612 | 8.1 | 18 | 13.6 | 22 | 21.3 |
| FL,M | 5,644 | 6.8 | 456 | 5.7 | 4,999 | 6.8 | 103 | 17.4 | 86 | 21.1 |
| FL,S | 6,051 | 5.0 | 1,138 | 3.0 | 4,667 | 5.3 | 158 | 12.2 | 88 | 17.1 |
| GA,N | 2,881 | 7.7 | 544 | 3.4 | 1,572 | 7.1 | 714 | 12.1 | 51 | 26.8 |
| GA,M | 634 | 11.3 | 130 | 7.7 | 495 | 12.6 | 4 | - | 5 | - |
| GA,S | 640 | 10.1 | 63 | 5.8 | 520 | 9.6 | 43 | 22.0 | 14 | 22.3 |

NOTE:  MEDIAN TIME INTERVALS NOT COMPUTED WHEN FEWER THAN 10 CASES REPORTED. THIS TABLE EXCLUDES LAND CONDEMNATIONS, PRISONER PETITIONS, DEPORTATION REVIEWS, RECOVERY OF OVERPAYMENTS, AND ENFORCEMENT OF JUDGMENTS. FOR FISCAL YEARS PRIOR TO 2001, THIS TABLE INCLUDED DATA ON RECOVERY OF OVERPAYMENTS AND ENFORCEMENT OF JUDGMENTS.

# EXHIBIT D

1  HENNIGAN, BENNETT & DORMAN LLP
   BRUCE BENNETT (Cal. Bar No. 105430)
2  JAMES O. JOHNSTON (Cal. Bar No. 167330)
   LANCE MILLER (Cal. Bar No. 241905)
3  865 South Figueroa Street, Suite 2900
   Los Angeles, California 90017
4  Telephone: (213) 694-1200
   Fax: (213) 694-1234
5
   *Reorganization Counsel for*
6  *Debtors and Debtors in Possession*

7

8              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
9                   LOS ANGELES DIVISION

10 *In re*                          )  Case No. 2:07-20027-TD
                                    )  CHAPTER 11
11 SOLIDUS NETWORKS, INC., d/b/a    )  (Jointly Administered)
   PAY BY TOUCH, a/f/k/a PAY BY     )
12 TOUCH SOLUTIONS, a Delaware      )  **NOTICE OF MOTION AND AMENDED AND**
   Corporation, et al.¹             )  **RESTATED MOTION FOR ORDER**
13                                  )  **(I) ESTABLISHING PROCEDURES AND**
              *Debtors.*            )  **DEADLINES FOR THE FILING OF PROOFS OF**
14                                  )  **CLAIM AND INTEREST; (II) ESTABLISHING**
                                    )  **PROCEDURES AND DEADLINES FOR THE**
15                                  )  **FILING OF REQUESTS FOR PAYMENT OF**
                                    )  **CERTAIN ADMINISTRATIVE EXPENSES**
16                                  )  **INCURRED THROUGH MAY 31, 2008;**
                                    )  **(III) APPROVING THE FORM AND SCOPE OF**
17                                  )  **NOTICE OF SUCH PROCEDURES AND**
                                    )  **DEADLINES; AND (IV) AUTHORIZING THE**
18                                  )  **APPOINTMENT OF CLAIMS AGENT;**
                                    )
19                                  )  **MEMORANDUM OF POINTS AND**
                                    )  **AUTHORITIES AND DECLARATION OF**
20                                  )  **THOMAS LUMSDEN IN SUPPORT THEREOF**
                                    )
21                                  )             Hearing
                                    )
22                                  )  Date:   May 21, 2008
                                    )  Time:   10:30 a.m.
23                                  )  Place:  255 East Temple Street
                                    )          Courtroom 1345
24                                  )          Los Angeles, CA 90012
                                    )
25 ─────────────────────────────   )

26 ─────────────
   ¹  The Debtors include the following entities: Solidus Networks, Inc., d/b/a Pay By Touch, a/k/a Pay By Touch Solutions, a/f/k/a BioPay, Pay By
27 Touch Payment Solutions, LLC, a/f/k/a EPX, a/f/k/a Payment Acquisition Corporation, a/f/k/a InterCept Payment Solutions, LLC, a/f/k/a SPS
   Payments, LLC, a/f/k/a IPS Solutions, LLC, a/f/k/a iPay, a/f/k/a Pay By Touch Solidus Merchant Services, Pay By Touch Processing, Inc.,
   a/f/k/a CSSI Acquisition Corporation, a/f/k/a Card Systems Solutions, Inc., Pay By Touch Check Cashing, Inc., Check Elect, Inc., Seven
28 Acquisition Sub, LLC, a/f/k/a Seventh Street Software, Pay by Touch Checking Resources, Inc., Indivos Corporation, a/f/k/a Smart Touch, Inc.,
   a/f./k/a Veristar Corporation, a/f/k/a Indivos Acquisition Corporation, CardSystems Payment Solutions, LLC, Maverick International Services,
   Inc., and ATMD Acquisition Corporation, a/f/k/a ATMD Direct, a/f/k/a ATM Online, Inc.

1    **TO THE HONORABLE THOMAS DONOVAN AND INTERESTED PARTIES**:

2        **PLEASE TAKE NOTICE THAT** Solidus Networks, Inc., d/b/a Pay By Touch, a/f/k/a Pay

3    By Touch Solutions ("Solidus"), and its affiliated debtors and debtors in possession herein

4    (collectively, the "Debtors"), hereby move this Court for the entry of an order, in substantially the

5    form of the proposed Order attached hereto as Exhibit A, pursuant to sections 105(a), 502(b),

6    and 503(a) of Bankruptcy Code, Rules 2002, 3003, 9007, and 9008 of the Federal Rules of

7    Bankruptcy Procedure (the "Bankruptcy Rules"), and 28 U.S.C. § 156(c):  (a) establishing certain

8    procedures and deadlines for the filing of proofs of claim and interest in this case; (b) establishing

9    certain procedures and deadlines for the filing of requests for the payment of certain administrative

10   expenses incurred through May 31, 2008; (c) approving the form and scope of the notice of those

11   procedures and deadlines; and (d) authorizing the appointment of Epiq Bankruptcy Solutions, LLC

12   ("Epiq") as official claims agent in this case, all as set forth in detail below.

13       **PLEASE TAKE FURTHER NOTICE THAT** the Honorable Thomas Donovan of the

14   United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") will

15   hold a hearing on this Motion on May 21, 2008 at 10:30 a.m., or as soon thereafter as the matter can

16   be heard, in Courtroom 1345 located at 255 East Temple Street, Los Angeles, CA 90012.

17       **PLEASE TAKE FURTHER NOTICE THAT any objection, response, or joinder to this**

18   **Motion must be in the form required by Local Bankruptcy Rule 9013-1(a)(7) and filed with**

19   **the Bankruptcy Court and served upon counsel for the Debtors, at the address set forth in the**

20   **caption to this Motion, and upon the Office of the United States Trustee for the Central**

21   **District of California, at 725 South Figueroa Street, Suite 2600, Los Angeles, California 90017,**

22   **so as to be received by no later than May 7, 2008.**  Papers not timely filed and served may be

23   deemed by the Court to be consent to the granting of the Motion.

24       This Motion amends, restates, and supersedes the Debtors' previously-filed "Motion For

25   Order (I) Establishing Procedures And Deadlines For The Filing Of Proofs Of Claim And Interest;

26   (II) Establishing Consequences For The Failure To Comply With Such Procedures And Deadlines;

27   (III) Approving The Form And Scope Of Notice Of Such Procedures And Deadlines; And

28   (IV) Authorizing The Appointment Of Claims Agent" [docket # 294], which was originally

1  scheduled for hearing on March 5, 2008, subsequently continued until March 26, 2008

2  [docket # 464], and then adjourned [docket # 555].

3       In support of this Motion, the Debtors submit the accompanying Declaration Of Thomas

4  Lumsden, the accompanying Declaration To Be Filed With Motion Establishing Administrative

5  Procedures Re 28 U.S.C. § 156(c), and respectfully represent as set forth below.

6

7  **<u>BACKGROUND</u>**

8       1.    On October 31, 2007 (the "<u>Involuntary Petition Date</u>"), four employees filed an

9  involuntary petition under chapter 11 of the Bankruptcy Code against Solidus (the "<u>Involuntary</u>

10  <u>Petition</u>").

11       2.    On December 14, 2007 (the "<u>Petition Date</u>"), Solidus consented to the entry of an

12  order for relief and the other Debtors commenced their reorganization cases by filing voluntary

13  petitions for relief under the Bankruptcy Code.

14       3.    On February 12, 2008, pursuant to this Court's "Order Extending The Time To File

15  Schedules, Lists And Statements Of Financial Affairs" [docket # 106], each Debtor filed its

16  Statement of Financial Affairs and Schedules of Assets and Liabilities (the "<u>Schedules</u>")

17       4.    On March 28, 2008, the Court entered its "Order (I) Authorizing Sale Of

18  Substantially All Of The Assets Of The Debtors' Core Business Operations Free And Clear Of

19  Liens, Claims, And Encumbrances; (II) Exempting Such Sale And Assignment From Any Stamp

20  Tax Or Similar Tax; And (III) Granting Related Relief" [docket # 587]. Pursuant to that Order, the

21  Debtors subsequently transferred substantially all of the assets of their core business operations to a

22  designee of their secured lenders. With the exception of certain obligations relating to contracts and

23  leases associated with the non-core "Pay By Touch Processing" business (which contracts and leases

24  potentially are subject to future assumption and assignment to Merrick Bank Corporation in

25  accordance with the Court's "Order (I) Authorizing Sale Of Assets Of Pay By Touch Processing,

26  Inc. Free And Clear Of Liens, Claims, And Encumbrances, (II) Authorizing The Sale Of

27  Designation Rights With Respect To The Assumption And Assignment Of Certain Executory

28  Contracts And Unexpired Leases In Connection Therewith, (III) Exempting Such Sale And

Hennigan, Bennett, & Dorman llp
lawyers
los angeles, california

Assignment From Any Stamp Tax Or Similar Tax And (IV) Granting Related Relief"

[docket # 596]), the Debtors have no ongoing business operations.

## THE REQUESTED RELIEF

5.    Based upon the Schedules, it appears that the Debtors have thousands of creditors and shareholders.

6.    One important precursor to any distribution of funds in these cases will be an assessment of the extent, validity, priority, aggregate amount and identity of holders of claims and interests that may be asserted against the Debtors' bankruptcy estates.  Moreover, it is critical that the Debtors and the Official Committee of Unsecured Creditors (the "Committee") ascertain the amount of asserted administrative expenses arising through May 31, 2008, in order to determine whether it is in the best interests of the estates to prepare and propose a liquidating plan of reorganization or to convert these cases to chapter 7.

7.    The Debtors submit that, under the circumstances and in order to enable determinations regarding the future direction of these cases and ultimately to facilitate timely distributions to administrative and prepetition claimants, it is appropriate for the Court to establish deadlines for (a) with respect to Solidus, the filing of (i) proofs of claim and interest arising before the Involuntary Petition Date, and (ii) proofs of claim for obligations arising between the Involuntary Petition Date and the Petition Date; (b) with respect to the remaining Debtors, the filing of proofs of claim and interest arising before the Petition Date; and (c) with respect to all Debtors, the filing of requests for the payment of certain administrative expenses, as described more fully below, allowable under sections 503(b)(1) or 503(b)(9) of the Bankruptcy Code and based upon facts or circumstances arising or occurring after the Petition Date and on or before May 31, 2008. The Debtors also submit that, given the great number of potential parties in interest in these cases, as well as the diverse nature of the Debtors' indebtedness, it is appropriate to establish customized procedures and notices regarding the filing of proofs of claim and interest and requests for payment of administrative expenses, as set forth more fully below.

1        8.     Specifically, the Debtors request that the Court enter an order granting the following

2  relief:

3  **I.    Definitions**

4        For purposes of the proposed deadlines and procedures –

5        a.     The term "Claim" will have the meaning set forth in section 101(5) of the Bankruptcy

6  Code and will include, without limitation, (i) any right to payment, whether arising in contract, tort,

7  or by statute, and whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent,

8  matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, regardless of

9  whether or not actual injury has or has not yet been manifested or actual losses have or have not yet

10  been incurred; and (ii) equitable remedies for breach of performance if such breach gives rise to a

11  right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

12  contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and

13  regardless of whether or not actual injury has or has not yet been manifested or actual losses have or

14  have not yet been incurred.

15        b.     The term "Gap Period Claim" will mean any Claim for obligations arising between

16  the Involuntary Petition Date and the Petition Date.

17        c.     The term "Interest" will have the meaning set forth in section 101(16) of the

18  Bankruptcy Code for the term "equity security."

19        d.     The term "Administrative Claim" will mean any Claim that (i) is based upon facts or

20  circumstances arising or occurring after the Petition Date and on or before May 31, 2008; and

21  (ii) qualifies as an administrative expense under sections 503(b)(1) or 503(b)(9) of the Bankruptcy

22  Code, and will include without limitation any such Claim (w) representing personal injury, property

23  damage, or other tort claims against the Debtors; (x) for breach of an obligation – contractual,

24  statutory or otherwise – by the Debtors; (y) for amounts incurred by the Debtors in the operation of

25  their businesses; or (z) representing an employee claim against the Debtors.

26  **II.    General Bar Date**

27        The Court will select a date (which the Debtors suggest to be approximately sixty (60) days

28  after the entry of an Order approving this Motion), at 4:00 p.m. prevailing Pacific time (the "Bar

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

1  Date"), which will be the last date and time by which entities may file (a) with respect to Solidus,

2  (i) proofs of Claim and Interest arising before the Involuntary Petition Date, and (ii) Gap Period

3  Claims; (b) with respect to the other Debtors, proofs of Claim and Interest arising before the Petition

4  Date; and (c) with respect to all Debtors, the filing of requests for the payment of Administrative

5  Claims, in each case except as otherwise set forth below.  The Bar Date will be enforceable

6  notwithstanding any otherwise applicable nonbankruptcy law that could govern the timing of the

7  assertion of a Claim or Interest against the Debtors.  The Bar Date will not apply to Claims or

8  Interests held by one Debtor against another Debtor.

9  **III.    Related Deadlines**

10         a.    Deadline for Section 501(b) and 501(c) Claims:  The date that is thirty (30) days after

11  the Bar Date, at 4:00 p.m. prevailing Pacific time, will be the last date and time by which (i) co-

12  debtors, sureties, guarantors, or other entities that may be liable to a creditor with the Debtors may

13  file proofs of Claim on behalf of creditors pursuant to section 501(b) of the Bankruptcy Code; and

14  (ii) the Debtors may file proofs of Claim on behalf of creditors pursuant to section 501(c) of the

15  Bankruptcy Code.

16         b.    Deadline for Rejection Claims:  The date that is the later of (i) the Bar Date, and

17  (ii) thirty (30) days after the date on which, as applicable, (x) a lease of nonresidential real property

18  to which the claimant is a party is deemed rejected pursuant to section 365(d)(4) of the Bankruptcy

19  Code, or (y) notice of the order authorizing the Debtors' rejection of the executory contract or

20  unexpired lease to which the claimant is a party is mailed to the claimant or its counsel, will be the

21  last date and time by which such claimant may file a proof of any Claim arising from the rejection of

22  such contract or lease; provided, however, that, notwithstanding the foregoing, a proof of Claim for

23  a pre-Petition Date arrearage or other pre-Petition Date obligation arising under an executory

24  contract or unexpired lease must be filed by the Bar Date.

25         c.    Deadline for Section 502(h) Claims:  The date that is the later of (i) the Bar Date, and

26  (ii) thirty (30) days after the date on which notice of the order providing for the recovery of property

27  under sections 522, 550, or 553 of the Bankruptcy Code is mailed to the claimant or its counsel will

28

1    be the last date and time by which such claimant may file a proof of any Claim arising from such

2    recovery of property.

3         d.     <u>Deadline for Section 502(i) Claims</u>:  The date that is the <u>later</u> of (i) the Bar Date, <u>and</u>

4    (ii) thirty (30) days after the date on which a Claim arises for a tax entitled to priority under section

5    507(a)(8) of the Bankruptcy Code will be the last date and time by which the applicable taxing

6    authority may file a proof of Claim.

7    **IV.    Appointment of Claims Agent**

8         Pursuant to 28 U.S.C. § 156(c), Epiq will serve as the official claims agent for these cases

9    (the "Claims Agent") on the terms and conditions set forth in the Bankruptcy Services Agreement

10   (the "Epiq Agreement") attached hereto as <u>Exhibit E</u> and, in that capacity, will perform the

11   following services:

12        a.     Collecting copies of all proofs filed with the Clerk of Court and maintaining a

13   claims register (the "Claims Register") for each of the Debtors;

14        b.     Specifying in the Claims Register at least the following information for each

15   proof docketed: (i) the unique Claim Number assigned by the Clerk of Court to each proof;

16   (ii) the date the proof was filed with the Clerk of Court; (iii) the name and address of the

17   claimant and the agent or attorney for such claimant; (iv) the classification(s) of the Claim or

18   Interest asserted (i.e., secured, unsecured, priority, gap period, administrative, etc.); and

19   (v) the asserted amount of the Claim;

20        c.     Recording all transfers of Claims and providing any notices of transfer

21   required by Bankruptcy Rule 3001(e);

22        d.     Making changes in the Claims Register pursuant to orders of this Court;

23        e.     Maintaining an official mailing list of all entities that have filed a proof of

24   Claim or Interest, which list will be available upon request by the Clerk of Court or upon

25   request and payment of an appropriate copying charge by any party in interest;

26        f.     Serving notices (including notices of the Bar Date in accordance with this

27   Motion) and other documents, and arranging for the publication of notices and other

28   documents, as instructed by the Debtors;

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

672686

1          g.     Disseminating disclosure statements, ballots, and other solicitation materials

2   for any plan or plans of reorganization filed in these cases, and tabulating and providing

3   reports regarding ballots, as instructed by the Debtors; and

4          h.     Promptly performing such further services as the Debtors or the Clerk of

5   Court shall request.

6   **V.    Claim Filing Procedures**

7          a.     Proofs of Claim and Interest must be actually received by the Clerk of Court, at the

8   following address, by no later than the Bar Date (or such other applicable deadline as set forth

9   herein):

10                 Clerk of Court
               United States Bankruptcy Court

11                 Edward R. Roybal Federal Building and Courthouse
               255 East Temple Street, Room 940

12                 Los Angeles, California 90012

13         b.     Proofs of Claim and Interest will be deemed filed only when actually received by the

14  Clerk of Court and must be filed in the English language and stated in lawful currency of the United

15  States (to the extent known and determinable).

16  **VI.    Scheduled Claims and Claim Amendments**

17         a.     Pursuant to section 1111(a) of the Bankruptcy Code, a proof of Claim will be deemed

18  filed against the applicable Debtor with respect to any Claim that (i) appears in Schedule D

19  (Schedule of Creditors Holding Secured Claims), Schedule E (Schedule of Creditors Holding

20  Unsecured Priority Claims), or Schedule F (Schedule of Creditors Holding Unsecured Nonpriority

21  Claims) of such Debtor's Schedules in a liquidated amount; and (ii) is not designated therein as

22  being a contingent or disputed claim (such Claims hereinafter are referred to as "Scheduled

23  Claims"); provided, however, that, notwithstanding such deemed filing of a Scheduled Claim, the

24  Debtors will retain the right to object to or otherwise dispute, and/or assert offsets, defenses, and/or

25  counterclaims to the amount of or liability with respect to any such Scheduled Claim; and the

26  Debtors will retain the right to amend their Schedules to add or delete claimants, to change the

27  amount of any Scheduled Claim, or to designate any such Scheduled Claim as disputed, contingent,

28  or unliquidated.

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

1     b.    If, after the Bar Date, the Debtors amend the Schedules to reduce the amount of,

2     delete, or change the status of a Scheduled Claim previously attributed to a specified claimant (such

3     claim being an "Amended Scheduled Claim"), such claimant may file a proof of Claim with respect

4     to such Amended Scheduled Claim by the later of the Bar Date, and thirty (30) days after the date on

5     which notice of the applicable amendment to the Schedules is mailed to the claimant or its counsel;

6     provided, however, that any proof of Claim filed after the Bar Date pursuant to this paragraph may

7     not exceed the amount previously set forth in a proof of Claim timely filed by the claimant on whose

8     behalf the Amended Scheduled Claim is deemed filed; or if no such proof of Claim timely was filed,

9     the amount previously designated in the Scheduled Claim for such claimant.  If the Debtors amend

10    the Schedules solely to increase the amount of a Scheduled Claim, the provisions of this paragraph

11    will not apply and no automatic extension of the time within which such claimant may file a proof of

12    Claim will be granted.

13          c.    A claimant may not amend a Scheduled Claim.

14          d.    The following entities will be required to file proofs of Claim or Interest before the

15    Bar Date:  (i) Any entity whose Claim or Interest is not listed in the Schedules; (ii) Any entity that

16    believes its Claim or Interest is improperly classified in the Schedules, is listed as holding a Claim

17    or Interest for an incorrect amount, or is listed as holding a Claim or Interest against the wrong

18    Debtor; and (iii) Any entity that asserts an Administrative Claim.

19    **VII.    Notices and Related Disclosure Items**

20          a.    Form of Bar Date Notice:  Within seven (7) days of the date of entry of an Order

21    approving the procedures and deadlines proposed in this Motion, the Debtors will cause to be sent

22    via first-class mail, as specified below, a notice of the Bar Date and the other approved procedures

23    and deadlines, in substantially the form of the proposed notice attached as Exhibit B hereto (the

24    "Notice"), to (i) all of their known creditors or potential creditors and shareholders; (ii) all entities

25    that have filed a request for special notice pursuant to Bankruptcy Rule 2002(i); and (iii) the other

26    parties required to be served with notice of the Bar Date pursuant to Bankruptcy Rules 2002(i),

27    2002(j) and 2002(k).

28

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

1    b.    <u>Form of Proof of Claim</u>:  With the mailing of the Notice, the Debtors also will

2    include a form proof of Claim in substantially the form of the proposed proof attached hereto as

3    <u>Exhibit C</u> (the "<u>Form Proof</u>").  The Form Proof conforms substantially to the form of proof of claim

4    proscribed by Form 10 of the Official and Procedural Bankruptcy Forms, with the following

5    important modifications intended to conform the Form Proof to the facts and circumstances of the

6    Debtors' cases and to make the analysis and assessment of proofs of Claim in these cases more

7    efficient and cost-effective:  (i) where a Form Proof is to be sent to a claimant for whom a potential

8    Claim has been identified in the Schedules, the Form Proof will indicate the amount, if any,

9    scheduled with respect to such potential Claim, the Debtor whose Schedules list the potential Claim,

10   and whether such potential Claim has been scheduled as unliquidated, contingent, and/or disputed;

11   (ii) the Form Proof will enable claimants to indicate that they assert a claim against a different

12   Debtor from that which listed the potential Claim in its Schedules; (iii) the Form Proof will enable

13   claimants to assert Gap Period Claims; and (iv) the Form Proof will enable claimants to assert

14   Administrative Claims.  The Debtors request that the Court also order that any entity asserting

15   Claims, Gap Period Claims, and/or Administrative Claims against more than one Debtor must file a

16   separate proof of claim with respect to each such Debtor on or before the applicable Bar Date.

17   c.    <u>Mailing Procedures</u>:  The Debtors will mail the Notice and the Form Proof to the

18   most recent address maintained for each relevant entity in the Debtors' books and records, as

19   reflected in the Schedules where applicable.  The Debtors, however, will be relieved of any

20   obligation to mail such documents to entities for which (i) there is no address set forth in their books

21   and records; (ii) the address set forth in their books and records is incomplete; or (iii) the address set

22   forth in their books and records is known to be inaccurate or defective.  The Debtors will be

23   authorized to notify such entities by publication, as set forth below.  With respect to envelopes that

24   are returned as undeliverable following the mailing of the Notice and the Form Proof, the Debtors

25   will re-mail such envelopes to the forwarding address set forth on such envelopes, if any; <u>provided</u>,

26   <u>however</u>, that the Debtors will be relieved of any other or further obligation to seek out an address

27   for a potential claimant, and instead are authorized to notify such potential claimants by publication

28   as set forth below, if they are unable to obtain the correct address after a reasonable inquiry.

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

672686                                    10

d.    <u>Publication</u>:  Within ten (10) days of the date of entry of an Order approving the procedures and deadlines proposed in this Motion, the Debtors will cause to be published a notice of the Bar Date and the other approved procedures and deadlines, in substantially the form of the proposed notice attached hereto as <u>Exhibit D</u> (the "<u>Publication Notice</u>"), once in the <u>San Francisco Chronicle</u>.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    The Proposed Deadlines And Procedures Are Reasonable And Appropriate Under The Circumstances**

9.    The Debtors believe that in complex cases such as these, with thousands of potential parties in interest, it is desirable for the Court to establish deadlines and procedures for filing proofs of Claim and Interest such as those requested herein.

10.    Bankruptcy Rule 3003(c) provides that, in a case pending under chapter 11 of the Bankruptcy Code, "[t]he court **shall** fix and for cause shown may extend the time within which proofs of claim or interest may be filed.  Notwithstanding the expiration of such time, a proof of claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2), (c)(3), and (c)(4)."  Fed. R. Bankr. P. 3003(c) (emphasis added).  Bankruptcy Rule 3003(c) is derived from section 502(b)(9) of the Bankruptcy Code, which provides that a claim may not be allowed to the extent that "proof of such claim is not timely filed."  11 U.S.C. § 502(b)(9).

11.    Further, section 503(a) of the Bankruptcy Code provides that "[a]n entity may <u>timely</u> file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause."  11 U.S.C. § 503(a) (emphasis added).  An inference can be drawn from section 503(a) that a deadline may be established for filing administrative expense claims to enable a debtor and its creditors to know what entities are asserting such claims and in what amounts. Indeed, the Bankruptcy Code requires payment of allowed administrative expense claims in full, in cash, on the effective date of a plan of reorganization unless the holder of such claim agrees to a different treatment.  *See* 11 U.S.C. § 1129(a)(9)(A).

12.     Bankruptcy Rule 2002(a)(7) provides that notice of the time fixed for filing proofs of claim must be sent to all parties in interest. Fed. R. Bankr. P. 2002(a)(7).  Accordingly, the Debtors propose that the Notice, along with the Form Proof, be mailed to all of the Debtors' known creditors and interest holders, and the Debtors request that the Court authorize and approve such proposed dissemination of notice and the form of the Notice and the Form Proof.  The Debtors also note that the Notice contains language which substantially complies with Local Bankruptcy Rule 3001-1. Similarly, by the authority of Bankruptcy Rule 2002(l), the Debtors request that the Court authorize the publication of the Publication Notice in the San Francisco Chronicle in order to give notice to claimants of whom the Debtors are unaware or for whom the Debtors do not have accurate, current address information.  The Debtors similarly request that the Court approve the form of the Publication Notice.

13.     The Debtors believe that the relief requested herein is necessary to enable them, among other things, to ascertain with reasonable certainty the amount and nature of Claims asserted against the bankruptcy estates, which will assist in the rapid administration of these cases. Moreover, the deadlines and procedures contemplated herein provide parties in interest sufficient opportunity within which to file a proof of Claim, a Gap Period Claim, and an Administrative Claim.  Most of such parties also have previously been served with a Notice of Commencement, providing notice of the filing of these cases and the date for the meeting of creditors.

14.     Thus, the Debtors submit that the proposed Bar Date and related deadlines and procedures are reasonable and appropriate under the circumstances and are in the best interests of the bankruptcy estates.

**II.     It Is In The Best Interest Of The Estate To Appoint Epiq As Official Claims Agent In This Case**

15.     By this Motion, the Debtors seek to appoint Epiq as the Claims Agent in order to assist the Debtors in processing and analyzing the multitude of Claims that are anticipated to be filed in response to the Bar Date.  As indicated by the firm summary attached hereto as Exhibit F, Epiq is well-qualified to perform claims processing and the various related services set forth in the Epiq Agreement.  Epiq specializes in consulting and providing data processing services to chapter 11 debtors in connection with the administration, reconciliation, and negotiation of claims, and Epiq

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

1  has provided identical or substantially similar services as official claims agent to many other

2  chapter 11 debtors of similar size.

3         16.    As compensation for the services provided, Epiq will bill the Debtors in accordance

4  with the amounts and procedures set forth in the Epiq Agreement.  No fee application or other filing

5  with this Court will be required, and Epiq has waived any request or claim to a retainer.  The

6  Debtors are informed that the prices set forth in the Epiq Agreement are at least as favorable as those

7  charged by Epiq to other chapter 11 debtors for similar services.

8         17.    The Debtors submit that the appointment of Epiq is appropriate pursuant to 28 U.S.C.

9  § 156(c), which governs staffing and expenses of the Bankruptcy Court and states in relevant part

10  that:

11            Any court may utilize facilities or services, either on or off the court's
              premises, which pertain to the provisions of notices, dockets, calendars, and
12            other administrative information to parties in cases filed under the provisions
              of title 11, United States Code, where the cost of such facilities or services are
13            paid out of the assets of the estate and are not charged to the United States.

14  28 U.S.C. § 156(c).

15         18.    The appointment of Epiq as Claims Agent is in the best interests of the estate

16  because, among other things, Epiq will relieve the Clerk of Court of the administrative burdens

17  associated with mailing notices and responding to requests for copies of claims, among other things.

18         19.    Pursuant to Local Bankruptcy Rule 5075-1 and this Court's Mega Case Procedures

19  Checklist, the Debtors confirm that:

20            a.    Epiq's service charges are fair and reasonable.

21            b.    The Debtors received a bid from a competing claims processor before

22  designating Epiq as the proposed Claims Agent.

23            c.    Epiq is not a creditor of the Debtors.

24            d.    Epiq's retention is subject to the consent and approval of the Clerk of Court.

25            e.    Epiq's services will be at the expense of the Debtors' bankruptcy estates and

26  will be paid directly by the Debtors.

27            f.    Epiq will be under the supervision and control of the Clerk of Court but will

28  not be an employee of the United States government.

672686                                13

g.    Epiq will waive any rights to receive compensation from the United States government in its capacity as Claims Agent in these cases.

h.    Epiq will not employ any past or present employees of the Debtors in connection with its work as Claims Agent in these cases.

i.    Epiq will maintain a website for the Debtors cases, located at http://chapter11.epiqsystems.com/Solidus, where parties in interest may access copies of all proofs of Claim or Interest free of charge.

j.    Epiq will implement security measures to ensure the completeness and integrity of the Claims Register, subject to approval by the Clerk of Court.

k.    Epiq will transmit to the Clerk of Court a copy of the Claims Register every week or as requested by the Clerk of Court.

l.    The Clerk of Court will be entitled to inspect Epiq's premises at anytime.

m.    Epiq will audit the claims information periodically to satisfy the Clerk of Court that claims information is being appropriately and accurately recorded in the Claims Register.

n.    The Clerk of Court will be able to independently audit the claims information at anytime.

o.    Nothing in this Motion or in Epiq's engagement requires the Clerk of Court to be responsible for service of particular pleadings, proposed orders, or documents in these cases. The party submitting a particular pleading or other document with the Court shall be responsible for all noticing and service functions relevant to the particular matter as may be required under applicable rules and shall file with the Clerk of Court a declaration of service regarding such noticing and service.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form of the proposed order attached hereto as Exhibit A, (a) establishing procedures and deadlines for the filing of proofs of claim and administrative claims in these cases; (b) establishing

672686                                    14

1  consequences for the failure to comply with such proposed procedures and deadlines; (c) approving

2  the form and scope of notice of such procedures and deadlines, all as set forth above; and

3  (d) authorizing the appointment of Epiq as Claims Agent in these cases.

4

5  Dated:  April 25, 2008                     HENNIGAN, BENNETT & DORMAN LLP
                                              865 South Figueroa Street, Suite 2900
6                                             Los Angeles, CA 90017

7                                             By: /s/ James O. Johnston
                                                  Bruce Bennett
8                                                 James O. Johnston
                                                  Lance Miller
9
                                              *Reorganization Counsel for*
10                                            *Debtors and Debtors in Possession*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hennigan, Bennett & Dorman llp
lawyers
los angeles, california

672686                                  15